```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,      ) CR 17-00101 LEK
 4                                   )
                   Plaintiff,        ) Honolulu, Hawaii
 5                                   ) December 15, 2017
         vs.                         )
 6                                   ) STATUS CONFERENCE;
      ANTHONY T. WILLIAMS,           ) MOTIONS HEARING
 7                                   )
                   Defendant.        )
 8     _____)

 9
                      TRANSCRIPT OF PROCEEDINGS
10           BEFORE THE HONORABLE RICHARD L. PUGLISI
                 UNITED STATES MAGISTRATE JUDGE
11
      APPEARANCES:
12
      For the Government:       ROBERT G. JOHNSON, AUSA
13                              Office of the United States Attorney
                                PJKK Federal Building
14                              300 Ala Moana Boulevard, Suite 6100
                                Honolulu, Hawaii 96850
15
      Also Present:            TIMOTHY A. RODRIGUES, BOP
16

17    For the Defendant:       ANTHONY T. WILLIAMS, Pro Se

18    Standby Counsel:         LARS ROBERT ISAACSON, ESQ.
                                547 Halekauwila Street, Suite 102
19                              Honolulu, Hawaii 96813

20

21    Official Court Reporter: Debra Read, CSR CRR RMR RDR
                                United States District Court
22                              300 Ala Moana Boulevard
                                Honolulu, Hawaii 96850
23

24
      Proceedings recorded by electronic sound recording; transcript
25    produced with computer-aided transcription (CAT).
```

```
 1   FRIDAY, DECEMBER 15, 2017                          9:32 A.M.
 2            THE COURTROOM MANAGER:  Criminal 17-00101 United
 3   States of America versus Anthony T. Williams.
 4        This case is called for a hearing for a Status Conference,
 5   Defendant's Motion for Clerk to Issue Blank Subpoenas,
 6   Defendant's Motion to Compel, and Defendant's Motion for Funds
 7   to Hire a Private Investigator.
 8        Appearances please, counsel.
 9            MR. JOHNSON:  Good morning, Your Honor.
10        Ronald Johnson, Assistant United States Attorney, on
11   behalf of the government.  Along with me are Megan Crawley,
12   Special Agent with the FBI, and Tim Rodrigues, local counsel
13   for the Bureau of Prisons
14            THE COURT:  Good morning.
15            THE DEFENDANT:  Good morning.
16        Private Attorney General Anthony Williams, common law
17   counsel for defendant.
18            THE COURT:  Good morning, Mr. Williams.
19            THE DEFENDANT:  Good morning.
20            THE COURT:  All right.  Mr. Williams, the government
21   last evening filed a response to your motion to compel and I
22   was wondering if you had a copy of that?  Were you given a --
23            THE DEFENDANT:  Yeah, they gave me a copy about 4:25
24   last night.
25            THE COURT:  Okay.
```

UNITED STATES DISTRICT COURT

```
 1              THE DEFENDANT:  Yesterday evening.
 2              THE COURT:  All right.  So I think this response is
 3   a comprehensive response to all of your pending issues, so did
 4   you want to respond to that?
 5              THE DEFENDANT:  Yes, I did.  We could go through it.
 6   I had sent my notice of authorities in support of the motion to
 7   compel, and we can --I mean, 'cause I really want to go through
 8   this motion that they filed just to show that it's filled with
 9   a bunch of lies, misrepresentations, things that was said I
10   said that I didn't say, things that said I was emailing that I
11   said that I didn't say.
12              THE COURT:  Okay.
13              THE DEFENDANT:  So, yes, I would definitely love to
14   go through this.  And I also printed out the actual responses
15   that I actually made to the different, you know, wardens and
16   the managers and stuff like that.  I got copies of those just
17   to show that what was in this declaration is actually false and
18   what they put in the motion to compel is actually false.  So I
19   got the documentation to prove that today.
20              THE COURT:  Okay.
21              THE DEFENDANT:  In my notice of authorities, the pro
22   se phone, I had sent a letter to the warden -- a email
23   regarding the pro se phone.  I sent it on 12-1 of this year.
24   And I basically, you know, told him, "According to the federal
25   law under Title 28 CFR 540.102, it specifically states that,
```

1   'Staff may not monitor an inmate's properly placed call to an

2   attorney.  The Warden shall notify an inmate of the proper

3   procedures to have an unmonitored telephone conversation with

4   an attorney.'

5       "Title 28 CFR 540.103 states, 'The Warden may not apply

6   frequency limitations on inmate telephone calls to attorneys

7   when the inmate demonstrates that communication to attorneys by

8   correspondence, visiting, or normal telephone use is not

9   adequate.'

10      "As your office already knows, I'm a pro se defendant and

11  as such I have to prepare my own defense.  I do have a standby

12  attorney that can assist me in getting me information,

13  documents, other necessary material or actions to assist me in

14  my preparation.  Therefore, I need to be able to call my

15  standby regularly to instruct him because he will not be able

16  to visit me every day as he has other cases that he has to tend

17  to and to visit me every day would not be feasible.  My trial

18  is set for May 16, 2018, and I have a lot of calls that need to

19  be made to witnesses, investigators, and government officials

20  that are vital to my defense.  I cannot use the social phone or

21  the electronic messages because they are monitored and my

22  communication with attorneys, public officials, and witnesses

23  are privileged communication in preparation for my trial.  I am

24  trying to resolve this issue along with getting a printer and

25  the ability to draft and save my motions with the FDC as I was

1    instructed to do by Judge Puglisi yesterday in order to prevent

2    him from having to issue an order to FDC to provide me with the

3    things I need in order to properly prepare my defense for my

4    trial.  Attorney Rodrigues was so instructed by the judge to

5    work with me in getting these things resolved.  The BOP policy

6    clearly contravenes the federal law and I'm appealing to the

7    administration to provide me what I need to properly defend

8    myself and be prepared for trial.  I am asking that someone

9    come and talk to me so that we can resolve this issue without

10   the Court's intervention in issuing a court order.  Thanks in

11   advance for your consideration in its most exigent manner."

12          Now, their response was, "Be aware there's no pro se

13   phone within the boundaries of BOP policy.  You may communicate

14   with your contacts via post or mail in anticipation of your

15   trial date in mid 2018.  You may also use your social phone

16   calls and electronic messages.  As you have been instructed

17   before, your standby attorney here in Honolulu is free to meet

18   you seven days a week."

19          And here's a problem, Judge Puglisi.  The email system

20   that the FDC has provided, you supposed to be able to email

21   whoever you going to email and it's supposed to only be delayed

22   about a hour.  They say the reason -- the reason I was told by

23   Officer Nar(phonetic) is that it takes a hour because they have

24   to filter, you know, the messages, make sure you're not sending

25   no threats or, you know, trying to concoct or, you know, escape

1   or something like that.  So it takes a hour.  They have to

2   scrutinize the email and then it's sent.

3        Well, my emails are taking four to seven days before

4   they're sent.  They're also taking four to seven days for me to

5   receive emails that are being sent to me, and I got copies of

6   that to show how long it's taking when it's only supposed to

7   take an hour.  And to me this is intentional.  This is the FDC

8   in collusion with the government to try to hinder my defense.

9   I can't contact anybody.  Like, if I sent my standby an email,

10  he won't get it for four to seven days, which is vital.  I

11  mean, May's going to come up, like, lightning fast.  It's going

12  to go be here quickly.  So I'm trying to get all the things

13  that I need to be able to facilitate me being prepared for

14  trial.  And everything I've done they've blocked my --I mean,

15  everything.

16       I mean, even to get the computer, the first to even get

17  the ediscovery, the computer, I had to go through hoops and

18  jumps and, I mean, just do everything.  I have the emails where

19  I sent the -- about the discovery discs, and this is on 10-27.

20  I said, "I went to court yesterday and was told by Attorney

21  Rodrigues in court that he didn't know that the PC was removed

22  from the room that was provided for me to prepare for trial.  I

23  would like to know when would the computer be put back in so I

24  can do my discovery and be prepared for trial."  Because the

25  whole reason they're moving me to another unit was to

1    say -- they say, "Well, there's already a computer in a room in

2    there, but, you know, just view your discovery CDs."

3         Well, when I got moved to the unit, there was no

4    computer.  So then I had to wait another two weeks in this unit

5    without a computer, which they could have just left me in the

6    unit I was at and brought the computer there, you know.  But I

7    feel like they made me move because they wanted to disrupt our

8    Bible studies that we were having, you know, in the 5B unit.

9    So they moved me -- they say, "You have to move to this or you

10   don't get the computer."  So I had no choice to move.

11        So they moved me there, but there was no computer.  So it

12   took about two weeks for them to get the computer.  So I

13   finally got the computer, but then the computer doesn't have

14   LexisNexis on it, doesn't have where I can type up anything on

15   there.  So I'm like, okay, I said I'm still handicapped, you

16   know, when I just came from a facility that affords inmates

17   that are not pro se all the things that I'm requesting.  They

18   have access to a computer with the LexisNexis program on it,

19   with word processing capabilities on the same computer and be

20   able to print from that same computer and they are not pro se.

21   They're -- all these have attorneys, so they don't have -- they

22   don't have a need for the access that I have.

23        And so the government is basically trying to say, Well,

24   you can handwrite your motions, and, yeah, you can handwrite

25   your motions and you can, you know, type it.  And like I put in

1    my notice of authorities in support, I said, "Defendant relies

2    upon a U.S. Supreme Court rulings *Bounds v. Smith* which state

3    in part that each library would stock legal forms and writing

4    paper and have typewriters and use of copy machines."

5         Now, Attorney Rodrigues previously argued that the FDC

6    has gone beyond the federal standards in providing a law

7    library for inmates to do research and type up their motions.

8    And I told him my dispute is not with the FDC that they have

9    provided a law library.  My dispute is that the law library is

10   inadequate and that *Bounds v. Smith*, *Younger v. Gilmore*, *Lewis*

11   *v. Casey*, and *Johnson v. Avery* specifically state there has to

12   be an adequate law library.

13        And making someone use a typewriter that's 40 years old

14   that has no correction capabilities on it when we're in a

15   computer age, especially when the *Bounds* U.S. Supreme Court

16   ruling was ruled on, there was no personal computers.  So the

17   only technological equipment that one could use would be a

18   typewriter.

19        Well, we have now computers that you can type like a

20   typewriter, but it's more sufficient as far as you being able

21   to go back and edit, save your documents and things like that,

22   and do research on the same, you know, computer.  But you can't

23   do that with a typewriter.

24        And the typewriter that they have provided, they don't

25   have instructions, they don't have a booklet to even show you

1   how to do whatever -- I don't know.  I've never used a

2   typewriter before.  I'm born in the computer age, so I don't

3   know what to use -- how to use that typewriter.

4          And then they want us to use a pay-to-type TRULINC system

5   where any motion that I'm typing they can actually see, you

6   know, what I'm typing or what --you know, what I'm planning for

7   my defense, and they shouldn't be allowed to be able to see

8   what I'm typing 'cause I can't see what they're planning, what

9   they're typing.  And I feel like it's a violation of my

10  Fourteenth Amendment equal protection of the law.

11         The update on the computer, this computer is not hooked

12  up to no network, so I don't get any updates on this computer

13  which would be very easy for them to set it up on a network.

14  And the things that I have requested it's not that the FDC

15  don't have the ability to do it.  Even the printer, I talked to

16  several of the unit officers that work in the unit that I work

17  in.  They said that they have a room that has at least four or

18  five printers just sitting there because they took the printers

19  from the unit from the officers 'cause the officers were using

20  the printer to print some of their own personal things, so they

21  took all the printers out of the unit and now they just got

22  them in a room sitting somewhere.  So it's like they already

23  have the printers; they could put that printer that they got,

24  one of those printers right there with me so I could use those

25  printers.

1          To the word processing on the computer, they have Word on

2     the computer, but they intentionally disabled it so I can't use

3     it to type on that.  And I feel like, again, that that was done

4     to just hinder my defense, hinder me from being able to do

5     proper research, being able to draft motions properly without

6     having to, you know, handwrite them or use an antiquated

7     typewriter.

8          So the things that I'm asking, other inmates have been

9     provided in other federal facilities, state facilities that are

10    not even pro se.  And so especially with the urgency of my

11    trial coming up in five months, I don't think it's asking too

12    much to be able to have a computer be -- printer be provided

13    with the word processing program on the document, and the FDC

14    have not exceeded the standard that *Bounds* has set by a long

15    shot.  It's very tedious the way I have to, you know, use one

16    computer to look at my discovery, then I have to leave that

17    computer, go downstairs, hopefully nobody's not on all the

18    computers.  If they're not, then I can get on there, do some

19    research, but only got two hours to do that.  Then I have

20    to -- it's going to -- automatically going to log you off.

21    Then I have to walk back upstairs after I've taken some notes

22    or whatever I can within those two hours, go back upstairs,

23    then do some more research on the discovery when I could do all

24    that at one station.  And that's all I'm saying that everything

25    that they've done has basically prevented me from being able to

1    properly prepare for trial.

2         In the statement there was a declaration made by the

3    associate warden that she says, "I'm not aware of any orders

4    having been imposed on the United States regarding Inmate

5    Williams's legal access.  He has, however, represented to me

6    and other staff members that Magistrate Judges Chang and

7    Puglisi have done so and that the FDC Honolulu is in contempt

8    of court."  I never made that statement.  What I did tell the

9    staff is that when we had the meeting, the hearing with

10   Judge Chang, Judge Chang basically gave the same admonishment

11   that you did, Judge Puglisi, for them to work with me in that

12   he felt like I wasn't asking too much to have a printer and,

13   you know, word processing document.  He basically expressed the

14   same thing that you did, that he didn't want to, you know,

15   issue a court order with something that could be worked out.

16        And I got a email from my standby with Attorney Rodrigues

17   expressing that he would rather handle this without a court

18   order.  I'm trying to find that email so you can see that

19   he -- that what they're telling the Court is not actually what

20   has been actually talked about and discussed between us.

21   They actually charged me -- wait till I find that.  Oh, yeah.

22        I'll go on to the next charge.  I'll find that later.

23   But they've accused me of threatening the staff.  In the

24   associate warden's declaration, she said, "Inmate Williams has

25   repeatedly threatened consequences and repercussions and

1    drastic actions if FDC Honolulu fails to meet the standards."

2    Said, "Several staff members, including me and FDC Honolulu

3    Captain Jeffrey Dixon, have cautioned Inmate Williams in person

4    and in writing to cease making additional threatening

5    statements."  And it says, "The docket for this matter reflects

6    comments from Inmate Williams that he intends to use lethal

7    violence against individuals who he believe have compromised

8    his rights under the Constitution.  'Any man or woman who tries

9    to restrict and violate my constitutional divine and common law

10   rights will be met with deadly force.'"

11        Those threats were never made by me to any staff member

12   here at FDC, any court personnel here.  And then she says,

13   "Based on Inmate Williams's prior threats of deadly force and

14   due to his sustained threats, FDC Honolulu initiated the

15   disciplinary process against Inmate Williams for acts of

16   threatening and insolence."

17        Now, this stemmed from the FDC continued to violate my

18   legal mail provisions, like, when I get mail from the courts,

19   it's opened outside of my presence.  And I wrote several

20   grievances regarding this.  I had -- I said -- well, this is

21   what I said, "I just received another legal mail from the

22   District Court of Appeals that was opened outside of my

23   presence.  I notified Officer Butell in our unit so that he

24   could be a witness to the continuous violation by your mailroom

25   staff regarding my legal mail."

1          And so their response was, "BOP program statement 5265.14

2    discusses legal mail from attorneys.  For the item to be

3    treated as legal mail, your attorney must identify herself as a

4    sender and the envelope must state 'Special Mail.  Open Only in

5    the Presence of the Inmate.'  It may also state

6    'Attorney-Client.  Open only in the presence of the inmate,' or

7    'Legal Mail.  Open only in the presence of the inmate.'  The

8    envelope must say somewhere, 'Open only in the presence of the

9    inmate.'  If your envelope did not contain this phrase, then it

10   would have been screened by the staff."

11         So my response was, "This mail was not from an attorney

12   but from the district court and I know exactly what it says

13   about mail from the courts and it does not have to have that

14   statement on legal mail from the courts.  According to federal

15   law, any mail from the courts is legal mail and must be opened

16   in the presence of the inmate.  You continue to violate the

17   federal law on the treatment of my legal mail and I'm

18   documenting every occurrence and every violation in order to

19   build my tort claim against the FDC Honolulu for violating my

20   rights in regards to my mail."

21         Now, I've shown them this is the FDC handbook.  This is

22   the FDC handbook in regards to mail and the treatment of mail.

23   And it says, "Mail from the chambers of a federal judge or from

24   a member of the U.S. Congress will be afforded special mail

25   handling without special mail markings on the envelope."

1          But they keep emailing me that if it don't have that

2     special mail marking, it's going to be treated like it's

3     regular mail.  And this has happened above ten times already.

4     And it's just frustrating that I'm supposed to have to follow

5     the law, but they feel like they don't have to follow the law

6     because they're the feds or, you know, they're the government

7     officials and they don't feel like that the law should apply to

8     them.  And I don't feel like that they should be rewarded for

9     continuing these violations.

10         But I need to look for this other thing.  I can let them

11    respond until I find the other thing that I need to address.

12              THE COURT:  What else did you have to address,

13    Mr. Williams?

14              THE DEFENDANT:  Oh, also the visitation.  They said

15    that they hadn't imposed any visitations on me, which they did.

16    Here's the -- I had sent a request for a friend to visit me.

17    Her name was Rosy Thomas.  So they sent me this saying that,

18    "Your status is pretrial holdover," and state, "Inmates are

19    only permitted visitations by immediate family members.  This

20    is the BOP policy."

21         Well, I showed the warden that according to federal law,

22    that pretrial inmates be afforded not only immediate family

23    members, but we can be afforded any other family member, also

24    friends and associates, business associates.  And once I did

25    show them that law, then they finally approved the visitor, you

1    know.  But they represented in here that they never denied me

2    or that, you know, any time I made a request, that they, you

3    know, approved it, which they did not.  I actually had to show

4    them the federal law before they actually approved it.  So they

5    did approve that after I showed them the law.

6        But everything else that I've shown them the law is

7    they've basically then fought me tooth and nails to basically

8    hinder my defense and to hinder me from being able to be

9    prepared for this trial on May the 16th.

10        THE COURT:  Okay.  Thank you, Mr. Williams.

11        Mr. Johnson, did you want to respond to any of this?

12        MR. JOHNSON:  Your Honor, just from a -- as a

13    preliminary matter, we had to work in conjunction with BOP in

14    this matter.  It had to go up BOP's chain, come over, go up my

15    chain before we were authorized to file a response.  So, you

16    know, we apologize to the Court that it was shortly before the

17    hearing.  But everybody vetted this and this is the position

18    that the two departments deemed appropriate to take.

19        The question in the beginning portion of this -- and as

20    Your Honor is well aware, is he really filing a motion to

21    compel or is he asking for injunctive relief?  And we'll defer

22    to the Court as to how to proceed, but we just did want to

23    bring that to the Court's attention so the Court, you

24    know -- if the Court's going to order anything, the Court can

25    make a proper ruling because Mr. Williams files motions and

1    appeals routinely and we want the record to be clear.

2         With respect to the specific conditions under which he's

3    being held and what's going on in the prison, Your Honor, the

4    prosecutor's always at a disadvantage, and we're very fortunate

5    to have Mr. Rodrigues who's in the facility and who's working

6    through these things with the Standby Counsel, Mr. Isaacson.

7    And I think other than saying that Mr. Williams in his -- in

8    his response to the Court today kind of indicates that legal

9    mail includes mail from court chambers or Congress.  The

10   regular filings which we're making and we're sending to him by

11   mail or noticing him on, those don't fit into that category.

12   They're not sealed documents.  They're not documents that

13   somehow the BOP shouldn't open.  They're coming to him in

14   regular mail.

15        If the Court were to send him something and it says,

16   "From the Chambers of Judge Puglisi," I'm sure that they

17   wouldn't open that mail.  Or if it comes from Mr. Isaacson and

18   is properly marked, they won't open that.

19        Basically the defendant gets into the system and wants

20   everything to be his way.  He wants his own phone.  He has the

21   ability to communicate.  He doesn't like the way the internal

22   system of the prison runs, and the prison is trying to be

23   flexible and accommodate him on things, but in general the

24   systemic process and the BOP policies are nationwide.  And so

25   our concern is, you know, while in extenuating circumstances

1   there can be situations where something should be accommodated

2   or something should be addressed, but some of the stuff he's

3   asking for is just --you know, he wants his own law office with

4   LexisNexis and word processing on a single terminal with a

5   printer at his side, be able to copy and paste.  To our

6   knowledge, no one has that within any BOP facility nationwide.

7        And with respect to the law library, I think he kind of

8   misses the point.  The law library itself and access to the

9   volumes which he's aptly cited in court today, it's an online

10  research system which is exactly state of the art.  It's what

11  we use for research.  While it's only updated in blocks and

12  it's not real-time updated as LexisNexis or West Next might be,

13  if you log on online, Mr. Rodrigues will explain why they can't

14  just give internet access to defendants to do whatever they

15  want because that's an online contact or it's going through an

16  online conduit and it could compromise things at the prison.

17  So we would just raise those issues.

18        And I would say, Your Honor, with respect to some of what

19  Mr. Williams is complaining of, I think that -- I can't recall

20  whether he ever submitted a financial affidavit to the Court

21  and said, "I am indigent."  He did indicate he wanted to

22  proceed on his own, he wanted to represent himself, and that

23  was covered with Judge Mansfield in a Faretta hearing.  But I

24  can't recall, because a PD wasn't involved, whether there was

25  an affidavit filed, whether he's been declared indigent, and

1   whether through that process, perhaps, he can get some of the

2   funding or reimbursements or moneys that would help him with

3   the copies and with communications and using TRULINCS, which

4   he's complaining about.  I don't recall.  But that might solve

5   some of the issues Mr. Williams is having.  We do want to try

6   to work cooperatively with him on that.  The --

7           THE COURT:  Well, there's no question he's indigent.

8           MR. JOHNSON:  Yeah, and I think so, but --

9           THE COURT:  And he filed the appropriate affidavit

10  and it was ruled on.

11          MR. JOHNSON:  Okay.

12          THE COURT:  And that's why he's been given standby

13  counsel at government expense.

14          MR. JOHNSON:  Right.

15          THE COURT:  So there's no question he's indigent.

16          MR. JOHNSON:  So if that's the case then, I'll let

17  Mr. Rodrigues address this, but there is the ability for the

18  court to pay some of the cost which he's complaining about and

19  that might alleviate some of the issues, and we want to try to

20  do that.

21      The other two issues which I think the Court has before it

22  are whether or not he can hire an investigator.  The government

23  has no objection to him through the court process and with the

24  guidance of Mr. Isaacson utilizing a investigator to assist him

25  in his defense.

1     The subpoenas, I think the Court had addressed that, but

2   that matter got put over.  We do, again, believe that ex parte

3   request for subpoenas should go through the Court per the

4   provision we cited previously.  We do believe he's indigent.

5           THE COURT:  Okay.

6           MR. JOHNSON:  And then I would ask Mr. Rodrigues to

7   respond to the -- within the facility issues that have been

8   raised.

9           THE COURT:  Right.  Mr. Rodrigues, maybe you could

10   address this issue.  Mr. Williams had stated that it takes four

11   to seven days for his emails to be processed and he's,

12   obviously, frustrated with not being able to send emails as

13   expeditiously as you can outside the detention center.

14     Do you know anything about how quickly his emails are

15   processed?

16           MR. RODRIGUES:  Yes, Your Honor, I am aware that

17   there was one message that I'm aware of that was held or

18   reviewed longer than the one hour period.  I'm not sure exactly

19   how long, but it was longer than we normally hold messages.

20   That is the only message I'm aware of.

21     And certainly his opinion may differ, but we do routinely

22   send these out within the timeline in the policy, certainly

23   within 24 hours.  And to the extent this impacts his ability to

24   contact counsel, Mr. Isaacson is free to reach out to

25   Mr. Williams's unit team on a regular basis periodically, let's

1    say twice a week, to schedule legal calls if he finds that he's

2    unable to visit in person.  This can become a routine practice

3    for standby counsel and Mr. Williams if they wish to speak by

4    phone, and the FDC has no problem with setting up those legal

5    calls if he so wishes.  So --

6            THE COURT:  Do you have any information about why

7    the email was held up beyond the one hour?

8            MR. RODRIGUES:  The emails are -- yes, Your Honor.

9    Emails are occasionally held for review based on content, and

10   I'm not sure what the specifics were of this one message, but I

11   believe that that's why it was held for a security review.

12           THE DEFENDANT:  It wasn't just one message.  This

13   has been every message I've sent for the last two months.  I've

14   been held for four to seven days.  But what I can do, we can

15   have them print out all the mails -- all the emails and show

16   the date that I sent it out and show the date that my people

17   received it, and then you can show the date that they sent the

18   email, 'cause what I had them start doing is putting in their

19   email the date and time that they were actually sending the

20   email so I can see exactly how long it's been from when they

21   sent it to when I received it.  And for the last almost two

22   months it's been four to seven days for every email that I send

23   out and that I receive.  And no other inmates have been

24   subjected to this but me 'cause I've asked all the guys around.

25   I say, "When you send a email, how fast does your people get

1  it?"

2      "Oh, within an hour."

3      We go back and forth, but I'm the only one that has this

4  four- to seven-day, you know, restriction on all my emails.

5          THE COURT:  Mr. Rodrigues, you're saying that there

6  is no such restriction on his emails?

7          MR. RODRIGUES:  There have been no special

8  restrictions placed on the defendant that haven't been placed

9  on any other inmates.  I'm not aware of any extraordinary

10 delays.  I'm certainly not aware of this systematic

11 discrimination against him that he's claiming here, Your Honor.

12     And these are -- there have been no national policies that

13 have been modified to his detriment.  We have made changes in

14 his favor, various ones that I can specify for the Court, to

15 accommodate him as a pro se pretrial detainee.  But there are

16 various reasons why we screen emails.  There could be security

17 issues, anything from witness intimidation to collusion, a

18 number of security matters that we look at emails and screen

19 for.

20     And there's certainly no constitutional right to email

21 communication, word processing, any of this.  But he can wake

22 up and literally steps from his cell have a state-of-the-art

23 legal research system, word processing discovery computer.

24     He's talking about going upstairs and downstairs within

25 his housing unit one flight of stairs.  He has virtually

1    unlimited access seven days a week to legal research.  He can

2    view his discovery throughout the week by checking the discs

3    out with the unit team.  And we do believe, as stated in the

4    papers, that we've adequately satisfied all of his requests in

5    one form or another.  He's simply refusing to take "Yes" for an

6    answer; no matter what we provide, it's inadequate.

7              THE DEFENDANT:  They haven't provided anything but

8    the computer just to see the ediscovery.  That's the only thing

9    they provided.

10             THE COURT:  Well, you do have access to a computer

11   to review the discovery, right?

12             THE DEFENDANT:  Right.  That's the only thing that

13   the computer can do.

14             THE COURT:  And you have access to a separate

15   computer for legal research?

16             THE DEFENDANT:  Right.

17             THE COURT:  Right.

18             THE DEFENDANT:  Right.

19             THE COURT:  And I think what you wanted was to

20   basically have one system.

21             THE DEFENDANT:  Right, like it is in Pahrump.  It

22   just -- everything is on there where I don't have to get up, go

23   downstairs, then come back upstairs, then make a note, go back

24   downstairs, where I can do that all right there in front of me.

25             THE COURT:  Right.  And I think Mr. Rodrigues's

1  point that he's making is that they've provided all of this

2  access discovery and the legal research through a computing

3  system and that they don't have a legal obligation to make it

4  all in one system, even though I would certainly agree with you

5  that would be more convenient.  But he's correct.  There's no

6  constitutional right for you to have it in one integrated

7  system.  So I think that's his main point.

8          THE DEFENDANT:  Well, as far as the word processing

9  and being able to save my documents, it's not that they don't

10  have --

11          THE COURT:  Okay.  Now, that's a different issue.  I

12  was talking about discovery and legal research.  But I hadn't

13  asked him yet about your word processing capability.

14      We had discussed that a little bit, Mr. Rodrigues, last

15  week, and the concern was he didn't have the ability once he

16  drafted a document to save it because I believe he mentioned

17  that anything that he typed into the computer was erased

18  basically within two hours --

19          THE DEFENDANT:  Every two hours it reboots and

20  erases everything.

21          THE COURT:  Do you have any information on that?  I

22  mean, one, is that true from your viewpoint?  And if true, is

23  there a way that we can give him the ability to save?

24          MR. RODRIGUES:  Yes, Your Honor.  We can give him

25  the ability to save.  But before I address that, when we moved

1    Mr. Williams to his current housing unit, it was to provide him

2    space in a unit where there was a room where we could put a

3    computer and that was a significant accommodation for his

4    discovery review.  There is --

5              THE DEFENDANT:  Can I respond to that, though?

6              MR. RODRIGUES:  Pardon me.

7              THE COURT:  Well, just wait a second, Mr. Williams.

8    Now, I gave you a lot of time at the beginning and I've got to

9    give everybody equal time here.

10             THE DEFENDANT:  Okay.

11             MR. RODRIGUES:  There is Microsoft Word on the

12   discovery review PC; however, the reason that it -- information

13   is erased is consistent with national information and IT

14   security policies that are set in Washington, D.C., and are

15   impossible for the local staff to abrogate without intervention

16   from D.C. specifically.  We can't change these systems without

17   national intervention.

18       I do have, Your Honor, an example of one of the many

19   briefs that inmates at FDC have successfully filed using the

20   TRULINC system.  This is a 70-page circuit brief, Tables of

21   Authorities, beautifully formatted.  It is certainly a

22   possibility for Mr. Williams to use the system to save whenever

23   he likes, come back to his work, and he can do that on the same

24   set of terminals where the LexisNexis research system is

25   present.

1        To the extent that he believes he shouldn't have to pay

2    the $3 an hour to pay the system, he can apply for funds before

3    the Court, but the BOP indigency standards would not allow us

4    to provide him with gratuitous TRULINC access.  He's had over

5    $700 in deposits.  He spent the vast majority of it on popular

6    music.

7            THE DEFENDANT:  That's not true.

8            MR. RODRIGUES:  He can certainly refund most of that

9    music and have him use it for TRULINCS, but -- and we have

10   provided to the Court his purchases of his music, etc.

11           THE COURT:  All right.  I just want to make sure I

12   understand what he has available to him because it's

13   interesting that a 70-page brief -- I assume filed with the

14   circuit court?

15           MR. RODRIGUES:  Yes, Your Honor.

16           THE COURT:  On an appeal?

17           MR. RODRIGUES:  Yes, Your Honor.

18           THE COURT:  -- was produced on the TRULINCS system,

19   right?

20           MR. RODRIGUES:  Yes, Your Honor.

21           THE COURT:  Now, the TRULINC system is not the

22   system that he uses to access his discovery, right?

23           MR. RODRIGUES:  That's right.

24           THE COURT:  It's a different system.  But are you

25   saying that the TRULINC system that is available to him has the

1    capability for him to save from day-to-day and go back and add

2    and subtract the way he wants to?

3              MR. RODRIGUES:  Absolutely, Your Honor.

4              THE COURT:  Okay.  Now, why does he not understand

5    that then?  I mean, is that not explained to these detainees?

6              MR. RODRIGUES:  I -- it is and I -- it should be

7    evident to Mr. Williams.  I certainly wouldn't want to

8    substitute my opinion for why he doesn't understand that.

9         But multiple briefs have been filed with this court in

10   this district, publicly filed briefs on the TRULINC system

11   where TRULINCS is identified on the header of the document as

12   having been produced on the system.  And Mr. Williams can

13   certainly take a look at this filing and use the system as much

14   as he likes to produce these documents, but they can be saved,

15   he can return to them as he likes, and he can insert whatever

16   legal research he believes is necessary.

17        But we do believe that we've provided everything that he

18   needs, perhaps not in the exact configuration that he wants it,

19   but certainly within constitutional parameters.  There's not so

20   much as a right for a typewriter, Your Honor, under the

21   Constitution.  We've provided significant accommodations beyond

22   that.  We have typewriters for his use, but should he wish to

23   use the system, he may do so as well.

24             THE COURT:  Well, he doesn't really want a

25   typewriter.  He wants a word processer.

```
1                MR. RODRIGUES:  And he may --

2                THE COURT:  But you're telling me that TRULINCS

3  gives him word processing capability where he can save from

4  day-to-day-to-day-to-day?

5                MR. RODRIGUES:  That's right.  And he may print, he

6  may revise, he may edit --

7                THE COURT:  Okay.  Just stop, sir.

8                MR. RODRIGUES:  Yes.

9                THE COURT:  Mr. Williams, why didn't you know about

10  that?

11                THE DEFENDANT:  No.  The system that they have --

12                THE COURT:  Yeah.

13                THE DEFENDANT:  -- when you log into it, the TRULINC

14  system, you being charged.  Just to click on it you being

15  charged.

16                THE COURT:  Is that why you don't use it, 'cause

17  you're going to get charged?

18                THE DEFENDANT:  Yeah, you're going to get charged.

19                THE COURT:  Well, the court has the ability, I

20  suppose -- if BOP doesn't recognize that you're indigent, we

21  have the ability to pay for that.

22                THE DEFENDANT:  Right.  And that's -- and

23  that -- I've been asking that since I been there.  And so they

24  said they not going to do it.  And so my whole objection to

25  this TRULINC system is is that they get to see anything I'm
```

1  typing.  And I don't feel like that they should see what I'm

2  typing against them to be prepared for something I'm getting

3  ready for trial.  That's unfair.

4      So then they need to let me know whatever they're typing

5  so I can see everything they're doing, any emails they're

6  sending, to make it fair 'cause this is supposed to be a fair

7  hearing and supposed to have equal protection of the law.  They

8  get to use a computer with word processing to type it.  He's

9  not using the TRULINC system.

10     Are you using the TRULINC system so to draft your motions?

11     No, he's not using TRULINC.  He's using a Microsoft word

12  processing where he can print it out, save, and go back and

13  save.  But he wants me to use a TRULINC system as a pro se

14  where he can -- where they can get an advantage and seeing what

15  I'm typing to try to be prepared for what I'm going to do in

16  court and at trial.

17         THE COURT:  All right.  Well, just hold on a second.

18  As he is utilizing the TRULINC system and saving and crafting

19  his documents from day-to-day, is somebody looking over his

20  shoulder?

21         MR. RODRIGUES:  Your Honor, there may be a way that

22  BOP can do this; however, there is -- nothing is referred to

23  our security staff for review until emails are sent.

24  Essentially this document is a long draft email and there is

25  absolutely no reason that it would be forwarded to any staff

1   member for review for any reason until it is, quote, "sent as

2   an email."  And if he simply drafts these documents, prints

3   them and never sends them to any outside contact, they will not

4   go to any BOP employee for review.

5           THE COURT:  So during the process of drafting and

6   crafting whatever document he's working on, whether it's a

7   court document or a letter to Mr. Isaacson, his standby

8   counsel, nobody is looking at those documents.  But I think you

9   said that there may be a capability of somebody looking at

10  them; it's just that that capability's not utilized?  Did I get

11  that right?

12          MR. RODRIGUES:  That's right, Your Honor.  When a

13  message is sent, prior to it being transmitted to the outside

14  contact it may be flagged for review.  But provided something

15  is not emailed to an outside contact, there is no reason it

16  would go to any staff member.  And I don't think anyone except

17  our central office would even have the capability of going in

18  and looking at a draft.

19      So I need to faithfully represent to the Court that it may

20  be technologically possible, but there's no reason or even

21  local capability for us to look at a draft message, which is

22  what this document would be.  It can be printed, modified,

23  etc., without being sent as an email transmission.  And he can

24  use that, and to the extent that he understands that, it will

25  not be monitored by any BOP staff.

1          THE COURT:  Well, there you go, Mr. Williams,

2     they're saying it's not monitored.

3          THE DEFENDANT:  It definitely is monitored because

4     especially seeing in light of the fact that my emails are being

5     held four to seven days, everything that I'm doing on that

6     system is being monitored by BOP.  So him saying that, no,

7     they're not going to monitor it, I definitely don't trust it

8     and I don't believe that.  And I know they would not have

9     anything in that system that someone in that facility cannot go

10    into and log into your account and see anything that you're

11    drafting, whether you're sending it or not, because it's on

12    that TRULINC system.

13         So any time you click on that TRULINC system, that means

14    he -- 'cause he had represented to -- in the prior hearing that

15    we had with Judge Chang that he didn't have access to my

16    emails.  This is what he'd wrote to Mr. Isaacson, that he

17    didn't have access to my emails, but then he goes on to have a

18    printout of some of the emails that I sent to the staff.  He

19    printed out the -- the media that I had downloaded for my MP3

20    player 'cause I -- you know, when I'm working I usually listen

21    to music while I'm working 'cause I work better when I just

22    have some music in my ear.

23         So he has access to that system to see everything that

24    I'm doing because he basically showed me that when he showed

25    all the emails I've sent they seeing, the music I download they

1   seeing, any request to staff they seeing.  They have -- on that

2   TRULINC system it's hooked up to that network.  So

3   anything -- when you log in that TRULINC system, it's being

4   monitored.  So everything he's saying about it's not being

5   monitored, they are monitoring it.

6         And I don't want them -- they should not be allowed to be

7   able to see my motions that I'm drafting, especially when I'm

8   drafting things against them, filing federal lawsuits or tort

9   claims that I actually have to file against them where they can

10  go in there and see what I'm filing because that would be

11  against my privacy right now.

12        Had I got a proper bond, I wouldn't be subjected to this

13  like my defendant -- my co-defendant.  She's out, she get the

14  email free, she don't have to worry about being restricted,

15  anything like that.

16        But I'm being unfairly targeted because of, number one,

17  who I am, number two, what I been exposing in this corrupt

18  system, especially in the federal system, and so they're

19  basically trying to make sure they can see what I'm doing, see

20  what I'm typing, make sure they kind of get a heads-up of what

21  I'm doing to be prepared for trial.  And I think that is

22  unfair.  I feel like it's a violation of the law, it's a

23  violation of my constitutional rights, and it's not like that

24  I'm asking for things that they don't already have that they

25  can provide.

1       It wouldn't do them nothing the -- the same way that they

2    brought the computer up to the room and they saying they sent

3    me to this unit because this unit is -- has the room with the

4    computer, well, the unit I was removed from has the exact same

5    room, the exact same room, has a typewriter in there, but it

6    don't have a computer.  So when they moved me to this new unit,

7    it didn't have a computer in there.  It took two weeks for them

8    to even get the computer to put in there for me to see the

9    discovery DVD.  They could have left me in the unit I was at.

10       So it's not that they been providing everything that they

11    can or being -- they've done everything to hinder me.  They

12    have not worked with me, and I think Mr. Isaacson can testify

13    to this, that we've tried everything to be cordial, to be

14    amicable, you know, to facilitate to whatever they need to do

15    to be able to accommodate what I need.  And it's not like I'm

16    asking them to go repurchase a new computer, or purchase a new

17    printer.  They already have these things right here at their

18    facility right there for me to be able to use.

19       And it's not like -- like with the word processing.  If

20    they don't want anything saved on the hard drive, that's fine.

21    Then I should be able to have a CD rewritable disk that I can

22    save it on, and after I get through, like with the discovery

23    disc, I give it to the officer at the end of the day and he

24    keeps it.  And when I get up in the morning, I be able to load

25    up my disc, redraft or edit whatever I need to edit on my

1   motions without having to use a system that's charging me for

2   every -- and see, it only -- it's not just charging you $3 a

3   hour; it's charging you $0.05 for every two lines you type.

4   That's what it's been charging me.  So that brief right there,

5   there's no way I could do a brief like that and afford that.

6        And matter of fact, I saw that whoever that draft it was

7   a medical doctor.  So he's not indigent.  He has money.  So it

8   was a medical doctor that did that brief.  So he had the money

9   to stay on that TRULINC system to do that and print all those

10  pages.  There's no way I could print all those pages.  There's

11  no way.

12       THE COURT:  Well, Mr. Rodrigues, I understand that

13  it's not appropriate in most instances for the federal court to

14  micromanage how you folks do your business, but he is making a

15  good point as far as the CD is concerned.

16       MR. RODRIGUES:  Judge, there's nothing to

17  prevent -- not -- I'm not at all suggesting that our staff

18  would do this, but what differentiates our current system and

19  our current proposal with our staff being able to look at the

20  CD that he writes to each and every day, this must rely on some

21  minimal trust and the ability of our staff to allow him to do

22  his legal work.  And whether he's saving to a disc or a thumb

23  drive or whatever exotic media he wants, the same risk exists

24  for federal officials to --

25       THE COURT:  Well, I think his main issue is

1    really -- didn't focus on the ability of your staff to review

2    whether it's a disc or the TRULINC system.  I think his main

3    point here is that the TRULINC system is making it

4    substantially inconvenient and harder for him to represent

5    himself because he would much rather do it with the computer

6    that he uses to look at his discovery and to be able to save on

7    the same -- I'm not sure on the same disc -- but on the similar

8    disc that he uses to review his discovery.

9        And the way he describes it, it sounds like a very

10   convenient way for him to not only look at his discovery, but

11   to do his word processing.  And I -- I understand that maybe

12   we're getting a little bit into the weeds, but he's

13   representing himself and he's experiencing frustration by

14   having to go from system to system.

15       Is that right?

16           THE DEFENDANT:  That's correct, Judge.

17           THE COURT:  All right.  And so is it possible for

18   you to allow him this sort of capability?

19           MR. RODRIGUES:  It's not possible locally, Your

20   Honor.  And before I go any further, there is significant case

21   law that discusses pro se pretrial detainees at federal

22   facilities and what is and is not appropriate.  And they simply

23   cannot put together a wish list of what could help them.  The

24   test is adequacy even for pro se pretrial criminal detainees

25   like Mr. Williams.

1          THE COURT:  Well, yeah, and I'm not arguing with you

2   on that.  I'm just -- as a -- as someone who's just concerned

3   that it could be easier for him, is it possible for you to

4   allow him access on this computer so that he can do word

5   processing?  I mean, is that -- is that possible?

6          MR. RODRIGUES:  I -- I'm not sure that I understand

7   what the challenge is.  There's one computer to view the

8   discovery review and there's another where both the legal

9   research and the typing, word processing can take place.

10          THE COURT:  Right.

11          MR. RODRIGUES:  And printing's possible from that

12   machine for both the legal research and --

13          THE COURT:  Well, do you understand, though, that

14   he's getting his discovery off a disc, right?  He's got a disc,

15   which I assume the U.S. Attorney's Office put together with all

16   of the discovery that he's entitled to, and when you have that

17   disc available to you at the same time you're trying to word

18   process, that's a pretty good advantage to be able to have the

19   ability to perhaps copy and paste and go back and forth between

20   reviewing discovery and crafting a document.  And I think that

21   is his primary beef here.  If he has to then not have that CD

22   when he is on the TRULINC system, that does provide him with a

23   pretty good disadvantage, doesn't it, in terms of being able to

24   word process?

25          MR. RODRIGUES:  I do understand the distinction that

UNITED STATES DISTRICT COURT

1    Your Honor is making.

2              THE COURT:  Okay.

3              MR. RODRIGUES:  And there is -- the FDC does not

4    have the ability to make these changes locally, Your Honor.

5    These systems are set up on a national basis and they were

6    controlled by our central office in Washington, D.C.  Our local

7    IT staff would not even be able to make the accommodations.

8    They could not reactivate the copy and paste function on an

9    inmate computer and they would be prohibited from using a staff

10   machine.  The inmate machines are set up and distributed from a

11   central -- central source with certain security parameters.

12        So perhaps a misunderstanding between the parties is that

13   Mr. Williams seems to think that this is an easy thing or this

14   is a simple matter for BOP, we have the software, we have the

15   hardware.  It is not easy and our staff are both actually and

16   under the personal opinion that they would be violating the

17   policies of our agency were they to even attempt any of these

18   things, and that's -- that is the case.

19             THE COURT:  Okay.  Well, Mr. Williams, I can't order

20   the BOP to do something that they say they can't do.

21             THE DEFENDANT:  Well, and that's incorrect.  He's

22   not -- that he's making a statement that's not true.  The

23   computer that they provided me --

24             THE COURT:  Yeah.

25             THE DEFENDANT:  --  it has word processing on there.

1    It's just they got to reboot the system, that every two hours

2    it give you a 10-minute warning, say 10 minutes it's going to

3    go reload and reboot.  So you click on the "Okay," and, you

4    know, you got 10 minutes.

5            THE COURT:  Right.

6            THE DEFENDANT:  Now, when they set up the computer,

7    whoever the IT guy is, he has a jump drive.  He has a jump

8    drive.  But the way they got the system set up, he has to come

9    back in with his jump drive, put the jump drive in the

10   computer, and he can un -- enable anything that he disabled

11   because they intentionally disabled the word processing

12   software on this computer.  It's already -- it comes with the

13   computer, but they disabled it with the little jump driver.

14           'Cause, like, when you go in -- 'cause I'm pretty

15   computer savvy, so I know what the parameters are and how to

16   disable and enable things.  So they had to have a disc to come

17   in, disable it, and it's on a checklist.  If you want to

18   disable this, it's on a check box.  So if you want to undisable

19   it, you can just click on, unbox it, click on, unbox it.  And

20   since it's not even hooked up to the network -- like he said,

21   this system is not hooked up to the system, so I cannot print

22   anything from that discovery at all, period.  It's not -- so

23   any documents I'm seeing, I need to print out to do a motion to

24   have a discovery, I can't do that on TRULINCS.  TRULINCS can't

25   copy or print from that disc.

UNITED STATES DISTRICT COURT

1          So I don't have a computer where I can print the

2    documents from the discovery to actually apply to a motion that

3    I'm putting.  So I don't have that ability because of the

4    way -- how they've done the computer and they've restricted me,

5    so I can't print anything from the disk.

6          And so it's hindering me from being -- 'cause when I do

7    the motion, you know, I like to put my exhibits and things with

8    it to prove what I'm saying.  I can't do that.  Right now

9    they've restricted my ability to do that by giving me a

10   computer, disabling the print function, disabling the word

11   processing, and then I can't even print from the computer to

12   print the disc that they gave me to view.

13         So that's not an adequate law library.  That's not -- and

14   you talking about a system.  They got all these computers in

15   here that has everything on there, even the system.  The

16   computer that we use that's downstairs, it has LexisNexis on

17   there, but they got it -- they got it manipulated to where

18   that's the only thing that's up.  So when you go to the

19   computer, you can't even access a word processing program even

20   though it's on there, but they've got it -- they -- the IT

21   people, they made them basically take it off so only thing you

22   can do is either go to social media, you know, do the TRULINCS

23   or the LexisNexis.  That's it.

24         Now, I just came from a facility which is a CCA facility,

25   and they got, you know, federal detainees, state detainees, the

1    same thing they got here.  It's a detention center, but they

2    provide all that for inmates that are not pro se.  And so I'm

3    saying why would -- why is it such a problem that I'm asking as

4    a pro se defendant the exact same thing that inmates that are

5    not pro se have more access to at another facility that has

6    attorneys that's drafting their motions?  I have to draft my

7    own motions, I have to do my own research, so -- but they're

8    afforded more access to a technologically advanced computer

9    that they should have access to.

10         And at the Pahrump facility they have 15 of these

11   computers.  So it's 15 computers that has the LexisNexis

12   program, word processing software, the ability to actually save

13   on the hard drive, and if they want to, they can actually get

14   their own disc or a jump driver to save their own personal, you

15   know, motions that they draft even though they have attorneys

16   that's actually representing their case.  They're not pro se,

17   but they are afforded this.

18         And I'm saying the BOP is doing this to me out of spite

19   and maliciousness when they have the capability to do it.  Or

20   if they feel like they don't have the capability, I can have

21   some people on the outside send me a computer, buy a computer

22   for me to put in that computer room, and donate it to the BOP

23   and they can keep it when I leave and I can have -- I can do

24   the same thing.  If they feel like it's a problem, I can have a

25   computer brought and bought, brand new computer to put in there

1   for me to be able to do what I need to do.

2          MR. ISAACSON:  Your Honor, may I be heard?

3          THE COURT:  Sure.

4          MR. ISAACSON:  Your Honor, I do apologize for being

5   a little late this morning.  I apologize to the Court.

6       Your Honor, I think -- I don't want to take anything away

7   from Mr. Williams -- saying this has been a process from the

8   beginning 'cause we started out with Judge Chang.  Initially

9   there was tons and tons -- tons of paper.  That's what we were

10  initially kind of facing, a huge storage unit issue about that.

11         Started talking to Judge Chang, Well, then, maybe he

12  could have a disc there, you know, so we would avoid the big

13  paper in the cell issue.  And Mr. Rodrigues certainly has -- we

14  have gone back and forth lots of letters, and certainly I think

15  they have certainly done a lot of things to try to help

16  Mr. Williams, I would say.  So I think it's been a process.

17         We -- recently then the discs were sent over.  They were

18  not able to be accessed.  There was discussion, Well, something

19  had to be done IT wise.  Then the passwords did work.  And

20  now -- so -- but we've had kind of increment as we go along.

21         I would suggest -- my suggestion has been from the

22  beginning how about we just send over a blank CD that he

23  can -- that be kept with the CDs?  'Cause they're keeping CDs

24  for him now for the discovery.  It just keeps with those same

25  ones, a blank one in a separate sleeve that he can only access.

1    He doesn't keep it in his cell; it's kept with everything else,

2    so he can just save it, and, you know, hopefully it'll work.

3    You know, maybe it will work.  But maybe we could at least try

4    it and they could take it back, put it back with his stuff.

5    You know, I don't see how -- the materials that were provided

6    with BOP, lots of regulations, I don't see anything saying that

7    is prohibited.  A blank -- maybe a zip drive could be a weapon

8    or something, but it's all going to be in the custody of them.

9    It's not going to be in his cell.  It'll be with the other CDs.

10   And if that helps the process -- and I don't see any specific

11   BOP thing saying you can't do that -- then hopefully it will

12   take care of a lot of these issues.  If it doesn't, we can come

13   back to you.  But that way -- and it seems like a very simple,

14   easy way to at least try to incrementally deal with this big

15   situation which is a big white collar case, a guy at FDC pro

16   se, representing himself, which is on outlier anyway.

17         So I would just suggest, Judge, that we give it a try.

18   Let me send a blank CD, let's see if it works.  Maybe it'll

19   take care of 90 percent of these problems.  And if it doesn't,

20   then we'll see if maybe we can come back some other time.  But

21   seems like a simple solution.

22         MR. RODRIGUES:  Judge --

23         THE COURT:  Mr. Rodrigues.

24         MR. RODRIGUES:  --  I realize it seems simple, it

25   seems reasonable.  It's simple and reasonable for everyone

1    except for the Bureau of Prisons.  We do have national policies

2    and procedures as to how these things work and it would take

3    significant departure and permissions at the highest levels for

4    the FDC to change how we do things.

5         I understand it does on its face seem like a simple

6    accommodation, but the question is not whether Mr. Williams is

7    being provided with the best possible access to the courts;

8    it's whether it's constitutionally adequate, and that is

9    supported by the case law.

10            THE COURT:  Well, I -- you know, I'm not so sure it

11   is because the case law's always fact-specific in this area,

12   and his situation is that he's pro se in a major white collar

13   case with a lot of documents.  And it could very well be that

14   he's being given inadequate access to these documents and a

15   word processing which would ultimately impact his ability to

16   defend himself, 'cause he has a constitutional right to defend

17   himself.  And I explained to him last time that's his choice,

18   and anybody that proceeds without a lawyer representing them,

19   in my view, isn't very bright in the first place.

20         But this man has shown me that he is tuned in to his

21   defense and he is tuned in to the issues and he's made an

22   intelligent choice to defend himself.  And I do think that when

23   somebody's made that choice and they're incarcerated,

24   particularly in a case that is a white collar case that has a

25   lot of documents, if the facility's national policies are

1   making it next to impossible for him to process the discovery

2   into documents and impossible for him to be able to make

3   arguments to the court and to properly defend himself, which he

4   has the constitutional right to do, it could be that this will

5   ultimately mean that his rights were violated.

6          MR. RODRIGUES:  Yes, Your Honor.  But it's not --

7          THE COURT:  So here's what I would like, 'cause

8   Mr. Isaacson actually made a suggestion the last time, not as

9   detailed as this morning, about the blank CD.  Mr. Isaacson

10  could provide the blank CD, could actually go to the unit and

11  he could find out whether your system is actually capable of

12  doing what these folks want you to do.  And if it is capable of

13  doing that with just a simple disabling click, then I'm

14  inclined to order that you folks give him this ability,

15  regardless of what your policy is nationally, because it sounds

16  like an easy, quick fix.

17         And I understand I can't order you to transfer him to a

18  suite of offices and all that stuff.  I mean, that's pretty

19  clear, and I wouldn't do that in the first place, but I am

20  seeing eyeball to eyeball a man that is totally frustrated with

21  reviewing his discovery and being able to word process in an

22  effort to defend himself.  That's my problem.  That is my focus

23  right now.  And if there's an easy fix, then you folks ought to

24  be able accommodate him.

25         So I'm going to order that you folks look into that, okay?

1          MR. RODRIGUES:  Judge, if I may?

2          THE COURT:  Yeah.

3          MR. RODRIGUES:  Two brief things.

4          THE COURT:  Yeah.

5          MR. RODRIGUES:  One is that one of the bedrock

6    principles in corrections is you do it for one, you do it for

7    all.  And several inmates who have either spoken to

8    Mr. Williams or witnessed him have approached us about asking

9    for their, quote, "own office."

10        And --

11         THE COURT:  Well, I'm not ordering any of that.

12         MR. RODRIGUES:  Of course, of course, Your Honor, we

13   understand.  Of course.

14         THE COURT:  Well, why wouldn't you give them all

15   their own --

16         MR. RODRIGUES:  I know.

17         THE COURT:  -- if they need --

18         THE DEFENDANT:  I'm the only pro se defendant.

19         THE COURT:  If all of them gives -- if we give them

20   all a CD, who cares?

21         MR. RODRIGUES:  Judge, I don't mean to make a

22   caricature of the Court by any means.  That's not what I'm

23   suggesting.  I only mean to say that the procedures that we

24   have in place that we control so strictly, when we begin to

25   make small deviations, we do have to consider the requests

1    coming from other inmates, represented or not, to have the

2    exact same thing.  And when there's a perception of being

3    treated differently, that can lead to management issues,

4    especially if the perception is based on race or some other

5    sensitive factor.  That's one reason why we are so concerned

6    about this.

7         The other is that if there is discovery, voluminous as it

8    might be --

9              THE COURT:  Yeah.

10             MR. RODRIGUES:  -- Mr. Williams can specify to

11   counsel and have several boxes in his cell for hard copy

12   review, if he so chooses.  That is entirely within our policy.

13   And if he wishes to have thousands of pages in hard copy review

14   of what he deems necessary, we will allow him to have that in

15   his cell.

16             THE DEFENDANT:  Judge, can I respond to that?  This

17   is my notes on the discovery CD.  I went through the discovery

18   CD.  These are all the notes that I took.  And I went through

19   each CD, outlined the documents, things that are relevant,

20   things that are not relevant to my case.

21        But I don't have the ability to print any of this out.  I

22   don't have the ability to be able to draft a motion, to put

23   these as exhibits because of what they deprive me of as far as

24   the unit that they gave me, the computer that they've given me.

25        And I told them, I said, Listen, I said, if I could

1    just -- with the legal materials from the outside sources under

2    Title 28 CFR 5554 -- excuse me -- 543.11, it says that a inmate

3    shall be allowed to purchase whatever he needs as far as legal

4    from outside sources.  But I'm afraid to even have someone send

5    something to me of a legal nature from outside 'cause I'm

6    afraid I would never get it because I've had people send me

7    stuff as of November 30th; I still haven't received it.  They

8    got the confirmation that it's been sent and received by the

9    FDC.  I still haven't received it.  I've mailed out things,

10   'cause I keep a log of everything I've mailed out, I put the

11   dates, I put who the recipient is, what it is, and then I

12   make -- whatever officer, I make him give me his name so I

13   could put his name that, okay, I gave you this mail to go out.

14   And so I have mail that I've sent out that hasn't gotten to his

15   destination.  I've had people send me mail that hasn't gotten

16   to me yet, still haven't gotten to me yet.

17          And so I'm looking at all these factors, the emails being

18   held for four to seven days, that they intentionally doing

19   everything possible to hinder me from representing myself

20   because I feel like they don't like that I represent myself.

21   But that's my personal choice.  I've represented myself before

22   and I've won.  All the other cases -- I been charged with 34

23   felonies.  I beat 32 of them by myself, two of them in appeals,

24   the one that has already been overturned in appeal, and the

25   other one that's still in appeals right now.

1          So I'm very versed on how to represent myself, but I've

2     been given the proper tools to be able to represent myself.

3     Like, just to give you an example about the pro se phone that

4     they're fighting me on, I sent several messages over the last

5     month-and-a-half to be able to get one pro se phone call.

6     Still haven't gotten it.  When I was incarcerated in Florida,

7     they give you a pro se phone list where you put the person's

8     name, the -- what they are and telephone number, and then it

9     goes to staff and they call these people to, you know, see if

10    it's okay for, you know, you to call them pro se, whether

11    they're a witness, you know, attorney or whatever, and they get

12    that list approved and then I'm able to use a pro se phone to

13    be able to call only these people that's on this list.

14         It's not outside of the scope of something that has not

15    already been provided in other cases in other states in other

16    situations.  But the FDC is -- to me is just bent on preventing

17    anything that would assist me that doesn't even disrupt the

18    orderly running of the facility, 'cause nothing he can say can

19    say that what I'm requesting would be a security risk.  He

20    can't say the CD would be a security risk 'cause you giving me

21    13 of them every day.  I get 13 discs every morning I get up.

22    So to have another blank disc would not be a security risk

23    because the only thing that's only going to be on this disk is

24    my motion that I'm drafting to basically protect myself, to

25    defend myself.  So I couldn't do nothing with these discs that

1    I couldn't do with these 13 discs.  If I wanted to use a disc

2    for a weapon, I could use one of those 13 right now, if I

3    wanted to use that.  But that's not my demeanor, that's not the

4    type of person I am and it wouldn't benefit me.

5         If I did something to the disc, then they would have

6    grounds to take the disc from me, you know, and put me in the

7    SHU, and now I really can't defend myself.  So I wouldn't use

8    something that stupid to use something that's for my benefit to

9    destroy it to try to harm somebody, you know, or use -- I don't

10   know how you could use a jump drive as a weapon.  But they give

11   us razors -- we get to purchase razors or they give us razors

12   that we get to keep all day.  They're not worrying about us

13   using razors and cutting the staff throats or cutting another

14   inmate's throat.  But you're worrying about me having a blank

15   disc that I can save my documents on that I'm drafting to

16   protect myself and to prove my innocence.

17        And to me, I feel like all this is done to spite me.  To

18   me it's malicious and I feel like I'm being unfairly targeted.

19   I don't know if it's because of my race or because of what I do

20   on the outside.  You know, I'm a civil rights activist.  And

21   they don't -- they know that with the proper tools what I'm

22   capable of.  But there's nothing that he could say as far as

23   what they've done to properly accommodate me, the things that

24   I've been requesting, and the things that I'm showing them in

25   the law that by law they're supposed to do because the BOP

1    policy, I was told by the Unit Manager Williams that BOP does

2    not have to follow federal law.

3         So I would like to ask you that question.  So can the BOP

4    make a policy that contravenes federal law?  And I'm supposed

5    to obey it if it's against federal law?  'Cause that's what I

6    was told.  But BOP policy trumps federal law.  And I wanted to

7    know from the Court is that true?  Is that somewhere in a

8    statute where it says BOP can make a policy that violates

9    federal law and violate the institution?  'Cause that's what

10   was told to me by Unit Manager Williams.  And I'm like, No, I'm

11   pretty sure that the BOP policy has to follow federal law.

12        So I say -- I asked him -- well, I say, "So Mr. Williams,

13   so if your BOP policy was to murder me in my cell, would you

14   follow that policy?"

15        And his exact words was, "Mr. Williams, then you just

16   hit.  You just a hit man, if that's BOP policy."

17        So to me, Attorney Rodrigues, they're looking at their

18   policy and disregarding the laws that governs pro se litigants

19   or that governs or constitutional rights as far as our access

20   to the court.  And like I said, my dispute is not, you know,

21   whether they've provided a computer and LexisNexis, but the way

22   they provided it to us it's not adequate 'cause right now even

23   with the blank discs that I get, okay, ones I draft the motion

24   and, you know, save my exhibits on there, how would I print it

25   out?  Because that computer is not hooked up to the printer on

1    a network.  It's not hooked up to any printer, so I can draft

2    it, but I can't print it.  And so now I'm still handicapped

3    because now I can't print out with, you know, the --

4               THE COURT:  Okay.  Now, let stop you there.  I

5    thought you could print off the discovery CD.

6               THE DEFENDANT:  No.

7               THE COURT:  Okay.

8               THE DEFENDANT:  No, I cannot print off.

9               THE COURT:  All right.  Mr. Rodrigues, last, the

10   story there with the printing?

11              MR. RODRIGUES:  There is no printer attached to the

12   ediscovery machine.  He can record any number range that he

13   wishes and ask standby counsel to produce those documents.  But

14   we do not have a printer connected to that machine.  He can

15   print out an unlimited amount of legal research.  He can type

16   on TRULINCS and type out his -- print out his work product, but

17   there is no printer attached to that machine --

18              THE COURT:  Why is that?

19              MR. RODRIGUES:  We have parameters for ediscovery

20   computers.  They're the same parameters that are in the

21   attorney-client visitation rooms.  We use certain programs and

22   the rules regarding whether a printer or certain other

23   peripheral devices can be connected.  And I would not be able

24   to comment on the rationale, Your Honor.  That's more of a

25   specialized discussion with our IT staff.

1      But it does follow the parameters for our ediscovery

2   machines.  Those machines can view hundreds of file types, but

3   that's it.  They don't allow for modification, printing, etc.

4           THE COURT:  Well, I certainly understand the rule on

5   not allowing modification, but I don't quite understand the

6   rationale for not being able to print.

7           MR. RODRIGUES:  Our rationale is that his printing

8   should take place via standby counsel.  And if there is no

9   other way that he can do that, that's a discussion that we can

10   have.  But he does have someone that he's described at the last

11   hearing as a "godsend," that Your Honor described as

12   essentially his assistant, that he's barely making use of that

13   could --

14           THE COURT:  Well, I don't think he's barely making

15   use.  I mean, Mr. Isaacson is all over --

16           MR. RODRIGUES:  I don't mean to suggest that

17   Mr. Isaacson is --

18           THE DEFENDANT:  I'm making use of him.

19           MR. RODRIGUES:  -- is not working very hard on this

20   case, but there are many ways that -- including printing of

21   discovery and things like that that Mr. Isaacson could assist

22   with that would get around these issues.

23      And again, Judge, I realize that it does seem like a

24   simple accommodation, but these are national policies that

25   would require deviation and configurations that are set at a

1    national level.  And if there's any way, even printing large

2    volumes and having them in his cell, this local facility would

3    greatly appreciate not having a reason to deviate from our

4    national policies, if there's any way to avoid that.

5              THE COURT:  Well, he's got to prepare his defense,

6    so I -- how's he going to print stuff off his CD if he didn't

7    have Mr. Isaacson?

8              MR. RODRIGUES:  That would be a discussion that I'd

9    have to have with my staff and my chain of command, Your Honor.

10   I'm not exactly sure how that's been accomplished in other

11   scenarios.

12             THE COURT:  'Cause he doesn't have to have

13   Mr. Isaacson, under the law.  I mean, we provide Mr. Isaacson

14   and we advise people who were proceeding pro se that at a

15   minimum they should have standby counsel to assist at least as

16   an advisor.  But they don't actually have to have one.

17             MR. RODRIGUES:  And, Your Honor, that's why he

18   has -- as he said, every morning he checks out his discs.  He

19   has the next several months all day every day to look at this

20   discovery, take some notes as he wishes, and to the extent that

21   there's specific pages that he feels after reviewing those

22   pages for hours he needs to have in hard copy form, that

23   certainly can't be that many, with the amount of time that he's

24   provided to look at these documents each and every day.

25             THE COURT:  So he would actually have to have

1   Mr. Isaacson come by and say what he wants and show him on the

2   computer --

3            MR. RODRIGUES:  And they could do so in the

4   attorney-client visitation room where they could jointly view

5   the discovery and look at it together --

6            THE COURT:  I mean, don't you view that as

7   cumbersome, particularly if he could be accommodated with a

8   printer?

9            MR. RODRIGUES:  The fact that, Your Honor, he can

10  view these materials almost all day every day without having

11  to --

12           THE COURT:  It's just that he can't do anything with

13  them --

14           THE DEFENDANT:  Right.

15           THE COURT:  -- other than eyeball, and then take,

16  you know, the legal pages and notes here.  So he can't print

17  them out and he can't word process with them, which to me as a

18  word processor that is critical that he be able to do that.

19  Why can't he do that?

20           MR. RODRIGUES:  The computer, the ediscovery

21  computer, Your Honor, is set up per our national parameters.

22  Again, I could --

23           THE COURT:  So you don't know the policy reason; you

24  just know that's the policy.

25           MR. RODRIGUES:  No, I can't represent to the Court

1    that I do.  I'm not saying that there is not one, and I would

2    be happy to come through government counsel to file something

3    explaining the rationale for this.  And I would ask that we

4    have the time to do so so I could seek rationale and

5    explanation from people knowledgeable with BOP as to why we do

6    things this way.

7                THE DEFENDANT:  Could I make this comment, Judge?

8                THE COURT:  So it's not because there's a shortage

9    of printers, right?

10                MR. RODRIGUES:  I don't believe so, Your Honor.

11                THE COURT:  All right.  So it could be set up; it's

12    just that there's a policy that differentiates between the

13    discovery computers and the word processing and legal research

14    computing system.

15                MR. RODRIGUES:  Your Honor, I don't know if it could

16    be set up.  I do know that the inmate computers are distributed

17    from a central source.  I don't know what hardware limitations

18    there may be, but I could certainly look into this for the

19    Court.

20                MR. JOHNSON:  Your Honor, if I could just interject

21    for a moment?

22                THE COURT:  Yeah.

23                MR. JOHNSON:  Early on we had discussions with

24    Judge Chang about, you know, if the system wasn't workable,

25    that he can have up to a certain square footage of his own cell

1    to store legal material.  So if, you know, he wants

2    Mr. Isaacson to print out everything we provided in discovery,

3    there is -- the discs are all indexed.  There is a very

4    detailed index for what's on the discs.  It's Bates stamped.

5    There's descriptions.  With the Bates stamps and the indexes

6    and hard copy, he would be able to go through whatever he

7    wanted, and that was one of the discussions.  And Judge Chang

8    said, well, you know, maybe we don't have to do that yet.  If

9    it becomes a problem later, then, you know, maybe that's a step

10   we take.

11        Because, you know, I'm not in the system, I don't work for

12   BOP, but one of the things that would immediately strike me is

13   that if BOP has a system for reviewing discovery and in, say, a

14   drug case you have cooperators or individuals who have turned

15   and flipped either defendants or confidential sources and it's

16   in the discovery material, and then that discovery material is

17   being reviewed on the same system that has your TRULINCS and

18   your word processing, you could copy and paste pieces of the

19   discovery material and send them out to your cohorts who are

20   outside the prison and say, "Hey," you know, "go look up these

21   guys because they're likely to be the ones who are testifying

22   against me from my review of discovery."

23        Now, would that get through the TRULINC system with the

24   review?  Well, not if it was blatantly stated.  But if it was

25   encoded, you know, much the way drug traffickers talk about

1    buying drugs, they never say, "I want 3 kilos of

2    methamphetamine," you know.  They have a way of saying it so

3    that it might be not be detected.  That's just one logical

4    reason why the systems would be separated, you know.  And I

5    don't know if that's their basis, but there clearly are some

6    issues that BOP is trying to address.

7         And the one other thing that may pose a problem with the

8    disc issue is that even if he's able to drop it on to a disk,

9    can he take that disk and print from it?  And the discovery

10   review computer right now, they can't print from that.

11        THE COURT:  Well, that's what we're talking about.

12        MR. JOHNSON:  Right, exactly.

13        THE COURT:  I just don't understand why -- that's so

14   simple.  I mean, we move printers around this courthouse, you

15   know, at the drop of a hat and we can hook them up in a matter

16   of minutes.  It's pretty easy stuff.

17        MR. RODRIGUES:  Judge, I'm not sure what the

18   technological limitations might be, but some of the reasons

19   that Mr. Johnson just mentioned, including the fact that if the

20   discovery is printed in full and you have hard copies floating

21   around, that easily one inmate could walk into another cell and

22   start flipping through sensitive documents.  These are all

23   concerns.

24        But with that said, even if all of discovery in this case

25   was printed, some of it could be kept in Mr. Williams's cell

1    and the rest in a storage room or a counsel's office, and he

2    could rotate, check out boxes as needed.  He could -- he could

3    conceivably have hard copies of everything in this case should

4    he believe that's necessary in his defense.  We would just ask

5    they be printed at a source outside of BOP and provided to our

6    facility, and we would allow him to keep a certain amount in

7    his cell up to three cubic feet, and then he could have the

8    rest in storage to check out, swap boxes as needed.

9           THE COURT:  So is the three cubic feet another

10   national standard or --

11          MR. RODRIGUES:  Yes, Your Honor.  And that can be

12   moved by our warden locally if he feels that it's a fire hazard

13   to have several more boxes in the housing -- in a cell.

14      But Mr. Williams can have the hard copies if he wishes.

15   We would greatly prefer that they be generated outside of our

16   facility.

17          THE COURT:  Okay.

18          THE DEFENDANT:  May I interject, Judge?

19          THE COURT:  Uh-huh.

20          THE DEFENDANT:  And I think, you know, they're used

21   to having inmates that have an attorney that, you know, the way

22   the Supreme Court has ruled that, you know, once you have an

23   attorney representing you, then the facility has met their

24   burden of adequate access because that attorney is the one

25   that's going to type up all your motions and, you know, do

1    everything for you.

2              THE COURT:  Right.

3              THE DEFENDANT:  But I'm not represented by anyone,

4    so I'm responsible.  And I think this hearing in this case

5    would be something that FDC should be taking seriously that

6    from here on out if they have a pro se defendant, they would

7    already have everything already ready for him by providing me

8    the things that -- because to me they're making it look like

9    this is my personal computer, like this is going to my personal

10   printer.  It's still the property of the BOP.  It's still in

11   their office at their facility.  So if you ever get another pro

12   se defendant, you already have everything done; it's already

13   been taken care of through a hearing like this so the pro se

14   defendant won't have to go through the hindrance and the

15   encumbrances that I -- that I've been --you know, had to

16   encounter.

17        So, you know, so I know they're used to dealing with

18   inmates that don't know the law like I do and that haven't

19   represented themselves like I have, but these are basic things

20   that they can not only have, but are very simple to --you know,

21   to correct and accommodate, you know, to have a printer put in

22   there and the disc and the word processing and that's it.

23        But, you know, as far as the pro se phone, I have yet to

24   be able to call him yet.  And I make several email requests and

25   I get the runaround, "Well, you got to go to the unit team

1    manager."  Okay, I email the unit team manager.  "Oh, you got

2    to email CMC for that."  Okay.  I email CMC for that.  "Oh, you

3    got to have this" -- and it's all this runaround and I'm still

4    not being able to make a call.  And I show them the law where

5    it says that the warden can't even limit my -- the frequency of

6    my attorney calls, but I'm told by Unit Manager Williams, "Oh,

7    no, you can only get one attorney call a week," but I showed

8    him the federal law that says no, I should -- I can't be

9    limited, especially being a pro se.

10          You know, with my trial coming up in May there's a lot of

11   things that me and Mr. Isaacson has to discuss and it's not

12   feasible because what was told me, "Well, your attorney can

13   visit you seven days a week," yes, he can, logically he can,

14   but that's not feasible because he has, you know, other cases

15   he has to -- and he can't just travel every day up here when

16   you can make a simple phone call, a 10-, 15-minute phone call

17   where we can handle a lot of stuff that would prevent him from

18   having to drive all the way up.  And I don't know the wait

19   times that he has to wait, but I'm pretty sure as soon as he

20   come here they don't send me right back down -- send me right

21   down to him.  I know it's a wait period when they come to visit

22   and then I --you know, I come down there.

23          So this would alleviate a lot of time for him where he

24   don't have to, you know, spend time, you know, coming to see me

25   physically, where we could discuss on the phone some of the

1    things that we need, and right now they've denied me that and

2    still haven't provided me that even though I emailed them the

3    law and they continue to -- everything that I bring up and I

4    bring up the law and they -- all they say is BOP policy, like

5    the Attorney Rodrigues, everything he said is BOP policy.  He's

6    never quoted not one federal law that state, yes, we have the

7    right to do this.  It's always about their policy and not about

8    federal law.

9         And it's just frustrating that every time I'm showing them

10   the law where they're wrong and they're supposed to do a

11   certain thing, and then they say, "Well, this is policy --

12             THE COURT:  All right.  Let me just stop you there,

13   Mr. Williams, because BOP policy complies with federal law.

14   Now, as far as specific situations like yours, there's a

15   crossover between what their policy is and what the law

16   requires, and then there's probably a gray area where we don't

17   have case law guidance on specific issues and that's what we're

18   doing here today.

19        You know, I'm not going to rearrange your detention

20   conditions in large part, but I am focussed on what you're

21   talking about, and what you're talking about is access to word

22   processing and the particular access to discovery and where

23   that intersects.  Now, they have policies that govern all that

24   that overall complies with federal law.

25        Now, in your specific case it may very well be that they

1   have to modify in small part their national policy to

2   accommodate your constitutional right to defend yourself

3   appropriately and reasonably in this case.  So that's what

4   we're talking about here.

5        As far as the phone calls are concerned, I'd like to just

6   give Mr. Rodrigues the opportunity to respond to what you're

7   saying.

8           MR. RODRIGUES:  Your Honor, following this hearing I

9   will email Mr. Isaacson the contact information for Walter

10  Williams who is the unit manager for the defendant, and as

11  needed, Mr. Isaacson can contact Mr. Williams and set up legal

12  calls at whatever interval each week he sees fit to make

13  contact with the defendant.  And that's, of course, in addition

14  to any in-person visits that he may wish to have.

15       Responding to the -- this issue of having the discovery

16  and the word processing on the same computer, Your Honor, if he

17  does provide Mr. Isaacson with on a rolling basis any discovery

18  that he needs, that can be dropped off in person.  We have a

19  drop box for legal material that can be left on a rolling

20  basis.  It can be mailed in, however he wants to have that

21  material sent to us.  We can store it and it -- we're talking

22  about several boxes, it's fine, however much he has, he'll be

23  able to have a certain amount in his cell at a given time.  He

24  can look at those papers, type while looking at the hard copy

25  documents at one computer.  And I hope that that would address

1    the problem of him being able to view this voluminous discovery

2    and type in real-time.

3        Copy and pasting I know is a function that's disabled

4    primarily to prevent inmates from leaving messages for one

5    another on the computer in some way, or pasting -- copying and

6    pasting from discovery and putting things into certain programs

7    and sending them to the outside.  That is one of the rationales

8    why copying and pasting is not permitted.

9        But he can print anything he wants.  We can store it for

10   him.  He can use one computer where he types, prints, does

11   legal research.  But we would just ask that that material be

12   sent in to him given that other inmates will surely expect that

13   they can print voluminous discovery, and that's something that

14   we would not be able to accommodate.

15           THE COURT:  All right.  We're out of time here,

16   Mr. Williams, so I've heard all your arguments.  I'm going to

17   grant your motion in part and deny it in part, and I'll issue

18   an order that reflects my ruling so that everyone has good

19   specific guidance.

20       But I like Mr. Isaacson's suggestion about the CD, if that

21   works, but I'm going to direct that Mr. Isaacson provide you

22   with a CD and that you be allowed to use the CD on the

23   discovery computer for word processing and to check that out

24   with the Federal Detention Center to see if that can be done.

25   You've described the process where it's a simple click of a

1   button to disable --

2              THE DEFENDANT:  Yes, sir.

3              THE COURT: -- versus enabling --

4              THE DEFENDANT:  Right.

5              THE COURT:  -- the word processing function.  And if

6   that's -- if that is as easy as you say, then I'm going to

7   direct that the Federal Detention Center give you that

8   capability.

9       I'm also going to direct that they look into providing a

10  printer off of the discovery computer to accommodate your

11  ability to print off that computer.  And if they come up with

12  some technological reason why that can't be done, then I'm

13  going to direct that they let me know in detail why that can't

14  be done.

15      But I think those two accommodations to you as well as

16  allowing direct access via the phone system to Mr. Isaacson

17  will greatly alleviate your present situation and frustration

18  that you have experienced in looking at your discovery,

19  processing your discovery, using the word processing system,

20  and being able to communicate with your standby counsel.

21      As far as the other line items that you have, a number of

22  other line items that we've talked about, the subpoenas and

23  investigators and all that stuff, and that will be set forth in

24  my order as well.

25             MR. ISAACSON:  Your Honor, may I address those

1    issues, if I can, the subpoenas issue?

2           THE COURT:  Yeah, just --

3           MR. ISAACSON:  Very, very briefly, Judge.  I've met

4    with Mr. Williams.  I'm surely going to help him with the

5    subpoena as we've talked about the procedure in this court to

6    issue said subpoenas and working together on that.

7        I should also let the Court know I've been working on

8    get -- looking at an investigator.  I think that I have been

9    able -- report this morning be able -- I've got that worked

10   out.  So hopefully I'll be able to get a motion before this

11   Court probably early next week in regard to an investigator.

12          THE COURT:  Great 'cause, Mr. Williams, your

13   requests were inadequate.  You didn't lay the appropriate

14   foundation.  And based on what Mr. Isaacson has told me here,

15   you folks appear to understand that and with the new motion,

16   I'll certainly take a fresh look at it.  But the way the motion

17   was presented, it doesn't comply with what's standard and

18   reasonable.

19          MR. JOHNSON:  Your Honor, again, we have no

20   objections to those two, and the process the Court's

21   suggesting, an ex parte to the Court with an adequate

22   explanation.

23          THE COURT:  Okay.

24          THE DEFENDANT:  Could I -- Judge Puglisi, could I

25   just interject this one more thing?

1              THE COURT:  Yeah.

2              THE DEFENDANT:  That in the order could you just

3    specifically state that, you know, to prevent the FDC from, you

4    know, preventing me from getting legal materials from outside

5    because I know this is going to be a problem because what I

6    want sent in, I want to have the Westlaw program sent in for me

7    'cause I'm very proficient on Westlaw, you know.  I haven't

8    worked with the LexisNexis like I have Westlaw, so I'll be able

9    to do a better research that I need to do on the Westlaw.  I

10   just don't want them to prevent me from getting the Westlaw or

11   like the Black's Law Dictionary on disc, you know, where I

12   could look up the legal terms and stuff like that.  I just

13   don't want them to prevent me from being able to get this stuff

14   from the outside that I'm allowed to by federal law.

15             THE COURT:  And you would look at those discs on the

16   discovery computer?

17             THE DEFENDANT:  Right, that's correct.

18             MR. RODRIGUES:  Judge, he's not asking for

19   software -- excuse me -- he's not asking for legal material.

20   He's asking for an executable software program.  Black's Law

21   Dictionary and virtually the entire universe of the United

22   States law is on the Lexis system.  It's in a very user

23   friendly format that I've used extensively through the inmate

24   interface.  It's duplicative of everything that he's required

25   under the law and we will not allow him to use an executable

1    software program on any of our machines.  That is not legal

2    material.  That is a software program and it will not be

3    allowed in.

4        He can have any legal material he wishes submitted as

5    legal mail and it will be not reviewed for content, it will be

6    protected and confidential if he chooses to receive it.  But we

7    will not allow him to run a program on our computer system.

8              THE DEFENDANT:  See, that's -- that's in violation

9    of Title 28 CFR 543.11.  That Westlaw is legal material.

10   That's not personal.  That's so I can be prepared to be able to

11   properly do the research.

12             THE COURT:  All right.  Mr. Williams, I'll issue my

13   order and then if you have other issues that you want to bring

14   up --

15             THE DEFENDANT:  And the email --

16             THE COURT:  -- following the -- following the entry

17   of my order, you're of course always welcome to file anything.

18             THE DEFENDANT:  And then the email, why they're

19   holding my email.  What I was going to do is print out so you

20   can see that I'm not just making empty statements about how

21   long they're holding my email and how long it's taken for --

22             THE COURT:  Well, they've made a representation to

23   the court that your emails are not held any more than the other

24   inmates --

25             THE DEFENDANT:  Right.

UNITED STATES DISTRICT COURT

 1              THE COURT:  -- with that one exception.

 2              THE DEFENDANT:  Right.  That's what I want to show

 3   you that's not true.

 4              THE COURT:  And I am not particularly concerned

 5   about the past at this point.  But they've made a

 6   representation to me about the present real-time, and if you

 7   have a problem in the next few weeks about emails getting

 8   delayed --

 9              THE DEFENDANT:  Okay.

10              THE COURT:  -- in the manner in which you say.

11              THE DEFENDANT:  Yes, sir.

12              THE COURT:  -- then I'll allow you another

13   evidentiary hearing and you can print those emails out --

14              THE DEFENDANT:  Okay.

15              THE COURT:  -- showing me when they were sent --

16              THE DEFENDANT:  Okay.

17              THE COURT:  -- and when you intended them to be

18   sent --

19              THE DEFENDANT:  Right.

20              THE COURT:  -- and when they were actually sent.

21              THE DEFENDANT:  Right.

22              THE COURT:  And we'll put exhibit stickers on them.

23              THE DEFENDANT:  Right.

24              THE COURT:  And we'll do it the old-fashioned way.

25              THE DEFENDANT:  Okay.

1                THE COURT:  But before we get into that --

2                THE DEFENDANT:  Okay.

3                THE COURT:  -- I want to give them the opportunity

4    to perform.

5                THE DEFENDANT:  Okay.

6                THE COURT:  All right.

7                THE DEFENDANT:  Yes, sir.

8                THE COURT:  What happened in the past is irrelevant

9    at this point.  You've brought it to the court's attention.

10               THE DEFENDANT:  Okay.

11               THE COURT:  And hopefully your emails will be sent

12   in a timely fashion.

13               THE DEFENDANT:  Okay.

14               THE COURT:  There's no need to make, I think, an

15   issue out of that at the moment.  All right?

16               THE DEFENDANT:  Okay.

17               THE COURT:  Thank you all.  Court's in recess.

18               (Proceedings concluded at 11:08 A.M.)

19

20

21

22

23

24

25

1                    TRANSCRIBER'S CERTIFICATE

2

3            I, DEBRA READ, court approved transcriber, United

4    States District Court, District of Hawaii, do hereby certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the

7    above-entitled matter and that the transcript page format is in

8    conformance with the regulations of the Judicial Conference of

9    the United States.

10
             DATED at Honolulu, Hawaii, February 2, 2018.
11

12
                         */s/ Debra Read*
13
                    DEBRA READ, CSR CRR RMR RDR
14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**