TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------

*cc: LEK*
*filed copy returned to filer*

FROM: 05963122
TO: Isaacson, Larsrobert
SUBJECT: ACQUITTAL MOTION COVER PAGE
DATE: 02/17/2020 05:57:08 PM

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 18 2020

at ___ o'clock and ___ min. ___ M
SUE BEITIA, CLERK

Anthony Williams
Private Attorney General
P.O. Box 30080
Honolulu, HI  96820

Counsel for the Defendant

UNITED STATES OF AMERICA                CASE NO. 17-00101 LEK

v.

ANTHONY TROY WILLIAMS

        PRIVATE ATTORNEY GENERAL Anthony Williams MOTION FOR JUDGMENT OF ACQUITTAL

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

----------------------------------------------------------------------------------------------------

FROM: 05963122
TO:
SUBJECT: MOTION FOR JUDGMENT OF ACQUITTAL
DATE: 02/17/2020 09:21:37 AM

MOTION FOR JUDGMENT OF ACQUITTAL

Private Attorney General Anthony Williams, a servant of the Most High Yahweh Elohim Yahshua, submits this Motion For Judgment of Acquittal pursuant to Rule 29. In support of this motion the undersigned state the following facts:

I. TESTIMONY OF GOVERNMENT WITNESSES

a. FBI Agent Megan Crawley

1. The government called Megan Crawley (hereinafter "Crawley"), an FBI Agent employed by the Honolulu field office. The undersigned question Megan Crawley as to the source of the complaints against the undersigned that generated this bogus complaint and indictment.

2. Crawley stated that she receive a call from a DFI investigator but could not remember the name of the investigator that called her and made the complaint.

3. The undersigned questioned Crawley regarding the names of the homeowners that the investigator stated made a complaint against the undersigned and again Crawley could not state or recall any names of the homeowners who made a complaint.

4. The undersigned questioned Crawley was there an incident report generated from the call Crawley alleges was made by the DFI investigator to Crawley regarding the complaints made by numerous consumers.

5. Crawley stated that she did not make a report of the alleged call from the DFI investigator.

6. The undersigned questioned Crawley whether the DFI mailed Crawley a complaint of any of the consumers and Crawley's answer was no.

7. The undersigned questioned Crawley whether the DFI emailed Crawley a copy of the complaint of any consumers and Crawley again answered no.

8. The undersigned questioned Crawley whether the DFI investigator faxed Crawley a copy of the complaint of any consumers and Crawley replied no.

9. The undersigned questioned Crawley and asked Crawley did any of the undersigned's clients call Crawley or Crawley's office and make a complaint against the undersigned and Crawley responded no.

10. The undersigned questioned Crawley and asked did any of the undersigned's clients email Crawley or her office and make a complaint and Crawley answered no.

11. The undersigned questioned Crawley and asked did any of the undersigned's clients visit Crawley's office and make a complaint and Crawley again answered no.

12. The undersigned questioned Crawley and asked Crawley did any of the undersigned's clients call Crawley to come to their home to make a complaint and Crawley answered no.

13. The undersigned questioned Crawley and asked Crawley did any of the clients homes that she visited state to Crawley that the undersigned scammed them or defrauded them and Crawley's answer was no not in those terms.

14. The undersigned questioned Crawley as to how the undersigned's clients made a complaint and Crawley couldn't state what the clients said that could be construed in terms comparable to them stating that they had been scammed or defrauded.

15. Crawley testified that she followed the undersigned to the airport and took a picture of the undersigned with his badge, handcuffs and ID on waiting to board his plane.

TRULINCS 05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------

16. Crawley further testified that the undersigned's badge, handcuffs and ID was fake.

17. The undersigned questioned Crawley and asked Crawley if the badge, ID and handcuffs were fake, why didn't Crawley arrest the undersigned for being in possession of a fake badge, ID and handcuffs and Crawley replied that she was only there for surveillance.

18. The undersigned questioned Crawley has the FBI ever charged the undersigned for carrying, possessing or presenting a fake ID and badge and Crawley answered no.

19. The undersigned questioned Crawley regarding the search warrant she obtained which included the offenses of bank fraud and money laundering and Crawley stated that she only does the investigation and that charges are brought by the US Attorney's office and not their office.

20. The undersigned questioned Crawley as to whether she found evidence of bank fraud and money laundering and Crawley avoided the question by repeating her previous answer that she is no responsible for bringing charges and that charges are brought by the US Attorney's office.

21. None of Crawley's testimony offered any sufficient proof of mail fraud or wire fraud that was committed by the undersigned.

22. Crawley presented no documented evidence of mail fraud or wire fraud.

23. Crawley's testimony was beneficial to the undersigned's innocence as her testimony revealed that no clients made a complaint against the undersigned and that her office NEVER received any complaints from the DCCA or clients regarding the undersigned committing fraud against them.

24. Crawley's testimony was extremely damaging to the government's case and proved that the government in fact had no legal basis to file these bogus charges against the undersigned.

b. FBI Agent Bryce Oleski

25. The government called FBI Agent Bryce Oleski (hereinafter "Oleski") from the Washington, D.C. office to offer testimony against the undersigned.

26. Oleski testified that he investigated the undersigned's office in Washington, D.C. and stated that the address used in the undersigned's mortgage was not an address that was used by the undersigned to make it appear that the undersigned had a bogus address on the mortgage document.

27. Oleski testified that he interviewed the owner of the office space that was the address on the undersigned's mortgage document and that the owner Dorita Dixon (hereinafter "Dixon") stated that she didn't know no person named Anthony Williams and never had any contact with a person named Anthony Williams.

28. Upon cross examination the undersigned questioned Oleski regarding his statement that Dixon stated that she didn't know the undersigned and Oleski confirmed that this is what Dixon had told her.

29. The undersigned called for the government's exhibit ___ and questioned Oleski regarding the exhibit.

30. The undersigned questioned Oleski does he recognize the type of document that was put before him and Oleski testified that it was a money gram.

31. The undersigned questioned Oleski whose name was listed as the sender and Oleski answered Anthony Williams.

32. The undersigned questioned Oleski whose name was listed as the recipient and Oleski answered Dorita Dixon.

33. The undersigned questioned Oleski what city and state did Dixon receive the money gram at and Oleski answered Washington, D.C.

34. The undersigned questioned Oleski what was the phone number listed as the recipient's phone number and Oleski answered (202)xxx-xxxx.

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------------------------

35. The undersigned questioned Oleski was 202 a normal prefix for the Washington, D.C. area and Oleski answered yes.

36. The undersigned then questioned Oleski as to the significance of the money gram receipt and asked Oleski does that prove that Dixon does actually know the undersigned and Oleski testified that someone could have presented fake ID and could have been someone other than Dixon.

37. The undersigned then questioned Oleski has he ever sent a money gram and Oleski answered no.

38. The undersigned then questioned Oleski has he ever sent money via western union and he answered yes.

39. The undersigned then questioned Oleski whether he understood that in order to send or receive funds via money gram or western union that one would have to present VALID identification in order to make those transactions and Oleski testified yes.

40. The undersigned then questioned Oleski as to whether he understood that the address was just a mailing address and not the actual physical location of the office and Oleski stated no.

41. The undersigned then questioned Oleski was it against the law to have a different mailing address than your actual business location address and Oleski answered no.

42. The undersigned then questioned Oleski as to whether he knew that one could get a physical mailing address from UPS to have packages sent but the address not be the physical location of your office and Oleski testified that he didn't know that UPS had provided any type of service of that nature.

43. The undersigned then questioned Oleski did his investigation reveal that the undersigned has P.O. Boxes as mailing addresses for his offices in the other states and not the physical address and he answered no.

44. The undersigned then questioned Oleski did he locate the physical address in Washington, D.C. and interview any of the undersigned's employees and Oleski answered no.

45. The government on redirect questioned Oleski was it possible that Dixon lied to him about not knowing the undersigned and Oleski answered yes.

46. Oleski's testimony did not offer any sufficient proof of any of the offenses alleged in the indictment neither did Oleski's testimony even allege that the undersigned had committed a federal crime.

47. Oleski's testimony was damaging to the government's position and beneficial in proving the undersigned's innocence.

c. FBI Agent Joseph Lavelle

48. The government called Joseph Lavelle (hereinafter "Lavelle"), a FBI Agent employed by the Miami, Florida field office and questioned Lavelle regarding the undersigned's office and business dealings in the State of Florida.

49. The government questioned Lavelle regarding the arrest of the undersigned at the Fort Lauderdale airport when the undersigned arrived from Hawaii and Lavelle stated he was present during the arrest but did not participate in the arrest.

50. The government questioned Lavelle regarding the undersigned's badge, ID and handcuffs that the undersigned was wearing when the undersigned deboarded the plane and was arrested.

51. Lavelle testified that the undersigned's badge, handcuffs and ID was confiscated by the Broward Sheriff's office.

52. Lavelle testified that in his opinion that the undersigned's badge, ID and handcuffs were fake and not legitimate.

53. On cross examination the undersigned questioned Lavelle as to whether the undersigned was charged by the FBI with carrying, possessing or presenting a fake badge or ID and Lavelle answered no.

54. The undersigned questioned Lavelle as to why if the badge and ID was fake, why did his FBI office allow the undersigned entrance to their building on multiple occasions with the same ID and badge and Lavelle answered that the agents who allowed the undersigned entrance didn't know that the ID and badge was fake.

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

-------------------------------------------------------------------------------------------

55. The undersigned then questioned Lavelle that isn't it FBI protocol and policy to VERIFY all identification presented before one is granted entrance into their federal building and Lavelle answered yes.

56. The undersigned then questioned Lavelle how is it that if the undersigned has been granted entrance into multiple FBI offices in multiple states with this ID and badge, then the ID and badge is valid and not fake and Lavelle answered he still felt the ID and badge was fake.

57. The undersigned then questioned Lavelle as to what the FBI had the undersigned under investigation for in Florida and Lavelle answered for Mortgage Fraud, Bank Fraud and Money Laundering.

58. The undersigned then questioned Lavelle did his office decline prosecution and Lavelle stated yes his office declined prosecution.

59. The undersigned then showed Lavelle the government's exhibit which was a FBI report from a supervisor stating that their office had declined prosecution.

60. The undersigned questioned Lavelle did he recognized this supervisor and Lavelle affirmed.

61. The undersigned questioned Lavelle as to whether this was his direct supervisor and Lavelle denied this was his direct supervisor but was the supervisor over the mortgage fraud unit.

62. The undersigned then questioned Lavelle did he investigate that the undersigned had offices in multiple states and Lavelle confirmed that he did investigate and verify that the undersigned had offices in several other states.

63. The undersigned then questioned Lavelle did he coordinate with other FBI offices to investigate the undersigned in other states and Lavelle affirmed.

64. The undersigned then questioned Lavelle as to whether any of the other FBI offices ever filed any charges against the undersigned in any of the other states and Lavelle answered no.

65. The undersigned then questioned Lavelle as to whether he knew that the undersigned had Caucasian and Asian employees in other states and Lavelle answered yes.

66. The undersigned then questioned Lavelle whether they investigated, arrested or charged any of the undersigned's white or Asian employees in any of the other states for running the same business and Lavelle answered no.

67. The undersigned questioned Lavelle as to whether any of the clients in Florida made a complaint against the undersigned and Lavelle answered no.

68. Lavelle's testimony did not offer any sufficient proof of any of the offenses alleged in the indictment neither did Lave

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

------------------------------------------------------------------------------------------------------

FROM: 05963122
TO:
SUBJECT: ACQUITTAL MOTION PAGE 2
DATE: 02/17/2020 09:20:52 AM

68. Lavelle stated that the basis of the FBI putting the undersigned under investigation was because of a statement that the undersigned made at a seminar in Ventura, California wherein the undersigned quoted multiple U.S. Supreme Court cases that stated if an officer tries to illegally and unlawfully arrest a citizen that the citizen has the right to resist that arrest even up to the point of taking that arresting officers life.

69. Lavelle stated that the business conduct of the undersigned was not the reason that the undersigned was placed under investigation.

70. The undersigned questioned Lavelle as to whether the FBI had the undersigned on the terrorist watch list and Lavelle confirmed that they did.

71. The undersigned then questioned Lavelle as to why the undersigned was placed on the terrorist watch list and Lavelle's response was because of what the undersigned stated at the seminar.

72. The undersigned questioned Lavelle as to whether the undersigned has any violence or violent charges in his FBI file and Lavelle confirmed that there was not.

73. The undersigned questioned Lavelle as to how the undersigned would be deemed a possible terrorist when the undersigned does not have a violent history and Lavelle stated that it was strictly because of the statement made at the seminar in Ventura California.

74. The undersigned presented the government's exhibit which showed parts of the FBI profile of the undersigned and Lavelle confirmed that it was a report that the FBI relies on when identifying subjects.

75. Lavelle verified that the undersigned was on the DO NOT DETAIN DO NOT ARREST list and verified that the statement and number that is on the undersigned's PAG ID is the same that is in the report.

76. The undersigned then questioned Lavelle did he call the Nashville Police department to ask why they were the ones who told the undersigned how to obtain his Sovereign Peace Officer (SPO) badge and Lavelle answered no.

77. The undersigned questioned Lavelle whether he called the law enforcement agency that created the  SPO badge and sent it to me and Lavelle answered no.

78. The undersigned questioned Lavelle did Broward County Sheriff's office charge the undersign with impersonating a police officer, carrying a fake badge, ID and handcuffs and Lavelle answered no.

79. The undersigned questioned Lavelle was it a crime for a citizen to have and carry their own handcuffs and Lavelle stated he didn't know of any law against it.

80. Lavelle's testimony did not offer any sufficient proof of any of the offenses alleged in the indictment neither did Lavelle's testimony allege that any federal crime had been committed.

81. Lavelle's testimony like the other two FBI agents that was solicited by the government predominantly focused on the Private Attorney General Identification Card, badge and handcuffs of the undersigned and how in their opinion they were fake ID's and badges and not authorized to be possessed by the undersigned despite the fact that neither agent from any office ever filed any charges for having a fake ID or badge and neither is the ID or badge listed as one of the counts in the indictment neither is the ID or badge even mentioned in the indictment, yet the government chose to focus so much time on trying to discredit the validity of the ID and badge which has absolutely nothing to do with the offenses charged in the indictment.

82. The solicitation of the erroneous opinions of FBI agents by the government attorneys was done to confuse the jury and the issues and is the exemplification of the definition of a what pettifoggers are and those who engage in pettifoggery.

D. FBI Agent Klevansky

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------------------------------------

83. The government called Agent Klevansky who is suppose to be an alleged expert in the mortgage industry, the Uniform Commercial Code (hereinafter "UCC") and how the mortgage industry work.

84. Before Klevansky could testify the undersigned had to question Klevansky to confirm that in fact he is an expert in the field he was testifying to.

85. The undersigned questioned Klevansky as to what does UCC 1-103.6 states and Klevansky did not know.

86. The undersigned questioned Klevansky as to what does UCC 1-308 states and Klevansky again did not know.

87. The undersigned questioned Klevansky as to what does UCC 9-311 states and Klevansky again stated he didn't know.

88. The undersigned then questioned Klevansky as to what section of the UCC dealt with negotiable instruments and Klevansky stated that he would have to have the code in front of him to search.

89. The undersigned then questioned Klevansky regarding the bankruptcy of the United States that took place in 1933 and Klevansky answered that he didn't have any knowledge that the U.S. had ever declared bankruptcy.

90. Based upon Klevansky's inability to answer simple questions that even a novice would know, the undersigned moved the court to strike Klevansky as an expert witness and that he could only testify as a lay witness.

91. The court disregarded Klevansky's obvious lack of knowledge and expertise in the field he was testifying in and deemed him an expert.

92. The government questioned Klevansky regarding the requirement in order to practice law as it is understood by him and other members of the bar and Klevansky testified that one would have to go to law school, pass the bar examination and then be admitted to practice by the Supreme Court in order to practice law.

93. Upon cross examination the undersigned questioned Klevansky as to whether he knew what the First Judiciary Act of 1789 section 35 stated and Klevansky stated that he didn't know.

94. The undersigned questioned Klevansky as to whether he has read any of the U.S. Supreme Court rulings that state laymen can assist others in court without being members of the bar association and without being charged with the unauthorized practice of law and Klevansky stated that he has never heard nor researched those cases.

95. The undersigned questioned Klevansky that if he had never researched or ever heard of those cases how could he determine that someone could not assist others in court without being a member of the bar and Klevansky stated that he only knew that in order to practice law one would have to be a member of the bar.

96. Klevansky's testimony solicited by the government was unremarkable and quite tedious which at times during his testimony several jurors were falling asleep because of the monotone of Klevansky's voice.

97. Klevansky testified to the normal routine of how mortgages are executed by mortgage companies and the practice of the industry and that the undersigned's mortgage and language he didn't recognize and deemed it to be fraudulent and that the UCC's filed had no legal effect.

98. Upon cross examination the undersigned questioned Klevansky as to whether he knew of ANY law that a homeowner couldn't file a UCC lien on their own property with them being the secured party creditor and Klevansky answered no he is not aware of any law.

99. The undersigned then questioned Klevansky as to whether he knew of ANY law that a homeowner couldn't file a mortgage on their own property with them being the beneficiary and secured party creditor and Klevansky answered no he is not aware of any law.

100. The undersigned questioned Klevansky as to whether he had ever seen a promissory note with the words stamped on it "PAY TO THE ORDER OF" to the bank and Klevansky stated he had never seen one.

101. The undersigned called for one of the government's exhibits and showed Klevansky a promissory note with the "PAY TO THE ORDER OF" stamp on it and Klevansky stated he had never seen the stamp on the note.

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------

102. Klevansky's explanation was that the stamp was merely as assignment by the bank to another bank but when the undersigned brought it to Klevansky's attention that the stamp was paid to the order of the bank that issued the note, Klevansky had no explanation for this.

103. The undersigned questioned Klevansky how long is a normal residential mortgage term and Klevansky stated normally 30 years and in a few cases 15 years.

104. The undersigned questioned Klevansky had he ever seen a mortgage taken out and satisfied and released in 1 month, 3 months, 6 months, 1 year, 3 years or 5 years and Klevansky stated that he had never seen a mortgage paid off or satisfied in the short amount of time.

105. Klevansky's testimony did not offer any sufficient proof of any of the alleged offenses in the indictment neither did Klevansky's testimony allege that any federal crime had been committed or that he had any first hand knowledge of any of the events alleged in the indictment.

106. Klevansky's whole testimony was filled with his own opinions not supported by law or facts and fell far short of presenting anything that could be construed as evidence that the undersigned had committed a federal offense. Klevansky's testimony was solicited for the sole purpose of the government to confuse the jury with issues not relevant to the charges in the indictment and to assert the government's position that one needs to be a member of the bar to practice law.

107. The undersigned is not being charged with the unlicensed practice of law (UPL) and the UPL is not a charge in the indictment because it is not a federal offense but a state offense and civil in nature.

e. OCP Employee Bump

108. The government called an employee of the Office of Consumer Protection (OCP) Bump and questioned Bump regarding the licensing of businesses in Hawaii with their office.

109. Bump testified that in order to be a mortgage loan originator or servicer, one who have to obtain a license through their office and that the undersigned's business Mortgage Enterprise Investments (MEI) did not possess such a license.

110. On cross examination the undersigned questioned Bump regarding the definitions in the Hawaii Revised Statutes regarding what a mortgage loan originator is or servicer and that was there any language in the statute that identified mortgage and foreclosure assistance and Bump testified that it did not.

111. The undersigned questioned Bump whether there was a statute for mortgage and foreclosure assistance and Bump replied that there was not.

112. The undersigned questioned Bump regarding the email communication that the undersigned had with the OCP before the undersigned registered his business and Bump stated that they weren't the one that the undersigned corresponded with.

113. Bump went on to testify that mortgage loan originators or companies that loan money must be licensed under the mortgage servicing statute.

114. The undersigned showed that there was no statute that governed mortgage and foreclosure assistance that would have mandated the undersigned to obtain a license for because there is no license for what the undersigned's company does.

115. Bump did not offer any sufficient proof of any of the alleged offenses in the indictment neither did Bump's testimony allege that a federal crime had been committed.

116. The undersigned is not being charged with having an unlicensed mortgage company which is a state offense under the Hawaii Revised Statute but the undersigned is being charged two federal offenses of mail and wire fraud.

117. Nothing in Bump's testimony offered any proof or evidence of the counts charged in the indictment and therefore Bump's testimony was damaging to the government's position but was beneficial to the defense in that no federal crime had been committed and Bump's testimony did not provide any evidence to the contrary.

f. HAWAII STATE BAR ASSOCIATION EMPLOYEE MAU-SHIMIZU

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------------------------

118.  The government called an employee of the Hawaii State Bar Association Ms. Mau-Shimizu (hereinafter "Mau") and Mau testified that the undersigned was not listed as an active member of the bar association with a license to practice law.

119.  Mau testified that the actions of the undersigned would constitute the unlicensed practice of law.

120. Upon cross examination the undersigned questioned Mau if she took Constitutional law in law school and Mau said yes about 40 years ago.

121. The undersigned questioned Mau as to whether Mau had an oath of office to uphold the U.S. Constitution and Mau affirmed.

122. The undersigned questioned Mau as to what does Article VI in the constitution state and Mau did not know what Article VI of the constitution stated.

123. The undersigned questioned Mau as to how she could uphold something that she didn't know and Mau responded that its been 40 years since she studied the constitution in law school.

124. The undersigned questioned Mau whether attorneys have to have continuous education and Mau stated that it was not required.

125. The undersigned questioned Mau whether there was a provision in the constitution that created the bar and Mau replied no.

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------

FROM: 05963122
TO:
SUBJECT: ACQUITTAL MOTION PART 3
DATE: 02/17/2020 09:20:17 AM

126. The undersigned questioned Mau whether there was an article, amendment or provision in the constitution that prevented anyone who was not a member of the bar from assisting others in court and Mau replied no.

127. The undersigned questioned Mau whether she was familiar with the First Judiciary Act of 1789 section 35 and Mau stated she was not familiar.

128. The undersigned questioned Mau whether she was familiar with the U.S. Supreme Court rulings which stated that laymen can assist others in court without being members of the bar and without being charged with unauthorized practice of law.

129. The undersigned questioned Mau that if she researched those cases and found out those cases stated such would she agree with the U.S. Supreme Court rulings and Mau replied yes.

130. The undersigned questioned Mau was there any provision in the constitution that even mentions the word attorney at law and Mau confirmed that there is not.

131. The undersigned questioned Mau whether the HSBA was a state governmental agency and Mau confirmed that it was not but was a professional non-profit organization.

132. The undersigned questioned Mau as to whether the HSBA was a PRIVATE CORPORATION and Mau gave the same answer that it was a professional non-profit organization.

133. The undersigned questioned Mau again the same question and notified Mau that it is a yes or no question and Kobayashi interjected and stated that Mau already answered the question when she did not because the undersigned asked a YES or NO question and the court prevented Mau from properly answering the question.

134. The undersigned begin to further question Mau when Kobayashi intervened again and stated that the undersigned could not question Mau with the line of questioning that the undersigned began to question Mau with.

130. The government solicited Mau's testimony for the sole purpose to present their narrative of the undersigned not being a member of the bar association and therefore not authorized to help clients with their foreclosures according to their own erroneous concept.

131. Nothing in Mau's testimony offered any evidence or sufficient proof of any of the alleged offenses in the indictment neither did Mau's testimony alleged that a federal crime had been committed.

132. Mau's testimony was irrelevant and immaterial to the charges in the indictment as the undersigned is not being charged with the unlicensed practice of law and none of the counts in the indictment have anything to do with practicing law without being a member of the bar association.

g. CENTRAL PACIFIC BANK EXECUTIVE MR. STANFORD

133. The government called an Executive from Central Pacific Bank (CPB) , Mr. Stanford (hereinafter "Stanford") who is allegedly an official of CPB that issued the alleged loan to one of the undersigned's client.

133. Stanford testified that the undersigned's client was current on their payment when they met the undersigned and that after meeting the undersigned the payments to CPB stopped.

134. Stanford testified that CPB loan the undersigned's client $520,000 and was evidence by a mortgage and note signed by the undersigned's client.

135. Stanford testified that the undersigned sent a letter to CPB's attorneys on behalf of the client but that the attorney's ignored the undersigned's letter because the undersigned wasn't a member of the bar.

136. Upon cross examination the undersigned questioned Stanford as to whether he understood the legal rights of a power of

TRULINCS 05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

----------------------------------------------------------------------------------------------------

attorney according to Hawaii Revised Statute 551D and Stanford stated that he understood the power of attorney.

137. The undersigned then questioned Stanford why that the power of attorney was not honored by the bank attorneys according to the law and his response was that they only recognize licensed attorneys which is contrary to the Power of Attorney statute.

138. The undersigned then questioned Stanford regarding his statement that CPB loaned the undersigned's client $520,000.

139. The undersigned then questioned Stanford if he personally saw that check for $520,000 that was allegedly used to finance the loan to pay for the house and Stanford replied no.

140. The undersigned questioned Stanford if he personally saw a money order for $520,000 and he replied no.

141. The undersigned questioned Stanford if he personally saw a cashiers check for $520,000 and he again replied no.

142. The undersigned questioned Stanford if he could provide the bank statement and ledger from CPB that shows they deducted and debited $520,000 on the date of the alleged loan to the undersigned's client and Stanford replied no.

143. After this line of questioning Kobayashi intervened and prevented the undersigned from further embarrassing the bank representative and exposing their fraud that they never loan anyone a dime but use the homeowner's signature on the note to create the funds to finance the loan.

144. The testimony of Stanford did not provide any evidence or sufficient proof of the alleged offenses in the indictment neither did Stanford's testimony allege that a federal crime had been committed.

145. Stanford's testimony was irrelevant and immaterial to the charges in the indictment as the undersigned is not being charged with bank fraud, money laundering or mortgage fraud and none of the counts in the indictment have anything to do with the way a client mortgage was drafted and filed by the undersigned in order to protect their home from foreclosure and fraudulent deceptive practices of the bank.

h. FBI ANALYST L. OTSUKA

146. The government called an employee of the FBI L. Otsuka (hereinafter "Otsuka") who was the analyzer of the undersigned's bank accounts.

147. Otsuka testified that she analyzed approximately four (4) business bank accounts of the undersigned and testified that she did a summary that showed how many checks with through those accounts and how much cash went through those accounts.

148. Otsuka testified that all the accounts she analyze that dealt with Hawaii clients had approximately $218,000 and that only $25,000 was cash but wasn't reflected in her summary.

149. On cross examination the undersigned questioned Otsuka as to whether her analization revealed that anything in the bank accounts were fraudulent or constituted a crime.

150. Otsuka testified that he job was not to determine whether there was anything fraudulent about the accounts but was to just analyze the amount of transactions that went through the accounts, the amount of money and the amount of clients.

151. The testimony of Otsuka did not provide any evidence or sufficient proof of the alleged offenses in the indictment neither did Otsuka's testimony allege that a federal crime had been committed.

152. Otsuka's testimony was irrelevant and immaterial to the charges in the indictment as the undersigned is not being charged with bank fraud or money laundering and none of the counts in the indictment have anything to do with the undersigned's transactions in his business bank account.

II. THE ALLEGED VICTIMS AND FORMER EMPLOYEES

153. The government called eight (8) former clients of the undersigned and two former employees and asserted that the undersigned defrauded homeowners out of their money with no services rendered.

TRULINCS 05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------------------------

a. JULITA ASUNCION

154. The government called Julita Asuncion (hereinafter "Asuncion") to the stand and questioned her regarding her interactions with the undersigned.

155. The government questioned Asuncion whether she saw the ID, badge and handcuffs of the undersigned and did that make her feel more inclined to trust in the undersigned and Asuncion stated that it did.

156. The government questioned Asuncion whether if she had known that the undersigned was not a member of the bar would she have signed up with the MEI program and Asuncion stated no.

157. The government presented the MEI application, mortgage and note and asked Asuncion if she recognized those documents and she confirmed that she did.

158. The government asked Asuncion if the undersigned did anything for her and Asuncion stated that the undersigned didn't do anything for her.

159. On cross examination the undersigned questioned Asuncion about the MEI application particularly the Foreclosure Disclosure which specifically states that the guarantee is NOT for any clients who are in foreclosure or facing foreclosure and that the undersigned's Common Law Office of America would do the best of their ability to protect their home.

160. Asuncion verified her signature on the Foreclosure Disclosure page and KNEW the terms and conditions of the contract.

161. Asuncion verified that she didn't make a payment for over a year because her paperwork wasn't properly completed because the undersigned was unlawfully incarcerated from September 13, 2013 to June 27, 2014.

162. After the undersigned won his case and returned to Hawaii the undersigned continued to execute his fiduciary duties to Asuncion until the undersigned was again unlawfully incarcerated.

163. The undersigned questioned Asuncion did she make a complaint to the FBI against the undersigned and she replied no.

164. The undersigned questioned Asuncion did she make a complaint to the DCCA or OCP against the undersigned and she again replied no.

165. The undersigned questioned Asuncion did she request a refund if she was not satisfied with the services of the undersigned and she again replied no.

166. The undersigned questioned Asuncion did she call FBI Agent Megan Crawley to come to her home to make a complaint against the undersigned and she replied no.

167. The undersigned questioned Asuncion did she make a complaint to the FBI or DCCA that the undersigned committed mail or wire fraud against her or that the undersigned scammed or defrauded her and her answer was no.

168. The testimony of Asuncion did not provide any evidence or sufficient proof of the alleged offenses in the indictment neither did Asuncion's testimony allege that a federal crime had been committed.

169. The government's attorney focused most of their questioning of Asuncion regarding the PAG ID card, SPO badge and handcuffs and that the undersigned is not a member of the bar licensed to practice law in the State of Hawaii.

170. The undersigned is not being charged with unlicensed practice of law or impersonating a federal officer and therefore the testimony that the government solicited from Asuncion is irrelevant, immaterial to the charges in the indictment and nowhere in Asuncion's testimony did the government reveal how and in what manner, shape or form that the undersigned committed mail and wire fraud against Asuncion.

171. Not one of the statements solicited by the government from Asuncion identified what the undersigned said to Asuncion through the use of the wire or mail that was false, fraudulent or a misrepresentation.

b. LOREEN TROXEL

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------------------------------

172. The government called Loreen Troxel (hereinafter "Troxel") who testified that the undersigned did absolutely nothing for her and that she only met the undersigned one time in 2013.

173. Troxel seem to be coached to make the statements that she made because she kept looking at the prosecutors table before and after she would give an answer.

174. Troxel said that after 2013 she had no more contact or dealings with the undersigned.

175. The undersigned submitted numerous exhibits to show that Troxel was lying and that Troxel used the undersigned's services in 2015.

176. The government used their same line of questioning with Troxel as they did with Asuncion and focused on the undersigned's PAG ID card, SPO badge and handcuffs and asked Troxel if she knew that the undersigned was not a member of the bar and not a "real attorney" would she have used the undersigned's services and Troxel replied no.

177. Upon cross examination the undersigned questioned Troxel if she remembered that the undersigned was unlawfully incarcerated by the FBI, State of Hawaii and State of Georgia in September 2013 and Troxel stated she couldn't recall.

178. The undersigned showed Troxel several exhibits that Troxel identified as documents drafted by the undersigned to help fight Troxel's foreclosure.

179. Troxel admitted that Edna Franco had scammed her and that the undersigned  had to take over the litigation and sue Deutsche Bank for using fraudulent documents created by robo-signers to unlawfully foreclosure on Troxel's home.

180. Troxel stated that the undersigned did not explain the program to her at which time the undersigned questioned Troxel if she remembered about what time she came to the undersigned's office.

181. Troxel remembered coming to the undersigned's office after 8 pm and remembered staying approximately 4 to 5 hours.

TRULINCS 05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

-------------------------------------------------------------------------------------------------

FROM: 05963122
TO:
SUBJECT: ACQUITTAL MOTION PART 4
DATE: 02/17/2020 09:17:23 AM

182. The undersigned asked Troxel what she and the undersigned were doing for 4 to 5 hours at the undersigned's office and Troxel then admitted that she had a lot of questions and that the undersigned had to answer all of her questions and then the undersigned questioned Troxel that if the undersigned answered all of her questions then the undersigned did in fact explain the program to Troxel in which Troxel agreed.

183. Troxel's testimony did not offer any sufficient proof of any of the offenses alleged in the indictment neither did Troxel's testimony allege that any federal crime had been committed against her.

184. Troxel's testimony was irrelevant and immaterial to the charges in the indictment as the undersigned is not being charged with having a ID, badge and handcuffs that the government deem is fake (which they are not) and not being charged with unlicensed practice of law as none of the counts in the indictment have anything to do with practicing law without a license or carrying non-governmental ID's, badges and handcuffs.

c. MARY JEAN CASTILLO

185. The government called Mary Jean Castillo (hereinafter "MJ") who was a former client and employee of the undersigned and who was the subject of two of the counts in the indictment for wire fraud for sending two money grams to the undersigned's mother but wasn't charged with the fraud although the undersigned's mother was.

186. MJ testified that the undersigned showed her documented proof that the program worked for clients in the mainland and the reason that she decided to work for the undersigned.

187. MJ testified that she remembered when the undersigned was unlawfully incarcerated and had to keep the undersigned's son for a little while until the undersigned's son could be sent back to his mother in the mainland.

188. MJ testified that she created documents to help streamline the process and testified of the numerous documents that had to be sent to various governmental agencies.

189. MJ testified that when she questioned the undersigned why he sent copies of everything he did to the Dept. of Justice and the FBI that the undersigned told her because the undersigned didn't have nothing to hide.

190. After the government questioned MJ whether she was more prone to believe the undersigned because of the ID, badge and handcuffs, the undersigned asked MJ was the undersigned a man of integrity and MJ said yes.

191. The undersigned questioned MJ was the undersigned a man of high moral character and MJ stated yes.

192. The undersigned questioned MJ was the undersigned a very spiritual man and believed in the principles of the bible and MJ answered yes.

193. The undersigned questioned MJ whether she thought that the undersigned was a fraud and was scamming people and MJ replied no.

194. The funds that MJ sent to the undersigned's mother was lawfully money obtained from the services rendered by the undersigned to numerous clients in Hawaii and there was nothing fraudulent or illegal about those funds.

195. The undersigned was not charged with bank fraud or money laundering and therefore the funds were not the subject of any of the alleged counts in the indictment and therefore could not constitute wire fraud.

196. Sending money via money gram is not a federal crime and therefore there was crime committed there when MJ sent the money to the undersigned's mother.

197. MJ's testimony vindicated the undersigned as being a man of high integrity, honesty, moral character and spiritual principles and not the type of man that would defraud innocent people out of their hard earned money.

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

-----------------------------------------------------------------------------------------------------

198. MJ verified that all employees had to sign an Attorney in fact Acceptance form that she signed which stated that they would always act with integrity and not defraud Common Law Office of America (CLOA) or the American people.

199. Nothing in MJ's testimony offered any evidence or sufficient proof of the offenses alleged in the indictment neither did MJ's testimony allege that a federal offense had been committed but that the undersigned is a man of integrity and a man that fight for the rights of the people.

d. MELVYN VENTURA

200. The government called Melvyn Ventura who is the subject of 16 of the counts the undersigned is being charged with in the indictment.

201. The government intimidated Ventura into changing his position about what he felt about the banks when they intimidated Ventura into meeting them and the FBI at the U.S. Attorneys office.

202. Before the intimidation by the government Ventura was adamant about the government corruption and corruption of the banks but after meeting with the prosecutors and FBI Ventura stated he felt guilty and that he signed his name on the mortgage and that he had to pay it back.

203.The government questioned Ventura in the same manner they questioned the other clients focusing on the ID, badge and handcuffs of the undersigned and the fact that the undersigned is not a member of the bar association and that the undersigned was not authorized to assist him in fighting his foreclosure.

204. Upon cross examination the undersigned produced several affidavits signed by Ventura which stated that the undersigned did not commit any crime against him and that the charges brought against the undersigned was retaliation against the undersigned for exposing the corruption of the government and the banks.

205. The government objected to these affidavits being entered in as evidence but Kobayashi correctly overruled their objection and allowed the affidavits to come into evidence.

206. The undersigned question Ventura as to the motions that the undersigned would file on his behalf and Ventura verified that the motions were effective and that the bank attorneys could never answer the motions that the undersigned filed.

207. Despite the government's attempt to slander the undersigned and make the undersigned look like a bad person, the undersigned asked Ventura did he feel the undersigned was a good man and Ventura answered yes.

208. The undersigned asked Ventura was the undersigned a man of integrity and Ventura answered yes.

209. The undersigned asked Ventura was the undersigned a man of faith and spiritual principles and Ventura answered yes.

210.The undersigned asked Ventura did he trust the undersigned and Ventura again answered yes.

211. The affidavit that Ventura gave stated that none of the payments were fraudulent that were sent to the undersigned and that the payments were for the undersigned fighting his foreclosure and keeping him in his home.

212. The Affidavit also stated that there was nothing fraudulent about the email communications between the undersigned and Ventura.

213. Sixteen (16) of the mail and wire fraud counts deal specifically with Ventura who has already provided multiple affidavits stating that he was never lied to nor defrauded yet the government maintains that the undersigned defrauded this client when this client has given several sworn statements that the undersigned did nothing wrong to him but has done a great service to him and others.

214. Ventura's testimony directly contradicts and contravenes the contents of the indictment and dispute the assertion of the government that the undersigned committed mail and wire fraud against Ventura.

215. Ventura's testimony establishes and verifies the undersigned's innocence and shows that the undersigned always acted with honesty and integrity and never did anything to defraud or deceive any clients.

TRULINCS 05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

---------------------------------------------------------------------------------------------------

216. Based on Ventura's testimony the 16 counts dealing with Ventura must be dismissed because Ventura himself swore that the undersigned committed no crime against him and put it in an affidavit form and then testified in court that the undersigned is a man of integrity, honesty and high moral character which is the opposite of what the government is alleging.

e. EVELYN SUBIA

217. The government called Evelyn Subia (hereinafter "Subia") who was a client of the undersigned.

218. Subia came to court and had an interpreter as if she couldn't speak or understand English.

219. Subia did not have to have an interpreter when she came to the undersigned's office and signed up for the services of the undersigned.

220. Subia stated she had a mortgage with American Servicing Company and that she wasn't in foreclosure when she met the undersigned.

221. The undersigned presented an exhibit which showed that Subia had been in default since 2011 and therefore was already in foreclosure when she applied for the services of the undersigned.

222. Kobayashi interjected and argued with the undersigned and stated that Subia being in default didn't mean that she was in foreclosure which was improper for a judge to interject and make statements that were not true.

223. The undersigned then questioned Subia did she pay the over $8,800 that she was in default at the time of the default letter to prevent from going into foreclosure and Subia verified that she had not paid the default and therefore went into foreclosure.

224. The undersigned then questioned Subia does she go to church and Subia replied through the interpreter yes.

225. The undersigned then questioned Subia was the church a Filipino church and Subia answered through the interpreter that it is an English church.

226. The undersigned questioned Subia did she and her husband sign the application along with the undersigned and she answered yes.

227. The undersigned showed Subia an exhibit of the Foreclosure Disclosure that she and her husband signed which stated they didn't qualify for the guarantee because they were in Foreclosure but that the undersigned and CLOA would do the best of our ability to fight their foreclosure and keep them in their home.

228. The undersigned questioned Subia about how many payments they made to MEI and Subia stated about 4 or 5 payments.

229. The undersigned questioned Subia did she remember that the undersigned was unlawfully incarcerated in September 2013 and could no longer assist Subia and Subia stated she couldn't remember.

230. The undersigned showed Subia a letter sent to Subia from MEI stating that MEI was sending back Subia's December and January payments because the undersigned was incarcerated and couldn't fulfill his fiduciary duties and Subia stated that she remembered the letter and the letter was entered in as evidence.

231. The undersigned also showed Subia a copy of the check that was sent back to Subia and was never deposited into MEI's account because the undersigned instructed his mother to send back all payments that were being mailed in and to refund any and all payments to clients who requests a refund.

232. The undersigned has a copy of the undersigned's business account to show that the check was never deposited into the account of MEI but was in fact sent back to Subia.

233. The undersigned presented numerous exhibits of the work the undersigned had done for Subia after the undersigned won his case and was released from jail.

234. Four of the mail fraud counts were payments sent but Subia for foreclosure assistance and does not constitute mail fraud.

235. As with the other clients the government focused on the ID, badge and handcuffs of the undersigned and the fact that the

TRULINCS 05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------------------------

undersigned is not a bar member but did not outline how and why the mailed payments constitute fraud for services rendered.

236. The Subia's are still in their home because of the work done by the undersigned.

237. Subia's testimony did not offer any evidence or sufficient proof of the alleged offenses in the indictment neither did Subia's testimony allege any federal crime was committed.

f. MACRINA PILLOS

238. The government called Macrina Pillos (hereinafter "Pillos") who was the victim of Henry Malinay and Anabel Cabebe.

239. The government solicited the same testimony from Pillos as they did the other witnesses by focusing on the undersigned's ID, badge and handcuffs and that the undersigned is not a member of the bar.

240. Pillos put on a performance worthy of an Oscar or an Academy Award by crying crocodile tears to play on the sympathy of the jury. Yet outside the presence of the jury Pillos was smiling and nodding at the prosecutors as to seek their approval for her performance.

241. Pillos testified that she met Anabel Cabebe (hereinafter "Cabebe") in Maui and paid Cabebe $1500 cash without receiving a receipt.

242. The undersigned questioned Pillos as to why she didn't receive a receipt and she replied that Cabebe stated she couldn't give her a receipt.

243. Pillos stated that Cabebe stated that she still worked for the undersigned.

244. Pillos stated that Cabebe prepared and filed her UCC on November 4-2013 while the undersigned was incarcerated at Oahu Community Correctional Center awaiting extradition to Georgia.

TRULINCS 05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

----------------------------------------------------------------------------------------------

FROM: 05963122
TO:
SUBJECT: ACQUITTAL MOTION PART 5
DATE: 02/17/2020 09:16:29 AM

245. Pillos testified that Cabebe and Malinay told her to not put any dates on the applications that she signed.

246. Pillos testified that Cabebe stated that she would relay any message she had to the undersigned.

247. The undersigned presented government exhibit 807 which was an application filled out be Pillos given to her by Cabebe with Pillos signature but no signature for Cabebe or any representative.

248. The undersigned questioned Pillos about the DCCA letter that she received on May 7, 2015 and Pillos confirmed that she remembered the letter.

249. The undersigned questioned Pillos that if she thought the service was a scam why did she have the mortgage filed almost a month after she was contacted that the service Cabebe was offering was a scam and Pillos stated that she trusted Cabebe to help her.

250. The undersigned questioned Pillos as to why she never called the undersigned if she had doubts or questions and Pillos stated that she didn't have the undersigned's number and that Cabebe stated that she would relay all messages to the undersigned.

251. The undersigned brought Pillos attention to the cover page of the MEI application wherein every customer must sign and above the signature is the toll free number and extension of the undersigned and Pillos verified her signature on the document.

252. The undersigned questioned Pillos as to why she never called the undersigned to get clarity if she had any doubt and Pillos stated she don't remember the number being on the page that she signed.

253. The undersigned questioned Pillos if she learned to speak, write and read English in school in the Philippians and Pillos confirmed that she did.

254. Pillos confirmed that all Filipino children must learn to read, write and speak English in grade school which shows that Subia's stunt of bringing in an interpreter was for a show to make it appear that she didn't understand English and was taken advantage of by the undersigned when in fact she could speak, read and write English very well.

253. Pillos' testimony did not offer any evidence of sufficient proof of any of the offenses alleged in the indictment except that the crimes were committed by Cabebe and Malinay and not the undersigned.

254. Pillos testimony revealed that she was scammed by Cabebe and Malinay who lied to Pillos by telling Pillos that she worked for the undersigned when they had formed their own company Mortgage Enterprise (ME) to make it appear that it was the company of the undersigned.

g. MARY LAFORTEZA

255. The government called Mary Laforteza (hereinafter "Laforteza") who had signed up for the services of the undersigned in May of 2013.

256. The government solicited the same testimony as they did the other clients by focusing yet again on the ID, badge and handcuffs of the undersigned and the fact the undersigned is not a bar member.

257. Laforteza testified that if she knew the undersigned was not a member of the bar she would not have signed up for the service.

258. Laforteza KNEW that the undersigned was not a member of the bar because the undersigned told Laforteza and showed Laforteza the undersigned's website which clearly states that the undersigned is not an attorney at law and explains what a Private Attorney General is and the difference between the two.

259. Upon cross examination Laforteza testified that Cabebe forged documents with her name on it and that Cabebe did not

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------

notarize any documents in Laforteza's presence but notarized the documents without Laforteza's knowledge.

260. The undersigned questioned Laforteza did she make a complaint to the DCCA against the undersigned and Laforteza replied no.

261. The undersigned questioned Laforteza did she make a complaint to the FBI against the undersigned and Laforteza replied no.

262. The undersigned questioned Laforteza did she make a complaint to the OCP against the undersigned and Laforteza replied no.

263. Laforteza testified that she was evicted out of her home and it was a traumatic experience.

264. The undersigned questioned Laforteza what were the men wearing that evicted her out of her home and she couldn't remember.

265. The undersigned questioned Laforteza were the men in police uniforms or sheriff uniforms and Laforteza couldn't remember.

266. The undersigned questioned Laforteza what kind of cars did the officers have and Laforteza stated she couldn't remember.

267. The undersigned questioned Laforteza that if it was a traumatic experience that is something you don't forget and how is it that she can't remember the incident and Laforteza maintained she couldn't remember.

268. The undersigned showed Laforteza by exhibits the work that was done for Laforteza that Laforteza and her husband signed yet Laforteza stated she couldn't remember signing the documents.

269. The undersigned showed Laforteza exhibits that contained emails from Laforteza to the undersigned yet Laforteza don't remember emailing the undersigned.

270. The undersigned questioned Laforteza regarding the attorney she hired named Keoni Agard and Laforteza remembers hiring the attorney.

271. The undersigned questioned whether the attorney helped Laforteza and Laforteza stated no.

272. The undersigned showed Laforteza a government exhibit where Laforteza and her husband requested that attorney Agard return their money because he didn't do anything to help them with their foreclosure.

273. The undersigned questioned Laforteza about how much she paid this attorney and Laforteza stated that it was more than $2,000 that she paid with the attorney doing absolutely nothing.

274. The undersigned questioned Laforteza did she or her husband ever request a refund from the undersigned and Laforteza responded no.

275. Laforteza stated she only make 4 or 5 payments to the undersigned which totaled approximately $5,200 dollars.

276. Laforteza knew the payments were to help her and her husband fight their foreclosure.

277. The email that the undersigned is being charged with was regarding the Laforteza's dissatisfaction with the attorney that paid and the undersigned notified the Laforteza's that the undersigned could not assist them unless the attorney of record was removed which is the absolute truth according to the law and the undersigned sent the Laforteza's a link to look up to show that attorneys at law first duty is to the courts and not to the client which is the ABSOLUTE TRUTH!

278. Laforteza's testimony did not offer any evidence or sufficient proof of any of the alleged offenses in the indictment neither did it provide any evidence of a federal offense being committed.

279. The fact that the undersigned is not a member of the bar is not a federal offense and does not constitute a federal crime.

h. NELSON MADAMBA

TRULINCS 05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------

280. The government called Nelson Madamba (hereinafter "Madamba") to testify that the undersigned told him that the undersigned was a federal officer.

281. The government solicited testimony from Madamba as they did the other witnesses focusing on the ID, badge and handcuffs of the undersigned and that these items some how made Madamba trust the undersigned more than he would have if he had known the undersigned was not a member of the bar.

282. Madamba admitted that he had seen some videos of the undersigned and that fact alone proves that Madamba KNEW the undersigned was not a member of the bar because the undersigned states this in the videos and notifies every client that he meets that he is not a member of the bar and neither does the undersigned EVER WANT TO BE!!

283. The undersigned questioned Madamba whether he had done an affidavit swearing to the fact that it was Edna Franco, Henry Malinay and Rowena Valdez that scammed him and not the undersigned.

284. Madamba stated that he didn't remember doing and affidavit and the undersigned presented an exhibit which was the affidavit signed by Madamba.

285. The undersigned asked Madamba to verify his signature and Madamba verified that it was his signature.

286. Madamba then states that the notary did not notarize the document in his presence and that the document was a forgery and the notary did not notarize the document in his presence.

287. Madamba's testimony did not offer any evidence or sufficient proof of any of the alleged offenses in the indictment neither did Madamba's testimony reveal any evidence that a federal crime had been committed.

288. None of the counts in the indictment deal with any transactions linked to Madamba.

i. MARIETHEZ MADAMBA

289. The government called Mariethez Madamba (hereinafter "Mariethez") and Mariethez testified that the undersigned told her that he was an attorney at law.

290. The government solicited testimony from Mariethez as other witnesses focusing on the undersigned's ID, badge and handcuffs and the fact that the undersigned is not a member of the bar.

291. The undersigned questioned Mariethez as to whether she had ever visited the prosecutors office and spoke with the prosecutors and Mariethez answered no.

292. The undersigned questioned Mariethez that if she didn't visit the prosecutors office how did she know to show up for court and she replied that she got a letter in the mail.

293. Kenneth Sorenson then requested a side bar with the court and notified the judge and the undersigned that this witness had in fact visited their office twice and wanted to notify the court.

294. After the side bar conversation the undersigned continued his questioning and notified Madamba that the prosecutor just stated that she had visited their office and was she lying or was the prosecutors lying.

295. After confronting Mariethez with her lie she now admits that she has been to the prosecutors office to talk to them before the trial.

296. The undersigned questioned Mariethez as to whether she signed an affidavit which states that Edna Franco, Henry Malinay and Rowena Valdez scammed her and Mariethez denied that she had signed such an affidavit.

297. The undersigned presented a sworn affidavit signed by Mariethez as an exhibit and asked Mariethez to verify her signature in which she verified that it was her signature.

298. Mariethez stated that she didn't remember the affidavit and that the notary stamp was not on the affidavit and that the notary was done without her knowledge.

TRULINCS 05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------

299. The undersigned questioned Mariethez whether she was still in her home and Mariethez testified that she is in fact still in her home.

300. The undersigned questioned Mariethez did she remember when her home went up for auction and the undersigned filed documents and instructed her what to do in order to stop the auction and Mariethez vaguely remembers but does remember that the auction was canceled.

301. Mariethez's testimony did not offer any evidence or sufficient proof of the alleged offenses in the indictment neither did Mariethez's testimony allege that any federal crime had been committed as none of the counts in the indictment had to do with any transactions between Mariethez and the undersigned.

302. The undersigned is not being charged with the unlicensed practice of law, mortgage fraud, bank fraud, carrying a fake ID, badge or handcuffs and nothing in Mariethez's testimony solicited by the government is evidence of mail or wire fraud.

j. HENRY MALINAY ONE OF THE PERSONS WHO SCAMMED HOMEOWNERS

303. The government called Henry Malinay (hereinafter "Malinay") as one of its' witnesses against the undersigned.

304. The government KNEW that Malinay was one of the former employees of the undersigned that the undersigned fired for violating company policies and procedures.

305. The government received numerous complaints against Malinay and his group which includes Edna Franco, Rowena Valdez, Angelita Pasion and Anabel Cabebe because of their scheme to defraud homeowners and the undersigned.

306. The government made a deal with Malinay that if he lied and testified against the undersigned he would not go to jail for his crimes.

307. Malinay stated that he KNEW what he did was wrong and that he did what he did at the direction of Edna Franco.

308. Upon cross examination the undersigned questioned Malinay as to why he and his other co-conspirators formed a copy cat company similar in name to the undersigned and Malinay testified that they formed it AFTER the undersigned was incarcerated because they still wanted to help the people while the undersigned was incarcerated.

309. The undersigned then exposed Malinay to be a liar and presented Malinay with a copy of the signature card that he and his other co-conspirators signed when they opened up a business account in the mainland under the name of MORTGAGE ENTERPRISE on August 7, 2013 and then another account on August 27, 2013.

TRULINCS  05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------------------------

FROM: 05963122
TO:
SUBJECT: ACQUITTAL MOTION PART 6
DATE: 02/17/2020 03:22:50 PM

310. After confronting Malinay with his obvious lie, Malinay then stated that he didn't know the undersigned had been incarcerated until Edna told him which is also an obvious lie.

311. The undersigned questioned Malinay as to whose idea it was to forge the undersigned's documents and change the name on the documents to MORTGAGE ENTERPRISE instead of MORTGAGE ENTERPRISE INVESTMENTS and Malinay stated that is was Franco's idea.

312. The undersigned questioned Malinay as to who would be the one to file the motions in court to fight the foreclosures since he didn't know nothing about the law and Malinay stated that Franco was suppose to answer the complaints and file motions on behalf of the clients.

313. The undersigned questioned Malinay did he remember that the undersigned placed his picture, Franco's and Hep Guinn's picture on the undersigned's website as scam artist after the undersigned found out what these charlatans had done and Malinay testified that he didn't remember no website and didn't see no website with his picture on it notifying the public that he was a scam.

314. The undersigned then produced one of the government's exhibits which was a deposition that Malinay testified at before James Evers of the DCCA and asked Malinay to read the conversation between him and Evers. Malinay then stated that he couldn't read English which the court now KNOWS is a lie because the undersigned INTENTIONALLY asked multiple government witnesses who were Filipino if every Filipino child had to go to school to learn to read, write and speak English and all of them unanimously stated yes.

315. Malinay's lie that he couldn't read English was an attempt by him to not read his incriminating statements however, Kobayashi allowed the undersigned to read the deposition to Malinay on the record.

316. The undersigned read the portion of the deposition where Malinay stated to Evers that the undersigned had placed his picture on the undersigned's www.usacommonlaw.com website and that it was very damaging to him and that he needed it off the website because it was affecting his business.

317. After another one of Malinay's lie was exposed Malinay continued to place the blame on Edna Franco and that he was just a recruiter which the evidence proves otherwise because Malinay was listed as a partner and owner on the bank account of MORTGAGE ENTERPRISE.

318. Malinay's testimony solicited by the government was filled with blatant lies and fabrication of the facts that the undersigned methodically exposed through questioning and presentation of exhibits.

319. Malinay testified that he has not done any jail time for all of the crimes he committed and the innocent people he victimized using the undersigned's good name and reputation and deceiving people into thinking that the company he set up with his co-conspirators was the same company of the undersigned.

320. Malinay admitted that he was the one that scammed those homeowners and it is Malinay that should be sitting in jail and not the undersigned.

321. The testimony of Malinay is not credible because Malinay had an extreme incentive to lie (which he did) to obtain leniency at his sentencing and to avoid from going to jail.

322. Nothing in Malinay's testimony proved any of the alleged charges in the indictment because none of the mail and wire fraud counts have anything to do with Malinay but Malinay is in fact the one who committed the crimes against the homeowners that the government called as witnesses, yet Malinay was never charged with any of the counts in the indictment but instead recently plead out to conspiracy to avoid going to trial and being convicted by a jury and being sent to prison.

323. All of the complaints that were filed in DCCA and OCP were against MORTGAGE ENTERPRISE, Malinay, Cabebe, Franco and Valdez and NONE of the complaints were against the undersigned, MORTGAGE ENTERPRISE INVESTMENTS or COMMON LAW OFFICE OF AMERICA.

TRULINCS 05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

-----------------------------------------------------------------------------------------------

SUMMARY

   The government has called its' witnesses and has presented its case and failed to meet the burden of proof beyond a reasonable doubt that the undersigned committed mail and wire fraud. The government's main focal point of its argument was that the undersigned is not a licensed attorney who is a member of the bar, the undersigned is carrying what they allege is a fake ID, badge and handcuffs and that the undersigned did not have the proper license to operate his business in Hawaii and somehow has committed mortgage fraud. The allege offenses that the government focused so much time and energy to get across to the jury are actually state charges and the State of Hawaii could have pursued those charges against the undersigned if they felt that a crime had been committed. However, the government did not file any charges against the undersigned for mortgage fraud, bank fraud, money laundering, carrying a fake ID, badge or handcuffs, unlicensed practice of law or failure to obtain a proper business license but charged the undersigned with mail and wire fraud.
   The government did not specify with no particularity as to how the undersigned committed the wire fraud and mail fraud. The government did not outline what in the particular emails were false, misrepresentation or omission but just listed a bunch of emails and 16 payments from two (2) clients that they say constitute mail fraud. The government's argument was baseless, meritless and nonsensical and the government by its own silent acquiescence admitted that there was nothing wrong with the undersigned's business as long as the customers brought their payment to the office instead of mailing them.   The undersigned was not charged with mortgage fraud, bank fraud or money laundering and the government is using the payments that were lawfully obtained from clients as the basis of two of the wire fraud counts wherein a former employee, Mary Jean Castillo wired two money grams to the undersigned's mother. The government has conceded that payments that were brought to the office were lawful but only payments that were mailed were somehow fraudulent. All of the payments at that time were payments that were brought to the office and not mailed because at that point in time the MEI bank account was at First Hawaiian Bank and customers didn't have to mail their payments but brought their payments to the office and then their payments were deposited.
   The government in its indictment did not mention ONE payment that was brought to the office as being illegally or unlawfully obtained but only identified two customers payments which was Melvyn Ventura and Evelyn and Arnold Subia. In it's indictment the government claimed that the undersigned never refunded any clients payments who requested a refund but the record shows that the undersigned refunded EVERY client that filled out a refund request and requested a refund.
   The FBI agents the government called as witnesses all testified that the undersigned has not been charged with any federal crimes in any other state and that there were NO COMPLAINTS from any clients against the undersigned nor his company in Hawaii or in any other states. The former clients that the government called were exposed as liars on the witness stand and that they had been coerced to lie and fabricate their story to assassinate the character of the undersigned. However, two of the government's own witnesses, Mary Jean Castillo and Melvyn Ventura both testified that the undersigned is a good man, a man of honesty and integrity, a man that lives by faith and spiritual principles of the bible and that they STILL trust the undersigned and that the undersigned fights for the rights of the people and would never do anything to defraud anyone because of his faith.
   The undersigned proved that there was no intent to deceive or defraud anyone and that all of the actions of the undersigned was done to protect homeowners from foreclosure and to expose the fraud that had been perpetrated upon them by the banks, the FBI and the courts.
   The government's case revealed that the real culprits of these crimes were Anabel Cabebe and Henry Malinay who both took plea deals to escape from going to prison for their crimes. One reoccurring narrative with the homeowners who were called to testify is that they were signed up by Henry Malinay or Anabel Cabebe and thus this is where the defrauding originated from as these two charlatans also defrauded and scammed the undersigned by going behind the undersigned's back and forging his documents and setting up a fraudulent copy cat company to deceive homeowners and to escape detection of their diabolical intent.
   The undersigned through questioning of the government's witnesses showed that the witnesses were not credible and told blatant lies and the FBI agents didn't fair no better in that they to were exposed in that they proffered testimony that they KNEW was fabricated to make it appear that the undersigned somehow was listing addresses and offices that didn't exist when upon examination the undersigned proved that he in fact had an office and the person that the FBI stated denied knowing the undersigned actually did know the undersigned and transacted business with the undersigned to set up the office in Washington, D.C.
   The things that the government has accused the undersigned of are mostly state offenses and the State of Hawaii had every opportunity to file charges against the undersigned for carrying a fake ID, badge or handcuffs, the unlicensed practice of law, mortgage fraud, mortgage rescue scheme or failure to obtain a proper business license. However, the state remained silent and therefore acquiesce that in fact there was no state crimes committed and consequently there were no federal crimes committed.

CONCLUSION

   Based upon the foregoing and the governments own witnesses testimony and the fact that most of the government's witnesses lied on the stand and the government never presented any evidence of mail and wire fraud as outlined in the

TRULINCS 05963122 - WILLIAMS, ANTHONY TROY - Unit: HON-D-B

--------------------------------------------------------------------------------------------------

elements of the indictment, the undersigned moves the court for a Judgment of Acquittal because the government failed to prove all the elements of mail and wire fraud.

Executed this 16th day of February 2020.

Righteously submitted,

/s/ Anthony Williams
Private Attorney General
Counsel to the Poor (Psalms 14:6)
Common Law Counsel (28 USC 1654, First Judiciary Act of 1789 section 35)