1                  IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF HAWAII

3

UNITED STATES OF AMERICA,        ) CR 17-00101 LEK
4                                )
                Plaintiff,       ) Honolulu, Hawaii
5                                ) February 5, 2020
    vs.                          ) February 6, 2020
6                                )
(1) ANTHONY T. WILLIAMS,         ) PARTIAL TRANSCRIPT:
7                                ) TESTIMONY OF JOSEPH LAVELLE
                Defendant.       )
8    _____ )

9

               PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
10             BEFORE THE HONORABLE LESLIE E. KOBAYASHI
                     UNITED STATES DISTRICT JUDGE
11

     APPEARANCES:
12

     For the Government:       KENNETH M. SORENSON, AUSA
13                             GREGG PARIS YATES, AUSA
                               Office of the United States Attorney
14                             300 Ala Moana Boulevard, Suite 6100
                               Honolulu, Hawaii 96850
15

     Also Present:            MEGAN CRAWLEY, FBI Special Agent
16

     For the Defendant (1)    ANTHONY T. WILLIAMS, *Pro Se*
17   Anthony T. Williams:      05963-122
                               Federal Detention Center Honolulu
18                             Inmate Mail/Parcels
                               P.O. Box 30080
19                             Honolulu, Hawaii 96820

20   Standby Counsel:         LARS ROBERT ISAACSON, ESQ.
                               547 Halekauwila Street, Suite 102
21                             Honolulu, Hawaii 96813

22   Official Court Reporter: Debra Read, RDR
                               United States District Court
23                             300 Ala Moana Boulevard
                               Honolulu, Hawaii 96850
24

     Proceedings recorded by electronic sound recording; transcript
25   produced with computer-aided transcription (CAT).

UNITED STATES DISTRICT COURT

1                            I N D E X

2                 CHRONOLOGICAL INDEX OF WITNESSES

3

4    GOVERNMENT'S WITNESS                                    PAGE

5

6    **JOSEPH LAVELLE**
       Direct Examination By Mr. Sorenson                      3
7      Cross-Examination By The Defendant                     11
       Redirect Examination By Mr. Sorenson                   47
8

9    FEBRUARY 6, 2020:

10

     **JOSEPH LAVELLE (Resumed the stand)**
11     Recross-Examination By The Defendant                   59

12

13                           I N D E X

14                        E X H I B I T S

15

16
     NO.                                                  PAGE
17
       500                                                    8
18     501                                                    8
       505                                                    9
19     602                                                    6
       604                                                    6
20

21   FEBRUARY 6, 2020:

22     2114-000007                                            69
       2114-000008                                            69
23

24

25

                      UNITED STATES DISTRICT COURT

```
 1  WEDNESDAY, FEBRUARY 5, 2020                          8:45 A.M.
 2                (Partial transcript begins:)
 3                THE COURT:  Thank you.
 4           Could you please call your next witness?
 5                MR. SORENSON:  Yes, Your Honor.  We call Special
 6  Agent Joe Lavelle to the stand.
 7                THE COURT:  Good afternoon, we'll have you sworn.
 8           JOSEPH LAVELLE, GOVERNMENT'S WITNESS, WAS SWORN
 9                THE COURTROOM MANAGER:  Thank you.  Please be
10  seated.  State your full name and spell your last name for the
11  record.
12                THE WITNESS:  Special Agent Joseph Lavelle, last
13  name spelled L-a-v-e-l-l-e.
14                THE COURT:  Your witness.
15                MR. SORENSON:  Thank you, Your Honor.
16                          DIRECT EXAMINATION
17  BY MR. SORENSON:
18      Q    Special Agent Lavelle, who are you employed by?
19      A    Federal Bureau of Investigation.
20      Q    And how long have you been so employed?
21      A    Ten years.
22      Q    What are your duties?
23      A    Currently my duties are I'm assigned to a violent
24  crime gang squad.  Previously I was assigned to a domestic
25  terrorism squad.
```

1       Q       And have you conducted investigations that involve

2   from time to time individuals that may be coming into the South

3   Florida area that you need to meet and either encounter either

4   for an interview or other action?

5       A       Yes, I have.

6       Q       In the scope of your employment, have you met an

7   Anthony Williams?

8       A       I have.  I have encountered with Anthony Williams.

9   We did not have an interview though.

10      Q       Okay.  And was there a particular time when you met

11  an aircraft that was coming into South Florida with

12  Mr. Williams on it?

13      A       I met Mr. Williams as he exited the airport along

14  with Broward sheriff's office deputies for his arrest.

15      Q       And were you there for the purpose of assisting in

16  the effecting of that arrest?

17      A       I was.

18      Q       Okay.  And did you observe the arrest?

19      A       I did.

20      Q       Did you take any part in it?

21      A       It was not necessary for my assistance but other

22  than observation.  That was it.

23      Q       Okay.  And during the context of the arrest, did you

24  have a chance to observe anything that was taken from

25  Mr. Williams?

UNITED STATES DISTRICT COURT

1       A       Yes, I did.

2       Q       What kind of items did you see taken from him?

3       A       Mr. Williams had a rolling bag.  He also had a -- a

4  gold-plated badge on his belt, a identification badge of sorts

5  on his lapel, and a pair of handcuffs.

6       Q       Were there other items taken as well?

7       A       Documents, checks, things of that nature.

8       Q       I'm going to direct your attention to Exhibit 602.

9       A       Uh-huh.

10              MR. SORENSON:  Your Honor, we're going to pull that

11  up on the screen, but not publish, obviously.

12      Q       (BY MR. SORENSON:)  Can you identify 602 from

13  looking at it on the screen -- or is it up there?  And we're

14  going to provide him -- I think -- I don't know if our --

15              THE COURT:  Would you like -- Ms. Elkington?

16              THE COURTROOM MANAGER:  I'm working on that.  There

17  we go.

18              THE COURT:  There you go.

19              MR. SORENSON:  We have it?

20              THE COURT:  Yes.

21              MR. SORENSON:  Okay.  Good.

22      Q       (BY MR. SORENSON:)  Special Agent Lavelle, what is

23  602, if you recognize it?

24      A       Various items confiscated from Mr. Williams after he

25  was arrested in Fort Lauderdale airport.

1      Q     And you know that how?

2      A     Because Broward County sheriff's office, they took

3  this particular picture at almost I think immediately after he

4  was arrested.

5            MR. SORENSON:  Your Honor, at this time I'm going to

6  move in Exhibit 602.

7            THE COURT:  Any objections?

8            THE DEFENDANT:  No objection.

9            THE COURT:  Received.

10           (Exhibit 602 received into evidence.)

11     Q     (BY MR. SORENSON:)  All right.  I'm going to direct

12  your attention over to Exhibit 604.  Do you recognize 604?

13     A     I do.

14     Q     And what is 604?

15     A     They're the same items that were confiscated from

16  Mr. Williams to include a gold badge, handcuffs, and an

17  identification badge of sorts.

18           MR. SORENSON:  Thank you.  Your Honor, at this time

19  we'll move in 604.

20           THE COURT:  Any objections?

21           THE DEFENDANT:  No objection.

22           THE COURT:  Received.  Do you wish to publish?

23           MR. SORENSON:  Yes, Your Honor.

24           THE COURT:  All right.  You may publish.

25           (Exhibit 604 received into evidence.)

UNITED STATES DISTRICT COURT

```
 1        Q       (BY MR. SORENSON:)  Okay.  Special Agent Lavelle,

 2   these are the items I think you've indicated that you took from

 3   him; is that correct?

 4        A       I took these from the Broward sheriffs's office

 5   evidence within the past few weeks.

 6        Q       That you observed being taken from him?

 7        A       Yes, sir.

 8        Q       Now, there's some items there in front of you.  Do

 9   you see those?

10        A       Yes, I do.

11        Q       Would you please pick up the item that's marked

12   Exhibit 500.

13        A       There's no, uhm --

14        Q       It's on the back.

15        A       Okay.  500?

16        Q       Yes.

17        A       Okay.

18        Q       Okay.  No, hold it down.

19        A       Okay.

20        Q       First off, tell us if you recognize that.

21        A       I recognize that as a badge taken from Mr. Williams.

22                MR. SORENSON:  Your Honor, at this time we're going

23   to move in Exhibit 500.

24                THE COURT:  All right.  Any objection?

25                THE DEFENDANT:  No objection.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Received.

 2              (Exhibit 500 received into evidence.)

 3              MR. SORENSON:  Your Honor, I'm going to ask to

 4    publish that, either -- would you prefer that we -- can we pass

 5    it around?  Or should I hold it up or --

 6              THE COURT:  So it's a small item.

 7              MR. SORENSON:  It is.

 8              THE COURT:  So I would allow to you pass it around.

 9    And would you like the courtroom manager to give that to the

10    jury?

11              MR. SORENSON:  Well, maybe.  We've got two other

12    items, so maybe we can do it all at one time.

13              THE COURT:  All right.

14       Q    (BY MR. SORENSON:)  All right.  I'm going to ask you

15    to look at Exhibit 501.  And what is 501?

16       A    It's a identification badge of sorts with Anthony

17    Williams's name and picture on it.

18              MR. SORENSON:  All right.  Your Honor, at this time

19    we're going to move in 604.

20              THE COURT:  Any objection?

21              THE DEFENDANT:  No objection.

22              MR. SORENSON:  Excuse me.  We're going to move in

23    501.

24              THE COURT:  501 is received.

25              (Exhibit 501 received into evidence.)
```

1     Q     (BY MR. SORENSON:)  And if you could, look at the

2   next exhibit that's up there.  I think it's marked at 502?

3     A     505.

4     Q     505, all right.  What is 505?

5     A     Pair of black handcuffs.

6     Q     All right.  And do you recognize those?

7     A     I do.

8     Q     And how do you recognize those?

9     A     They're the handcuffs confiscated from Mr. Williams

10  after his arrest.

11          MR. SORENSON:  Your Honor, we're going to offer 505

12  as well.

13          THE COURT:  Any objection?

14          THE DEFENDANT:  No objection.

15          THE COURT:  Received.

16          (Exhibit 505 received into evidence.)

17          MR. SORENSON:  And we'll move to publish at this

18  time.

19          THE COURT:  All right.

20          MR. SORENSON:  May I approach the witness?

21          THE COURT:  No.  Ms. Elkington will.  Thank you.

22          MR. SORENSON:  All right.

23          THE COURT:  All right.  The record will reflect all

24  three exhibits, 500, 501, and 505, are being handed to the

25  jurors for their inspection.


UNITED STATES DISTRICT COURT

```
 1      Q     (BY MR. SORENSON:)  Now, Special Agent Lavelle --

 2            THE COURT:  I'm sorry.  They're looking at the

 3  exhibits.

 4            MR. SORENSON:  Okay.  Do you want to --

 5            THE COURT:  Yeah.  So it's hard for them to listen

 6  and look at the items at the same time, so...

 7            All right.  The record will reflect that all three

 8  exhibits, 500, 501, and 505, have been returned to the witness.

 9       Your next question.

10            MR. SORENSON:  Thank you, Your Honor.

11      Q     (BY MR. SORENSON:)  Special Agent Lavelle, do you

12  have an FBI shield or badge?

13      A     I do.

14      Q     And do you wear it on your person?

15      A     I do.

16      Q     Where do you wear it?

17      A     On my belt near my weapon.

18      Q     Do you currently have it on?

19      A     I do.

20            MR. SORENSON:  All right.  Your Honor, may the

21  witness come down in front of the jury and display how he

22  carries his badge?

23            THE COURT:  Why is that relevant?

24            MR. SORENSON:  Well, because it's going to be the

25  same way the defendant was wearing his.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  All right.  So he's already -- well, do

2    you have any objection, Mr. Williams?

3          THE DEFENDANT:  I don't have no objection.

4          THE COURT:  Okay.  He doesn't have an objection.

5    You can go down.

6          MR. SORENSON:  Okay.  Thank you.

7    Q     (BY MR. SORENSON:)  And is that generally the

8    accepted location for FBI agents to wear their shield?

9    A     It is.

10   Q     And when you observed the arrest of Mr. Williams

11   that day, where did he have his shield?

12   A     On his belt in the same position.

13         MR. SORENSON:  All right.  Your Honor, that's all

14   the questions I have.

15         THE COURT:  All right.  Thank you.

16         All right.  Mr. Williams -- oh, let me just inform

17   the jury.  So, Mr. Williams also wants to call Agent Lavelle in

18   his case, but to be more time efficient, I'm allowing him to do

19   his cross-examination as well as his direct examination today,

20   so he's allowed to go beyond cross-examination in questioning

21   Agent Lavelle because I'm not going to have him recalled the

22   second time in order to be more time efficient.

23         All right.  So, Mr. Williams.

24                          CROSS-EXAMINATION

25   BY THE DEFENDANT:

1      Q      Agent Lavelle, do you remember when I visited your

2  FBI office in Miami?

3      A      I have a recollection of you visiting our office.

4  The exact date I couldn't tell you.

5      Q      And were you one of the agents that I talked to?

6      A      You were not -- I was not, no.

7             MR. SORENSON:  Your Honor, just for form sake, I

8  believe this is beyond the scope of our direct exam.  I don't

9  know if he's going into his direct immediately, but we'd prefer

10  the cross go first so that we know, because I haven't had a

11  chance to read this item.

12             THE COURT:  So do you want time to review it?  We

13  can take a recess until you to do that.

14             MR. SORENSON:  Well, if we're going to

15  do -- probably for form sake is there going to be any cross

16  with respect to what we did on direct just so we know that's

17  over and we'll note that --

18             THE COURT:  I'm not going to have him break it up

19  with regard to that.  So do you want time to review the

20  document before --

21             MR. SORENSON:  We do, Your Honor.

22             THE COURT:  -- questioning?

23      All right.  So ladies and gentlemen of the jury, we're

24  going to take a recess and give the government some time to

25  review.

UNITED STATES DISTRICT COURT

1          What do you think?  10 minutes?

2              MR. SORENSON:  Yes, Your Honor.

3              THE COURT:  All right.  So if you could leave your

4     iPads and notebooks behind.  Of course, don't discuss the case,

5     allow anyone to discuss it with you.  And we will bring you

6     back after they've reviewed for about 10 minutes.

7          Please rise for the jury.  We're in recess.

8              (Open court out of the presence of the jury.)

9              THE COURT:  The record will reflect the jury's no

10    longer present.  Present are counsel and Mr. Williams.

11         Mr. Isaacson, please go to a microphone.

12             MR. ISAACSON:  Sorry, Judge.  I just thought --

13    there was only one copy made?

14             THE COURT:  There are additional copies being made,

15    but we wanted to make one copy right away.

16             MR. ISAACSON:  Oh, okay.

17             THE COURT:  So we're in recess.

18             (A recess was taken.)

19             (Open court out of the presence of the jury.)

20             THE COURT:  All right.  Let the record reflect the

21    jury's not present.  Present are counsel and Mr. Williams.  And

22    I'm sure the witness is somewhere around.

23         But I just want to make sure we all have a copy of the

24    transcript which is dated June 23, 2017, and it is in the

25    matter of the State of Florida versus Anthony Williams, case

 1   No. 17-00074-CF-10A before Judge Andrew Siegel, S-i-e-g-e-l.

 2         All right.  So, Mr. Sorenson, have you had an opportunity

 3   to review it to your satisfaction?

 4         MR. SORENSON:  I have, Your Honor.  Thank you very

 5   much, and I appreciate the time.

 6         There are a number of issues here, Your Honor.  I think

 7   the first one is going to be this is actually at least two

 8   separate transcripts.  The first part appears to be a

 9   transcript of a sentencing hearing and it appears to jump

10   around quite a bit.  But it's unrelated to this witness in its

11   entirety.

12         THE COURT:  Okay.  So -- so I guess first of all,

13   Mr. Williams, as I understand Mr. Sorenson, part of his

14   objection is that this is not a complete document because

15   apparently -- well, first of all, we can tell the page

16   numbering isn't entirely consistent from 1 through 668.

17         And second, I believe it's the sort of the subject matter

18   is -- doesn't appear to be involving Agent Lavelle.

19         So what's your position on this document?  And if you

20   could clarify if you're intending to ask the court to receive

21   it into evidence.

22         THE DEFENDANT:  Well, the only part that regard him

23   is page 251 to 268.  That's his actual testimony.

24         MR. SORENSON:  And that's correct, Your Honor.

25         THE COURT:  Okay.

1          MR. SORENSON:  And the problem with those pages is

2     we don't have any certification on this transcript.

3          THE COURT:  Okay.  So first of all, are you -- do

4     you want -- are you going to be asking this court to admit

5     it --

6          THE DEFENDANT:  Yes.

7          THE COURT:  -- into evidence?  Okay.  In its

8     entirety?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Okay.  So I'm not going to admit it into

11     its entirety --

12          THE DEFENDANT:  Well, just the portion that he's --

13          THE COURT:  So Agent Lavelle's testimony?

14          THE DEFENDANT:  Yeah, his testimony.

15          THE COURT:  So help me understand why it's relevant

16     to his testimony today or with regard to this case against you.

17          THE DEFENDANT:  Well, like he said, he was the one

18     that was there that when they took my badge and stuff off me,

19     he testified about the homeowners in Florida in my case that

20     they interviewed and things like that.  So I wanna be able to

21     question him regarding that because he was part of the

22     investigating my mortgage company and common law office there

23     with Megan Crawley here.  They both was in contact with each

24     other.

25          Also, they were also the two agents that went to Texas and

1    got all my, you know, office stuff from my mom's house too.  So

2    he was there at that -- you know, at that location also.

3              THE COURT:  All right.  So he's here, so you can ask

4    him questions about that, but I'm not going to permit this to

5    be entered into evidence because I also note there's

6    handwriting, I assume by you, that has commentary with regard

7    to the testimony, such as on page 259 it says in handwriting,

8    "Damn liar, had no witnesses."  And I believe there are others.

9              MR. SORENSON:  A number of other notations, Your

10   Honor.

11             THE COURT:  On page 260, "I did not say, Your

12   Honor," et cetera, so that would be statements that he didn't

13   make nor were a part of the official transcript.

14        However, you can use this to refresh his recollection or

15   to impeach him, if you wish.  I'm just not going to receive it

16   into evidence.  You can confront him with the statement in your

17   questions, but I cannot receive it into evidence and have it

18   published to the jury.

19             THE DEFENDANT:  That's fine.

20             THE COURT:  All right.  So any other issues and then

21   we'll bring in the jury?

22             MR. SORENSON:  No, Your Honor.

23             THE COURT:  And if you could bring Agent Lavelle in

24   and put him on the stand, we'd most appreciate it.

25        We're in recess.

UNITED STATES DISTRICT COURT

1          (A recess was taken.)

2          (Open court in the presence of the jury.)

3          THE COURT:  All right.  Welcome back, ladies and

4    gentlemen of the jury.

5          Mr. Williams, your witness.

6          Q     (BY THE DEFENDANT:)  Agent Lavelle, can you state

7    for the record again what kind of work you do for the FBI?

8          A     Currently assigned -- I'm assigned to Dade County

9    violent crime task force.

10         Q     And what did do you before that?

11         A     My prior assignment within the Miami division was a

12   domestic terrorism squad.

13         Q     So domestic terrorism.  So when you viewed me coming

14   off the plane, why was you there to view the arrest?

15         A     You were under investigation by myself and our

16   division within the FBI.

17         Q     And since you are you said the counterterrorism

18   department?

19         A     Yes, sir.

20         Q     So was I under investigation for being a possible

21   terrorist?

22         A     Possible sovereign citizen.

23         Q     A possible terrorist?

24         A     A sovereign citizen which is it falls within the

25   FBI.  Our policy dictates that sovereign citizens fall under a

1    domestic terrorism policy, basically guidance.

2        Q    And so what made you feel like I'm a terrorist?

3        A    Well, I don't feel like you're a terrorist.  I mean,

4    it -- if you're asking me what actions you made that concerned

5    myself and the FBI --

6             MR. SORENSON:  Your Honor, I would object on

7    relevance grounds.

8             THE COURT:  All right.  Overruled.

9         Continue with your answer.

10            THE WITNESS:  You made -- I guess I would say you

11   made basically threats along the lines of common law and

12   sovereign that if a law enforcement officer were to take action

13   against yourself or others that you didn't deem necessary or

14   were warrantless, that you would have the right to take that

15   law enforcement officer's life or basically deadly force.

16       Q    (BY THE DEFENDANT:)  And did I send that letter

17   certified to one of the law enforcement agencies?

18       A    I don't know what letter you're referring to.

19       Q    So how did you get that -- where do you get that

20   assertion from?

21       A    You made that statement specifically in Ventura,

22   California, to a group of foreclosure homeowners.

23       Q    And would that be considered terroristic threat?

24       A    It -- it concerned the FBI and our department

25   basically.  It was -- we did not view it as a terroristic

UNITED STATES DISTRICT COURT

1   threat.  It was basically an if/then sort of situation:  If

2   this happens, then I will take action.  So it was not a direct

3   terroristic threat, no, sir.

4        Q      Okay.  So is me as a regular citizen and you as a

5   law enforcement officer --

6        A      Uh-huh.

7        Q      -- if we had an encounter on the street, right, and

8   you violated my right and say you assaulted me illegally

9   unlawfully, didn't have no right to arrest me or no right to

10  detain me, so are you saying I don't have a right to defend

11  myself against you even up to the point of taking your life if

12  you assault me?

13       A      Mr. Williams, I don't know.  I don't deal in

14  hypothetical situations.  If a law enforcement officer were to

15  take action to arrest you and you didn't deem it necessary, you

16  do not have the right to take that law enforcement officer's

17  life.

18       Q      And what law are you basing that on?

19       A      Of what -- murder?

20       Q      That wouldn't be murder.  I'm saying what law are

21  you basing that on?

22       A      I don't understand your question, sir.

23       Q      The Supreme Court case --

24              MR. SORENSON:  Your Honor, I'm going to object

25  again.  I just think we're getting very far afield here.

1          THE COURT:  Okay.  So how is this related to what

2   he's testified about that you made a statement to the group of

3   homeowners in Ventura, California, which is what started their

4   investigation of you?

5          THE DEFENDANT:  Right, 'cause he's saying that based

6   on a statement that I made to a group of people at my

7   seminar --

8          THE COURT:  Yeah.

9          THE DEFENDANT:  -- they deemed me a terrorist.

10          THE COURT:  Right.  So, okay.  So -- but that's not

11   what's before us.  So if you want to ask him anything that he

12   did in the investigation of you, you can do that.  But I think

13   we're going far afield if we're talking about to what extent

14   people can avail themselves in raising self-defense.  Does that

15   make sense?

16          So you can ask him what he did, what he knows, et cetera,

17   with regard to you.

18   Q      (BY THE DEFENDANT:)  Okay.  So because I made that

19   statement, that somehow put me under your all radar --

20   A      Yes, sir.

21   Q      -- that I'm a violent man?

22   A      Your criminal history indicated some degree of

23   concern for us and specifically with traffic violations and

24   traffic stops with local police officers as far as resisting

25   arrest.  So, I mean, there are varying degrees of violence, but

1    you definitely concerned us, sir.

2         Q     So you're saying that in my history, I have a

3    criminal history that is violent toward police officers?

4         A     You were booked, I believe, several times in your

5    history for resisting officers.

6         Q     With violence?

7         A     I believe -- I don't have your criminal history in

8    front of me, but I believe several of them were without

9    violence.  They were resisting without violence.

10        Q     Okay.  So I've protested, but it wasn't with

11   violence?

12        A     Yes, sir.

13        Q     So it was without violence?

14        A     Yes, sir.

15        Q     So there's nothing in my history that says I'm a

16   violent person?

17        A     Yes, sir.

18        Q     So -- 'cause you have access to my FBI file,

19   correct?

20        A     Your criminal history, yes, sir.

21        Q     Okay.  So in my FBI file is there anything that's

22   designated in there that I'm a threat to police officers in

23   the --

24        A     Yes, sir.  Like I stated before, the threats and the

25   statements you made about taking police officers' lives was

1    very concerning for the FBI.

2         Q    So if I'da said if a man breaks in my house and I'ma

3    protect my family --

4              THE COURT:  Okay.  So I'm not going to let you do

5    any hypotheticals 'cause that's not sort of what's before us

6    now.  So if you want to talk about specifically what you said

7    or didn't say to this group of homeowners, you can ask

8    questions.  But he's not here to answer hypotheticals.  He's

9    here to answer what he saw, heard, or did.

10        Q    (BY THE DEFENDANT:)  Okay.  So you all -- so it's

11   the policy of the FBI to label someone violent and a terrorist

12   based on a statement that they've made to a audience where it

13   was a hypothetical situation and it was a if this happens, then

14   this will happen?  That's --

15        A    No, sir, that's not our -- I mean, you -- what that

16   statement prompted was one of many prompters to our beginning

17   of our investigation of you and your activities in South

18   Florida and basically throughout the country.

19        Q    So --

20        A    We didn't label you a terrorist or a violent person.

21   I mean --

22        Q    Well, that's in your -- so you seen my FBI report

23   that you have on me, correct?

24        A    I don't understand what your question is, sir.

25        Q    Like the FBI report that you all have on me.  'Cause

UNITED STATES DISTRICT COURT

1   you got the police report and then you have an FBI report.

2         A      We have a case file.

3         Q      You have a case file?

4         A      Yes, sir.

5         Q      So in my case file is there any indication in there

6   that I am a violent man?

7         A      No, sir.

8         Q      So in my FBI file, it does not state for a law

9   enforcement officer when he approaches me to proceed with

10  caution and that I'm armed and dangerous?  That's not in the

11  FBI report?

12        A      I don't know the answer to that question, sir.

13        Q      So once you get labeled a sovereign citizen, what is

14  the normal FBI protocol as far as dealing with that American?

15        A      Well, we would examine the situation and the facts

16  and the subject and make a determination whether or not an

17  investigation of that person should ensue.

18        Q      So have anyone ever charged me of being violent

19  toward them in your investigation?

20        A      Your criminal history, sir, I don't believe so.

21        Q      So I'm not a violent person in your criminal

22  history -- with my criminal history, but you all are

23  surveillancing me as if I am; is that correct?

24        A      Yes, sir.

25        Q      And that was based on a statement that I made which

1    it was actually, if you was at the seminar, it was based on a

2    Supreme Court case.  Did you --

3                MR. SORENSON:  Objection, Your Honor.

4                THE COURT:  Okay.  You can ask him if he knows what

5    you said.

6                THE DEFENDANT:  Okay.

7                THE COURT:  Yeah.

8        Q    (BY THE DEFENDANT:)  At the seminar --

9        A    Yes, sir.

10       Q    -- did you hear the whole statement what I said and

11   the Supreme Court ruling that I quoted before I made that

12   statement?

13       A    No, sir.

14       Q    Okay.  So you're not familiar with the affidavit

15   that I sent to your office in Miami regarding resisting an

16   unlawful arrest of an officer?  You not --

17       A    I believe you sent several letters, specifically to

18   our Special Agent in charge, to our office certified mail.  I

19   don't have the letters in front of me.  I believe you made

20   several statements about, you know, various topics, sir.

21       Q    Right.  So would it be normal if someone -- say, I

22   sent you a letter and said, "Agent Lavelle, if you put your

23   hands on me, I'm going to kill you," would that be something

24   that you would file charges on?

25       A    No, sir.

1          Q      So I can write you a letter and tell you, "I'ma kill

2     you if you put your hands on me," and that's okay as an

3     official?

4               MR. SORENSON:  Your Honor, again, objection on

5     relevance grounds.  This is a mortgage fraud case.  We're way

6     out of the --

7               THE DEFENDANT:  Just to deal --

8               THE COURT:  So I have to sustain the objection.  So

9     you can ask him questions about his investigation of you and

10     how it relates to the charges against you in the District of

11     Hawaii, but we're wasting time and we're going far afield.  So

12     ask another question.

13          Q      (BY THE DEFENDANT:)  Okay.  When I was arrested by

14     the Broward sheriff office, why were you there?  I know what

15     they were there 'cause what they charged me with.  But why

16     would the FBI be there when they arrested me?

17          A      You were currently under investigation by our

18     office.

19          Q      Okay.  And so you saw them take my badge, my

20     handcuff, and my ID when I got off the plane, correct?

21          A      I saw that you were taken into custody and I saw the

22     badge and the handcuff and the ID on your person.  And then

23     later at the Broward sheriff's office, I saw one of the

24     exhibits that were put up before here, the series of documents

25     and everything that we've talked about.

1     Q     Okay.  Did the Broward County sheriff's office

2  charge me with impersonation of a police officer?

3     A     No, sir.

4     Q     Did the FBI charge me with impersonation of a police

5  officer?

6     A     No, sir.

7     Q     Did Broward County sheriff's office charge me with

8  carrying a fake ID?

9     A     No, sir.

10     Q     Did the FBI charge me with carrying a fake ID?

11     A     No, sir.

12     Q     Did Broward County charge me with carrying

13  handcuffs?

14     A     No, sir.

15     Q     Did the FBI charge me with carrying fake handcuffs

16  or handcuffs?

17     A     No, sir.

18     Q     Is it a crime for a citizen to have their own

19  handcuffs?

20     A     No.

21     Q     Is it a crime for the citizen to go through TSA when

22  it's been approved by TSA to fly on an airplane with those

23  handcuffs?

24     A     It is not.

25     Q     Is it a crime if it's been cleared through TSA to

27

 1   actually wear a sovereign peace officer badge on a plane?

 2        A     I don't believe so.

 3        Q     And did you call the Davidson Sheriff County Office

 4   in Nashville to ask why they were the one to tell me how to get

 5   a -- obtain a sovereign peace officer badge?

 6        A     I don't recall.

 7        Q     Did you call the law enforcement agency that

 8   actually created the sovereign peace officer badge for me?

 9        A     Not to my recollection.

10        Q     Do you know how long I've had this sovereign peace

11   officer badge?

12        A     No, sir.

13        Q     And what was the reason that the FBI confiscated my

14   Lexus in Miami?

15        A     We applied for a search warrant for documents and

16   electronics that were inside.

17        Q     And what was the probable cause for that?

18        A     We had probable cause that evidence existed inside

19   the Lexus in the computers and hard drives that were in there

20   basically contained evidence of mortgage fraud documents.

21        Q     And who notified you that I may have been committing

22   mortgage fraud in Florida?

23        A     Who notified me?

24        Q     Yes.  'Cause you would have someone who would have

25   to notify you and then you would investigate it, right?

UNITED STATES DISTRICT COURT

1     A    Well, I mean, when we began our investigation, it

2  didn't take long for us to realize there were several websites

3  attributed to you, U.S. Common Law and Mortgage Enterprise

4  Investments, where we saw a mortgage reduction scheme and we

5  believed you were engaged in activity in mortgage fraud.

6     Q    So you based it on just going to my website and

7  looking at a website?

8     A    Well, that and talking to homeowners in South

9  Florida.  And basically it was our understanding that you were

10  engaged in mortgage fraud.

11     Q    So you spoke with homeowners.  Can you tell me

12  exactly or just give me an approximate number how many

13  homeowners did you all interview in Florida that were my

14  clients?

15     A    I believe the number was around 15, sir.

16     Q    So about 15.  Do you know around approximately how

17  many clients total I have in Florida?

18     A    No, sir.

19     Q    Did you just interview the clients that are in

20  Miami-Dade or did you interview clients in other counties?

21     A    I believe we tried to focus on the Southern

22  District, so it would include Dade and Broward counties.

23     Q    So you didn't interview any other clients in any of

24  the upper counties like West Palm Beach or anything like that?

25     A    My specific office, we may have.  I can't recall --

 1   cut leaves which is basically we ask other offices to conduct

 2   interviews on our behalf, but I can't recall anything in any

 3   other counties within Florida.

 4        Q     And you personally interviewed a lot of these

 5   clients?

 6        A     I did.

 7        Q     And do you remember one client named Donna

 8   Hickenbottom?

 9        A     I do.

10        Q     And what color is she?  What's her nationality?

11        A     She's white.

12        Q     She's white.  And in your investigation, what was

13   her relation toward me and my company?

14        A     She worked for you during a period of time and I

15   believe she was in a relationship with you.

16        Q     So she worked for me.  In your investigation, did

17   you see where she would file some of the documents like in the

18   county and things like that?

19        A     Within the clerk's office, yes, sir.

20        Q     And so you are familiar that before she came to work

21   with me that she was a client?  Are you familiar with that?

22        A     Yes, sir.

23        Q     Okay.  So -- so you're aware that I would go to

24   court with her and assist her?

25        A     Yes, sir.

1          Q       In fighting on foreclosures?

2          A       Yes, sir.

3          Q       Okay.  Now, when you interviewed her, did she say

4    that she felt like I defrauded her or was defrauding her

5    or -- when you interviewed her?

6          A       Her interview was a long time ago.  I don't believe

7    she said that she was being defrauded by you because of various

8    reasons.

9          Q       So any of the other homeowners in Florida that you

10   interviewed, did any of them call your office or come by your

11   office and make a complaint against me?

12         A       No, sir.

13         Q       When you visited them, did they make a complaint

14   after you visited them and say, Hey, this guy wronged us; he

15   did something fraudulent, or, He didn't do what he promised he

16   said he was going to do for us?  Did any of them make that

17   statement to you?

18         A       Yes, sir.

19         Q       Which one made that statement to you?

20         A       Hmm, the homeowners that come to mind are Shirley

21   Callington and Consuelo Garcia are the two that come to mind.

22         Q       Them two said I didn't do what I said I was going to

23   do?

24         A       Yes, sir.

25         Q       And you have -- did you take a statement from them?

UNITED STATES DISTRICT COURT

1      A      I did.

2      Q      And do you have that copy of that statement?

3      A      Do I have it with me?  No, sir.

4      Q      Okay.  So those are the only two that you said made

5  a complaint against me?

6      A      I specifically remember them basically saying that

7  they -- that they gave you money and your promise to reduce

8  their mortgages by 50 percent and that promise was never

9  upheld.

10      Q      And did they ask -- did they tell you why I couldn't

11  fulfill that promise?

12      A      No, they didn't.

13      Q      Okay.  Don't you know why I couldn't fulfill that

14  promise?

15      A      I believe I know why, yes, sir.

16      Q      Because I was incarcerated 'cause you all

17  incarcerated me?

18      A      That was not the answer I was going to give you,

19  sir.

20      Q      Well, are you aware that I was incarcerated in 2013

21  for a rape and child molestation falsely?

22      A      Yes, sir.  It was out of state of Florida.  Was it

23  at Georgia?

24      Q      Right.

25      A      Yes, sir.

1    Q      So you're aware that the FBI is the one that tried

2    to fake my fingerprints to make me the perpetrator of that

3    crime?

4    A      No, sir.

5    Q      You weren't aware of that?

6    A      No, sir, I wasn't.

7    Q      So you didn't see the extradition video that's up on

8    YouTube?

9    A      No.  I'm sorry.

10   Q      So during my incarceration, would it be fair to say

11   that I couldn't protect the homeowners 'cause I was

12   incarcerated during that time, so I couldn't service them

13   'cause I was obviously locked up fighting my criminal charge?

14   A      I would not agree with that statement.

15   Q      Okay.  So if I'm locked up, how would I be able to

16   go to court and still defend their property rights if I'm

17   fighting my criminal case in a whole different state?

18   A      Sir, you're not licensed to practice law or licensed

19   mortgage broker, so I don't know how you would have the ability

20   or the rights to reduce somebody's mortgage by 50 percent.

21   Q      Okay.  So now you say I'm not a licensed mortgage

22   broker?

23   A      Yes, sir.

24   Q      Did Broward initially charge me with unlicensed

25   mortgage broker charge?

 1      A      The initial charges, I can't recall.

 2      Q      So did the FBI charge me with unlicensed mortgage

 3 broker?

 4      A      In the Southern District, no, sir.

 5      Q      In any district in Florida?

 6      A      Not to my recollection, sir.

 7      Q      And in your investigation, you -- what would the

 8 specific federal charges that you were investigating me for

 9 that you felt you had probable cause that my business was

10 committing in Florida?

11      A      The specific charges would have been mail, wire, and

12 mortgage fraud for the Southern District.  Excuse me.

13      Q      So mail, wire, and mortgage fraud.

14      A      Yes, sir.

15      Q      And did you all ever charge me with mail, wire, and

16 mortgage fraud in Florida?

17      A      No, sir.

18      Q      Did you all receive any statements from any clients

19 that was written to your office stating that I committed fraud

20 against them, that I scammed them or defrauded them?

21      A      No, sir.

22      Q      And in your investigation, you found out that I got

23 offices in multiple states, correct?

24      A      Yes, sir.

25      Q      And do you know what those states were?

UNITED STATES DISTRICT COURT

34

```
 1        A       As specifically off the top of my head, Hawaii,

 2   here, and California, and perhaps Tennessee.

 3        Q       What about Texas?

 4        A       Yes, sir, Texas.

 5        Q       Were you one of the agents that searched my mom's

 6   home, took her computer, took the files out of her home office?

 7        A       I was present, yes, sir.

 8        Q       Okay.  So you know I had a office in Texas.  Now, in

 9   your investigation in your collaboration with the Texas FBI

10   office, how many clients in Texas filed charges against me, my

11   company, or my mother for fraud?

12        A       I don't recall, sir.

13        Q       You don't recall or you don't recall there's any?

14        A       I don't recall that there's any.

15        Q       In California, were you in contact with the FBI

16   agent or office there?

17        A       Yes, sir, for specifically for the Ventura mortgage

18   event.

19        Q       Okay.  So of all my clients in California that I

20   have, how many clients in California filed any charges against

21   me or made a complaint against me or my company for mortgage

22   fraud or scamming them or anything like that?

23               MR. SORENSON:  Your Honor, I'm going to object

24   because he keeps saying how many people filed charges and I

25   think that assumes some kind of legal conclusion.  And it
```

UNITED STATES DISTRICT COURT

1  infers that people filed charges.  We just object to the form

2  of the question.

3          THE COURT:  All right.  Overruled.

4      Okay.  If you understand the question, you can answer it.

5          THE WITNESS:  Okay.  No -- no victims in California,

6  to my knowledge and recollection.

7      Q      (BY THE DEFENDANT:)  Okay.  And so you know that

8  upon your investigation, I also have an office in Tennessee,

9  correct?

10     A      Yes, sir.

11     Q      And you know I been -- you know how long I been in

12  Tennessee?  Do you know about the time frame I was in Tennessee

13  before I came to the other states?

14     A      Yes, sir, I was aware of that.

15     Q      Okay.  So you know I was in Tennessee around 2009 --

16  since 2009?

17     A      Perhaps, yes, sir.

18     Q      Okay.  And so you're aware that the FBI office in

19  Nashville also did the same thing that you all did in Florida

20  and had my mortgage company and my common law office under

21  investigation, federal investigation?  You're aware of that

22  too, correct?

23     A      Yes, sir, I was.

24     Q      Okay.  And are you aware that one of your agents --

25  fellow agents named Joe Craig was calling around my clients and

1    telling them that I'm a crook, I'm a fraud, I'm not a real

2    minister?  Are you aware that he was doing that?

3        A     No, sir.

4        Q     Did you see the YouTube video that I posted of this

5    confrontation with that FBI office, confronting about them

6    defaming my character and slandering my name, saying I'm a

7    crook, saying my mortgage company is fraudulent?  Did you get

8    to view that video that's on YouTube?

9        A     I don't recall viewing that video, sir.

10       Q     In your communication with the Nashville office, did

11   they tell you that they ever filed any charges since 2009

12   against me, my company, or any of my employees for mortgage

13   fraud, mail fraud, wire fraud, bank fraud, or money laundering?

14       A     They did not file charges.

15       Q     Okay.  So in your investigation, the only state

16   that's ever filed any charges, federal charges against me, is

17   the state of Hawaii; is that correct?

18       A     Yes, sir.

19       Q     Okay.  And are you aware of the federal lawsuit that

20   I had previously filed against you and Agent Crawley?

21       A     A federal lawsuit?

22       Q     Yes, in 2014 and 2016.

23       A     Well, we didn't know each other, I believe, in 2014,

24   but I was not aware that you had a federal lawsuit against me.

25       Q     So you was never served at your office that federal

 1    lawsuit?

 2         A     No, sir.

 3         Q     And in Florida, who told you that I was committing

 4    these -- or possibly committing these federal crimes?  Like,

 5    did you get an anonymous tip?  Or did a client come by and say,

 6    Hey, this guy's going this?

 7         A     No, sir.  As I said before, it was just basically we

 8    viewed your website and Common Law Office of America and your

 9    status as a private attorney general, Mortgage Enterprise

10    Investments; it seemed pretty clear to us what was going on

11    from viewing the websites that were attributed to you.

12         Q     So you can tell from a website whether somebody's

13    committing a crime or not?

14         A     No, you can't.  It's a part of an investigation,

15    it's a piece of evidence.

16               THE DEFENDANT:  Can I get the government exhibit of

17    my badge and handcuffs?  I don't know what number that was.

18               THE COURT:  The photograph?

19               THE DEFENDANT:  Yeah, the photograph.

20               THE COURT:  I believe that's 604.

21               THE DEFENDANT:  That's 604.  Now, he's going to have

22    to actually get the actual ID so he can look at 'cause it don't

23    have a picture on the back side of it on here.  But I want him

24    to look at the back side of the --

25               THE COURT:  Is that still up with you?

UNITED STATES DISTRICT COURT

1          THE DEFENDANT:  The ID.

2          THE COURT:  Yeah.  So is that the badge or the ID?

3          THE DEFENDANT:  The ID.

4          THE COURT:  The ID.  So that's 505.  Do you want him

5   to look at that?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Okay.

8     Q    (BY THE DEFENDANT:)  On the back of the ID, what

9   does it say at the top?  What's written at the top?

10    A    "U.S. Congress codified the private attorney general

11  principal into law with the enactment of the Civil Rights

12  Attorney's Fees Award Act of 1976, 42 U.S.C., 1988."

13    Q    And what else is written on there?

14    A    "Senate report No. 94-9011."

15    Q    Does anywhere on there say FBI number on there?  Do

16  you see where it says, Do not detain --

17    A    "Do not detain.  Do not arrest.  FBI number."

18    Q    Okay.  And can you identify if that's the real FBI

19  number that you all have for me?

20    A    I cannot.

21    Q    You cannot verify it?

22    A    I don't have your FBI number memorized, sir.

23    Q    You all don't have it --

24    A    Memorized, no, sir.

25    Q    So if I went to the FBI office and I handed you that

1    ID, would you let me in the FBI office with that ID?

2        A    No, sir.

3        Q    You wouldn't?

4        A    No, sir.

5        Q    So if your other colleagues and your superiors let

6    me in with that ID, would you say they were breaking the law or

7    breaking your policy?

8        A    I would say it would be a lapse in judgment on their

9    part.  Perhaps, you know, this identification badge seems to

10   look legitimate when it's not.  So maybe if they were to

11   inspect it more closely, they would realize that it's a

12   fabrication.

13       Q    So -- so you're saying that your office -- your

14   colleagues, your FBI colleagues are incompetent?

15       A    No, sir.

16       Q    So they don't understand if a ID that's been handed

17   to them is valid or not?

18       A    I'm not sure of your question, sir.

19       Q    You don't understand the question?

20       A    No, sir.

21            THE COURT:  No.  So he's answered that if colleagues

22   did allow entrance using such an ID badge, he would question

23   their judgment.  So ask another question.  Move on.

24       Q    (BY THE DEFENDANT:)  So you would question one

25   agent's judgment or all agents' judgments?

UNITED STATES DISTRICT COURT

1            THE COURT:  For what?

2            THE DEFENDANT:  For letting me in with that ID,

3    'cause it's not just one.

4            THE COURT:  Well, that's assuming facts not in

5    evidence 'cause we don't know that that ever happened.

6        Second is that he's already answered that question.  He

7    would -- he would question their judgment if they allowed

8    entrance with a badge like that.  He's already testified to

9    that, so ask him another question.

10       Q     (BY THE DEFENDANT:)  Okay.  So you have a training

11   that's superior to your colleagues that you can identify what's

12   fake and they can't?

13       A     No, sir.

14       Q     So you all have the same training, so if you would

15   identify something as fake, one of your colleagues most likely

16   be able to identify something as fake, correct?

17       A     We do not get fake identification badge training, if

18   that was your question.

19       Q     Okay.  So in order for me to come to the Miami

20   office, which I did.  I came --

21           THE COURT:  Okay.  You can't testify with regard to

22   that.  That's not something he has personal knowledge.  So you

23   need to ask a question in a different area.

24       Q     (BY THE DEFENDANT:)  But if I came to the office --

25           THE COURT:  No.  He did not go -- see you come into

UNITED STATES DISTRICT COURT

1    any FBI office.  So he can only testify what he saw, what he

2    did, what he told people, what he heard.

3         So you can't give him a hypothetical, If you did this,

4    then what would you do?  Okay?

5         So you need to ask him a question about his investigation

6    or what he saw with regard to you at the airport or any other

7    place.

8         Q    (BY THE DEFENDANT:)  So if you're asserting that the

9    ID is fake, why didn't you charge me with carrying a fake

10   federal ID and I have a FBI number on there?

11        A    Well, I -- I don't know the specific United States

12   Code for fake ID.  I'm not exactly sure the violation.  I have

13   some recollection of using a false federal credentials for

14   monetary gain, but the decision of prosecution over a fake ID

15   was not made by me.

16        Q    So you're saying that it's fake, but I haven't been

17   charged with it in any jurisdiction, whether it was state

18   or --

19             THE COURT:  Well, again, you can't testify.  So he

20   can just tell you what he did, and what he's telling you is

21   that he's not responsible for deciding what criminal charges to

22   bring.  He does the investigation and then he turns it over to

23   the U.S. Attorneys.

24        So ask him a question about what he did or didn't do.

25        Q    (BY THE DEFENDANT:)  Okay.  So when you completed

UNITED STATES DISTRICT COURT

1   your investigation with -- how many other agents did you

2   investigate me with in Florida?

3        A     The other agents -- there was -- I mean, our squad,

4   my squad has approximately seven special agents.  I was the

5   lead case agent for your investigation.

6        Q     And that was for mortgage fraud?

7        A     No.  I was assigned to the domestic terrorism squad

8   at that time, sir.

9        Q     Okay.  So when did -- where did the mortgage fraud

10  come in?

11       A     Well, there was a -- what we call a parallel

12  investigation for mortgage fraud activities that was run of the

13  Miami division's mortgage fraud squad, and my squad tried to

14  focus on if there was any threats of basically force or

15  violence of yourself.

16       Q     So you assessed that I was violent?

17       A     No, sir.

18       Q     So at the conclusion of your investigation, your

19  office declined prosecution, correct?

20       A     Not my office.  The U.S. Attorney's Office, sir.

21       Q     Well, the U.S. Attorney's Office in Florida declined

22  prosecution?

23       A     Yes, sir.

24       Q     Your office also declined -- can I show him this

25  Miami office report?

43

 1                  THE COURT:  So that's -- that's his report?

 2                  THE DEFENDANT:  This is from -- it was drafted by --

 3                  THE COURT:  Well, is it an exhibit?

 4                  THE DEFENDANT:  Yes, it's an exhibit, Exhibit 2137.

 5                  THE COURT:  Okay.  So we'll put that in front of him

 6      and then you can ask him, without reading the contents, if he

 7      recognizes it.

 8                  THE DEFENDANT:  Okay.

 9                  MR. ISAACSON:  It's a new exhibit.

10                  THE COURTROOM MANAGER:  Your Honor, it's not here.

11                  MR. ISAACSON:  It's a new exhibit.

12                  THE COURT:  Oh.

13                  MR. SORENSON:  It has not been introduced, Your

14      Honor.

15                  THE COURT:  I know it hasn't been received.  But do

16      you have a copy of it?

17                  THE DEFENDANT:  Yes, right here.

18                  THE COURT:  Mr. Sorenson?

19                  MR. SORENSON:  We have a copy, I believe.

20                  THE COURT:  So --

21                  MR. SORENSON:  I'm sorry.  We don't have one.  I

22      thought it was in our books 'cause it has a number on it.

23                  MR. ISAACSON:  We showed it to you.

24                  MR. SORENSON:  Not drafted by the witness, Your

25      Honor.

UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  So do you have any objection to

2   the witness being shown the document --

3          MR. SORENSON:  No.

4          THE COURT:  -- see if he recollects it?

5          MR. SORENSON:  Not to refresh recollection, but --

6          THE COURT:  Okay.  So why don't you give a copy to

7   Ms. Elkington and we will put that in front of the -- not

8   we -- she will put that in front of the witness.

9       So, Agent Lavelle, do you recognize this document?

10      Q    (BY THE DEFENDANT:)  Is that an authentic --

11         THE COURT:  No.  I'm sorry.  I asked him a question,

12   so wait.  Wait.

13         THE DEFENDANT:  Okay.

14         THE COURT:  I'm just asking if he recognizes it.

15         THE WITNESS:  I recognize it as a FBI document, yes,

16   Your Honor.

17         THE COURT:  All right.  So ask him a question about

18   it.

19      Q    (BY THE DEFENDANT:)  Okay.  And are you familiar

20   with the Agent Leonard Fuella?  How you pronounce that?

21   Fuella?

22      A    He's a -- he would be a supervisor of the squad of

23   mortgage fraud with the Miami division.

24      Q    Okay.  So is he your direct supervisor or he just a

25   supervisor?

1     A     He is a supervisor of the mortgage fraud squad and I

2    was not on that squad.

3     Q     Okay.  And it was his determination --

4           MR. SORENSON:  Objection, Your Honor.  I think he's

5    about to tell what the content of this is.

6           THE DEFENDANT:  No.  I'm asking him a question.

7           THE COURT:  Right, no.  So -- so let me just ask a

8    question.

9     So, Agent Lavelle, are you -- were you involved at all in

10   whatever the subject is of that document?  Did you have input?

11   Did you participate in making --

12          THE WITNESS:  I did not participate in making this

13   document, but the declination of the U.S. Attorney's Office for

14   prosecution was made for a variety of reasons, if that's what

15   we're getting at.

16          THE COURT:  Okay.  So you can ask him -- he

17   obviously knows that the U.S. Attorney's Office for that

18   district for Florida declined prosecution.

19          THE DEFENDANT:  Okay.

20          THE COURT:  So do you want to ask him about that?

21   But this document, he didn't produce it, and, you know, he

22   didn't participate in direct input.  It's a different division.

23          THE DEFENDANT:  Okay.

24          THE COURT:  But he knows that they declined

25   prosecution.  That seems to be your point.

UNITED STATES DISTRICT COURT

46

1           THE DEFENDANT:  Okay.

2           THE COURT:  So you can ask him a question about

3  that.

4           THE DEFENDANT:  Okay.  Can I have this published?

5           THE COURT:  No.

6           THE DEFENDANT:  To --

7           THE COURT:  No.

8           THE DEFENDANT:  -- into evidence?

9           THE COURT:  'Cause he can't authenticate it.  But

10  you can ask him about the subject of that, which is your point,

11  right?  That they declined prosecution?

12           THE DEFENDANT:  Right.

13     Q     (BY THE DEFENDANT:)  Did you talk to any agents in

14  the New York office about my office in New York?

15     A     I don't recall.

16     Q     Did you talk to any agents in Illinois about my

17  office in Illinois?

18     A     I don't recall.

19           THE DEFENDANT:  Okay.  I don't have no more

20  questions.

21           THE COURT:  All right.  Thank you.

22           MR. SORENSON:  I have some redirect and cross, Your

23  Honor, but I won't be long.

24           THE COURT:  All right.  Very good.  You got 6 more

25  minutes.


                    UNITED STATES DISTRICT COURT

                        REDIRECT EXAMINATION

1

2    BY MR. SORENSON:

3        Q      Special Agent Lavelle, you testified on direct exam

4    with respect to the idea or concept of other states filing

5    charges.  Do you remember that?

6        A      Yes, sir.

7        Q      I think the question might have been something like,

8    So Hawaii's the only state that's ever filed charges.  Do you

9    remember that question?

10       A      Federal charges, yes, sir.

11       Q      Okay.  Well, you didn't say federal charges at the

12   time.

13       A      I believe the question was federal charges.

14       Q      Okay.  Were there charges filed in any other state?

15       A      Yes, sir.

16       Q      What charges were filed in another state?

17       A      In the state of Florida --

18              THE DEFENDANT:  Objection.  Beyond the scope.

19              THE COURT:  All right.  Overruled.  You asked him

20   about charges filed in other areas, so opened the door.

21        All right.  So the question -- you can finish your answer.

22       Q      (BY MR. SORENSON:)  Do you have personal knowledge

23   of other charges being filed?

24       A      Yes, sir.

25       Q      And did you, in fact, testify at a trial where other

1  charges were litigated?

2      A     Yes, sir.

3      Q     And who were those charges filed against?

4      A     Anthony Troy Williams.

5      Q     And do you recall what those charges were?

6      A     They were grand theft and filing false documents and

7  I believe identity theft.

8      Q     Are you familiar with the circumstances under which

9  the grand theft charges were brought?

10     A     Yes, sir.

11     Q     Were they related to mortgage fraud?

12     A     Yes, sir.

13     Q     Were they related to his -- his mortgage fraud -- or

14  mortgage reduction plan as you've described it?

15     A     Yes, sir.

16     Q     And was it this plan to reduce mortgages by

17  one-half?

18     A     Yes, sir.

19     Q     And -- and -- but in Florida, the state of

20  Florida -- was it Broward County?

21     A     Yes, sir.

22     Q     He was charged with grand theft based on that; is

23  that correct?

24     A     Yes, sir.

25           THE DEFENDANT:  Objection.

1    Q    (BY MR. SORENSON:)  Did the victims --

2         THE COURT:  Wait.  I'm sorry.  So your objection is?

3         THE DEFENDANT:  Improper impeachment by Rule 609.

4         THE COURT:  All right.  So you opened the door with

5    regard to charges being brought on the mortgage-related.  So

6    I'm going to overrule on that basis.

7    Q    (BY MR. SORENSON:)  Mr. Williams also asked you a

8    lot of questions about people complaining about him; is that

9    correct?

10   A    Yes, he did, sir.

11   Q    And were there homeowners involved with respect to

12   those grand theft charges?

13   A    There were.

14   Q    And did they have complaints?

15   A    They testified about Mr. Williams's activities in

16   mortgage.

17        THE DEFENDANT:  Objection.  Hearsay.

18        THE COURT:  All right.  Overruled.

19    Okay.  Next.

20   Q    (BY MR. SORENSON:)  And did they testify that he had

21   offered them this same scheme to --

22        THE DEFENDANT:  Objection.  That's leading and

23   hearsay.

24        THE COURT:  Okay.  Sustained.

25   Q    (BY MR. SORENSON:)  What did they testify about?

1      A      They testified about Mr. Williams acting as a
2  private attorney general and being able to reduce their --
3             THE DEFENDANT:  Objection.  Again, hearsay and
4  that's not what they testified.
5             THE COURT:  Okay.  Well, you didn't object to the
6  question.  He already began his answer, so next question.
7      Q      (BY MR. SORENSON:)  Is -- can he finish the answer,
8  Your Honor?
9             THE COURT:  No, 'cause it is hearsay.  So ask him
10  another question.  But his answer to that point will stand.
11      Q      (BY MR. SORENSON:)  Okay.  So -- and you testified
12  in this trial yourself; is that correct?
13      A      I did, sir.
14      Q      And are you familiar with what happened in that
15  trial?
16      A      I am.
17      Q      And what happened?
18      A      Mr. Williams was found guilty.
19      Q      Was Mr. Williams seated here in courtroom -- the
20  courtroom today convicted of grand theft there?
21      A      Yes, he was.
22      Q      All right.  And was he also charged any time in
23  Florida with the unauthorized practice of law?
24      A      He was.
25      Q      And do you know what that was related to?

 1        A      It was related to him -- his activities of

 2   pretending to be a board certified -- a Florida bar certified

 3   attorney.

 4        Q      Okay.  And was it in the context of representing

 5   people?

 6        A      Yes, sir.

 7        Q      And was that in court proceedings?

 8        A      It was.

 9        Q      What types of court proceedings?  Do you know?

10        A      Foreclosure proceedings.

11        Q      Do you know how many counts he was convicted of with

12   the unauthorized practice of law?

13        A      I don't recall.

14               THE DEFENDANT:  Improper 609.

15               THE COURT:  All right.  Overruled.

16        Q      (BY MR. SORENSON:)  Are you familiar with whether he

17   was convicted?

18        A      Sir, there were actually several trials for

19   Mr. Williams.  One trial I believe resulted -- it was a hung

20   jury and then there was a second trial.  So I don't have all

21   those charges.

22        Q      All right.  If you don't know for sure, don't

23   testify to it, okay?

24        A      All right.

25        Q      But was he charged with the unauthorized practice of

```
 1   law?

 2        A      He was, yes, sir.

 3        Q      And was he convicted of grand theft in Florida?

 4        A      He was.

 5        Q      Was that in Broward County, Florida?

 6        A      It was.

 7        Q      And was that related to a mortgage reduction --

 8        A      It was, yes, sir.

 9        Q      -- operation?

10        A      Yes, sir.

11               MR. SORENSON:  Thank you, Your Honor.  That's all I

12   have.

13               THE COURT:  All right.  Do you have any other

14   questions?

15               THE DEFENDANT:  Yes.

16               THE COURT:  Okay.  We have literally one minute

17   left.  So I promised them that I would finish by 2:00.

18               THE DEFENDANT:  May I start tomorrow then?

19               THE COURT:  So, well -- so if you can come up to the

20   microphone.  How many -- how much more?  'Cause you --

21               THE DEFENDANT:  It's going to be --

22               THE COURT:  -- would have had the right --

23               THE DEFENDANT:  It's going to be more than one

24   minute 'cause he opened up the --

25               THE COURT:  Understood.  So it'd be more than five
```

1  minutes?

2            THE DEFENDANT:  Yes.

3            THE COURT:  All right.  Then I'm going to excuse the

4  jury.

5       All right.  So, ladies and gentlemen, I'm going to excuse

6  you for the day.  As I promised you at the beginning, you'll be

7  released by 2 o'clock and it is 2 o'clock.

8       So please leave your things behind with regard to the iPad

9  and your notebook.  Of course, don't discuss the case with

10  anyone or allow anyone to discuss it with you.  Don't research,

11  Google, or otherwise investigate any of the witnesses or

12  issues.  And, of course, don't engage in any social media and

13  don't read, listen to, or watch any media account, should there

14  be any.

15      I wish you a very good evening on behalf of Mr. Williams

16  and all of us here.  You are excused for the day.

17      Please rise for the jury.

18            (Open court out of the presence of the jury.)

19            THE COURT:  All right.  The record will reflect that

20  the jury's no longer present.  Present are the witness and the

21  attorneys and Mr. Williams.

22      I apologize, Agent Lavelle; you're going to have to come

23  back tomorrow morning.

24            THE WITNESS:  It's okay.

25            THE COURT:  Part of the job.

54

1          THE WITNESS:  Thank you.

2          THE COURT:  You're excused for today.  Please don't

3    talk to anybody about your testimony or until the completion of

4    your testimony.

5       Okay.  So any issues that we need to take up before we --

6          THE DEFENDANT:  Yes.

7          THE COURT:  What is it, Mr. Williams?

8          THE DEFENDANT:  Do I have to wait till he leave

9    or --

10         THE COURT:  Yes, that's a good idea.

11      All right.  The record will reflect that Agent Lavelle's

12   no longer in the courtroom.

13      Mr. Williams.

14         THE DEFENDANT:  Yeah.  I asked him about federal

15   charges.  I didn't ask him about state charges.  Since he

16   brought up those state charges, I have the trial transcript for

17   the whole trial 'cause he just lied on the stand and said that

18   it was for mortgage reduction and that's not what the trial was

19   about.

20         THE COURT:  Well, you can -- you can try to impeach

21   him if he gave a statement under oath in the transcript.  If

22   it's just -- he didn't testify at it, then you can't confront

23   him with other people's testimony.

24         THE DEFENDANT:  But, no, he -- what he stated, he

25   stated that the trial was about mortgage fraud and that was not

UNITED STATES DISTRICT COURT

 1    the trial -- what the trial about.

 2            THE COURT:  Okay.  And you can ask him about that

 3    and confront him with that, like, with it.  I'm not going to

 4    put the entire trial transcript in evidence because the

 5    majority of that's going to be irrelevant, but you can show him

 6    and ask him to review a part of it or whatever and, you know,

 7    Does that refresh your recollection?  It had nothing to do with

 8    mortgage reduction or what have you.

 9            THE DEFENDANT:  Well, see, he wouldn't have been

10    sitting in the rest of the trial, you know.  He only sat in his

11    portion.  So he don't know what was testified, and so he's

12    making a comment that what was testified to by the -- and there

13    was no victim.  There was no homeowner that made a complaint.

14    That was not what the charge was.

15            THE COURT:  Okay.  So you can ask him what he

16    understands the charge was.  He's testified what he testified

17    about and if you believe that he's mistaken or lying or what

18    have you, you can point out to him, for instance, Isn't it true

19    it was about identification theft? -- or whatever.  I'm not

20    sure what the case was about.  I just used that as an example.

21            And if he says -- and not mortgage refinancing, or what

22    have you, and see what his answer is.  If he agrees with you,

23    then we move on.  If he doesn't agree with you, then you may

24    want to show him something and have him take a look at it, ask

25    him if that refreshes his recollection that, in fact, the trial

1   was about something else.

2      Okay.  But I'm not going to let the whole trial transcript

3   in evidence because it's not relevant to the issues in this

4   case.  It's going to introduce a lot of other stuff that may

5   confuse the jurors.

6          THE DEFENDANT:  I mean, that -- what he said would

7   confuse them already what he said because now they're thinking

8   that that's what I was charged with and that's not.  And then

9   he said identity theft.  I was not charged -- that has nothing

10  to do with identity theft.  I never been charged or even --

11         THE COURT:  I don't know.  So you can cross-examine

12  him on that.  So I will let you do that, okay?

13     And then I believe we'll be finished after Mr. Williams

14  has an opportunity to question.

15     But with regard to your -- I don't know if you're raising

16  an issue about the trial transcript.  I'm not going to receive

17  it into evidence for the reasons I've stated.

18     Are there any other issues that you want to bring up

19  before we recess for the day?

20         MR. ISAACSON:  Just list tomorrow's witnesses for

21  the government.

22         THE DEFENDANT:  Yeah, a list of witnesses.

23         THE COURT:  All right.  So Mr. Sorenson has handed

24  over a Post-it and it lists, I assume --

25         MR. SORENSON:  We spare no expense.

UNITED STATES DISTRICT COURT

1          THE COURT:  Yes, you're a very generous man,

2   Mr. Sorenson.

3       All right.  So anything else that we need to address with

4   regard to witnesses or evidence?

5          MR. SORENSON:  Not at this time, Your Honor.

6       Oh, one housekeeping.

7          THE COURT:  Yes.

8          MR. SORENSON:  Your Honor, I just want to make sure

9   I understand.  Mr. Williams is going to question Agent Lavelle

10  tomorrow.  Is the Court's practice not to allow either a

11  rebuttal or surrebuttal questioning in case there's some area

12  that he goes into that he opens up?

13         THE COURT:  Right.  So it's a little confusing

14  'cause he's doing cross and direct, right?

15         MR. SORENSON:  Right.

16         THE COURT:  And you're doing redirect and cross.  So

17  my intention is to let Mr. Williams finish his questioning and

18  then excuse the witness.  If, however, you feel that something

19  has come up that is, you know, misleading or that's new, then

20  I'll let you make -- state your case after he concludes outside

21  the presence of the jury and then I'll decide whether or not

22  you can ask him more questions.

23         MR. SORENSON:  Your Honor, I don't intend to come

24  back up.  If I want to, it's probably because I feel strongly

25  that there is something and I will assure the Court that I will

UNITED STATES DISTRICT COURT

1   be just as fast as I was here.

2           THE COURT:  All right.  So, yeah, I'm less concerned

3   about time than I don't know how much relevance really Agent

4   Lavelle has, and I'm sure there are other witnesses who are

5   going to speak more directly as to the allegations in the case.

6       All right.  If nothing further then, Mr. Williams, you're

7   remanded back to the custody of the U.S. Marshals Service, and

8   I wish everyone a very good evening.

9           MR. ISAACSON:  May I remain with Mr. Williams for a

10  brief time?

11          THE COURT:  You may.  I have -- so, yes.

12  15 minutes, should that be sufficient?  10 minutes?

13          MR. ISAACSON:  Yes, Your Honor.

14          THE COURT:  Okay.  Very good.  We're in recess.

15  Thank you.

16          (Proceedings adjourned at 2:07 P.M. until

17          Thursday, February 6, 2020, at 8:30 A.M.)

18

19

20

21

22

23

24

25

1  THURSDAY, FEBRUARY 6, 2020                          10:01 A.M.

2            (Partial transcript begins:)

3            THE COURT:  Good morning.  And good morning, ladies

4  and gentlemen of the jury.  Thank you for your patience with us

5  this morning.  We're trying to get the exhibits organized so we

6  could go more smoothly today.

7       So Agent Lavelle is back on the stand.  I remind you

8  you're still under oath.

9       Mr. Williams, I believe it's your turn to question.

10           THE DEFENDANT:  Can I get the government

11  exhibit -- I don't know exactly the number -- with the badge,

12  my ID?

13           MR. SORENSON:  Oh.

14           THE COURTROOM MANAGER:  It was 604.

15           MR. SORENSON:  Your Honor, may I approach and hand

16  this --

17           THE COURT:  Yes, you may, the actual badge, yes.

18           MR. SORENSON:  This is, for the record, Exhibit 501,

19  Your Honor.

20           THE COURT:  Thank you.  All right.  Let the record

21  reflect 501 is before the witness.

22       Mr. Williams.

23           **JOSEPH LAVELLE, PREVIOUSLY SWORN, RESUMED THE STAND**

24                      RECROSS-EXAMINATION

25  BY THE DEFENDANT:

UNITED STATES DISTRICT COURT

1       Q       Yes.  Mr. Lavelle -- Agent Lavelle, do you remember

2   making a statement that I had been convicted of identity theft?

3       A       No, sir.  I believe I said that you were accused.

4   Whether or not you were found guilty, uhm, there were several

5   trials in Broward County, so I believe you were charged with

6   identity theft.  I don't -- I don't recall whether or not you

7   were found guilty.

8       Q       Okay.  'Cause yesterday you had said I was found

9   guilty; that's why I questioned you about it.

10      A       Okay.

11      Q       But I was not.  So I don't have to ask you other

12  questions.

13              After your investigation, other than these federal

14  charges in Hawaii, have any of your agencies in any other state

15  filed any federal charges against me for my conduct or my

16  business conduct?

17      A       No, sir.

18      Q       And did the FBI investigate, charge, or arrest any

19  of my white employees in the state of New York?

20      A       State of New York, no, sir.

21      Q       Did they investigate, charge, or arrest any of my

22  agent employees in New York?

23      A       No, sir.

24              MR. SORENSON:  Your Honor, I'm going to object as

25  this being beyond the scope.  We were not talking about other

1  employees of his.  I think it was narrowed now to just him

2  and --

3          THE COURT:  All right.  Overruled.  Go ahead.

4      Q    (BY THE DEFENDANT:)  Did the FBI investigate charge,

5  or arrest any of my white employees in Arkansas?

6      A    No, sir.

7      Q    Did they investigate, charge, or arrest any of my

8  agent employees in Arkansas?

9      A    No, sir.

10     Q    Did they investigate, arrest, or charge any of my

11 Caucasian or Asian employees in California?

12     A    No, sir.

13     Q    Did they investigate, charge, or arrest any of my

14 Asian or Caucasian employees in Illinois?

15     A    No.

16     Q    Did they investigate, charge, or arrest any of my

17 employees in the state of Florida?

18     A    Well, the term "employee," there was Mr. William

19 Hatchett.  Whether or not he was an employee of MEI --

20     Q    He's not Caucasian.

21     A    Oh, Caucasian.  So, yes, sir, correct.

22     Q    All right.  So did you all investigate, charge, or

23 arrest any of my Caucasian employees in Florida?

24     A    Investigate, yes, sir.

25     Q    And who was that?

```
 1          A      But charge, no.

 2          Q      And who was that?

 3          A      Ms. Donna Hickenbottom.

 4          Q      Again, you investigated her, but you never charged

 5    her?

 6          A      Yes, sir.

 7          Q      And did you investigate, charge, or arrest any of my

 8    Caucasian or Asian employees in North Carolina?

 9          A      No, sir.

10          Q      Okay.  Did the FBI file any charges against me for

11    bank fraud?

12          A      Did we investigate you for bank fraud or --

13          Q      Right.

14          A      -- or charge you with bank fraud?  I'm sorry.

15          Q      Charge me for bank fraud.

16          A      We did not charge you with bank fraud.

17          Q      Did you file charges against me for mortgage fraud?

18          A      In the Southern District?

19          Q      Yes.

20          A      No, sir.

21          Q      Okay.

22          A      Of Florida.

23          Q      And did you file charges against me for unlicensed

24    mortgage broker?

25          A      Federally or state in South Florida?
```

UNITED STATES DISTRICT COURT

1          Q      In the federal?

2          A      Federal, no.  No, sir.

3          Q      Okay.  And I had questioned you yesterday about why

4     you all had designated me as a possible terrorist in your

5     system; do you remember that?

6          A      Yes, sir.

7                 THE DEFENDANT:  Okay.  I have a criminal history

8     from the FBI.  It's Exhibit 2114, and it's on -- start at

9     page 7.

10                MR. SORENSON:  Your Honor?

11                THE COURT:  Yes.

12                MR. SORENSON:  We have looked at 2114.  It does not

13    have a criminal history in it and certainly not an FBI criminal

14    history.  There is a DMV record in here I see.

15                THE COURT:  Can I have a copy of it?

16                MR. SORENSON:  It's 2114.

17                THE DEFENDANT:  Yes, page 7.

18                THE COURT:  Do you have a copy for the court?

19    You're supposed to have a copy for the court, the law clerk,

20    the witness.

21                MR. ISAACSON:  We have two sets of binders.

22                THE DEFENDANT:  Yes, it's Defense Exhibit 2114.

23                MR. ISAACSON:  It's over there, Judge.  I can bring

24    you --

25                THE COURT:  Yeah, but where's the court copy?  Do

 1   you not want the witness to have one?

 2              MR. ISAACSON:  Yes, Your Honor.  We have two sets of

 3   binders.  Can I give you those?

 4              THE COURT:  Where's the court's copy?  That's all

 5   I'm asking.  It's in here?

 6              THE COURTROOM MANAGER:  Is this part of the exhibits

 7   that were already in the binders?

 8              MR. ISAACSON:  Yes, yes.

 9              THE DEFENDANT:  Yes.

10              THE COURTROOM MANAGER:  Thank you.

11              THE COURT:  So this is not a new exhibit that --

12              THE DEFENDANT:  No, it's not a new exhibit.

13              THE COURT:  All right.  So, Mr. Sorenson, are you

14   referring to page 7 or the entire document?

15              MR. SORENSON:  Well, there's a -- there's a lot of

16   stuff in here.

17              THE COURT:  Correct.

18              THE DEFENDANT:  I'm only going to question him on

19   page -- off of page 7, 8, 9, and 10.

20              MR. SORENSON:  Okay.

21              THE COURT:  Where's the page numbering for that?

22              THE DEFENDANT:  It should be at the bottom.  It says

23   2114 dash and it has 000007.

24              THE COURT:  Okay.  I'm not --

25              THE DEFENDANT:  Bates number 029020.

UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  So you're going to question him

2  as to 7, 8, and 9?

3          THE DEFENDANT:  Yeah, 7, 8, 9, and 10.

4          THE COURT:  This is 2014, right?

5          THE DEFENDANT:  2114.  2114.

6          THE COURT:  Yeah, so 2114, I don't have that page

7  numbering.  I have 290116, 290117 on the bottom right-hand

8  corner.  I'm sorry.  What --

9          THE COURTROOM MANAGER:  It's Exhibit 2114, Your

10  Honor.

11          THE COURT:  Oh, so the one in the middle you're

12  talking about, not the bottom right?

13          THE DEFENDANT:  Yeah, the one in the middle, yeah.

14  It should have Message Detail at the top, the name --

15          THE COURT:  Yes, I see that.

16          THE DEFENDANT:  Okay.

17          THE COURT:  7, 8 and 9.  You're going to question

18  him about 9 and 10?

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  Okay.  And so plaintiffs, I'm sorry, you

21  have an objection to this or --

22          MR. SORENSON:  Well, I -- Your Honor, I think it's

23  an incomplete record.  It does appear to be related to

24  Mr. Williams.  He's purported to call this his criminal

25  history, which it is not.  It may be part of an NCIC record,

1    but we're not sure.  It's certainly not complete.

2      I guess if he needs the witness to have his recollection

3    refreshed by something, this could be used for that, but it's

4    certainly not something he can subsequently talk about from

5    here as to the content of it.

6            THE COURT:  All right.  So if you can lay a

7    foundation that this witness is familiar with this or somehow

8    created it or relied on it, then you can ask him questions

9    about it.

10           THE DEFENDANT:  Okay.

11           THE COURT:  All right?

12      Q    (BY THE DEFENDANT:)  You have the document in front

13   of you, Agent Lavelle?

14      A    I do.

15      Q    And do you recognize that that's like a criminal

16   NCIC check for, you know, individuals when they run it?

17      A    It does appear to be so, yes, sir.

18      Q    Okay.  And where it says --

19           THE COURT:  Before you go into the content, he has

20   to say that he used it, that he's familiar with this, that he

21   knows who it's related to.

22           THE DEFENDANT:  Okay.

23      Q    (BY THE DEFENDANT:)  Can you just go over and see

24   who it's related to?

25           THE COURT:  Well, first of all, Agent Lavelle, are

1  you familiar with this format of this document?

2            THE WITNESS:  I am, yes, Judge.

3            THE COURT:  Okay.  And that's the type of document

4  or information that you use in your duties as a FBI agent,

5  correct?

6            THE WITNESS:  Yes, Judge.

7            THE COURT:  Okay.  And so by looking at this

8  document, can you see if it refers to any individual?

9            THE WITNESS:  Yes, I do.

10           THE COURT:  Okay.  So you can ask him now with

11  regard to the contents.

12      Q      (BY THE DEFENDANT:)  Okay.  And who does this

13  document refer to, Agent Lavelle?

14      A      Anthony Troy Williams.

15      Q      Okay.  And on the -- it should have a gray area

16  that's highlighted.  The first gray area that's highlighted, do

17  you see what that says?

18      A      Yes, I do.

19      Q      And is that related to what we talked about about

20  the FBI putting me on a possible terrorist list?

21      A      Well, list -- the questioning yesterday were if -- I

22  think you asked me was if I thought you were a terrorist or

23  something along those lines.

24      Q      Well, that I was classified by the FBI as being a

25  possible terrorist.

1          A     Yes, sir.

2                THE DEFENDANT:  Okay.  Can I move the --

3                THE COURT:  You wanted to move this page and the

4     next page into evidence?

5                THE DEFENDANT:  Yes, ma'am.

6                THE COURT:  All right.  Any objection?

7                MR. SORENSON:  Well, Your Honor, if it's purported

8     to be a criminal history, like I indicated, it's not a complete

9     document.  There's a --

10               THE COURT:  Let him put --

11               MR. SORENSON:  There appears to be a selective

12    choice of a couple pages here.  We're willing to stipulate that

13    the document states that he was on a terrorist watch list.

14               THE COURT:  All right.  Mr. Williams.

15               THE DEFENDANT:  Well, the whole document, I mean,

16    you can start from page 1 where it says Suspect, but I thought

17    we'd just expedite it so I don't have to go through all this

18    stuff.

19               THE COURT:  So you want this page which says Page 1

20    of 1 and Page 2 of 2?  Or you don't want the second page?

21               THE DEFENDANT:  Yeah, I really wanted to enter in 7,

22    8, but we can enter the whole thing if need be, if you want to

23    have the continuity of the whole document.  But the rest of the

24    document is really not relevant to Mr. Lavelle, and, you know,

25    with them putting me on a terrorist watch list.

UNITED STATES DISTRICT COURT

1          THE COURT:  I agree.  So over the objection of the

2    government, Exhibit 2114 at pages 2114-000007, and -08 will be

3    received.

4          THE DEFENDANT:  All right.  And I would like to

5    publish it.

6          THE COURT:  All right.  You may publish.  You're

7    going to have to use the docucam.  I don't think the government

8    has it on its computer.

9          (Exhibits 2114-000007, 2114-000008

10         received into evidence.)

11   Q     (BY THE DEFENDANT:)  Okay.  Can you see that on the

12   screen?

13   A     Yes, sir.

14         THE DEFENDANT:  Can you put it on here?  'Cause I

15   can't see it on this one.  It's not going to show on this

16   screen.

17         THE COURTROOM MANAGER:  Your Honor, I believe it's

18   because it's hooked to the -- thank you.

19   Q     (BY THE DEFENDANT:)  Okay.  Agent Lavelle, can you

20   read what the first thing highlighted that says "Do not

21   advise"?

22   A     "Do not advise this individual that they may be on a

23   terrorist watch list."

24   Q     And is that the normal procedure with the FBI if

25   they do have someone on the terrorist watch list that they

1    don't advise them that they're on that type of list?

2    A    Yes, sir.

3    Q    And can you go down to where it says the Do not

4    detain and read that what that says?

5    A    "Do not detain or arrest this individual unless

6    there's evidence of a violation of federal, state or local

7    statutes."

8    Q    Okay.  And can you read under where it says "Law

9    enforcement sensitive information" starting with "Warning"?

10   A    "Warning.  The following record contains expired

11   license plate data.  Use caution.  Contact entering agency to

12   confirm status."

13        You want me to continue?

14        "Do not advise this individual they are on a

15   terrorist watch list, possible terrorist organization member.

16   Caution."

17   Q    So when a police officer sees this type of

18   information and, say, they stop me, would that put them on a

19   heightened alertness or awareness when they stop me?

20   A    Yes, sir.

21   Q    So that will place me in a more dangerous situation

22   with a law enforcement officer being that I been labeled as a

23   terrorist, wouldn't you say?

24   A    I would not agree with that.

25   Q    So if they were being on alert heightened, so

1    they're not going to treat me just as a average citizen, would

2    you not say?

3         A    I would agree they would follow their normal

4    procedures with whatever incident that they would have

5    encountered you with.  I don't know what -- are you talking

6    about like a traffic stop?

7         Q    Right.  Any type of encounter.  So if they pull this

8    up --

9         A    Right.

10        Q    -- they gonna be on more of a, like, alerted;

11   otherwise they wouldn't be so, you know, Okay, this guy might

12   be a terrorist.  You know what I'm talking about?  Like that?

13        A    Sir, I would say a local police officer's always on

14   high alert.  He's always going to be aware of his surroundings

15   and any potential danger.  Traffic stops are inherently

16   dangerous for any individual they pull over, so...

17        Q    So do you all put this for every citizen?  Do you

18   all put this in your system for every citizen?

19        A    No, sir.

20        Q    So I've been selected to have a different status

21   than the average citizen when I'm pulled over?

22        A    Yes, sir.

23        Q    Where you see where it says Date of birth, can you

24   read that line where it says "FBI" and the number?

25        A    Hmm, I'm trying to find the line.  Is it towards the

UNITED STATES DISTRICT COURT

1   bottom?

2       Q      You see where the first redacted --

3       A      The first redaction under 1971?

4       Q      Right.

5       A      Right.

6       Q      It's on that line.  You see where it says "FBI"?

7       A      658?

8       Q      Right.  Can you read that number for me?

9       A      658566RB7.

10      Q      And what is that number?

11      A      That's your FBI number according to this document.

12      Q      Okay.  So if you was to look up that number in the

13  FBI system, that would bring up the information regarding me?

14      A      It would -- I could use that number to bring up your

15  NCIC.

16      Q      Okay.  So when you brought up the NCIC from that

17  number, it would bring up all this information?

18      A      Theoretically, yes, sir.

19             THE DEFENDANT:  Okay.  Now we need to go to

20  Government Exhibit 604, and I'd like to publish.

21             MR. SORENSON:  No objection, Your Honor.

22             THE COURT:  Okay.  You need to hook in the laptop

23  again?  Is it hooked in?

24             MR. SORENSON:  Your Honor, I think it's good to go.

25             THE COURT:  All right.  It's not on the screen.

```
 1                THE COURTROOM MANAGER:  Oh, sorry.  There we go.

 2        Q     (BY THE DEFENDANT:)  And you have a copy of

 3   the -- my actual ID up there with you?

 4        A     I do.

 5        Q     Okay.  Can you look on the back of the ID?  And do

 6   you see where it says "FBI number"?

 7        A     I do.

 8        Q     And can you read that number for me?

 9        A     658566R137.

10        Q     And is that the same number that's on the FBI NCIC

11   report?

12        A     With the exclusion of the last few digits, the first

13   7 or so digits are identical.

14        Q     Okay.  So if you saw that number, you would

15   recognize that that's a FBI number that they have assigned to

16   me?

17        A     Yes, sir.  Sir, as we spoke yesterday, I don't have

18   your FBI number memorized, I mean, no.

19        Q     Okay.  But if that was my FBI number, you would be

20   able to -- if I presented that ID to you, you could look in

21   your system and it would bring up any information regarding me

22   if that's my FBI number that's printed on there?

23        A     It would bring up your NCIC criminal history.

24        Q     And so you would be able to identify that that's who

25   I am --
```

UNITED STATES DISTRICT COURT

1        A       Yes, sir.

2        Q       -- correct?

3                Okay.  I'd like for to you look at the letter that's

4     on exhibit page 9 -- 2114, page 9.  You have that in front of

5     you?  And who is that letter addressed to?

6        A       FBI Honolulu.

7                MR. SORENSON:  Your Honor, this is not in evidence,

8     this letter.  Appears to be a letter written by Mr. Williams.

9                THE COURT:  All right.  So you can't refer to the

10    contents of the report.

11               THE DEFENDANT:  Okay.

12               THE COURT:  Unless you establish that somehow he

13    created it, received it, used it, has personal knowledge.

14       Q       (BY THE DEFENDANT:)  Are you familiar with this

15    letter that I sent to the FBI Honolulu?

16       A       Not off the top of my head, sir.

17               THE DEFENDANT:  Okay.  I can't question him on

18    this.  I have no more questions for Agent Lavelle.

19               THE COURT:  All right.  Thank you very much.

20          Mr. Sorenson, I'll give you a brief -- I don't know what

21    this is.  If it's --

22               MR. SORENSON:  Mercifully, Your Honor, no.  We will

23    not go forward.

24               THE COURT:  All right.  Very good.  So Agent Lavelle

25    I thank you.  I excuse you as a witness.  You can leave all the

1    exhibits there and please don't discuss your testimony with

2    anyone till the conclusion of the trial.  Good day.

3           (This concludes the partial testimony requested.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25