```
 1                IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF HAWAII

 3
     UNITED STATES OF AMERICA,     ) CR 17-00101 LEK
 4                                 )
              Plaintiff,           ) Honolulu, Hawaii
 5                                 ) February 6, 2020
        vs.                        )
 6                                 ) PARTIAL TRANSCRIPT:
     (1) ANTHONY T. WILLIAMS,      ) TESTIMONY OF BRYCE OLESKI
 7                                 )
              Defendant.           )
 8   _____)

 9
                PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
10            BEFORE THE HONORABLE LESLIE E. KOBAYASHI
                    UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Government:          KENNETH M. SORENSON, AUSA
13                                GREGG PARIS YATES, AUSA
                                  Office of the United States Attorney
14                                300 Ala Moana Boulevard, Suite 6100
                                  Honolulu, Hawaii 96850
15
     Also Present:                MEGAN CRAWLEY, FBI Special Agent
16
     For the Defendant (1)        ANTHONY T. WILLIAMS, Pro Se
17   Anthony T. Williams:         05963-122
                                  Federal Detention Center Honolulu
18                                Inmate Mail/Parcels
                                  P.O. Box 30080
19                                Honolulu, Hawaii 96820

20   Standby Counsel:             LARS ROBERT ISAACSON, ESQ.
                                  547 Halekauwila Street, Suite 102
21                                Honolulu, Hawaii 96813

22   Official Court Reporter:     Debra Read, RDR
                                  United States District Court
23                                300 Ala Moana Boulevard
                                  Honolulu, Hawaii 96850
24
     Proceedings recorded by electronic sound recording; transcript
25   produced with computer-aided transcription (CAT).
```

1                          I N D E X

2                CHRONOLOGICAL INDEX OF WITNESSES

3

4    GOVERNMENT'S WITNESS                                    PAGE

5

6    **BRYCE OLESKI**
       Direct Examination By Mr. Yates                         3
7      Cross-Examination By The Defendant                      9
       Redirect Examination By Mr. Yates                      15
8

9

10
                           I N D E X
11
                         E X H I B I T S
12

13
     NO.                                                     PAGE
14

15     605                                                     6
       606                                                     7
16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1              THURSDAY, FEBRUARY 6, 2020
    11:47 A.M.
 2
                    (Partial transcript begins:)
 3         BRYCE OLESKI, GOVERNMENT'S WITNESS, WAS SWORN

 4            THE COURTROOM MANAGER:  Thank you.  Please be

 5   seated.

 6       State your name and spell your last name for the record.

 7            THE WITNESS:  My name is Bryce Oleski, last name

 8   O-l-e-s-k-i.

 9            THE COURT:  Your witness, Mr. Yates.

10            MR. YATES:  Thank you, Your Honor.  May I approach

11   to hand the witness binder to the court manager?

12            THE COURT:  You may.  And, Mr. Williams, do you have

13   the exhibits that are in the witness binder, the numbers?

14            MR. ISAACSON:  One moment, Your Honor.

15            THE COURT:  All right.  You may hand it to the

16   witness.

17            MR. YATES:  Thank you.

18            MR. ISAACSON:  Could I see 605 again?

19                      DIRECT EXAMINATION

20   BY MR. YATES:

21       Q    Good morning.

22       A    Good morning.

23       Q    Can you please explain to the jury who your employer

24   is?

25       A    Sure.  I work for the FBI as a special agent.  I
```

1  work white collar crime in the Washington, D.C. area.

2       Q    That's the Washington field office?

3       A    That's correct.

4       Q    Now, you were involved in the investigation of
5  Anthony Williams and Mortgage Enterprise Investments, correct?

6       A    Yes.

7       Q    And can you please explain to the jury what you were
8  tasked to do?

9       A    Sure.  So the Honolulu office of the FBI reached out
10 to me and asked me to assist with the investigation.
11 Specifically, they asked me to take a look at an address in
12 Washington, D.C., 6230 Third Street, NW, Unit No. 5 in
13 Washington, D.C., and they gave me a list of businesses, and
14 they wanted me to verify or disprove whether those businesses
15 had actually operated at that address in Washington, D.C.

16      Q    Okay.  And what businesses were you tasked to look
17 up?

18      A    There were several, specifically, Mortgage
19 Enterprise Investments, the Common Law Office of America, the
20 United States Office of the Private Attorney General, Federal
21 Mortgage American Trust, and the Federal American Title
22 Company.

23      Q    Okay.  Now, what evidence did you uncover that there
24 was a business at 6230 Third Street, NW, Apartment or Suite 5
25 called the Federal Mortgage American Trust?

1    A    There was no evidence that that business ever
2  operated from that address.
3    Q    Did you conduct a business records search for
4  businesses in Washington, D.C., at that address between 2012
5  and 2015?
6    A    Yes, I did.
7    Q    And what was the results of that business records
8  search?
9    A    So I went on the Washington, D.C. business records
10 site and I typed in the address, and it came up with eight
11 businesses that operated during that time frame, none of which
12 were any of the businesses I previously mentioned.
13   Q    Now, did you ever visit that address, 6230 Third
14 Street, NW?
15   A    I did.
16   Q    Okay.  I'm going to ask you to turn to an exhibit in
17 front of you, that is, Exhibit 605.
18   A    All right.  I'm looking at it.
19   Q    So before we show that to the jury, I ask you if you
20 recognize Exhibit 605?
21   A    I do.
22   Q    Okay.  And is Exhibit 605 a photograph that you
23 took?
24   A    Yes.
25   Q    And is that a fair and accurate depiction of the

1    commercial property that that's at 6230 Northwest,

2    Washington, D.C.?

3        A    Yes.

4             MR. YATES:  Your Honor, at this time we ask to admit

5    Exhibit 605.

6             THE COURT:  Any objections?

7             THE DEFENDANT:  No objection.

8             THE COURT:  Received.

9             (Exhibit 605 received into evidence.)

10            MR. YATES:  May we publish, Your Honor?

11            THE COURT:  You may.

12       Q    (BY MR. YATES:)  The jury is now looking at

13   Exhibit 605.  Can you please explain to the jury what it is

14   that they're looking at?

15       A    Sure.  This is a photo that I took of the outside of

16   the address that I mentioned.  The bottom floor is a day care

17   center, and then in the very center of the photo is a door that

18   leads to the upstairs, and when you go up the stairs it's a

19   long hallway with offices on either side.

20       Q    I'm going to ask you, Agent Oleski to look in your

21   binder at Exhibit 606.

22       A    All right.

23       Q    And before I ask to have this moved in, I'm going to

24   ask you some foundational questions.

25            Do you recognize Exhibit 606?

1      A      I do.

2      Q      Okay.  Now, is 606 a photograph that you took?

3      A      Yes.

4      Q      And is this a fair and accurate depiction of what
5   appears to be a sign at the commercial property 6203
6   Street -- Third Street, NW?

7      A      Yes.

8             MR. YATES:  Okay.  Your Honor, at this time I ask to
9   move into evidence Exhibit 606.

10            THE COURT:  Any objection?

11            THE DEFENDANT:  No objection.

12            THE COURT:  Received.

13            (Exhibit 606 received into evidence.)

14            MR. YATES:  May we publish?

15            THE COURT:  You may.

16     Q      (BY MR. YATES:)  Sir, so can you please explain to
17  the jury what they're looking at Exhibit 606?

18     A      Sure.  So at the building that I showed you that we
19  looked at a photograph of a minute ago, as soon as you open the
20  door, this is the directory that hangs on the wall of the
21  businesses that operate out of that building.

22     Q      So when you got to the property, can you please
23  explain to the jury what it is that you did?

24     A      Yes.  So I -- when I arrived at the property, I
25  walked around, I took photos of the outside.  The front door is

1    actually locked with a pin code, so I spoke with someone and
2    they let me in, walked up the stairs -- or actually before I
3    walked up the stairs, I took this photo, and then when I walked
4    up the stairs, I spoke with a few of the neighbors and they
5    directed me to the landlord, the person who managed the
6    property.
7         Q    What was the name of that landlord?
8         A    It was a gentleman by the name of Micah Bump.
9         Q    And did you get a sense for how large Suite 5 of the
10   property at 6203 Third Street, NW, is?
11        A    Yes.  I got to enter the suite directly adjacent to
12   it and it was about 550 square feet roughly, big enough for a
13   few desks for people to work at.
14        Q    Did you ascertain the name of the tenant who
15   occupied Suite 5 of that address from 2012 to 2015?
16        A    I did.  It was -- it's actually on this
17   list -- Integrative Bodywork and Massage.  It's a office where
18   they have -- gave massages.
19        Q    How about historically between 2012 and 2015?
20        A    Sure.  Between 2012 and 2015, the person who leased
21   the unit was named Dorita M. Dixon.
22        Q    Did you have an opportunity to speak with Ms. Dixon?
23        A    I did.
24        Q    And what did she say about whether she knew Anthony
25   Williams?

```
 1                THE DEFENDANT:  Objection.  That's hearsay.
 2                MR. YATES:  It's actually --
 3                THE COURT:  Go ahead.
 4                MR. YATES:  Oh, that's not offered for the truth.
 5                THE COURT:  All right.  But regarding his
 6   investigation and steps he took.  All right.  Overruled on that
 7   basis.
 8        Q   (BY MR. YATES:)  And what did she say about whether
 9   she knew Ms. Anthony Williams?  Excuse me.
10        A   She said that she did not know Anthony Williams.
11                MR. YATES:  Nothing further on direct, Your Honor.
12                THE COURT:  All right.  Any questions, Mr. Williams?
13                THE DEFENDANT:  Yes.
14                          CROSS-EXAMINATION
15   BY THE DEFENDANT:
16        Q   Mr. Oleski, you out of the Washington, D.C. office?
17        A   So I'm part of the Washington field office, but I
18   physically sit in Manassas, Virginia.
19        Q   And did you speak with one of my employees in
20   Washington, D.C., named Shirley Ann Stewart?
21        A   I did not.
22        Q   Okay.  And did you know that she runs my office in
23   Washington, D.C.?
24        A   I did not.
25        Q   Okay.  Did you visit my office there?
```

1	A	I don't know your office.
2	Q	Okay.  And the address that he just had you read, did you know that that was just a mailing address for Federal Mortgage American Trust and not the actual physical location?
5	A	I did not know; however, from speaking with Ms. Dixon, I've determined that she did not receive mail there that didn't belong to her.
8	Q	Okay.  So she told you that she did not know me at all?
10	A	That's correct.
11		DEFENDANT WILLIAMS:  Okay.  Can I get the government Exhibit 817, please?
13	Q	(BY THE DEFENDANT:)  And before I get into this, are you familiar with FedEx and UPS where you can actually purchase a mailing address from one of those businesses but not have your physical address actually at the FedEx or UPS store?
17	A	Can you resay the question?
18	Q	Are you familiar with, you know, the UPS and FedEx where you can actually purchase a business mailing address just for mailing purposes and your actual physical business not be at that mailing address?
22	A	I was not aware that that -- that you can use a address that you're not physically at.
24	Q	Okay.  On this document -- can I publish it?
25		THE COURT:  It's not in evidence, I believe.

UNITED STATES DISTRICT COURT

```
 1                THE DEFENDANT:  Can I enter it into evidence.
 2                THE COURT:  It is in evidence?  Okay.  Then you may
 3   publish.
 4                THE DEFENDANT:  Okay.
 5        Q   (BY THE DEFENDANT:)  And are you familiar with this
 6   type of document?
 7        A    No, I'm not.
 8        Q    So you not familiar with sending MoneyGram from
 9   Walmart?  You've never seen a MoneyGram sent from Walmart?
10        A    I've seen MoneyGram before.  I'm not personally
11   familiar with this document.
12        Q    Okay.  Can you read who the sender information is,
13   who the end is sender is on this document?
14        A    "Sender information:  Anthony Williams."
15        Q    Okay.  And can you read who the receiver is on this
16   document?
17        A    "Receiver:  Dorita Dixon.
18        Q    Okay.  Now, you just testified that Dorita Dixon
19   said she did not know me?
20        A    That's correct.
21        Q    Okay.  So from this document could you ascertain
22   that she does know me, if I'm sending her money?
23        A    I don't know that.
24        Q    Okay.  So -- but you talked to her?
25        A    I did speak with her.
```

1    Q    Okay. And I'm showing you a document of a money
2  order of a wire that I sent from MoneyGram from me to her. And
3  what's her address there? What's the city and state?
4    A    I see two addresses. Are you talking about the part
5  of the box you're sending from or --
6    Q    No, the receiver. What's the receiver's city and
7  state destination? What's the receiver's --
8    A    Destination is Washington, D.C.
9    Q    Washington. And does it have a phone number?
10   A    Yes.
11   Q    Okay. Do you -- do you know like what's the prefix
12 for usually Washington, D.C. numbers?
13   A    It's 202.
14   Q    Okay. So that is a Washington, D.C. number?
15   A    It would appear to be so.
16   Q    Okay. So if I'm sending someone a MoneyGram, and I
17 have their actual number, that is, a number that's in the
18 Washington, D.C. area, would you say that I actually do know
19 this person, that I have had communication in order for me to
20 send them some money?
21   A    It's possible; however, dealing with a lot of
22 identity theft, I do not know -- I would not know that to be
23 proof that you know this person.
24   Q    Okay. So -- and when you -- have you ever done a
25 MoneyGram?

1    A    I have not.

2    Q    You ever sent a Western Union?

3    A    Yes.

4    Q    Okay.  So if you sent the Western Union, what is the
5  procedure in sending the money?  Do you have to -- let me ask
6  you this question.

7    A    Sure.

8    Q    Do you have to present valid identification to send
9  it?

10   A    You have to present identification.  Doesn't have to
11 be valid as my experience in identity theft tells me.

12   Q    Okay.  So what type of identification would you have
13 to present in order to send money?

14   A    You'd want to present some type of photo ID.

15   Q    And that would consist of what?

16   A    Could be a driver's license.

17   Q    A driver's license.  Could it had be state ID?

18   A    I'm not an expert on Western Union, but I assume it
19 could be.

20   Q    So if you was to receive it when someone send you
21 money and you go to, say, Western Union and MoneyGram and say,
22 "Hey, someone sent me some money," so would you have to present
23 valid identification that you were the person that the money
24 was sent to so you would be the right person to pick that money
25 up?  Correct?

 1	A	I believe you do.
 2	Q	Okay.  So could you see the amount of money that I
 3	sent?  What was the amount?
 4	A	$430.
 5	Q	Okay.  Now, did you ask her had she ever had any
 6	money sent to her from me?
 7	A	No, I did not.
 8	Q	Okay.  Did you ask the building manager how much did
 9	it cost to rent a mailing address there?
10	A	I did not.
11	Q	Okay.  So how do you know that I didn't have a
12	mailing address purchased for this location by Ms. Dorita
13	Dixon?
14	A	So my understanding is that Dorita Dixon doesn't
15	have the ability to sell a mailing address for a location she
16	doesn't own.  Speaking with the property manager, I would
17	believe that the property manager would have knowledge of such
18	a deal.
19	Q	So she had never had rented a spot out of there?
20	She had never rented a office space or a space there?  She had
21	never rented it at all?
22	A	No, she absolutely rented a space there.
23	Q	Okay.  So she did rent a space there.  Okay.  So how
24	long was she there?
25	A	I don't know the full length.  I just know she was

 1   there between 2012 and 2015.
 2        Q    Okay.  So she was there during the time that the
 3   trustee of the company that I have as trustee listed as the
 4   mailing address, correct?
 5        A    That's correct.
 6        Q    Okay.  So do you not understand that that was
 7   the -- what the money was sent for to have a mailing address in
 8   Washington, D.C., that was attached to my Washington, D.C.
 9   office?
10        A    I do not understand that.
11        Q    Okay.  So you didn't complete your investigation?
12        A    I completed the investigation of speaking with
13   Dorita Dixon on and asking her if she knows Anthony Williams,
14   and she said no.
15        Q    So you never talked to anybody else in Washington,
16   D.C., any of my other employees in Washington, D.C.?
17        A    I don't know who your employees are.
18             THE DEFENDANT:  Okay.  I have no more questions.
19             THE COURT:  All right.  Thank you.
20        Mr. Yates, do you have any questions?
21             MR. YATES:  Very briefly, Your Honor.
22                         REDIRECT EXAMINATION
23   BY MR. YATES:
24        Q    Agent Oleski, you testified that you did conduct
25   some interviews in connection with your investigation, correct?

```
 1      A     That's correct.
 2      Q     And you were asked in particular by Anthony Williams
 3   regarding your interaction with Ms. Dorita Dixon, correct?
 4      A     That's correct.
 5      Q     And Dorita Dixon indicated to you that
 6   you -- that -- excuse me -- that she did not know Anthony
 7   Williams, correct?
 8      A     That's correct.
 9      Q     All right.  And then Mr. Williams had raised and
10   presented to you and showed to you Exhibit 817, correct?
11      A     That's correct.
12      Q     Okay.  And 817 appears to --
13            THE COURT:  We have it in front of us, so what's
14   your question.
15      Q     (BY MR. YATES:)  Okay.  Is it possible that Dorita
16   Dixon was lying about knowing Mr. Anthony Williams?
17      A     Absolutely possible.
18            MR. YATES:  Nothing further.
19            THE COURT:  All right.  You're excused as a witness.
20   Thank you.  Please don't discuss your testimony with anyone
21   until the conclusion of the trial.  Good day, sir.
22            THE WITNESS:  Thank you, ma'am.
23         (This concludes the partial testimony requested.)
24
25
```

```
 1                    COURT REPORTER'S CERTIFICATE

 2

 3             I, DEBRA READ, Official Court Reporter, United

 4   States District Court, District of Hawaii, do hereby certify

 5   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 6   true, and correct transcript of the stenographically reported

 7   proceedings held in the above-entitled matter and that the

 8   transcript page format is in conformance with the regulations

 9   of the Judicial Conference of the United States.

10
             DATED at Honolulu, Hawaii, February 23, 2020.
11

12

13                    /s/ Debra Read

14                    DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25
```