1          IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF HAWAII

 3

    UNITED STATES OF AMERICA,      ) CR 17-00101 LEK
 4                                  )
              Plaintiff,            ) Honolulu, Hawaii
 5                                  ) February 6, 2020
        vs.                         )
 6                                  ) PARTIAL TRANSCRIPT:
    (1) ANTHONY T. WILLIAMS,        ) TESTIMONY OF LOREEN TROXELL
 7                                  )
              Defendant.            )
 8    _____)

 9

10          PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE LESLIE E. KOBAYASHI
11               UNITED STATES DISTRICT JUDGE

11
    APPEARANCES:
12
    For the Government:     KENNETH M. SORENSON, AUSA
13                          GREGG PARIS YATES, AUSA
                            Office of the United States Attorney
14                          300 Ala Moana Boulevard, Suite 6100
                            Honolulu, Hawaii 96850
15
    Also Present:           MEGAN CRAWLEY, FBI Special Agent
16
    For the Defendant (1)   ANTHONY T. WILLIAMS, *Pro Se*
17  Anthony T. Williams:    05963-122
                            Federal Detention Center Honolulu
18                          Inmate Mail/Parcels
                            P.O. Box 30080
19                          Honolulu, Hawaii 96820

20  Standby Counsel:        LARS ROBERT ISAACSON, ESQ.
                            547 Halekauwila Street, Suite 102
21                          Honolulu, Hawaii 96813

22  Official Court Reporter: Debra Read, RDR
                            United States District Court
23                          300 Ala Moana Boulevard
                            Honolulu, Hawaii 96850
24
    Proceedings recorded by electronic sound recording; transcript
25  produced with computer-aided transcription (CAT).

                    UNITED STATES DISTRICT COURT

1                        I N D E X

2              CHRONOLOGICAL INDEX OF WITNESSES

3

4    GOVERNMENT'S WITNESS                              PAGE

5
     Direct Examination By Mr. Yates                     3
6    Cross-Examination By The Defendant                 18
     Redirect Examination By Mr. Yates                  53
7    Recross-Examination By The Defendant               59

8

9                        I N D E X

10                     E X H I B I T S

11

12   NO.                                              PAGE

13
     409                                                51
14   806                                                 9
     2040                                               32
15

16

17

18

19

20

21

22

23

24

25

                 UNITED STATES DISTRICT COURT

1   THURSDAY, FEBRUARY 6, 2020                                8:42 A.M.

2                 **LOREEN TROXELL, GOVERNMENT'S WITNESS, WAS SWORN**

3                 THE COURTROOM MANAGER:  Thank you.  Please be

4   seated.

5        Please state your full name and state your -- spell your

6   last name for the record.

7                 THE WITNESS:  My first name is Loreen, my last name

8   is Troxell.

9                 THE COURT:  Okay.  Just a minute.  Can everybody see

10  the woman?  I'm just concerned.  The seat's a little low.

11  Would that -- or is it the screen?  The monitor, okay.

12       So we're going to move the monitor to the side.  Is that

13  better?  Can you see or you want it moved some more?  I mean,

14  let us know because you need to be able to see the witness.

15       Okay.  All right.  Thank you very much, Ms. Elkington.

16       Mr. Yates, your witness.

17                 MR. YATES:  Thank you, Your Honor.  May I approach

18  the courtroom manager to pass along this binder?

19                 THE COURT:  You may.  And, Mr. Williams, do you have

20  the exhibit range for this witness?

21                 MR. YATES:  We discussed this prior to testimony.

22  It's going to be Exhibit 806 and 206.

23                 THE COURT:  All right.  You may begin.

24                          DIRECT EXAMINATION

25  BY MR. YATES:

1    Q     Good morning.  Ms. Troxell, can you please briefly

2    explain to the jury what you do for a living?

3    A     I am a caregiver.

4    Q     And where are you employed as a caregiver?

5    A     Aiea.

6    Q     Do you have a care home?

7    A     Foster home.

8    Q     Okay.  And who is -- who owns that foster home?

9    A     I do.

10   Q     And how long have you owned this foster home?

11   A     Ever since 2000.

12   Q     And how many patients do you have living at the

13   foster home?

14   A     Three elderly.

15   Q     Okay.  And they live in your foster home, correct?

16   A     Yes.

17   Q     Is it fair to say that you depend on your house to

18   make a living?

19   A     Yes.

20   Q     Now, do you have a mortgage on that home?

21   A     Yes.

22   Q     And how much did you borrow to buy that home?

23   A     Uhm, 699.

24   Q     Was that the price or the amount that you borrowed?

25   A     That's the price for the house.

UNITED STATES DISTRICT COURT

1    Q    And do you recall how much you borrowed?

2    A    Uhm, could be 611.

3    Q    Okay.  Now, Ms. Troxell, you were an MEI client,

4  correct?

5    A    Yes.

6    Q    Okay.  That's Mortgage Enterprise Investments?

7    A    Yes, sir.

8    Q    Right.  Now, before you became an MEI client, how

9  much were you paying on your monthly mortgage?

10   A    2200.

11   Q    Okay.  Per month, correct?

12   A    Per month, yeah.

13   Q    Now, when you first got your mortgage, do you recall

14  who your mortgage was with?

15   A    Could you repeat the last question?

16   Q    Sure.  Who was your lender and your servicer when

17  you first got the mortgage?

18   A    Ocwen.

19   Q    At some point your mortgage servicer was Ocwen; is

20  that right?

21   A    Yes.

22   Q    Okay.  Now, when did you first meet Anthony

23  Williams?

24   A    I don't remember the date, but I met him over at

25  Democrat Street in Kalihi.


UNITED STATES DISTRICT COURT

1    Q    And when you say Democrat Street, are you referring

2    to anyone's house in particular?

3    A    Yes.

4    Q    Okay.  And whose house?

5    A    It's Anabel Cabebe's house.

6    Q    Okay.  And do you remember that meeting when you

7    first met Anthony Williams?

8    A    Yes, sir.

9    Q    Can you please explain to the jury the purpose of

10   that meeting?

11   A    That meeting was to explain to us that we can get

12   cut in half our mortgage payment.

13   Q    How many people were at that meeting?

14   A    Kind a few.

15   Q    And what does a few mean?

16   A    But -- yeah.

17   Q    What does a few mean?

18   A    Uhm, I have my friend, uhm, Edna -- Edna Franco was

19   there, uhm, Anabel Cabebe was there, and Mr. Anthony Williams

20   was there.

21   Q    Okay.  Now, how long did you stay at this meeting?

22   Do you recall?

23   A    Oh, I believe it was 10 to 30 minutes.

24   Q    Okay.  And you heard Anthony Williams speak?

25   A    Uhm, Edna, no.

UNITED STATES DISTRICT COURT

1     Q    No.  Anthony Williams?

2     A    Yes.

3     Q    Okay.  And what did you hear Anthony Williams say at

4  that meeting?

5     A    About cutting down -- cutting in half our mortgage

6  payment.

7     Q    Okay.  How did Anthony Williams introduce himself?

8     A    Anthony Williams, attorney general.

9     Q    Okay.  And did you understand what attorney general

10 was?

11    A    All I -- I know about attorney general is have a

12 power to do something important for me.

13    Q    Okay.  And did you ever talk to Anthony Williams

14 yourself?

15    A    Yes.

16    Q    And how did you refer to Anthony Williams?

17    A    He's a very powerful man.

18    Q    Okay.  When I say "how do you refer to him" is when

19 you addressed him, did you call him Anthony?  Did you call him

20 Mr. Williams?  Or did you call him something else?

21    A    I call him Mr. Williams, sir.

22    Q    Okay.  All right.  Now, what did you understand that

23 an attorney general could do for you in particular?

24    A    He could do a lot.

25    Q    Yeah?

```
 1       A       Especially my mortgage.  I know he can cut it in
 2  half.
 3       Q       And if you got into legal trouble or if there was
 4  any foreclosure, did Mr. Williams say what he could do for you?
 5               THE DEFENDANT:  It's leading.  Objection.  It's
 6  leading.
 7               THE COURT:  All right. Foundational, so I'll
 8  overrule the objection.
 9        Do you have the question before you?  Do you want him to
10  repeat it?
11               THE WITNESS:  Yes.
12               THE COURT:  Yes.  Could you repeat it for her?
13               MR. YATES:  No problem.
14       Q       (BY MR. YATES:) If you got into legal trouble or
15  foreclosure, what could Anthony Williams do for you?
16       A       Yes.  He can -- like, he can file the UCC for me to
17  protect me from any -- anybody that have interest in my home to
18  foreclose it.
19       Q       Did he say anything else about what he could do if
20  you got into legal trouble?
21       A       Yes.
22       Q       What did he say?
23       A       If my mortgage company, Ocwen, ever call me, I have
24  to tell him that he will be charging them 1,000 every time they
25  call.
```

UNITED STATES DISTRICT COURT

1        Q      Okay.  $1,000?

2        A      $1,000, yeah.

3        Q      Okay.  So as a result of Anthony Williams's

4   representations, you eventually signed up for MEI, correct?

5        A      Yes, sir.

6        Q      Okay.  So I'm going to ask you to take a look in

7   your binder at Exhibit 806.

8        A      This is the UCC financial statement?

9        Q      No, no.  It's 806.

10       A      806.

11       Q      There should be tabs on the side.

12       A      Okay.  Yes.

13       Q      Okay.  So can you please take a look at Exhibit 806

14   and tell me if you recognize your signature on those documents?

15       A      Oh, this is 806.

16       Q      806.

17       A      Yeah.

18              THE COURT:  Are you going to enter 806 into

19   evidence?

20              MR. YATES:  After she lays a foundation.

21              THE COURT:  All right.  Any objection, Mr. Williams,

22   to 806?

23              THE DEFENDANT:  No objection.

24              THE COURT:  Received.

25              (Exhibit 806 received into evidence.)

UNITED STATES DISTRICT COURT

 1                THE COURT:  Do you wish to publish?

 2                MR. YATES:  Sure.

 3                THE WITNESS:  Oh, okay.

 4                MR. YATES:  Yes, Your Honor, may I publish?

 5                THE COURT:  You may.  So it's also on the screen,

 6   too, so whatever's easiest for you, Ms. Troxell.

 7        Q     (BY MR. YATES:)  So, Ms. Troxell, can you see

 8   Exhibit 806?

 9        A     Yes.

10        Q     And you recognize your handwriting and your

11   signatures throughout 806?

12        A     Yes, the handwriting.  Not the handwriting, but the

13   signature is.

14        Q     Okay.  And is 806 your MEI application?

15        A     Yes, sir.

16        Q     Okay.  So it says here on your MEI application that

17   your mortgage company at the time was Ocwen and your monthly

18   payment was 2263.09.  Do you see that on the first page?

19                THE COURT:  Do you want to highlight it for her on

20   the screen?

21         All right.  If you look at the screen, Ms. Troxell.

22                THE WITNESS:  Yes.

23                THE COURT:  That's what he's pointing out to you.

24   Do you see that?

25                THE WITNESS:  Yes, that's my mortgage payment.

1    Q    (BY MR. YATES:)   Okay.   Now, did Anthony Williams

2  tell you what he was going to do with the mortgage that Ocwen

3  had or was servicing for you?

4    A    He gonna cut it in half.

5    Q    Okay.   So that's referring to the payment, right?

6    A    Yes.

7    Q    But what about the underlying mortgage itself?   What

8  did he say MEI was going to do with the mortgage itself?

9    A    He will take it over.

10   Q    He will take it over?

11   A    Yeah.

12   Q    And by "he," you mean Mortgage Enterprise

13  Investments?

14   A    Yes.

15   Q    Okay.   And so at the time that you signed up for

16  Mortgage Enterprise Investments, how would you characterize

17  your payment history with Ocwen?

18   A    I am on time.

19   Q    On time?

20   A    Yes.

21   Q    So you were paying Ocwen on time for your mortgage

22  payments, right?

23   A    Yes.

24   Q    And then you signed up for MEI?

25   A    Yes, sir.

UNITED STATES DISTRICT COURT

1    Q    Okay.  So did Anthony Williams tell you anything

2    about what to do with your monthly payments to Ocwen?

3    A    Stop -- we are not gonna pay them any more.  We

4    gonna start paying MEI.

5    Q    Okay.  And how much were you supposed to start

6    paying MEI?

7    A    Uhm, suppose to be half of this 2263.09, but

8    we -- and then he calculated into half of that.  But we

9    negotiate to Anabel Cabebe if we can pay 900, and he said yes.

10   Q    Okay.  So after you signed up for MEI, you started

11   to pay just $900 per month to MEI, correct?

12   A    Yes, sir.

13   Q    Okay.  And how much were you paying to Ocwen after

14   that?

15   A    We was paying 2,200.

16   Q    After MEI how much were you paying?  So after you

17   signed up and you started to pay MEI, how much were you paying

18   Ocwen every month?

19   A    That, 2,200 -- oh, after the --

20   Q    After MEI.

21   A    Okay.  It was --

22   Q    No, no.  Hold on.

23   A    20- --

24   Q    Let me back you up.  So you signed up for MEI,

25   right?

```
 1      A      Yes.

 2      Q      And Anthony Williams told you to stop paying Ocwen?

 3      A      Yes.

 4      Q      So did you stop paying Ocwen?

 5      A      Yes.

 6      Q      So you didn't pay Ocwen any more money?

 7      A      No more.

 8      Q      Okay.  So I'm going to ask you -- I'll take this

 9   down.  I'm going to ask you to turn to the next exhibit, okay?

10   And the next exhibit is Exhibit 206  which has been admitted.

11             So, Your Honor, may I publish Exhibit 206?

12             THE COURT:  You may.

13             THE WITNESS:  206.  Yes.

14      Q      (BY MR. YATES:)  Okay.  So do you have Exhibit 206

15   in front of you, Ms. Troxell?

16      A      Yes, sir.

17      Q      Okay.  So now, what do you recognize Exhibit 206 to

18   be?

19      A      This is about UCC.

20      Q      Okay.  And did Anthony Williams tell you what the

21   UCC was going to do?

22      A      Yes.

23      Q      Okay.  What did he say?

24      A      He told me that UCC is something that will -- I can

25   get protected whoever that have interest and foreclosing on my
```

14

1    property.

2         Q    Okay.  Who filed this UCC document?

3         A    Anabel Cabebe.

4         Q    And whose idea was it to file this document?

5         A    Anthony Williams.

6         Q    So if you look at Exhibit 206, it lists your name as

7    the debtor and the secured party.  Do you see that?

8         A    Yes, sir.

9         Q    Okay.  And whose idea was it to write your name as

10   the debtor and the secured party on this UCC document?

11        A    Anthony Williams.

12        Q    Okay.  So I'm going to point your attention to the

13   bottom of the Exhibit 206.  The bottom of 206 has a sentence

14   that says, "This mortgage will be discharged in accordance with

15   UCC 1-20139-3-401 and 1-308."

16             Do you see that?

17        A    Yes, sir.

18        Q    Who wrote that language?

19        A    Anthony Williams probably.

20        Q    Okay.  And what did you understand that this

21   language meant when you -- when you signed up with MEI?

22        A    This is just like a lien in my property.

23        Q    Okay.  So let's talk -- talk about what happened

24   after you signed up for MEI.  I believe you testified that you

25   stopped paying Ocwen; is that right?

UNITED STATES DISTRICT COURT

     1        A      Yes.

     2        Q      So what happened after you stopped paying Ocwen your

     3    monthly mortgage payments?

     4        A      I receive foreclosure letter from the attorney.

     5        Q      And did you have any communication with Anthony

     6    Williams about the foreclosure letter from Ocwen?

     7        A      No, because he already in jail.

     8        Q      Okay.  Did Anthony Williams -- I believe you said

     9    earlier something about Anthony Williams was going to charge a

    10    thousand dollars?

    11        A      Yes.

    12        Q      Okay.  Could you clarify what you meant there?

    13        A      Uhm, he told me that when Ocwen calls, he will

    14    charge them $1,000 a day every time they call.

    15        Q      And did you ever talk with Ocwen when they started

    16    to talk to you about the -- or when they started to reach out

    17    to you about the foreclosure?

    18        A      Uhm, yes.

    19        Q      Okay.  So at a certain point, did you ever doubt

    20    that Anthony Williams's program was real?

    21        A      When he got, uhm, put in jail, that's when I think

    22    it's not real.

    23        Q      So did Anthony Williams do anything to stop your

    24    foreclosure?

    25        A      Not really.


                          UNITED STATES DISTRICT COURT

```
 1      Q      What is the status of your foreclosure now?

 2      A      I have to hire a lawyer to defend me.

 3      Q      And has he done anything to help you stay in your

 4 home?

 5      A      Yes.

 6      Q      How much have you paid in legal fees to fight

 7 foreclosure?

 8      A      I paid him 25,000.

 9      Q      Dollars?

10      A      Dollar.

11      Q      And before you stopped paying your mortgage to

12 Ocwen, your Ocwen mortgage was, you said, $2,200 per month?

13      A      Yes.

14      Q      At some point since you joined MEI, you entered into

15 a modification with Ocwen, correct?

16      A      Correct.

17      Q      Okay.  Or at least you were negotiating

18 for -- negotiated --

19      A      Yes.

20      Q      -- been negotiating for -- okay.

21             How much is Ocwen asking you to pay on your mortgage

22 after a modification?

23      A      It was 3800.

24      Q      How many months were you working -- or were you

25 involved in the MEI program?
```

17

1      A      Uhm, how many months?

2      Q      I'll ask that question a different way.  How much

3  did you pay to MEI?

4      A      I paid $900 a month times 4, plus the beginning, the

5  initial fee of 3500.

6      Q      Now, Ms. Troxell, have you ever tried to sell your

7  home?

8      A      Yes, sir.

9      Q      And what was the result?

10     A      I couldn't sell it because of the lien.

11     Q      Yeah.  And what do you mean by the lien?

12     A      I hire a Realtor to sell the property for me so it

13  will stop all this problem.  I cannot sell because there was a

14  lien in my property that put by me -- I put a lien on my own.

15  I found that out when I hire a Realtor and then the Realtor

16  told me You cannot sell your property because there is a lien

17  on it and it's putting it by you and you need to hire a lawyer

18  to remove that because of the UCC that's being put in there.

19     Q      Ms. Troxell, when you refer to the UCC lien, are you

20  talking about Exhibit 206 that was before --

21     A      Yes.

22     Q      -- the jury moments ago?  That was Exhibit 206,

23  correct?

24     A      Yes, sir.

25            MR. YATES:  Your Honor, there are a number of things

UNITED STATES DISTRICT COURT

1    I'd like to get into.  Is this a good time for a break 'cause

2    we have been going on for about an hour 20 minutes.

3              THE COURT:  I think we started after 9:00.  Let's

4    see.  Yeah, we started at 9:15, so that means we'll be going to

5    10:45.

6              MR. YATES:  Okay.

7         Q    (BY MR. YATES:)  Ms. Troxell, is English your native

8    language?

9         A    Pardon me, sir?

10        Q    What is your first language?

11        A    Uhm, Filipino-English, Ilocano.

12        Q    Ilocano?  Okay.  If you found out that Anthony

13   Williams was not an attorney, would you still have signed up

14   for the Mortgage Enterprise Investments?

15        A    No, sir.

16             MR. YATES:  Nothing further from the government on

17   direct, Your Honor.

18             THE COURT:  All right.  Thank you.

19         Mr. Williams, do you have any questions for this witness?

20             THE DEFENDANT:  Yes, ma'am.

21             Can we publish the Government's Exhibit 806, please,

22   the MEI app?

23             THE COURT:  You may.

24                         CROSS-EXAMINATION

25   BY THE DEFENDANT:

UNITED STATES DISTRICT COURT

1       Q       Okay.  Ms. Troxell, who referred you to my program?

2  Do you remember the person?  I mean, you can look at the

3  application and see who was on there, who referred you.  See

4  where it says Referred By?

5       A       It's -- it's you.

6       Q       Oh, on the application it says referred By --

7               THE COURT:  Do you want to circle the area you're

8  referring her to --

9               THE WITNESS:  Henry Malinay.

10      Q       (BY THE DEFENDANT:)  Okay.  Henry Malinay.  And who

11  is Henry Malinay?

12      A       He's your partner.

13      Q       He used to work for me, that's correct?

14      A       Pardon me?

15      Q       Did he used to work for me?

16      A       Yeah, he used -- he worked for you.

17      Q       Okay.  And who also used to work for me?

18              THE COURT:  That she can remember?

19      Q       (BY THE DEFENDANT:)  Yeah, that you can remember.

20  Who else did I hire that used to work for me also?

21      A       Anabel Cabebe.

22      Q       And is there anybody else?

23      A       Edna Franco.

24      Q       Edna Franco.  Now, when you met me, do you remember

25  what you said about Edna Franco, what you told me about how you

UNITED STATES DISTRICT COURT

1    felt about her?

2         A     I don't have a good relationship with her.

3         Q     Right.  And so you -- is it safe to say when we had

4    our conversation, you had told me that you didn't trust her; is

5    that correct?

6         A     Could you repeat that, please?

7         Q     When we -- when we spoke and I had told you who I

8    had hired and when you found out that it was Edna Franco, do

9    you remember telling me, "I don't trust that woman"?

10        A     Correct.

11        Q     Okay.  Now, on this application, what's the date

12   that you signed up?

13        A     Henry Malinay.

14        Q     No.  What date?

15        A     What date?

16        Q     Yes.

17              THE COURT:  If you look at the screen, he's circled

18   the area he wants you to look at.

19              THE WITNESS:  12-9-13.

20              THE DEFENDANT:  No.  7 --

21              THE WITNESS:  Is that the 7 --

22              THE DEFENDANT:  Yes.

23              THE WITNESS:  -- 9, 2013?

24        Q     (BY THE DEFENDANT:)  Yes.  So you signed up on

25   July 9th, 2013, correct?

1      A      Yes.

2      Q      And after he -- you were just questioned by the

3 prosecutor and you had outlined that I had went to jail?

4      A      Yes.

5      Q      Do you remember what month I went to jail?

6      A      I don't remember, but I just know you went to jail.

7      Q      Right.  And it was shortly after this, correct?

8      A      Yes.

9      Q      Right.  So you was not able to actually go through

10 the full process of what my company does; is that correct?

11      A      Could you say that again?

12      Q      Since I was incarcerated, you were not able -- I was

13 not able to take you through the whole process of what my

14 company does, correct?

15          MR. YATES:  Objection.  Foundation.  Also

16 testimony -- providing testimony from the questioner.

17          THE COURT:  All right.  Overruled.

18      If you understand the question, you can answer it.  If you

19 don't, just let him know.

20      Q      (BY THE DEFENDANT:)  Like, okay, you signed up in

21 July?

22      A      Yes.

23      Q      So August and September -- September I was

24 unlawfully and illegally arrested and jailed?

25          MR. YATES:  Objection.  Testifying.

1          THE COURT:  So she doesn't know when you were in

2     jail.  She just knows when you're in jail.  So you can't tell

3     her to assume that or what have you.  But you can ask her about

4     what she expected or what she knew your company was going to do

5     or did for her.

6          Q     (BY THE DEFENDANT:)  So after I was wrongfully

7     incarcerated, that's when you answered that that's when you

8     felt like what I did didn't work; is that correct?

9          A     I still don't understand your question.

10         Q     When he asked you did you feel like my

11    company -- well, my process would work, you said after I got

12    locked up and I got jailed is when you felt that what I did

13    wouldn't work; is that correct?  After I got -- after I got

14    incarcerated, is that when you felt like, okay, this is not

15    going to work?

16         A     I just don't -- I don't know.  I don't understand

17    your question.

18         Q     You had answered with the prosecutor that after I

19    got locked up, after I went to jail, your statement was that's

20    when you felt like, okay, this is not going to work; is that

21    correct?

22         A     Yes.

23         Q     Okay.  So after I got incarcerated, what happened

24    during my incarceration?  Who did you turn to?  Who tried to

25    help you during my incarceration?

1      A      It was Anabel Cabebe.

2      Q      And was there anybody else?

3      A      Uhm, Henry Malinay.

4      Q      Okay.  And did you know that before I got

5   incarcerated that I had already fired Henry Malinay and Anabel

6   and Edna before I got incarcerated?  Did you know that?

7              MR. YATES:  Objection.  Testifying.

8              THE COURT:  Overruled.

9      Q      (BY THE DEFENDANT:)  Did you know that, that I had

10  fired them --

11             THE COURT:  Your question is pending.  So what's

12  your answer?

13             THE WITNESS:  Yes, I knew.

14     Q      (BY THE DEFENDANT:)  Okay.  So after my

15  incarceration and I won my case and I came back to Hawaii, did

16  you rehire me to assist you with your foreclosure?

17     A      Not a foreclosure.

18     Q      What did you --

19     A      You continue what Edna Franco started.

20     Q      Well, do you remember when I met you after I won my

21  case and I was released -- when I met you, you had told me what

22  Edna and her crew had done, and I told you what they did was

23  totally wrong, what they told you was a lie?  Do you remember

24  that conversation?

25     A      Yes.

```
 1      Q      Okay.  So at that point you had already went into

 2 foreclosure, correct?  This is 2015.  Do you remember the year?

 3      A      Yes.

 4      Q      Okay.  So did I --

 5      A      But it wasn't foreclosure.

 6      Q      Was in foreclosure?

 7      A      No.

 8      Q      Okay.  So what was it?

 9      A      It was Edna's idea to do a litigation in my property

10 because I can get it without paying for it.

11      Q      And so Edna told you that you would get it free and

12 clear?

13      A      Yes.

14      Q      Okay.  And did I tell you that what Edna them was

15 telling people was wrong?  Do you remember?

16      A      No.

17      Q      You don't remember the conversation?

18      A      You would continue on the paperworks that Edna were

19 started to do.

20      Q      No.  Do you remember what I told you is that I will

21 help you litigate with your lawsuit against Deutsch Bank?  Do

22 you remember that?  And I filed the document against Deutsch

23 Bank?  Do you want me to show you the documents to refresh your

24 memory?

25             MR. YATES:  Objection, Your Honor.  He's testifying.
```

UNITED STATES DISTRICT COURT

1            THE DEFENDANT:  No, I'm asking --

2            THE COURT:  Overruled.

3      So do you remember this, what he's -- do you understand

4   his question?

5            THE WITNESS:  Yeah.

6            THE COURT:  Okay.  Do you remember what he asked

7   you, if you remember?  Do you remember?

8            THE WITNESS:  I don't remember that.

9            THE COURT:  Okay.  At one time did you know the

10  answer to that question?

11           THE WITNESS:  Uhm --

12           THE COURT:  If you looked at documents, would it

13  help you?

14           THE DEFENDANT:  Okay.

15           THE COURT:  You have to answer out loud.  Is that a

16  yes?

17           THE WITNESS:  Yes.

18           THE COURT:  All right.  What document would you like

19  to show her to refresh her memory?

20           THE DEFENDANT:  I'd like to show Defense

21  Exhibit 2040.

22           THE COURTROOM MANAGER:  2040?

23           THE DEFENDANT:  Yeah, 2040.

24           THE COURT:  Did you have a page number that you'd

25  like her to look at a particular page?

UNITED STATES DISTRICT COURT

1          THE DEFENDANT:  It's starting at page 1.

2          THE COURT:  You want her to look at the entire

3    document?

4          THE DEFENDANT:  Well, this -- no, not the entire

5    document, just from page 1 to -- it's actually going to have to

6    skip around 'cause all of that's not relevant to her testimony

7    right now.  So we're going to have to skip from page 1, 2,

8    3 -- page 1, 2, and 3 and page 20 through --

9          THE COURT:  Okay.  Let's start with this.  If you

10   could look at page 1, 2, and 3 --

11         THE DEFENDANT:  Right.

12         THE COURT:  -- of Exhibit 2040.  All right?  And

13   just read it to yourself.  And when you're done, if you could

14   look up.

15     Okay.  Now the question he asked you was, "Do you remember

16   what I told you is that I will help you litigate with your

17   lawsuit against Deutsch Bank?  Do you remember that I filed the

18   document against Deutsch Bank?"

19         THE WITNESS:  Yes, I do.

20      Q    (BY THE DEFENDANT:)  Okay.  So the document before

21   you is the document that I drafted for you, correct?

22      A    Correct.

23      Q    Okay.  One of the documents.  Okay.  Now turn to --

24         MR. YATES:  I'm sorry, Your Honor.  I understood

25   that he was going to refresh his -- the witness's recollection

1    with this document.

2              THE COURT:  He did, yes.

3              MR. YATES:  Okay.

4              THE COURT:  So what's -- we're waiting for the next

5    question.

6              MR. YATES:  I see.  Okay.

7         Q    (BY THE DEFENDANT:)  Turn to page 20.

8              THE COURT:  Okay.  This is not in evidence, so she

9    can't read it or anything.

10        Do you have a question?

11             THE DEFENDANT:  Yeah.  I just want her to verify

12   that I also filed this document on her behalf.

13             THE COURT:  Well, you can ask her.

14        Q    (BY THE DEFENDANT:)  Okay.  You see page 20?

15        A    I don't know how to look.

16        Q    Okay.  Can --

17        A    It's kind of too many.

18             THE DEFENDANT:  Can you all help her like get

19   page 20?

20             THE COURT:  Put the page on the docucam and show it

21   to her.  It will not be displayed to the jury.

22        All right.  If you'd look at the screen and take a look at

23   that, have you seen that document before?  Have you seen that

24   document before?

25             THE WITNESS:  Did saw it before.

UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  What's your question about the

2  document?

3      Q    (BY THE DEFENDANT:)  Okay.  And so that's the

4  document that I drafted for you for you to file for your

5  litigation against Deutsch Bank?

6      A    Yeah, but you did not do anything.

7      Q    This is the document I filed on your behalf,

8  correct?

9      A    What did you say again?  Question?

10     Q    Is this not the document, the motion that I filed on

11  your behalf to fight Deutsch Bank to litigate on your behalf?

12     A    Yes.

13     Q    Correct?

14     A    Correct.

15          THE DEFENDANT:  Okay.  I would like to publish that.

16          MR. YATES:  Objection to the --

17          THE DEFENDANT:  I'd like to enter it into evidence.

18          MR. YATES:  -- the document.  This appears to

19  be -- the Exhibit 2040 appears to be several documents grouped

20  together.  And they appear to be unrelated.

21          THE DEFENDANT:  I mean, it's related because this is

22  a document I filed on behalf of -- on her behalf to fight the

23  bank.

24          THE COURT:  Right.  So what his objection, though,

25  is is not that you can't -- it's not authentic and it's not

1    admissible.  What he's saying, though, it's more than one

2    document.

3        So you're saying -- she has to take a look at each of the

4    documents that were filed.  So there's one that was filed

5    July 30, 2015.  She's looked at the face sheet of that and

6    she's recognizes it and she has testified that this was filed

7    on her behalf by you.

8        The next document is also filed on July 30, 2015, and it's

9    a separate document from the first one.  She hasn't recognized

10   that one.

11       And then there's a third document that is filed at a later

12   date that is a separate document as well and she has not

13   recognized that.

14       So do you want all of these in evidence?

15               THE DEFENDANT:  Yeah.  Let me let her recognize them

16   first and identify them, and then we'll enter all of them in.

17               THE COURT:  Okay.

18               THE DEFENDANT:  So let me get into the next

19   document.

20               THE COURT:  Well, no, I think that's part -- isn't

21   that part of the -- the one that you already have indicated?

22               THE DEFENDANT:  Well, this is the -- it's part of

23   the document, part of the 2040 document.  But I thought I

24   needed to let her --

25               THE COURT:  No.  So my point is if you look at

UNITED STATES DISTRICT COURT

30

1  2040-01, that's the one she recognized.  So that entirety of

2  the document I understand that you want her -- you want to

3  receive that.  She's recognized the document.

4           THE DEFENDANT:  Okay.  So --

5           THE COURT:  If you look at 2040 page 35 --

6           THE DEFENDANT:  Right.

7           THE COURT:  That's a separate filing.  She hasn't

8  recognized that as anything.

9      And then if you look at 2040 page 41, that's yet another

10  filing filed August 15, 2015, and she hasn't recognized that.

11  So that's what I'm saying.

12           THE DEFENDANT:  Okay.  I just --

13           THE COURT:  Yeah, so not each page but --

14           THE DEFENDANT:  Each filing.

15           THE COURT:  Right, each filing.

16           THE DEFENDANT:  Okay.

17      Q    (BY THE DEFENDANT:)  Mrs. Troxell, do you recognize

18  this filing that I drafted on your behalf?

19      A    I don't remember.

20      Q    Do you recognize your signature?

21      A    Yes, I do.

22      Q    Okay.

23           THE COURT:  Wait.  What page was that on that you

24  just showed her?

25           THE DEFENDANT:  Page 5.

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Okay.  Page 5.  And this is having to do
 2   with the July 30, 2015 --
 3              THE DEFENDANT:  Right.
 4              THE COURT:  --  filing, and that appears at 2040 page
 5   39.  Okay.
 6        Q    (BY THE DEFENDANT:)  And do you recognize this
 7   document, Ms. Troxell?  You don't recognize that?
 8        A    I don't.
 9              THE COURT:  Okay.  So you want to admit this
10   entire --
11              THE DEFENDANT:  Yeah.  Well, let me -- 'cause she
12   don't recognize it.
13              THE COURT:  Oh, I thought she said -- oh, "I don't."
14   I thought she said, "I do."  Okay.
15        Q    (BY THE DEFENDANT:)  Okay.  Do you recognize your
16   signature?
17        A    Yes, I do.
18              THE DEFENDANT:  Okay.  That's the whole document.
19   That's each which motion that was filed.  I'd like to enter
20   this into evidence.
21              THE COURT:  All right.  Any objection?
22              MR. YATES:  Yes.  It appears that the witness did
23   not recognize every document.  If we can split this up into
24   separate exhibits, that might be more appropriate --
25              THE COURT:  No.  It's received.
```

UNITED STATES DISTRICT COURT

32

1           (Exhibit 2040 received into evidence.)

2           MR. YATES:  Okay.

3           THE COURT:  You don't have a legal objection.  She

4    recognized her signature, it's filed under her name, so it's

5    received.

6      All right.  Do you want to publish anything?

7           THE DEFENDANT:  Yes, I would like to publish.

8           THE COURT:  Okay.  What do you want to publish?

9           THE DEFENDANT:  Page 1 first.

10          THE COURT:  All right.  Put it under the docucam.

11     Q    (BY THE DEFENDANT:)  And Ms. Troxell, can you read

12   the name of this document that I filed on your behalf?

13          THE COURT:  No, let's move on.  Okay.  We can all

14   read it.  It's in evidence.  What do you have a question about

15   this?

16     Q    (BY THE DEFENDANT:)  This litigation was against

17   Deutsch Bank, right?  The lawsuit that you said Edna had

18   initiated for you, correct?

19     A    Yes.

20     Q    Okay.  And the lawsuit was because Deutsch Bank had

21   used fraudulent documents, fraudulent signed mortgage to get

22   your mortgage.  Do you remember that?

23     A    No.

24     Q    You don't --

25     A    I don't remember.

UNITED STATES DISTRICT COURT

 1      Q      You don't remember.  Okay.  I'm going to refresh

 2   your memory.

 3             Do you recognize this assignment of mortgage by

 4   Deutsch Bank?

 5      A      I don't remember anything you showing me.

 6      Q      These are your documents that was in your mortgage

 7   and filed on your mortgage.

 8             THE COURT:  Okay.  Ask her the next question.

 9      Q      (BY THE DEFENDANT:)  Do you remember this document

10   that was in your mortgage by Deutsch Bank?

11      A      I don't.

12      Q      Don't remember that.  Ms. Troxell, do you remember

13   me explaining to you that the assignment of mortgage was signed

14   by what is called robo-signers or fake signers?  Do you

15   remember the conversation about that?

16      A      Robo-signers.

17      Q      Right?

18      A      Yes, you said about that.

19      Q      All right.  The document that I'm going to show you

20   is what I drafted for you outlining the robo-signers in the

21   documents.

22             THE COURT:  This is Exhibit 2040?

23             THE DEFENDANT:  Yes.  It's Exhibit 2040 and this is

24   page -- from page 20 and it goes to page -- it goes to 20 -- it

25   goes to 2034, that whole document.


UNITED STATES DISTRICT COURT

34

```
 1              THE COURT:  What page do you want to show her?

 2              THE DEFENDANT:  I have to show her several pages.

 3              THE COURT:  All right.

 4              THE DEFENDANT:  'Cause I got to show what I actually

 5    did for her and what I was exposing --

 6              THE COURT:  No, don't tell me what -- testify.  Just

 7    show where -- whatever you want to and ask her a question.

 8    It's in evidence.

 9              THE DEFENDANT:  All right.

10              THE COURT:  All right?  And you have permission to

11    publish.

12              THE DEFENDANT:  Thank you.

13       Q    (BY THE DEFENDANT:)  Okay.  Ms. Troxell, Deutsch

14    Bank had filed a motion to dismiss your complaint for fraud.

15    Do you remember that?

16       A    No, sir.

17       Q    You don't remember them filing a motion to dismiss?

18              THE COURT:  She said no.

19              THE WITNESS:  No, sir.

20              THE COURT:  So ask the next question.

21       Q    (BY THE DEFENDANT:)  Can you read the caption of the

22    motion that I filed on your behalf?

23              THE COURT:  All right.  So it's in evidence.  It's

24    in front of the jury.  We can all read.  What question do you

25    want to ask?
```

1              THE DEFENDANT:  Well, I want her to do the same

2    thing that the prosecutor did with Megan Crawley so I can enter

3    it in so I can outline different parts of it.

4              THE COURT:  Okay.  So it's in evidence, so if you

5    want to direct her attention to a certain part of the document,

6    you can, and then ask her.

7              I'm not going to have all the witnesses come up here and

8    be reading all the exhibits.  If there's a specific area that

9    you want to ask her about, please do so.

10        Q      (BY THE DEFENDANT:)  Okay.  Can you see section D on

11   your screen?

12        A      I don't even understand all this papers you showing

13   me.

14             THE COURT:  All right.  Can you see it, though?

15        Q      (BY THE DEFENDANT:)  Can you see it?

16        A      Yeah, I could see it.

17             THE COURT:  All right.

18             THE WITNESS:  I don't understand it.

19             THE COURT:  Understood.  What's your question?

20        Q      (BY THE DEFENDANT:)  When I was fighting your

21   litigation, did I expose that the documents that were filed by

22   Deutsch Bank were robo-signers and they were fraudulent

23   documents that had already been done a show on *60 Minutes* that

24   showed that these were actual robo-signers?  Do you remember

25   that?

UNITED STATES DISTRICT COURT

1      A      You may show a robo-signer, but I did not see this

2   form.

3      Q      Well, you filed this document.  I drafted it for you

4   so --

5             THE COURT:  No.  So ask her a question about the

6   document.  She says she doesn't understand it.  She said she

7   remembers you talking about robo-signers.  So what's your

8   question?

9      Q      (BY THE DEFENDANT:)  Okay.  Did you understand what

10  the robo-signers were?

11     A      Yes.

12     Q      Okay.  And so you did understand that robo-signers

13  are fraudulent?

14     A      Fraudu- --

15     Q      Yes.

16     A      Your question?

17     Q      Yes.  Did you understand that robo-signing is

18  illegal, that you can't sign a document and that's not your

19  real name.  You understand that, right?  That was fraudulent?

20     A      Fraud, yes.

21     Q      Okay.  So when I was filing on your behalf, what I

22  was exposing was that the assignment of mortgage that was in

23  your case was actually signed by these fraudulent robo-signers.

24  Now, do you remember that?

25     A      Yes.

UNITED STATES DISTRICT COURT

1     Q     Okay.  That's what this document was about and

2     that's what I was fighting on your behalf.

3           THE COURT:  Do you know that?  That's a question.

4     Did you know that he was doing this?

5           THE WITNESS:  The robo-signer? No.

6           THE COURT:  No.  Did you know why he was filing

7     these?

8           THE WITNESS:  Yes.

9           THE COURT:  Did you file this or did Mr. --

10          THE WITNESS:  He did it.

11          THE COURT:  Okay.

12          THE WITNESS:  I don't know anything about legal

13    matters.  All they do is give me this paper and turn it in

14    there, bring it to the court.  But I don't even know what's

15    inside that form.

16          THE COURT:  Okay.  All right.  What's your next

17    question?

18    Q     (BY THE DEFENDANT:)  Right.  So after we filed the

19    documents for you -- so once I would file the documents for you

20    and then the bank would respond, did I always respond back with

21    the response when they would respond to your motion?

22    A     Not always.  And you don't explain to me what inside

23    the context of the form that you telling me to turn it into

24    the -- to the federal court.  I don't know.

25    Q     So you don't remember coming to the office and after

1   I drafted the document for you and I explained to you what

2   I -- the legal case law that I put in the document, what the

3   contents of the documents was before you filed it, you don't

4   remember coming to my office and explaining it before I give it

5   to you for you to go ahead and file it?  You don't remember

6   that?

7        A      No, because you supposed -- your helper Anabel

8   supposed to mail that paper without me seeing the form and

9   you -- and Anabel supposed to mail that paper.  She did not

10  mail it and you -- I get screwed up from that.

11       Q      So you're saying that Anabel never showed you the

12  document?

13       A      No, because you supposed to show me the document

14  because you are the one doing the legal papers.

15       Q      Now, Ms. Troxell, I showed you this

16  document -- didn't you sign a document?

17       A      Yeah.  You -- if a powerful man, an attorney general

18  will ask me to sign that papers, I don't have enough -- enough

19  knowledge of all this legal papers that you asking me to sign.

20       Q      Okay.  So did you ask me to explain it a little more

21  before you filed it?  Because when you were at my office, I

22  asked you, I said, "Ms. Troxell" --

23              THE COURT:  Okay.  You need to ask her one question

24  at a time.

25              THE DEFENDANT:  Okay.

UNITED STATES DISTRICT COURT

 1          THE COURT:  So your first question is, Did you ask

 2   him to explain a little more before you filed it?  That's the

 3   question.  Did you ask him to explain a little more before you

 4   filed it?

 5          THE WITNESS:  Yeah, but he don't have no time to

 6   answer me that question 'cause he's so busy dealing with other

 7   customers.

 8          THE COURT:  Okay.  So that's her answer.  What's

 9   your next question?

10     Q     (BY THE DEFENDANT:)  Okay.  So when you signed the

11   document, where did you sign the document at?

12     A     Democrat.

13     Q     Okay.  So was I there after I drafted the document

14   for you for you to sign it?

15     A     Excuse me?

16     Q     So after I drafted the document for you, you came to

17   the office to sign it because you have to sign it 'cause I

18   drafted the document on your behalf.  So when you came to the

19   office, you signed a document, correct?

20     A     Yes.

21     Q     Okay.  Now, any client that comes to me before I let

22   you go and file anything, I ask you do you have any questions

23   for me?

24     A     But you asked me to sign that papers without my

25   knowledge what's the content that --

                  UNITED STATES DISTRICT COURT

1    Q    I went over the document with you, Ms. Troxell.

2         THE COURT:  All right.  So we're going round and

3    round and she already answered your question about whether she

4    asked questions.  Her answer is her answer, so you need to ask

5    her another question.

6         THE DEFENDANT:  Okay.

7         THE COURT:  And I'll let you one more and then we're

8    going to take a recess and then you can resume.

9    Q    (BY THE DEFENDANT:)  Okay.  Earlier you said that

10   after I had got unlawfully incarcerated and I was locked up,

11   that after that you didn't trust my program, correct?

12   A    Correct, yes.

13   Q    Okay.  So if you didn't trust my program after I got

14   locked up, why did you hire me after I freed myself after I won

15   my case and came back to Hawaii?

16   A    Because you told me that you won the case and you

17   got out from jail.

18   Q    I did.

19   A    And then Anabel Cabebe is in our group.  She was the

20   one telling us that it's okay.  But we never know -- we never

21   even proven it if you can be trusted.

22        THE COURT:  All right.  Stop.  So you can resume.

23   We're overdo for our first recess.  All right.  Uhm, resume

24   after the recess.

25        All right.  Ladies and gentlemen, we're going to take our

1    first recess for 15 minutes.  If you would again leave your

2    iPads and your notes behind.  Of course, don't discuss the case

3    with anyone or allow anyone to discuss it with you.

4         Please rise for the jury.  They and the rest of us are in

5    a 15-minute recess.  Thank you.

6              (A recess was taken.)

7              (Open court out of the presence of the jury.)

8              THE COURT:  So we have counsel, Mr. Williams -- can

9    we get the witness on the stand?  And I will ask Ms. Elkington

10   to get the jury, unless there are any matters we need to take

11   up.

12        No?  All right.  We're in recess.

13             (A recess was taken.)

14             (Open court in the presence of the jury.)

15             THE COURT:  The record will reflect the presence of

16   the ladies and gentlemen of the jury, counsel, and

17   Mr. Williams.  We'll just have a momentary while we try to --

18   all right.  Very good -- start up the flat screen TV and we are

19   back in business.

20        All right.  So, Mr. Williams, Ms. Troxell's on the stand.

21        I remind you you're still under oath.  You may be seated.

22        And you may continue your question.

23        Q    (BY THE DEFENDANT:)  Ms. Troxell, you had answered

24   earlier that you had tried to sell your home and that the

25   Realtor said that you couldn't sell it because of the UCC that

 1   was filed; is that correct?

 2        A    Yes.

 3             THE DEFENDANT:  Okay.  And could you pull up the

 4   Government Exhibit 206, the UCC, please?  I'd like to publish

 5   it.

 6             THE COURT:  You may.

 7        Q    (BY THE DEFENDANT:)  Ms. Troxell, on line 3, whose

 8   name is listed as the secured party on this UCC lien?

 9        A    The bottom?

10        Q    Oh, says line 3, Secured Party right here.

11             THE COURT:  Could you put a little dot or -- that's

12   where he's referring to.

13             THE WITNESS:  My name.

14        Q    (BY THE DEFENDANT:)  Your name, correct?  And did

15   your Realtor tell you that you could have the lien removed

16   yourself?

17        A    No.

18        Q    Did your attorney tell you that you could have the

19   UCC removed yourself?

20        A    No.

21        Q    When the Realtor or the attorney didn't notify you

22   that, did you call me and ask me how to remove the UCC lien?

23        A    No, because you are in jail.

24        Q    So this is at the time I was in jail?

25        A    No, when I tried to help -- to sell my house --

1     Q     Okay.

2     A     -- you already in jail.

3     Q     Okay.  So you couldn't ask me how to remove it from

4   the UCC?

5     A     There's no way I can get in touch with you.

6     Q     Right.  So there was no way you could get in touch

7   with me, but you're saying that the Realtor nor your attorney

8   told you that you could have simply just filed a UCC removal

9   off the -- in the Bureau to remove the lien to sell your home?

10  Neither one of them told you that, correct?

11    A     No.

12          THE DEFENDANT:  Okay.  Can I get government

13  Exhibit 806?  And I need page 5.

14          THE COURT:  Can you clear the --

15    Q     (BY THE DEFENDANT:) Okay.  Ms. Troxell --

16          THE COURT:  Do you want this published?

17          THE DEFENDANT:  Yes, ma'am, I need this published.

18          THE COURT:  All right.  You may publish.

19    Q     (BY THE DEFENDANT:)  And I have circled -- the title

20  of this document, can you read the title of the document?

21    A     What's the question, sir?

22    Q     Can you read the title of the document?

23    A     Foreclosure Disclosure.

24    Q     Okay.  And is that your signature at the bottom?

25    A     Yes.

UNITED STATES DISTRICT COURT

1       Q     And that was my signature with you?

2       A     Yes.

3       Q     Okay.  And when you filled out the MEI application,

4    I had you sign each document, I read each document to you and

5    we both signed, correct?

6       A     No.  As I said, I was asked to sign a papers without

7    my knowledge what's in it.

8       Q     So when you came to my office and I sat you down,

9    'cause there are six pages on the MEI app, so I signed and you

10   signed.  I read each page to you and I explained to you what

11   each paper meant.  Do you not remember that, coming to the

12   office and me explaining that to you?

13      A     Yeah, so many papers in a pack.  All you ask me is,

14   "Sign here," pointing, "Sign here."

15            As I said, I don't have knowledge of all the legal

16   papers and I trusted you then 'cause you are general

17   attorney --

18      Q     Ms. Troxell, do you know --

19      A     -- that explaining to me.

20      Q     Do you mean how many pages the MEI application is?

21      A     I'm not sure.

22            THE DEFENDANT:  Okay.  We can go through the -- can

23   you go to the No. 1 page and we'll see how many pages my

24   application is?  Yes, the same document, 806.  So let me count

25   how many pages it is.  I think it's 6 pages.

UNITED STATES DISTRICT COURT

1          Now go up to 2, 3, 4, 5, 6, 7 -- that's it.

2     Q     (BY THE DEFENDANT:)  Okay.  So the MEI application

3  is only six pages, Ms. Troxell.  So it's not a whole stack of

4  papers.  Can you see that?

5     A     Yes, I see it.

6     Q     Okay.  And so there's not a whole bunch of language

7  on the MEI papers on each page, there's not a whole lot of

8  writing, there's not a whole lot of legal terms that would

9  confuse someone.

10          Can you go back to --

11          THE COURT:  Well, is that a question?

12          THE DEFENDANT:  Right.

13          THE COURT:  Does she agree with you?

14     Q     (BY THE DEFENDANT:)  Right.  Do you see a lot of

15  legal terms on there that you don't understand --

16     A     I did not see this form.

17     Q     Is that your signature, Ms. Troxell.

18     A     I know it's my signature, but I did not see this

19  form being specifically show me what's in this form.  All I

20  being asked is, "Sign here.  Sign here."

21     Q     No, Ms. Troxell, you came to my office, I read each

22  page to you.  You don't remember me reading each page to you?

23  'Cause there's not that much to read.

24          THE COURT:  Okay.  So the question is do you

25  remember him reading each page of this document?

UNITED STATES DISTRICT COURT

1           THE WITNESS:  No.

2           THE COURT:  Okay.

3      Q    (BY THE DEFENDANT:)  No, you don't --

4           THE COURT:  She said, "No."  So what's the next

5  question?

6      Q    (BY THE DEFENDANT:)  Do you remember what I

7  explained to you what it meant by you being the secure party on

8  your UCC?  Do you remember what I explained to you what that

9  does for you?

10     A    Yes.  You told me that UCC can protect me from

11 anyone that have interest of foreclosing or taking my property

12 away from me.

13     Q    And when I explained to you that the UCC liens

14 protects your interest in your property, that in order for it

15 to be removed, do you remember what I told you in order for

16 that UCC to be removed?

17     A    No.  You don't tell me anything about being removed.

18 All you told me is I -- that UCC can protect me from anyone

19 that are interested foreclosing or taking away my property from

20 me.

21     Q    So what did I explain to you what the UCC does?

22     A    I just said.

23     Q    Right.  So if the bank tried to foreclose on you,

24 what would they have to do to the UCC lien?  Do you remember me

25 explaining that to you?  Like if they tried to foreclose --

1     A     As I said, what you said to me, the UCC will protect

2   me from anyone that will interest and will foreclose my

3   property.

4     Q     And that they would have to go to court -- we would

5   have to go to court, correct?

6     A     No, you did not tell me anything about going to

7   court.

8     Q     So what did I explain to you then?

9     A     I just said.  That will protect me from anyone that

10  taking away my property or foreclose my property from me.

11    Q     So -- so you really didn't -- I don't think you

12  really understood what I said to you that day, Mrs. Troxell.

13          THE COURT:  Is that your question?

14          THE WITNESS:  No.

15    Q     (BY THE DEFENDANT:)  Did you fully understand what I

16  told you that day?

17    A     Yes, sir.  I just said you told me UCC can protect

18  me from anyone that interested or taking my property away from

19  me or foreclosing my property away from me.

20    Q     And even after I got incarcerated, were they able to

21  evict you out of your house?

22    A     I did not understand a word.

23    Q     I said even after I got incarcerated, when I was

24  illegally incarcerated in 2013, two months after you signed up,

25  was the bank able to evict you from your house?

1       A       No.

2       Q       Okay.

3       A       Because I called them myself.

4       Q       Okay.  You called them yourself?

5       A       Uh-huh.

6       Q       And what happened?

7       A       And then they talked to me that as long as I gonna

8    agree with Ocwen to pay my mortgage and do my modification, I

9    will be okay.

10      Q       And did they tell you that the lien would somehow

11   encumber them or was damaging to you or damaging to them?  Did

12   they --

13      A       That wasn't discussed when I'm doing the

14   modification with Ocwen.  That only mentioned only when I tried

15   to sell my property.

16      Q       Okay.  Now, do you remember me going over your

17   mortgage that was by Deutsch Bank and the note?  Do you

18   remember coming to my office, you bringing your mortgage

19   documents, and I went over and explained to you the legal terms

20   in your mortgage document?  Do you remember that?

21      A       No.  I did not bring my mortgage note to you.  You

22   have printed out for me.

23      Q       Well, no, you came to the office.  I had

24   Anabel -- you came to the office with the mortgage document

25   'cause that's in the application.  You have to get your

UNITED STATES DISTRICT COURT

1    mortgage note and your mortgage document.

2         A    No.

3              THE COURT:  Okay.  So you're asking her did she

4    bring it to you?

5              THE DEFENDANT:  Right.

6              THE COURT:  And to Anabel?

7              THE DEFENDANT:  Right.

8              THE COURT:  Did you bring your mortgage documents to

9    Mr. Williams and Anabel?

10             THE WITNESS:  No, I did not, ma'am.

11             THE COURT:  Okay.  So the next question.

12        Q    (BY THE DEFENDANT:)  So who brought it to us?

13        A    You got it -- you have it yourself.

14        Q    So I got it or did Anabel --

15        A    I don't know how you got it.

16        Q    So --

17        A    I don't know.

18        Q    So when you came to my office, I had your mortgage

19   and your note documents from your original lender?

20        A    Yeah.

21        Q    Okay.  Now, do you remember the conversation that we

22   had and me explaining --

23             THE COURT:  Well, "Do you remember the

24   conversation" --

25             THE DEFENDANT:  Right.

UNITED STATES DISTRICT COURT

1          THE COURT:  -- "that we had?"

2     Q    (BY THE DEFENDANT:) Do you remember the conversation

3  that we had?

4          THE COURT:  So this is the first time you met?

5          THE DEFENDANT:  No, this wouldn't be first time.

6  This would probably been the second or third time.

7          THE WITNESS:  What conversation we had?

8     Q    (BY THE DEFENDANT:)  Regarding your mortgage with

9  Deutsch Bank, the mortgage and the note.

10    A    All I remember that you mentioned to me about is the

11 robo-signing.

12    Q    Okay.  I mentioned that.  I did mention that.  I --

13 but I also mentioned about the note, what happens to your note.

14 You don't remember that conversation --

15    A    Don't remember.

16         THE DEFENDANT:  Okay.  Can the -- Government

17 Exhibit 409 -- 408 and 409 -- actually, 409, just 409.

18         THE COURT:  We don't have that -- those as being in

19 evidence.  Did you offer them in evidence?

20         THE DEFENDANT:  Oh, it's not in evidence.

21         MR. SORENSON:  Your Honor, those are not in evidence

22 at this time.  They could be loan documents from another

23 person.

24         THE COURT:  Okay.  So if you offer them -- if you

25 want to offer them into evidence, you have to, you know, have

UNITED STATES DISTRICT COURT

1    this witness verify that --

2              THE DEFENDANT:  Yeah, I need to verify it.  Can I

3    get your Exhibit 409 for her to verify that it's her note and

4    that it's her signature?

5              MR. SORENSON:  409?

6              THE DEFENDANT:  Yeah, 409.

7              THE COURT:  All right.  Mr. Yates, are you objecting

8    to having it received into evidence?

9              MR. YATES:  Actually, no, Your Honor.

10             THE COURT:  Okay.  So they're going to agree to have

11   it received in evidence.

12             THE DEFENDANT:  All right.  I'd like to publish it.

13             THE COURT:  Okay.  So this is Exhibit 409 is

14   received in evidence.

15             (Exhibit 409 received into evidence.)

16             THE COURT:  All right.  So that's before the

17   witness.  And wish to publish?  Yes.

18        Q    (BY THE DEFENDANT3:)  You recognize that document,

19   Ms. Troxell?

20        A    I don't recognize the document, but I can recognize

21   my --

22        Q    You recognize your signature?  Okay.  So that's the

23   note that you signed that is attached to your mortgage for

24   Deutsch Bank?

25             MR. YATES:  Objection.  Testimony.

```
 1                THE COURT:  All right. So you're asking her --

 2                THE DEFENDANT:  Right.

 3                THE COURT:  -- if she recognizes that --

 4                THE DEFENDANT:  Right.

 5                THE COURT:  -- as the note about Deutsch Bank.

 6         Do you recognize that --

 7         Q    (BY THE DEFENDANT:) Do you recognize that as the

 8    note?

 9         A    This?

10         Q    Yes, with your signature.

11         A    With my signature, yes.

12         Q    (BY THE DEFENDANT:)  Right.  Can you see -- look to

13    the left and where it says right here -- you see where it says,

14    "Paid to the order of without recourse Argent Mortgage Company

15    LLC"?

16         A    Where?

17         Q    I got it circled.

18                THE COURT:  If you look at the screen --

19                THE DEFENDANT:  The screen?

20                THE COURT: -- he has it circled in red.

21                THE DEFENDANT:  Uh-huh.

22                THE WITNESS:  What's the question again?

23         Q    (BY THE DEFENDANT:)  Was that on the document when

24    you signed it?  Do you remember that?

25         A    I'm sorry, but I cannot recall.
```

1          THE DEFENDANT:  You don't recall?

2     Okay.  Got no more questions for Ms. Troxell.

3          THE COURT:  Thank you.  And we can depublish that.

4          MR. YATES:  May I begin?

5          THE COURT:  All right.  Your witness, Mr. Yates.

6          MR. YATES:  Thank you, Your Honor.

7                    REDIRECT EXAMINATION

8  BY MR. YATES:

9     Q     Now, Ms. Troxell, Mr. Williams asked you a number of

10 questions relating to some legal work that he did for you.  Do

11 you recall that?

12    A     No, sir.

13    Q     No, when he just asked you questions about the legal

14 documents, do you remember that Mr. Williams a few minutes ago

15 asked you about some legal documents?

16    A     Yes.

17    Q     Okay.  And he asked you a question about how you

18 hired Anthony Williams again after he was in jail.  Do you

19 remember that?

20    A     I did not hire him again.

21    Q     Okay.

22    A     It was continued of what he left out.

23    Q     Fair enough.  And you said that he continued because

24 he had won his case?  Do you remember saying that?

25    A     What -- can you repeat?

1      Q      Why did you work with Anthony Williams again after

2  he went to jail?

3      A      Because I was already in deep kim chee of my

4  mortgage, and they are the one that started the trouble, so I

5  have to continue with him.  So, you know, I need the help at

6  that time.

7      Q      And when you realized you were in deep kim chee, you

8  said that you spoke with Anabel Cabebe.  Do you remember that?

9      A      Yes.  We been speaking with Anabel Cabebe during the

10  time that he was incarcerated.

11      Q      Okay.  And what did Anabel Cabebe say to you about

12  continuing with Anthony Williams after he was incarcerated?

13      A      He won -- he won the case and he still -- he's a

14  good guy.  He can do a lot of things for us.  He -- you

15  could -- you could get your house for free if he will continue

16  fighting for you.

17      Q      Okay.  So Anabel Cabebe promised that you could get

18  your house for free; is that right?

19      A      Yes.

20      Q      What was your relationship to Anabel Cabebe?

21      A      She, uhm -- we both caregivers, so we belong in the

22  same association together, so we see each other once in a

23  while.

24      Q      And were you friends?

25      A      We consider a friend because we belong in the same

UNITED STATES DISTRICT COURT

 1   group.

 2        Q     Now, you just talked about some lawsuits that

 3   Anthony Williams was helping you with.  Do you remember that?

 4        A     Yes, sir.

 5        Q     Okay.  And I believe Mr. Williams just asked you

 6   that he filed a lawsuit for you in court.  Do you remember

 7   saying that?

 8        A     He -- uhm, he helped me and continue what Edna

 9   started.

10             MR. YATES:  Okay.  Can I publish I guess it's

11   Exhibit 2040 page 35.

12        Q     (BY MR. YATES:)  So Ms. --

13             THE COURT:  So wait.  You may publish.  And what

14   page?

15             MR. YATES:  It's to the page -- the appropriate

16   page, it's page 35.

17             THE COURT:  Okay.  Is that on the screen?  Yeah.

18   Okay.

19        Q     (BY MR. YATES:)  Ms. Troxell, do you recall this

20   document?

21        A     UCC, yes.

22        Q     No, no.  It's -- it's the document that should be on

23   the screen.  It has your name on it and it says on the side,

24   "Common law jurisdiction demand for a trial by jury."

25             You recognize that document?

56

1          No problem.  We can take it down.

2          My question is just that you recall that Anthony

3   Williams and you were involved in filing a lawsuit; is that

4   right?

5      A    Yes, sir.

6      Q    Okay.  And that was during your foreclosure; is that

7   right?

8      A    Uhm, yes, yes.

9      Q    Okay.  Now, at that time you believed that Anthony

10  Williams was a lawyer, correct?

11     A    Yes.

12     Q    And that he could write legal briefs for you?

13     A    Yes.

14     Q    Okay.  And that he could give you legal advice,

15  right?

16     A    Yes.

17     Q    And you believed that Anthony Williams could save

18  your house from foreclosure, right?

19     A    Yes.

20          THE DEFENDANT:  These are all leading questions.

21          MR. YATES:  Yes, Your Honor.  The witness has

22  demonstrated that she has some difficulty with English, so I

23  would ask for a little bit of latitude here.

24          THE COURT:  All right.  Overruled on that basis.

25     Q    (BY MR. YATES:)  Now, at any time did Anthony

UNITED STATES DISTRICT COURT

 1    Williams tell you that he was not allowed to practice law in

 2    court?

 3         A    Yes, yes.

 4         Q    He told you that he was not allowed to practice law?

 5         A    Yes.

 6         Q    Okay.

 7         A    So I have -- I will be the one to deal with all this

 8    judges or bring the papers to the court.

 9         Q    Okay.  So he said that he couldn't do it, so he was

10    going to ask you to do it; is that right?

11         A    Yes.

12         Q    But did he ever tell you that he was not allowed to

13    write the briefs for you?

14         A    A brief --

15         Q    Did he tell you that he was not allowed to write a

16    legal brief?

17         A    Yes.

18         Q    He told you that he couldn't write it?

19         A    Yes.

20         Q    Okay.  But he wrote one for you anyway?

21         A    Yes.

22         Q    Okay.  Anthony Williams just asked you about your

23    UCC lien.  Do you remember him asking you?

24         A    Yes.

25         Q    And he asked you whether you understood that you

UNITED STATES DISTRICT COURT

1    could -- let me withdraw that question.

2            Ms. Troxell, did you understand how to remove a

3    lien?

4    A    I don't.

5    Q    Okay.  And Anthony Williams never told you, right?

6    A    No, sir.

7    Q    Mr. Williams just asked you a number of questions

8    about signing documents and you answered that you signed the

9    documents without understanding what was in the documents; is

10   that right?

11   A    Yes.

12   Q    Okay.  Did you sign those documents because you

13   trusted Anthony Williams?

14   A    Yes, sir.

15   Q    And you trusted him because he was an attorney

16   general, right?

17   A    Yes.

18   Q    Ultimately, despite the lawsuits that Mr. Williams

19   filed, did the bank put your house in foreclosure?

20   A    Yes.

21   Q    Okay.  Did you ever get your MEI money back?

22   A    No.

23           MR. YATES:  No further questions, Your Honor.

24           THE COURT:  So, Ms. Troxell, thank you for your

25   testimony.  You're excused as a witness -- yes, Mr. Williams?

UNITED STATES DISTRICT COURT

1           No, it's direct, cross-examination, and redirect.  Is she

2    a witness that you subpoenaed?

3               THE DEFENDANT:  Yes.

4               THE COURT:  Oh, okay.  So you're -- so I'll let you

5    do -- I guess -- I don't know what it would be -- redirect and

6    cross.  I'll give you an opportunity to do that.

7                         RECROSS-EXAMINATION

8    BY THE DEFENDANT:

9        Q    Ms. Troxell, the document he just showed you was a

10   demand for a trial by jury that I had filed on your behalf that

11   you signed.  Do you remember that document?

12       A    I don't understand how you ask me the question.

13              THE COURT:  Okay.  So it's not whether she remembers

14   it.  What question do you have about the document?

15              THE DEFENDANT:  The document he just pulled up.

16   Which number was it?

17              MR. YATES:  That's your document.

18              THE COURT:  I believe it's 2040.

19              THE DEFENDANT:  2040.

20              MR. SORENSON:  No, we don't have it.  You're going

21   to have to put it on there.

22              THE COURT:  All right.  Ask her another question

23   while they find that document.

24       Q    (BY THE DEFENDANT:)  Ms. Troxell, did I explain to

25   you that by the Constitution, the Seventh Amendment, that you

UNITED STATES DISTRICT COURT

```
 1    have a right to a trial by jury before you could be deprived of

 2    your property?

 3         A     I don't remember.

 4         Q     Did the court grant you a trial by jury before you

 5    could be at least in foreclosure and kicked out of your home?

 6         A     I'm sorry, but I don't understand the question.

 7               THE COURT:  So he's asking you did you have a trial

 8    in that case with a jury like this?

 9               THE WITNESS:  Yes.

10               THE COURT:  You had a trial?

11               THE WITNESS:  No.

12               THE COURT:  Okay.

13               THE WITNESS:  No.

14               THE COURT:  On the lawsuit that was filed, did you

15    have a trial?

16               THE WITNESS:  No.

17               THE COURT:  All right.  Next question.

18         Q     (BY THE DEFENDANT:)  Okay.  And do you understand

19    that that was your constitutional right to have one?

20               THE COURT:  Asked and answered.  She already said

21    she doesn't understand.  So get --

22               THE WITNESS:  I don't know.

23         Q     (BY THE DEFENDANT:)  Okay.  And so he just

24    requestioned you about you couldn't talk to me because I was

25    incarcerated.  So you couldn't have asked -- asked me how to
```

1   remove the UCC because I was incarcerated, correct?

2        A    No.

3        Q    Right.  And so -- but you had already answered that

4   your Realtor nor your attorney didn't tell you that you could

5   have simply removed it yourself to sell your home?

6        A    No, because that wasn't put there in the first

7   place.

8        Q    No, I'm saying but you said you tried to sell your

9   home and then your Realtors said that you couldn't sell it

10  because the lien was on there.  I'm saying they didn't notify

11  you that you could have just removed it yourself because you're

12  a secure party, correct?

13       A    I don't know how to remove it.  Plus, in the first

14  place, that lien shouldn't be there in the first place.

15       Q    Well, that lien was put on there 'cause remember I

16  explained to you why the lien?  You still don't remember the

17  conversation we had when you came to the office?

18       A    But it's gonna -- it's gonna -- it's kind of tricky

19  that we put that lien in there without me knowing what gonna

20  affect me in the future.

21       Q    No.  I explained that to you, Ms. Troxell.

22       A    No, you did not.

23            THE COURT:  Okay.  This not for you folks to have a

24  discussion.  This is for you to have a question and she'll

25  answer it.

UNITED STATES DISTRICT COURT

1      Q      (BY THE DEFENDANT:)   Okay.  Do you remember how long

2  you was at my office and how many hours you was talking to me?

3  Do you remember how many hours?

4      A      I remember that time.

5      Q      Okay.  How long were you at the office and do you

6  remember at what time --

7      A      Long, long time.

8             THE COURT:  Okay.  So you have to wait till he

9  finishes the question --

10            THE WITNESS:  Okay.

11            THE COURT:  -- and then you answer.  Okay.

12     Q      (BY THE DEFENDANT:)   Okay.  And do you remember

13  about what time in the day that you came to my office?

14     A      Night time.

15     Q      Night time?  About what time?

16     A      I cannot tell you the time, but it's night time.

17     Q      So would you say it was after 8 o'clock at night?

18     A      Could be, yes.

19     Q      Okay.  And so after 8 o'clock at night I was still

20  at my office working?

21     A      Yes.

22     Q      Okay.  And so I took my time with you to sit down

23  with you and explain to you late at night at my office all the

24  documents that I was going to file, the UCC, the mortgages, the

25  things I was going to file.  You don't remember the long

UNITED STATES DISTRICT COURT

1   conversation that we had, the hours?  You don't remember all

2   those hours?

3       A    I asked you all the question.

4       Q    Right.

5       A    And you answer all the questions I ask you.

6       Q    That's correct.  Right.  So do you remember that it

7   was probably about four or five hours we were there?

8       A    Yeah, because I have plenty concern to ask you --

9       Q    Yes, you did.

10      A    -- and for you to answer.

11      Q    Yes, ma'am, you did.  And that's why I went through

12  that whole application with you.  I took my time with you

13  because I do see that you --

14           THE COURT:  No, no.  So you have to ask her a

15  question.

16           THE DEFENDANT:  Okay.

17           THE COURT:  Did he take his time with you and go

18  over everything with you in his office?

19           THE WITNESS:  Only with my question to be answered.

20           THE COURT:  Okay.  Next question, yeah.

21           THE DEFENDANT:  I have no more questions.

22           THE COURT:  All right.  Thank you very much.

23       All right.  Now I'm going to excuse you as a witness,

24  Ms. Troxell.  Please don't discuss your testimony with anyone

25  until the trial's completed.  Good day, ma'am.

UNITED STATES DISTRICT COURT

1              THE WITNESS:   Thank you.

2         (This concludes the partial testimony requested.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3              I, DEBRA READ, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

6    true, and correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the regulations

9    of the Judicial Conference of the United States.

10             DATED at Honolulu, Hawaii, February 22, 2020.

11

12

13                    */s/ Debra Read*

14                    DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT