```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,      )  CR 17-00101 LEK
 4                                   )
                  Plaintiff,         )  Honolulu, Hawaii
 5                                   )  February 11, 2020
        vs.                          )  February 12, 2020
 6                                   )
      (1) ANTHONY T. WILLIAMS,       )  PARTIAL TRANSCRIPT:
 7                                   )  TESTIMONY OF HENRY MALINAY
                  Defendant.         )
 8    _____)

 9
                  PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
10               BEFORE THE HONORABLE LESLIE E. KOBAYASHI
                      UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12
      For the Government:      KENNETH M. SORENSON, AUSA
13                             GREGG PARIS YATES, AUSA
                               Office of the United States Attorney
14                             300 Ala Moana Boulevard, Suite 6100
                               Honolulu, Hawaii 96850
15
      Also Present:            MEGAN CRAWLEY, FBI Special Agent
16
      For the Defendant (1)    ANTHONY T. WILLIAMS, Pro Se
17    Anthony T. Williams:     05963-122
                               Federal Detention Center Honolulu
18                             Inmate Mail/Parcels
                               P.O. Box 30080
19                             Honolulu, Hawaii 96820

20    Standby Counsel:         LARS ROBERT ISAACSON, ESQ.
                               547 Halekauwila Street, Suite 102
21                             Honolulu, Hawaii 96813

22    Official Court Reporter: DEBRA READ, RDR
                               United States District Court
23                             300 Ala Moana Boulevard
                               Honolulu, Hawaii 96850
24
      Proceedings recorded by electronic sound recording; transcript
25    produced with computer-aided transcription (CAT).
```

1                          I N D E X

2               CHRONOLOGICAL INDEX OF WITNESSES

3

4    GOVERNMENT'S WITNESS                              PAGE

5

     Direct Examination By Mr. Sorenson                 3
6    Cross-Examination By The Defendant                30

7    **WEDNESDAY, FEBRUARY 12, 2020**                  **65**

8    Cross-Examination Resumed By The Defendant        65
     Redirect Examination By Mr. Sorenson             113
9

10                         I N D E X

11                       E X H I B I T S

12

13

     NO.                                              PAGE
14   _____

15   301                                               18
     725                                               33
16
     **WEDNESDAY, FEBRUARY 12, 2020**                  **65**
17

18   2161, pages 1-7
     2161, pages 37-41                                 75
19

20

21

22

23

24

25

                   UNITED STATES DISTRICT COURT

```
 1   TUESDAY, FEBRUARY 22, 2020                          12:56 P.M.

 2              (Partial transcript begins:)

 3         HENRY MALINAY, GOVERNMENT'S WITNESS, WAS SWORN

 4              THE COURTROOM MANAGER:  Thank you.  Please be

 5   seated.

 6       You can state your name and spell your last name for the

 7   record.

 8              THE WITNESS:  Oh, my name Henry Malinay.

 9              THE COURTROOM MANAGER:  You can have a seat.

10        Your witness.

11              MR. SORENSON:  Thank you, Your Honor.

12                         DIRECT EXAMINATION

13   BY MR. SORENSON:

14       Q    Good afternoon, Mr. Malinay.  Where do you currently

15   reside, sir?

16       A    I'm sorry, sir?

17       Q    Where do you currently reside?

18       A    In Las Vegas.

19       Q    Was there a time when you lived here in Honolulu,

20   Hawaii?

21       A    I came here in 1982.

22       Q    Came in 1982 did you say?

23       A    Yes.

24       Q    And did you live here in Hawaii after 1982?

25       A    Yeah, I live here.
```

UNITED STATES DISTRICT COURT

```
 1      Q      Okay.  How long did you live in Hawaii

 2 after -- between 1982 and the time you left to go to Las Vegas?

 3      A      About 30 years.

 4      Q      How many?

 5      A      30 years, sir.

 6      Q      30 years?

 7      A      Yes.

 8      Q      When did you move to Las Vegas?

 9      A      About three days -- three years ago, three years

10 now.

11      Q      And so did you live in Honolulu or at least the

12 Honolulu area from 1982 all the way up to 2004[sic]?

13      A      Yes.  Yes, sir.

14      Q      Actually up until what time -- about three years

15 ago?

16      A      What's that?

17      Q      Up until about three years ago, did you say?

18      A      Yes.

19      Q      Okay.  And when you lived here in Honolulu, where

20 did you live?

21      A      I live in Aiea.

22      Q      Okay.  And did you own a house?

23      A      Yes, sir.

24      Q      And where was that house located?

25      A      In 98-058 Kaimu Loop, Aiea.
```

5

```
1    Q    And did you own that house?

2    A    Yes.

3    Q    You were the owner, correct?

4    A    Yes, me and my wife.

5    Q    And are you a U.S. citizen?

6    A    Yes, sir.

7    Q    Are you a naturalized U.S. citizen?

8    A    Yes, sir.

9    Q    How long have you been a naturalized U.S. citizen?

10   A    It's kind of long time, over 20 years.

11   Q    And where is your home country or your original

12   country?

13   A    Oh, I born in the Philippines.

14   Q    In the Philippines?

15   A    Yes.

16   Q    And do you speak the Filipino language?

17   A    Yes, sir.

18   Q    What language do you speak?

19   A    Yeah, some Tagalog and English.

20   Q    Do you speak Ilocano?

21   A    Yes.

22   Q    What is your primary language, Filipino language?

23   Is it Ilocano or Tagalog?

24   A    Ilocano.

25   Q    And do you know other Ilocano Filipinos that live
```

UNITED STATES DISTRICT COURT

1    here in Hawaii?

2         A    Yes, a lot.

3         Q    Okay.  And how did you come to know a number of

4    them?

5         A    What was that, sir?

6         Q    How did you come to know the Ilocano Filipinos that

7    live here?

8         A    Because I join a network marketing before.

9         Q    Uh-huh.

10        A    Yeah.

11        Q    What kind of network marketing did you do?

12        A    Xango Juice.

13        Q    Can you please spell that, if you can?

14        A    I remember the X-a-n-g-o.

15        Q    Xango, did you say?

16        A    Yeah, Xango, X-a-n-g-o.

17        Q    Is that how you pronounce it?

18        A    Yes, sir.

19        Q    All right.  And through Xango or at least marketing

20   that, did you come to know a number of people?

21        A    Yes, a lot.

22        Q    And did you have some kind of network that you

23   worked within?

24        A    Yes, sir.

25        Q    Okay.  And what did you sell?

UNITED STATES DISTRICT COURT

```
 1      A      The juice vitamin.  Vitamin, the juice.

 2      Q      Now, when it comes to English, do you speak and

 3   understand English fairly well?

 4      A      Yeah.  Yes, sir.

 5      Q      But English is not your first language, is it fair

 6   to say?

 7      A      That's my second language.

 8      Q      How about reading and writing?

 9      A      Not too much.

10      Q      Not too much?

11      A      Yes.

12      Q      If you were shown a document, could you read it and

13   understand it do you think?

14      A      No.

15      Q      Okay.  Are you currently married?

16      A      Yes, sir.

17      Q      How long have you been married?

18      A      My kids now is about 20 -- about 30 years.

19      Q      30 years.  And what's your wife's name?

20      A      Marilyn Malinay.

21      Q      Now, let's talk about your home that you mentioned

22   earlier.  Do you recall when you bought that?

23      A      What's that, sir?

24      Q      Do you recall when you bought your house?

25      A      Yeah, I bought the house.
```

1     Q     Okay.  Do you recall when that was?

2     A     It was 19 -- 2004 I think I bought the house.

3     Q     2004?

4     A     Yes, sir.

5     Q     And did you borrow some money to buy it?

6     A     Yeah, 'cause my -- my Realtor they know the guy, so

7  I borrow $70,000 to put on the house.

8     Q     Did you also borrow some money from a bank?

9     A     Yes, sir.

10    Q     Okay.  And do you recall what bank that was?

11    A     Wells Fargo.

12    Q     Uh-huh.  And do you recall roughly how much money

13  you borrowed from Wells Fargo?

14    A     'Cause I bought the house 560, and then I put down

15  70, so about -- almost 500,000.

16    Q     Okay.  And when you borrowed the $500,000, did you

17  sign a note or a promise to pay Wells Fargo back?

18    A     Yes, sir.

19    Q     Okay.  And did you attempt to pay them back?

20    A     Yes.

21    Q     Okay.  Were you trying to pay them on a monthly

22  basis?

23    A     Yes, I do monthly.

24    Q     And do you know how long the term was for your

25  mortgage?

1      A      30 years.

2      Q      30 years?

3      A      Yes, sir.

4      Q      Do you recall the amount of your monthly obligation,

5  how much you paid every month?

6      A      About 3,800.

7      Q      Okay.  So was there a time when you met a person by

8  the name of Anthony Williams?

9      A      Yeah.  I meet him at restaurant.

10      Q      Okay.  And when you met him, did you become familiar

11  with his appearance?

12      A      Yes.

13      Q      Okay.  Do you see him in the courtroom here today?

14      A      Oh, there's the guy, right there (pointing).

15      Q      Would you please indicate who you're pointing at?

16      A      What's that sir?

17      Q      Would you please indicate who you're pointing at?

18      A      Yeah, the white hat.

19          MR. SORENSON:  Your Honor, if the record could

20  reflect the witness has identified Anthony Williams as the

21  person he met as Anthony Williams?

22          THE COURT:  It shall.

23      Q      (BY MR. SORENSON:)  Okay.  So you indicated you had

24  a meeting with Mr. Williams; is that correct?

25      A      Yeah.  He met me in the restaurant and then I meet

1    him.

2         Q     Okay.  And what was the purpose for your meeting

3    Mr. Williams?

4         A     They said that they have to cut my mortgage.

5         Q     Did he tell you that he could cut your mortgage?

6         A     Yes, sir.

7         Q     Okay.  If you could, describe what he told you about

8    your mortgage.

9         A     Well, because I said that I have a mortgage and they

10   cut in half and then the monthly is half or eliminate, that's

11   what he told.

12        Q     And so you currently at that time, I think you've

13   indicated, were paying around $3800; is that correct?

14        A     Yes, sir.

15        Q     And so was his representation he could cut that

16   amount in half?

17        A     He never did help me.

18        Q     No, I understand.  But was it the representation

19   that that amount would be cut in half?

20        A     Yeah, that's what they said.

21        Q     Okay.  And how about the term, the 30-year term of

22   your mortgage?  What did he say about that?

23        A     Just half too.

24        Q     Okay.  So let's talk a little bit about

25   Mr. Williams.  Was this the first time you'd ever met him?

```
 1        A      Today?

 2        Q      No, no.  At the meeting that day?

 3        A      Oh, yeah, first time, first time.

 4        Q      Okay.  And where was that meeting specifically?

 5        A      I believe in Tony Roma's in Pearl City across the

 6   Anna Miller.

 7        Q      Okay.  And who else was at that meeting?

 8        A      Angie Pasion with the husband and Edna Franco and

 9   him and me.

10        Q      Now, Mr. Williams, did you see anything like a badge

11   or a shield on him that day?

12        A      Yes, yeah.  He show me the badge and the handcuff.

13        Q      Okay.  I'm going to show you a couple

14   exhibits -- Your Honor, could I pass a couple of exhibits up to

15   the witness?

16               THE COURT:  You may.  Give it to Ms. Elkington,

17   please.

18               MR. SORENSON:  Your Honor, for the record, I'm first

19   showing the witness Exhibit 500.

20               THE WITNESS:  Yeah.  I remember this one.

21        Q      (BY MR. SORENSON:)  Okay.  And tell the jury how do

22   you remember that?

23        A      Well, first of all, I ask them --

24        Q      No, the badge that you --

25        A      Oh, the badge, yes, this one.
```

1      Q      Yes, sir.

2             THE COURT:  Have you seen that before?

3             THE WITNESS:  Yes, Judge.

4             THE COURT:  Okay.  When did you see that for the

5      first time?

6             THE WITNESS:  In the first time I meet him, Judge.

7             THE COURT:  When you met Mr. Williams?

8             THE WITNESS:  Yeah.

9      Q      (BY MR. SORENSON:)  Okay.  And when you saw him with

10     that, was he wearing it?

11     A      He pull up in the pocket.

12     Q      Where did he have it?

13     A      Just pull out and show me like this (demonstrating).

14     Q      Okay.  He showed it to you?

15     A      Yeah.

16     Q      Is that correct?

17     A      Yes.

18     Q      I think you've indicated he had some handcuffs too;

19     is that correct?

20     A      Yes.

21     Q      So I'm going to direct your attention to the

22     exhibits right there.  If you could, I think those -- is that

23     Exhibit 505?

24     A      Yes, yes.  I think, yes.

25     Q      Okay.  And do you recognize the handcuffs?

1       A       Yeah.

2       Q       Please just -- we're not finished talking about

3    them, so hold them up there.

4               Okay.  Now, did Mr. Williams tell you anything about

5    those handcuffs?

6       A       Well, he told me that I'm -- 'cause I don't know

7    about the attorney general Private, so he said, "I'm the

8    highest, more than anybody, so and then I can handcuff

9    everybody."  That's what he told me.

10      Q       He told you he could handcuff people?

11      A       Yeah.

12      Q       Did he tell you he had that kind of authority?

13      A       I don't know 'cause I just believe him at that time.

14      Q       Did he indicate to you that he could handcuff

15   people?

16      A       Yeah, he could handcuff people.  That's what he

17   said.

18      Q       And you indicated that he said something about being

19   a private attorney general.  Do you recall that?

20      A       Yeah, because he said, "I'm the private attorney

21   general," yeah.

22      Q       And when he told you he was a private attorney

23   general, what did that mean to you?

24      A       I just kind of took like the highest, yes.

25      Q       And what does the highest mean to you?

1        A        Like all the attorney and then highest all the

2    attorney.

3        Q        Now, if I told you I was an attorney, would you

4    consider him to be a higher attorney because he's a private

5    attorney general?

6        A        Yeah.  That's what he said, so I believe him.

7        Q        Okay.  And did he tell you how he became a private

8    attorney general?

9        A        They said they came from the mainland and they go

10   all over the place.  That's what he told me.

11       Q        Uh-huh.  And did he show you any paperwork with

12   respect to being a private attorney general?

13       A        Yeah, he show me some of the paperwork and he read

14   to me.

15       Q        Okay.  And what did he tell you?

16       A        He said -- he said, "Oh, this is all my paperwork

17   and I'm the attorney general."  That's what he told me.

18       Q        Did he mention anything about the governor of

19   Hawaii?

20       A        Yeah, he mentioned that one too.  He wen show me the

21   paperwork from the governor.  He wen -- yeah.

22       Q        What did he tell you about the governor of Hawaii

23   and him being a private attorney general?

24       A        He said they said a legit attorney general in

25   Hawaii.  That's what he told me.

```
1          Q      Legit?

2          A      Yeah.  That's what he told me.

3          Q      Did he indicate to you that he'd been appointed to

4   that position?

5          A      I don't know, sir.

6          Q      Okay.  And I'm going to ask you -- I think there's

7   another exhibit up there.  It's 501.  Do you see the

8   credentials, the photograph with his picture on it?  Do you see

9   that in front of you?

10         A      This one?

11         Q      Okay.  Do you recognize that?

12         A      Yeah, he show me this one, Attorney.

13         Q      Okay.  Tell the jury what context did he show that

14  to you in?

15         A      Well, I see the United States.  That's what he told

16  me.

17                THE COURT:  When he showed it to you --

18                THE WITNESS:  And I just kind of trust him, yeah.

19         Q      (BY MR. SORENSON:)  And you indicated United States.

20  Did you see United States on there?

21         A      Yeah, I see United States and I kind of trust him

22  whatever he said at the time.

23         Q      Did you believe that he worked for the government?

24         A      He just, "I'm higher in the government."  That's

25  what he told me --
```

```
 1        Q       Okay.

 2        A       -- Attorney.

 3        Q       And did he tell you why he was higher in the

 4   government?

 5        A       I don't know.  Just kind of trust him at that time,

 6   Attorney.

 7        Q       Now, these things that he told you in the badge and

 8   all that, did that cause you to trust him more?

 9        A       Yes, Attorney.

10        Q       After you saw these things, did you believe in him?

11        A       Yes, Attorney.

12        Q       And did it make you believe more in the

13   representations he --

14                THE DEFENDANT:  Objection.  It's leading.

15                THE WITNESS:  Yes.

16                THE COURT:  Sustained.  Sustained.  So the last

17   answer you'll disregard.

18         All right.  Ask another.

19        Q       (BY MR. SORENSON:)  What did it make you believe

20   when you saw these things?

21        A       Yeah, because he show me all this badge and all the

22   credential that they have, Attorney.

23        Q       Uh-huh.  And with respect to his -- his mortgage

24   program, the mortgage reduction program, did it have any effect

25   on you as far as believing in that or not?
```

1          A      Yes, kind of trust people because he show me all the

2     paperwork that he finish in different state.

3          Q      Okay.  Now, did there come a time when you decided

4     to sign up with his mortgage reduction plan?

5          A      What's that?

6          Q      Did you sign up with his mortgage reduction plan?

7          A      Oh, yes, yes, yes.

8          Q      Do you recall whether or not he ever filed a

9     document called a UCC financing statement for you?

10         A      Yes, he did all that.

11         Q      Okay.  I'm going to direct your attention to an

12    exhibit.  It's Exhibit 301.

13                Your Honor, could I display it?  Or I guess I could

14    walk one up for him.  It'd probably be the easiest way.

15                THE COURT:  Is it in his binder or no?

16                MR. SORENSON:  He doesn't have a binder 'cause I

17    only have one exhibit.

18                THE COURT:  Oh, okay.  You can show it to him on the

19    docucam.  We have it loaded.  Just put it under the docucam so

20    he can see it.

21                MR. SORENSON:  Okay.

22                THE COURT:  Yeah.

23         Q      (BY MR. SORENSON:)  Okay.  Mr. Malinay, do you

24    recognize this?

25         A      Yes.

1      Q    What is it?

2      A    They said that, "See, I filed this one.  Now you

3    debt free."

4      Q    Okay.

5      A    The --

6      Q    Let me stop you there.

7           Your Honor, at this time --

8           THE COURT:  Let me just ask.  Do you have any

9    objections to me receiving Exhibit 301 into evidence,

10   Mr. Williams?

11          THE DEFENDANT:  No, I don't have no objection.

12          MR. SORENSON:  Okay.  It's moved in, Your Honor, and

13   we ask to have it published.

14          THE COURT:  You may.

15          MR. SORENSON:  And I think I can actually pull it up

16   on our system here.

17          THE COURT:  All right.

18          (Exhibit 301 received into evidence.)

19     Q    (BY MR. SORENSON:)  Okay.  Mr. Malinay, if you can,

20   look at the screen.  It might be a little easier.  I'll ask you

21   at this top part here, first off, is that your name there,

22   Henry Malinay?

23     A    Yes, me and my wife.

24     Q    Okay.  Marilyn, is that your wife?

25     A    Yes, sir.

1      Q      All right.  And Mr. Malinay, I know you have some
2  difficulty with reading.  What did Mr. Williams tell you that
3  this document would do for you?
4      A      They said that half my mortgage and my monthly and
5  give a chance to eliminate the debt.
6      Q      Did he tell you that this would discharge your
7  mortgage?
8      A      Yeah, that's a discharge, that's what he told me,
9  'cause I do it before, the --
10     Q      After this was filed, did you believe you still had
11  a mortgage or not?
12     A      Before they told me, "You done."  That's what he
13  told me, finish.  That's what he told me.
14     Q      And as a result of that, did you stop paying your
15  mortgage?
16     A      Yes, sir.
17     Q      Okay.  Now, did there come a time when you started
18  working for Mr. Anthony Williams?
19     A      What's that, sir?
20     Q      Did there come a time when you started working for
21  Mr. Williams?
22     A      Uh-huh.
23     Q      And if you could tell the jury how you came to work
24  for him.
25     A      Well, because at that time I get hard time to pay my

UNITED STATES DISTRICT COURT

 1    mortgage off and on.  Then my neighbor came to my house with

 2    Edna Franco and then he show us the program, and kind of sounds

 3    good 'cause I looking for people to helping us to keep my house

 4    at the time, Attorney.  Then couple weeks, then Edna Franco and

 5    Angie Pasion call me that I have to meet someone like Anthony.

 6         Q     Okay.  And when you met with Mr. Williams, did you

 7    talk to him about working for him?

 8         A     Yeah, because he told me that time that he asked me

 9    what kind of job I do, I network marketing; he said, "Oh, I

10    need you."  That's what he told me.

11         Q     And as far as needing you, what did you take that to

12    mean?

13         A     'Cause I know some people that they need help with

14    the mortgage at that time.

15         Q     And these people that you know, are these all people

16    that have immigrated from the Philippines?

17         A     Yes, sir.

18         Q     Are these all Ilocano --

19         A     Yeah, Ilocano.

20         Q     -- Filipino speakers?

21         A     Yeah.

22               THE COURT:  You just have to wait till the attorney

23    is pau, is finished --

24               THE WITNESS:  Okay.  Yes.

25               THE COURT:  -- question and then you can answer.

21

 1          THE WITNESS:  Oh, sorry.

 2          THE COURT:  Just wait little bit.

 3          THE WITNESS:  Sorry, Judge.

 4          THE COURT:  Thank you.

 5     Q    (BY MR. SORENSON:)  Okay.  And so did you then enter

 6     into an agreement to work with Mr. Williams?

 7     A    Yes.

 8     Q    And did you become familiar with a company by the

 9     name of Mortgage Enterprise Investments?

10     A    Yes.

11     Q    And what company is that, do you know?

12     A    He told me that he owned that mortgage.

13     Q    Uh-huh.  Did tell you he owned that company?

14     A    Yes.

15     Q    And were you employed by that company?

16     A    They call sharing.  They have on the -- on the form

17     they have sharing.  So whatever I service people, I put my name

18     on it so I get commission.

19     Q    And did you start meeting with people?

20     A    Yes, sir, because that's instruction to us to meet

21     people.

22     Q    And did Mr. Williams tell you what to tell people

23     about his mortgage plan?

24     A    Yes, sir.

25     Q    What did he tell you to tell them?

UNITED STATES DISTRICT COURT

1          A      Because they -- they told us at that time this is

2     what you say to people, cut the mortgage half.

3          Q      Okay.  Now, if I'm one of those people you're trying

4     to sell this program to, what would you have told me?

5          A      Just tell you that what kind of mortgage you have

6     and then let's say some 400,000, "Oh, I have a friend that can

7     help you.  That's his program."

8          Q      And you told them about the program?

9          A      Yes, sir.

10         Q      And what did you tell them about the program?

11         A      They can cut their -- half of their mortgage and

12    then the monthly.

13         Q      And would you then refer them to Mr. Williams?

14         A      Yes, sir.

15         Q      Okay.  And how many people would you guess that you

16    met with and recruited for Mr. Williams?

17         A      I don't remember.  I think -- yeah, I guess some

18    people, but I don't know how many people now 'cause -- yeah.

19         Q      You don't know how many people you met with?

20         A      No, not -- maybe more than 50, I think.

21         Q      More than 50?

22         A      Yes.

23         Q      Okay.  Was there a time you actually went to Maui as

24    well?

25         A      Yes.

UNITED STATES DISTRICT COURT

1     Q     And what did you do there for Mr. Williams?

2     A     Because I know the -- the owner with the radio,

3   that's in my Xango, my network.  And they get two lady from --

4   in Hawaii that they know somebody in -- in Maui, so they invite

5   me to Maui.

6           Then they do the meet and I meet them.  And then

7   after that then they tell me that, "Oh, you know a lot of

8   people in Maui," 'cause I know that I get the radio station --

9   yeah? -- that's my friend, "so we'll just announce to the radio

10  and announce a meeting."

11          So I did that and then Mr. William do the meeting in

12  the hotel.

13    Q     Now, did there come a time when Mr. Williams

14  indicated that he could represent you with respect to your

15  mortgage?

16    A     Yes, Attorney.

17    Q     And did you believe he was an attorney at that

18  point?

19    A     Yes, Attorney.

20    Q     And I'm going to direct your attention to August of

21  2013.  Did you come to federal court during that month with

22  Mr. Williams?

23    A     Yes, with him.

24    Q     Okay.  Tell the jury what happened when you came to

25  federal court with him.

24

1       A       Well, the judge said that, "You're not real

2    attorney.  You're not practicing in Hawaii."

3       Q       Did Mr. Williams attempt to represent you in court

4    that day?

5       A       Yes, sir.

6       Q       And when he tried to do that, what happened?

7       A       And I think they deny my case because he's not

8    attorney.

9       Q       Did the court tell him he was not an attorney?

10      A       Yes, sir.

11      Q       And did the court deny his ability to represent you?

12      A       Yes, sir.

13              THE DEFENDANT:  Objection as hearsay.

14              THE COURT:  So it's foundational.

15              MR. SORENSON:  It's also in the record, Your Honor.

16              THE COURT:  Yeah.  And overruled.

17      Q       (BY MR. SORENSON:)  Okay.  So when that hearing

18   finished that day, did your opinion of Mr. Williams change?

19      A       Well, I believe the time went down I believe.  Then

20   after that they bring me to the Anabel's office and talk to me

21   again, so...

22      Q       Right.  And after that time, did you then continue

23   to work for Mr. Williams?

24      A       Yes, sir.

25      Q       And did you continue to sell his product to people?

UNITED STATES DISTRICT COURT

1     A     Yes, sir.

2     Q     And based on your ongoing work with him, did there

3  come a time when you got charged with a crime?

4     A     Yes.

5     Q     What were you charged with?

6     A     Because I sell the program and then it's not went

7  through all the program because I lose my house and other

8  people.

9     Q     Were you charged with wire fraud or conspiracy to

10  commit wire fraud?

11     A     Yes, sir.

12     Q     And did you plead guilty to that charge?

13     A     I plead guilty.  I plead guilty at that time.

14     Q     And was that -- were you charged with a conspiracy

15  to sell this product with Mr. Williams?

16     A     What's that?

17     Q     Were you charged in a conspiracy to sell this

18  program, this mortgage reduction program, with Mr. Williams?

19     A     Yes, sir.

20     Q     Now, did there come a time when Mr. Williams left

21  Hawaii?

22     A     Yes, sir.

23     Q     And I'm going to direct your attention to

24  September 2013 or so.  Did it come to your attention that he

25  left Hawaii in that time frame?

 1        A        Yeah, 'cause I see in the news.

 2        Q        Okay.  And after he left Hawaii, did you continue to

 3   try to market this program?

 4        A        Yeah, 'cause I ask Edna because that's his partner,

 5   I said, "What we gonna do now?  Because the people I bring, I

 6   don't want them to lose their house."

 7                 And Edna said, "Oh, let's go form another company in

 8   the mainland, similar with Anthony Williams so can continue on

 9   the business."  That's what he told me -- tell me.

10        Q        Did there come a time when you decided to branch off

11   and start selling this program on your own?

12        A        Yes.

13        Q        And did you do that with others?

14        A        Uhm, it was Edna and Anabel and Angie Pasion.

15        Q        And during the time when Mr. Williams was gone, did

16   you continue to do the same thing?

17        A        Yeah, because Edna, they change the program because

18   I want them to continue the system so we can finish the people

19   that I bring.

20        Q        What was the name of your business that you opened?

21        A        I think Mortgage Enterprise.

22        Q        Okay.  And Mr. Williams's business name was what?

23        A        Mortgage Enterprise Investment.

24        Q        Now, did there come a time when Mr. Williams

25   returned to Hawaii?

 1     A     Since then I don't see him, Attorney.

 2     Q     So you're not aware whether he came back or not?

 3     A     No, I don't know that.

 4     Q     Now, when you signed up for the program, did you

 5 stop paying your mortgage?

 6     A     No, Attorney, 'cause they tell me to get off already

 7 my house.

 8     Q     No.  When you -- when you signed up with

 9 Mr. Williams and he did the financing statement we saw --

10     A     Yes, Attorney.

11     Q     -- did you stop paying the mortgage at --

12     A     Yes, that's what he told me, Attorney.

13     Q     All right.  And did Mr. Williams tell you that your

14 mortgage was discharged at that point?

15     A     Yeah, they said All your balance is discharged.

16 That's what he told me.

17     Q     And did you come to find out that that wasn't

18 correct at some point?

19     A     Yeah.  And then after that, I lose my house.

20     Q     Okay.  Tell the jury how you lost your house.

21     A     Because they -- I lost my house because I don't pay,

22 you know, my monthly now and they said somebody that -- oh,

23 somebody sheriff coming to your house and take your house, so I

24 just move the house.

25     Q     Uh-huh.  And did the bank take over your house?

```
 1        A      I don't know if the bank take over the house.  I
 2   think so.
 3        Q      Did you lose your house because you had stopped
 4   paying?
 5        A      Yes, because of him, Attorney.
 6        Q      Now, if you had known that Anthony Williams wasn't
 7   an attorney back when you first signed up, would you have
 8   signed up with him?
 9        A      If I know that he's not true, I don't want to sign
10   up.
11        Q      If you had known that those government credentials
12   that he showed you or those official-looking credentials were
13   not government credentials, would you have signed up with him?
14        A      Yeah, if I don't see all this thing and then all the
15   paperwork, I don't want to sign up.
16        Q      If you had known that he could not eliminate your
17   mortgage, would you have signed up with him?
18        A      What's that, Attorney?
19        Q      If you had known that he could not eliminate your
20   mortgage, would you have signed up with him?
21        A      No, Attorney.
22        Q      Did you rely on his representations?
23        A      What's that?
24        Q      Did you rely on his representations?
25        A      No, Attorney.
```

UNITED STATES DISTRICT COURT

29

1        Q       Did you rely on his representations?

2        A       I lie?

3        Q       Did you rely -- I'm sorry?

4        A       Oh, yeah, yeah, yeah.  Yeah, I trust him a lot at

5    that time.

6        Q       Okay.  Do you still feel that way about him?

7        A       What's that?

8        Q       Do you still feel that way about him?

9        A       Yes, Attorney.

10       Q       No.  Do you still trust him?

11       A       Before, yes, Attorney.

12       Q       Do you trust him now?

13       A       No.  I don't like any more.

14       Q       Okay.

15       A       Yeah.

16               MR. SORENSON:  Your Honor --

17               THE WITNESS:  I hate him.

18               MR. SORENSON:  Just a moment, Your Honor?

19        Your Honor, that's all the questions I have.  Thank you.

20               MR. ISAACSON:  One moment, Your Honor, if I could.

21               THE DEFENDANT:  I'm going to actually need more

22    time.

23               THE COURT:  I'm sorry.  You need to stand up and

24    speak into the microphone.  Are you not ready to go forward

25    with your cross-examination?

1          THE DEFENDANT:  Well, 'cause I got some -- a lot of

2    the documents that's not been put into evidence that's relating

3    to him.  I didn't think we would get to him today.  I only got

4    some of them but not all of them.  It's a lot, especially

5    dealing with him.

6          THE COURT:  Okay.  Is there other areas you can

7    start out with that don't have to do with the documents?

8          THE DEFENDANT:  Yeah, I could start out.

9          THE COURT:  Do you want to start with those areas

10   and then tomorrow probably he'll continue on?

11         THE DEFENDANT:  Okay.

12         THE COURT:  Are you able to do that?

13         THE DEFENDANT:  I can do that.

14         THE COURT:  All right, sir.  Why don't you start

15   your cross-examination.  So just go as far as you can.

16         THE DEFENDANT:  Okay.

17         THE COURT:  And if it's less than the time that we

18   have, then that's fine.

19         THE DEFENDANT:  Okay.

20                    CROSS-EXAMINATION

21   BY THE DEFENDANT:

22   Q    Okay.  Mr. Malinay, when did you say you met me?

23   What month and what year?

24   A    If not mistaken, on the -- what year this one now?

25   In -- I think it's about five years from now, six years.

 1        Q        So what year?  In like 2013?  2014?  What year?

 2        A        I think if I'm not mistaken between '12 to '13.

 3        Q        Okay.  Now, when you met me, I showed you the

 4    documentation for the private attorney general and the laws

 5    regarding that, correct?

 6        A        Yeah, you show me your badge, all this.

 7        Q        And you saw the videos of me also going through the

 8    airport with that badge, the handcuff, and the ID, correct?

 9        A        Yes, 'cause you show me on the YouTube.  That's what

10    you told me.

11        Q        Correct.  So you saw that personally, though, right?

12        A        Yeah.

13        Q        Now, you said that you formed the fraudulent

14    company, Mortgage Enterprise, after I was incarcerated; is that

15    correct?

16        A        What's that?

17        Q        You said you and Edna after I was falsely

18    incarcerated in September, you said that you formed the copy

19    cat company trying to copy my company in -- after I got

20    incarcerated.

21        A        Yeah, because I bring some people that's kind of

22    worry about their -- I collect some money from them, and

23    Edna -- I asked Edna how can continue on, I don't want them to

24    lose their house like me, you know.

25        Q        So you did that --

```
1     A     That's because your program.

2     Q     So you did that after I got incarcerated?

3     A     Yeah.

4     Q     Did I advise you to do that?

5     A     No.  Edna told me that.

6     Q     Okay.  So you saying you did that after I got locked

7  up though, right?

8     A     Yeah, because I ask Edna we going to do now 'cause I

9  see Anthony on the TV that, you know, you went to the jail, so

10 what we gonna do now all these people now?  I was kind of

11 worry.

12            THE DEFENDANT:  Okay.  I need Government

13 Exhibit 721, please.

14            MR. SORENSON:  Is that in evidence?

15            THE DEFENDANT:  Yes, it is.

16            MR. YATES:  It's not in evidence.

17            THE DEFENDANT:  I need you all Exhibit 721,

18 Government Exhibit 721 and also 725.

19        No, I need 725.  Sorry.  725.  Can you all turn it like

20 right side so we can see it?

21            MR. SORENSON:  You can rotate it.  I can make it

22 bigger.

23            THE DEFENDANT:  Click on it.

24     Q     (BY THE DEFENDANT:)  Okay.  Mr. Malinay, it's turned

25 sideways, but can you see this signature card?
```

UNITED STATES DISTRICT COURT

```
 1      A      Yes.

 2      Q      And what bank is this from?

 3      A      Chase.

 4      Q      Chase Bank?

 5      A      Yeah, Chase.

 6      Q      And is that your name at the first one on top of

 7   there?

 8      A      Yes.

 9      Q      And is that your signature?

10      A      Yes.

11      Q      And can you read what date that says?

12             MR. SORENSON:  Your Honor, this is not in evidence

13   at this juncture.

14             THE COURT:  Yes.  So are you going to offer it into

15   evidence?

16             THE DEFENDANT:  Yes.

17             THE COURT:  All right.  Any objection?

18             MR. SORENSON:  No objection, Your Honor.

19             THE COURT:  Okay.  Received.

20             (Exhibit 725 received into evidence.)

21             THE COURT:  Do you wish to publish?

22             THE DEFENDANT:  Yep, I wish to publish it.

23             THE COURT:  All right.  You may publish.

24         All right.  So what did you want to ask him?

25      Q      (BY THE DEFENDANT:)  Okay.  Mr. Malinay, you just
```

1    said that you all formed the company after I was incarcerated.

2    But the date on here is August 27, 2013.  This was two weeks

3    before I was incarcerated.

4            MR. SORENSON:  Objection to the testimony, Your

5    Honor.  He can ask the question.

6            THE COURT:  Yeah.  So sustained.

7        All right.  Do you know if this -- did you sign this

8    before or after Mr. Williams left Hawaii because he was

9    incarcerated?

10           THE WITNESS:  I think after because I kind of worry

11   if somebody helping all my friend at the time 'cause he went to

12   the jail.

13           THE COURT:  Okay.  'Cause you went to the jail to

14   visit him?

15           THE WITNESS:  Oh, I never visit him.

16           THE COURT:  Oh, oh.

17           THE WITNESS:  I see on the news and Edna told me

18   that I went -- she went to the jail, and I'm kind of worry,

19   Judge, that how I can help all my friend.

20           THE COURT:  Okay.  So he says it was after he saw on

21   the news that you were incarcerated.  So you can ask him

22   another question.

23       Q    (BY THE DEFENDANT:)  Okay.  Well, do you know the

24   date that I was arrested, Mr. Malinay?

25       A    I don't know what's your date you're arrested, but

UNITED STATES DISTRICT COURT

1    Edna told me that time that, "Hey, Anthony went to the jail."

2    That's what he told me.  I don't know what date that you

3    arrested.

4         Q    You don't know the date that I was arrested was

5    September 13th, 2013?

6         A    No.  I don't pay attention on that one because Edna

7    told me that, "Oh, Anthony went to the jail."  That's what he

8    told me.

9         Q    Okay.  So if -- this date is before I went to jail,

10   it's August 27th.  I went to jail on September 13th.

11             THE COURT:  No, no, so you can't testify.  He says

12   he doesn't know what date it is.  So you have to ask him

13   another question.

14        Q    (BY THE DEFENDANT:)  Okay.  So if that was your

15   intention, then why did you fly to California to open up this

16   account?

17        A    Because Edna told me that you went to the jail and I

18   call Edna, "How can help all my people?"

19             And they said, "Okay.  Let's go form another

20   business in California."  That's what Edna told me.

21        Q    So -- so Edna -- so you're saying Edna is the master

22   mind for the scam?

23        A    Yeah, he's the one.  Yeah, he is the one to tell us

24   to do it.

25        Q    So you couldn't have opened up a bank account here

UNITED STATES DISTRICT COURT

1    in Hawaii to help the Hawaii people?

2         A    'Cause Edna told me to California, so I went to

3    California.

4         Q    So whose idea was it to copy my documents, to forge

5    my documents?

6         A    Must be Edna.  That's your partner before.

7         Q    So it was Edna that told you to copy -- to forge my

8    documents?

9         A    I don't know 'cause she said, "Oh, you can use this

10   one."  That's what he told me because the same -- "Me and

11   Anthony same -- the same head of this program."  That's what he

12   told me.

13        Q    So how could that be -- how could you believe that

14   when I fired you, Edna, and Rowena after this -- about five

15   days after this date?  How could you that be possible when I

16   fired you, Edna --

17             MR. SORENSON:  Objection.

18             THE DEFENDANT:  -- and Rowena?

19             MR. SORENSON:  It's testimony.  He needs to ask a

20   question.

21             THE COURT:  Okay.  So -- so the question is do you

22   remember that he fired you, Edna, and Rowena?

23             THE DEFENDANT:  Yes.

24             THE WITNESS:  No, I don't remember that.

25             THE COURT:  In -- what is the date of

UNITED STATES DISTRICT COURT

1   this -- in -- after August 27, 2013?  So after you signed this,

2   do you remember that Mr. Williams fired you, Edna, and Rowena?

3            THE WITNESS:  I don't remember, Judge.

4            THE COURT:  Okay.  He doesn't remember it.

5       Q    (BY THE DEFENDANT:)  So do you remember I put your

6   picture, Edna picture, and Hap picture on my website on a

7   public notice?  Do you remember that website I put up against

8   you?

9       A    No, but I -- all I remember that you put me -- you

10  make me a business card.

11      Q    That was before I fired you, right?

12      A    Yeah.

13      Q    Right before I fired you?

14      A    Yeah.

15      Q    Right.  So you don't remember me showing you when I

16  came back when I got out and found out what you was doing, you

17  don't remember I showed you the website where I put your

18  picture and her picture as scam artists?

19           MR. SORENSON:  Your Honor, again we've got a lot of

20  testimony.

21           THE COURT:  So your question is do you remember

22  putting -- do you remember Mr. Williams put your photo and

23  Edna's photo on a website?

24           THE WITNESS:  I don't remember, Attorney -- aye --

25  Judge.

    1            THE COURT:  All right.  So ask him the next

    2   question.

    3       Q     (BY THE DEFENDANT:)  So you said you wanted to help

    4   people, right?

    5       A     Yeah, because that's your program.

    6       Q     Okay.  So did you know how to help people?

    7       A     Well, 'cause Edna and you telling me at the time

    8   that I can gather people and just bring the people to you guys,

    9   that's what I did.

   10       Q     So what did you do to help people?  What did you do?

   11       A     Well, I saw your program, you know, the form, the

   12   application, and then this is what this to people to help us,

   13   that's what I tell people.

   14       Q     So you just had people to fill out the application?

   15       A     Yeah, they fill out the application.

   16       Q     And then after they filled out the application, then

   17   what did they do?

   18       A     And then I put my name in the referral fee and then

   19   I fill out, and then I give to Edna and then give to you.

   20       Q     No, you couldn't have gave it to me --

   21       A     Yes.

   22       Q     -- I wasn't there.

   23       A     Yes.

   24       Q     I was in jail.

   25            THE COURT:  Wait, wait.  All right.  This is not a

1    conversation.  It's a question and an answer.  Okay?  So he

2    says he gave it to you.

3                    THE DEFENDANT:  Okay.

4                    THE COURT:  What's your next question?

5        Q    (BY THE DEFENDANT:)  How could you have given it to

6    me when I was locked up in jail for nine months during this

7    time?

8        A    No, before --

9                    MR. SORENSON:  Objection --

10                   THE WITNESS:  Before --

11                   THE COURT:  Wait, wait, wait, wait.  Okay.  So stop

12   and wait.

13        What's your objection, Mr. Sorenson?

14                   MR. SORENSON:  Objection again to the form.  It's

15   not even a question.  He -- it's a statement.

16                   THE COURT:  All right.  So it's cross-examination.

17   Overruled.  So you said that you sent it to Mr. Williams.  His

18   question to you is how could you have done that if he was in

19   prison?

20                   THE WITNESS:  Well, I understand at that time,

21   Judge, is because him and Edna they work together.  That's

22   my -- our like kind of boss in the program.  So I give to Edna

23   and Anabel 'cause I don't know how to do all these things.

24                   THE COURT:  Okay.  So that's his answer.

25        Q    (BY THE DEFENDANT:)  Okay.  That was before you got

UNITED STATES DISTRICT COURT

1  fired, before I fired you all.  After I fired you all --

2           THE COURT:  No.  So he says he doesn't remember

3  that.

4           THE WITNESS:  I don't remember that.

5           THE COURT:  So what's your question?

6      Q   (BY THE DEFENDANT:)  Okay.  So if you was forming

7  this company to help my clients, why didn't you notify me?

8      A   Well, 'cause I thought all the people I bring, you

9  and Edna's client and that's what I understood.

10     Q   So when I got out of jail -- when I won my case and

11 I got out of jail and I came back to Hawaii, if it was your

12 intention to help my clients, why when I came back here you

13 didn't contact me?

14     A   Yeah, because I find out that you scam at the time

15 so I don't want to contact you any more.

16     Q   So you saying that I was the scam?

17          THE COURT:  Well, so ask him a question.

18     Q   (BY THE DEFENDANT:)  So you saying that when I won

19 my case and I came back, you determined that I was the scam and

20 you didn't want nothing to do with me?

21     A   Yeah.  I don't want to deal with you at that time

22 already.

23     Q   So --

24     A   I lose my house.

25     Q   Well, you was -- were you in foreclosure when you

UNITED STATES DISTRICT COURT

```
 1   met me?

 2        A     What's that?

 3        Q     Weren't you in foreclosure when you met me?

 4        A     No.  You were in jail already at the time I lose my

 5   house.

 6        Q     Do you remember me going to court with you?

 7        A     Yes.

 8        Q     And represent you in court, right?

 9        A     Yeah.

10        Q     Okay.  Why were we at the court?

11        A     Yeah, because you tell me to help me to save my

12   house.

13        Q     No.  Why were we at court?  For what?  What was the

14   reason we was -- I showed up for court for you?  What was the

15   reason?

16        A     Yeah, because you tell me to cut my mortgage.

17        Q     No.  What was the reason we was at court?  That has

18   nothing --

19        A     To save -- try to foreclose my house.

20        Q     'Cause what?

21        A     Foreclose my house.

22        Q     'Cause you was in foreclosure?

23        A     Yeah.

24        Q     Now, what month was that?

25        A     I don't remember now.
```

```
 1      Q      You don't remember it was July 26, 2013?

 2      A      Yeah, I think so, yeah.

 3      Q      Right.  So when you met me you was already in

 4  foreclosure, correct?

 5      A      But still live in the house at the time yet.

 6      Q      Yes, you was still living in the house, but you was

 7  in foreclosure already?

 8      A      Right.

 9      Q      Right.  Right.  So you couldn't -- you didn't

10  qualify for the mortgage reduction because you was in

11  foreclosure, remember?

12      A      Yeah, because --

13      Q      Okay?

14             THE COURT:  Wait, wait.  Okay.  So what's your

15  answer?

16             THE WITNESS:  Yeah, that's why I -- I heard your

17  program, that's why I came to you.

18      Q      (BY THE DEFENDANT:)  Right.  To save you from

19  foreclosure, correct?

20      A      Yeah.

21      Q      Right.  So that's why I showed up for court with

22  you, correct?

23      A      Correct.

24      Q      Right.  'Cause you was already in foreclosure?

25      A      Correct.
```

```
 1       Q       Now, when I would represent you, Edna, and all the
 2  other people, did I always show up to court?  Was I the one
 3  that showed up to court?
 4       A       Only show up to me, only my case.
 5       Q       Right.  Did I show up for other clients?
 6       A       I don't know.  I don't see you there.
 7       Q       You didn't -- you wasn't there with the other --
 8       A       No.
 9       Q       -- the other clients?
10       A       Only --
11       Q       You don't remember that?
12               THE COURT:  Wait.
13               THE WITNESS:  No.
14               THE COURT:  Let him finish the question.
15       Okay.  Did you see him represent other clients in court?
16               THE WITNESS:  No, only me.
17               THE COURT:  Okay.  What's your next question.
18       Q       (BY THE DEFENDANT:)  So if you felt like what I was
19  doing was a scam, after I got out, why did you continue to scam
20  people?
21       A       Yeah, 'cause your partner Edna said that I can
22  continue and because I don't know what she's doing.  That's
23  what she told me and so I tried to save the people's house like
24  I do.
25       Q       You're not answering the question.  Let me slow it
```

UNITED STATES DISTRICT COURT

44

1    down and ask you this again.

2              You said that you felt like I was a scam after I won

3    my case and came back to Hawaii.  Now, my question to you is

4    this:  If you felt like what I was doing was a scam, why did

5    you continue to scam people?

6         A    Yeah, because that's what Edna told me.

7         Q    No, you can't put this on Edna, Mr. Malinay.

8              THE COURT:  Wait, wait.  No.  So this is a question

9    that you have to ask him.  So what's the question?

10        Q    (BY THE DEFENDANT:)  So did Edna put a gun to your

11   head to scam people?

12        A    No.

13        Q    So you was a participating and a willing conspirator

14   in the fraud?

15        A    Yeah, that's why I plead guilty and I went to the

16   court.

17        Q    Right.  Because you were guilty, right?

18        A    Right.

19        Q    Right.  Because you know you scammed all those

20   people?

21        A    Right.

22        Q    Correct?  And you knew you couldn't do no work for

23   them like I could, right?

24        A    Yeah, because it's your program.  I learn from you.

25        Q    You didn't learn the program.  You got fired before

UNITED STATES DISTRICT COURT

```
 1   you could be trained.  Remember?

 2        A     Yeah, but that's your program.

 3        Q     Right.  But you didn't know the program, did you?

 4        A     What's that?

 5        Q     Did you know the program?

 6        A     Only I know the cut the half of the mortgage and the

 7   monthly.

 8        Q     So did you know the process?

 9        A     No, I don't know the process.

10        Q     Okay.  So if you didn't know the process, how could

11   you offer something to somebody else that you don't know,

12   Mr. Malinay, that you don't know how to do?

13        A     Yeah, because that's your instruction, you and Edna,

14   that you got the people and I do all the job.  That's what you

15   tell me at the time, you and Edna.

16        Q     No.  When you said I went to jail and you formed

17   this fraudulent company, you said you all had to help people,

18   correct?

19        A     Yeah, because --

20              THE COURT:  Wait, wait.  Let him finish.

21              THE WITNESS:  Because Edna at the time -- because I

22   thought you and Edna forever partner at the time.  That's what

23   I understood.

24        Q     (BY THE DEFENDANT:)  How could you understand that,

25   Mr. Malinay, when you knew I sent -- do you remember the email
```

1    I sent you, Anabel, and Edna?  Do you remember that email?

2        A     No I don't remember.

3        Q     Well, I'll have that email tomorrow.

4              THE COURT:  Okay.  So ask a question.  Do you have

5    more questions you want to ask him or you want to wait until

6    you have your documents?

7              THE DEFENDANT:  I just -- give me a couple more

8    questions.

9              THE COURT:  All right.

10       Q     (BY THE DEFENDANT:)  Now, you had filed bankruptcy,

11   right, Mr. Malinay?

12       A     Yeah.

13       Q     Okay.  And what --

14       A     Bankruptcy?  No, it never went through the

15   bankruptcy.

16       Q     You didn't -- so bankruptcy you didn't --

17       A     2010.  2010.

18             THE COURT:  Okay.  One of you can only speak at a

19   time.  So in 2010, did you file bankruptcy?

20             THE WITNESS:  Yes, Judge.

21             THE COURT:  Okay.  But it didn't go through?

22             THE WITNESS:  No, no.  It had already went through.

23             THE COURT:  That went through in 2010?

24             THE WITNESS:  Uh-huh, in 2010.

25             THE COURT:  Ask your question.


UNITED STATES DISTRICT COURT

```
 1       Q      (BY THE DEFENDANT:)  Did you file another

 2   bankruptcy?

 3       A      Yeah, I file, but it never went through the

 4   bankruptcy.  They deny.

 5       Q      Okay.  Why did they deny you bankruptcy?

 6       A      I don't know, 'cause I had my attorney at that time,

 7   but I don't know.  They said you didn't qualify so that's what

 8   I know.

 9              THE DEFENDANT:  Exhibit 2048, page 7 -- starting at

10   page 7, ending on page 21.

11       Q      (BY THE DEFENDANT:)  Mr. Malinay, can you see this

12   document?

13       A      Yes.

14       Q      And does this document pertain to you?

15       A      Yeah, 'cause I went to the DCCA --

16       Q      Okay.

17       A      -- to --

18       Q      And is this document --

19              THE COURT:  Wait, wait.  First of all, what document

20   number is this?

21              THE DEFENDANT:  It's 2048 and it's page from 7 to I

22   think 21.

23              THE COURT:  Okay.  So what's your question?  He

24   recognizes the document.

25              MR. YATES:  Actually, Your Honor, we're having
```

 1   trouble locating it.  One moment.

 2                THE COURT:  Oh, I'm sorry.

 3                MR. YATES:  Could we have that document number read

 4   again?

 5                THE COURT:  Yes, 2048.

 6                THE DEFENDANT:  -48.

 7                MR. SORENSON:  Whatever's on the screen is not what

 8   we have as 2048.

 9                THE DEFENDANT:  It starts at page 7.

10                THE COURT:  Yeah, so it's several pages in.  If you

11   go -- it's right after the handwritten notes.

12                MR. SORENSON:  Yes.  Okay.  I have it, Your Honor.

13                THE COURT:  Okay.  Thank you.

14        All right.  So he said he recognizes it and then what's

15   your next question?

16        Q    (BY THE DEFENDANT:)  Was this -- this was your

17   bankruptcy proceeding?

18        A    Yeah, but it is not went through.

19        Q    Say again?

20        A    It's not went through.  They deny.

21        Q    Okay.  And do you remember the reason they denied

22   your bankruptcy?

23        A    I don't have no idea.  I have attorney at the time

24   just tell me that Oh, you deny.  I don't know what the reason.

25                THE DEFENDANT:  Okay.  I'd like to introduce into

                     UNITED STATES DISTRICT COURT

1   evidence.

2              THE COURT:  Okay.

3              MR. SORENSON:  Well, we object, Your Honor.

4              THE COURT:  Yeah, no.  So I think this is going to

5   take a few minutes to address.  So what I suggest is I excuse

6   the jury for today and then I'll make an evidentiary ruling so

7   we can start in the morning.

8              THE DEFENDANT:  Okay.

9              THE COURT:  All right?

10             THE DEFENDANT:  All right.

11             THE COURT:  So, ladies and gentlemen, I'm going to

12  excuse you for the day with my usual long instructions.  Don't

13  discuss the case with anyone or allow anyone to discuss it with

14  you, including your fellow jurors.  Don't research, Google, or

15  otherwise investigate any of the witnesses or anything that was

16  discussed during testimony.  Of course, don't go on any social

17  media about the trial, and don't listen to, read, or watch any

18  media account should there be any.

19             Thank you for your kind attention today.  We'll see you

20  tomorrow morning at 8:30.

21             Please rise for the jury.  They're excused for the day.

22             (Open court out of the presence of the jury.)

23             THE COURT:  And the record reflect the jury's no

24  longer present.  Present are counsel and Mr. Williams.

25             Any objection to me excusing Mr. Malinay today with the

UNITED STATES DISTRICT COURT

1   instruction that of course you're not to talk to anyone about

2   the case and that he remains under oath?  Any objection?

3       Okay.  Mr. Malinay, I'm going to excuse you for today.

4   You need to come back tomorrow morning to finish your

5   testimony.  Please don't talk to anybody about your testimony.

6           THE WITNESS:  Yes, Judge.

7           THE COURT:  All right?  And I'll just remind you you

8   continue to be under oath.

9           THE WITNESS:  Thank you, Judge.

10          THE COURT:  All right.  Good day.  Have a good

11  afternoon and evening.  All right.

12      All right.  So one of the issues we need to talk about is

13  this document that is contained within the exhibit identified

14  as 2048.  This begins with the face sheet.  It was a filing,

15  apparently in the United States Bankruptcy Court.  It was filed

16  by the attorneys for the State of Hawaii Office of Consumer

17  Protection.  It is -- it says Plaintiff's Scheduling Conference

18  Order.  So I think they're referring to them as a plaintiff in

19  another action and then they're filing it in the Chapter 13

20  bankruptcy action.  That's what it appears from the face sheet.

21      All right.  So, Mr. Williams, you want to put it into

22  evidence.

23          THE DEFENDANT:  Yes.

24          THE COURT:  Mr. Sorenson is objecting to that.  I'm

25  going to hear his objections and then I'll hear your position.

UNITED STATES DISTRICT COURT

1          Mr. Sorenson?

2              MR. SORENSON:  Well, yes, Your Honor.  I think this

3     is being offered for impeachment purposes.  I would say first

4     off this is not -- obviously this is not this defendant's

5     statement.  This is -- this is the statement of James Evers of

6     the Hawaii -- State of Hawaii as you pointed out, Office of

7     Consumer Protection.  I think he wants to offer it for the

8     truth of the matters asserted in the document which are

9     statements made by Mr. Evers, I believe, about his bankruptcy.

10         So it's just -- it's hearsay.  It's -- it's not his

11    statement.  We object.

12             THE COURT:  All right.  So, Mr. Williams, what do

13    you wish to offer this for?

14             THE DEFENDANT:  Well --

15             THE COURT:  Okay.  So this is hearsay.  I mean, it's

16    an out-of-state -- out-of-court statement and so what are you

17    offering it for?

18             THE DEFENDANT:  Well, to show that he's the actual

19    culprit that made this whole charge that they're charging me

20    with --

21             THE COURT:  Right.

22             THE DEFENDANT:  -- is 'cause this man right here.

23             THE COURT:  Right.  So how does this document in his

24    bankruptcy action or in the underlying action filed against him

25    by the Office of Consumer Protection relate to that?  And then

1    we'll talk about why it's an exception to the hearsay rule.

2              THE DEFENDANT:  Because these are where the

3    complaints were generated from.  No complaints were generated

4    from me or my actions.  All the complaints were generated from

5    this man.  They have a copy of the actual bank records that

6    they flew to California, because when he first was interviewed

7    he said he didn't have nothing to do --

8              THE COURT:  So again, I'm going to ask you with

9    regard to this filing, though, by James Evers on behalf of the

10   State of Hawaii Office of Consumer Protection, pages 1 through

11   14 of the submission in bankruptcy court, what does that have

12   to do for this case?

13             THE DEFENDANT:  Well, it shows that he's the actual

14   culprit that was committing these crimes against the people and

15   it wasn't me that the complaints were filed against.  It was

16   him.  That's why OCP got the complaints against him and not me.

17             THE COURT:  I understand.  So if that's your offer

18   of proof for it, then the objection is upheld 'cause that's not

19   what this entails.  This entails a statement on behalf of the

20   Office of Consumer Protection in the bankruptcy action stating

21   that they have claims that he has not accounted for, but they

22   are concerned he's going to discharge in bankruptcy so they're

23   objecting to that process and are informing the bankruptcy

24   judge.

25             It's not verified.  I don't have a file mark or anything

1  that would make it an exception to the hearsay rule in terms of

2  a official document so...

3           THE DEFENDANT:  I mean, it is.  It's stamped on the

4  bottom U.S. Bankruptcy Court Docket No. 22 filed 5-2015.  It's

5  at the bottom.

6           THE COURT:  All right.  So that's not acceptable for

7  purposes of an exception to the hearsay rule.  It's not a

8  verified copy from the Clerk of the Court or anything.

9      All right.  So is there anything else that -- in this --

10          MR. ISAACSON:  If I may, I don't think the parties

11  are objecting on that basis though.

12          THE COURT:  Well, he objected on hearsay.

13          MR. SORENSON:  Authentication is a different thing.

14  But if he wants it for the truth of the matters asserted in

15  this, then he's going to have to put it in --

16          THE DEFENDANT:  That's not --

17          MR. SORENSON:  -- put in another way.  We still will

18  object on --

19          THE COURT:  Yeah, he can get it in as an official

20  government document if it is certified by the Clerk of the

21  Court for the bankruptcy court.  Then that's an exception to

22  the hearsay rule.

23      You're objecting on the basis --

24          MR. SORENSON:  No, authentication is different than

25  admission because he still has to show relevance and it's not

54

1    relevant, and --

2              THE COURT:  But you objected on hearsay.

3              MR. SORENSON:  Obviously hearsay.

4              THE COURT:  And so if you agree that it's

5    authenticated, then I'll tell you that it can come in under the

6    hearsay --

7              MR. SORENSON:  Well, then I certainly don't agree

8    under authentication because authentication is different than

9    admission for evidentiary purposes.  Authentication means it is

10   what it says it is.

11             THE COURT:  Well, Rule 803 it says that certain --

12   where declarants.  It doesn't have to be unavailable -- an

13   exception to the hearsay rule is if it is a public records

14   exception, a record or statement of public office, if it sets

15   out, so forth.  So if you -- for instance, if you had

16   some -- like a judgment of conviction in our court and the

17   clerk certifies it, then I can receive it under 803 subsection

18   (8).  So it's not just authentication.  I mean, it's an

19   exception to the hearsay rule.

20        So if you're objecting on hearsay, then I need a certified

21   copy unless you guys are stipulating that it's an authentic

22   copy and that it can come in under the public records

23   exception.

24             MR. SORENSON:  Well, and we also object on relevance

25   grounds, Your Honor.  If it's offered for impeachment, we state

UNITED STATES DISTRICT COURT

1    that it's an extrinsic document.  Under 608(b) it shouldn't

2    come in.  He's stuck with the answer.

3            THE COURT:  Yeah, so anyway, I'm not going to

4    receive it into evidence.

5        Is there another portion of this exhibit -- 'cause it

6    contains all sorts of documents that you're seeking -- that we

7    can address now before he retakes the stand tomorrow?

8            MR. ISAACSON:  Your Honor, just a clarification.

9            THE COURT:  Yes.

10           MR. ISAACSON:  If I can get a certified copy of the

11   documents, will you allow it into evidence if I can get it from

12   the court?

13           THE COURT:  It's not relevant.

14           MR. ISAACSON:  No, I understand that.

15           THE COURT:  Yeah.

16           MR. ISAACSON:  But if that's --

17           THE COURT:  Right.

18           MR. ISAACSON:  -- the only basis of the

19   authentication --

20           THE COURT:  Right.

21           MR. ISAACSON:  -- I may be able to solve it is.

22           THE COURT:  He objected on hearsay, but I'm telling

23   you it's not relevant.

24           MR. ISAACSON:  Very well, Your Honor.

25           THE COURT:  So where are we with the rest of the

1    document -- the rest of the exhibit, I mean?  The exhibit has

2    several documents in it.  Are there other parts of it that

3    you're attempting to -- if we can clear that up today before he

4    retakes the stand.

5              MR. ISAACSON:  Apparently not, Judge.  I think we're

6    still trying to get organized with these documents.

7              THE DEFENDANT:  Well, I got this --

8              MR. ISAACSON:  Sorry.

9              THE DEFENDANT:  This is his sworn statement under

10   oath under this case.  This is the -- this they just gave me,

11   this 18 that we just got.

12             THE COURT:  Well, are you talking about -- so are

13   you talking about Exhibit 20- --

14             THE DEFENDANT:  It's not --

15             THE COURT:  -- -48?  Because you have the affidavit

16   of truth in that one.  Is that what you're talking about?

17             THE DEFENDANT:  No, it's not in there.

18             THE COURT:  Okay.

19             THE DEFENDANT:  This is a separate -- this --

20             THE COURT:  They're not signed, but, uh-huh?

21             THE DEFENDANT:  It's not in evidence.  This is just

22   18 that they gave me.

23             THE COURT:  All right.  So you need to look through

24   those documents then?

25             THE DEFENDANT:  Yes, 'cause these are ones that I

 1    want to -- 'cause these documents deal with him.  There's a

 2    letter to him from DCCA.

 3              THE COURT:  Okay.  So those you're going to seek

 4    admission tomorrow, is that what I'm hearing?

 5              THE DEFENDANT:  Right.

 6              THE COURT:  Okay.  So do you want to go over them

 7    now and I can rule on whether they're going to come in or not?

 8    Or is that something you still need to look at and prepare for

 9    tomorrow?

10              THE DEFENDANT:  Yeah, I mean, I need to -- 'cause

11    these documents need to come in because they relevant to the

12    case, relevant to his witness.

13              THE COURT:  So again, do you want me to look at them

14    today and indicate to you whether the court will receive them

15    into evidence --

16              THE DEFENDANT:  Yes.

17              THE COURT:  -- or not?

18              THE DEFENDANT:  Yes.

19              THE COURT:  Or what you can do is wait till he takes

20    the stand and then we can address it during one of the

21    recesses.

22              THE DEFENDANT:  I think it'd be best to do it now to

23    expedite time.

24              THE COURT:  Okay.  I agree.  I'm not going to force

25    you to do it, but if you feel prepared to address it now, I'm

1    happy to do so.

2         Okay.  So does Mr. Sorenson have copies of this and have

3    they been identified as exhibits?

4              THE DEFENDANT:  Well, this is their discovery that

5    they gave me.

6              THE COURT:  Okay.  But did you have an exhibit

7    number so that --

8              THE DEFENDANT:  No, I don't have an exhibit number

9    yet.

10             THE COURT:  Okay.  So that's one thing you guys are

11   going to do this evening then, I take it, is -- all right.  So

12   then let's do that this evening and then we'll address it

13   tomorrow during a recess so that we can do it in an organized

14   manner, that we have it identified on the record.  Or we could

15   do it -- if you want to start out with it in the morning, we

16   can do it before we bring the jury in.

17             MR. SORENSON:  I think that might work better, Your

18   Honor, only because we don't -- I mean, I'm hoping that we

19   don't go all the way to a recess with this witness, and if we

20   do that and we're waiting to address all these and then

21   do -- it's just -- if we can do it in the morning --

22             THE COURT:  Yes.  So if Mr. Williams and his team

23   would identify each of the documents that they wish to admit

24   tomorrow with an exhibit number, give a copy of that to

25   Mr. Sorenson so he knows the exhibit number, then let's be

UNITED STATES DISTRICT COURT

1    prepared at 8:30 to address that before I bring in the jury.

2    So Ms. Elkington can let them know You're not going to come in

3    for a while; Judge is going to address certain things and then

4    we'll bring you folks in.

5        Does that make sense?

6            MR. SORENSON:  Yes, Your Honor, it does.

7            THE COURT:  Okay.  Mr. Isaacson, do you have

8    something -- you look like you had an inquiring face.

9            MR. ISAACSON:  Oh, no, Judge.  There was another

10   matter.

11           THE COURT:  Oh, you have another matter?

12           MR. ISAACSON:  Yes.

13           THE COURT:  Okay.  What is that?

14           MR. ISAACSON:  Your Honor, this Court had talked

15   about the witness -- defense witnesses in this case and

16   yesterday had quashed a number of them.

17           THE COURT:  Yes.

18           MR. ISAACSON:  But there was a possibility or at

19   least a thought that maybe some might be allowed to testify if

20   they had connections with Hawaii.

21       I have asked Mr. Williams to look at the chart of defense

22   witnesses and to -- he's marked a number of them which he

23   believes have ties.  I thought he might address that with you,

24   if that would be acceptable to the Court.

25           THE COURT:  All right.  Well, he already indicated

UNITED STATES DISTRICT COURT

1    that they had ties, but there was no evidence with regard to

2    what's -- you know, either exhibits or witnesses who would

3    testify about those people.

4         So I understand he's going to say that they came to

5    Hawaii, they took part in some of the representations, they had

6    interactions with Ms. Cabebe or Mr. Malinay, but where's the

7    evidence?  I'm not going to have these people hauled all the

8    way to Hawaii if it turns out they had minimal contact.

9              THE DEFENDANT:  But I don't -- I don't see where in

10   law that that's a ground.  It's like the clients here.  Just

11   because they here doesn't mean they relevant, does it, just

12   'cause they live in Hawaii?

13             THE COURT:  I'm not ruling on the clients here.

14             THE DEFENDANT:  Right.  But I'm saying --

15             THE COURT:  You made a proffer with regard to the

16   clients that they had familiarity with --

17             THE DEFENDANT:  They do.

18             THE COURT:  -- MEI --

19             THE DEFENDANT:  They do.

20             THE COURT:  -- and with Mr. Malinay and Ms. Cabebe.

21   That makes sense to me.  Somebody in Tennessee who happens to

22   work for your Tennessee office, I'm not going to order them to

23   appear in court on a subpoena --

24             THE DEFENDANT:  That can --

25             THE COURT:  I'm not finished.  Do you understand

1   that?  Do you understand that I'm speaking still?  Yes or no,

2   Mr. Williams?

3              THE DEFENDANT:  Yes, I understand that.

4              THE COURT:  All right.  Then you need to wait until

5   I finish.  I have accorded you that same respect, so knock it

6   off.

7        Here's the deal.  I'm not going to subpoena and force

8   witnesses to come and testify unless you can first show that

9   they have some sort of connection with MEI and its activities

10  in Hawaii.  Just because they work for some other part of your

11  business in another city is not a reason; that's not reasonable

12  to have them come and testify about whatever's done in your

13  corporation.

14       So until you do that, I am not going to order that they be

15  brought here by the marshals pursuant to a subpoena.  Then the

16  obligation is on you to show why these people have a connection

17  to the issues in this case.

18       So what is it that you want to show me with regard to

19  these witnesses?  What document?  What witness has testified

20  about these people?

21              THE DEFENDANT:  They -- I got witnesses that will

22  testify --

23              THE COURT:  No.  To date in the trial?  Who has

24  testified about these people?  What document have they created

25  that involves any of the clients in Hawaii?

UNITED STATES DISTRICT COURT

1          THE DEFENDANT:  We haven't got to them yet.

2          THE COURT:  Well, then I'm not going to order them

3   to -- I have made myself clear that you have to demonstrate

4   that there is a reasonable basis to have these witnesses come

5   from the mainland.  I'm not going to have them come here and

6   testify what you do in Tennessee or Washington, D.C. or any

7   place else.  They have to have some sort of connection to the

8   claims here in Hawaii involving what you did, just like you

9   can't be convicted or presented -- the government can't present

10  evidence of what you did in Tennessee or Florida or what have

11  you to say that you did the same thing here in Hawaii, you

12  know, at a different time with different clients and so forth.

13  I'm not going to let you guys -- you come in and say,

14  "Everything I did was legal because they said it was good in

15  Chicago or Florida," or what have you.  That's been my

16  consistent ruling throughout this case.

17       So you need to show me for each of those witnesses that

18  you want to call in your case who are on the mainland who I

19  have -- I have already ruled that I'm not going to enforce the

20  subpoena, I'm quashing the subpoena.

21       So I told you I'd give you two days to do it because you

22  guys made this big deal that you need more time, as much time

23  as possible.  So if you don't do it by the end of court

24  tomorrow, I'm not enforcing those subpoenas.  I'm quashing

25  them.  I'm standing by my ruling.  It's as simple as that.  So

UNITED STATES DISTRICT COURT

1    you better have it all marshalled out as to what documents you

2    believe connect these people to the Hawaii Mortgage Enterprise

3    operations.

4         All right.  Anything you don't understand about that?

5              THE DEFENDANT:  No.  Can I speak?

6              THE COURT:  Yes, you may speak.

7              THE DEFENDANT:  Now the way you've ruled, the same

8    thing you just told me, you allowed them to do.  You allowed

9    them to bring FBI agents that has nothing to do with Hawaii,

10   ain't never been to Hawaii, ain't never talked to no clients

11   here in Hawaii, but you allowed them to call them as witnesses

12   and get on that witness stand.

13        But now you don't want me to call my witnesses that can

14   testify the same thing that his witnesses said in the opposite

15   of me in favor of me.  So you're violating my Sixth Amendment

16   right to call witnesses in my defense and you violating a

17   Federal Rule of Evidence 406 where I can prove habitual

18   practice of my company.  You violating my rights.

19             THE COURT:  All right.  Your objection's on the

20   record.  You're completely wrong, with all due respect, about

21   your Sixth Amendment right and so forth on the basis, but you

22   preserved your objection for the record.

23        The law doesn't work just because they get to call

24   somebody, you get to call somebody.  But be that as it may,

25   you've decided to represent yourself; you have able standby

UNITED STATES DISTRICT COURT

1    counsel, you can you consult with him.  I've made myself clear

2    with regard to these witnesses.  I'm quashing their subpoenas

3    unless by tomorrow at the end of the trial day you can show

4    some sort of connection about the facts, events, circumstances

5    involved with the claims in the indictment.  All right?

6        I will see all of you tomorrow at 8:30.  We will address

7    whatever documents identified as exhibits at that time, whether

8    or not the court will receive them in evidence.

9        I wish all of you a very good evening.

10           MR. ISAACSON:  May I remain for 20 minutes?

11           THE COURT:  You may, yes.

12           MR. ISAACSON:  Thank you.

13           THE COURT:  All right.  We're in recess.

14       (Proceedings adjourned at 2:06 A.M. until

15       Wednesday, February 12, 2020, at 8:30 A.M.)

16

17

18

19

20

21

22

23

24

25

1    WEDNESDAY, FEBRUARY 12, 2020                        8:58 A.M.

2              THE COURT:  All right.  Good morning to all of you

3    and good morning ladies and gentlemen of the jury.  Thank you

4    very much for your patience.  We're hopeful that our work in

5    the past hour is going to make things go smoothly.  At least

6    that's our desire and that's why we worked and kept you waiting

7    and waiting.  So thank you very much.

8         So, Mr. Williams, Mr. Malinay's on the stand.  Your

9    witness.

10        Mr. Malinay, I just remind you you're still under oath.

11             THE WITNESS:  Yes, ma'am.

12                     CROSS-EXAMINATION RESUMED

13   BY THE DEFENDANT:

14        Q    Mr. Malinay, how many times have you spoken with the

15   prosecutor's office?

16        A    Prosecutor's office?

17        Q    The prosecutors.  How many times have you spoken

18   with them?

19        A    I think the first one's last week.

20        Q    The first time was last week?

21        A    Yeah.

22        Q    So that was the only time you spoke to them, just

23   last week?

24        A    Well, I see him couple time in his office.

25        Q    Okay.  And did you make any calls to him or did you

UNITED STATES DISTRICT COURT

```
 1    all text any messages?

 2         A     No.  Just, you know, I don't know how to text.

 3         Q     And you did take a plea deal, correct?

 4         A     Yes.

 5         Q     And what was that plea deal for?

 6         A     Because I did it and it's my fault.

 7         Q     So you admit that you lied to these customers and

 8    that you scammed these customers, correct?

 9         A     Yes, because that's what I learned from you.

10         Q     You did not learn that from me.

11         A     Yes.

12         Q     Okay.  So now when you -- approximately how many

13    people made a complaint against you at the DCCA?  Just give me

14    a round figure.

15         A     If I'm not mistaken, about 17.

16         Q     17?

17         A     If I'm not mistaken, yeah.

18         Q     And why did they file a complaint against you?

19         A     Because the mortgage fraud that you did us before

20    and I used that one.

21         Q     I'm saying what agency did they make a complaint to

22    against you?

23         A     DCCA.

24         Q     Okay.  And were you interviewed by the agency?

25         A     What's that?
```

1     Q     Were you interviewed by that agency?

2     A     Yes.

3     Q     And did you take a sworn statement?

4     A     Yeah.

5     Q     Okay.  And what was the name of the person that

6  interviewed you?

7     A     Mr. Evers the name, Evers from the DCCA I think it

8  was, yeah.

9           THE DEFENDANT:  Can I get Exhibit 2 -- 2159 pulled

10 up for this witness?

11    Q     (BY THE DEFENDANT:)  Just want you to look over that

12 sworn statement.  Just get yourself familiar with it before I

13 question you about it.  Those are your statements?

14    A     Well, I don't know how to read.

15    Q     But is that your statement, your sworn statement?

16 Is that the deposition of that sworn statement that you gave?

17    A     Well, I don't know how to read.

18    Q     On the front page it says -- you see where it's the

19 heading?  You see what the heading says on the first page?

20    A     Yeah.

21    Q     Okay.  And then you see where it says, "In

22 reference," says "In Re:" and colon?  It's on the first page?

23    A     In here?

24          THE COURT:  Yeah.  So if you look at the first page,

25 the first page of that document.

UNITED STATES DISTRICT COURT

1            THE WITNESS:  This one, Judge?

2            THE COURT:  Yeah, yes.  If you look at that page,

3   okay, and do you remember that you gave -- that you were asked

4   questions and you gave answers under oath --

5            THE WITNESS:  Yes.

6            THE COURT:  -- on Wednesday, February 25, 2015?  Do

7   you remember that?

8            THE WITNESS:  It's kind of long time, Judge.

9            THE COURT:  Right, it was a long time ago.  But do

10  you remember that there was a court reporter who took down your

11  testimony?

12           THE WITNESS:  Yes.

13           THE COURT:  You were asked questions?

14           THE WITNESS:  Yes, Judge.

15           THE COURT:  And you gave answers?

16           THE WITNESS:  Yes.

17           THE COURT:  Okay.  You remember that.

18           THE WITNESS:  Yeah.  But I forgot already.

19           THE COURT:  Okay.  So ask him questions.

20      Q    (BY THE DEFENDANT:)  Now, in this deposition

21  Mr. Evers he had asked you, "Have you had consumers try to call

22  you for their money back?"  Did anybody call you for -- to ask

23  for their money back?

24      A    Yeah, that's what they said, but the time I cannot

25  get my job because, you know, if you go my name at the time and

UNITED STATES DISTRICT COURT

1    I stay online and I cannot find a job because your program.

2         Q    No.  Let me ask you this again.  Mr. Evers had asked

3    you had any consumers called you and asked for a refund.

4         A    Yeah, because that's your program.

5         Q    What did you tell him?

6         A    Yeah, this is Anthony's program.

7         Q    Can you turn to page 64 of the -- your examination?

8              THE COURT:  There's four pages per page.  Okay.

9         Q    (BY THE DEFENDANT:)  It should be at the top right,

10   page 64 at the top right.  Can you see that?

11        A    Yeah.  If you read it and I listen.

12        Q    Okay.  You see where it says the second -- the first

13   question, can you read that for me?

14        A    No.

15        Q    The first question that he asked you?

16             THE COURT:  Yeah.  You got to ask him if he's able

17   to read English.

18        Q    (BY THE DEFENDANT:)  You're not able to read

19   English?

20        A    No.  You know that.

21        Q    But you was able to read English very well,

22   Mr. Malinay, and you speak English very well.

23        A    I learned 'cause I in the U.S. in 1982.  I don't

24   know how to read English.  You know that at the beginning.  I

25   told you at the beginning.

UNITED STATES DISTRICT COURT

```
 1     Q     Mr. Malinay, now you claiming --

 2           THE COURT:  So ask him a question.  So --

 3           THE DEFENDANT:  Okay.  Let me qualify him.

 4     Q     (BY THE DEFENDANT:)  So where did you go to school

 5  at, Mr. Malinay?

 6     A     In the Philippines.

 7     Q     So in the Philippines they didn't teach you English,

 8  to speak English?

 9     A     No.

10     Q     So you never took no English classes in the

11  Philippines?

12     A     No.

13     Q     So how did you learn how to speak English,

14  Mr. Malinay?

15     A     Well, my family I learn and the TV, that's my

16  friend.

17     Q     So if you don't know how to really speak English

18  and -- you don't know how to write English, right?

19     A     No.

20     Q     So how did you sign your name on a bank account?

21     A     Well, I know how to sign my name.

22     Q     So how did you fill out the application for people

23  if you don't know how to write English?

24     A     I'm not the one to fill out the application.  Like

25  you see, if you get all the application, you show me, it's not
```

1   my write.  Only I put my name on it.

2        Q    So you know how to write your name, but you don't

3   know how to write nothing else?

4        A    Yes.

5        Q    Is what you're saying?

6        A    Yeah.

7        Q    So you don't know how to spell the word cat in

8   English?

9        A    No.

10        Q    Who did you tell the people to call when they

11   started calling you because you had scammed them?  Who did you

12   tell the people to call?

13        A    What's that?

14        Q    Who did you tell the people that you scammed to call

15   when they start calling you and asking for their money back?

16   Who did you tell them to call?

17        A    You.

18        Q    Now --

19        A    Because you give us.

20        Q    -- why would you tell them to call me when you knew

21   you didn't work for me?

22        A    Well, because that's why you tell me all the time,

23   you lecture us like you like a agent at the time.  You always

24   say that, "You have to listen to me."

25        Q    Now, do you remember yesterday -- do you remember

UNITED STATES DISTRICT COURT

1  your testimony yesterday when I asked you when did you -- when

2  did I fire you and when did you started open up this other

3  fraudulent company?  You remember that?

4       A    That's why --

5       Q    Do you remember that?  Yes or no?

6            THE COURT:  I'm sorry.  So you need to let him

7  answer the question and then --

8            THE WITNESS:  If you give me the paperwork that you

9  fire me and then maybe I remember.  You have a paperwork that

10  you fire me?

11      Q    (BY THE DEFENDANT:)  Yes.  I got the email.

12      A    I need this.  Maybe I can remember.

13      Q    No.  Yesterday you testified -- remember you

14  testified that after I went to jail -- do you remember that?

15      A    Yeah.

16      Q    Okay.  So you said after I went to jail, you said

17  you and Edna said that you all needed to help the people,

18  correct?

19      A    Yeah, because I kind of concern about the people

20  that I involve, like I do, you know, 'cause I tried to finish

21  the paperwork because you always say that, "I'm the best.  I

22  know how to do this one."  A lot of house at the help, so I

23  just kind of trust you at the time.

24      Q    No.  You testified that after I got incarcerated,

25  that you and Edna formed your own company.  Do you remember me

UNITED STATES DISTRICT COURT

1   showing you the bank account that you flew to California and

2   set up Mortgage Enterprise, correct?

3        A    Yes, because --

4        Q    And that was set up in August 27, 2013, correct?

5        A    Yeah, because --

6        Q    That was --

7             THE COURT:  Let him answer the question.

8             THE WITNESS:  Yeah, because at the time I was kind

9   of worried the people that I -- just ask to get the money and I

10  want them to finish the house, you know.  So and then Edna

11  telling me to form another company similar in your company,

12  Edna and Anabel and me at the time, because I understood that

13  you and Edna partner at that time because you always tell me

14  that.

15       Q    (BY THE DEFENDANT:)  So how you misunderstanding

16  this, Mr. Malinay?  I wasn't incarcerated yet when you opened

17  up this bank account.  I was still here in Hawaii.

18            MR. SORENSON:  Objection.  He's doing testimony.

19            THE COURT:  So is that your question?  Did you know

20  he was -- it was before he was incarcerated that you opened up

21  the new company?

22            THE WITNESS:  Uhm, 'cause I call Edna at the time,

23  Judge, that I say, "Oh, Anthony's in the jail, so what we going

24  to do now?"  I don't know if he's in the jail at the time or

25  still here.  I don't know.

1          THE COURT:  Okay.  So he doesn't know is his answer.

2          THE WITNESS:  No.

3          THE COURT:  So ask him another question.

4     Q     (BY THE DEFENDANT:)  So how could you not know,

5     Mr. Malinay, when I was incarcerated on September 13, 2013?

6          THE COURT:  Okay.  So ask him if he knew you were

7     incarcerated on September --

8     Q     (BY THE DEFENDANT:)  So you remember I was

9     incarcerated in September?

10    A     That's what Edna told me, but I don't see you in the

11    jail.  That's why Edna always tell me that.

12    Q     But you saw the news stories.  Remember you saw the

13    news story right?

14    A     Yeah.

15    Q     So you know that was in September?

16    A     Yeah.

17    Q     Okay.  So now if that was in September, you, Edna,

18    and Anabel opened up this bank account in August, before I was

19    incarcerated, right?

20    A     I don't remember that one.  Yeah, because you give

21    me the paperwork, then maybe I can remember.

22         THE DEFENDANT:  Exhibit -- Defense Exhibit 2161,

23    page 37.

24         THE COURT:  Did you say 2161?

25         THE DEFENDANT:  Yes, ma'am, page 37.  Page 37 and 38

UNITED STATES DISTRICT COURT

1    and 39 -- actually and 40.

2              THE COURT:  Yes, they're in the middle.

3       Q    (BY THE DEFENDANT:)  And do you recognize this bank

4    account --

5       A    Yes.

6       Q    -- with your name on it?

7       A    Yeah, yeah.

8       Q    And can you read the date that it was opened up,

9    Mr. Malinay?

10             THE COURT:  Wait.  Do you want it in received in

11   evidence.

12             THE DEFENDANT:  Yes, I want it received and I want

13   to publish it.

14             THE COURT:  Okay.  So Exhibit 2161, pages 37 through

15   41 are received, only those portions of the exhibit.

16             THE DEFENDANT:  Right.

17             (Exhibit 2161 pages 37-41 received into evidence.)

18             THE COURT:  All right.  So you want him to read

19   what?

20             THE DEFENDANT:  On the date on page 37.  What was

21   the date that this bank account was opened by him, Anabel

22   Cabebe, and Edna Franco.  And I'd like to publish it too so the

23   jury can see it.

24             THE COURT:  Okay.  So it's on.  So if you want to

25   put the document under the docucam, you may publish.


                    UNITED STATES DISTRICT COURT

1              THE DEFENDANT:  Okay.

2         Q    (BY THE DEFENDANT:)  You see the date over there on

3    the right, Mr. Malinay?

4         A    Yeah.  I don't remember this one, but I see the

5    date.

6         Q    You don't remember it?

7         A    Yeah.

8         Q    Okay.  What date does that say?

9         A    08-07-2013.

10        Q    So that's August 7th, 2013, that you Anabel and Edna

11   Franco opened up this bank account in the name of Mortgage

12   Enterprise, correct?

13        A    Yeah.  I remember that one, but I don't remember the

14   date.  I know that Edna and Anabel and me open, but I don't

15   know exactly the date.

16        Q    But you don't remember opening this account?

17        A    I remember that I open the account, but I don't

18   remember what's the date.

19        Q    Okay.  Well, that's the date.  It's confirmed.  So

20   you see the date was August.  Now, is this your signature?

21        A    Look like it's not my signature, this one.

22        Q    So you didn't sign that signature card, Mr. Malinay?

23        A    Yeah, 'cause I don't remember this one.

24        Q    So you went to the bank with Anabel and Edna Franco,

25   correct?

UNITED STATES DISTRICT COURT

1    A    Yeah.

2    Q    So when you went to the bank, didn't they give you a

3    little signature pad to sign to be added to the account?

4    A    Yes.

5    Q    Okay.  So then you signed on that pad, correct?

6    A    Yes, uh-huh.

7    Q    Okay.  So you signed and opened up this fraudulent

8    company, Mortgage Enterprise, with Edna Franco and Anabel

9    Cabebe in August of 2013, correct?

10   A    Yes.

11   Q    Okay.  So but I was not incarcerated till

12   September 2013, correct?

13   A    I don't know.

14   Q    Well, you just testified that you knew you saw it on

15   the news.

16   A    I don't know what's the date that one.

17   Q    No, but you saw it on the news, right?

18   A    Yeah, I see on the news, but I forget the date.

19   Q    Okay.  So I was not incarcerated in August, so I was

20   still here in Hawaii, correct?

21   A    I don't know 'cause I don't see you since then.

22   Q    So why did you open up this account a

23   month-and-a-half before I was incarcerated, Mr. Malinay?  What

24   was the purpose of this account before I was locked up?

25           THE COURT:  Okay.  So which question do you want him

UNITED STATES DISTRICT COURT

1    to answer?  You asked him --

2         Q    (BY THE DEFENDANT:)  What was the purpose of you

3    opening this account before I was incarcerated?

4         A    Yeah, because Edna call me that, Oh, Anthony going

5    to jail and then we have to open the account in California

6    so -- 'cause I always tell Edna that how can all help all these

7    people now?

8         Q    Mr. Malinay, you saw me during this time.  Remember

9    me doing your UCC lien during this time in August?  Remember I

10   was still helping you?  Remember that?

11        A    Yeah.

12        Q    Okay.  Now, did I charge you to do any of the work

13   for your foreclosure?  'Cause you was already in foreclosure,

14   correct?

15        A    You tell me that you -- I find people so no judge

16   me.  That's what you told me, so I find people.

17        Q    No.  So when I met you, you was already in

18   foreclosure, correct?

19        A    Yeah, I know.

20        Q    Okay.

21        A    Off and on.

22        Q    So I didn't charge you to help you fight your

23   foreclosure, did I not?

24        A    I paid $3,000, me and my wife, twice.

25        Q    Paid to who?

UNITED STATES DISTRICT COURT

```
 1      A      Both you and Edna.

 2      Q      You paid it to Edna?

 3      A      Yeah, 'cause Edna told me that both of you own the

 4   company.

 5      Q      No, that's not correct.

 6      A      That's what he told me.

 7      Q      You did not pay my company.  So you told me you paid

 8   Edna?

 9             THE COURT:  Wait, wait.  So you need to ask him a

10   question.  You can't make statements.

11      Q      (BY THE DEFENDANT:)  Okay.  So you said you paid

12   Edna $10,000?

13      A      No, $3,000.

14      Q      So you paid Edna $8,000?

15      A      $3,000.

16      Q      $3,000?

17      A      Yeah.

18      Q      So when you paid Edna $3,000, when did you pay her

19   this $3,000?

20      A      My wife paid twice with Edna.

21      Q      When?

22      A      I forgot already.  That's kind of long.

23      Q      You don't know the time frame?

24      A      No.

25      Q      Was that before I went to jail?  After I went to
```

UNITED STATES DISTRICT COURT

 1   jail?

 2        A    Before, after I meet you.

 3        Q    Was it during this time that you opened the bank

 4   account that you paid her?

 5        A    No, no, before that.

 6        Q    So you paid her way before that?

 7        A    Yeah, before -- first time I meet you, that's why

 8   Edna tell me to pay $3,000.

 9        Q    Well, you know you met Edna before you met me,

10   correct?

11        A    I know.

12        Q    Right?

13        A    But I pay the money the time I meet you because Edna

14   said, "This is my partner.  He get lot of experience and lot of

15   house to help already in the mainland."  That's why me and my

16   wife give the money to Edna because at the time I meet you.

17        Q    But you still haven't answered what was the purpose

18   of you opening up this account while I was still free?

19        A    Yeah, 'cause Edna told me to open account because a

20   different company.

21        Q    So -- so why wouldn't you come and talk to me?  Why

22   didn't you ask me?  'Cause I was here in Hawaii.  Why didn't

23   you come to the offices and --

24             THE COURT:  So you need to ask one question.

25        Q    (BY THE DEFENDANT:)  Okay.  Why didn't you come to

UNITED STATES DISTRICT COURT

 1   the office and talk to me?

 2        A     Because I don't want to talk to you that time

 3   already 'cause I was so mad.

 4        Q     So wait a minute.  Let's get this straight.  So in

 5   August you were mad at me?

 6        A     August.  I don't remember the date.

 7        Q     I mean, this was just what you were saying because

 8   you saying this is the reason you opened up this bogus account

 9   with Edna.  You saying now that you were mad at me.  That's the

10   reason why you didn't come to the office and talk to me?

11        A     Yeah.

12        Q     So what were you mad at me for?

13        A     Yeah, 'cause I know that you scam.

14        Q     So if I was a scam, then why did you open up this

15   account with Edna and Anabel to continue scamming people if you

16   thought it was a scam?

17        A     Yeah, that's why I feel guilty because I take

18   responsibility what I did.

19        Q     Yeah, you did this on your own with Edna and Anabel?

20        A     Yes.

21        Q     You did this behind my back.  You did not notify me,

22   did you?

23        A     No.

24        Q     Right?

25        A     Not in your company 'cause at the time your company

UNITED STATES DISTRICT COURT

1    is out, so Edna and Anabel I open account, a different company.

2         Q     So whose idea was it to forge the documents, my

3    company's documents?  Was that your idea?

4         A     If you show me something, then I remember.

5               THE DEFENDANT:  Exhibit 2161 and I want to publish

6    it.  It's page 1, 2, 3, 4, 5.

7               THE COURT:  What about 6 and 7?  You're not seeking

8    those to be admitted at this time?

9               THE DEFENDANT:  Yeah, yeah, yeah, 6 and 7 too.

10   Sorry.  Yeah.

11              THE COURT:  Okay.  So 1 through 7?

12              THE DEFENDANT:  Right.

13              THE COURT:  Okay.  So based on the prior ruling, 1

14   through 7 -- pages 1 through 7 of Exhibit 2161 are received.

15              (Exhibit 2161 pages 1-7 received into evidence.)

16        Q     (BY THE DEFENDANT:)  Okay.  Mr. Malinay, you

17   recognize this MEI application?

18        A     Yeah, this Edna make this one.

19        Q     So you had nothing to do with forging this document?

20        A     Yeah, 'cause that's why he told me the same thing in

21   your company at the time.

22        Q     So whose decision was it to try to make it look like

23   my company name?  Whose decision was that?  Your decision or

24   was that Edna's decision?

25        A     All of us.

UNITED STATES DISTRICT COURT

 1      Q      So all of you all decided we going to take the

 2   Investments off and name it Mortgage Enterprise?

 3      A      Correct.

 4      Q      What was your intent of making it look like my

 5   company?  What was your intent?

 6      A      My intent at the time 'cause I tried to save the

 7   people that I bring in at the time because that's -- Edna told

 8   me all the time that you and her is partner, so I just kind of

 9   trust.  That's why whatever Edna tell me that time, I said yes

10   because that's what you told me, that you partner.  You always

11   tell me that before.

12      Q      Before I fired her.

13      A      I don't know if you fire her.  I don't know about

14   that.

15      Q      You knew that, Mr. Malinay --

16             THE COURT:  Wait, wait, wait.  So ask him --

17             THE WITNESS:  If you show me the paperwork you fire

18   her, then I trust you.

19      Q      (BY THE DEFENDANT:)  Okay.  So now you recognize

20   this Mortgage Enterprise application, correct?

21      A      Yes.

22      Q      And this is the application that you had most of the

23   people in Maui fill out, correct?

24      A      Correct.

25      Q      Now, could you help those people with their

UNITED STATES DISTRICT COURT

 1   foreclosure?

 2        A     Well, that's -- that's Edna told me 'cause that's

 3   you and Edna partner at the time, so that's your form, similar

 4   the form, but only thing is no MMI.  It's not your company, but

 5   same form.

 6        Q     You see the date on this application, Mr. Malinay,

 7   at the bottom right-hand corner I got on the screen?

 8        A     Yeah.

 9        Q     Okay.  That's December 20th of 2013, correct?

10              THE COURT:  It's not published.  Did you want to

11   publish it?

12              THE DEFENDANT:  Yeah, I want to publish it.

13              THE COURT:  Okay.  You may publish.

14        Q     (BY THE DEFENDANT:)  Okay.  You see the date?

15        A     Uh-huh.

16        Q     Okay.  Now, at this time I was still incarcerated,

17   correct?

18        A     I don't remember if you in custody at the time.

19        Q     Do you know I was incarcerated in September, right?

20   September 2013?

21        A     I know that you in the news and Edna told me in

22   jail, but I don't remember what's the date.

23        Q     So you don't remember me coming back in 2014?

24        A     No.

25        Q     You recognize this power of attorney form?

1       A       What's on the top?

2       Q       Well, it's cut off, but it says Short Form Power of

3   Attorney, Hawaii Revised Statute 551D.  But you recognize that

4   this is one of the forms that you all forged?

5       A       Yeah, I don't fill out this one.

6       Q       You don't remember?

7       A       I remember the form, but I don't fill up all this

8   one.  Maybe the customer fill out this one.

9       Q       This is one of your clients, Felicitas Pasion.  This

10  is one of the clients that made --

11              THE COURT:  So are you asking him?

12              THE DEFENDANT:  Right.

13      Q       (BY THE DEFENDANT:)  Is this one of your clients

14  that made a complaint against you?

15      A       Yes.

16      Q       Okay.  Now, do you see where it says Mortgage

17  Enterprise and then underneath that it says attorneys in fact?

18      A       Yeah.

19      Q       Okay.  Why didn't you put your name, Edna name, or

20  Anabel name as the attorney in fact?  Why did you just put

21  Mortgage Enterprise?

22      A       I don't know 'cause I don't recollect before that

23  time.  Give me all the form.

24      Q       No, this is -- this is the form that you said Edna

25  forged of my form.  So this is you all's form.  This is not

UNITED STATES DISTRICT COURT

1    mine.

2              THE COURT:  So ask him if he knows that if it's his

3    form.

4         Q    (BY THE DEFENDANT:)  So you know this is the form

5    that Edna edited and put Mortgage Enterprise on that, correct?

6         A    I guess so, yeah.

7         Q    And you recognize this form right here?

8         A    Yeah, 'cause that's your office in Democrat.

9         Q    So whose idea was it to use my office address with

10   your business name?  Was it that your idea or was it Edna's

11   idea?

12        A    Everybody's idea at the time.

13        Q    So -- so all of you all conspired to say Hey, we're

14   going to use his address as our address?

15        A    Yeah, because Anabel said, Oh, this is my office so

16   we can use the address.  That's what he told me at the time.

17        Q    Okay.  Now, can you see where it says Recording Fee

18   Bureau of Conveyance Research UCC Filing?  You see that?

19        A    Yeah.

20        Q    And it's -- whose idea was it to start collecting

21   cash only?  Was that your idea or was it Edna's idea?

22        A    That's Edna's idea, but everybody agree at the time.

23        Q    So all you all agreed that you all rather have you

24   people paid $1,500 cash without a receipt?

25        A    Yeah, 'cause same like you before, that's what you

1    tell us.

2         Q    That's not what I told you, Mr. Malinay.

3              THE COURT:  All right.  So it's not a conversation.

4    You need to ask a question.

5         Q    (BY THE DEFENDANT:)  Back to your deposition that

6    you swore under oath, Mr. Malinay.  Now yesterday I asked you

7    do you remember going on the website after I fired you and Edna

8    and you said you didn't remember.  Remember that yesterday?

9         A    Yeah.  If you can show me, maybe I remember.  It's a

10   long time.

11        Q    So right now you don't remember going to the USA

12   Common Law website and seeing the public notice page that I

13   created just for you, Edna, and Henry, and Rowena for you all

14   scamming people?  Do you remember that website?

15        A    Well, if you show me, maybe I remember.

16        Q    I'm saying so you don't remember?

17        A    No, 'cause if you show me something, like I said,

18   then maybe I remember.

19        Q    I want you to take your attention to page 64 on

20   the --

21             THE COURT:  You have to give him an exhibit number.

22             THE DEFENDANT:  Exhibit 2159.  Go back to page 64,

23   Exhibit 2159.

24        Q    (BY THE DEFENDANT:)  You see that?

25        A    Where?

 1        Q        Page 64 where we're at?

 2        A        What number?  Oh.

 3        Q        I'ma show you a website --

 4                 THE COURT:  Okay.  So wait, wait.  So are you

 5   refreshing his recollection with page 64, or did you want to

 6   ask him a question about that?

 7                 THE DEFENDANT:  Well, I was going to ask him a

 8   question, then I wanted to show him the actual website 'cause I

 9   he said he needed to refresh his memory.

10                 THE COURT:  Okay.  So you --

11                 THE DEFENDANT:  Well, let me ask him the question

12   first.

13                 THE COURT:  Yeah.

14        Q        (BY THE DEFENDANT:)  Okay.  After -- after I went to

15   jail, after I was incarcerated wrongfully, and you and Edna

16   where you already set up --

17                 THE COURT:  All right.  So ask him the question.

18   You can't testify.  So what period of time are you asking him

19   and what do you want to ask him?

20        Q        (BY THE DEFENDANT:)  The period of time between

21   September 2013 till September 2014 when I got my case

22   dismissed, what were you telling the people -- who were you

23   telling the people to contact when they had a complaint or if

24   they had a question about Mortgage Enterprise?  Who were you

25   telling them they need to contact?

1      A      Well, I tell them that Edna because you always tell

2    me that you and Edna is partner.

3      Q      Okay.  Now, can you -- see where on page 64 where

4    James Evers asked you, he said --

5              THE COURT:  All right.  So tell him the line number,

6    what line.  There's a little number --

7      Q      (BY THE DEFENDANT:)  See on line number 5 --

8              THE COURT:  Okay.  So -- well, the question starts

9    at 4.

10             THE DEFENDANT:  Well, 4.

11             THE COURT:  Yeah, so did you -- were you asked these

12   questions and did you give this answer?

13     Q      (BY THE DEFENDANT:)  Right.  So were you asked this

14   question --

15             THE COURT:  Do you have that in front of you -- oh,

16   I'm sorry.  You know what?  He can't read English.  So --

17             THE DEFENDANT:  I'm going to have to read it.

18             THE COURT:  Right.  So he's going to read it to you

19   and he's asking you do you remember this.

20             THE WITNESS:  Okay, Judge.

21             THE COURT:  All right.

22     Q      (BY THE DEFENDANT:)  Okay.  This is Mr. Evers.  He

23   said, "So our consumers have said that it's the basis of this

24   document that they've tried to get ahold of you.  Have you had

25   consumers try to call you for their money back?"

UNITED STATES DISTRICT COURT

1              This was your answer:  "Some."

2              "What do you tell them."

3              This is your answer:  "I told them, you know, I'm

4     not the owner of the company.  I only refer only.  I don't

5     know.  I can't answer.  Talk to the company."

6              His next question, "And do they say -- and do they

7     say who should I call?"

8              Your answer is, "And I tell them to go to the

9     website because Anthony got a website.  The Mortgage Enterprise

10    Investments Common Law, they have a website."

11             This is his question:  "What website is it?"

12             Your answer:  "Common Law Office of America.  Yeah,

13    they have a website there."

14             His question:  "Is there just one Common Law Office

15    of America?  Is it just one business using that name or is

16    there more than one?"

17             Your answer:  "I don't know idea, sir."

18             His question to you:  "What about Mortgage

19    Enterprise?  Is there just one or is there more than one."

20             Your answer:  "I believe only one that I know,

21    yeah."

22             His question:  "And the one that you know of is

23    being run or overseen by Common Law Office of America; is that

24    right?"

25             Your answer:  "Yes, that one was right."

1          His question:  "So when consumers want their money

2     back, you would tell them to go to the Common Law Office of

3     America website?"

4          Your answer:  "Yeah.  I point them to the website

5     because I think they have a telephone number there to call."

6          Now, my question to you, Mr. Malinay, you knew I was

7     incarcerated at this time, so when the people were calling you,

8     why would you tell them to call me when you knew that your

9     company had nothing to do with my company after you set it up?

10    A     Yeah, because you always say that to us before that

11    you have a office in the mainland and people answer.

12    Q     Yeah, that was my office but that was not your

13    office.  Remember you just said you all formed Mortgage

14    Enterprise.  This is your company, has nothing to do with

15    Mortgage Enterprise Investments.  You all forged your own

16    documents --

17          THE COURT:  Okay.  So ask him a question.

18    Q     (BY THE DEFENDANT:)  So why would you point them --

19    after you opened up this Mortgage Enterprise company, you,

20    Henry, and Anabel, why would you tell people to call my company

21    when you knew that your company had nothing to do with mine?

22    A     Because I thought at the time it was the same

23    company.  That's what I understood.

24    Q     You -- Mr. Malinay, you knew this was a separate

25    company.  Now you've already admitted--

1      A      Yeah.

2      Q      -- you've already pled guilty that you lied to those

3   people, correct?

4      A      Yes.

5      Q      You admitted that you defrauded these people,

6   correct?

7      A      Yes.

8      Q      And you not only defrauded these people, you

9   defrauded me and my company, correct?

10      A      Because some of the people at the time that I bring

11   to you is people calling me.

12      Q      But you didn't -- these people -- these were not --

13   do you know these -- none of these people knew me?  Did you

14   know that?  Right?

15      A      Yeah, because you always tell us that you don't

16   come, but you train us to go out at the time.

17      Q      No, Mr. Malinay.  You're not understanding.  I was

18   incarcerated during all these complaints that were filed

19   against you.  You do understand that, correct?

20      A      Yeah.  That's why I plead guilty.

21      Q      Right.  Because of your actions, correct?

22      A      Yeah.

23      Q      Right.  So your actions had nothing to do with my

24   company.  You and Anabel --

25            THE COURT:  Is that your question that -- you can

1    only ask one question at a time.

2         Did any of your actions have anything to do with

3    Mr. Williams's company?

4              THE WITNESS:  What's that, Judge?

5              THE COURT:  So you pled guilty, yes?

6              THE WITNESS:  Yes, Judge.

7              THE COURT:  The reasons for you pleading guilty, did

8    that have anything to do with Mr. Williams's company?

9              THE WITNESS:  Yeah.  My -- our company, Judge,

10   because I know that I -- that's my -- that's our fault because,

11   you know, I open our company.

12             THE COURT:  Okay.  So when you say "our company,"

13   what are you referring to?  What is "our company"?  Who is "our

14   company"?

15             THE WITNESS:  Edna and Anabel, Judge.

16             THE COURT:  Okay.  So ask another question.

17        Q    (BY THE DEFENDANT:)  So your company is not my

18   company?

19        A    No.  The one I guilty is my -- the Mortgage

20   Enterprise.

21        Q    Right.  So the company that you, Edna, and Anabel

22   set up, right?

23        A    Correct, yeah.

24        Q    Okay.  So now I'm going to show you on the screen,

25   'cause you said you don't remember, the website that I put up

UNITED STATES DISTRICT COURT

```
 1    against you being a scam artist, right?

 2         A    Yeah.

 3         Q    Okay.  Now take a look at the screen.

 4              THE COURT:  All right.  So could you identify it for

 5    the record?  It's not in evidence yet so --

 6              THE DEFENDANT:  This is my Common Law Office of

 7    America website.  This is my public notice page that I created

 8    after I found out what these scam artists was doing.

 9              THE COURT:  Okay.  So remember this is not going to

10    be received into evidence 'cause he didn't create it.

11              THE DEFENDANT:  Right.

12              THE COURT:  You can ask him if he's familiar with it

13    or seen it before.

14         Q    (BY THE DEFENDANT:)  Okay.  Now, do you remember

15    seeing this website, Mr. Malinay?

16         A    No.  I don't know how to open a computer.

17         Q    So you --

18         A    Maybe you did this one.  I don't know.  Yeah, I

19    don't know.

20         Q    Okay.  Let me find your statement right quick.

21    Okay.  Exhibit 2162 and it's page -- how you gonna see what

22    page it's on?  Page 21.  Exhibit 2162, page 21.

23              I'll publish this for you.  Can you see that,

24    Mr. Malinay?

25         A    Yeah, I see my last name.
```

UNITED STATES DISTRICT COURT

1              THE COURT:  It's page 80.  Now, remember he can't

2    read English.

3        Q    (BY THE DEFENDANT:)  Okay.  Mr. Malinay, I'm going

4    to read the question that Mr. Evers asked you and I'm going to

5    read your response since you can't read it, okay?

6        A    Uh-huh.

7        Q    Mr. Evers, he asked, "Did you ask him why he did

8    this?"

9              Your answer:  "I tried to call him, but -- you know,

10   on the telephone because I went to the website and get the

11   number, yeah.  See it's bad what he put on me."

12             You see that, Mr. -- you see that, Mr. Malinay?

13             THE COURT:  He can't read English.

14             THE WITNESS:  I can't read it.

15       Q    (BY THE DEFENDANT:)  Okay.  This is your answer:

16   "And then all my people that I know that they wen Google my

17   name and I explained to them that I don't know the guy put my

18   name on it on his own website."

19             Mr. Evers:  "He is also accusing Edna Franco."

20             Your response:  "I guess so."

21             Mr. Evers:  "Have you talked to Edna Franco about

22   this scam alert?"

23             Your answer:  "I think I spoke to him about this one

24   too, to Google Anthony's website.  I don't know what he did?

25             Mr. Evers:  "You talked to who?"

1        Your answer:  "Edna.  I mentioned to this one that,

2    'Oh, go look on Anthony's website.  You have a picture on it

3    and I get my picture and disappointment.  Can you eliminate

4    that because it's not good for me because I doing a network and

5    after that she wouldn't trust me, you know."

6        Now --

7        MR. SORENSON:  Your Honor, at this point I

8    would -- is there a question?  Maybe it'd be better if we parse

9    this out because he's representing that's what this document

10   says and perhaps if we had a question that was related to it?

11       THE COURT:  All right.  So were you asked these

12   questions and did you give those answers under oath?

13   Q    (BY THE DEFENDANT:)  Right.  Now, Mr. Malinay, were

14   these the questions that Mr. Evers asked you under oath and

15   these are your answers, correct?

16   A    I don't remember.  It's been long time.

17   Q    This is a sworn statement, Mr. Malinay.  You swore

18   under oath to these words.

19       THE COURT:  Right.  So ask him a question.  Does he

20   remember them?  He says no.  So what do you want to do now?

21   Q    (BY THE DEFENDANT:)  So are you saying these are not

22   your words, Mr. Malinay, under oath?

23   A    No, 'cause I don't see this one.  But I know that I

24   spoke to him, but I don't remember this one.

25   Q    So are you disputing the validity of the court

UNITED STATES DISTRICT COURT

1   reporter that reported that, took -- transcribed the

2   examination?

3        A     No.  I know -- I agree that I spoke to him, but I

4   don't remember this one.  I don't see this paperwork.

5        Q     Okay.  Well, according to this document to your

6   sworn statement, you knew that I had a website, according to

7   this sworn statement that you took before, correct?  From what

8   I just read?

9        A     Well, you always tell me that you have a website.

10       Q     Well, according to your sworn statement, you knew I

11  had a website and you knew that I put your picture on the scam

12  alert on my website, according to your testimony that you did

13  with Mr. Evers.  That's what I just read to you.

14             Did you not understand what your words said --

15             THE COURT:  So you got to ask him only one question

16  at a time.

17       Q     (BY THE DEFENDANT:)  Okay.  Did you not understand

18  what I just read to you?

19       A     I don't remember read.  It's kind of long.

20       Q     Well, I'm saying do you not remember

21  him -- you -- him questioning you about me putting your

22  picture, her picture, and Hap's picture on my website as scam

23  artists?  Do you not remember having that conversation under

24  oath with him?

25       A     I don't remember, yeah.  I kind of long time, ma'am.

UNITED STATES DISTRICT COURT

1     Q      Okay.  That was 2015.  But this has been

2  memorialized in a transcript, a sworn statement that you made

3  to Mr. Evers.  So you are agreeing that you did talk to him,

4  right?

5     A      Yeah, I talk to him, yeah.

6     Q      So you're not disputing the truth of this

7  examination of your words under oath, correct?

8     A      Because I don't see the paperwork, but I know I

9  spoke to him.

10     Q      Right.  So what I'm asking you is you're not

11  disputing that you talked to him and these are -- these are the

12  answers that you gave him?  You're not disputing that, are you?

13     A      Uhm, I don't know 'cause I forget what I tell to him

14  before.  It's kind of long time.

15     Q      Well, that's why I just read you his words.

16  So -- and your answers.  So did you hear the answer that I gave

17  that you said that you went to the website?

18     A      So this is -- Judge, is this from State the

19  paperwork?

20     THE COURT:  Yes.  So this is -- you were examined on

21  March 2, 2015, at the State of Hawaii Office of Consumer

22  Protection, and it's in the United States bankruptcy case

23  15-00044.

24     THE WITNESS:  If this is from the State of Hawaii,

25  then maybe I said that, tell him that, yeah, because I have to

UNITED STATES DISTRICT COURT

1    tell the truth at the time, all the time.

2         Q    (BY THE DEFENDANT:)  Right.  So you was under oath

3    to tell the truth.  So the truth of the matter is that you did

4    go on the website, correct?  But based on your statement --

5         A    Yeah.  Edna -- if I went, maybe Edna show me in the

6    website.

7         Q    Right.  Now, do you remember telling Edna that you

8    need to get me to take your name and your face off of the

9    website because it was damaging you?  You remember that?

10        A    Yeah, that's -- I do network marketing and my name

11   in Hawaii, 'cause I live 30 years in Hawaii, and I don't have

12   this kind of problem before.

13        Q    So me putting your picture on my website as a scam

14   artist, it was damaging your reputation, correct?

15        A    Yeah, 'cause you tried to take me down at the time.

16        Q    Right, 'cause you was scamming people, right?  You

17   admit you were scamming people?

18             THE COURT:  So what question do you want to ask?

19        Q    (BY THE DEFENDANT:)  You admit that you were

20   scamming people, correct?

21        A    Correct.  I --

22        Q    Okay.  Right.  So that's why I put you on the

23   website with Edna and Hap, correct?

24             THE COURT:  He doesn't know why you did it, okay?

25   So he can't testify about your intention.  So you need to ask

UNITED STATES DISTRICT COURT

```
1    him a question that is within his personal knowledge.

2         Q    (BY THE DEFENDANT:)  Well --

3              THE COURT:  All right.  Do you know why

4    your -- Mr. Williams put that information on the website?  Do

5    you know why he did that?

6              THE WITNESS:  I think if I'm not mistaken, Judge, is

7    Edna told me that he tried to -- to put on the website so he

8    can, you know, get away that he's doing it.  That's what Edna

9    told me at the time.

10             THE COURT:  That's why he thinks you did it.

11             THE WITNESS:  He tried to put me on this program,

12   but I don't know anything, Judge.

13             THE COURT:  All right.  So ask him another question.

14        Q    (BY THE DEFENDANT:)  Okay.  So do you remember I

15   made a FBI complaint against you and Edna and sent you all a

16   copy?

17        A    I don't -- if you show me the paperwork, then I

18   remember.

19        Q    Do you remember the DCCA complaint I filed against

20   you?

21        A    If you show me the paperwork, then I remember.

22        Q    Do you remember DCCA contacting you?

23        A    Yeah, I know somebody contacting me, but --

24        Q    Right.  So when DCCA contacted you, what did they

25   tell you why they was contacting you for?
```

```
 1        A      We had to go and testify, tell -- ask me what this

 2   scam thing.

 3        Q      Right.  So they had -- they interviewed you about

 4   you scamming people, correct?

 5        A      Yes.

 6        Q      And then all the people that complained against you?

 7        A      Yeah, at the time, yes, so --

 8        Q      How much -- how much money would you say just

 9   approximately -- how much money you scammed people out of, just

10   an approximate number?

11        A      I forget already 'cause I think 74,000, I believe,

12   and the DCCA that you give me 74,000.  That's what I know.

13        Q      Just 74,000?

14        A      That's what I know.

15        Q      So what about the other, like, $500,000?

16        A      When was that?

17        Q      The money that you all collected from people you all

18   scammed.

19        A      No.  If you show me the paperwork, then --

20        Q      What was your bank account?

21        A      What's that?

22        Q      It was the bank account -- remember the bank

23   account?  Remember you opened up Chase Bank, right?

24        A      Yeah.

25        Q      Okay.  And then you also opened up Wells Fargo
```

1    account, right?

2        A    Yes.

3        Q    And you also opened up a Union account, right?

4        A    Yes.

5        Q    Now, would you like to see some of the checks?

6        A    Yeah, the kind of amount.  I don't know that kind of

7    amount.

8             THE DEFENDANT:  Exhibit 2160 start at page --

9    page 24.  I'd like to publish.

10            THE COURT:  All right.  So this is pages 24

11   through -- do you want all of them in evidence?

12            THE DEFENDANT:  Yes, ma'am.

13            THE COURT:  Okay.  So 24 through 42.  All right.  So

14   those are received based on the prior ruling.

15       Q    (BY THE DEFENDANT:)  I'm only going to show you just

16   two.  I'd like to publish this one.

17            THE COURT:  All right.  You may.

18       Q    (BY THE DEFENDANT:)  Do you recognize this victim,

19   Mr. Malinay, Primal Gijal?

20       A    Yeah.

21       Q    And is this your signature on the endorsement?

22       A    Yes, uh-huh.

23       Q    Okay.  You recognize this one also, this check that

24   was made out to cash?

25       A    Yes.

UNITED STATES DISTRICT COURT

1      Q      And do you recognize that this check is made

2    out -- this check is made out to Mortgage Enterprise and not

3    Mortgage Enterprise Investments?

4      A      Correct, yeah.

5      Q      And do you see the date on there?

6      A      Yeah.

7      Q      August 25th, 2013?

8      A      Uh-huh.

9      Q      So that was before I was incarcerated.  So you did

10   this before I was incarcerated, right?

11     A      I don't remember that you went to the jail, but

12   always Edna told me that, you know.

13     Q      So, Mr. Malinay, how many days in prison have you

14   done so far for scamming all these victims?

15     A      I never have a problem since then.

16     Q      I'm saying but you've already pled guilty, correct?

17     A      Yeah, I plead guilty.

18     Q      Okay.  So I've been unlawfully incarcerated for four

19   years for something I didn't do.

20            MR. SORENSON:  Objection to the form of the

21   question, Your Honor.

22            THE COURT:  You can't testify.  So you can ask him

23   about himself.  What would you like to ask him?

24     Q      (BY THE DEFENDANT:)  So when you took the plea deal,

25   what was the terms of the plea deal?  That you wouldn't do no

UNITED STATES DISTRICT COURT

1  jail time?

2      A    I don't know 'cause I have to go back in May -- May

3  I think, Judge?

4      Q    So you have to go back into May for what?

5      A    I think May 20th, I believe.

6           THE COURT:  So he's asking you what's going to

7  happen when you come back to court on May 20th.

8           THE WITNESS:  Oh, that I don't know 'cause I just

9  plead guilty because I did wrong and responsible for what I

10  did.

11      Q    (BY THE DEFENDANT:)  So when did you plead guilty?

12      A    My court before, the last week?

13      Q    Last week was the first time you pled guilty?

14      A    Yeah.  I don't know the day now.

15      Q    Do you remember FBI Agent Megan Crawley?

16      A    Yeah, her (pointing).

17      Q    That's her, right?

18      A    Yeah.

19      Q    Did you meet her before this year?

20      A    This year?

21      Q    Have you met her before this year, before 2020?

22      A    Yeah.

23      Q    When did you meet her?

24      A    Uhm, in this building.

25      Q    What year?

UNITED STATES DISTRICT COURT

1      A      What's that?

2      Q      What year did you meet her?

3      A      Which year?  Only last week, I believe, yeah.

4      Q      So this is the first time that you met her was last

5  week?

6      A      Yeah.

7      Q      Okay.  So I want you to look at --

8      A      Yeah.

9      Q      This is the report.  I want you to see the date of

10  this report.  Can you see that date?

11            MR. SORENSON:  Your Honor, this witness does not

12  know what this document is.  Perhaps a foundation could be laid

13  on that first?

14            THE COURT:  Well, I -- you know, he's -- you're

15  trying to refresh his recollection --

16            THE DEFENDANT:  Right.

17            THE COURT:  -- on this.  So he can show him anything

18  to refresh his recollection.  We're not -- I don't think he's

19  asking it to be received in evidence.

20            THE DEFENDANT:  No.

21            MR. SORENSON:  No.  And there is a motion in limine

22  with respect to these types of documents, Your Honor.

23            THE COURT:  Okay.

24            MR. SORENSON:  Yeah.

25            THE COURT:  So if you look at that date on the

UNITED STATES DISTRICT COURT

```
 1   document -- and I know you don't read English so the rest of

 2   it's not going to mean anything to you -- does that help

 3   refresh your recollection as to when you first met Agent

 4   Crawley?

 5            THE WITNESS:  This year, Judge?  This year or

 6   before?

 7            THE COURT:  No, the date on the upper right-hand

 8   corner.  Do you see the numbers?

 9            THE WITNESS:  Yeah, 'cause I hired this attorney

10   Ching, yeah, and I remember this one now, yeah.  That's the one

11   that I meet her in the office.

12            THE COURT:  Okay.  So on that date do you think you

13   met Agent Crawley on January 20, 2017?

14            THE WITNESS:  Yes, Judge.  I remember now.

15            THE COURT:  Okay.  That refreshes his recollection,

16   January 2017.

17       Q    (BY THE DEFENDANT:)  Okay.  Now, when you met her in

18   January 2017, what was the content of your meeting?

19       A    You asking me before 'cause I don't know this one.

20   You asking me before that I involve you and me and Edna.

21       Q    So when you met Agent Crawley, did she say

22   that -- did they proffer your agreement to where you would

23   testify against me at my trial?

24       A    Testify against you?

25       Q    Yeah, that you would have to testify against me?
```

 1      A      I remember is just tell the truth.  That's what they

 2   told me, so I just tell the truth.  I forget what I said to her

 3   before already, so long.

 4      Q      So but you do remember meeting her before last week,

 5   like you said?

 6      A      Yeah.

 7      Q      Okay.  So did you sign an agreement at that meeting

 8   in 2017?

 9      A      2017?  I don't remember.

10      Q      So but you remember meeting her?

11      A      Yes.

12      Q      But you don't remember signing an agreement?

13      A      Yeah, I forgot already.  Maybe I sign.  I don't

14   know.

15      Q      If I read to you what she wrote about your

16   agreement, would that refresh your memory?

17           THE COURT:  Well, so this document can be used to

18   refresh his recollection, but you can't refer to it and, like,

19   read the document into the record.

20       So you can ask -- he's testified that he can't remember if

21   he came into an agreement with Agent Crawley, so --

22      Q      (BY THE DEFENDANT:)  Okay.  You said that your

23   attorney -- you was with your attorney Ching?

24      A      Yeah, that's my attorney at the time 'cause I --

25      Q      Okay.  Now, do you remember discussing with your

1    attorney Ching the agreement that you signed that day per her

2    report?

3         A     I think so, yeah.  I don't recall what I signed.

4         Q     You don't know what you signed, though?

5         A     Maybe that's the one, yeah.

6         Q     So you signed something, but you don't

7    remember -- you don't remember what it was?

8         A     Yeah, 'cause I don't know how to read.

9         Q     So did your attorney tell you -- did he read to you

10   what you were signing?

11        A     Yeah.  This is that -- he told me at the time that

12   you had to tell the truth.  Whatever investigation said, you

13   have to tell the truth.  So that's why I, you know.

14        Q     So you signed something at this meeting with Agent

15   Crawley, right?

16        A     Yeah.

17        Q     And that was an agreement?

18        A     What --

19        Q     It was like a plea agreement, correct?

20        A     When?

21        Q     When you met her in 2017, the first time you said

22   you met her.

23        A     Yeah, I don't plead guilty at the time yet.

24        Q     Well, you hadn't pled guilty?

25        A     No, not that time, yeah.

1      Q     So what did you sign the agreement for?  'Cause this

2  was a plea agreement.  So what was the agreement for?

3            MR. SORENSON:  Objection to the mischaracterization

4  of what this document is and a reference to a plea agreement.

5  I don't know where that comes from.

6            THE COURT:  Yeah.  Sustained.

7            THE DEFENDANT:  He just said he signed the

8  agreement.  I'm asking him what was the agreement.

9            THE COURT:  No.  You called it a plea agreement and

10  that mischaracterizes his testimony.

11     Q     (BY THE DEFENDANT:)  Okay.  So what was the

12  agreement that you signed?  Do you remember the title of the

13  agreement that you signed?

14     A     Well, just tell me that at the time that signature

15  here and then you just tell the truth.  That's what he told me

16  at the time.

17     Q     Okay.  So your attorney didn't explain to you any

18  details or any stipulations in this agreement that you would

19  have to cooperate with the government; whatever they need to

20  you say, you had to say?  He didn't explain to you --

21            THE COURT:  Okay.  So you -- I'm not going to have

22  you inquire what his attorney discussed because that's called

23  the attorney-client privilege.

24      But you can ask him if he has an understanding, if he has

25  that kind of agreement with the government.

UNITED STATES DISTRICT COURT

1          But any conversations or discussions or advice between the

2     attorney and the client, I can't -- I can't allow you to ask

3     questions.

4               THE DEFENDANT:  Okay.

5          Q    (BY THE DEFENDANT:)  So in your dealings with Edna

6     Franco, was it your normal practice to send her money?

7          A    What's that?

8          Q    Was it your normal practice to send her money?

9          A    Yeah, because what I understood the time is at the

10    beginning both of you own the company because as you tell me

11    all the time.

12         Q    No.  This is -- this is your company with Edna.

13    This has nothing to do with me.  Everything I'm asking --

14              THE COURT:  Okay.  So wait.  So ask him a question.

15         So you're asking questions about Mortgage Enterprise.

16         Q    (BY THE DEFENDANT:)  Right, your company.  So when I

17    was incarcerated -- even really before I was incarcerated, once

18    you all formed this company, was it your normal practice to

19    send money to Edna?

20         A    Yeah, because every time I collect money before, I

21    have to give to her.

22         Q    Okay.  And what did you have to give her that money

23    for?

24         A    For the people that I sell the system.

25         Q    And how would you give her money?

1        A        Sometime cash, sometime check.

2        Q        Did you ever send a MoneyGram or Western Union?

3        A        I think sometime I believe before.

4        Q        Okay.  And so if you thought you was helping these

5   people, what did you do?  What did Edna do to try to help these

6   people?  What did you do?

7        A        Yeah, because I always tell her that we're

8   going -- 'cause I don't know how to do all the paperwork, and

9   same thing like you said before, they just collect people's

10  paperwork and then process.  That's what you tell me and same

11  thing with Edna.

12       Q        So what were you processing though?  You just got

13  applications filled out.  What were you processing?

14       A        What we do the time is collect from the bank, like

15  you did before, and I give to Edna and answer her the

16  paperwork.

17       Q        So did you see Edna answer any of the bank's motions

18  from the attorneys?  Did you see her answer all these

19  clients' --

20       A        Yeah, same thing like you.

21       Q        So if she answered all these clients, if she did

22  answer, why did all these clients make a complaint against you

23  and her?

24       A        I don't know.  Maybe like me, I lose my house, you

25  know.

UNITED STATES DISTRICT COURT

1      Q      I'm saying if you helped them, they wouldn't have

2  lost their house.  So what did you do to help them stay in

3  their house?  What did you file and what did Edna file?

4      A      Every time that the bank send them a letter, the

5  owner, then I pick up and then Edna answer again and something

6  like you did before, your company.

7      Q      No.  So why did the clients, your clients, why did

8  they contact OCP and say they never heard from you again?

9  That's what their complaint --

10          THE COURT:  Well, ask him if he knows that was the

11  complaint.

12      Q      (BY THE DEFENDANT:)  Right.  So why did they

13  complain that they never heard from you again?

14      A      Yeah, because I'm so scared all the time because I

15  don't want to talk to anybody at the time already, I so scared.

16      Q      Because you knew what you were doing was wrong?

17      A      Right.

18          THE DEFENDANT:  I got no more questions for

19  Mr. Malinay.

20          THE COURT:  All right.  Thank you I think this is a

21  good time for us to take a recess.

22       So, ladies and gentlemen of the jury, if you would please

23  put down your iPads and your notebooks.  And of course don't

24  discuss the case with anyone or allow anyone to discuss it with

25  you.

1          We're in recess for a 15-minute recess.

2          Please rise for the jury.

3                    (A recess was taken.)

4                    (Open court out of the presence of the jury.)

5                    THE COURT:  All right.  So the witness is on the

6    stand.  Mr. Sorenson and counsel are -- and Mr. Williams are

7    present.

8          I'm going to have Ms. Elkington go get the jury.  All

9    right.  Very good.  We're in recess.

10                   (A recess was taken.)

11                   (Open court in the presence of the jury.)

12                   THE COURT:  And let the record reflect the presence

13   of the ladies and gentlemen of the jury, Mr. Malinay on the

14   witness stand.

15         You've witness, Mr. Sorenson.

16                   MR. SORENSON:  Thank you, Your Honor.

17                            REDIRECT EXAMINATION

18   BY MR. SORENSON:

19         Q    Mr. Malinay, you testified you worked for Anthony

20   Williams; is that correct?

21         A    Yes, Attorney.

22         Q    And did Mr. Williams hire you himself?

23         A    Yes, Attorney.

24         Q    Why did he hire you?

25         A    Because he asked me what I do before and I tell him

 1   that I do network marketing.  And so he said, "I need you

 2   because you got a lot of contact with the Filipino community."

 3   That's what he told me.

 4        Q     And because of your network marketing, did you have

 5   contacts within the Ilocano Filipino community?

 6        A     Yes, Attorney.

 7        Q     And was this a community of people that Mr. Williams

 8   was interested in marketing his product to?

 9        A     Yes, Attorney.

10        Q     And were you sort of the gateway to that community

11   for him?

12        A     What's that, Attorney?

13        Q     Were you sort of the gateway to that community for

14   him?

15        A     He always tell me, "I need you."  That's what he

16   told me, Attorney.

17        Q     Did Mr. Williams train you to do what you did?

18        A     Yes, they train us in Anabel's office all the time,

19   Attorney.

20        Q     And did he tell what you to tell people?

21        A     What's that, Attorney?

22        Q     Did he tell you what to tell people about the

23   product that you were selling to them?

24        A     Yeah, yeah.  He said, This is what you say, not to

25   say.  That's what he said.  So I -- he said, Oh, you cut the

1   mortgage half and the monthly.  That's what he train us,

2   Attorney.

3        Q     And did you talk then to these people for

4   Mr. Williams?

5        A     Yes, I do the same thing, but it's us.

6        Q     And specifically what did you tell them?

7        A     'Cause I said, Well, if you get a mortgage, hard

8   time to pay the monthly, they have a program that Anthony

9   Williams and Edna help us 'cause I join too, yeah.

10       Q     And you told them the deal was what?  The half and

11  half kind of thing?

12       A     Yes, because of the program, Attorney.

13       Q     And, Mr. Malinay, you don't deny scamming these

14  homeowners, do you?

15       A     No, Attorney.

16       Q     Did you scam people on behalf of Anthony Williams?

17       A     Yes, Attorney.

18             THE DEFENDANT:  Objection.  That's leading and that

19  did not happen.

20             THE COURT:  Sustained.  The last answer will be

21  stricken and the jury will disregard the response.

22       Q     (BY MR. SORENSON:)  When you scammed people, did you

23  scam people for anybody in particular?

24       A     Only that one, Attorney, on the mortgage.

25       Q     Uh-huh.  And were you working for anybody when you

1   were scamming people?

2       A     No, Attorney, just only this -- I involve this kind

3   of mortgage.

4       Q     Okay.  When you were working for Mr. Williams, were

5   you scamming people?

6               THE DEFENDANT:  Objection.  That's leading.

7               THE WITNESS:  Yes, Attorney.

8               THE COURT:  Sustained.  The last answer will be

9   stricken.

10      Q     (BY MR. SORENSON:)  During the period you were

11  working with Mr. Williams, did you sell his product to people?

12      A     Yeah, because that's why he gets us to sell the

13  product, Attorney.

14      Q     And based on your work with Mr. Williams, were you

15  charged with crimes?

16      A     Well, yeah.  Right now that's why I know now, yes.

17      Q     Okay.

18      A     I know this is scam system.

19      Q     Were you charged with the crime of conspiracy to

20  commit wire fraud with Mr. Williams?

21      A     Yes, Attorney.

22      Q     Okay.  And did you plead guilty to that?

23      A     Yeah, I plead guilty at that one.

24      Q     Have you been sentenced yet?

25      A     Not yet, Judge -- Attorney.

UNITED STATES DISTRICT COURT

1    Q    Okay.  And do you have a plea agreement with the

2  United States?

3    A    What's that?

4    Q    Do you have a plea agreement?  Did you enter into a

5  plea agreement?

6    A    Yes.

7    Q    Okay.  And in that plea agreement, did you agree to

8  plead guilty?

9    A    Yes, because I did it and I apologize about that.

10    Q    That's okay.  Did the United States make any

11  promises to you with respect to what your sentence would be?

12    A    No, not yet, Attorney.

13    Q    And what was your understanding of the plea

14  agreement your obligations were to do?

15    A    I don't know how much the sentence, Attorney.

16    Q    What's that?

17    A    I don't know what the sentence, what I have.

18    Q    Okay.

19    A    I don't know.

20    Q    Did you agree to testify if you were called to

21  testify in this case?

22    A    Yes, Attorney.

23    Q    Okay.  And did you agree to testify?

24    A    Yes.

25    Q    And were you told what to say when you testified?

```
 1    A    Yes, I tell the truth attorney.

 2    Q    I'm sorry?

 3    A    Yes, I tell the truth from what I learned.

 4    Q    Can you say that again?

 5    A    I just tell the truth if I testify again.

 6    Q    Okay.  Did you say you would testify to the truth?

 7    A    Yes.

 8    Q    And is that what you've done here?

 9    A    Yes, Attorney.

10    Q    Now, with your arrangement with Mr. Williams, I

11 think he touched on the fact that you had signed up with him

12 also; is that correct?

13    A    What's that, Attorney?

14    Q    You had signed up for his services as well; is that

15 correct?

16    A    Yes, Attorney.

17    Q    And did you have to pay him?

18    A    Yeah, $3,000.

19    Q    Okay.  Did you pay him for the services that he

20 performed for you?

21         THE DEFENDANT:  Objection.  That's leading.

22         THE WITNESS:  Yeah, because --

23         THE COURT:  I'm sorry.  Let me answer this.

24 Overruled 'cause it's foundational.

25         So what did you pay Mr. Williams for?  What was the $3,000
```

UNITED STATES DISTRICT COURT

1   for?

2           THE WITNESS:  Because to process the paperwork

3   to -- so they can start my paperwork.

4       Q    (BY MR. SORENSON:)  Did you have to pay him every

5   month?

6       A    No, I don't pay him every month.  But he said that

7   since you know people, if you invite people, then don't charge

8   you.  That's what he told me, Attorney.

9       Q    So you didn't have to pay him because your job was

10  to bring people in?

11      A    Yes, like a swap kind of thing.

12          MR. SORENSON:  Your Honor, that's all the questions

13  I have.  Thank you.

14          THE COURT:  There's no further questions,

15  Mr. Williams?

16          MR. SORENSON:  Your Honor, this witness --

17          THE COURT:  It was not on his list?

18          MR. SORENSON:  No.

19          THE COURT:  Sorry, I thought he was.  Thank you.

20       So, Mr. Malinay, then, you're excused as a witness, all

21  right?  So you can go.  But don't talk to anybody about your

22  testimony until the trial is done.

23          THE WITNESS:  Yes.

24          THE COURT:  All right.  Good day, sir.

25          THE WITNESS:  Okay.  Thank you, Judge.

UNITED STATES DISTRICT COURT

1            (This concludes the partial testimony requested.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1               COURT REPORTER'S CERTIFICATE

2

3          I, DEBRA READ, Official Court Reporter, United

4   States District Court, District of Hawaii, do hereby certify

5   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

6   true, and correct transcript of the stenographically reported

7   proceedings held in the above-entitled matter and that the

8   transcript page format is in conformance with the regulations

9   of the Judicial Conference of the United States.

10          DATED at Honolulu, Hawaii, February 22, 2020.

11

12

13              */s/ Debra Read*

14              DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT