```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3
        UNITED STATES OF AMERICA,      ) CR 17-00101 LEK
 4                                     )
                    Plaintiff,         ) Honolulu, Hawaii
 5                                     ) February 11, 2020
          vs.                          )
 6                                     ) PARTIAL TRANSCRIPT:
        (1) ANTHONY T. WILLIAMS,       ) TESTIMONY OF MELVYN VENTURA
 7                                     )
                    Defendant.         )
 8      _____)

 9
                    PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
10              BEFORE THE HONORABLE LESLIE E. KOBAYASHI
                    UNITED STATES DISTRICT JUDGE
11
        APPEARANCES:
12
        For the Government:        KENNETH M. SORENSON, AUSA
13                                 GREGG PARIS YATES, AUSA
                                   Office of the United States Attorney
14                                 300 Ala Moana Boulevard, Suite 6100
                                   Honolulu, Hawaii 96850
15
        Also Present:             MEGAN CRAWLEY, FBI Special Agent
16
        For the Defendant (1)     ANTHONY T. WILLIAMS, Pro Se
17      Anthony T. Williams:      05963-122
                                  Federal Detention Center Honolulu
18                                Inmate Mail/Parcels
                                  P.O. Box 30080
19                                Honolulu, Hawaii 96820

20      Standby Counsel:          LARS ROBERT ISAACSON, ESQ.
                                  547 Halekauwila Street, Suite 102
21                                Honolulu, Hawaii 96813

22      Official Court Reporter:  DEBRA READ, RDR
                                  United States District Court
23                                300 Ala Moana Boulevard
                                  Honolulu, Hawaii 96850
24
        Proceedings recorded by electronic sound recording; transcript
25      produced with computer-aided transcription (CAT).
```

UNITED STATES DISTRICT COURT

1                          I N D E X

2                  CHRONOLOGICAL INDEX OF WITNESSES

3

4       GOVERNMENT'S WITNESS                                    PAGE

5

        Direct Examination By Mr. Yates                        3
6       Cross-Examination By The Defendant                    37
        Redirect Examination By Mr. Yates                     82
7       Direct Examination By The Defendant                   96

8

9

                                I N D E X

10                           E X H I B I T S

11

12      NO.                                                    PAGE

13

        2042                                                   56
14      2042 pages 10-25                                       72
        2043                                                   69
15      2149                                                   48
        2151                                                  101
16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

```
 1    TUESDAY, FEBRUARY 22, 2020                    9:52 A.M.
 2                 (Partial transcript begins:)
 3         MELVYN VENTURA, GOVERNMENT'S WITNESS, WAS SWORN
 4              THE COURTROOM MANAGER:  Thank you.  Please have a
 5    seat.
 6        State your name and spell your last name for the record.
 7              THE WITNESS:  Okay.  My name is Melvyn Ventura,
 8    M-e-l-v-y-n, V-e-n-t-u-r-a.
 9              THE COURT:  Your witness.
10              MR. YATES:  Your Honor, may I approach with the
11    witness binder?
12              THE COURT:  You may.
13                        DIRECT EXAMINATION
14    BY MR. YATES:
15         Q    Good morning, Mr. Ventura.
16         A    Good morning, sir.
17         Q    Could you please tell the jury who your employer is?
18         A    Uhm, would you repeat that, sir?
19         Q    Who do you work for?
20         A    I work for the City and County of Honolulu.
21         Q    And what do you do for the City and County of
22    Honolulu?
23         A    I'm a maintenance mechanic.
24         Q    Just to warn you, you should wait till I finish my
25    question before you answer so the court reporter can finish
```

4

 1   typing your answer.

 2        A     I'm sorry, sir.

 3        Q     And how long have you been working with the City and

 4   County of Honolulu?

 5        A     It's going to be 30 years this month.

 6        Q     And where are you from originally?

 7        A     Originally from the Philippines.

 8        Q     And what is your first language?

 9        A     Ilocano.

10        Q     Now, Mr. Ventura, at some point you became a

11   Mortgage Enterprise Investments or MEI client; is that correct?

12        A     Yes, sir.

13        Q     Now, before you became an MEI client, did you own

14   your own home?

15        A     Yes.

16        Q     Okay.  And before you became an MEI client, how much

17   did you owe on your mortgage?

18        A     504,000.

19        Q     Do you recall how much your monthly mortgage payment

20   was to your bank?

21        A     My monthly payment was 1,722.

22        Q     Do you recall the name of the bank with which you

23   had a mortgage, at least at the time of your interactions with

24   MEI?

25        A     It was National Bank and then it merged to PNC Bank.

UNITED STATES DISTRICT COURT

1    Q    That's PNC, correct?

2    A    Yes, sir.

3    Q    Okay.  And at the time that you applied for and

4  became associated with MEI, what was the status of your

5  payments to PNC?

6    A    I was up to date, sir.

7    Q    Okay.  So you were not in foreclosure, correct?

8    A    Excuse me, sir?

9    Q    You were not in foreclosure, correct?

10    A    No.

11    Q    At that time?

12    A    At that time, yes.

13    Q    Okay.  So how did you become -- let me withdraw

14  that.

15         Could you please explain to the jury how it is that

16  you first became introduced to Mortgage Enterprise Investments?

17    A    At first I was introduced by my wife's sister and

18  the husband.  I was somewhat hesitant to go and listen to a

19  presentation, but eventually they convinced me to go and listen

20  to the presentation.

21    Q    Okay.  Where was that presentation?

22    A    It was at Starbuck in Aiea.

23    Q    And what do you recall the presentation promised?

24    A    It was presented very well.  It's very interesting,

25  you know, that, you know, 'cause of living in Hawaii, when you

 1   hear this kind of presentations, you know, and it will -- I

 2   thought it will give me -- it will give me an extra money to

 3   spend.  That's what I got convinced for.

 4        Q     Okay.  And what were you promised?

 5        A     To -- I was promised to a mortgage reduction, cut my

 6   mortgage in -- my balance in half.

 7        Q     So was there any one-time fees?

 8        A     There was they call it processing fee.  At first I

 9   paid 1500 --

10              THE COURT:  What kind of fee?

11              THE WITNESS:  Processing fee.  Yes.  Sorry.

12        Q     (BY MR. YATES:)  Okay.  A one-time processing fee of

13   how much?

14        A     1,500.

15        Q     And was there a monthly fee?

16        A     Afterwards, yes, there were monthly fee.

17        Q     And how much was the monthly fee to MEI?

18        A     They cut it in half, so actually it was $866, but

19   and then I'm paying extra just to run it up 900 a month.

20        Q     Okay.  And after that initial meeting, what did you

21   decide?

22        A     Well, I decided to go for it.

23        Q     So I'm going to show you the first of several

24   exhibits.  And this is Exhibit 17, which has been admitted into

25   evidence.

1          So may we publish, Exhibit 17?

2          THE COURT:  You may.

3          MR. YATES:  Thank you.

4     Q    (BY MR. YATES:)  So Mr. Ventura, in your binder if

5     you can turn to Exhibit 17?

6          THE COURT:  You can either look in the binder, that

7     folder, Exhibit 17.  It's also going to appear on the screen.

8          THE WITNESS:  Okay.

9          THE COURT:  Okay?

10         THE WITNESS:  Okay.  I'm on there.

11         MR. YATES:  Oh, my.  Oops.  One moment.  Okay.

12    There we go.

13    Q    (BY MR. YATES:)  So do you recognize Exhibit 17?

14    A    Yes, sir.

15    Q    Okay.  What is Exhibit 17?

16    A    It's a customer informations.

17    Q    Okay.  Is this a document that you prepared to apply

18    for --

19    A    Yeah.

20    Q    -- MEI?

21    A    Yes, sir.  It's a MEI application.  Yes, I did.

22    Q    And is this your handwriting?

23    A    Yes, sir.

24    Q    And your signature at the bottom?

25    A    Yes, sir.

UNITED STATES DISTRICT COURT

1       Q       Okay.  If you flip through Exhibit 17, there's a

2   number of documents with signatures.  Can you verify that you

3   signed each of these documents with your signature?

4       A       I didn't quite understand you, sir.

5       Q       Yes.  Can you flip through Exhibit 17 and verify

6   that the signatures that indicate your name, Melvyn Ventura,

7   were signed by you?

8       A       Yes, sir.

9       Q       Okay.  And after you signed up for MEI, did you

10  receive a welcome letter?

11      A       Yes, sir.

12              MR. YATES:  Okay.  Your Honor, Exhibit 100 has been

13  admitted into evidence.  May I publish?

14              THE COURT:  You may.

15      Q       (BY MR. YATES:)  So, Mr. Ventura, can you please

16  take a look at Exhibit 100?

17      A       100?

18      Q       Yes.

19      A       Yeah, I'm on there, sir.

20      Q       All right.  So can you verify is this the welcome

21  letter that you received from Mortgage Enterprise Investments?

22      A       Yes, sir.

23      Q       Okay.  So I'm going to highlight some

24  documents -- or excuse me -- some language from this and I'd

25  like you to tell me about it.  Can you see that, Mr. Ventura?

9

1      A     Yes, sir.

2      Q     Okay.  So I'm going to read a little bit from this.

3  It says here, "Your former mortgage company no longer have an

4  interest in your property and if they send you any

5  correspondences threatening foreclosure proceedings -- or

6  procedures or that if you don't pay them that your credit

7  rating will be negatively affected, this is in violation of the

8  FDCPA, TCPA, RESPA, and TILA and we will litigate on your

9  behalf to the full extent of the law."

10       Do you see that?

11     A     Yes, sir.

12     Q     Okay.  Did Mr. Anthony Williams talk to you about

13  this language?

14     A     I don't remember, sir.

15     Q     Okay.  What did you understand MEI and Anthony

16  Williams would do for your -- or to your previous PNC mortgage?

17     A     I understand that by putting my mortgages into MEI,

18  my mortgage will be reduced to half.

19     Q     Okay.  And when you say that you understand that the

20  mortgage was going to be put into MEI, what do you mean?

21     A     When I will -- forgive me, sir.  Let me gather my

22  thought.

23     Q     It's okay.  You used the phrase MEI and I'm not sure

24  the jury has heard that phrase MEI before.  By MEI do you mean

25  MEI?

UNITED STATES DISTRICT COURT

```
 1      A     Yes.

 2      Q     Okay.  So did you understand that your mortgage with

 3  PNC would be put into or given to MEI?

 4      A     Yes.

 5      Q     Okay.  Now, Mr. Ventura, you actually met with

 6  Anthony Williams in person, correct?

 7      A     Afterwards, yes, sir.

 8      Q     Okay.  And where did you meet Anthony Williams?

 9      A     In their office at the Democrat Street.

10      Q     Okay.  Democrat Street?  And was that an office

11  building or a house?

12      A     It's a -- I believe it is a house but using it as an

13  office.

14      Q     I see.  Do you know whose house that was?

15      A     That was Ms. Anabel Cabebe.

16      Q     Do you recall who was present at that house?

17      A     There were a lot of people in there standing in

18  line.

19      Q     And can you describe your own meeting with Anthony

20  Williams?

21      A     My meeting with Mr. Williams is somewhat

22  interesting.  Exciting.  I will say exciting because I was

23  anxious to meet him at that time.

24      Q     How did Anthony Williams introduce himself?

25      A     Well, he presented himself as a private attorney
```

UNITED STATES DISTRICT COURT

1    general.

2         Q    And what did you understand the words or the term

3    private attorney general to mean?

4         A    From my understanding with the private attorney

5    general is to represent the people.

6         Q    Okay.  And that's what he told you?

7         A    Yes.

8         Q    Okay.  Did Anthony Williams refer you to any other

9    sources of information for you to review?

10        A    It was not Mr. Anthony, but it was Mr. Malinay that

11   provide me the information to go and to look up, search about

12   the process that they're doing.

13        Q    And you said "search."  Did you mean that you went

14   onto the worldwide web?

15        A    Yes, sir.

16        Q    Okay.  And what website or websites did you look at?

17        A    Oh, I went on usacommonlawofamerica.

18        Q    Okay.  And what do you understand was USA Common Law

19   America?  What was it?

20        A    I thought it's a big company, it's a legit company

21   that, you know, I could depend on in case I need help, legal

22   help.

23        Q    Okay.  And was USA Common Law America also referred

24   to as Common Law Office of America?

25        A    I'm -- I can't remember, sir.  I don't know.


                      UNITED STATES DISTRICT COURT

```
 1        Q      CLOA?

 2        A      CLOA.  I don't know, sir.

 3        Q      Okay.  What do you recall seeing on that website?

 4        A      I'm sorry, sir.  What was that again?

 5        Q      What did you see on the website, usacommonlaw?

 6        A      There were several private attorney generals in

 7   there, their status -- I mean, their -- what I say? --

 8   their -- what kind of position they are, what position they

 9   are, what kind of -- you know, what they do in the business and

10   then credibility, I should say.

11        Q      How many private attorney generals do you remember

12   seeing on that website?

13        A      At first I remember 1, 2, 3, 4, 5 maybe.

14        Q      Okay.  Do you remember any of them?

15        A      I still remember some of them.

16        Q      Okay.  Who are they?

17        A      Uhm, one of them is Randy -- Randy -- I can't

18   remember his last name, and then afterwards Anabel Cabebe was

19   there, Edna Franco was there, and then some other people that I

20   could not recall, sir.

21        Q      Okay.  Was Anthony Williams also listed?

22        A      Yes.

23        Q      Who do you understand authored or wrote that

24   website?

25        A      It's very informative, you know, in term of legal
```

1    proceedings, you know, how they approach mortgage -- mortgage

2    issues.

3         Q    Okay.  But whose website do you remember that was?

4         A    I think it's belongs to Mr. Williams.

5         Q    Okay.  And prosecute from understanding both from

6    the website and from what you were told, what did you

7    understand a private attorney general could do for you?

8         A    He could help me discharge my house.

9         Q    Discharge your house?

10        A    Discharge from PNC Bank.

11        Q    Okay.  So what happens in the case of foreclosure?

12   What do you understand that a private attorney general could do

13   for you?

14        A    He could help me -- he could represent me in court.

15        Q    So as you sit here today, what did you understand

16   the difference was between a private attorney general and a

17   regular lawyer?

18        A    I don't see that much difference except that he's

19   private and representing regular people.

20        Q    Now, did Anthony Williams tell you exactly what he

21   was going to do as part of the MEI process?

22        A    Yes, sir.

23        Q    Okay.  What do you understand the MEI process would

24   do?

25        A    It was explained to me that by filing a -- filing a

1   document to Bureau of Conveyance, that would secure -- secure

2   me that no one can foreclose me by having that documents in

3   there.

4        Q    So I'd like to show you another document and that's

5   Exhibit 208.

6             And, Your Honor, Exhibit 208 has also been admitted

7   into evidence.  We ask that we may be permitted to publish?

8             THE COURT:  You may.

9        Q    (BY MR. YATES:)  Mr. Ventura, I'm going to ask you

10  to turn to Exhibit 208.  It's both in your binder and on your

11  screen.

12            Do you recognize Exhibit 208?

13       A    Yes, sir.

14       Q    And you'd seen this document before, correct?

15       A    Uhm, pardon me, sir?

16       Q    You've seen this document before?

17       A    Yes, sir.

18       Q    Okay.  And what did you understand this UCC

19  financing statement would do for you?

20       A    My understanding is it's a legit document, that it

21  can -- it can protect me from foreclosure.

22       Q    Okay.  And why do you understand -- let me withdraw

23  that.

24            Did Anthony Williams explain to you why this

25  BOC -- excuse me -- why this UCC document was legit?

 1        A       There were a time before I met Mr. Malinay that I'm

 2   doing my own research.   There are some website that I went

 3   through, there are some movies that I watch and documentary,

 4   documentary about -- about the financial crisis in the late

 5   2000.  I also watch the *Strawman Myth*, and as well as the --

 6   what you call -- documentary what is called *Inside Job*.   And

 7   that's what make me anxious to meet Mr. Williams because I

 8   already knew what they're talking about.

 9        Q       Okay.

10        A       It's a very good informations that I thought it

11   work.  It's a complex process, but it, you know, is going to

12   work.

13        Q       So I want to direct your attention specifically,

14   however, to the UCC form, not about these movies.   So did

15   Anthony Williams explain to you what this UCC form would do?

16        A       Yes, sir.

17        Q       Okay.   And I'm going to point your attention here to

18   a part of the screen, and on the UCC form it says, "This

19   mortgage will be discharged in accordance with UCC1-201(39) and

20   1-308."

21              Do you see that?

22        A       Yes, sir.

23        Q       Okay.   Did Anthony Williams explain to you what this

24   UCC form was supposed to do for you?

25        A       Yes, sir.


                    UNITED STATES DISTRICT COURT

16

1        Q        And what did he say?

2        A        With this one it will eventually discharge my

3    mortgage.

4        Q        Now, Mr. Ventura, how did you typically pay your MEI

5    monthly fee?

6        A        I mail it in every month.

7        Q        Okay.  Did you use a check?

8        A        Excuse me, sir?

9        Q        Did you use a check?

10       A        Yes.

11       Q        So I'm going to direct you once again to your

12   binder.

13               Your Honor, at this point I'm going to be referring

14   to Exhibits 101 through 132.  They've all been admitted into

15   evidence.  We're not going to walk through every single

16   document, but what I will have him do is walk through the first

17   of these and we'll have him talk about the remainder en masse,

18   if that's okay with the Court?

19               THE COURT:  Yes.

20       Q        (BY MR. YATES:)  Okay.  So, Mr. Ventura, the first

21   thing I'd like to have you do is take a look at Exhibits 101

22   and 102 and they're in your binder in front of you.

23       A        I'm under it, sir.

24       Q        Okay.  So do you recognize Exhibit 101?

25       A        Yes, sir.

1          MR. YATES:  Okay.  So Exhibit 101 has been admitted.

2    May I publish, Your Honor?

3          THE COURT:  You may.

4          Q     (BY MR. YATES:)  So Exhibit 101 appears to be a

5    invoice from MEI; is that correct?

6          A     Yes, sir.

7          Q     Okay.  But there's some handwriting on this

8    document.  Can you explain whose handwriting that is?

9          A     That is my handwriting.

10         Q     Okay.  And what are you communicating with this

11   handwriting?  What does it say?

12         A     What does it say?

13         Q     Yes.

14         A     It's on the comments it says, "In order to be in

15   compliance" --

16         Q     No, no.  I just want to -- I just want you to

17   explain to the jury why you were writing on this document.

18         A     To -- to make sure that I'm up to date with my

19   payment.

20         Q     Okay.  And so is the first number here under

21   miscellaneous a date?

22         A     Yes, sir.

23         Q     Okay.  And then the second number across from that

24   is a payment amount; is that correct?

25         A     Yes, sir.

18

```
1        Q    Okay.  So please take a look at Exhibit 102.

2             May I publish 102, Your Honor?  It has been

3   admitted?

4             THE COURT:  You may.

5             MR. YATES:  Thank you.

6        Q    (BY MR. YATES:)  Do you have 102 in front of you?

7        A    Yes, sir.

8        Q    Okay.  So is Exhibit 102 an envelope that you mailed

9   on or about November 28th, 2014?

10       A    Yes, sir.

11       Q    Okay.  So is that the envelope that you used to mail

12  this invoice document?

13       A    Yes, sir.

14       Q    Okay.  And did you include a check with this

15  mailing?

16       A    Yes, sir.

17       Q    Okay.  So let's just walk through just another one

18  of these and then we'll have you go through the remainder en

19  masse, okay?

20       A    Okay.

21       Q    So please take a look at Exhibit 103 and Exhibit 104

22  -- I'm not going to publish that.  But is Exhibit 103 and

23  Exhibit 104 also an invoice with your handwriting that you

24  mailed to MEI?  And this time it would be on or about January

25  of 2015?
```

19

```
 1        A     Yes, sir.

 2        Q     Okay.  Now, take a look at 105, 106, and 107.

 3   Similarly, is this an MEI invoice with your envelope and a

 4   check that you mailed to MEI January 29, 2015?

 5        A     Yes, sir.

 6        Q     Okay.  So now take a look at 109 and 112.

 7        A     109?

 8        Q     Yeah, and then 112, and then 115.

 9        A     112, okay.

10        Q     Okay.  And then 117.

11        A     −15, 117.

12        Q     Then 119.

13        A     119.

14        Q     Okay.  And then 122.

15        A     122?

16        Q     Yes.  And 125.

17        A     125.

18        Q     Okay.  And then 128.

19        A     128.

20        Q     Yeah.  And then 131.

21        A     131.

22        Q     Okay.  Now, are all those envelopes that you mailed

23   to MEI?

24        A     Yes, sir.

25        Q     Okay.  And you mailed them between the dates of
```

UNITED STATES DISTRICT COURT

```
 1    February 2015 through October of 2015; is that right?  You can

 2    take a look at the first and the last.  It'll be 109 and 132 --

 3    excuse me -- 131.

 4         A     132.

 5         Q     131.

 6         A     130 -- there's no 139, sir.

 7         Q     131.

 8         A     Oh, I'm sorry.

 9         Q     109 to 131.

10         A     Okay.

11         Q     So are those dates between February 28, 2015, and

12    October 28, 2015?

13         A     Yes, sir.

14         Q     Okay.  So you mailed all of those envelopes between

15    those dates, correct?

16         A     Yes, sir.

17         Q     Okay.  Now, I'm going to go through that one more

18    time with what were contained in those envelopes, okay?  So if

19    you could turn to 110, and then 113?

20         A     110?

21         Q     Uh-huh.

22         A     Okay.

23         Q     And then 113.

24         A     -13?

25         Q     Yeah.  And then 117.
```

1        A        –15?

2        Q        118, excuse me.

3        A        118?

4        Q        Yep.  And then 120.

5        A        120?

6        Q        Yeah.  And then 123.

7        A        122?

8        Q        –3.

9        A        –3?

10       Q        123.

11       A        Okay.

12       Q        And then 126 at the bottom.

13                THE COURT:  Okay.  Is there a point to this because

14       the jury's just sitting here.  You guys are talking to each

15       other.

16                MR. YATES:  Two more and then he's going to verify

17       that he sent all of these in.

18                THE COURT:  So you couldn't get him to look at this

19       beforehand?

20                MR. YATES:  He did look at it beforehand.

21                THE COURT:  Okay.  'Cause you can't ask him about

22       all of these.  We're just sitting here.  We have no idea what

23       you guys are looking at.

24                MR. YATES:  If I can get through two more?

25                THE COURT:  You can, but please don't do this again.

22

```
 1              MR. YATES:  Certainly not.

 2              THE COURT:  Okay.

 3         Q    (BY MR. YATES:)  And then tab 129.

 4         A    129?

 5         Q    Correct.  And then tab 132.

 6         A    132.

 7         Q    Correct.  Now are all those checks that you mailed

 8    between February 28th, 2015, and October 28th, 2015, to MEI?

 9         A    Yes, sir.

10         Q    Okay.  Now, did Anthony Williams say anything about

11    referring other clients to MEI?

12         A    I don't remember him suggesting that to me, but I

13    have a friend, a sister that going to church with me, and

14    because I wanted to help her with the same situation that I'm

15    at, so I refer it -- referred them to him.

16         Q    Okay.  So after you signed up for MEI, what did

17    Anthony Williams tell you to do regarding your mortgage

18    payments to PNC?

19         A    It was -- at that time it was Mr. Malinay that told

20    me to -- that I can -- I can stop making payment.

21         Q    Okay.  And what did you do?

22         A    I stop make the payment.

23         Q    And what happened after you stopped making the

24    payments to PNC?

25         A    And once again starting to get delinquency notice,
```

UNITED STATES DISTRICT COURT

1    foreclosure threat.

2         Q    Okay.

3         A    A letter.

4         Q    And what, if anything, did MEI or Anthony Williams

5    do after you started getting these threats?

6         A    And then they stop the foreclosure.

7         Q    How did they stop foreclosure?

8         A    By filing some documents in court.

9         Q    Okay.  Did the foreclosure indeed -- were you out of

10   foreclosure at that point?

11        A    At that point I was -- could you elaborate the

12   question, sir?

13        Q    Sure.  You said that they stopped the foreclosure.

14   But did you actually get out of foreclosure at that point?

15        A    No.

16        Q    Okay.  So do you understand that MEI and Anthony

17   Williams did anything that pulled you out of foreclosure at

18   all?

19        A    Could you repeat the question, sir?

20        Q    Yeah.  Did they do anything to take you out of

21   foreclosure?

22        A    They -- they tried to challenge it in court.

23        Q    Okay.  And was that successful?

24        A    It was.  I believe it was 'cause I still have my

25   house.

24

1      Q      But you're still in foreclosure, correct?

2      A      I'm still in foreclosure, yes, sir.

3      Q      So if you learned that Anthony Williams could not

4    act as a lawyer, how would that affect your --

5             THE DEFENDANT:  Objection.  This is leading.

6             MR. YATES:  I'm asking him how it's going to affect

7    his decision.

8             THE COURT:  So anyway, you have to wait till he

9    finishes his question.  Overruled.

10         So ask him the question.

11     Q      (BY MR. YATES:)  If you learned that Anthony

12   Williams could not act as your lawyer, how would that change

13   your decision regarding paying MEI?

14     A      Then I would step back.

15     Q      Okay.  And if you'd learned that Anthony Williams

16   could not represent you in foreclosure, how would that change

17   your decision about paying MEI?

18     A      Then I would not listen to them.

19     Q      And if you'd learned that the UCC could not actually

20   discharge your PNC mortgage, how would that change your

21   decision regarding paying MEI?

22     A      Then I wouldn't have put my mortgage in the

23   situations that I'm at.

24     Q      And did you rely on Anthony Williams's

25   representations when you continued with the MEI program?

UNITED STATES DISTRICT COURT

 1      A    At first I did.

 2      Q    Okay.  How many payments did you make to MEI?

 3      A    I believe I sent in maybe 12 -- 12 payments, maybe.

 4  Yeah, I would say just 12 payments, about a year.

 5      Q    Now, Mr. Ventura, could you please -- well, could

 6  you please tell the jury the following:  You had borrowed I

 7  believe you testified $500,000 or so from the bank and you

 8  promised to pay the bank back $1700 or so --

 9           THE DEFENDANT:  Objection as leading.

10      Q    (BY MR. YATES:) -- every month; is that correct?

11           Foundational for the remaining questions.

12           THE COURT:  All right.  Overruled.

13           THE WITNESS:  Yes, sir.

14      Q    (BY MR. YATES:)  Okay.  And one day as part of the

15  MEI program, you stopped paying the bank back; is that correct?

16      A    Yes, sir.

17      Q    Okay.  How do you feel now about your decision to

18  take part in the MEI program?

19      A    I actually regret it, sir.

20      Q    Why is that?

21      A    I -- you know, when my first pretrial interview I

22  was asked these questions.  These questions was did -- how

23  would I say it?  Did it occur of mind that you sign a document,

24  an agreement to pay my loan?  With that question, sir, I

25  was -- I -- I feel guilty because my signature on that

UNITED STATES DISTRICT COURT

1    documents; it's a seal of my agreement to pay that loan.  And

2    that is the time that I feel guilty because -- because of my

3    faith in God, I'm reading the Bible, and in the Bible said that

4    in Psalms, somewhere in Psalms Proverb 16:3 -- I may not be

5    correct -- but if you could search these word, it will show in

6    the Bible, it says, "A wicked man borrows but does not -- and

7    does not repay."

8             And, you know, walking around parading Jesus Christ

9    on my shirt in there, I realize, hey, I'm a hypocrite, you

10   know, and I'm representing God and then I'm not honest.  That

11   changed my -- my course of direction, sir, because I feel

12   guilty.

13            MR. YATES:  I have no further questions on direct,

14   Your Honor.

15            THE COURT:  You know, Mr. Williams, we're up for our

16   recess at this time.  So why don't we take a recess and then

17   have you begin your cross-examination.

18       All right.  Ladies and gentlemen of the jury, please leave

19   your notebooks and your iPads behind.  We're going to take a

20   15-minute recess at this time and then return for

21   cross-examination.

22       Please don't discuss the case with anyone or allow anyone

23   to discuss it with you.  And, of course, don't do any research

24   or investigation on your own.

25       Please rise for the jury.  They're on a 15-minute recess

1     as are we.

2                      (A recess was taken.)

3                      (Open court out of the presence of the jury.)

4              THE COURT:  Let the record reflect the jury is not

5     present.  Present are counsel and Mr. Williams.

6         I believe the government has a issue they'd like to raise?

7              MR. YATES:  Yes, Your Honor, very briefly.  We were

8     presented with three documents yesterday which we understand

9     that the defendant wishes to use with respect to this current

10    witness, Mr. Melvyn Ventura.  The government has significant

11    concerns regarding these three documents and because they may

12    require, you know, some argument, wish to bring this to the

13    Court's attention outside the presence of the jury.

14        To briefly outline them, there is -- one --

15             THE COURT:  Is it possible to put them on the

16    docucam so I can see them?

17             MR. YATES:  We sure can.

18             THE COURT:  All right.  Thank you.

19             MR. YATES:  So the first document that the

20    government is referring to is a -- appears to be a five-page

21    email chain.  The most recent emails are all between the

22    witness and Mr. Williams.  They appear to be communications

23    that Mr. Williams is having with the witness pertaining to the

24    subject of his testimony.  We certainly don't have a problem

25    with Mr. Williams communicating with the witness; that's, you

1    know, his own business.

2         We do, however, have serious concerns with this -- the

3    hearsay nature of this email chain.  It appears merely to be

4    Mr. Williams's attempt to, you know, litigate his own case

5    theory with this witness.

6         We also have concerns with the fact that, you know, he

7    seems to be making incendiary arguments regarding, you know,

8    the -- it looks like a suggestion to go to the Bureau of

9    Conveyances website to look up the mortgages of the judge and

10   the prosecutor to see how many mortgages they paid off.  It

11   seems like it has no relevance whatsoever.

12        But primarily, this is a hearsay statement.  All of it are

13   hearsay statements.  They're certainly hearsay against

14   the -- as to the party.  We could, as the government, introduce

15   a party admission, but it's not something that Mr. Williams can

16   introduce on his favor.  And with respect to Mr. Ventura, the

17   witness, he's not a party.  So these are not party admissions

18   that can be admitted against him.

19        Also, this out-of-court statement is NOT a statement under

20   oath in a separate proceeding, so it's not even proper as

21   impeachment evidence should Mr. Ventura testify contrarily to

22   this document.

23        So with respect to that document, we object.

24             THE COURT:  All right.  Mr. --

25             MR. YATES:  I can go through all three or I can

UNITED STATES DISTRICT COURT

1    leave you to discuss.

2              THE COURT:  What are the other two documents?

3              MR. YATES:  The other two documents are

4    affidavits -- or I should say they're named affidavits.  The

5    first of these purports to be an affidavit by Mr. Ventura.  It

6    is not signed.  Certainly the government has not seen this

7    document or is not aware of this document.  And there's no

8    indication that this document was ever introduced as part of

9    any legal proceeding under oath.  So this is not -- this is

10   also entirely hearsay, not relevant, and it's outside of any

11   exception.

12        Finally, there is a third affidavit, again, just a

13   document that's named an affidavit.  This one does appear to

14   have a signature on it and it does appear to have some kind of

15   acknowledgement or notary statement.  However, also there's no

16   indication that this was introduced as part of a legal

17   proceeding under oath.  And so absent any foundation, it's not

18   even proper for impeachment, but even with that foundation,

19   it's certainly not proper as substantive evidence.

20        Thank you, Your Honor.

21             THE COURT:  What about a prior recorded -- what

22   about a recorded recollection, 803(5)?

23             MR. YATES:  803(5), yes, Your Honor.  With respect

24   to the affidavit, these are merely conclusory statements.  I'm

25   going to note nothing fraudulent about an email, nothing

1    fraudulent about an email; that's the representations over and

2    over again.  So we're not clear how this is a fact that would

3    represent a recorded recollection --

4              THE COURT:  Well, it was made or adopted by the

5    witness when the matter was fresh in the witness's memory.

6    That's the second prong of recorded recollection.

7              MR. YATES:  Sure, but --

8              THE COURT:  I guess he can deny it or can be

9    confronted with it, but it looks like it's squarely within

10   Rule 803(5) as a recorded recollection.

11             MR. YATES:  And the government's position with

12   respect to that is that this would pertain to recorded facts

13   and not merely legal conclusions or conclusory statements as is

14   the case with this affidavit.

15        One moment.

16        Also, another note, it does say that at least according to

17   that exception that this was adopted when the matter was fresh

18   in the witness's memory.  This is dated looks like 2018, so

19   it's not clear that that's -- that foundation has been laid.

20             THE COURT:  All right.  It's an adopted statement so

21   maybe he had a better recollection in 2018 than 2020, but,

22   okay.  So those are the two, the unsigned affidavit, the signed

23   affidavit.

24             MR. YATES:  The email chain -- and the email chain.

25             THE COURT:  And the email chain.


UNITED STATES DISTRICT COURT

1           MR. YATES:  Yes, Your Honor.

2           THE COURT:  All right.  Mr. Williams?

3           THE DEFENDANT:  Well, they're argument, first of

4    all, it's utterly ridiculous.  They want to exclude an email

5    exchange between me and this witness when they're whole bogus

6    indictment has to do with four emails between me and this

7    witness.  So they want to indictment me on emails that's a

8    out-of-court statement that ain't sworn under oath, but they

9    don't want to enter in a sworn statement by this same witness

10   that's accounting what these email statements between him and

11   me were about, that there was nothing fraudulent about, and

12   he's sworn to oath to a notary that there's nothing fraudulent

13   and while it was fresh in his mind.

14        Also, there is another affidavit I need to show you that

15   this witness also did in 2015.  Do I need to put it on the

16   screen?

17           THE COURT:  Well, have you given it to the

18   prosecutors?

19           THE DEFENDANT:  Yeah, I got it from them.  It's part

20   of their discovery.

21           THE COURT:  Okay.

22           THE DEFENDANT:  They got it off my computer and all

23   that stuff.  It's Exhibit 2138.

24           THE COURT:  All right.  You've already identified it

25   as an exhibit?

1          THE DEFENDANT:  Right.

2          THE COURT:  Okay.

3          THE DEFENDANT:  It's page 18.

4          THE COURT:  Okay.  This is a --

5          THE DEFENDANT:  Affidavit from the witness.

6          THE COURT:  By Mr. Ventura.

7          THE DEFENDANT:  Yeah.  On 20 --

8          THE COURT:  Why don't you put it on the docucam.

9          MR. YATES:  Yeah, we just received this today, Your

10   Honor.

11          THE DEFENDANT:  No, you didn't.  You been had this.

12          THE COURT:  All right.  So I --

13          MR. ISAACSON:  Mr. Williams, is there a second page

14   to it?

15          THE COURT:  We'll get into when it was produced.

16   But so this you also want to use with regard to Mr. Ventura; is

17   that right?

18          THE DEFENDANT:  Yes.  This was actually --

19          MR. YATES:  Your Honor, I'm going to need the page

20   number.  This exhibit contains numerous documents that are --

21          THE DEFENDANT:  18 and 19.  Page 18 and 19.  This

22   was actually produced in the government's discovery under Bates

23   number 030246.

24          THE COURT:  Okay.  So -- so let's leave the

25   affidavits aside.  What about the emails?

UNITED STATES DISTRICT COURT

33

1            THE DEFENDANT:  Yeah, the emails --

2            THE COURT:  Why is that not hearsay?

3            THE DEFENDANT:  Well, because this is the direct

4    statement from this witness and to me and my direct statements

5    to him, the same thing they're trying to use their hearsay

6    statements to charge me with, this bogus --

7            THE COURT:  So charging is another thing, being in

8    trial.  So a hearsay statement is an out-of-court statement

9    being offered for the truth of the matter that's not been given

10   under oath.  So we agree that the emails are not given under

11   oath and so they're exceptions for allowing a statement, and I

12   don't see any exception with regard to the email.  So he's not

13   an opposing party so there's not that exception.

14        But moreover than that, I'm wondering why it's relevant

15   that you folks, whatever the subject matter of the emails are,

16   is relevant to the issues in this.

17            THE DEFENDANT:  Because --

18            THE COURT:  Is he saying something different than he

19   said to you in his email?

20            THE DEFENDANT:  Well, what he's stating is

21   that -- well, in the email that he appreciates me for stopping

22   his foreclosure.

23            THE COURT:  Okay.  So it's relevant to what they

24   asked him about the foreclosure.

25            THE DEFENDANT:  Right.

                    UNITED STATES DISTRICT COURT

34

1                    THE COURT:  Okay.

2                    THE DEFENDANT:  Right.  And that he knows that what

3    I was doing was right and helping people; that, you know, I'm a

4    good -- you know, good-hearted person, my intentions are good.

5                    THE COURT:  Okay.

6                    THE DEFENDANT:  So, you know, he's just basically

7    telling me how he appreciates, you know, what I do, my fight

8    against corruption and things like that.

9           Also, it goes directly to -- 'cause the 16 of the counts

10   has to deal with him, his 12 payments and 4 of his email

11   correspondence to me.  So in order for me to defend myself

12   against these emails that they're saying is fraudulent, I can

13   show how other emails that was, you know, communication with

14   this.

15                   THE COURT:  Okay.  So I'm going to allow the emails

16   in but only Mr. Ventura's, not your emails to him because your

17   emails to him don't reflect his recorded recollection or

18   his -- his understanding at the time.  So only his part of the

19   emails come in.

20                   THE DEFENDANT:  So only his response.

21                   THE COURT:  His responses.

22          Of the affidavits, the one that's not signed --

23                   THE DEFENDANT:  Right.

24                   THE COURT:  -- can't come in.

25                   THE DEFENDANT:  I know can't come in.


                         UNITED STATES DISTRICT COURT

1          THE COURT:  The one that is signed by him can come

2    in as a recorded recollection under 803(5).  Same for this

3    affidavit of truth; as long as he verifies that's his

4    signature --

5          THE DEFENDANT:  Right.

6          THE COURT:  -- then you can offer it --

7          THE DEFENDANT:  Okay.

8          THE COURT:  -- if you're offering it as an exhibit.

9       Mr. Isaacson, you have a clarification?

10         MR. ISAACSON:  Yeah, I do, Judge.  The email you are

11   speaking of has been marked Defense Exhibit 2051.  And you do

12   have a copy.  So my understanding is if we were able to redact

13   Mr. Williams's portion of this, then you would -- that's what

14   you're speaking of?

15         THE COURT:  I would receive it into evidence over

16   the objection of the government under 803(5).

17         MR. ISAACSON:  And the affidavit is signed is

18   Defense Exhibit 2149 and that's the one we're referring to for

19   the signed affidavit.

20         THE COURT:  Correct.

21         MR. ISAACSON:  Okay.

22         THE COURT:  Now, let me just look at the notes to

23   see if it can only be read into evidence or can be received as

24   an exhibit.  It states in the rule, "If admitted, the record

25   may be read into evidence but may be received as an exhibit

1    only if offered by an adverse party."

2        So he is a witness --

3            THE DEFENDANT:  For the government.

4            THE COURT:  Mr. Ventura is a witness being offered

5    by the government.  Mr. Williams is the adverse party with

6    regard to that.  He's the one offering it into evidence.  So I

7    think that means I can receive it into evidence -- let me just

8    look at the notes real quick.  Okay.  Doesn't really talk about

9    that.  So I'm going to find that you're adverse so you can

10   offer it as an exhibit.

11       Again, so my clarification of my ruling with regard to the

12   emails, only Mr. Ventura's statements will be received over the

13   objection of the government, and only the signed affidavits

14   will be received as recorded recollection being offered by

15   Mr. Williams who's the adverse party since Mr. Ventura's being

16   called by the government.

17           THE DEFENDANT:  Okay.  So we're going to need time

18   to redact and get copies.

19           MR. ISAACSON:  Your Honor, I can either -- I don't

20   know -- we can -- Ms. Yeung's back at the office.  We could try

21   to electronically do it, have her bring it down in 15 minutes.

22           THE COURT:  I'll leave that to you, but we're going

23   to start with the witness 'cause we have the jury waiting.  So

24   he can start with something else other than the emails, but

25   when you get it to him, you get it to him.  But you need to

UNITED STATES DISTRICT COURT

1    show Mr. Yates first before you guys -- that is, show him the

2    redacted document before you can offer it.

3              MR. ISAACSON:  Yes, Your Honor.

4              THE COURT:  All right.  We're in recess and we'll

5    have Ms. Elkington get the jury.

6              (A recess was taken.)

7              (Open court in the presence of the jury.)

8              THE COURT:  And the record will reflect the ladies

9    and gentlemen of the jury, counsel and Mr. Williams.

10   Mr. Ventura is on the stand.

11      Your witness, Mr. Williams.

12             THE DEFENDANT:  Can I get the Government Exhibit 100

13   pulled up, please?

14             THE COURT:  Thank you, Mr. Sorenson.

15             THE DEFENDANT:  Yeah.  And then I'm gonna need the

16   numbers of the application.  Is that 101?  'Cause I'm gonna

17   need that and 101.  I just want the date.

18             MR. SORENSON:  That date?

19             THE DEFENDANT:  Yep.

20                          CROSS-EXAMINATION

21   BY THE DEFENDANT:

22      Q    Good morning, Mr. Ventura.

23      A    Good morning, sir.

24      Q    On the letter that was sent to you by MEI, what date

25   is that?

1      A      August 28, 2013.

2             THE COURT:  Did you want this published?

3             THE DEFENDANT:  Yes, ma'am.

4             THE COURT:  You may publish.

5      Q      (BY THE DEFENDANT:)  And do you remember what month

6      that you signed up actually, the actual month that you signed

7      up?

8      A      I don't remember, sir.

9             THE DEFENDANT:  Can we get the MEI app, your

10     government exhibit I think is 101?  I think it's the 101, yeah,

11     the MEI app that you pulled up.

12            MR. SORENSON:  Your Honor, I'm going to pull up 101.

13     Not sure what it is.

14            THE COURT:  All right.  Is that already received?

15            THE DEFENDANT:  Yes, already received in evidence.

16     It's his MEI application.

17            THE COURT:  All right.  Do you wish to publish?

18            THE DEFENDANT:  That's not it.  The MEI application.

19            MR. SORENSON:  Just the application?

20            THE DEFENDANT:  Yeah, the application.

21            MR. SORENSON:  It's 17.

22            THE DEFENDANT:  17, okay.  Okay.  I'm going to

23     publish this.

24            THE COURT:  You want to publish it?

25            THE DEFENDANT:  Yeah, the date.

UNITED STATES DISTRICT COURT

39

```
 1                THE COURT:  You may.

 2      Q       (BY THE DEFENDANT:)  Okay.  Mr. Ventura, what day

 3  did the application say that you signed up?

 4      A       Under my signature?

 5      Q       Yes.

 6      A       June 12th, 2013.

 7      Q       Okay.  So that's approximately two months from when

 8  you received the welcome letter, correct?

 9      A       Yes, sir.

10      Q       And do you remember what happened to me the next

11  month, about 16 days later from the welcome letter, September

12  13th?  Do you remember what happened to me?

13                THE COURT:  Wait.  September 13th?

14                THE DEFENDANT:  Yeah, September 13, 2013.

15                THE WITNESS:  I think --

16                THE COURT:  I'm sorry.  Wait, wait.  So you're

17  referring to Exhibit 100?

18                THE DEFENDANT:  Right.

19                THE COURT:  That letter?  That letter's dated

20  August 28th.

21                THE DEFENDANT:  Yeah, August 28th.

22      Q       (BY THE DEFENDANT:)  So 16 days later which was

23  September 13th, do you remember what happened to me?

24      A       I think that was the first time that you got

25  incarcerated.
```

1      Q      Correct.  And so when I was incarcerated, was I able

2   to complete your process because of my incarceration?

3      A      No, sir.

4      Q      Okay.  And so when I was incarcerated, who was in

5   charge of trying to assist you at that time?

6      A      It was my contact at that time.  It was Ms. Anabel

7   Cabebe.

8      Q      Ms. Anabel Cabebe.  And did you have any contact

9   with Edna Franco and Henry Malinay?

10     A      Anabel Cabebe referred me to Edna Franco.

11     Q      Okay.  And what did Ms. Franco tell you?

12     A      Would you repeat that, sir?

13     Q      What did Ms. Franco tell you?

14     A      What did --

15     Q      She talked to you.  What did she --

16            MR. YATES:  Objection.  Hearsay.

17            THE COURT:  Sustained.

18            THE WITNESS:  When --

19            THE COURT:  So don't answer the question.

20       All right.  Next question.

21     Q      (BY THE DEFENDANT:)  So you didn't have -- can I ask

22   him about the conversation?

23            THE COURT:  Yeah, it's hearsay.

24            THE DEFENDANT:  'Cause when he did it was hearsay

25   but --

41

 1              THE COURT:  So I sustained the objection, so ask him

 2    a question.

 3        Q     (BY THE DEFENDANT:)  Do you know who Edna Franco is?

 4        A     Yes, sir.

 5              THE DEFENDANT:  Okay.  And I'd like to publish 2138,

 6    Exhibit 2138.  Yes, Defense Exhibit 2138.

 7              THE COURT:  Has that been received in evidence,

 8    Ms. Elkington?

 9              THE DEFENDANT:  I don't think we received it yet,

10    this one.

11              THE COURTROOM MANAGER:  It has not, Your Honor.

12              THE COURT:  All right.  So it can't be published.

13              THE DEFENDANT:  I'll just question him first and

14    then lay the foundation.

15              THE COURT:  Yeah, sure.

16        Q     (BY THE DEFENDANT:)  Okay.  Mr. Ventura, is that

17    your signature on this document?

18        A     What exhibit, sir?

19              THE DEFENDANT:  Can he see it?

20              THE COURT:  You want him to look at 2138?

21              THE DEFENDANT:  2138, No. 18 and 19, page 18 and 19.

22              THE COURT:  Page 18 and 19?

23              THE DEFENDANT:  Right.

24              THE COURT:  So if you look at the bottom, there's a

25    tiny number on the bottom and there's a number 18.

UNITED STATES DISTRICT COURT

```
 1              THE WITNESS:  Okay.  On the bottom of the last page?
 2              THE COURT:  On the bottom of each document.
 3              THE WITNESS:  Oh, each document.
 4              THE COURT:  There's a long number and the last two
 5  numbers are 1-8.
 6              THE COURTROOM MANAGER:  Your Honor, there is no 1-8
 7  on this.
 8              THE COURT:  If you --
 9              THE WITNESS:  That's the one?
10              THE COURT:  If you look on the -- all right.  It's
11  before the witness.
12      Q      (BY THE DEFENDANT:)  Okay.  And can you verify your
13  signature, Mr. Ventura?
14      A      Yes, sir, that is my signature.
15      Q      And what is the title of this document?
16      A      It's a affidavit of truth.
17      Q      Okay.  And what day did you sign this affidavit of
18  truth?
19      A      That was in May 13th.
20      Q      What year?
21      A      Uhm, 2015.
22      Q      Okay.  I'm gonna just ask you a few questions in
23  regard to this affidavit that you had notarized in 2015.  In
24  this affidavit, did you state that Edna Franco paid
25  you -- well, you paid her $2500 in cash without ever receiving
```

1   a receipt for your payment?

2        A     Yes, sir.

3        Q     And did you try to call Edna Franco, Henry Malinay

4   on numerous occasions but no one ever answered the calls or

5   texts?

6        A     I did try.

7        Q     And did they ever answer?

8        A     Never get answer because my contact was Anabel

9   Cabebe.

10       Q     Okay.  So you never got to talk to Henry or --

11       A     I never did.

12       Q     Okay.

13             THE COURT:  Okay.  Wait.  You have to wait till he

14   finishes his question, okay, Mr. Ventura?  And then he'll wait

15   for you to finish your answer.

16             THE WITNESS:  Sorry, ma'am.

17             THE COURT:  No problem.

18        Go ahead, ask another question.

19       Q     (BY THE DEFENDANT:)  And did Edna Franco and Henry

20   Malinay, did they promise you that they could save your home

21   from foreclosure when I was incarcerated, according to your

22   sworn statement?

23             MR. YATES:  Your Honor, we're referring to this

24   document as if it's in evidence and it's not and so it's not

25   clear what the purpose of this document is.  And if it's for

UNITED STATES DISTRICT COURT

44

1    refreshment purposes only, then it's improperly being used.

2                    THE DEFENDANT:  It's just --

3                    THE COURT:  So he's asking him -- I don't think he's

4    using the document.  Overruled.

5                    MR. YATES:  He just referred -- oh, sorry.

6                    THE COURT:  So what are you asking him?  Is that

7    what he stated in the document?

8                    THE DEFENDANT:  Right.

9                    THE COURT:  Or is that what he remembers?

10   Q     (BY THE DEFENDANT:)  Is that what you remember you

11   stated in the document?

12                   THE COURT:  Okay.  So you can ask him if he

13   remembers.

14                   THE DEFENDANT:  Okay.

15                   THE COURT:  Okay?  If you're going to put the

16   document in, then you have to ask for it to be moved in.  But

17   you can ask him what he remembers.  If he doesn't remember it,

18   then you can use -- you can either refresh his recollection or

19   you can ask that this be entered into evidence as a recorded

20   recollection that he doesn't remember now but he knew at one

21   time.

22   Q     (BY THE DEFENDANT:)  Okay.  Do you remember doing

23   this affidavit, Mr. Ventura?

24   A     Yes, sir.

25                   THE DEFENDANT:  Okay.  Now, I would like to enter it

UNITED STATES DISTRICT COURT

1   in as evidence.

2            THE COURT:  No.  You can ask him if he remembers any

3   of the things.  If he does remember it, then we don't enter it

4   in.  If he doesn't remember it, then we can enter it in.  It

5   only comes into evidence if he had a recollection at one time

6   and he doesn't remember it now and his memory was better then,

7   then we can receive it in.

8        So you can ask him each of these things and, you know, if

9   he remembers it, then it doesn't come in.

10           THE DEFENDANT:  Okay.

11      Q    (BY THE DEFENDANT:)  Do you remember that Edna

12  Franco had already been sanctioned by the DCCA?  Do you

13  remember that?

14      A    I remember that.

15      Q    Okay.  And did you remember that Edna and Henry set

16  up a fraudulent company, tried to name it like mine?  Did you

17  remember that?

18      A    I heard about it.

19      Q    Okay.  You heard about it but you don't remember all

20  the --

21      A    I don't remember.

22      Q    Okay.  Did you make a complaint to the FBI against

23  me or MEI or CLOA for fraudulent names or deceiving you or

24  anything like that?

25      A    No, sir.

1          THE DEFENDANT:  Okay.  Defense Exhibit 2149.

2          MR. YATES:  Your Honor, I do object to this exhibit

3   even being shown to the witness until he establishes the

4   foundation for that previous hearsay exception recorded

5   recollection refreshed.

6          THE COURT:  Okay.  So --

7          THE DEFENDANT:  Well --

8          THE COURT:  -- he's not offering it into evidence

9   yet.  So it's only if he doesn't remember will we get into the

10  document.

11         MR. YATES:  Understood.  But it's currently being

12  shown to the witness and it seems like if it's not going to be

13  introduced into evidence, it's not properly before the witness

14  even for the purposes of this exception until the foundation is

15  laid that the defendant does not recall the specific --

16         THE COURT:  Which is ironic because if he doesn't

17  remember, it's going to come in.  But if it's in front of him

18  and he testifies about it -- I don't know if it refreshes his

19  recollection.  So you don't want it shown to him?

20         MR. YATES:  Correct, Your Honor, that is the rule.

21         THE COURT:  Okay.  So you're right.  So this can't

22  be shown to him right now.  You can ask him questions.  If he

23  doesn't remember, then I'll receive it into evidence and then

24  you can question him.

25         THE DEFENDANT:  Okay.

UNITED STATES DISTRICT COURT

47

1      Q      (BY THE DEFENDANT:)   Mr. Ventura, do you remember

2   doing another affidavit after this affidavit?

3      A      What was that question again, sir?

4      Q      Do you remember doing another affidavit after you

5   did the 2015 affidavit?

6      A      No, sir.

7             THE DEFENDANT:  Okay.  Now I would like to enter it

8   in.

9             THE COURT:  Okay.  So do you want to refresh his

10   recollection or you're asking -- okay.  He just doesn't

11   remember the affidavit, but it's the contents of the affidavit

12   that you want to get in.

13            THE DEFENDANT:  Right.  I want it in as an exhibit.

14            THE COURT:  I know, but you can't get the contents

15   of the affidavit in until he says he doesn't remember it but he

16   knew it at one time.  Okay?

17      So what is in here that you want to get into evidence you

18   can ask him.  Just because he doesn't remember signing another

19   affidavit doesn't mean that he doesn't remember the facts

20   contained in the affidavit.  So for you to get the facts

21   contained in the affidavit, he has to now say he doesn't

22   remember.

23            THE DEFENDANT:  Okay.

24      Q      (BY THE DEFENDANT:)   Do you remember filling out an

25   affidavit regarding the email communication that you and I had?

UNITED STATES DISTRICT COURT

48

1      A      Did you send me an email?

2      Q      Yeah.  Do you remember doing the affidavit regarding

3  the email or do you remember what email it was regarding?

4      A      No, sir.

5      Q      Okay.  Do you remember stating in the email that

6  MEI, me, or CLOA didn't commit mail or wire fraud against you?

7  Do you remember that?

8      A      No, sir.

9             THE DEFENDANT:  I would like to move it into

10  evidence.

11             THE COURT:  All right. So -- yeah, all right.  So

12  based on the prior ruling by the court that you've established

13  that he doesn't have -- he had a recollection at one time and

14  he doesn't have one now, so I'm going to receive Exhibit 2149

15  into evidence over the government's objection.

16             THE DEFENDANT:  And I'd like to publish it.

17             THE COURT:  You may publish.

18             (Exhibit 2149 received into evidence.)

19      Q      (BY THE DEFENDANT:)  Okay.  Mr. Ventura --

20             THE COURT:  It's not published to the jury yet.

21             THE DEFENDANT:  Okay.

22             THE COURT:  Okay.  Now it is.

23      Q      (BY THE DEFENDANT:)  Do you still reside at 94-730

24  Kuhaulua Place, Waipahu, Hawaii?

25      A      Yes, sir.

UNITED STATES DISTRICT COURT

1    Q    Okay.  And did you ever contact the FBI or DCCA and

2  make a complaint against me, MEI, or CLOA?

3    A    No, sir.

4    Q    And the payments that you were sending to MEI,

5  didn't you understand that that was to help fight your

6  foreclosure that you were in at that time?

7    A    Yes, sir.

8    Q    And the quarterly statement that was sent to you

9  that you received from MEI, you did understand that those were

10  not false; they just reflected your balance that you would owe

11  if you was able to complete the program?

12    A    That is from my understanding sir.

13    Q    Okay.  Now, you do understand the email that we had

14  regarding your December payment in November 23rd that there was

15  nothing fraudulent about the email that you sent me in

16  November, correct?

17    A    Yes, sir.

18    Q    Okay.  And was there anything fraudulent about the

19  response I sent you regarding you not have to make -- you

20  didn't have to make that December payment?

21    A    Would you repeat that again, sir?

22    Q    Was there anything fraudulent about my response

23  email telling you that you didn't have to make that December

24  payment?

25    A    Uhm, I thought it was -- it was okay.

UNITED STATES DISTRICT COURT

1        Q       Okay.  And there was nothing fraudulent about your

2    response that you sent to me on the following -- response to

3    the email, correct?

4        A       Yes, sir.

5        Q       Okay.  And do you support my fight for the people to

6    get justice in the courts?

7        A       For all these years, sir, I have known you, sir, I

8    believe in you.  I have trusted you all these years.

9        Q       Okay.

10       A       Not until I -- I have a meeting with my first

11   pretrial interview when they asked me the questions that did

12   this -- didn't this occur to your mind that the -- that your

13   signature on a documents -- the signature on the documents

14   is -- signature of the documents is a seal of your agreement to

15   pay the loan.

16       Q       And who told you that, Mr. Ventura?

17       A       The prosecutors.

18       Q       And are they in the courtroom today?

19       A       Yes, sir.

20       Q       And could you point them out?

21       A       Uhm, Mr. Gregg.

22       Q       He was the only one?

23       A       Yes.

24       Q       Okay.  So prior to you talking to them or prior to

25   them tampering with you, they -- you would -- had a different

1   view?

2              MR. YATES:  Objection to the characterization.

3              THE COURT:  All right.  Rephrase the question.

4   Don't use the word "tamper."

5        Q    (BY THE DEFENDANT:)  So prior to them telling you

6   about your signature as a seal or to that effect, you had a

7   prior different belief?

8        A    Yes.

9        Q    Now --

10       A    I --

11             THE COURT:  Wait.  Let him finish his answer.

12             THE DEFENDANT:  I'm sorry.  Go ahead.

13             THE WITNESS:  Yeah.  In fact, sir, I was even

14   defending you at first.  But when that question asked and

15   thought of myself being a Christian, it just like slapped me in

16   the face and I'm ashamed of it because it's true.  That is my

17   signature and that is a -- my promise to pay off the loan.  So

18   that's when I changed -- I changed my perspective of the whole

19   situation, sir.

20       Q    (BY THE DEFENDANT:)  So, Mr. Ventura, so if you were

21   loaned lawful money by someone, you believe you should pay it

22   back, correct?

23       A    Of course, yes.

24       Q    Okay.  Now, if someone told you that they loaned you

25   some money and they deceived you into thinking that you were

52

1   loaned some money and they actually didn't loan you money,

2   would you feel guilty?

3      A   If there is a documentation where I signed a

4   document that proved that I'm liable, whatever, money that lend

5   to me.

6      Q   Right.  But what I'm asking you is that if you found

7   out that it was fraudulent, that they deceived you into

8   thinking that you were actually loaned funds, then would you

9   feel that guilt?

10     A   I still feel guilty 'cause they loaned me that

11  money.

12     Q   That's what I'm asking you.  If you found out that

13  they didn't loan you money, though you thought they loaned you

14  money, if you found out that it was a fraud, that they actually

15  didn't loan you any money, now would you feel guilty about not

16  paying someone that didn't loan you a dime?

17        MR. YATES:  Asked and answered.

18        THE COURT:  Overruled.  Do you --

19        THE WITNESS:  If it's a fraud and they did -- let me

20  just put it this way, sir.  I have a house.

21        THE DEFENDANT:  Uh-huh.

22        THE WITNESS:  They lent me that money.  So even if

23  it's a fraud, I still liable for that money because of my

24  house.  Without that money that they lend me, I wouldn't be

25  able to have my house.

 1      Q      (BY THE DEFENDANT:)   Okay.  I'm going to come

 2   back --

 3      A      So just like going around finding a way not to pay

 4   the loan.  It's just like robbing a bank.

 5      Q      So you feel that once fraud is exposed, that you

 6   still liable to still pay back the bank even though it was

 7   fraudulent?

 8      A      Yeah, because of the house.  I still have the house.

 9      Q      Right.  But you didn't --

10      A      Yeah.

11      Q      But you didn't feel that way until after you talked

12   to the prosecutors, until the prosecutor called you and had you

13   come to the office; is that correct?  That's when you felt like

14   that, correct?

15      A      Uhm, would you repeat that again, sir?

16      Q      Well, you didn't have that feeling, you didn't feel

17   that way until after you went to the prosecutor's office and

18   they told you what they told you, correct?

19      A      After I was already -- I was already guilty, sir,

20   what has been going on.

21      Q      Well, I'm saying --

22      A      And I feel guilty already because, you know, like I

23   said, you know, I been very active in the church.  I know what

24   the Bible teach me, and when I see those things, I read some

25   things like pertaining to borrowing money, you know, that's

1    when I feel guilty.  I think about, you know, what I have done

2    and I feel guilty.  Oh, yeah, they lent me the money, you know,

3    I have a house.  There's no such thing as having a free home.

4    You have to pay for it, sir.

5         Q    Let me ask you this question:  When you got your

6    home -- right? -- did you see the check that the bank said they

7    loaned you?

8         A    I did not.

9         Q    Did you ask for verification of the check that they

10   said they loaned for your house?

11        A    I did not.

12        Q    Do you remember me filing documents against the bank

13   on your behalf when we was fighting your foreclosure?

14        A    Yes.

15        Q    And do you remember one of the questions I would ask

16   the bank is if you loaned my client lawful money, produce the

17   bank statement that shows you debited this money to purchase

18   his house on behalf of my client?  Do you remember that was one

19   of the questions and the answers and admissions?

20        A    Yeah.  But that it doesn't matter because of my

21   signature.  I am liable to that loan --

22        Q    Right.

23        A    -- because of my signature.  It's my face on there,

24   sir.

25        Q    I understand that.

UNITED STATES DISTRICT COURT

1      A      It's my face on that -- you know, that document that

2   I signed.  That's why it make me feel guilty and feel like I'm

3   hypocrite.  If you see me, I'm walking around with my shirt,

4   the Church of Christ.  I feel guilty.

5      Q      Do you remember what the bank's answer was to that

6   question about loaning them money?

7      A      Well, all those questions you asked the bank they

8   could not provide you, they could not answer you.

9      Q      Correct.  Now I'm going to come back to this

10  affidavit.  I want you to look at this.  This is a note

11  that --

12             THE COURT:  Wait.  What exhibit is this?

13             THE DEFENDANT:  This is Exhibit 2042, page 7, 8, and

14  9.

15             THE COURT:  Okay.

16             THE COURTROOM MANAGER:  Your Honor, it's not in

17  evidence.

18             THE COURT:  Okay.

19      Q      (BY THE DEFENDANT:)  Now, when you got your

20  mortgage, who was the mortgage by?

21      A      Who was the mortgage?

22      Q      Yes.  Who is -- like when you -- when the

23  foreclosure was filed against you, what company was trying to

24  foreclose you on your home that I was fighting?

25      A      What company that filed the foreclosure?

UNITED STATES DISTRICT COURT

```
1        Q       Right.

2        A       It was National City or PNC.  I don't remember, sir.

3   PNC Mortgage I think.

4        Q       PNC Bank?

5        A       Yeah.

6        Q       Now, do you recognize this note that you signed?

7        A       Yes.

8        Q       Okay.  And can you look at the third page, page 9.

9   Is that your signature?

10       A       Yes, sir.

11       Q       Now, when you signed this note, Mr. Ventura, did it

12  have all those stamps on there?

13       A       It wasn't there.

14       Q       Okay.  So these stamps were put on there after you

15  signed this note?

16               MR. YATES:  Your Honor, it appears that we're now

17  talking about the document itself as if it were in evidence.

18  So we do ask that either it be moved into evidence or that we

19  ask that the document be taken down.

20               THE DEFENDANT:  I'd like to move it into evidence.

21               THE COURT:  All right.  Received.  Do you want to

22  publish?

23               THE DEFENDANT:  Yes, I'd like to publish.

24               THE COURT:  Okay.  You may publish.

25               (Exhibit 2042 received into evidence.)
```

UNITED STATES DISTRICT COURT

1        Q       (BY THE DEFENDANT:)  So when you signed the note,

2    there was none of this stamp nowhere?

3               THE COURT:  Yes, that's what he testified, yes.

4    What's the next question?

5               THE WITNESS:  None were there.

6               THE COURT:  What's the next question?  He's already

7    answered twice.

8        Q       (BY THE DEFENDANT:)  Do you know what it means when

9    they put paid to the order of on a promissory note that you

10   signed?

11       A       According to your explanation before it was -- it's

12   been cast out.

13       Q       Well, do you remember what I explained to you all

14   what that means when a bank paid to the order of themselves on

15   a note?  Do you remember the conversation?  I know it's been a

16   while.  It's been about, what, 2013, 2015 --

17              THE COURT:  So the question -- you need to ask one

18   question at a time.

19       Do you remember what he told you about what it means when

20   somebody stamps it like that?

21              THE WITNESS:  Yes, I remember, but I can't remember

22   exactly how you explained it.  But for my understanding is that

23   that means they sold -- they sold the note.

24       Q       (BY THE DEFENDANT:)  Okay.  So when they put the

25   paid to the order stamp on there --

 1              THE COURT:  All right.  So why is this relevant to

 2     anything?  What is it relevant to with regard to it?  So we

 3     have the note.  What questions do you want to ask him about it?

 4              THE DEFENDANT:  Well, 'cause --

 5              THE COURT:  He told you what his understanding is.

 6     So what's the question you want --

 7              THE DEFENDANT:  Because he's saying he felt guilty

 8     and I'm showing that he was never loaned anything.  I'm showing

 9     him what the process what the banks do in the fraud that I was

10     exposing.

11              THE COURT:  I don't want you testifying about that.

12     Ask him a question within his own knowledge.  He's told you how

13     he feels and why he feels it.  All right.

14        Q     (BY THE DEFENDANT:) So did the prosecutors explain

15     to you when they talked to you that Tuesday that when a bank

16     put the paid to the order stamp on that, that that created the

17     funds for the loan?  Did they explain that to you?

18        A     No, it was not.

19        Q     Did any attorney that you ever talked to explain to

20     you that when the bank put a paid to the order stamp on that

21     note, that that creates the fund from your signature to

22     actually finance your own loan?

23        A     No, sir.

24        Q     All right.  So you don't know -- you haven't done

25     the research to see that that's actually the process of what

59

1    happens, correct?

2        A     No.  But it doesn't matter, sir.  It doesn't matter.

3    Like I said, my signature on there.  So I don't care what the

4    bank would do already.  You know, everybody wants to makes

5    money.  So I don't care what they're going to do after a while.

6    My signature, that's what makes me guilty because I signed the

7    document honestly, I made my -- I promised to pay it back

8    through my signature.  That's what make me feel guilty.

9        Q     Okay.  Now, earlier you said that you had did some

10   research about the strawman, correct?

11       A     Yes.

12       Q     And what is your understanding of what a strawman

13   is?

14       A     My understanding is there is a way you could have a

15   house free and clear.  Like I said, it's a complex process.

16   But there is a way how you could do that.  And that's the

17   reason why I -- you guys got me convinced because I already

18   watched that before I met Mr. Henry Malinay.  I already know

19   what you guys talking about.

20             But like I said, just recently it dawned into my

21   mind that, you know, no matter what, it's still wrong because I

22   signed.  That's my signature on there on the document.

23       Q     Right.

24       A     That represent me who I am.  It's my face on there.

25       Q     Right.  Now, did you know that when you signed on

UNITED STATES DISTRICT COURT

 1    there, that you're not getting the house -- nothing for

 2    nothing -- that you created the funds for the loan?  Do you

 3    understand that?  That you're not getting it for nothing, the

 4    funds were created by you?  Do you understand that?

 5        A    I understand.  But like I say, it won't matter any

 6    more because of the signature.

 7        Q    So during the -- when you met me, did you get to go

 8    on the website, my website?  Did you --

 9        A    I did.

10        Q    Okay.  Now, when you went on the website, was there

11    a lot of informative information on the website?

12        A    There is.

13        Q    And did you see any of the videos that I posted of

14    me in court representing other clients in other states on the

15    website?

16        A    Not on the website.

17        Q    Well, where did you go at?

18        A    On YouTube there is.

19        Q    So you went on YouTube and you saw videos of me in

20    court assisting other clients in other states and in Hawaii,

21    correct?

22        A    Yes, sir.

23        Q    And did you see the video that I went to the FBI

24    office?

25        A    I did.

                    UNITED STATES DISTRICT COURT

1      Q      Okay.  And do you remember why I went to the FBI

2   office?  Do you remember the contents?

3              MR. YATES:  Objection.  Relevance.

4              THE COURT:  Yeah.  What's the relevance?

5              THE DEFENDANT:  Because they're charging me with

6   mail and wire fraud from my business and that's what I went to

7   the FBI to confront them about.

8              THE COURT:  All right.  So sustained.  It's not

9   relevant with regard to his direct testimony.  So ask another

10  question, please.

11             THE DEFENDANT:  Well, I mean, he actually saw the

12  video.

13             THE COURT:  Yes, but it's not relevant to his

14  testimony.  So go ahead and ask another question.

15     Q      (BY THE DEFENDANT:)  So when you saw the video, did

16  you see how I represented myself and confronted the FBI?

17             MR. YATES:  Objection.

18             THE COURT:  Yeah, sustained.  The jury is reminded

19  that questions by Mr. Williams and counsel is not evidence and

20  they will disregard his question.

21        All right.  So ask another question.

22     Q      (BY THE DEFENDANT:)  Did you see the video of me

23  presenting my private attorney general ID to the TSA?

24             MR. YATES:  Objection.  Relevance.

25             THE COURT:  Sustained.  Ask another question.

UNITED STATES DISTRICT COURT

1           THE DEFENDANT:  They made so much about my ID being

2    fake and so this is a eyewitness that saw the video of me --

3           THE COURT:  Yes, but that doesn't mean that it's

4    valid.  It just means that he saw a video.  You can watch

5    videos of anything.  So it's not relevant to Mr. Malinay -- I'm

6    sorry -- Mr. Ventura's testimony today on direct examination.

7    You can can ask him questions about his mortgage, his knowledge

8    of you, your interactions.

9        So please ask --

10       Q     (BY THE DEFENDANT:)  Mr. Ventura, have you done your

11   own independent research regarding debt and credit rights for

12   consumers?

13       A     No, sir.

14       Q     You've never done any research?

15       A     No.

16       Q     So what kind of research have you done?

17          THE COURT:  He's just testified he hasn't done any

18   research.

19          THE DEFENDANT:  I'm saying that was on credit.  But

20   I'm asking him what kind of research have you done in regards

21   to mortgages, notes, 'cause you said you had seen a movie or

22   something -- you had said you had seen an *Inside Job* or movie

23   or something like that.

24          THE WITNESS:  Yes.

25          THE DEFENDANT:  Okay.

1              THE WITNESS:  I'm -- I'm -- in the beginning I'm

2    doing a research because of my issues.  I'm doing research

3    because I want to find a way how to get away from it, how to be

4    able to defend myself when I'm -- to defend myself with

5    the -- with the issues that I'm already on.

6        Q    (BY THE DEFENDANT:)  Okay.  Now, do you remember a

7    motion that I filed for you that the court issued -- well, that

8    the banks filed a motion for protective order against me?  Do

9    you remember that?

10       A    Yes, sir.

11       Q    And do you remember that the order asked the court

12   to strike the motion that I filed so the bank wouldn't have to

13   answer me?

14       A    Yes, sir.

15       Q    And did I always promptly answer any motions that

16   the bank filed against you for foreclosure?

17       A    Would you repeat that, sir?

18       Q    Did I always promptly file a response to any motion

19   that the bank filed against you?

20       A    Yes, sir.

21       Q    And have you come to know me that I'm also a avid

22   believer in the Bible?

23       A    Yes, sir.  That's why -- that's why every now and

24   then I called you brother because of our -- our understanding

25   about the Bible, although we disagree on some belief.

                    UNITED STATES DISTRICT COURT

64

1      Q    All right.

2      A    Some doctrines.

3      Q    Uh-huh.  Now, and so now that you've known me, is it

4    safe to say that you know that everything I do, I do based on

5    my faith?

6      A    Yes.

7      Q    And since you've come to know me, in your own

8    personal experience am I a man of integrity?

9      A    Yes.

10     Q    And am I a man if I promise you I'm going to do

11   something, I'm going to do just that?

12     A    Yes.

13     Q    Okay.  And am I someone that you saw championed and

14   stand up for the rights that people that can't stand up for

15   themselves?

16     A    Yes.

17     Q    Now, I'm going to bring your attention to a motion

18   that I had filed.  This is Defense Exhibit 2042.

19          Does the government have any objection to me

20   publishing this?

21          THE COURT:  You want to enter it into evidence?

22          THE DEFENDANT:  Enter into evidence.

23          THE COURT:  Any objection?

24          MR. YATES:  I need to see this document.  I

25   apologize.  One moment, please.

1          So we do object.  This is -- it appears to be a document

2    filing -- out-of-court document filing.  It's not clear what

3    the relevance is to this proceeding.

4               THE DEFENDANT:  Well, it's filed in court.

5    Actually, it's a court document.

6               THE COURT:  Right.  So what's the relevance to this

7    case?

8               THE DEFENDANT:  That this is one of the documents

9    that I would file to fight his foreclosure, you know, so to

10   assist him in staying in his home.  This is one of the -- this

11   is actually the first document that I would file to the

12   complaint.  This is the answer to the complaint.

13              THE COURT:  I understand what it is, but why is that

14   relevant to the claims in this case?  We're not -- we're

15   not -- this is not a trial about the foreclosure.

16              THE DEFENDANT:  Well, they're charging me and saying

17   that I misrepresented what I could do for the clients, and I'm

18   showing what I actually did and I had a lawful authority to do

19   what I did to assist them in staying in their homes.

20              THE COURT:  Right.  But where -- so point out to me

21   where on this that indicates that you did this.  It doesn't

22   have your name on it.

23              THE DEFENDANT:  No.  I'm fixing to ask him was I the

24   one that drafted this for him.

25              THE COURT:  So you could just ask him if you drafted

1   legal documents for him, but we don't need to receive it

2   because your name isn't anywhere on this document.

3            THE DEFENDANT:  Well, I mean --

4            THE COURT:  It's just going to be his testimony

5   about it, so for me to receive it into evidence doesn't serve

6   any purpose.  But you can ask him if you drafted things for him

7   to file.

8            THE DEFENDANT:  Okay.

9            THE COURT:  So the objection is sustained.  But you

10  can ask a question.

11       Q    (BY THE DEFENDANT:)  Okay.  Is this one of the

12  motions that you can recognize that I filed on your behalf,

13  Mr. Ventura?

14       A    Yes, sir.

15       Q    And can you see how many pages this was -- how many

16  pages it was?

17            THE COURT:  I'm sorry.  So what's your question?

18  Does he know how many pages are on that document?

19            THE DEFENDANT:  Right, on that document.

20            THE WITNESS:  I don't remember how many pages, sir.

21       Q    (BY THE DEFENDANT:)  Okay.  Now, when I would draft

22  documents for you, did I give you a copy of the document that I

23  draft?

24       A    You did.

25       Q    And so you was able to review, peruse, and look at

1    the laws that I would put in the document to assist you in

2    fighting the foreclosure, correct?

3         A    Yes, sir.

4         Q    So I never just drafted something and didn't notify

5    you so you could actually see what I was filing?

6         A    No.

7         Q    Okay.  So everything that I did for you was what I

8    contracted to do for you?

9         A    Yes, sir.

10        Q    And the only reason you didn't get to finish the

11   actual process is because of my illegal incarceration which was

12   16 days after you was formally welcomed to the MEI program,

13   correct?

14        A    Yes.

15        Q    And you are familiar with Rosy Thomas?

16        A    Yes.

17        Q    And who is Rosy Thomas?

18        A    It's someone that I met later.

19        Q    And is she a client of mine?

20        A    Yes.

21        Q    And did I also fight her foreclosure?

22        A    Yes.

23        Q    And did I also fight her mom's foreclosure?

24        A    Yes.

25        Q    And is her mom and her still in their home?

UNITED STATES DISTRICT COURT

1          A     Yes.

2          Q     Okay.  And if I hadn't of helped you with the

3    foreclosure, do you think that the bank would have foreclosed

4    on your house?

5          A     Yes.

6                THE DEFENDANT:  Okay.  Now, the UCC, what was

7    the -- you all exhibit number, his UCC document?

8                MR. SORENSON:  17, I believe?

9                THE DEFENDANT:  I think it's 100.  Yeah, blow up

10   the -- yeah.

11         Q     (BY THE DEFENDANT:)  Okay.  Mr. Ventura, you did

12   some -- little research on what a strawman is, correct?

13         A     Yes.

14         Q     Okay.  Now, when the UCC was done, do you remember

15   explaining -- me explaining to you that the strawman is really

16   the all capital letters name that you have like on your

17   driver's license and things like that?

18         A     Yes, sir.

19         Q     Okay.  So when the UCC was filled out, it was

20   supposed to have been filled out where the all capital letters

21   name is the debtor and the upper case lower case name is the

22   secured creditor?

23         A     Yes, sir.

24         Q     Okay.  Can you look at the date when this document

25   was filed?

1      A      I don't see -- I don't see the date on there.

2      Q      It should be at the top.  Okay.  Can you see that

3   date?

4      A      Yes.

5      Q      Now, on December 4th of 2013, I was still

6   incarcerated, correct?

7      A      You were incarcerated, but I think you were -- you

8   got off temporarily.  That's the reason why that was the time

9   that you did the filing.

10     Q      Well, now, Mr. Ventura, if you remember correctly, I

11  didn't get out still September 2014.

12     A      2014.

13     Q      Right.  Do you remember?

14     A      I don't remember that.

15     Q      Okay.  Do you remember me refiling the UCC in its

16  proper form?

17     A      Yes.

18            THE DEFENDANT:  Okay.  Defense Exhibit 2043, I'd

19  like to enter this into evidence?

20            THE COURT:  Any objection?

21            THE DEFENDANT:  UCC lien.

22            MR. YATES:  No objection.

23            THE COURT:  All right.  Received.

24            (Exhibit 2043 received into evidence.)

25            THE DEFENDANT:  I'd like to publish it.

UNITED STATES DISTRICT COURT

70

1              THE COURT:  You may publish.

2         Q    (BY THE DEFENDANT:  And can you see the UCC form,

3    Mr. Ventura?

4         A    Yes.

5         Q    Okay.  On the top it has individual surname and it

6    has your name in all capital letters, correct?

7         A    Yes, sir.

8         Q    And that's part of under where it says debtor name,

9    correct?  You see --

10        A    Yes, sir.

11        Q    Okay.  Now, can you turn to the second page?  And

12   you see where number 11 -- can you see number 11?

13        A    Yes.

14        Q    And it says Additional Secure Party's Name, correct?

15        A    Yes, sir.

16        Q    And how was your name spelled in that box?

17        A    It's spelled capital letter and lower case.

18        Q    Right.  So in your research of the strawman and the

19   secure party, the secure party wouldn't be the all capital

20   letters name, correct?

21        A    Yes.

22        Q    It would be the upper case lower case, correct?

23        A    Yes.

24        Q    And do you remember this is the reason why I had to

25   redo this because it was done wrong by Edna and her team?

1       A      Yes.

2       Q      Okay.  Now, on the mortgage that you got with the

3  bank, did you sit down -- did you ever read your mortgage,

4  Mr. Ventura?

5       A      It was explained, but I didn't really read it.

6              THE DEFENDANT:  Okay.  I'd like to -- Exhibit 2042

7  starting at page 10, I'd like to publish and enter it into

8  evidence.

9              THE COURT:  Any objection to receiving it into

10  evidence?

11             THE DEFENDANT:  This is his actual --

12             MR. YATES:  What document is it?

13             THE DEFENDANT:  It's 2042 and it starts at page 10.

14             MR. YATES:  Through what?

15             THE DEFENDANT:  10 through 25.

16             THE COURT:  You only want that portion of the

17  exhibit received?

18             THE DEFENDANT:  No, the whole mortgage.

19             THE COURT:  But those pages?

20             THE DEFENDANT:  Yeah.

21             THE COURT:  10 through --

22             THE DEFENDANT:  Right.

23             THE COURT:  What I'm saying is you identified many

24  pages under 2042.

25             THE DEFENDANT:  Right.

UNITED STATES DISTRICT COURT

1          THE COURT:  But you're not seeking to admit the

2   entire document?

3          THE DEFENDANT:  No, not the entire.

4          THE COURT:  You only want the note.

5          THE DEFENDANT:  Yeah, just the mortgage from 10 to

6   25 'cause this is his actual mortgage.

7          THE COURT:  Don't testify what it is.  I'm just want

8   to clarify that.  Okay.

9          MR. YATES:  So with the understanding that it's just

10  2042 pages 10 through 25, the government has no objection.

11          THE COURT:  All right.  So that portion of 2042 will

12  be received, just that part.  All right?

13      So that's in evidence.  Do you wish to publish?

14          THE DEFENDANT:  Yes.

15          THE COURT:  All right.  You may publish.

16          (Exhibit 2042 pages 10-25 received into

17          evidence.)

18      Q    (BY THE DEFENDANT:)  Okay.  Mr. Ventura, is this the

19  copy of the mortgage that you signed with the bank?

20      A    Yes, sir.

21      Q    Okay.  And can you turn to page 17 of your mortgage?

22      A    Number 17?

23      Q    Yes, sir.

24          THE COURT:  It's the one on the screen in front of

25  you.

73

1          THE WITNESS:  Okay.

2          THE COURT:  Is there a particular part of it you

3    want him to look at?

4          THE DEFENDANT:  Yes.  It's going to be paragraph 10,

5    mortgage insurance.

6          THE COURT:  All right.  Can you see that on the

7    screen?  There's a number 10 and there's a title says Mortgage

8    Insurance?

9          THE WITNESS:  Yes, ma'am.

10          THE COURT:  What's your question?

11     Q     (BY THE DEFENDANT:)  Okay.  So when you made your

12    mortgage payment, did the bank outline what constitute your

13    full payment to the bank?

14     A     No.

15     Q     Like, do you remember getting like a loan statement

16    or a payment statement every month from the bank?

17     A     Yes.

18     Q     And do you remember like usually it's on the

19    right-hand say -- it'll say principal, interest, taxes,

20    insurance, and then it will constitute the payment?  Do you

21    kind of remember that?

22     A     Yes, sir.

23     Q     Now, did you know what the insurance part of your

24    payment was for?

25     A     The insurance is to cover any structure damage.

UNITED STATES DISTRICT COURT

74

1      Q     No, no.  That's -- that's separate --

2            THE COURT:  No, no.  So that's his understanding,

3   okay?  So that's what he understood.

4       Now ask another question.

5      Q     (BY THE DEFENDANT:)  Okay.  Do you know the

6   difference between property insurance and mortgage insurance?

7      A     Yeah.  Property insurance is -- that's what cover

8   the -- whatever damages that may occur in the property.

9      Q     Correct.  Now, do you know what mortgage insurance

10   is?

11     A     Mortgage insurance that was supposed to cover the

12   mortgage in case of death in the family.

13     Q     Okay.  This is in your mortgage.  Can you look at

14   paragraph 10?

15     A     Yes.

16     Q     You see where it says Mortgage Insurance?  Can you

17   read that, just that first --

18           THE COURT:  No, I'm not going to have him read.

19   It's in evidence.  What question do you want him to answer

20   regarding this section?

21     Q     (BY THE DEFENDANT:)  Did you know that mortgage

22   insurance was actually a part of your loan?

23     A     Yes.

24     Q     Okay.  So did you know that the mortgage insurance

25   actually protected the bank from if you ever defaulted on the

 1   loan?

 2              MR. YATES:  Objection.  Testifying.

 3              THE WITNESS:  Yes.

 4              THE COURT:  All right.  Overruled.  Okay.  So he did

 5   know that.  So what's the next question?

 6        Q    (BY THE DEFENDANT:)  Okay.  So when you defaulted on

 7   your loan and didn't pay it, did you know that the insurance

 8   paid the bank the amount -- full amount of the money that they

 9   said they loaned you?  Did you know that?

10        A    Yes.

11        Q    Okay.  So if you knew they paid the full amount of

12   the insurance and that you were the one that paid the premium,

13   why would you feel guilty when now you already paid off the

14   loan?

15        A    Once again, like I said, you know, they lent me the

16   money and Psalm -- Psalm 37 verse 21 says, "A wicked man

17   borrows but does not pay."  So I'm still liable to whatever

18   loan that they loaned me.  It doesn't matter.

19        Q    Okay.  Let me put it this way --

20        A    'Cause -- 'cause like I said, that it's my face on

21   there.

22              THE COURT:  All right.  So ask another question.

23   I'm not going to -- no, you can't ask questions on this.  He's

24   already answered you several times about why he feels guilty.

25   This is not an opportunity to change his mind.

UNITED STATES DISTRICT COURT

1          THE DEFENDANT:  I'm not trying to change his mind.

2          THE COURT:  Ask him about what he testified in

3   direct or anything to do with this case.

4     Q     (BY THE DEFENDANT:)  Okay.  So you have a car, a

5   vehicle, correct?

6          THE COURT:  Not going to let you ask him those

7   questions.  It has nothing to do with the facts of this case.

8       So ask a question.

9     Q     (BY THE DEFENDANT:)  So you were the one that make

10  the payment on the mortgage, right?

11    A     Yes.

12    Q     You the one that made the payment?

13    A     Yes.

14    Q     So you paid the principal?  You pay the interest?

15         THE COURT:  All right.  Again, not going to have you

16  ask the line of questioning 'cause again it goes with regard to

17  his feelings about his obligation to pay the mortgage.  Ask him

18  a question having to do with this case.

19    Q     (BY THE DEFENDANT:)  Can you turn to page 19 of the

20  mortgage?

21         THE COURT:  What paragraph?  It's in front of you.

22         THE DEFENDANT:  Paragraph 16.

23         THE COURT:  All right.  What's your question.  It's

24  in front of him.

25    Q     (BY THE DEFENDANT:)  Did you understand what law was

UNITED STATES DISTRICT COURT

1    governing your mortgage?

2         A     No, sir.

3         Q     So do you know the rights that you had in pertaining

4    to your mortgage?

5         A     No, sir.

6              THE DEFENDANT:  Okay.  I don't have no more

7    questions?

8              THE COURT:  All right.  Do you have more than

9    10 minutes of questioning of this witness?

10             MR. YATES:  I believe so.

11             THE COURT:  So we'll take our recess now then and

12   then you'll follow that with your redirect.

13        Ladies and gentlemen, we're going to take another recess

14   for 15 minutes.  If you'd leave your iPad and your notebooks

15   behind, and of course don't engage in any social media

16   regarding the trial or any witnesses.

17        Please rise for the jury.  We're in a 15-minute recess.

18   Thank you.

19             (A recess was taken.)

20             (Open court out of the presence of the jury.)

21             THE COURT:  The record will reflect the jury's not

22   present, nor is the witness.  Present are Mr. Williams and

23   counsel.

24        So, Mr. Williams, I understand you have an issue you'd

25   like resolved before we bring in the witness and the jury.

1        THE DEFENDANT:  Yes.  It's clear that the

2   prosecutor's office intimidated Mr. Ventura into feeling guilty

3   for something that he hasn't felt guilty about his whole life.

4   And so when you have a person like that who, you know, is a

5   good person, but the FBI come knocking at your door, request

6   that you come talk to them, or -- that would, you know, scare

7   anybody.  And so he clearly was scared into changing his belief

8   that oh, I got to pay because of my signature.  That's

9   clear -- that clearly violates the witness tampering statute

10  where you cannot persuade someone to either change what they

11  was going to testify or even change who they was going to

12  testify for, which they've done that clearly.

13       THE COURT:  Okay.  So what are you asking for?

14       THE DEFENDANT:  Dismissal because of witness

15  tampering.

16       THE COURT:  Okay.  And who will be responding on

17  behalf of the government?

18       All right.  Mr. Sorenson, if you could just speak into a

19  microphone.  Thank you.

20       MR. SORENSON:  Your Honor, I would simply respond

21  that I don't know that any foundation for witness tampering has

22  been laid whatsoever.  This witness did not say anybody

23  tampered with him.  He discussed with our office in pretrial

24  preparation his testimony.  During the context of his testimony

25  we talked about the notes and his promises to pay on those

UNITED STATES DISTRICT COURT

1    notes in areas that we were going to go into on direct

2    examination.

3        There's no -- there's certainly no showing of a corrupt

4    effort to persuade or dissuade Mr. Ventura from testifying any

5    way.  I think it's been pretty clear from his testimony what

6    his beliefs are.

7            THE DEFENDANT:  Well, here's the documentation.  I

8    can put it up on the -- the -- it's Defense Exhibit 2150.

9            THE COURT:  What is it?

10           THE DEFENDANT:  This is where he sent the email to

11   one of my other clients saying that after talking to him, he's

12   backing out of testifying for me.

13           THE COURT:  Okay.  But that doesn't have to do with

14   Mr. Ventura.

15           THE DEFENDANT:  Yeah, it is.  It's Mr. Ventura.

16   This is his email.

17           THE COURT:  Okay.  Why don't you put it on the

18   docucam so I can see it.

19       All right.  So this is not an email to you.  It's an email

20   to Rosy.

21           THE DEFENDANT:  Right, Thomas, and she forwarded

22   that to me.

23           THE COURT:  All right.  So he basically reiterates

24   sort of what he testified to today.

25           THE DEFENDANT:  Right, and what he says, "But they

UNITED STATES DISTRICT COURT

1    were right.  They made me understand."  So they persuaded him

2    into saying that Oh, I got to pay my mortgage.  They persuaded

3    him that.  He didn't have that sentiment before they contacted

4    him.  That was not his sentiment because this man did as much

5    research as I did, and then he said he didn't, which he did;

6    that's the reason why he knew what I was talking about because

7    he did research it.

8         But like I said, when the FBI come calling or U.S.

9    Attorney's Office, and they're very intimidating, the

10   average -- if a person don't have the faith like I have and no

11   fear, then they gonna fold, and that's what happened.

12             THE COURT:  So just for the record, this is an email

13   dated January 18, 2020, from Mr. Ventura to Rosy Esprecion --

14             THE DEFENDANT:  Right.

15             THE COURT:  -- E-s-p-r-e-c-i-o-n,  subject re:

16   Affidavit from ATW.

17        All right.  So I understand what your position is and your

18   argument and you're seeking dismissal.  So your oral motion is

19   denied.  The court does not find that the government has

20   intimidated, influenced, or otherwise forced --

21             THE DEFENDANT:  Persuaded.

22             THE COURT:  --  Mr. Ventura corruptly.  He has

23   testified that it was his honest change in belief after looking

24   at the documents and meeting with the prosecutors.

25        All right?  So anything else that we need to take up

UNITED STATES DISTRICT COURT

1    before we bring Mr. Ventura back?

2            MR. SORENSON:  Can we just add in, Your Honor, that

3    the Court did do a motion in limine on this, I believe, with

4    respect to a motion to dismiss, so just for the record on that

5    front as well.

6            THE COURT:  Right.  Well, I mean, now we've had an

7    opportunity, though, to have Mr. Ventura talk about why he

8    changed his mind and his feelings, and he never mentioned that

9    you folks were intimidating him, forcing him, et cetera.

10        So, Mr. Isaacson, is there something that you wanted

11   clarified?

12           MR. ISAACSON:  Yes, Your Honor.  Pursuant to this

13   Court's ruling yesterday and your instructions this morning, I

14   have presented the list of defense witnesses asking

15   Mr. Williams to identify any of the out-of-state people that

16   you have quashed that --

17           THE COURT:  Do we need to take this up before we

18   have Mr. Ventura testify further?

19           MR. ISAACSON:  I don't know, Judge.  I'm just trying

20   to get the word --

21           THE COURT:  Can we do this at the end of the day so

22   we can make the most time of the jury?

23           MR. ISAACSON:  Of course, Your Honor.

24           THE COURT:  Okay.  Thank you.  So I'm happy for you

25   to bring it up; it's only we have so much time with the jury

UNITED STATES DISTRICT COURT

1    and I would like to get through as many witnesses as possible.

2              MR. ISAACSON:  Of course, Your Honor.

3              THE COURT:  All right.  So if there's nothing

4    further, then I'm going to have Ms. Elkington get the jury, and

5    if the government would please bring Mr. Ventura in.

6         All right.  We're in recess until the jury returns.

7              (A recess was taken.)

8              (Open court in the presence of the jury.)

9              THE COURT:  Let the record reflect the presence of

10   the ladies and gentlemen of the jury.  Mr. Ventura is on the

11   stand.

12        Mr. Yates, your witness.

13             MR. YATES:  Yes, Your Honor.

14                      REDIRECT EXAMINATION

15   BY MR. YATES:

16        Q    Mr. Ventura, Mr. Williams asked you about a number

17   of affidavits that you had submitted to this court.  Do you

18   recall that?

19        A    This court?

20        Q    His questions.  Do you remember that Mr. Williams

21   just asked you that -- about whether you submitted affidavits

22   to this court?

23        A    Yes.

24        Q    Okay.  And you recall writing affidavits for

25   Mr. Williams, correct?

UNITED STATES DISTRICT COURT

1       A       Yes.

2       Q       Okay.  But who actually wrote those affidavits?

3       A       Mr. Williams.

4       Q       Okay.  And you just signed them, correct?

5       A       Repeat that, sir.

6       Q       You just signed them?

7       A       Yes.

8       Q       Okay.  And in the affidavits I believe you just

9   testified that you blamed Edna Franco and perhaps Henry Malinay

10  for some issues with MEI; is that right?

11      A       With MEI?

12      Q       Yes.

13      A       I don't remember that.

14      Q       Okay.  Did you at some point sign an affidavit in

15  which you said that Edna Franco and Henry Malinay made some

16  representations to you about MEI?

17      A       I don't quite understand that, sir.

18      Q       That's fine.  But to be very clear to the jury, you

19  also interacted with Anabel Cabebe when you were dealing with

20  MEI business, correct?

21      A       Yes, sir.

22      Q       And you also interacted with Anthony Williams on MEI

23  business, correct?

24      A       Yes, sir.

25      Q       And you relied on the representations made to you by

UNITED STATES DISTRICT COURT

1   Anthony Williams, correct?

2        A     Yes.

3        Q     Okay.  Now, you recall just moments ago that

4   Mr. Williams asked you certain questions about a November

5   email, a November 2000 -- one moment -- 2014 email?

6        A     Yes.

7        Q     And he asked you whether those emails were

8   fraudulent.  Do you recall that?

9        A     Yes.

10             MR. YATES:  Okay.  Your Honor, may I publish

11   Exhibit 9 which has been admitted previously?

12             THE COURT:  You may.

13        Q     (BY MR. YATES:)  You can also look in your binder in

14   front of you, Mr. Ventura.  Can you please take a look at

15   Exhibit 9 and let me know when you're done?

16        A     Yes.

17        Q     Okay.  And is Exhibit 9 a email exchange between you

18   and Mr. Williams that took place between November 23rd and

19   November 27th of 2014?

20        A     Yes.

21        Q     Okay.  When Mr. Williams was just asking you about

22   whether an email in November 2014 was fraudulent, is this the

23   email exchange that he was referring to?

24        A     Yes.

25        Q     Okay.  And at the time that you had this email

UNITED STATES DISTRICT COURT

1    exchange with Mr. Williams, you didn't understand that MEI was

2    a fraudulent enterprise, correct?

3         A     No.

4              THE DEFENDANT:  Objection.  That's misleading.

5              THE COURT:  Sustained.  So the witness's last answer

6    is stricken and you are not to regard it.

7              MR. YATES:  Okay.

8              THE COURT:  All right.  Mr. Yates, next question.

9              MR. YATES:  Yes, Your Honor.

10        Q     (BY MR. YATES:)  Now, you also testified on

11   cross-examination that you had a conversation with the

12   prosecutors.  Do you recall that?

13        A     Yes, sir.

14        Q     Okay.  And I believe that you had indicated that you

15   had come to the realization that your signature on your loan

16   documents was your seal; is that correct?

17        A     Yes, sir.

18        Q     Okay.  Whose words were those?  Were those your

19   words or the words of the prosecutors?

20        A     That's my words.

21        Q     Okay.  Did the government make any promises to you

22   with respect to your testimony here today?

23        A     No, sir.

24        Q     Okay.  Did the government make any threats to you

25   regarding your testimony here today?

1      A      Repeat that, sir.

2      Q      Did the government make any threats --

3      A      No.

4      Q      -- to you?  Now, you were asked in your

5   cross-examination about the documents that Mr. Williams had

6   filed on your behalf in court.  Do you recall that?

7      A      Yes.

8             THE COURT:  Okay.  So it's not a memory test of what

9   he remembers.  Just ask him a question about his testimony.

10            MR. YATES:  I apologize, Your Honor.  I was merely

11  trying to focus --

12            THE COURT:  Then just ask him.  When you were asked

13  such and such in your -- by Mr. Williams, then you can ask him

14  a question.

15            MR. YATES:  Understood, Your Honor.  Thank you for

16  that.

17     Q      (BY MR. YATES:)  And when you were asked by

18  Mr. Williams regarding his filing documents on his behalf -- on

19  your behalf, rather, you understand that those were in the

20  context of foreclosure proceedings, correct?

21     A      Yes.

22            THE DEFENDANT:  Objection.  That's leading.

23            THE COURT:  Sustained.

24     Q      (BY MR. YATES:)  Okay.  Do you remember what context

25  those filed documents were in?

UNITED STATES DISTRICT COURT

87

```
 1        A     I don't remember, sir.

 2        Q     Okay.  What legal proceedings were you in when

 3   Anthony Williams was representing you?

 4        A     I don't know.

 5        Q     Okay.  Did that have something to do with your

 6   foreclosure?

 7        A     Yes.

 8        Q     Okay.  And you understand that when --

 9              THE DEFENDANT:  Objection as leading.

10              MR. YATES:  I'll withdraw that.

11              THE COURT:  All right.

12        Q     (BY MR. YATES:)  When Anthony Williams filed

13   documents on your behalf, how long did it take for the court to

14   make decisions?

15        A     I don't remember, sir.

16        Q     Okay.  Was it immediately or was it a long period of

17   time?

18        A     I don't remember.

19        Q     What is your understanding about the effect that

20   Anthony Williams's filings had on the length of time it would

21   take to foreclose on your property?

22        A     My understanding is that it will be -- it will

23   eventually discharge.

24        Q     Okay.  But eventually it was not discharged,

25   correct?
```

UNITED STATES DISTRICT COURT

```
 1        A      Yes.

 2        Q      Yeah.  And when you say "it," you're referring to

 3   your mortgage loan, correct?

 4        A      Yes.

 5        Q      Okay.  Do you recall or rather -- excuse me -- when

 6   did Anthony Williams come back from his incarceration?

 7        A      I don't remember.

 8        Q      Okay.  Do you recall your testimony that it was in

 9   September of 2014?

10        A      Yes.

11        Q      Okay.  When were the checks that you sent to MEI?

12        A      I don't remember.

13        Q      Would it refresh your recollection --

14        A      Yes.

15        Q      -- to look at the checks in front of you?

16        A      Yes.

17        Q      So you have a binder in front of you.

18        A      Oh.

19        Q      And so if I can direct your attention to an envelope

20   which is at Exhibit 102, would that refresh your recollection

21   as to when you were sending checks to MEI?

22        A      Yes.

23        Q      Okay.  When was that?

24        A      That was November 28th.

25        Q      Of what year?
```

1    A    Of 2014.

2    Q    And so that's after you understand that Mr. Williams

3  was released from incarceration, correct?

4    A    Yes.

5         MR. YATES:  Your Honor, I believe that the defendant

6  had admitted into -- or requested and an exhibit was admitted

7  into evidence, Exhibit 2043.  May I publish?

8         THE COURT:  Let's just check.  I think 2043, was

9  that the portions?

10         MR. YATES:  This, the UCC document filed in Texas.

11         THE COURTROOM MANAGER:  That's not the portions,

12  Your Honor.

13         THE COURT:  Was 2043 received?

14         THE DEFENDANT:  Yes, it is received.

15         THE COURTROOM MANAGER:  Yes, Your Honor.

16         THE COURT:  All right. You may publish.

17         MR. YATES:  Thank you, Your Honor.

18    Q    (BY MR. YATES:)  Now, Mr. Ventura, you have in front

19  of you on the screen Exhibit 2043, and this was an exhibit that

20  the defendant had just shown you.  And in the course of your

21  testimony I believe you were testifying regarding

22  the -- whether a debtor's name was in capital letters and the

23  security -- or secured party's creditor's was in lower case

24  letters.  Do you remember that testimony?

25    A    Yes.

UNITED STATES DISTRICT COURT

90

1      Q      Okay.  So that was in the context of a conversation

2    about straw man.  Do you recall that?

3      A      Yes, sir.

4      Q      Can you explain to the jury what you understand a

5    straw man is?

6      A      My understanding what a straw man, it is the

7    explanation about the reason why my -- my name is spelled all

8    capital letters is -- is it's because it's explained like it's

9    a corporation, that's why it's spelled capital letter.  That

10    way that being as a corporation, it's like a business.  So

11    that's how they treat it.  That's how it explained that we are

12    treated like a business.

13      Q      And who explained that to you?

14      A      The straw man that I did watch, I did search, straw

15    man.

16      Q      Okay.  So you understood this concept from based on

17    your own searches; is that right?

18      A      Yes.

19      Q      Okay.  And did you discover that in the context

20    of -- I'm sorry.  I'm going to withdraw that.

21             Why were you looking up straw man?

22      A      I did look it up because of my situation already.

23    You know, I'm already in debt and I took some -- I attended

24    some classes about Fair Debt Collection Practices Act, and then

25    someone mentioned to me about straw man.  They told me to look

1    it up.  So I look it up.

2        Q     Okay.  And how do you feel about that, that by

3    filing a document with just having your letters in capital

4    letters from one place and then lower case letters elsewhere,

5    how do you feel that -- first of all, let me withdraw that

6    question.

7             THE DEFENDANT:  Objection.

8             MR. YATES:  I'll withdraw the question.

9             THE COURT:  Okay.  The question's withdrawn.  All

10   right.  What's your question?

11       Q     (BY MR. YATES:)  And what do you feel was the effect

12   of having this document, this UCC financing document with

13   capital letters in one place and lower case letters in the

14   other?  What do you understand was the effect of that?

15       A     I don't know how to answer that, sir.

16       Q     Okay.  Who prepared this document, Exhibit 2043?

17       A     Mr. William.

18       Q     Okay.  You did understand that this document had

19   something to do with a straw man tactic; is that correct?

20       A     Yes.

21       Q     And how do you feel about using a straw man tactic

22   to avoid your loans?

23       A     In the beginning initially, like I said, I do

24   believe that it work, but it's a complex process that not

25   anybody can process that.  So I was -- I believe in it, but

92

1    eventually I changed that belief because of the signature that

2    I was asked.

3         Q    But Mr. Williams told you that this was going to

4    discharge your debt, correct?

5         A    Yes.

6         Q    And did this document discharge your debt?

7         A    No.

8         Q    With respect to the mortgage insurance clause that

9    you saw on your PNC and National City mortgage, what do you

10   understand -- let me withdraw that.

11              With respect to the mortgage insurance clause of

12   your National City mortgage, in any event of a default, who do

13   you think would be paying for the --

14              THE DEFENDANT:  Objection.  Speculation.

15              MR. YATES:  -- costs?

16              THE COURT:  All right.  Overruled.

17              THE WITNESS:  My understanding that it's supposed to

18   pay off -- pay off the loan in -- when it's defaulted for

19   certain days.

20        Q    (BY MR. YATES:)  And who would be paying off that

21   loan?

22        A    The insurance.

23        Q    Okay.  So you understand that there is a party that

24   will be paying off of the default, correct?

25        A    Yes.

1      Q      Okay.  And it wouldn't be you; is that correct?

2      A      No.

3      Q      Okay.  Now, Mr. Ventura, you also testified

4   regarding Mr. Williams and your opinion of Mr. Williams.  Do

5   you recall that?

6      A      Yes.

7      Q      And you had testified that you thought of him as a

8   man of faith?

9      A      Yes.

10     Q      And integrity?

11     A      Yes.

12     Q      You formed those opinions based upon your

13  understanding of the MEI program and what he told you when you

14  first signed up, correct?

15     A      Yes.

16     Q      Okay.  And have your feelings -- rather, has your

17  understanding about Mr. Williams' representations changed?

18     A      It changed -- it changed the minute that the

19  question about my -- about me signing the document.  That's the

20  time that my -- it changed my -- my -- my point of view about

21  Mr. Williams.

22     Q      And when you say when you signed the document, are

23  you referring to the loan documents?

24     A      Yes, sir.

25     Q      Okay.  So your opinions about Mr. Williams have

94

1    changed, correct?

2        A      It has changed, but I still look -- I still look him

3    up as a friend.

4        Q      And although you may look at him as a friend, do you

5    believe that Mr. Williams was honest with you with respect to

6    the MEI program?

7        A      With the MEI program, yes.

8        Q      Okay.  You thought he was being honest with you?

9        A      With his responsibility about our agreement, he was

10   honest, you know, he was up to, you know -- when he say he

11   represent me in court and he's there to help me.

12       Q      But you understand that he didn't have the ability

13   to represent you in court, correct?

14              THE DEFENDANT:  Objection.  That's misleading.

15              THE COURT:  Overruled.

16        Did you understand whether or not Mr. Williams had the

17   authority to represent you in court?

18              THE WITNESS:  At that time I don't.

19       Q      (BY MR. YATES:)  And how about now?

20       A      Yes -- yeah, because of the -- his status as being

21   private attorney general, yes.  Yeah, he has the ability to

22   represent me in court.

23       Q      And you thought that when you applied for MEI,

24   correct?

25       A      Yes.

1     Q     And how about now?

2     A     About now because it changed my belief.  Although he

3  may be able to represent me, I only focussing now on my own

4  personal -- personal, uhm -- my own personal that I am

5  responsible for the things that I've done.

6     Q     Okay.  Is it fair to say that you don't have an

7  opinion or refuse to --

8          THE DEFENDANT:  Objection.  Misleading.

9          MR. YATES:  -- offer an opinion as to Mr. Williams's

10  credibility now?

11          THE COURT:  Sustained.  It's leading.  Ask him a

12  question.

13          MR. YATES:  Yes, Your Honor.

14     Q     (BY MR. YATES:)  Mr. Ventura, Mr. Williams did

15  indicate to you or promise you that your mortgage would be

16  discharged, correct?

17     A     Yes, sir.

18     Q     And is your mortgage discharged?

19     A     Not yet.

20          MR. YATES:  Okay.  I have nothing further on

21  redirect, Your Honor.

22          THE DEFENDANT:  I need to redirect.

23          THE COURT:  All right.  Did you list him as one of

24  your witnesses?

25          THE DEFENDANT:  Yes.

1              THE COURT:  All right.

2                          DIRECT EXAMINATION

3    BY THE DEFENDANT:

4        Q     Okay, Mr. Ventura, we're going to try to clear

5    everything up 'cause --

6              THE COURT:  All right.  Don't have a preamble.  And

7    now you are doing it on your direct, you need to ask open-ended

8    questions, not leading.

9        Q     (BY THE DEFENDANT:)  Okay.  Mr. Ventura, you

10   understand I wasn't able to finish your process because of my

11   incarceration, right?

12       A     Right.

13             MR. YATES:  Objection.  Leading.

14             THE COURT:  Sustained.  You're to disregard his last

15   answer.

16        Ask him a nonleading question.

17       Q     (BY THE DEFENDANT:)  Okay.  Now, did you get to

18   finish my process?

19       A     You won't be able to finish it because you are

20   incarcerated.

21       Q     Okay.  So that was the reason you didn't finish my

22   process?

23             MR. YATES:  Objection.  Leading.

24             THE WITNESS:  Yes.

25             THE COURT:  Sustained.  Ask him a question.

1          THE WITNESS:  Sorry.

2     Q    (BY THE DEFENDANT:)  Okay.  So the reason you didn't

3  finish my process is because what you answered is I was

4  incarcerated?

5          MR. YATES:  Objection.  Leading.

6          THE COURT:  Sustained.  All right.  So he's already

7  answered the question and you're just repeating it.  So why

8  don't you ask him another --

9     Q    (BY THE DEFENDANT:)  Okay.  Now, he just tried to

10  ask you has your opinion of me changed, and so I don't think he

11  asked you correctly.  Now, do you still feel like I'm a man of

12  faith?

13     A    Yes.

14          MR. YATES:  Objection.  Leading.

15          THE COURT:  Sustained.  You'll disregard the last

16  answer.

17      Ask an open-ended question:  What's your opinion of

18  Mr. Williams now?  That's an open-ended question.

19     Q    (BY THE DEFENDANT:)  Am I a man of faith?

20          THE COURT:  No.

21          MR. YATES:  Objection.  Leading.

22          THE COURT:  Sustained.  That's leading.

23     Q    (BY THE DEFENDANT:)  In your opinion, am I a man of

24  faith?

25          MR. YATES:  Objection.  Leading.

1            THE COURT:  Sustained.  Ask him, "What is your

2    opinion of me now?"

3        Q     (BY THE DEFENDANT:)   What is your opinion of me now

4    in regards to my faith?

5        A     I'm still looking at you as a man of faith, but we

6    have differences in regarding of our obedience to His word.

7    And what make us difference because I believe that the Bible

8    give us wisdom and discretion to make a very good decision.

9        Q     Uh-huh.  Do you feel I have integrity still right

10   now?

11           MR. YATES:  Objection.  Leading.

12           THE COURT:  Sustained -- no, I mean, overruled.

13   That is an open -- I mean, that's a yes or no.

14       Do you feel that he has --

15           THE WITNESS:  Yes.

16           THE COURT:  Okay.  And then -- anyway, ask him

17   another question.

18       Q     (BY THE DEFENDANT:)  Do you still feel that I have

19   clients' best interest at heart?

20       A     Yes.

21           MR. YATES:  Objection.  Leading.

22           THE COURT:  Sustained.  Strike the last answer.

23       Ask him an open-ended question.

24       Q     (BY THE DEFENDANT:)  Do you feel like I have a good

25   heart?

UNITED STATES DISTRICT COURT

99

1            MR. YATES:  Objection.  Leading.

2            THE COURT:  Okay.  I'm not going to let you have

3   this --

4            THE DEFENDANT:  Okay.

5            THE COURT:  He's already told you what his -- how he

6   feels about you and so it's been asked and answered and now

7   we're going down a rabbit hole of irrelevance.  So ask him

8   another question.

9            MR. ISAACSON:  Your Honor, one moment.  If I may ask

10  Mr. Williams?

11           THE COURT:  Yes, you may.  Do you want --

12           MR. ISAACSON:  Excuse me, Your Honor.

13           THE COURT:  Yes.  Thank you.

14      Q    (BY THE DEFENDANT:)  Okay.  Mr. Ventura, tell me how

15  you feel about my faith and what I believe in.

16           MR. YATES:  Objection.  Relevance.

17           THE COURT:  Okay.  It's marginally relevant.  I'll

18  let you ask him this one question, then we're moving on.

19       Okay.  Tell him how you feel.

20           THE WITNESS:  I still believe that you still have

21  faith in God, still -- because of -- because of your fear in

22  God, I still believe that you can be trusted.

23      Q    (BY THE DEFENDANT:)  Now, do you remember a few days

24  ago sending me a email and us -- a communication in the email?

25      A    Yes, sir.

1       Q      Okay.  And I'm going to show you on this Defense

2    Exhibit 2151.

3              MR. YATES:  Your Honor, this is beyond the scope of

4    my examination.

5              THE DEFENDANT:  This one has already been approved

6    for entering into exhibit.

7              THE COURT:  All right.  It is beyond the scope, but

8    he also gets to do his redirect, so overruled.

9         All right.  Do you remember sending this email to

10   Mr. Williams?

11             THE WITNESS:  Yes, ma'am.

12             THE COURTROOM MANAGER:  This is not in evidence.

13             THE COURT:  I'm sorry?  It's not in evidence.  Okay.

14   So he's laid the foundation.

15        Is this a true and correct copy?  Do you see that -- has

16   this been changed from what you sent him, if you could look at

17   the document?

18             THE WITNESS:  No, still the same.

19             THE COURT:  Still the same, okay.

20             MR. ISAACSON:  Your Honor -- oh, sorry.  These are

21   the redacted here I want to make sure that he's referring to.

22   I'm sorry.

23             THE DEFENDANT:  Right.

24             MR. ISAACSON:  Is it?

25             THE COURT:  That's what appears on the screen.

1                MR. ISAACSON:  Oh, the screen.  Okay.  We have the

2     paper.

3                THE COURT:  Yeah, okay.  So what's your next

4     question?  Are you going to ask for it to be entered into

5     evidence?

6                THE DEFENDANT:  Yes.

7                THE COURT:  So just this one dated February 9th is

8     what you want in evidence?

9                THE DEFENDANT:  Yes.

10               THE COURT:  All right.  Mr. Yates?

11               MR. YATES:  There has to be a foundation with

12    respect to whether the witness recalls or does not recall the

13    substance of this exhibit, so...

14               THE COURT:  He just said it was in the same or

15    substantially the same condition, so overruled.  It's received.

16         You want to publish?

17               THE DEFENDANT:  Yes, ma'am, want to publish.

18               THE COURT:  Published.  Ask him a question.

19               (Exhibit 2151 received into evidence.)

20         Q    (BY THE DEFENDANT:)  Mr. Ventura, in this email you

21    talk about both of our faith, correct?

22         A    Yes, sir.

23         Q    Okay.  And did you also talk about --

24               THE COURT:  All right.  No.  It's in evidence.  What

25    do you want to ask him about this document?  Is there a

1   specific line that you want him to refer to?

2          THE DEFENDANT:  Okay.  The second -- the second and

3   third line.

4          THE COURT:  Okay.  What about it?

5   Q    (BY THE DEFENDANT:)  Uhm, is that how you still feel

6   right now, Mr. Ventura, where it says you are a minister of

7   Yahweh?

8   A    Are you talking about the first paragraph on the

9   top?

10         THE COURT:  All right.  You see where it says, "You

11  have a very good intention and a good heart that you're willing

12  to sacrifice for others suffering for a good cause.  But is it

13  right with God?  You're able to save my house from foreclosure

14  and it may even have a free and clear title.  But don't you

15  think that it's like robbing a bank?  Thanks God that he opened

16  my eyes to see that it was a mistake."

17       Is that what you wrote?

18         THE WITNESS:  Yes, ma'am.

19         THE COURT:  All right.  What do you want to ask him

20  about that?

21  Q    (BY THE DEFENDANT:)  Do you still feel about the

22  part that you said about me being a minister of Yahweh and I

23  have a good heart?  You still feel that way?

24  A    I still believe that.

25         THE DEFENDANT:  Okay.  One more exhibit.  This is

UNITED STATES DISTRICT COURT

1    Exhibit 2149.  It's already been entered into evidence.  I'd

2    like to publish it.

3              THE COURT:  All right.  You may publish.

4         Q    (BY THE DEFENDANT:)  Now, Mr. Ventura, when you sign

5    a document that's drafted on your behalf, do you read it?

6         A    Uh-huh, I read it.

7         Q    Okay.  So the affidavits that was drafted for you,

8    did you read it to make sure that everything in the affidavit

9    was truth and what you felt?

10        A    Yes.

11        Q    Okay.  So you didn't sign it blindly; you signed it

12   knowing what you were stating in this sworn statement?

13        A    Yes, sir.

14             THE DEFENDANT:  Okay.  No more questions.

15             THE COURT:  All right.  So, Mr. Ventura, you're

16   excused as a witness, but don't discuss your testimony with

17   anyone until after the trial is finished.

18             THE WITNESS:  Okay, ma'am.

19             THE COURT:  All right.  So I wish you a very good

20   day.

21        All right.  Good-bye.

22             THE WITNESS:  Good-bye, ma'am.

23             THE COURT:  Thank you.

24             (This concludes the partial testimony requested.)

25

UNITED STATES DISTRICT COURT

1                    COURT REPORTER'S CERTIFICATE

2

3              I, DEBRA READ, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

6    true, and correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the regulations

9    of the Judicial Conference of the United States.

10                    DATED at Honolulu, Hawaii, February 22, 2020.

11

12

13                    */s/ Debra Read*

14                    DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25


                        UNITED STATES DISTRICT COURT