1                  IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF HAWAII

3
     UNITED STATES OF AMERICA,      ) CR 17-00101 LEK
4                                   )
                Plaintiff,          ) Honolulu, Hawaii
5                                   ) February 12, 2020
       vs.                          ) February 13, 2020
6                                   )
     (1) ANTHONY T. WILLIAMS,       ) PARTIAL TRANSCRIPT:
7                                   ) TESTIMONY OF MACRINA PILLOS
                Defendant.          )
8    _____)

9              PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE LESLIE E. KOBAYASHI
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Government:        KENNETH M. SORENSON, AUSA
                                GREGG PARIS YATES, AUSA
13                              Office of the United States Attorney
                                300 Ala Moana Boulevard, Suite 6100
14                              Honolulu, Hawaii 96850

15   Also Present:             MEGAN CRAWLEY, FBI Special Agent

16   For the Defendant (1)     ANTHONY T. WILLIAMS, *Pro Se*
     Anthony T. Williams:      05963-122
17                             Federal Detention Center Honolulu
                               Inmate Mail/Parcels
18                             P.O. Box 30080
                               Honolulu, Hawaii 96820
19
     Standby Counsel:          LARS ROBERT ISAACSON, ESQ.
20                             547 Halekauwila Street, Suite 102
                               Honolulu, Hawaii 96813
21
     Official Court Reporter:  DEBRA READ, RDR
22                             United States District Court
                               300 Ala Moana Boulevard
23                             Honolulu, Hawaii 96850

24
     Proceedings recorded by electronic sound recording; transcript
25   produced with computer-aided transcription (CAT).


                      UNITED STATES DISTRICT COURT

1                    I N D E X

2          CHRONOLOGICAL INDEX OF WITNESSES

3

4    GOVERNMENT'S WITNESS                          PAGE

5

6    **MACRINA PILLOS**
       Direct Examination By Mr. Yates              3
7    **THURSDAY, FEBRUARY 13, 2020**               **27**

8

9    **MACRINA PILLOS (Resumed the stand)**
       Direct Examination Resumed By Mr. Yates     27
10     Cross-Examination By the Defendant          28
       Redirect Examination By Mr. Yates           52
11

12

13                   I N D E X

14                 E X H I B I T S

15

16   NO.                                          PAGE

17

     807                                          15
18   819                                          16
     820                                          22
19

20   **THURSDAY, FEBRUARY 13, 2020**               **27**

21   2035, page 8                                 39

22

23

24

25

                 UNITED STATES DISTRICT COURT

```
 1   WEDNESDAY, FEBRUARY 12, 2020                          1:22 P.M.

 2                 (Partial transcript begins:)

 3        MACRINA PILLOS, GOVERNMENT'S WITNESS, WAS SWORN

 4             THE COURTROOM MANAGER:  Thank you.

 5      If you can state your name and spell your first and last

 6   name for the record.

 7             THE WITNESS:  Okay.  I'm Macrina Pillos.  And I --

 8             THE COURTROOM MANAGER:  If you can just spell your

 9   name.

10             THE COURT:  Spell your name.

11             THE COURTROOM MANAGER:  Go ahead and have a seat.

12             THE COURT:  Sit down.

13             THE COURTROOM MANAGER:  Just spell your last name

14   for the record.

15             THE WITNESS:  P, like in Peter, -i-l-l-o-s, like in

16   Sam.

17             THE COURT:  So Mr. Yates is going to ask you some

18   questions.

19        Your witness, Mr. Yates.

20             MR. YATES:  Thank you, Your Honor.

21                        DIRECT EXAMINATION

22   BY MR. YATES:

23      Q    Ms. Pillos, can you please tell the jury what you do

24   for a living?

25      A    Well, I'm retired right now.
```

UNITED STATES DISTRICT COURT

1      Q      And since when?

2      A      I think that was in 2000 -- 2000 -- I'm not quite

3  sure, but it's 2012 or '11.

4      Q      And what did you do before you retired?

5      A      Oh, I used to work for Clinical Laboratories of

6  Hawaii.

7      Q      And can you please briefly describe your educational

8  background?

9      A      Oh, I am -- I was a registered midwife back home in

10  the Philippines.

11      Q      And where are you from then?

12      A      Uhm, Manila.

13      Q      And that's in the Philippines?

14      A      That's in the Philippines.

15      Q      Okay.  Can you please tell the jury what your first

16  language is or was?

17      A      Okay.  Ilocano, Tagalog, and English.

18      Q      Now, at some point you became a client of Anthony

19  Williams and Mortgage Enterprise Investments, correct?

20      A      Yes.

21      Q      Okay.  Let's talk about the period before then.

22  Before you were an MEI client, where did you live?

23      A      942 Akaiki Place.

24      Q      And where is that?

25      A      Maui.

UNITED STATES DISTRICT COURT

1      Q      And when was your house purchased?

2      A      That was in 2012.

3      Q      And originally whose name was on the deed?

4      A      It was my niece who is Wengie Pillos and my

5   sister-in-law who is Amy Pillos.

6      Q      And can you please explain to the jury why it is

7   that their names were on the deed?

8      A      Okay.  It was under their name because they want to

9   help us to purchase a house.

10      Q      And did your niece and sister-in-law -- I believe

11   you said Amy and Wengie; is that correct?

12      A      Right.  Correct.

13      Q      -- did they have a mortgage on the house?

14      A      No.

15      Q      Who paid the mortgage?

16      A      Me and my husband paid for the mortgage.

17      Q      Okay.  And how much was owing every month?

18      A      It's 2,221.

19      Q      And you took over the mortgage or you had the

20   mortgage on the house; is that correct?

21      A      Yes.

22      Q      And who was the mortgage servicer?

23      A      Wells Fargo.

24      Q      And at the time that you enlisted or enrolled with

25   MEI, how would you describe the status of your payments?

UNITED STATES DISTRICT COURT

```
 1          A       Well, this --

 2          Q       Your payments to --

 3          A       To Wells Fargo?

 4          Q       -- to Wells Fargo, yes.

 5          A       It's 2,221.

 6          Q       Okay.  So can you describe were you paying

 7   currently?  Were you behind?

 8          A       We were very currently.

 9          Q       Okay.  And what was the balance on your mortgage?

10          A       It was 258- -- aye -- 358,000, around there.

11          Q       Okay.  So let's talk a little bit about how you

12   became involved in MEI.  How did you first learn about MEI?

13          A       Well, the first time was -- this was the first time

14   that Henry Malinay came over to Maui.

15          Q       And do you recall when that meeting was?

16          A       It was the middle part of the year which is I think

17   June 2013, if I'm not mistaken.

18          Q       And what do you remember about that meeting?

19          A       Well, about that meeting, Henry Malinay told us that

20   they're going to reduce the mortgage.

21          Q       Okay.  How much were they -- excuse me.  Let me

22   withdraw that.

23                  How much were they promising to reduce your mortgage

24   by?

25          A       Okay.  The reduced payment would be about
```

UNITED STATES DISTRICT COURT

1    100-something thousand dollars.

2         Q     Okay.

3         A     And our monthly payment going be -- will be $1,032.

4         Q     Okay.  Did he also talk about the term of your

5    mortgage?

6         A     15 years.

7         Q     Okay.  And what was the term of your Wells Fargo

8    mortgage?

9         A     30 years.

10        Q     So he was going to -- or the MEI program was going

11   to cut your mortgage term in half?

12        A     Right.

13        Q     Okay.  Is it fair to say that the program was also

14   going to cut your monthly payment in half?

15        A     Right.

16        Q     And your total mortgage loan, correct?

17        A     Correct.

18        Q     Okay.  Now, other than Henry Malinay, did you talk

19   to anyone else with MEI about the MEI program?

20        A     Oh, sure.  That was the time when I met Anabel

21   Cab- -- Anabel Guzman.

22        Q     And let's talk a little bit about why you met with

23   Anabel -- you called her -- I'm sorry.  What did you call her?

24        A     Anabel.

25        Q     Anabel you said?

1          A          Guzman.

2          Q          Guzman.  And is Anabel Guzman also known as Anabel

3  Cabebe?

4          A          Oh, no, this is -- I'm so sorry -- different.

5          Q          Okay.

6          A          This is -- Guzman is the last name.

7          Q          Guzman is her last name?

8          A          Not Cabebe.  I'm so sorry because I have another

9  Anabel which name is Cabebe.

10         Q          Okay.  Now, at some point did you have to address an

11  issue with respect to your deed?

12         A          Yes.

13         Q          Okay.  And what did -- please explain to the jury

14  what you had to do.

15         A          Okay.  Anabel Guzman told us that -- no --

16                    THE DEFENDANT:  Objection.  This is hearsay.

17                    THE COURT:  Sustained.

18         Q          (BY MR. YATES:)  Okay.  Did Anabel Cabebe do any

19  notarizing for you?

20         A          Sure, yes.

21         Q          Okay.  And did Anabel Cabebe make any comments to

22  you or statements to you about --

23                    THE DEFENDANT:  Objection.  That's misleading and

24  hearsay.

25                    THE COURT:  All right.  So foundational.

UNITED STATES DISTRICT COURT

```
 1                    MR. YATES:  Foundational.

 2                    THE COURT:  Overruled.

 3          And you have to wait till he finishes the question.

 4          Okay.  So ask your question.  It's overruled.

 5          Q    (BY MR. YATES:)  Okay.  So did Anabel Cabebe

 6   notarize your quitclaim deed?

 7          A    Yes.

 8          Q    And did Anabel Cabebe make any representations to

 9   you about MEI?

10          A    Yes.

11          Q    Okay.  So let's talk about Anabel Cabebe's

12   representations to you about the quitclaim deed, okay?

13          A    Okay.

14          Q    All right.  So can you explain --

15                    THE DEFENDANT:  Objection.  This is beyond the

16   scope.  It has nothing to do with --

17                    MR. YATES:  Well, it's my direct.

18                    THE COURT:  Well, so anyway, let me hear his

19   objection.  Beyond the scope and what else is your --

20                    THE DEFENDANT:  Right.  It's not relevant to any the

21   charges.  It's not relevant.  It's --

22                    THE COURT:  Okay.  So he has a relevancy objection,

23   and --

24                    MR. YATES:  She's a victim of the -- a homeowner

25   victim of the charged scheme, Your Honor.
```

UNITED STATES DISTRICT COURT

1            THE COURT:  No, I know the witness is.

2            MR. YATES:  Oh, I see.

3            THE COURT:  But he's objecting to the question

4    involving Anabel Cabebe.

5            MR. YATES:  I see.  With respect -- this is part of

6    the scheme.  Ms. Cabebe actually accepted a large sum of

7    money --

8            THE COURT:  So you don't have to go into specifics.

9    Are you saying it's because you're saying Anabel Cabebe

10   worked --

11           MR. YATES:  Correct.

12           THE COURT:  -- with Mr. Williams?  Okay.  So that's

13   the relevance aspect of it?

14           MR. YATES:  Yes, correct.

15           THE COURT:  But are you going to ask for hearsay?

16           MR. YATES:  Yes, and to the extent that Ms. Cabebe

17   was an agent of MEI --

18           THE COURT:  Right.

19           MR. YATES:  -- and an employee of MEI --

20           THE COURT:  Right.

21           MR. YATES:  -- who utilized -- who offered her home

22   office --

23           THE COURT:  So you don't have to go into specifics.

24   So what exception to the hearsay rule are you offering?

25           MR. YATES:  Agent and co-conspirator of the party.

UNITED STATES DISTRICT COURT

1              THE DEFENDANT:  I'm objecting because she formed her

2    own company that was Mortgage Enterprise not Mortgage

3    Enterprise Investments.

4              THE COURT:  Right.

5              MR. SORENSON:  That's --

6              THE DEFENDANT:  I'm not charged with conspiracy.

7              THE COURT:  Wait.  So are you going to lay a

8    foundation with regard to the time period and that -- her

9    understanding of the relationship between Ms. Cabebe and

10   Mr. Williams?

11             MR. YATES:  Sure.  But I will also note that it's,

12   you know -- I don't believe that it's been established that

13   Ms. Cabebe has founded another company.  At least our evidence

14   has demonstrated that she was always --

15             THE COURT:  I'm not going to let you argue it now.

16             MR. YATES:  Of course.

17             THE COURT:  But he has evidence that's already been

18   received which are the bank statements -- the bank cards --

19             MR. YATES:  Correct.

20             THE COURT:  -- when they formed accounts in the name

21   of Mortgage Enterprise.

22             MR. YATES:  Correct.  And we also have evidence --

23             THE COURT:  Well, I don't want to argue the

24   evidence, but I'm just saying if you're going to ask her

25   questions offering hearsay under that exception, you have to

UNITED STATES DISTRICT COURT

```
 1    show there's some sort of connection --

 2              MR. YATES:  Sure.

 3              THE COURT:  -- between Mr. Williams --

 4              MR. YATES:  Sure.  And I can go ahead and ask her

 5    who she understood Anabel Cabebe worked for.

 6              THE COURT:  Yes.  You have to do that first before

 7    you ask for the hearsay.

 8              MR. YATES:  Understood.

 9         Q    (BY MR. YATES:)  Ms. Pillos, do you understand who

10    Anabel Cabebe worked for?

11         A    MEI.

12         Q    MEI?

13         A    Yeah.

14         Q    And who do you understand MEI was owned by?

15         A    Owned by Anthony Williams.

16         Q    Okay.  Now, with respect to -- did you understand

17    that there was an issue with respect to your -- your deed?

18         A    Yes.

19              THE DEFENDANT:  Objection.  Leading.

20              THE COURT:  All right.  So --

21              MR. YATES:  That's fine.

22              THE COURT:  -- foundational.  Overruled.

23         All right.  What point in time are we talking about?

24              MR. YATES:  It's shortly after she signed up -- or

25    rather, she only --
```

1          THE COURT:  What year?  What year?

2          MR. YATES:  2013.

3          THE COURT:  Okay.

4          MR. YATES:  She's just described a June 2013 meeting

5    with Henry Malinay.

6          THE COURT:  Yes.  Okay.

7     Q     (BY MR. YATES:)  And what was the issue with the

8    deed?

9     A     Well, the issue of the deed was to take over

10   the -- take over the deed, me and my husband.

11    Q     You needed -- you were told you needed to take over

12   the deed?

13    A     Yes.

14    Q     Who told you that?

15    A     Malinay.

16    Q     And so what did you do to take over the deed?

17    A     So Anabel came over to Maui and she help us for the

18   quitclaim.

19    Q     Okay.  And how did she do that?

20    A     Handwriting.

21    Q     Okay.  And did she also record a quitclaim deed for

22   you?

23    A     Yes.

24          THE DEFENDANT:  Objection.  Leading.

25          MR. YATES:  And.

1          THE COURT:  Overruled, foundational.

2      What's your next question?

3      Q     (BY MR. YATES:)  And how much did she charge you for

4  that quitclaim deed?

5      A     $1,000 in cash.

6          MR. YATES:  I would like to show the witness an

7  exhibit which has not yet been admitted into evidence, but I

8  would like to lay a foundation and then seek its admission.

9      Q     (BY MR. YATES:)  Ms. Pillos, can you look into your

10  binder at Exhibit 807?  Now, at a certain point, Ms. Pillos,

11  did you sign up for MEI services?

12      A     Yes, we did.

13      Q     Okay.  So if you take a look at 80 -- Exhibit 807,

14  do you recognize this document as the MEI application that you

15  signed?

16      A     Yes.

17      Q     And are those your signatures that appear throughout

18  Exhibit 807?

19      A     Right.

20      Q     Is this a true and correct copy of the MEI

21  application as you remember it?

22      A     Yes.

23          MR. YATES:  Okay.  Your Honor, at this time I ask to

24  move to admit Exhibit 807 into evidence.

25          THE COURT:  Any objection?

```
 1                MR. ISAACSON:  One moment, Your Honor.

 2                THE DEFENDANT:  No objection.

 3                THE COURT:  All right.  807 is received.

 4                (Exhibit 807 received into evidence.)

 5                MR. YATES:  May I publish, Your Honor?

 6                THE COURT:  You may.

 7        Q     (BY MR. YATES:)  Now, Ms. Pillos, the jury can now

 8   see the document that you're referring to.  Is 807 a copy of

 9   the MEI application that you filled out?

10        A     Yes.

11        Q     Okay.  Do you remember anything that was unusual or

12   that stood out that you were told when you were filling out

13   this application?

14        A     Okay.  They told us not to put the date.

15        Q     Oak.  Don't put any dates on this document?

16        A     Any dates on this stuff, so we just signed the

17   paper.

18                MR. YATES:  Now, Your Honor, I've got a new exhibit

19   here that I'd like to put before the defendant -- oh, excuse

20   me -- the witness, and I'd like to have her lay a foundation.

21   It's Exhibit 819.

22        Q     (BY MR. YATES:)  So, Ms. Pillos, can you please turn

23   in your binder to Exhibit 819?  Do you have it in front of you?

24        A     Yes.

25        Q     Okay.  Do you recognize Exhibit 819?
```

1      A     Yes.

2      Q     Now, is Exhibit 819 a UCC financing statement that

3  was filed on your behalf?

4      A     Yes.

5      Q     Okay.  Now, who filled out the information in this

6  document?

7      A     Anabel Cabebe.

8      Q     Okay.  And did she do that on your behalf?

9      A     Yes.

10      Q     Okay.  And who recorded this document?

11      A     Anabel Cabebe.

12      Q     And is this -- and did she do that on your behalf?

13      A     Yes.

14      Q     Okay.  And is this a true and correct copy of the

15  UCC document as you remember it?

16      A     Yes.

17            MR. YATES:  Your Honor, at this time we would move

18  to move Exhibit 819 into evidence.

19            THE COURT:  Any objection?

20            THE DEFENDANT:  No objection.

21            THE COURT:  Received.

22            (Exhibit 819 received into evidence.)

23            MR. YATES:  May I publish, Your Honor?

24            THE COURT:  You may.

25      Q     (BY MR. YATES:)  So, Ms. Pillos, Exhibit 819, the

1   UCC document, is now on the screen in front of you.  Now, I

2   believe you just testified that this is a copy of the UCC

3   document that MEI recorded for you at the Bureau of

4   Conveyances; is that correct?

5        A     Right.

6        Q     Okay.  And this was prepared for you by Anabel

7   Cabebe?

8        A     Right.

9        Q     Okay.  Now, this was all prepared for you as you

10  were applying for the MEI program, correct?

11       A     Correct.

12       Q     Okay.  Now, when you signed up for MEI's services,

13  what, if anything, did Henry Malinay or Anabel Cabebe tell you

14  about how much to pay MEI?

15             THE DEFENDANT:  Objection.  That's hearsay.

16             THE WITNESS:  Which is --

17             THE COURT:  Sustained.  I'm sorry.  You can't answer

18  that question.  Sustained.

19             MR. YATES:  Okay.  I would like to invoke the

20  hearsay exception for agency and --

21             THE COURT:  All right.  But you have to show it

22  first.

23             MR. YATES:  Okay.  Right.  Yes, Your Honor.

24       Q     (BY MR. YATES:)  Ms. Pillos, at that time when you

25  applied for MEI, did you understand that Henry Malinay and

1   Anabel Cabebe were working for MEI?

2            THE DEFENDANT:  Objection.

3            THE WITNESS:  Yes.

4            THE DEFENDANT:  That's leading.

5            THE COURT:  Wait.  So it's foundational.  Overruled.

6       Okay.  So your answer is, "Yes."  All right.

7       Q    (BY MR. YATES:)  And do you understand that MEI was

8   owned by Anthony Williams?

9       A    Yes.

10      Q    Okay.  Now, what did Anthony Williams -- excuse me

11  what the Henry Malinay and --

12           THE COURT:  Okay.  It's still hearsay.  So you have

13  no connection between Anabel Cabebe, Henry Malinay, and

14  Mr. Williams.  You have to show that there's a connection

15  between them.  Just because he owned MEI and she understood --

16  I mean, what was the basis --

17           MR. YATES:  They were employees.  She just testified

18  that they were employees -- they represented they were

19  employees of MEI.

20           THE COURT:  Yeah.  So how does she know that?  How

21  does she know that?  What does she base that

22  Mr. Williams -- did she ever meet Mr. Williams?  Did he tell

23  her that?

24           MR. YATES:  We -- I appreciate that, Your Honor.

25           THE COURT:  Yeah.

UNITED STATES DISTRICT COURT

 1      Q      (BY MR. YATES:)  Did you start paying MEI at that

 2  point?

 3      A      Uhm, yes, right after, yeah, we did.

 4      Q      Okay.  And how much were you paying MEI?

 5      A      $1,032.

 6      Q      Per month, correct?  Per --

 7      A      Pardon me?

 8      Q      Per month?

 9      A      Per month.

10      Q      Now, what did you understand you were to do with

11  respect to your Wells Fargo payments?

12      A      Well, Mr. Williams told us that he is going to call

13  Wells Fargo.

14      Q      Okay.  So at some point you did meet Mr. Williams,

15  correct?

16      A      Yes, we did meet him.

17      Q      Okay.  And so let's talk a little bit about that.

18  Can you please describe the context in which you met

19  Mr. Williams?  What happened?

20      A      Oh, Anabel Cabebe introduced Mr. Williams to us,

21  that he owned the MEI.

22      Q      Okay.  Thank you, Your Honor -- excuse me -- thank

23  you, Ms. Pillos.

24      A      It's good, make somebody nervous.

25      Q      Okay.  And why did Ms. Cabebe introduce you to

1    Anthony Williams?

2        A    Pardon me?

3        Q    Why did Ms. Cabebe introduce you to Anthony

4    Williams?

5        A    Because she told us that he owned the MEI.

6        Q    Okay.  And why did you need to speak with or why did

7    you want to speak with Anthony Williams?

8        A    Because of the foreclosure and the letter that we

9    received for the default letter from Wells Fargo.

10       Q    Okay.  So let's talk about that.  So at some point

11   you stopped paying Wells Fargo; is that correct?

12       A    Right, because they told us to -- not to pay Wells

13   Fargo any more.

14       Q    Okay.  And so as a result of those instructions to

15   stop paying Wells Fargo, you received default letters?

16       A    Right.

17       Q    And then you went into foreclosure?

18       A    Right.

19       Q    Okay.  And as a result of that, you met with Anthony

20   Williams?

21       A    Yes.

22       Q    Okay.  Now, how did Anthony Williams refer to

23   himself when he spoke with you?

24       A    Well, we met each other at one of the office in

25   Maui, and he introduced himself as a general attorney.

UNITED STATES DISTRICT COURT

1    Q    Okay.  And what do you understand a general attorney
2  to be?

3    A    Oh, to fight for us.

4    Q    Okay.  What do you understand the difference is
5  between a general attorney and an attorney at law?

6    A    They are the same.

7    Q    Okay.  And when you met with Anthony Williams, what
8  was the status of your payments to MEI?

9    A    It's $1,032 we were still paying.

10   Q    I'm sorry.  You were still paying MEI when you met
11  Anthony Williams, correct?

12   A    Yes.

13   Q    Okay.  And what did Anthony Williams do or what did
14  he say in response to your concern about your foreclosure
15  proceeding?

16   A    Well, at that point he told us that he is going to
17  contact Wells Fargo and he gave us a letter to show it to the
18  court and to show it to the server.

19   Q    Okay.  And what did Anthony Williams tell you that
20  letter was going to do when you gave it to the court or you
21  gave it out the server?

22   A    Okay.  To stop the foreclosure and to stop for the
23  eviction.

24   Q    And did you ever show that letter to the court?

25   A    Yes, we did.

UNITED STATES DISTRICT COURT

1     Q     And what was the result?

2     A     The result was the judge doesn't agree about that

3   because he is not licensed -- he is not -- Mr. Williams not

4   licensed in Hawaii.

5     Q     Now, did you and Mr. Williams also talk about the

6   MEI mortgage?

7     A     Yes, we did.

8           MR. YATES:  Okay.  So, Your Honor, at this time I

9   would like to show the witness Exhibit No. 820.

10    Q     (BY MR. YATES:)  So if you could turn to 820 in your

11  book in front of you.  Ms. Pillos, if you could look through

12  820 and verify that that's your signature that appears on the

13  fifth and sixth pages of Exhibit 820 and let me know.

14    A     Yes.

15    Q     Okay.  Now is Exhibit 820 a copy, a true and correct

16  copy of the MEI mortgage that you signed for the MEI program?

17    A     Yes.

18          MR. YATES:  Okay.  Your Honor, at this time I move

19  to admit Exhibit 820 into evidence.

20          THE COURT:  All right.  Any objection?

21          THE DEFENDANT:  No objection.

22          THE COURT:  Received.

23          (Exhibit 820 received into evidence.)

24    Q     (BY MR. YATES:)  All right.  So Ms. Pillos, is

25  what's being shown to -- may I publish, Your Honor?

23

1          THE COURT:  You may.

2      Q     (BY MR. YATES:)  Now, Ms. Pillos, is what's being

3   shown to the jury now a copy of the MEI mortgage that was

4   prepared for you as part of the MEI program?

5      A     Yes.

6      Q     Okay.  Now, what, if anything, did Anthony Williams

7   represent to you about what this MEI mortgage was supposed to

8   do for you and for your Wells Fargo mortgage?

9      A     Take over the mortgage.

10     Q     So this MEI mortgage was supposed to do what now?

11     A     To take over the mortgage.

12     Q     Take over your Wells Fargo mortgage?

13     A     Wells Fargo mortgage, yeah.

14     Q     And what, if anything, was this mortgage document

15  supposed to do with respect to your foreclosure?

16     A     Right.

17     Q     What was it supposed to do?

18     A     Supposed to stop for the foreclosure.

19     Q     So do you understand the significance of a

20  foreclosure?  Do you know what a foreclosure is?

21     A     Sure.  They take away our house.

22     Q     Okay.  And you were in a foreclosure proceeding at

23  that time, correct?

24     A     Right.

25     Q     Why didn't you hire a lawyer?

UNITED STATES DISTRICT COURT

24

1        A       Just because we thought Williams would be able to

2    help us out.

3        Q       You continued to pay MEI after you met Anthony

4    Williams, correct?

5        A       Correct.

6        Q       Okay.  And how were you paying MEI at that point?

7        A       Well, at that time we —— first we sent $1,500 to

8    Anabel Cabebe, and after that we paid by —— through checks

9    payable —— mailed it to Anabel Cabebe.

10       Q       Payable to whom?

11       A       MEI.

12       Q       So let's talk about the conclusion of those

13   foreclosure proceedings.  How did that end?

14       A       We have been evicted.

15       Q       So let's talk a little bit about that.  Do you

16   recall the circumstances of your eviction?

17       A       Oh, sure, was very bad because during that eviction,

18   it was Sunday and it was 7 o'clock —— and I'm so sorry about

19   this.  My grandson has autism and we're afraid —— he was

20   shaking.  He was shaking because, you know, all of us, we were

21   so scared because they keep on pounding the door, yelling at us

22   to get out from the house.  So he didn't know what's —— you

23   know, what's going on because they never come to us and tell us

24   ahead of time that they will going to evict us.

25               So my grandson came out from the room because they

UNITED STATES DISTRICT COURT

1    were -- they're in the middle of sleeping because that was

2    Sunday, and lucky thing my niece came over and she hug him

3    because he was shaking and we were afraid that he's going

4    through trauma.  So we -- you know, we don't know -- really

5    don't know because it was scary.  We were thinking about my

6    grandson and if he's going through trauma, you think Williams

7    will help us?  You think William can pay all of this, our loss,

8    our house?  We love our house.  We love our house.  But we've

9    been doing fine, paying our mortgage, but once this MEI came,

10   that's the time when we lost our house.  And, you know, it

11   hurts us so much because we work hard on that house.

12            So I really appreciate it if everything -- I would

13   like to, you know, to file a claim against him, you know.  It's

14   not only $8,000.  It's more than that because of everything

15   we've been through -- stress, depressed --

16            THE COURT:  Okay.  So he's going to have to ask you

17   a question.  All right.  Thank you.

18            THE WITNESS:  Sure, I will.  Sorry about that.

19            THE COURT:  No, no, that's fine.  I understand.

20            THE WITNESS:  I'm sorry.

21            THE COURT:  Do you want to drink some water or take

22   some time?  We're almost at the end of the day.

23            THE WITNESS:  No, that's okay.  I'm just thinking

24   about my grandson.

25            THE COURT:  Why don't we actually recess for the day

1   and give her some time.

2        So, ladies and gentlemen of the jury, I'm going to excuse

3   you a little bit earlier, and if you leave your notebook and

4   your iPads behind.  And, of course, with my usual warnings:

5   Don't discuss the case with anyone or allow anyone to discuss

6   it with you.  Don't research or investigate any witnesses or

7   events.  And don't engage in social media or read, watch, or

8   listen to any media accounts, should there be any.

9        All right.  Please rise for the jury.  They're excused

10  until 8:30 tomorrow morning.  Thank you again for your kind

11  patience with us on behalf of Mr. Williams and all of the

12  attorneys.

13            (Open court out of the presence of the jury.)

14            THE WITNESS:  I'm sorry.  I'm sorry.

15            THE COURT:  No, you're fine.  If you'd like some

16  water, go ahead and have some.  Just sit down and have a few

17  minutes, all right?  So take your time.  You don't have to

18  leave the courtroom.

19        What I'm going to do is have a recess for a few minutes

20  and then we'll come back and we'll pretrial for tomorrow.  All

21  right.  We're in recess.

22            (This concludes the partial testimony requested.)

23            (Proceedings adjourned at 2:26 P.M., until

24            Thursday, February 13, 2020, at 8:30 A.M.)

25

UNITED STATES DISTRICT COURT

1   THURSDAY, FEBRUARY 13, 2020                           8:50 A.M.

2        **MACRINA PILLOS, PREVIOUSLY SWORN, RESUMED THE STAND**

3                      DIRECT EXAMINATION RESUMED

4   BY MR. YATES:

5        Q    Good morning, Ms. Pillos.

6        A    Good morning.

7        Q    Could you please tell the jury the name of your

8   husband?

9        A    Danilo Pillos.

10       Q    And on our checks, whose name appears?

11       A    Danilo, my husband.

12       Q    Okay.  Now, moving on from your testimony yesterday,

13   if you knew that MEI would not take over your Wells Fargo

14   mortgage, how would that have changed your decisions?

15       A    Well, I have to pay my mortgage to Wells Fargo.

16       Q    And if you knew that Anthony Williams could not

17   practice law, would that have changed your decision?

18       A    I still -- I still have to pay for my mortgage to

19   Wells Fargo.

20       Q    And if you knew that Anthony Williams could not

21   represent you in court, what would you have done?

22       A    Pardon me?

23       Q    If you knew that Anthony Williams could not

24   represent in court, would you still have signed up with MEI?

25       A    No.  I still have to go for my mortgage which is

 1    Wells Fargo.

 2              MR. YATES:  I have no further questions on direct,

 3    Your Honor.

 4              THE COURT:  All right.  Mr. Williams, your witness.

 5                        CROSS-EXAMINATION

 6    BY THE DEFENDANT:

 7         Q    Ms. Pillos?

 8         A    Yes.

 9         Q    Where were you born?

10         A    I was born in the Philippines.

11         Q    And the Philippines, did you go to school?

12         A    Oh, yes.

13         Q    And did you graduate high school?

14         A    Yes.

15         Q    Did you go to college?

16         A    Sure.

17         Q    Okay.  So when you went to school in the

18    Philippines, was one of the curriculums that they taught you

19    how to speak English?

20         A    Yes.

21         Q    Did they teach you how to write English?

22         A    Yes.

23         Q    Did they teach you how to read English?

24         A    Yes.

25         Q    Was that a normal curriculum for Filipino children

      1    in the Philippines?

      2         A    Yes.

      3         Q    So every Filipino child when they go to school they

      4    learn to read, write, and speak English?

      5         A    Yes.

      6         Q    So there would be no Filipinos that went to school

      7    in the Philippines that didn't know how to speak English,

      8    correct?

      9              MR. YATES:  Objection.

      10             THE COURT:  Overruled.  So to the extent you

      11   understand the question --

      12             THE WITNESS:  Yes, Your Honor.

      13             THE COURT:  -- you can answer it.  So do you have

      14   the question before you?

      15             THE WITNESS:  No, Your Honor.

      16             THE COURT:  Could you repeat that?

      17        Q    (BY THE DEFENDANT:)  With the Filipino curriculum,

      18   so there would be no Filipino child that went to school that

      19   didn't learn how to read, write, or speak English?

      20        A    Yes.

      21        Q    Okay.  So every Filipino children they taught that?

      22   That's their curriculum in school?

      23        A    Right.

      24        Q    Okay.  So when did you meet me, Ms. Pillos?  What

      25   year?

                        UNITED STATES DISTRICT COURT

```
 1     A     When I met you?

 2     Q     Yes.  What year?

 3     A     That was in 2015, if I'm not mistaken, right.

 4     Q     Okay.  So what year did you meet Anabel and Henry

 5  Malinay?

 6     A     I met Henry Malinay in 2013.

 7     Q     Okay.  So you met Henry Malinay before you ever met

 8  me?

 9     A     Right.

10     Q     And you met Anabel before you ever met me?

11     A     Right.

12     Q     And they're the ones that signed you up, correct?

13     A     Right.

14     Q     So when they signed you up, did they tell you -- did

15  they tell you personally that they actually was still working

16  for me?

17     A     Yes.

18     Q     And so you believed that they -- what they told you

19  was true?

20     A     Right.

21     Q     So did they tell you that the time that they wrote

22  you up that I was incarcerated, that I was in jail?  Did they

23  tell you that?

24     A     No.

25     Q     So you didn't know that the whole time that they
```

```
 1   dealt with you that I was actually unlawfully incarcerated at

 2   the time?

 3             MR. YATES:  Mischaracterizes evidence, Your Honor.

 4             THE COURT:  All right.  Overruled.

 5             THE WITNESS:  Pardon me?

 6        Q    (BY THE DEFENDANT:)  So you didn't know that I was

 7   incarcerated the whole time you was dealing with Anabel and

 8   Henry?

 9        A    No, I don't know.

10             THE DEFENDANT:  Okay.  I'd like to pull up

11   Government Exhibit 820 -- no -- 819, please.

12        Q    (BY THE DEFENDANT:)  And you recognize this

13   document, Ms. Pillos?

14        A    Yes.

15        Q    And who filled out this document for you?

16        A    Anabel Cabebe.

17        Q    And can you see the date right there?

18        A    Yes.

19        Q    And that's -- it says November 4th, 2013, correct?

20        A    Yes.

21        Q    Okay.  So Anabel and Henry didn't tell you that two

22   months prior --

23             MR. YATES:  Objection, Your Honor.  Mischaracterizes

24   the document.

25             THE DEFENDANT:  I haven't finished the question.
```

UNITED STATES DISTRICT COURT

```
 1                    THE COURT:  I'm sorry.  What is the date?

 2                    MR. YATES:  November 4th, 2014.

 3                    THE DEFENDANT:  I said 2013.

 4                    THE COURT:  Well, let me look at the transcript.

 5      All right.  He said -- it's recorded as 2013.  So your

 6      question.

 7                    THE DEFENDANT:  Okay.

 8                    THE COURT:  The objection's overruled.  Your

 9      question.

10         Q     (BY THE DEFENDANT:)  So you didn't know that when

11      you -- this document was filed by Anabel that I had been

12      incarcerated two months prior to this?  You didn't know that,

13      correct?

14         A     No, I didn't know that.

15         Q     Okay.  Now, you said you had paid Anabel for the

16      services that she and Henry said that they could provide to

17      you, correct?

18         A     Pardon me?

19         Q     You said that -- yesterday you testified that

20      Anabel -- you had to pay Anabel for the services they said they

21      could provide to you, correct?

22         A     Yes.

23         Q     And did you pay her in cash?

24         A     I paid him -- I paid Anabel $1,000 to process this

25      paperwork.
```

1      Q      Was that in cash or a check?

2      A      In cash.

3      Q      Did she give you a receipt?

4      A      No.

5      Q      So did you ask for a receipt?

6      A      No.

7      Q      You didn't think that was odd that you would pay

8   somebody a thousand dollars and they didn't want to give you a

9   receipt?

10      A      Well, the thing was that because we are lots of us

11   who sign up, so I don't think none of us asked for the receipt.

12      Q      So none of you asked for a receipt?

13      A      No.

14      Q      Okay.  So you met Anabel you said in Maui?

15      A      Yes.

16      Q      And so she flew to Maui to meet you?

17      A      Right.

18      Q      Now, did she fly with Henry with you --

19      A      No, only her.

20      Q      So just her?

21      A      Yes.

22      Q      So when did you meet Henry?

23      A      I met Henry for the first time that was in 2013.

24      Q      Okay.

25      A      And this was the times that he introduced us

UNITED STATES DISTRICT COURT

1   regarding about MEI.

2       Q     Okay.  So did he actually tell you MEI, Mortgage

3   Enterprise Investments, or did he say Mortgage Enterprise?

4       A     Mortgage Enterprise Investments.

5       Q     So he actually used the word "investments"?

6       A     Right.

7       Q     And he said that he worked for that company?

8       A     Right.

9       Q     And that he was working for me?

10      A     Right.

11      Q     That's what Mr. Malinay told you?

12      A     Right.

13      Q     Now, if you knew that Mr. Malinay did not work for

14  me, would that have influenced you not to sign up with him?

15      A     Sure.

16      Q     Okay.

17            THE DEFENDANT:  Now, give me Government Exhibit 807,

18  please.

19      Q     (BY THE DEFENDANT:)  You recognize this form,

20  Ms. Pillos?

21      A     Yes.

22      Q     And that's your signature?

23      A     Yes.

24      Q     Do you see my signature anywhere on that form?

25      A     No.  But I saw this name, Williams, ET.

| | | |
|---|---|---|
| 1 | Q | Okay.  Can you see that page, the foreclosure? |
| 2 | A | Yeah. |
| 3 | Q | Do you see my signature on that form? |
| 4 | A | No. |
| 5 | Q | Do you see my signature on that form, the next form? |
| 6 | A | No. |
| 7 | Q | Do you see my signature on this form? |
| 8 | A | No. |
| 9 | Q | Do you see my signature on this form? |
| 10 | A | No. |
| 11 | Q | Do you see my signature on this form? |
| 12 | A | No. |
| 13 | Q | But is that your signature? |
| 14 | A | Yes. |
| 15 | Q | And that's your husband's signature? |
| 16 | A | Yes. |
| 17 | Q | And do you see my signature on this form? |
| 18 | A | No. |
| 19 | Q | Is that your signature? |
| 20 | A | Yes. |
| 21 | Q | And that's your husband's signature? |
| 22 | A | Yes. |
| 23 | Q | Now, who filled this form out, Ms. Pillos? |
| 24 | A | Anabel Cabebe. |
| 25 | Q | So Anabel filled this form out? |

UNITED STATES DISTRICT COURT

1     A     Right.

2     Q     Now, why isn't there a date on the form?

3     A     Just because Malinay told us not to put any dates on

4  it.

5     Q     So doesn't it have the word "date" in a line -- can

6  you see --

7     A     Yes, I can see that.

8     Q     -- where it says "date" on a line --

9     A     Yeah.

10          THE COURT:  One of you at a time needs to speak.  So

11  you need to wait till she finishes her answer, and you need to

12  wait until he finishes his question.

13          Okay.  So I think she gave her last answer, so ask her

14  another question.

15     Q     (BY THE DEFENDANT:)  So they told -- what was the

16  reason they told you not to put a date on --

17     A     They never gave us any reason why.

18     Q     You didn't question that?

19     A     No.

20     Q     So did you question why neither one of them signed

21  as a representative if they worked for MEI?

22     A     No.

23     Q     Did you talk to any other MEI clients?

24     A     No, because I don't know them.

25     Q     So -- so Henry and Anabel talked to you and so you

1   never got to talk to any other --

2        A    No.

3            THE COURT:  Wait until he finishes the question,

4   okay?  And wait until she finishes her answer.  All right.

5        Q    (BY THE DEFENDANT:)  So you don't know of any other

6   clients in Maui that actually signed up for Mortgage Enterprise

7   Investments?

8        A    No.

9        Q    Okay.  Now, Ms. Pillos, did you call the FBI and

10  file a complaint against me?

11       A    Oh, I cannot remember.  I cannot recall because that

12  was already way far.  I couldn't remember.

13       Q    Okay.  Did you file a complaint with the DCCA

14  against me?

15       A    I cannot remember, sir.

16       Q    Did you make any complaint to any agency against me?

17       A    Well, I did.  I remember.  Yes, I did call.

18       Q    You called and made a complaint against me

19  personally?

20       A    Right, right.

21       Q    And what was the complaint?

22       A    The complaint was regarding about my foreclosure.

23  That's my -- that's my complaint.

24            THE DEFENDANT:  Okay.  Now, give me

25  Government -- well, my exhibit, Defense Exhibit 2035 and it's

UNITED STATES DISTRICT COURT

1    page 8.

2          Q    (BY THE DEFENDANT:)  Can you see that on your

3    screen, Ms. Pillos?

4          A    Yes.

5          Q    Now, this letter was addressed to you from the DCCA,

6    Ms. Pillos; is that correct?

7          A    Yes.

8          Q    And do you remember this letter?

9          A    Yes, I remember this letter.

10         Q    And what -- excuse me.  What was this letter in

11   regards to?

12              MR. YATES:  Your Honor, is this document going to be

13   placed into evidence?  'Cause if not, the government objects to

14   this.

15              THE COURT:  All right.  So you can't go into the

16   content of the letter unless it's in evidence.  Do you want me

17   to receive it into --

18              THE DEFENDANT:  Yes.

19              THE COURT:  Any objection?  Just this page of

20   Exhibit 2035.

21              THE DEFENDANT:  Right.

22              THE COURT:  Any objection, Mr. Yates?

23              MR. YATES:  Yes, Your Honor.  The government objects

24   to 2035, page 8.  This is a hearsay document.  It appears to be

25   merely an inquiry document, so this does not have any indicia

UNITED STATES DISTRICT COURT

1   of authorship by the current witness and does not appear that

2   the current witness has any part in its creation or its

3   initiation.

4           THE COURT:  Okay.  But it clearly was received by

5   her.  She's identified it as correspondence that she received.

6   So the court is going to receive it into evidence over the

7   objection of the government.

8           THE DEFENDANT:  I'd like to publish it.

9           THE COURT:  You may publish.

10          THE COURTROOM MANAGER:  Your Honor, just to be

11  clear, that's page 8?

12          THE COURT:  Just page 8.  Ye.

13      Ah.

14          THE COURTROOM MANAGER:  Thank you.

15          THE COURT:  The rest of the identified exhibit is

16  not received.

17          (Exhibit 2035, page 8 received into evidence.)

18      Q   (BY THE DEFENDANT:)  Okay.  Ms. Pillos, on this

19  document, you see the date right there?  I'm going to circle

20  it.

21          THE COURTROOM MANAGER:  Your Honor, he's asked to

22  publish it?

23          THE COURT:  Yes, he may.

24      Q   (BY THE DEFENDANT:)  And what is the date of that

25  document, Ms. Pillos?

UNITED STATES DISTRICT COURT

 1        A      May 7, 2015.

 2        Q      And so when the DCCA contact you, were they

 3   contacting you regarding numerous complaints that were filed by

 4   other Maui residents?

 5        A      I'm not --

 6        Q      You can go ahead and read the -- read the -- can I

 7   read it to her?  Or she, you know, won't know how to read it?

 8               THE COURT:  No.  She can't testify about anything

 9   she doesn't remember.

10               THE DEFENDANT:  What I'm saying, that was to her.

11        Q      (BY THE DEFENDANT:)  So you remember receiving this

12   letter, Ms. Pillos?

13               THE COURT:  She already --

14               THE WITNESS:  I couldn't -- I don't remember because

15   this was a long time.

16        Q      (BY THE DEFENDANT:)  I know.  But you just said you

17   do --

18               THE COURT:  All right.  Ask her a question.  She

19   said she doesn't remember receiving this letter.

20               THE DEFENDANT:  Well --

21               THE COURT:  So what do you want to ask her about it?

22               THE DEFENDANT:  Well, the first question I did ask

23   her.  She did remember it.

24               THE COURT:  She just testified she doesn't remember,

25   this was a long time ago.  You can ask her another question.


                    UNITED STATES DISTRICT COURT

1    You can try to refresh her recollection.  What do you want to

2    do?

3        Q      (BY THE DEFENDANT:)  When the DCCA contact you, did

4    they tell you that the complaints were against Mortgage

5    Enterprise?

6        A      Right.

7        Q      Right.  But they didn't tell you it was against

8    Mortgage Enterprise Investments, right?

9        A      They did.

10       Q      So this letter, can you look at the first two

11   paragraph, first two sentences on the document?  And you see

12   where it says, "The Office of Consumer Protection have received

13   numerous complaints against a business called Mortgage

14   Enterprise"?

15       A      Yes.

16       Q      Okay.  And it does not say investments, correct?

17       A      When they called me, they said Mortgage Enterprise

18   Investments.

19       Q      Okay.  So but you understood that it was Henry and

20   Anabel that wrote you up for this so-called -- their program,

21   correct?

22       A      I don't remember.

23       Q      Well, I'm saying you say Henry --

24       A      Yes, Henry.

25       Q      Right.  So they're the ones that wrote you up for

UNITED STATES DISTRICT COURT

```
1     the Mortgage Enterprise program that they promised you?

2          A     Right.

3          Q     And you paid them, correct?

4          A     Right.

5          Q     Do you have any documentation that you paid me?

6          A     Yes.  I have all the checks here, the copy of the

7     checks --

8          Q     Yes.

9          A     -- that I gave it to you.

10         Q     Yes.  What check did you pay Mortgage Enterprise

11    Investments?

12         A     Hold on.  Let me check if I have here.  I

13    don't -- oh, it's not in this book.  Yes, I'm so sorry, but I

14    have it.

15         Q     Okay.  Now, do you remember after you met me in

16    2015, that I informed you that Anabel and Henry did not work

17    for me?  You don't remember that conversation we had?

18               THE COURT:  Wait.  Is your question that does she

19    remember or she doesn't remember?  What's your question?

20         Q     (BY THE DEFENDANT:)  Do you remember the

21    conversation that we had about Anabel and Henry not working for

22    me?

23         A     I don't remember.

24               THE DEFENDANT:  Can I get exhibit -- Government

25    Exhibit 820?  And I think this one's already been received into
```

 1    evidence, hasn't it?  The government -- it's already in

 2    evidence?

 3              THE COURT:  Yes, it has been received.

 4              THE DEFENDANT:  Okay.  I'd like to publish it.

 5              THE COURT:  You may.

 6       Q    (BY THE DEFENDANT:)  Okay.  Ms. Pillos, you see the

 7    first line that I circled?

 8       A    Yes.

 9       Q    And on there does it state that the date that you

10    did this mortgage with Mortgage Enterprise Investments is the

11    21st day of April 2015?

12       A    Right.

13       Q    Okay.  And is that your signature, Ms. Pillos?

14       A    Yes.

15       Q    That also your signature?

16       A    Yeah, that's my signature.

17       Q    Okay.  And who was the notary that notarized this

18    document?

19       A    Piros, Cecelia Piros.

20       Q    And where was this document notarized at?

21       A    Pardon me?

22       Q    Where were you at when this document was notarized?

23       A    In her office.

24       Q    And where is her office?

25       A    In Kahului.

```
 1        Q       Kahului?

 2        A       Yes.

 3        Q       Is that in Maui?

 4        A       That's in Maui.

 5        Q       Okay.  Now, was I present when you signed this

 6   document?

 7        A       No, you wasn't present.

 8        Q       So I wasn't present?

 9        A       No.

10        Q       Did you receive a note?  'Cause a note goes with

11   this.  Did you receive a MEI note to sign?

12               MR. YATES:  Objection.  Testifying.

13               THE DEFENDANT:  No.

14        Q       (BY THE DEFENDANT:)  Did you receive a MEI note to

15   sign?

16               THE COURT:  He objected.  What's your objection?

17               MR. YATES:  Objection.  He's testifying with respect

18   to the presence of a note.

19               THE COURT:  Overruled.

20         So you're asking her was there a note attached to this

21   when she signed?

22               THE DEFENDANT:  Right.

23               THE WITNESS:  I don't remember.

24        Q       (BY THE DEFENDANT:)  Okay.  So you don't remember

25   signing this document and then a separate document?
```

1      A      Yeah, I don't remember.

2      Q      Okay.  So do you have any paperwork, any

3  documentation that has your signature and my signature on it?

4      A      No.

5      Q      And so when you signed this mortgage document, what

6  did Ms. Piros tell you?

7              THE COURT:  She's Ms. Pillos.

8              THE DEFENDANT:  No, I mean Piros, Ms. Piros.

9              THE WITNESS:  Anabel was with her.

10     Q      (BY THE DEFENDANT:)  So Anabel was with her?

11     A      Yes.

12     Q      So Anabel was present when Ms. Pea rows notarized

13  the document?

14     A      Right.

15     Q      And what did Anabel tell you about once you signed

16  this document?  What did she tell you?

17     A      Well, in fact, that was the first time that I met

18  Anabel, and that was -- she introduce me that you are

19  the -- you are the, uhm, promoter on this mortgage, you are the

20  owner of this mortgage.

21     Q      Okay.  Wait a minute, Ms. Pillos.  So you saying

22  this -- when you signed this mortgage document, you saying now

23  this was the first time you met Anabel?

24     A      Yes.

25     Q      But you just testified that Anabel -- you met Anabel

1   in 2013 and you paid her cash without a receipt.

2       A      Yeah -- oh, this is my second time.  I'm sorry.

3   Yeah, this is my second time to meet Anabel.  The first time

4   was the one he did the other paperwork.

5       Q      So this is the second time --

6       A      Yeah.

7       Q      -- you met Anabel?

8       A      This is the second time.

9       Q      Okay.  So when Anabel filled out this document for

10  you and -- did you see her draft it or was it already prepared?

11      A      It's already prepared.

12      Q      Okay.  So when she gave you the document, did she

13  explain to you what the document was?

14      A      No.

15      Q      Did she --

16             THE COURT:  Wait.  Okay.  Wait.  You guys are

17  talking over each other.  So let her finish her answer.

18             THE WITNESS:  I don't remember at all.

19      Q      (BY THE DEFENDANT:)  Okay.  So you don't remember

20  her explaining what the purpose of this document was?

21      A      No, I don't remember.  I for- -- I don't remember.

22      Q      Okay.  Now, you signed this document.  It

23  says -- okay.  On the first page it says you signed the

24  document on the 21st day of April 2015.  But can you see the

25  date here that it's filed?

UNITED STATES DISTRICT COURT

1     A     Yes.

2     Q     Okay.  Did you ask Ms. Anabel why the late filing?

3  Why was it filed over a month after you signed up, after you

4  signed this document?

5     A     No, I don't remember if I call -- I don't remember.

6     Q     Okay.  So do you remember how many checks that you

7  sent or that you gave Anabel after you signed this document?

8     A     Well, ever since we started paying her, we always

9  mailed it to her because she told us that we have to mail the

10 check to her and she will be the one to mail it out to you.

11    Q     Okay.  So Anabel told you to mail the check from

12 Maui?

13    A     Yeah.

14    Q     To her?

15    A     To her.

16    Q     And then that she would mail the check to me?

17    A     Right.

18    Q     Okay.  Now, after this exchange, did you talk to me

19 on the phone after this document was created?

20    A     No, because I don't even know you.  I didn't even

21 know your number.

22    Q     Right.  Now, if you was in foreclosure, did you call

23 my 800 number to contact me to -- if you was in foreclosure?

24    A     No, because I don't know your number.  You never

25 give me -- us your number.  The only thing I call was Cabebe.

1     Q     Okay.  So your only contact was Anabel?

2     A     Yes.

3     Q     And did you have any contact with Henry after this?

4     A     No.

5     Q     So from this time it was just you and Anabel?

6     A     Right.

7     Q     Okay.  So you didn't know whether she had

8  authorization from me or not 'cause you never talked to me,

9  correct?

10    A     Right.

11    Q     Okay.  So yesterday you had talked about your

12 foreclosure.  Did Anabel send you any documents to file on your

13 behalf to fight your foreclosure?

14    A     No.

15    Q     Did she send any documents to your husband?

16    A     No.

17    Q     Did you see any documents that were filed on your

18 behalf?

19    A     No.  I don't remember.

20    Q     Okay.  So when none of this happened -- 'cause

21 remember the DCCA had sent you a letter on May 7th, 2015,

22 correct?

23    A     Right.

24    Q     Okay.  So this document was filed after DCCA had

25 already contacted you about the fraudulent Mortgage Enterprise

UNITED STATES DISTRICT COURT

1    that had the deal with Henry and Anabel.  So if they contacted

2    you before this document was filed, why would you continue to

3    do business with Anabel?

4        A      Well, because that was the time that we still -- we

5    knew that you would be able to help us out.

6        Q      So that's what she told you?

7        A      Yes.

8        Q      So -- but you never talked to me after you talked to

9    Anabel?  You said you couldn't -- you didn't know my number?

10       A      No.

11       Q      So how could you know that if you never talked to

12   me?

13       A      Well, because when I called Anabel, she told me to

14   call -- that she will be the one to call you.  That's why we

15   kept on calling Anabel because I don't know your number.  I

16   never even met you at that time yet.

17       Q      So why didn't you ask Anabel just to give you my

18   number so you can call me directly?

19       A      Well, you know, because I was kind of stressing and

20   we really didn't know what to do that time.  So since I have

21   Anabel Cabebe's number, I always call her because I know that

22   she's working for you.

23       Q      Okay.  Ms. Pillos --

24              Can I get Government Exhibit 807 back up again,

25   please?

50

 1              Okay.  Ms. Pillos, you see this form right here?

 2      A     Yeah.

 3      Q     Okay.  You see it says Client and Company Protection

 4   Form?  You see that at the top under Mortgage Enterprise

 5   Investments?

 6      A     Yeah.

 7      Q     Okay.  Now, did Anabel explain to you why I had to

 8   add this cover page to all the applications?

 9      A     No.  I don't remember.

10              THE DEFENDANT:  Okay.  Can you -- can we blow this

11   up a little bit?

12      Q     (BY THE DEFENDANT:)  Can you see where it says

13   Client under there, Ms. Pillos?

14      A     Yes.

15      Q     And can you read that -- do you understand what it's

16   saying, this -- this little excerpt on this form?

17      A     Yes.

18      Q     And does it have my toll free 800 number on this

19   form, Ms. Pillos?

20      A     Yes.

21      Q     And does it have my direct extension?

22      A     Yes.

23      Q     And is it talking about that if a rep charge you

24   fees beyond what's stated in the app, to call me personally?

25      A     Well, the thing we didn't -- I don't remember if we

UNITED STATES DISTRICT COURT

1   received this letter.  I don't remember at all.

2        Q    Okay.  Ms. Pillos, is that your signature?  Is that

3   your signature, Ms. Pillos?

4        A    Yes.

5        Q    Okay.  So you signed this form that had my direct

6   number, my direct extension to call me if you had any questions

7   about Anabel, what she did, if you had any questions.  So you

8   telling me that Anabel told you that she would call me?

9        A    Right.

10       Q    But you had the form with my direct line and my

11  direct number to call and talk to me.

12       A    Well, the thing is that, okay, we signed the

13  paperwork, but I really don't remember.

14       Q    I'm saying when you signed this paperwork, you

15  didn't read the document?  You didn't read the -- what you were

16  signing?

17       A    No.  I forget.

18       Q    And so you didn't see the number on here?

19       A    No.  I don't remember.

20       Q    So you never got to really talk to me to verify that

21  Anabel didn't work for me no more?

22       A    Well, she introduced me.  She introduced -- Anabel

23  introduced me that you are the owner of the Mortgage

24  Enterprise -- Mortgage Enterprise Investments.

25       Q    Right.  Well, I am the owner of Mortgage Enterprise

UNITED STATES DISTRICT COURT

1    Investments.  But did she tell you that I'm not the owner of

2    Mortgage Enterprise?

3         A     No, she never say that that you are not the owner.

4         Q     So she didn't -- did she make a distinction between

5    Mortgage Enterprise Investments and Mortgage Enterprise?

6         A     She did say Mortgage Enterprise Investments and you

7    are the owner.

8         Q     Okay.  I'm asking you did she make a distinction?

9    Did she say there's a Mortgage Enterprise Investments and then

10   there's a Mortgage Enterprise?

11        A     No.  I forget.

12        Q     So you don't remember?

13        A     I don't remember.

14        Q     Okay.  So, Ms. Pillos, if you knew at this time that

15   Anabel nor Henry actually worked for me, that I actually fired

16   them for fraud, would you have done business with them?

17        A     No.

18              THE DEFENDANT:  Okay.  I have no more questions.

19              THE COURT:  All right.  Redirect.  Your witness.

20              MR. YATES:  Yes, Your Honor.

21                     REDIRECT EXAMINATION

22   BY MR. YATES:

23        Q     Ms. Pillos, when was your meeting with Henry Malinay

24   when you discussed signing up for MEI?

25        A     This was the middle of the year.  I think this is

UNITED STATES DISTRICT COURT

53

1    June 2013.

2        Q     Okay.  And I believe you testified just now

3    regarding some documents, so I'd like to put them up.

4             Your Honor, the first document is Exhibit 807 which

5    is in evidence.  May I publish?

6             THE COURT:  You may.

7        Q     (BY MR. YATES:)  Okay.  Now, Mrs. Pillos, you recall

8    this document?  This is the MEI application?

9        A     Yes.

10       Q     Okay.  And what were you told regarding filling in

11   dates for this application?

12       A     Henry Malinay told us not to put the dates on it.

13            MR. YATES:  Your Honor, I'd like to put up 820 which

14   is in evidence.  May I publish?

15            THE COURT:  You may.

16       Q     (BY MR. YATES:)  Now, Ms. Pillos, do you recall

17   testifying regarding this MEI mortgage?

18       A     Right.

19       Q     Okay.  And you recall testifying that you signed

20   this mortgage, correct?

21       A     Correct.

22       Q     Okay.  Now I'm going to turn to the first page here.

23   There appears to be a date that's written in.  Is that your

24   handwriting?

25       A     No.

UNITED STATES DISTRICT COURT

54

1     Q     And the handwriting refers to a date, correct?

2     A     Correct.

3     Q     And I turn to the signature page for this MEI

4  mortgage, and the MEI mortgage page here has some signatures,

5  and I believe you testified those -- that's your signature and

6  your husband's signature, correct?

7     A     Right, correct.

8     Q     Is that your handwriting where the date is?

9     A     Right.

10    Q     Is that your handwriting?

11    A     Right.

12    Q     Whose handwriting is the date?

13    A     Oh, the date, Mrs. Piros.

14    Q     Piros?

15    A     Yeah, the one who did the --

16    Q     Do you recall when you filled out the MEI mortgage

17  document?

18    A     Pardon me?

19    Q     Do you recall when you filled out this MEI mortgage

20  document?

21    A     Can you repeat?

22    Q     When did you fill out the MEI mortgage document,

23  this document?

24    A     This was in 2013.

25    Q     Okay.  But I see that the dates that are on this

UNITED STATES DISTRICT COURT

1    document are 2015.  Do you have an explanation for that?

2        A    They supposed to take over my mortgage which is

3    Wells Fargo.

4        Q    Okay.  But you recall that you signed this document

5    in 2013, correct?

6        A    Right.

7        Q    Without dates?

8        A    Right.

9        Q    Now, you recall that you had signed up with the

10   entity Mortgage Enterprise Investments, correct?

11       A    Correct.

12       Q    And who did you sign your checks to?

13       A    Oh, payable to Mortgage Enterprise Investments.

14       Q    And where did you send those checks?

15       A    To Cabebe.

16       Q    And to Anabel Cabebe in -- on Oahu?

17       A    On Oahu.

18       Q    Do you remember if it was the Democrat Street house?

19       A    Yes, 600 something.

20       Q    And when you were in foreclosure, who did you call?

21       A    Anabel Cabebe.

22       Q    And after you called Anabel Cabebe, who visited you

23   in Maui to help you?

24       A    Uhm, Mr. Williams.

25       Q    Did you understand where your checks were going

1    to -- whose account the checks were going to?

2         A     Mr. Williams's.

3         Q     Okay.  And those were the checks that were written

4    to MEI, correct?

5         A     Correct.

6               MR. YATES:  Nothing further on redirect, Your Honor.

7               THE COURT:  All right.  Thank you very much --

8               THE WITNESS:  Well, I just only want to express my

9    feelings.

10              THE COURT:  Yes.  I'm so sorry.  You know, I know

11   you've been through a lot, but this is a trial.  So there has

12   to be an attorney or Mr. Williams asking you questions.  But if

13   you would like to, you know, speak to the assistant from their

14   office and express your feelings.

15              THE WITNESS:  Thank you so much, Your Honor.  Thank

16   you very much.

17              THE COURT:  So you're excused as a witness, okay?

18              THE WITNESS:  Thank you so much, Your Honor.

19         (This concludes the partial testimony requested.)

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2

 3            I, DEBRA READ, Official Court Reporter, United

 4   States District Court, District of Hawaii, do hereby certify

 5   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 6   true, and correct transcript of the stenographically reported

 7   proceedings held in the above-entitled matter and that the

 8   transcript page format is in conformance with the regulations

 9   of the Judicial Conference of the United States.

10                    DATED at Honolulu, Hawaii, February 23, 2020.

11

12

13                    /s/ Debra Read

14                    DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25
```