1                 IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF HAWAII

3
    UNITED STATES OF AMERICA,        ) CR 17-00101 LEK
4                                    )
               Plaintiff,            ) Honolulu, Hawaii
5                                    ) February 13, 2020
        vs.                          )
6                                    ) PARTIAL TRANSCRIPT:
    (1) ANTHONY T. WILLIAMS,         ) TESTIMONY OF DAMON STANFORD
7                                    )
               Defendant.            )
8    _____)

9
                  PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
10               BEFORE THE HONORABLE LESLIE E. KOBAYASHI
                     UNITED STATES DISTRICT JUDGE
11
    APPEARANCES:
12
    For the Government:        KENNETH M. SORENSON, AUSA
13                             GREGG PARIS YATES, AUSA
                               Office of the United States Attorney
14                             300 Ala Moana Boulevard, Suite 6100
                               Honolulu, Hawaii 96850
15
    Also Present:             MEGAN CRAWLEY, FBI Special Agent
16
    For the Defendant (1)      ANTHONY T. WILLIAMS, *Pro Se*
17   Anthony T. Williams:      05963-122
                               Federal Detention Center Honolulu
18                             Inmate Mail/Parcels
                               P.O. Box 30080
19                             Honolulu, Hawaii 96820

20   Standby Counsel:          LARS ROBERT ISAACSON, ESQ.
                               547 Halekauwila Street, Suite 102
21                             Honolulu, Hawaii 96813

22   Official Court Reporter:  DEBRA READ, RDR
                               United States District Court
23                             300 Ala Moana Boulevard
                               Honolulu, Hawaii 96850
24
    Proceedings recorded by electronic sound recording; transcript
25   produced with computer-aided transcription (CAT).


                      UNITED STATES DISTRICT COURT

1                        I N D E X

2            CHRONOLOGICAL INDEX OF WITNESSES

3

4  GOVERNMENT'S WITNESS                          PAGE

5

6  **DAMON LESLIE JAMES BRIAN STANFORD**
    Direct Examination By Mr. Yates              3
7   Cross-Examination By The Defendant           8

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1   THURSDAY, FEBRUARY 13, 2020                          9:26 A.M.

 2                    (Partial transcript begins:)

 3   DAMON LESLIE JAMES BRIAN STANFORD, GOVERNMENT'S WITNESS,

 4                           WAS SWORN

 5                THE COURTROOM MANAGER:  Thank you.  Please be

 6   seated.

 7        If you can state your full name and spell your last name

 8   for the record.

 9                THE WITNESS:  Full name is Damon Leslie James Brian

10   Stanford.  Last name is spelled S-t-a-n-d-f-o-r-d.

11                THE COURT:  Your witness.

12                MR. YATES:  Yes, Your Honor.

13                          DIRECT EXAMINATION

14   BY MR. YATES:

15        Q     Good morning, Mr. Stand ford.  Can you please tell

16   the jury who your employer is?

17        A     I'm currently employed by Central Pacific Bank.

18        Q     And what is your title at Central Pacific Bank?

19        A     I am the Resolution and Recovery Manager Assistant

20   Vice President.

21        Q     Now, what are your responsibilities as the

22   Resolution and Recovery Assistant Vice President?

23        A     My duties include overseeing of foreclosures,

24   bankruptcy, complex litigation, and troubled debt for the bank.

25        Q     Now, are you -- do your responsibilities also
```

1    include being a records custodian for Central Pacific Bank?

2         A    They do.

3         Q    And was Central Pacific Bank the lender for

4    Mr. Reymundo and Ms. Mary Jane Laforteza?

5         A    Yes.

6         Q    Are you familiar with the records of Central Pacific

7    Bank for Mr. Reymundo and Ms. Mary Jane Laforteza?

8         A    Yes.

9         Q    Now, Mr. Stanford, can you please explain to the

10   jury when the Lafortezas became clients of Central Pacific

11   Bank?

12        A    Mr. and Mrs. Laforteza became clients of the bank in

13   May of 2012.

14        Q    And how did the Lafortezas become clients of Central

15   Pacific Bank?

16        A    They had submitted a mortgage application for a

17   property.

18        Q    And was this a refinance?

19        A    Yes.

20        Q    And how much money did the Lafortezas borrow?

21             It appears, Mr. Stanford, that you're referring to

22   some documents.  If you need to refresh your recollection,

23   please do ask.  But if you don't need to refresh your

24   recollection, I ask that you close that.

25        A    Yes, sorry.  The amount of the financing was

 1  approximately $525,000.

 2        Q      What was the term of the Lafortezas' loan?

 3        A      It was 30 years, sir.

 4        Q      Okay.  And for that -- that was for a house at

 5  94-284 Loaa Street?

 6        A      Yes.

 7        Q      And that was subject to a Central Pacific Bank

 8  mortgage, correct?

 9        A      Yes.

10        Q      So let's talk a little bit about the Lafortezas'

11  payment history after refinancing with Central Pacific Bank.

12  So from June 2012 through November of 2012, how would you

13  characterize the Lafortezas' payment history?

14        A      They were making their payments on time.

15        Q      And how about from December 2012 to approximately

16  June of 2013?

17        A      The payments were being made on time.

18        Q      Okay.  And did there come a time when payments

19  stopped?

20        A      Yes.

21        Q      Okay.  And when was that?

22        A      I would need to refer to the exhibits, if I could.

23        Q      You may -- Your Honor, may he refresh his

24  recollection with respect to an exhibit?

25        A      Thank you.

UNITED STATES DISTRICT COURT

```
 1        Q      What, may I ask -- for the record, what exhibit

 2   would help you refresh your recollection?

 3        A      The payment history.

 4        Q      Okay.  And so --

 5        A      Which would be Exhibit 415.

 6               MR. YATES:  Your Honor, may the witness refresh his

 7   recollection with Exhibit 415?

 8               THE COURT:  He may.

 9               THE WITNESS:  Thank you.

10        The last payment that was received was on July 25th, 2013,

11   and there were no more payments thereafter.

12        Q      (BY MR. YATES:)  Okay.  So what did Central Pacific

13   Bank do after the Lafortezas stopped paying their mortgage in

14   or about July of 20- -- you said -13?

15        A      Yes.

16        Q      What did Central Pacific Bank do?

17        A      We sent a demand letter to the Lafortezas.

18        Q      Okay.  And did you receive any response from the

19   Lafortezas?

20        A      We did not.

21        Q      And what happened then?

22        A      We subsequently assigned the account to outside

23   counsel to commence the foreclosure action.

24        Q      Okay.  And what was the end result of the

25   foreclosure action against the Lafortezas?
```

UNITED STATES DISTRICT COURT

1       A       Once the foreclosure was completed, title was

2   transferred back to the bank.

3       Q       Okay.  And did the bank take the house and sell it?

4       A       Yes.

5       Q       What was the final loss amount for Central Pacific

6   Bank?

7       A       $99,000.

8       Q       Now, could the Lafortezas have done anything to stop

9   the foreclosure on their house after --

10              THE DEFENDANT:  Objection.  Speculation.

11              MR. YATES:  It's his job.

12              THE COURT:  All right.  So why don't you ask him and

13  lay the foundation for that.  I'll sustain.

14      Q       (BY MR. YATES:)  Mr. Stanford, do your

15  responsibilities as the recovery and resolution manager or vice

16  president include overseeing foreclosure actions?

17      A       Yes.

18      Q       Okay.  And for Central Pacific Bank, correct?

19      A       Yes.

20      Q       Okay.  Now, could the Lafortezas have stopped the

21  foreclosure on their house once the proceedings began?

22      A       Yes.

23      Q       Okay.  And what could they have done?

24      A       They would need to have submitted some financial

25  information to support that they wished to retain the home.

```
 1      Q     Did the Lafortezas do that?

 2      A     No.

 3      Q     Now, are you familiar with Anthony Williams?

 4      A     Yes.

 5      Q     How are you familiar with Anthony Williams?

 6      A     Mr. Williams had sent a letter, I believe in April

 7   of 2015 or 2016, as I recall, indicating that the bank did not

 8   have reason to foreclose nor for the commissioner who was

 9   assigned by the court to collect rents.

10      Q     And did Central Pacific Bank engage with Anthony

11   Williams?

12      A     No, we did not.

13      Q     Why not?

14      A     We are required under Hawaii Revised Statutes to

15   only engage in counsels which hold a bar license.

16      Q     And did you understand that Anthony Williams had a

17   bar license?

18      A     To my knowledge, he did not.

19            MR. YATES:  Nothing further on direct, Your Honor.

20            THE COURT:  All right.  Any cross-examination?

21            THE DEFENDANT:  Yes.

22            THE COURT:  Okay.  Your witness.

23                      CROSS-EXAMINATION

24   BY THE DEFENDANT:

25      Q     Now, Mr. Standford, you said that you come to know
```

1  me?

2       A     Yes.

3       Q     And you came to know me through correspondence?

4       A     Yes.

5       Q     So you said that your policy is that you

6  don't -- your company don't deal with someone who's not a

7  member of the bar?

8       A     I said that when an attorney is licensed, attorneys

9  speak to attorneys under Hawaii Revised Statutes.

10      Q     So -- and so you're saying that in order for you all

11  to correspond with someone, they would have to be a member of

12  the bar?

13      A     Our attorney would need to correspond if you are an

14  attorney.

15      Q     So you cannot correspond with anybody unless they're

16  an attorney?

17      A     Our attorneys will correspond with other attorneys.

18  I do not personally correspond with attorneys.

19      Q     So is that what the bank attorneys told you?

20      A     We did not have any indication that you were a

21  licensed attorney.

22      Q     Okay.  Now, you just said that your -- the attorneys

23  for the bank deal with that, correct?

24      A     Correct.

25      Q     So you didn't deal with that, correct?

UNITED STATES DISTRICT COURT

1      A      I received the correspondence that was sent to the

2   commissioner, as stated.

3      Q      And so when you received that correspondence, what

4   did you do with the correspondence?

5      A      It was noted and it was filed.

6      Q      Did you send it to your attorneys?

7      A      The attorney was the recipient of the document via

8   the foreclosure commissioner.

9      Q      Okay.  Now, did you have privy to the letter that I

10   sent to your bank's attorney?

11      A      Yes.

12      Q      And was that a power of attorney form that I sent?

13   Do you remember I sent to your bank attorneys?

14      A      I would need to refresh my memory by looking at the

15   document.

16      Q      I mean, you said you all received the correspondence

17   from me, correct?

18      A      Right.  I did not bring it into the courtroom today.

19      Q      Okay.  So do you understand the power of attorney

20   statute in Hawaii?

21      A      Yes.

22      Q      And do you know that what statute it is?  Do you

23   know what the actual law is?

24      A      I cannot quote it to you verse.

25      Q      If I was to tell you that it's Hawaii Revised

1  Statutes 551D, would you recognize that?

2       A     No.

3       Q     So you still wouldn't recognize it.  So do you know

4  what the statute says in regards to power of attorney?

5       A     Specifically I have to refresh my memory and read

6  the document.

7       Q     Okay.  So right now you don't know really what a

8  power of attorney does in reference to someone corresponding

9  with your attorneys regarding their property?

10      A     Because this was a matter under litigation and was

11 already adjudicated or in adjudication with the court, that

12 information would needed to be asked to by the court.

13      Q     So -- so I was dealing with your bank attorneys,

14 correct?

15      A     Yes.

16      Q     Okay.  So did you ever send a letter back to me

17 personally from you?

18      A     No.  I don't need to.

19      Q     Okay.  So in my correspondence with the attorneys,

20 did you see the other letters that I sent your bank attorneys?

21      A     The letter that I saw was specifically written to

22 the commissioner.

23      Q     So you didn't see the letter that I sent to your

24 bank attorneys?

25      A     No, I did not.

1    Q    Okay.  So you don't know what the contents of that

2    letter that I sent to them?

3    A    I could not speak to it.

4    Q    Okay.  So you can't testify here truthfully that I

5    did not have a right to assist the Lafortezas because I had a

6    power of attorney; that correct?

7    A    No.

8    Q    So -- so then you do know the Hawaii Revised

9    Statutes, what it says according to power of attorneys then?

10   A    I'm familiar with it, but we rely on outside counsel

11   to direct the bank for foreclosures.

12   Q    So you don't -- do you understand what Hawaii law is

13   and that everybody still have to follow the law?

14   A    Yes.

15   Q    Okay.  So if the Hawaii Revised Statutes 551D states

16   that once I get a power of attorney, that if I send a letter to

17   your bank or to your bank attorney, that they would have to

18   deal with me directly on behalf of my clients?  Now, do you

19   understand that?

20   A    I understand that that expectation would need to

21   have been sent to the court as well.

22   Q    The court has nothing to do with the correspondence

23   between the client and the bank, sir.  Do you not understand

24   that?

25   A    I understand that there was an intercession by the

13

1    commissioner of a letter by Mr. Anthony Williams, and in my

2    understanding, it didn't have any weight.

3        Q    Okay.  So -- and so you very versed in law then?

4        A    I am not an attorney.

5        Q    Okay.  So how can you make that statement they

6    didn't have any weight if you're not an attorney and you don't

7    know the law?

8        A    It was my understanding that if you were a power of

9    attorney that you would have filed some action for the

10   Lafortezas in open court.

11       Q    I -- so you didn't see all the motions I filed for

12   the Lafortezas in court?

13       A    I understand that those motions were denied.

14       Q    No.  Where -- you got some paperwork that said the

15   motions were denied?

16            THE COURT:  So that's his understanding, so you can

17   ask him another question.

18       Q    (BY THE DEFENDANT:)  So -- so your whole

19   understanding is from what someone told you, but not in, like,

20   your actual knowledge of the law?

21       A    I have knowledge of foreclosures.

22       Q    Okay.  You just mentioned about the commissioner,

23   right?

24       A    Yes.

25       Q    Okay.  Now, do you know the law regarding

UNITED STATES DISTRICT COURT

1    appointment of commissioners?

2         A    I am familiar with the law regarding appointment of

3    commissioners.

4         Q    Okay.  So did you know that that law is Title 12

5    U.S.C. 3754, correct?

6         A    That law refers to nonjudicial foreclosure action.

7    In this case it was a court oversight commissioner appointed.

8         Q    No, sir, that's a misstatement of law.  Now --

9              MR. YATES:  Objection.  Argumentative.

10             THE COURT:  I'm sorry.  So what's your objection?

11             MR. YATES:  Argument.

12             THE COURT:  All right.  Sustained.

13         All right.  Ask a question.

14         Q    (BY THE DEFENDANT:)  Okay.  So under the Title 12

15    U.S.C. 3754, who has to appoint a commissioner by law in order

16    to be a commissioner in a foreclosure whether it's nonjudicial

17    or judicial?

18             MR. YATES:  Objection.  Relevance.

19             THE DEFENDANT:  'Cause he says he -- he said he

20    knows --

21             THE COURT:  True, that's true, but how is it

22    relevant to the issues that were raised in his direct

23    examination?

24             THE DEFENDANT:  Because he's saying that the letter

25    was sent to him.  He's saying I sent the letter to the

UNITED STATES DISTRICT COURT

1  commissioner, which I did, I sure did --

2          THE COURT:  Right, right.  So you've asked

3  him -- now we're going far afield about how commissioners --

4          THE DEFENDANT:  Right --

5          THE COURT:  So nobody's disputing that a

6  commissioner was appointed.

7          THE DEFENDANT:  Right.  So my --

8          THE COURT:  All right.  So he has testified with

9  regard to they put no weight on the letter that you sent, so

10  you can ask him about that.  But we're not going to go down

11  this whole road about commissioners and what does the law

12  require 'cause that's not at issue in this case.

13          THE DEFENDANT:  Well, see, that was the issue where

14  the commissioner was trying to foreclose and so that's the

15  letter I sent.  So I'm asking him when I sent him that letter,

16  I was challenging the legality or the commissioner actually

17  being properly authorized in order to be a commissioner to

18  initiate a foreclosure, and that was the correspondence I had

19  with the bank.

20          THE COURT:  Right.  So that's not relevant because

21  it wasn't covered by Mr. Yates in his direct examination.  You

22  can question him why he's saying they placed no weight on your

23  letter or didn't give it any -- didn't take any action as a

24  result of it.  You can ask him that.  But we're not going to

25  litigate the fact that the Lafortezas were foreclosed and the

1    bank took the house back and sold it.

2        You're trying to bring that issue in and say whatever you

3    want to say with regard to the commissioner.  Does that make

4    sense?

5            THE DEFENDANT:  Well, yeah, because he -- his whole

6    testimony was, okay, he sent the letter, you know, to the

7    commissioner, and that's why I was asking him, okay, well, what

8    law did he have --

9            THE COURT:  So I'm not going to let you ask him

10   about the law, okay?  You can ask him a question about he

11   testified about the letter you sent, if you want, whatever you

12   want to ask him about it.

13           THE DEFENDANT:  Okay.

14           THE COURT:  But on the law with regard to the

15   commissioner, I'm not going to let you question in that area.

16   Q    (BY THE DEFENDANT:)  Okay.  So in your -- so you

17   said you with Central Pacific Bank, correct?

18   A    I'm sorry.  I don't understand the question.

19   Q    So you're with Central Pacific Bank?  That's who you

20   work for?

21   A    Yes.

22   Q    Okay.  And so on your mortgages, do you all ever

23   have MERS as an assignee on there?

24   A    Yes.

25   Q    Yes.  Okay.  So do you understand who MERS is?

UNITED STATES DISTRICT COURT

1     A     I understand the concept and the entity of MERS.

2     Q     Okay.

3           MR. YATES:  Objection.  Relevance.

4           THE COURT:  Sustained.  All right.  So I'm not going

5  to let you ask in this area.  He's not here to testify with

6  regard to how the mortgage system works.  He's talking

7  specifically to this one mortgage.

8           THE DEFENDANT:  Right, and that's what I'm talking

9  about 'cause their mortgage has MERS on there; that's why I'm

10  fixing to question him about it because the Lafortezas'

11  mortgage has MERS on it.  That's why I'm questioning him.

12          THE COURT:  No, you're not going to be allowed to

13  ask those questions.  He's testified as to the facts that they

14  stopped making payments, that it was foreclosed, as a result

15  the bank took it back and they sold it at a loss.

16      So if you want to ask him about that or correspondence --

17          THE DEFENDANT:  No --

18          THE COURT:  -- that he may have received from you,

19  you may --

20          THE DEFENDANT:  So --

21          THE COURT:  -- not the whole MERS system and the

22  mortgage system in America.

23     Q     (BY THE DEFENDANT:)  Okay.  So, Mr. Stanford, so

24  since you work for the bank, then you do know that MERS is a

25  fraudulent company, correct?

UNITED STATES DISTRICT COURT

```
 1              MR. YATES:  Objection.  Relevance.

 2              THE COURT:  Sustained.  All right.  He's not here to

 3    testify with regard to that and so it's not relevant to his

 4    testimony.

 5         So you can ask him a question about the Lafortezas and

 6    what he testified to.

 7         Q    (BY THE DEFENDANT:)  So you saying that Central

 8    Pacific Bank lost you said $99,000?

 9         A    Yes.

10         Q    How did they lose $99,000, sir?

11         A    It was the loss between the amount owed by the

12    Lafortezas versus the sales price.

13         Q    Okay.  So you're alleging that Central Pacific Bank

14    loaned the Lafortezas you said $500,000?

15         A    520-some odd thousand dollars, yes.

16         Q    500-some odd thousand.  Do you have the bank records

17    to present in court today to show that you loaned the

18    Lafortezas $520,000?

19              MR. YATES:  Objection.  Relevance.

20              THE COURT:  All right.  So overruled.

21         Okay.  So, Mr. Stanford, are there -- is there

22    documentation that reflects that Central Pacific Bank loaned

23    that amount of money to the Lafortezas on that 30-year

24    mortgage?

25              THE WITNESS:  Yes, Your Honor, that would be the
```

1    note and mortgage.

2              THE COURT:  So there are documents.

3         Q    (BY THE DEFENDANT:)  Okay.  No, the note and

4    mortgage is --

5              THE COURT:  I'm not going to let you question him --

6              THE DEFENDANT:  Well, I'm fixing to ask him --

7              THE COURT:  No.  I'm not going to let you question

8    him about the mortgage.  He's not here to testify about that.

9    You can't test the legality of the foreclosure; that's not the

10   issue.

11             THE DEFENDANT:  Well, I'm --

12             THE COURT:  The fact is it did get foreclosed and

13   CPB took it back.  So you can ask him about that.

14        Q    (BY THE DEFENDANT:)  Okay.  So do you have in your

15   possession and can you provide to this Court your bank ledger

16   from Central Pacific Bank on the date that you said you loaned

17   the Lafortezas the $520,000 that showed that as a deduction for

18   $520,000 on that date out of Central Pacific Bank's account?

19             THE COURT:  Again, that's not relevant.

20             THE DEFENDANT:  Well, it --

21             THE COURT:  It's not relevant to his testimony on

22   direct.

23             THE DEFENDANT:  He's --

24             THE COURT:  You need to form a question that has to

25   do with the facts that he testified about.  So form a question.

UNITED STATES DISTRICT COURT

1          THE DEFENDANT:  Well, I'm going to because he asked

2    him did they loan the Lafortezas money.  He said yes.  He said

3    they -- they loaned the Lafortezas $520,000.

4          Now, my question is can you provide the proof of that?

5    That should be very easy to prove.  If you've loaned somebody

6    $520,000, you should be able to get a bank statement from

7    Central Pacific Bank, Here, we deducted $520,000 today for the

8    Lafortezas.  That's what I'm asking him, can he provide that.

9          THE COURT:  Okay.  That is not relevant to the

10   issues in the case because he's testified with regard to the

11   court judgment that they got on the foreclosure.  So that's

12   relevant to the foreclosure action, but it's not relevant to

13   the issues in this case and what Mr. Yates has asked him --

14         THE DEFENDANT:  But that's what Mr. Yates asked him,

15   did they loan him and he said yes, so I'm questioning him --

16         THE COURT:  No.  I've ruled.  So you can ask him a

17   question, or if you're done questioning him, then we'll go to

18   the next witness.

19      Q    (BY THE DEFENDANT:)  So did you see the check that

20   was cut to the Lafortezas for $520,000, Mr. Stanford?

21      A    No.

22      Q    So did you see a money order that was cut for the

23   $520,000 for the Lafortezas?

24      A    No.

25      Q    Did you see a certified check, cashier's check that

UNITED STATES DISTRICT COURT

1   was for $520,000 for the Lafortezas?

2       A      Those transactions regarding the transfer of the

3   property to money were held in escrow.

4       Q      So did you see the -- did you see the money, the

5   $520,000?  Did you see the actual money that was put up for the

6   Lafortezas?  Did you personally see it?

7       A      No, I did not.

8              THE DEFENDANT:  Got no more questions for this

9   witness.

10             THE COURT:  All right.  Any redirect?

11             MR. YATES:  No redirect, Your Honor.

12             THE COURT:  All right.  Mr. Stanford, thank you very

13  much for your testimony.  You're excused as a witness.  Please

14  don't discuss your testimony with anyone until the conclusion

15  of the trial.

16             (This concludes the partial testimony requested.)

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1                   COURT REPORTER'S CERTIFICATE

 2

 3              I, DEBRA READ, Official Court Reporter, United

 4    States District Court, District of Hawaii, do hereby certify

 5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 6    true, and correct transcript of the stenographically reported

 7    proceedings held in the above-entitled matter and that the

 8    transcript page format is in conformance with the regulations

 9    of the Judicial Conference of the United States.

10
                   DATED at Honolulu, Hawaii, February 23, 2020.
11

12

13                        /s/ Debra Read

14                   DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT