```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,    ) CR 17-00101 LEK
 4                                 )
                  Plaintiff,       ) Honolulu, Hawaii
 5          vs.                    ) February 20, 2020
                                   )
 6                                 ) PARTIAL TRANSCRIPT:
      (1) ANTHONY T. WILLIAMS,     ) TESTIMONY OF DR. LEONARD
 7                                 ) GEORGE HOROWITZ
                  Defendant.       )
 8    _____)

 9
                 PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
10               BEFORE THE HONORABLE LESLIE E. KOBAYASHI
                      UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12
      For the Government:      KENNETH M. SORENSON, AUSA
13                             GREGG PARIS YATES, AUSA
                               Office of the United States Attorney
14                             300 Ala Moana Boulevard, Suite 6100
                               Honolulu, Hawaii 96850
15
      Also Present:           MEGAN CRAWLEY, FBI Special Agent
16
      For the Defendant (1)   ANTHONY T. WILLIAMS, Pro Se
17    Anthony T. Williams:    05963-122
                               Federal Detention Center Honolulu
18                             Inmate Mail/Parcels
                               P.O. Box 30080
19                             Honolulu, Hawaii 96820

20    Standby Counsel:        LARS ROBERT ISAACSON, ESQ.
                               547 Halekauwila Street, Suite 102
21                             Honolulu, Hawaii 96813

22    Official Court Reporter: DEBRA READ, RDR
                               United States District Court
23                             300 Ala Moana Boulevard
                               Honolulu, Hawaii 96850
24
      Proceedings recorded by electronic sound recording; transcript
25    produced with computer-aided transcription (CAT).
```

UNITED STATES DISTRICT COURT

1                          I N D E X

2              CHRONOLOGICAL INDEX OF WITNESSES

3

4   DEFENDANT'S WITNESS                                    PAGE

5

6   **DR. LEONARD GEORGE HOROWITZ**
      Direct Examination By The Defendant              3
7     Cross-Examination By Mr. Sorenson               36
      Redirect Examination By The Defendant           73

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                  UNITED STATES DISTRICT COURT

```
 1   THURSDAY, FEBRUARY 20, 2020                    10:39 A.M.
 2                    (Partial transcript begins:)
 3   DR. LEONARD GEORGE HOROWITZ, DEFENDANT'S WITNESS, WAS SWORN
 4            THE COURT:  Good morning.  Hi.  If you could hand
 5   your notes over to the courtroom manager, please.  Thank you.
 6            THE COURTROOM MANAGER:  Thank you.
 7            THE COURT:  I'll hold those for you.  If you need to
 8   refer to them, we need to show it to Mr. Williams and the
 9   attorneys before you can answer.
10            THE COURTROOM MANAGER:  Please be seated, sir.
11            THE WITNESS:  Thank you.
12            THE COURTROOM MANAGER:  You're welcome.  State your
13   full name, sir, and please spell your last name, and speak into
14   the microphone.
15            THE WITNESS:  Yes.  My name is Leonard George
16   Horowitz.  And I have a Hebrew name.  My Hebrew name is Arya
17   ben Shlomo Halevi.  That's relevant to the facts in this case
18   because my case with Mr. Williams involves a ministry, the
19   Royal Bloodline of David Judeo-Christian ministry that I'm the
20   overseer of.
21            THE COURT:  All right.  Mr. Williams, your witness.
22                    DIRECT EXAMINATION
23   BY THE DEFENDANT:
24       Q    Good morning, Dr. Horowitz.
25       A    Good morning, Mr. Williams.
```

UNITED STATES DISTRICT COURT

1      Q    Dr. Horowitz, where did you go to school at?

2      A    Huh, Rutgers College for biological sciences.  I

3 went to Tufts University School of Dental Medicine.  I became a

4 dentist, practiced for 16 years, went on to receive beyond

5 faculties at Harvard and Tufts University behavioral science.

6 I got a master's in public health in behavioral science, media,

7 health education, health promotion, and persuasion technologies

8 research and development at Harvard University, and then went

9 on to do work with the pharmaceutical industry.

10     Q    And have you written any -- authored any books

11 Dr. Horowitz?

12     A    23 books, 7 documentary films, some have been award

13 winners.

14     Q    And how many best sellers have you had as far as

15 books?

16     A    I have three national best sellers.  I'm the leading

17 author in the field of HIV AIDS and infectious diseases

18 according to Wikipedia.

19     Q    And when did you meet me, Dr. Horowitz?  Do you

20 remember?

21     A    I do remember.  It was at the Bureau of Conveyances.

22 I'm not sure the year precisely, but I think it was around 2011

23 or '12 where I was having difficulties with Mr. Paul J. Sulla,

24 Jr.

25          And you knew me from my work in having publishing

UNITED STATES DISTRICT COURT

1   and being on video, and so you made the acquaintance.

2        Q    And so, Dr. Horowitz, so when you was having

3   problems with your mortgage, you said was Attorney Sulla.  And

4   what did he -- what did he do or what was he trying to do with

5   your mortgage, with your home?

6        A    Steal the property.  Effectively has done so through

7   forgeries, a set series of forgeries and fraud, and according

8   to my beliefs and the evidence that I hold, having bribed

9   officials in the Third Circuit Court of Hawaii that has granted

10  Mr. Sulla our property.  He currently possesses our property,

11  and the good fortune is that he was recently indicted for one

12  of the series of forgeries by the prosecutor in Hilo.

13       Q    Now, when you was fighting to keep your home from

14  being stolen by Mr. Sulla, did you have to hire an attorney at

15  law?

16       A    I hired seven attorneys before I engaged you.

17       Q    And how --

18       A    Actually, let me clarify.  I hired a series of seven

19  attorneys, I think four or five of them before I met you.

20       Q    Okay.  And approximately how much money did you

21  spend?

22       A    In attorney's fees currently over $350,000.

23       Q    And were they effective?

24       A    Not at all, absolutely not, just, I'm sorry to say,

25  grossly disappointing.

1       Q      Did they try to educate you on the law and your

2  rights in fighting against this illegal taking of your home?

3       A      Only my current attorney who is Margaret Wille.

4  She's very, very nice, very competent, and has done her best to

5  educate me, and I appreciate that.

6       Q      Okay.  Now, I'm going to show you a document.

7              Can I get the Government Exhibit 835 again, the

8  mortgage?

9              Now, Dr. Horowitz, now this is a mortgage that I had

10 drafted on you and your wife's behalf; is that correct?

11      A      I believe so.

12      Q      And you have done extensive research on what a legal

13 fiction is and a strawman is, correct?

14      A      Correct.

15      Q      Could you explain to the jury the concept of what a

16 strawman or a legal fiction is?

17             MR. SORENSON:  Objection, Your Honor.  I don't think

18 he's called to be an expert on giving an opinion ton that.

19             THE DEFENDANT:  This is --

20             THE COURT:  All right.  So -- so sustained.  He

21 can -- you can ask him for his understanding.

22             THE DEFENDANT:  Well, 'cause this is part of the

23 document.

24             THE COURT:  Did you want to publish it?

25             THE DEFENDANT:  Yes, I want to publish.  This is

UNITED STATES DISTRICT COURT

1    part of the language in the document.

2              THE COURT:  You can ask for his understanding.

3              THE DEFENDANT:  That's what I'm --

4              THE COURT:  Okay.

5        Q    (BY THE DEFENDANT:)  So based on your research that

6    you've researched with legal fictions and strawman, what did

7    your research reveal about what a strawman is or a legal

8    fiction?

9        A    Well, essentially that a strawman is when you sign

10   you capital letters of your name, it's really not your person

11   person, it's more of like somewhat of a corporate entity that's

12   a different -- it's different -- legally it's a different

13   entity than your blood person.

14             So to my knowledge, very simply, that's what it is.

15   And the reason I understand that that exists is I suspect

16   there's positive as well as negative reasons and justifications

17   for doing that.  I'm not completely studied in all of it, but

18   suffice it to say there's people who abuse it and people -- and

19   the system, supposedly the justice system, that justifies it

20   for expedience or for protecting assets that sometimes require

21   protecting.  Sometimes they don't.  And that's where it becomes

22   very challenging from my perspective to understand who's right,

23   who's wrong, who's being honest, and who's being dishonest.

24        Q    So when I drafted this document and I had this

25   strawman or the legal fiction as a all capital letters, you

1    understood that that wasn't you, the flesh and blood man, was

2    the borrower?

3         A      That's correct.

4         Q      Okay.

5         A      And I would also add that I personally have never

6    used this document in any business transactions because, quite

7    honestly, it's still so confusing for me to really comprehend

8    what this is really about that I didn't have full faith and

9    knowledge.  However, I am absolutely certain that this was done

10   in good faith.  It wasn't done to try to steal anybody's money

11   or try to manipulate a system that essentially was not corrupt.

12              The system itself in which mortgage loans, I am very

13   clear, is so grossly corrupt, and at the time, if you remember

14   correctly, that this was taking place -- and this is dated

15   2015 -- between approximately 2008 and 2015, there was a

16   terrible mortgage crisis in the United States.  The whole

17   undermining of the U.S. economy occurred because of the fraud

18   in the mortgage industry.

19              MR. SORENSON:  Objection.  Relevance, Your Honor.

20              THE WITNESS:  So --

21              THE COURT:  Sustained.  So the last statement will

22   be stricken from the record and the jury is to disregard his

23   unresponsive.

24        Next question.

25        Q      (BY THE DEFENDANT:)  Well, in your research based on

UNITED STATES DISTRICT COURT

1    the fraud that had been committed against you, what did you

2    find about the fraud in the mortgage industry?

3        A    I found that, first of all, we have -- I have a

4    very, very unique case.  I wasn't dealing with a traditional

5    lender, not a bank, not a loan agency, I was dealing with

6    literally from the very beginning an organized crime

7    racketeering enterprise, a man who sold us the property, took

8    back $350,000 in a note that I had to pay, and that was the

9    beginning of how I was defrauded.

10           Essentially that document, the mortgage and note,

11   was taken and placed into a fake church.  So they took the

12   mortgage, they took the note, and they transferred it into a

13   fake entity to defraud me, defraud the courts.

14           And essentially, the entire mortgage trauma that I

15   had to go through now 15 years -- it started in 2003, actually,

16   when I purchased the property in 2004 -- we've been involved in

17   this, the man who sold us the property was a convicted felon.

18   I didn't know that.  He was convicted of marijuana trafficking.

19   He was involved --

20           MR. SORENSON:  Objection, Your Honor.  I think we've

21   gone into a narrative answer.  We're into nonrelevant territory

22   and I think the question was more about what legal research he

23   did which I think he was soliciting an expert opinion.  So

24   multiple objections.

25           THE COURT:  All right.  So sustained.  So ask the

UNITED STATES DISTRICT COURT

1   next question.  It's getting to a narrative.  You need to ask

2   him a question with a responsive answer.

3        Q     (BY THE DEFENDANT:)  On the -- on the mortgage

4   document, the trustee is listed as Federal Mortgage American

5   Trust.  You did understand that that was one of my companies

6   also, did you not, Mr. Horowitz?

7        A     I did understand that.

8              MR. SORENSON:  Objection.  Leading.

9              THE COURT:  So -- so anyway, overruled.  So his

10  answer stands.  Next question.

11       Q     (BY THE DEFENDANT:)  And you did understand that

12  Mortgage Enterprise Investments was also my company?

13       A     Yes, I did.

14       Q     Okay.  And so you understood that the purpose of

15  this document was to assist you in protecting your property

16  interests on your home?

17       A     Absolutely.

18       Q     It was not drafted to make you pay me --

19             MR. SORENSON:  Objection.  Leading.

20             THE COURT:  Sustained.  Okay.  What was his

21  understanding.

22       Q     (BY THE DEFENDANT:)  What was your understanding

23  that the mortgage document was drafted for?

24       A     It was to protect our assets against the organized

25  crime mob that was trying to steal the property.

1      Q     So is your understanding that I wasn't trying to get

2   400,000 or $500,000 out of you to pay me for 15 or 20 years,

3   something like that?

4      A     Absolutely.  If I might just give my tiny little bit

5   expanded opinion on this?

6           THE COURT:  No.  Ask the next question.

7           THE WITNESS:  Okay.

8           THE COURT:  It's a question and answer format, it's

9   not a lecture.

10          THE WITNESS:  Okay.

11          THE COURT:  Okay.  So go ahead.  Ask a question.

12     Q     (BY THE DEFENDANT:)  So you understood that the

13  mortgage document, that you were the secure party creditor on

14  the document?

15     A     Yes.

16     Q     And that I -- my company was not the secure party

17  creditor?

18     A     I absolutely know that's true, and I don't find that

19  you had any intent to defraud me, period.

20     Q     Right.  And so I remember -- do you remember after

21  you saw some of my videos that you had commented about what I

22  was doing that the government would come after me?  You

23  remember that?

24     A     That's part of what I'd like to comment on.

25          THE COURT:  Do you remember that or not?

UNITED STATES DISTRICT COURT

1          THE WITNESS:  I do remember that.

2          THE COURT:  Next question.

3      Q    (BY THE DEFENDANT:)  And what did you tell me at

4  that time?

5      A    I told you that I didn't believe you.  I told you

6  that I can't conceive of how the system that we entrust, that

7  we have faith and trust in, would be so corrupt.

8          So what I did in response to that, as a responsible

9  person who has a duty to not simply myself, my loved ones, and

10 community, I started to research what you were reporting on and

11 I found that it was unbelievably accurate.

12     Q    And so in your research, you found that everything

13 that I had stated that you previously didn't believe was

14 actually true?

15         MR. SORENSON:  Objection.  Leading.

16         THE COURT:  Sustained.  What did you find in your

17 research.

18     Q    (BY THE DEFENDANT:)  So what did you find in your

19 research that you had disputed with me?

20     A    I had initially questioned the legitimacy of a

21 private attorney general.  I couldn't conceive of that, yet I

22 had to go into the record to find out whether this guy was

23 legitimate or not.  And what I found was that 42 U.S.C. 1988

24 was a provision by the United States Congress that when

25 faced -- when we the people are faced with a racketeering

1    organized crime gang operating in our community, the United

2    States Congress has given us the right to advance a private

3    attorney general litigation on behalf of the community.

4        Q     And so you actually read that statute, didn't you,

5    Dr. Horowitz?

6        A     And I was shocked.  And then I further researched

7    and found that there was a case Sierra Club in Hawaii, a state

8    case where they acted as private attorney generals in defense

9    of environment and in defense of the community.

10       Q     And now, does a private attorney general have to be

11   an attorney at law that's a member of the bar association?

12       A     No, it doesn't.

13       Q     And so you did the research on that, correct?

14       A     That's correct.

15       Q     And you verified that, correct?

16       A     That's correct.  I was shocked and that's exactly

17   the truth.

18       Q     And so do you remember one of the things you didn't

19   believe me was that attorneys didn't have a license?  Do you

20   remember that discussion?

21            MR. SORENSON:  Objection to the leading, Your Honor.

22            THE COURT:  Okay.  So overruled.  Foundational.  You

23   can answer yes or no to the question.

24            THE WITNESS:  Yes.

25       Q     (BY THE DEFENDANT:)  And we had a friendly

1  discussion or debate about whether attorneys actually had a

2  license 'cause at that time you believed they did, correct?

3       A     Heated debate, absolutely.

4       Q     And after you did your research, what did you find

5  out?

6       A     That you were right and I was wrong.

7       Q     Okay.  That attorneys at law do not have a real

8  license?

9       A     That's correct.

10      Q     Okay.  And so after you did the research, did you

11 start to trust me that the things I was telling you were

12 actually true?

13      A     Yes.

14      Q     And so your interaction with me, did I ever tell you

15 anything that you researched that was contrary to what I told

16 you?

17      A     No.

18      Q     And so when the -- you came to my office one day and

19 you said -- do you remember saying, "Anthony, they're going to

20 try to discredit you"?  You remember that?

21      A     Yes.

22      Q     Do you remember what charge you say they was going

23 to charge me with?

24      A     Probably practicing law without a license.

25      Q     And what's the other charge you said that they was

1    going to try to charge me with to discredit me?

2       A       Probably fraud in the mortgage industry.

3       Q       Okay.  And did you also -- do you remember telling

4    me that for people like me, they have to shut me down because I

5    was exposing the corruption?  Do you remember that

6    conversation?

7       A       I do remember that, totally consistent with what's

8    taking place in headline news today with a 2-tier justice

9    system where there's privileged and unprivileged.

10      Q       And do you remember me being incarcerated in

11   September 2013?

12      A       Yes, I do.

13      Q       And do you remember the charge I was falsely accused

14   of?

15      A       I was appalled by the charges against you.  Yes, I

16   do remember them.

17      Q       And what was those charges?

18      A       Pedophilia, engaged in child manipulation.  I

19   believe the case was in Florida.  And what I saw specifically

20   as fact is that that expressly followed your request to the

21   Attorney General of the State of Hawaii to meet with him to

22   solve some of the terrible problems that we, the people, in

23   terms of the mortgage being defrauded industry that you wanted

24   to bring to the Attorney General's attention, and that you then

25   went to the Attorney General's office by his invitation and

UNITED STATES DISTRICT COURT

1    were met by the media that had already been warned that they

2    are going to arrest you and they -- that night I watched the

3    local news, KHON, and I saw this man being accused falsely of

4    sexually abusing a child.

5         Q    And now, Dr. Horowitz, you were present at the

6    extradition hearing, correct?

7         A    Yes.

8         Q    And you were one of the persons that actually filmed

9    the hearing?

10        A    I was.

11        Q    And do you remember how the FBI tried to fake my

12   fingerprints?

13             MR. SORENSON:  Objection.

14             THE WITNESS:  I do.

15             MR. SORENSON:  Leading, Your Honor.

16             THE COURT:  Overruled.  Foundational.  But -- okay.

17   So I'm going to let you ask a couple more questions in this

18   area, but as the court already ruled, it's not relevant to the

19   issues in this case.

20             THE DEFENDANT:  Well --

21             THE COURT:  So go ahead.  He said yes.  What's your

22   next question?

23        Q    (BY THE DEFENDANT:)  Okay.  And so did the -- did

24   the judge follow his oath in that extradition hearing?

25        A    I didn't -- I did not perceive good faith operations

UNITED STATES DISTRICT COURT

1    in that court.

2         Q     And did I specifically ask the judge would he follow

3    his oath that day?

4         A     Yes, I heard you say that.

5         Q     And --

6              THE COURT:  Okay.

7         Q     (BY THE DEFENDANT:)  What was his answer?

8              THE COURT:  And that's hearsay.  So now you need to

9    move on to a different area.  We've covered now the extradition

10   hearing.  It has limited relevance to the issues in this case.

11             THE DEFENDANT:  Okay.  Can I get government

12   Exhibit 209, please.

13        Q     (BY THE DEFENDANT:)  Now, Dr. Horowitz, did you or

14   your wife file a complaint to the FBI against me?

15        A     We filed about four or five complaints with the FBI,

16   been in touch with and worked with three previous FBI

17   investigators related to the entire matter that we're facing

18   with having our property stolen.  And on top of that, we filed

19   about 15 complaints with the local police, both in Honolulu as

20   well as on the Big Island.

21             One of those complaints, one out of 15, resulted in

22   the prosecution -- or the current grand jury indictment of the

23   felon who forged the documents that stole our property.

24        Q     But you never made a complaint against me and what I

25   did for you?

UNITED STATES DISTRICT COURT

```
 1           A      No, not at all.

 2           Q      Did you make a complaint to DCCA about me and what I

 3    was doing?

 4           A      No.

 5           Q      And did you authorize the DCCA to void your mortgage

 6    and your UCC lien that you filed?

 7           A      Give me that again, please.

 8           Q      Did you authorize the OCP and the DCCA to void your

 9    mortgage and your UCC that you filed?

10           A      No, not to my knowledge.  It's -- that would be news

11    to me.

12                  THE DEFENDANT:  Can I get back to the page?  I think

13    it's page 5, please?  No, go down.  Go down.  Go down.  Go

14    down.  Go down.  Okay.

15           Q      (BY THE DEFENDANT:)  Can you -- I would like to

16    publish it again.

17                  THE COURT:  You may.

18           Q      (BY THE DEFENDANT:)  Do you see letter M,

19    Mr. Horowitz?

20           A      I see the letter here on the screen -- or I see M,

21    yes.

22           Q      Okay.  And you see your name down there on the

23    paragraph M?

24           A      Yes, I do.

25           Q      So did you get a letter from OCP or the DCCA telling
```

UNITED STATES DISTRICT COURT

19

```
 1   you that they were going to void out your mortgage?

 2        A    No, I never -- I am not aware of ever having

 3   received that.

 4        Q    Did you receive a letter that saying they're going

 5   to void out your UCC lien that protected your house?

 6        A    No, I never -- never recall receiving anything like

 7   that.

 8        Q    So this is the first time that you have any

 9   knowledge that they even voided out your own documents that you

10   didn't authorize for them to void?

11        A    Yes.

12        Q    Now, had you known they wanted to do this, what

13   would you have told them, Dr. Horowitz?

14        A    What would I have told them about this?

15        Q    Right, about them voiding out that.  Would you have

16   gave them authorization to void it?

17        A    And this was the mortgage that your organization --

18        Q    Yes.

19        A    -- created?

20        Q    Yes.

21        A    Had they sent that to me, I probably would have done

22   nothing.  I probably would have just thought to myself, well,

23   that's par for the course; we're dealing with an organized

24   crime gang that is literally in charge of these kinds of

25   administrative proceedings, and if they're telling me that this
```

UNITED STATES DISTRICT COURT

1    mortgage is void, then what do I know?  I'm just a doctor.

2    What do I know about high finance?  What do I know about

3    proceedings of how mortgages are dismissed or altered?  I don't

4    know much about that.

5          Q     Now, when you filed the UCC lien, you did your

6    research first on what a UCC financing statement is, correct?

7          A     I did that, yes.

8                THE DEFENDANT:  Right.  And so -- can I get

9    government Exhibit 832?  I'd like to publish.

10         Q     (BY THE DEFENDANT:)  So on the organization name

11   under the debtor name, you did understand that that's the

12   strawman, the all capital letters?  Correct?

13         A     That's correct.

14               THE COURT:  Is 832 in evidence?

15               THE DEFENDANT:  Yes, it is.

16               THE COURT:  It is?  It's received?  All right.  It

17   may be published.

18         Q     (BY THE DEFENDANT:)  And so why did you have this

19   UCC lien filed with all the attached and the exhibits on there?

20         A     Well, from the research that I did that was prompted

21   by your directions and then basically guidance, I then began to

22   research this concept of strawman and this concept of UCCs, and

23   there was a massive amount of publications on the internet.

24               Now, again, there's fake news and there's fake

25   internet stuff and there's good stuff, and yet when I started

1    to really dig on this concept of liening properties, I felt

2    after reading the laws that I had every right to lien the

3    property that was being stolen from me, that I had massive

4    amounts of money and loving labor invested in.

5              So that was my understanding of filing a UCC lien on

6    my property.

7         Q    And did you feel like -- after you researched, did

8    you feel like you was filing it according to the law?

9         A    Yes.

10        Q    And you didn't feel like you was doing anything

11   wrong?

12        A    No.

13        Q    Because that was your property, correct?

14        A    Yeah.  I have too much to lose.  Why would I -- why

15   would I risk my entire professional reputation in committing a

16   felony or a misdemeanor even?  I would have to be

17   reasonably -- reasonable.  I would have to investigate

18   something before I commit myself to a legal filing.

19        Q    Now, you witnessed me with my private attorney

20   general ID, correct?

21        A    Yes.

22             THE DEFENDANT:  Exhibit 501.  I'd like to publish

23   it.

24             THE COURT:  You may.

25        Q    (BY THE DEFENDANT:)  And is that the ID you remember

UNITED STATES DISTRICT COURT

1    I would carry, Dr. Horowitz?

2        A    Yes.

3        Q    And do you remember taking a plane flight with me

4    one time, you and Sherri?

5        A    Uhm, that one I -- that one escapes me.  I can't

6    remember that.

7        Q    When we was in Hilo, we had to take a plane flight,

8    me, you, and Sherri.  You remember, as a matter of fact, it was

9    on my birthday?

10       A    Gee, whiz, I'm sorry.  I can't remember.

11       Q    Can't remember that?

12       A    I fly -- you know, fly, travel a lot.

13       Q    It's been about six years anyway.  So but you do

14   recognize that that's my private attorney general ID?

15       A    I not only recognize it, but I have to tell you that

16   when you showed me that, I did not believe it was real.  And so

17   I subsequently investigated the fact that you had received an

18   Apostille from I believe it was the state of Tennessee that I

19   actually researched to find out whether this was legitimate or

20   not, and lo and behold, I found that it was legitimate.

21       Q    And so you found out that I actually had it

22   certified an Apostille from the secretary of state of

23   Tennessee?

24       A    That's correct.

25       Q    After you researched and verified it?

UNITED STATES DISTRICT COURT

23

1          A      That's correct.  And that's what then also prompted

2     me to go into looking at strawman and looking at all these

3     other things that you were saying, including the private

4     attorney general, 42 U.S.C. 1988, the provision by the United

5     States Congress.

6          Q      And did you also look up the -- did you get to look

7     up the center report or any of the congressional acts or like

8     the U.S. Supreme Court cases in your research?  Did you look up

9     some of the cases about private attorney generals?

10         A      Well, you referred me to *Button*, the case of *Button*

11    in particular, and that was very convincing for me.  And then

12    subsequently on my own I found the *Sierra* case because some

13    states their laws differ from federal.  And so I had to make

14    sure that what was taking place in the state of Hawaii was as

15    legitimate or lawful, legal, as in federal courts.  And I found

16    that there was, in fact, a state case --

17                MR. SORENSON:  Objection, Your Honor.  I think so

18    we're getting into legal opinion territory.

19                THE COURT:  So -- so objection's overruled.  He's

20    testified the research he's done, but Mr. Sorenson has a point.

21    I'm not going to have him testify with regard to what these

22    legal cases hold or what their legal significance is.

23          All right.  Next question.

24         Q      (BY THE DEFENDANT:)  Well, as part of my job as a

25    private attorney general, you -- did you understand I would

UNITED STATES DISTRICT COURT

24

1   fight for the rights of the people?

2       A      Absolutely.  In fact, I find this entire proceeding

3   ridiculous and here's why --

4              THE COURT:  All right.  So that's not the question.

5   What's the next question?

6       Q      (BY THE DEFENDANT:)  Do you find these proceedings

7   ridiculous?

8       A      I find these --

9              MR. SORENSON:  Objection.  His opinions about these

10  proceedings are completely nonrelevant.

11             THE COURT:  Sustained.  All right.  Next question.

12      Q      (BY THE DEFENDANT:)  So a private attorney general,

13  did I assist you into making a complaint against the crooked

14  attorney Paul Sulla?

15      A      Yes.

16      Q      And did I not accompany you to the Kona Police

17  Department to actually file the complaint and the arrest

18  warrant for him?

19      A      That's my point.  The fact is --

20             THE COURT:  I'm sorry.  That's a yes or no answer to

21  that question --

22             THE WITNESS:  Yes.

23             THE COURT:  -- did he accompany you.  Next question.

24      Q      (BY THE DEFENDANT:)  And so when we went there, did

25  I have the documentation in hand to show the officer?

UNITED STATES DISTRICT COURT

```
 1        A     Yes.

 2        Q     And when I showed him the law, did he follow the

 3   law?

 4        A     No.

 5        Q     Did he, in fact, state he was not going to follow

 6   that state law?

 7        A     Yes, that's what he said.

 8        Q     And did you and Sherri actually videotape this

 9   incident?

10        A     Yes, we did.

11        Q     And did you upload it to YouTube?

12        A     Yes, we did.

13        Q     And is it actually on one of your website channels?

14        A     I believe it still is, yes.

15        Q     And do you remember that I actually had to fight a

16   eviction for one of my clients of mine here --

17              MR. SORENSON:  Objection.  Leading.

18              THE COURT:  Sustained.

19        Q     (BY THE DEFENDANT:)  Do you remember a eviction that

20   we attended for one of my clients?

21        A     Yes.

22        Q     And did you also videotape that incident?

23        A     Yes.

24        Q     And did I show the sheriff my private attorney

25   general ID card?
```

1     A     I believe so.

2     Q     And did I let him know that he could not take their

3  property without a trial by jury?

4     A     Yes.

5     Q     And you have researched that yourself that the

6  Seventh Amendment applies even in --

7              MR. SORENSON:  Objection.  He's --

8              THE DEFENDANT:  -- a foreclosure case, right?

9              MR. SORENSON:  -- a legal opinion on the Seventh

10  Amendment.

11             THE DEFENDANT:  I'm asking what he researched.

12             THE COURT:  Well, he's asking.  Did you research

13  Seventh Amendment?

14             THE WITNESS:  Yes, I did.

15             THE COURT:  Okay.  What's your next question?

16     Q     (BY THE DEFENDANT:)  And what did the Seventh

17  Amendment state, Dr. Horowitz?

18             MR. SORENSON:  There's the objection.

19             THE COURT:  All right.  Sustained.  Ask another

20  question.  He's not a legal expert.

21             THE DEFENDANT:  I'm -- he don't have --

22             THE COURT:  He can't -- yeah.  He --

23             THE DEFENDANT:  I'm asking what he read in the

24  Seventh Amendment.

25             THE COURT:  Right.  And --

UNITED STATES DISTRICT COURT

27

1      Q      (BY THE DEFENDANT:)  So what did you read in the

2  Seventh Amendment?

3      A      Well, there -- you're not supposed to take anybody's

4  property.  You have civil rights and you have property rights

5  and due process rights, and so that's the issue that we're all

6  dealing with is people with mortgages and homes that are being

7  stolen by corrupt individuals and organizations.

8      Q      And so when you read the Seventh Amendment, did it

9  not state that you have to have a trial by jury before your

10 property can be taken?

11     A      Yes.

12     Q      And did you get a trial by jury before your property

13 was taken?

14     A      No.

15     Q      Have you witnessed any homeowner ever being able to

16 get a trial by jury before they home is illegally taken and

17 foreclosed on?

18     A      I don't know, but I know there's a lot of people

19 that have been damaged.

20     Q      Right.  And so based on your experiences,

21 Dr. Horowitz, based on your own personal research and your own

22 experience with me, am I a man that will concoct a scheme to

23 defraud anybody?

24     A      No.

25     Q      Am I a man that stands on the principles of the

1  Bible, and Yeshua, and the creator?

2          MR. SORENSON:  Objection to the leading, Your Honor.

3  He can ask him what kind of man he thinks he is, but --

4          THE COURT:  All right.  So overruled.  It's

5  foundational.

6      Do you have an answer?

7          THE WITNESS:  Yes, I do.

8          THE COURT:  All right.  And what is your answer?

9          THE WITNESS:  The answer is it would be --

10          THE COURT:  Yes or no question that he asked you.

11  Is was a leading question, so you can answer yes or you can

12  answer no.

13          THE WITNESS:  I'm responding to the prosecutor's

14  attorney.

15          THE COURT:  No, that's not an answer -- I mean,

16  that's not a question.  That was an objection.  So that's not

17  testimony or question.

18      The question that was posed to you by Mr. Williams is, "Am

19  I a man that stands on the principles of the Bible, Yeshua; is

20  that correct -- and the creator?"

21          THE WITNESS:  Yes.

22          THE COURT:  Next question.

23      Q    (BY THE DEFENDANT:)  And so would you recommend my

24  services to anyone that is fighting for their house, fighting

25  any legal issue?

UNITED STATES DISTRICT COURT

1       A     I wouldn't, not because of you, but because of the

2    system itself is so outrageously corrupt, it's nauseating.

3       Q     So you see where I've been prevented from actually

4    assisting people in this system?

5       A     I see you as a pain in the neck and a person who

6    because of that has been persecuted and retaliated against.

7    This proceeding, I feel is one --

8             MR. SORENSON:  Objection.  We don't --

9             THE WITNESS:  I feel --

10            MR. SORENSON:  -- need to hear his opinions about

11   the proceedings, Your Honor.

12            THE COURT:  So you have to let him finish his

13   answer.  Okay.  You feel --

14            THE WITNESS:  I feel that Kenji Price, being one of

15   the law enforcers that I personally and videotaped my request

16   to the prosecution here that they become aware of the crime and

17   corruption that I personally have been victimized by, and I

18   have gotten no response whatsoever.  That's why I would not do

19   what you're suggesting.

20       I can't -- I can't -- given the degeneration and

21   untrustworthiness of the judicial system that I depended on,

22   that I had full faith and trust in, that they would so neglect

23   their responsibilities, no, I would not be able to go to them

24   and say, "Mr. Williams is a good guy."  No.  I'm sorry.

25       It's -- it's -- being here is frightening.

1          MR. SORENSON:  Objection, Your Honor.  We're in a

2  narrative answer again.

3          THE WITNESS:  Yeah.

4          THE COURT:  Sustained.  Ask the next question.

5     Q     (BY THE DEFENDANT:)  So my intention -- so do

6  you -- do you believe my intentions were always good to clients

7  and customers?

8     A     Absolutely, yes.

9     Q     And so you believe that nothing I did was to try to

10  steal somebody's home or just take their money with no --

11    A     You had no intent to do that ever.

12    Q     Okay.  And so based on your research and based on

13  the things that I told you, would you state that everything

14  that I did was according to the law?

15    A     To the best of my knowledge and research, yes.

16    Q     Okay, and you are very educated man, correct?

17    A     Unfortunately in some cases knowledge gets you into

18  trouble.

19    Q     Right.  And so -- but I'm not -- I'm not so smart

20  that I would deceive you, am I?

21    A     Well, you're very, very bright when it comes to

22  these matters, brighter than I was.  And no, you would not

23  deceive me.  That's the issue.  You're not -- your intent was

24  never to deceive me.  And from my understanding of you, having

25  witnessed you, filmed you, been engaged with your organization,

1    there's not one thing that I could ever say that you did that

2    was deceptive, fraudulent, in any way.

3        Q    Now, when you introduce yourself, you introduce your

4    name as Dr. Leonard Horowitz and then you said your Hebrew

5    name.  What is your Hebrew name again?

6        A    Arya ben Shlomo Ha Levi.  That literally translated:

7    Arya is lion of God, ben Shlomo means son of Solomon.  My

8    father was son of Solomon, his father was.  Goes way back.  So

9    I am of the Davidian bloodline, and yet because of

10   intermarriage, I am Ha Levi.  So Ha Levi means a Levite, so I'm

11   a Levitical priest that is engaged with spiritual issues which,

12   from my perspective, this is today.  This is a spiritual crisis

13   that America's facing.  We're witnessing it on headline news.

14   The Justice Department is at the forefront because where the

15   rubber meets the road --

16            MR. SORENSON:  Objection, Your Honor.  I think we're

17   back in narrative land.

18            THE COURT:  Yes.  Next question.

19       Q    (BY THE DEFENDANT:)  So, Dr. Horowitz, with you

20   having your regular birth name and your Hebrew name, do you

21   have a Hebrew name to deceive people?

22       A    No.  It's a burden, frankly, to carry, as you well

23   know, Mr. Williams.

24       Q    Yes, I do.  And so with me also having a Hebrew

25   name --

UNITED STATES DISTRICT COURT

1          THE COURT:  Does he know you have a Hebrew name?

2   You need to lay the foundation.

3          Q     (BY THE DEFENDANT:)  Do you know I also have a

4   Hebrew name?

5          A     You mentioned that once.

6          Q     So do you feel like me having a Hebrew name, that's

7   some way I was being deceptive to people?

8          A     No, I don't get that at all.

9          Q     If I put my Hebrew name on my letterhead with my

10  also government name, would you feel like I was being deceptive

11  'cause I list both names, my Hebrew and my American name?

12         A     No, but I could appreciate that the general

13  population would think that that's weird and maybe say Well,

14  what's wrong with this guy.

15         Q     But you use your Hebrew name and your regular name,

16  right?

17         A     Well, actually I don't like to, and for -- if you go

18  back into the case laws that I've been involved in, I've tried

19  to hide the fact because --

20         MR. SORENSON:  Objection.  Relevance, Your Honor.

21         THE COURT:  All right.  So overruled.  So he says he

22  doesn't use his Hebrew name.

23          You have any more questions?

24         Q     (BY THE DEFENDANT:)  Well, what's the reason why you

25  are hesitant?

UNITED STATES DISTRICT COURT

1      A      Persecution.

2      Q      Like for being a Hebrew?

3      A      Deprivation of rights because essentially there is

4  prejudice.  There's anti-Semitism.  And so as a Christian

5  Jew -- I mean, Messianic Jew.  I'm a Messianic Jew; I'm not

6  simply a Jew -- but people don't really grasp fully what that's

7  all about.  So I have hid it as best I can.

8           Unfortunately, my mortgage was written to the name

9  of The Royal Bloodline of David.  And so this court, likewise,

10  knows in another case we have, Civil 16-666 -- interesting case

11  number -- where The Royal Bloodline of David is the plaintiff.

12  And so I've now been forced --

13           THE COURT:  Now, we're kind of going far afield.

14    What's your next question?

15      Q      (BY THE DEFENDANT:)  Okay.  So Dr. Horowitz, if you

16  found out that I have multiple companies, which you do, and

17  that I use a address, one address for two of my companies,

18  would you think I was deceiving you?

19      A      No, not necessarily without more facts.

20      Q      And so if I got a company and I got -- I'm using the

21  same address for, say, like the United States Office of the

22  Private Attorney General and also Federal Mortgage American

23  Trust, would you think that because I got a address for -- one

24  address for two of my companies, would you think that it's odd

25  or that's against the law?

UNITED STATES DISTRICT COURT

                                                                    34

1        A     No.

2        Q     So -- so your experience with me has been positive,

3   correct?

4        A     Uhm, with you as a person, absolutely.  With the

5   system, I'm disgusted.

6        Q     Right.  So you saw how the system has railroaded

7   me --

8              MR. SORENSON:  Objection.  Leading and --

9              THE DEFENDANT:  -- about prosecutions --

10             MR. SORENSON:  -- no factual basis for that either.

11             THE COURT:  Sustained.  It's leading, so --

12             THE DEFENDANT:  Well --

13             THE COURT:  -- what question do you want to ask him

14   about what he saw or heard?  You can ask him those questions.

15       Q     (BY THE DEFENDANT:)  Do you remember me fighting my

16   rape charge and representing myself?

17       A     I do.

18       Q     Do you remember me getting the case dismissed?

19       A     I do.

20       Q     And coming back to Hawaii?

21       A     I do.

22       Q     And continuing to help clients?

23       A     That I'm not aware that you were helping people

24   after you came back after that ordeal.  I thought you may have

25   been tied up in the litigation against you.


                        UNITED STATES DISTRICT COURT

1          THE DEFENDANT:  Right.  Okay.  So I have no more

2   questions.

3          THE COURT:  Okay.  Thank you.

4      Do you have any questions?  Is it Mr. Sorenson?

5          MR. SORENSON:  It is, Your Honor.  Your Honor, do

6   you want to take a break or -- I could be just a little while.

7          THE COURT:  Let me -- how long?  Yes, I think so.

8   We've gone for an hour-and-a-half.  We are going to take a

9   recess now and then we'll continue with your cross-examination.

10      All right.  Ladies and gentlemen, we're going to take a

11   recess, 15 minutes.  Please leave your notebooks and iPad

12   behind.  Of course, don't research, investigate, or Google any

13   of the witnesses or issues that have been raised.

14      Please rise for the jury.  They're in a 15-minute recess,

15   as are we.

16          (A recess was taken.)

17          (Open court out of the presence of the jury.)

18          THE COURT:  All right.  The record will reflect the

19   jury is not present.  Present is Mr. Williams and counsel.

20      And any matters we need to take up?  Otherwise, we'll call

21   in the jury.

22      All right.  Mr. Williams, you have something?

23          THE DEFENDANT:  We can do it after, I guess.

24          THE COURT:  Okay.  All right.  Very good.  Then,

25   Ms. Feria, if you would get the jury.  And we're in recess and

UNITED STATES DISTRICT COURT

 1      then you'll start your cross.  Thank you.

 2                  (A recess was taken.)

 3                  (Open court in the presence of the jury.)

 4                  THE COURT:  Welcome back, ladies and gentlemen of

 5      the jury.  Mr. Williams is present and counsel.  The witness is

 6      on the stand.

 7               Your witness, Mr. Sorenson.

 8                  MR. SORENSON:  Thank you, Your Honor.

 9                          CROSS-EXAMINATION

10      BY MR. SORENSON:

11          Q     Mr. Horowitz, let's go over in the beginning here.

12      Let me just establish you're not a lawyer; is that correct?

13          A     That's correct.

14          Q     You never went to law school?

15          A     That's correct.

16          Q     You're medically trained I think you indicated?

17          A     That's correct.

18          Q     You're a dentist?

19          A     Dentist and actually I was trained at Tufts

20      University during the period in which it was medical dentistry.

21      My degree is in Doctor of Medical Dentistry.  We were trained

22      in internal medicine as well as actual dentistry, and I went on

23      to become an oral surgeon/periodontist University of Rochester

24      post Tufts.

25          Q     Did you practice dentistry during that time frame?

                    UNITED STATES DISTRICT COURT

37

1        A        I mentioned 16 years I practiced

2   dentistry/periodontology as well as, obviously, oral surgery.

3        Q        At some point you moved to Hawaii, I guess?

4        A        I did, that's correct.

5        Q        And you moved over to the Big Island initially?

6        A        That's correct.

7        Q        And where?  The Pahoa area?

8        A        Yes, that's right.

9        Q        Is that where you bought your residence?

10       A        The first residence was in the Vacationland section

11   of Pahoa, and then subsequently the property that was stolen

12   from us was in the -- a little bit more near -- near Pahoa

13   town.

14       Q        Okay.  But while you do have some medical training,

15   absolutely no legal training; is that fair to say?

16       A        Well, I'd say I have a substantial now, after years

17   of going through the school of hard knocks, the law school of

18   hard knocks.  I've been forced -- because of the bankruptcy

19   that I had to file, I had to study and do *pro se* litigation

20   myself.  So I have --

21       Q        I'm talking about going to a school --

22       A        Certified school, no, sir.

23       Q        -- and learning from people who know what they're

24   talking about.  Have you been to a school that teaches law

25   practice?

UNITED STATES DISTRICT COURT

38

1    A    No.

2    Q    Okay.  No paralegal school?

3    A    No.

4    Q    Okay.  So no training in that respect whatsoever?

5    A    Well, I must say that as a consumer health activist

6   and advocate, because I find what is neglected in the legal

7   system is the amount of stress and distress that these kinds of

8   proceedings cause on myself, my family, and society --

9    Q    Sir, my question is about the legal practice --

10    A    I'm answering it, please.

11    Q    -- not about you're saying right now, okay?

12    A    I'm answering it, sir.

13    Q    So please answer the question.

14    A    I am.

15    Q    Stay within that area, okay?

16    A    That's exactly what -- so I want you to know that I

17   authored proselegalaid.com which is an online service that you

18   can actually go and go in there for free for a 30-day trial,

19   and you could see how it is that I personally have now been

20   preparing for *pro se* litigations.

21         So that's been my training.  It's been the school of

22   hard knocks, and I know that your ilk does not appreciate the

23   fact that there is a human being that has enough brain cells

24   capable of interpreting law, reading law, reading case law,

25   going on Google Scholar, finding case law and being able to

UNITED STATES DISTRICT COURT

39

1    then in a reasonably competent way, which I can tell you is not

2    particularly common in your profession, competence, because I

3    personally have had seven lawyers, as I mentioned, and most of

4    them are grossly incompetent and several of those have been

5    either -- either disbarred or currently, with Mr. Dubin, is up

6    under disbarment charges.

7          Q     And so based upon your prior experience, you've gone

8    away from I guess what you've indicated, my ilk, and gone to

9    the ilk of Mr. Williams; is that correct?

10         A     That's not totally correct, no.

11         Q     But you did go to him and he did represent your

12   interests, didn't he?

13         A     I went to Mr. Williams in 2011, 2012, and he did

14   represent our interests, correct.

15         Q     And you employed his services, didn't you?

16         A     I did, yes.

17         Q     How much did you pay him?

18         A     I believe I paid Mr. Williams a total of somewhere

19   in the neighborhood of 2500, maybe, $2,800 all together.

20         Q     And did you sign up for his mortgage reduction

21   program?

22         A     Uhm, I don't believe that I signed up for that

23   program because there was not a need in our circumstance to

24   sign up for that particular program, and I'm not aware of if

25   he's done that with other people.

UNITED STATES DISTRICT COURT

1      Q      Fair to say you really don't know anything about him

2   offering a one-half reduction on people's mortgages for

3   one-half the term for the payment of a fee?

4      A      No, that's not my knowledge of interacting with

5   Mr. Williams.

6      Q      So your testimony to this jury has been, well,

7   related to many things unrelated to the charges in this case

8   which are related to the mortgage reduction scheme?

9              THE DEFENDANT:  Objection.  That's a

10   mischaracterization.

11             THE COURT:  Overruled.

12      Q      (BY MR. SORENSON:)  You're not testifying about what

13   we're here about today, right?  You're testifying about his

14   help to you in a foreclosure action; is that fair to say?

15      A      I understand my testimony here today involves two

16   aspect of this case, to my knowledge.  As a fact witness, not

17   an expert witness, I understand that he's being charged with

18   the fraud in creation of mortgages and defrauding people.  And

19   I have a mortgage and I have been defrauded not by

20   Mr. Williams, but virtually by the system itself.

21      Q      But you would concede there can be fraud by

22   individuals who will go to folks and help them or purport to

23   help them with their mortgages; is that fair to say?

24      A      It's fair to say.  And I would add that I am aware

25   that Mr. Williams had people, women particularly, who were

UNITED STATES DISTRICT COURT

41

1  untrustworthy.  One was Edna Franco who has already been -- who

2  was indicted with Franco Services, and she was put out of

3  business, I understand, by the state.

4          Unfortunately, Mr. Williams did not listen to me.  I

5  told him that she was untrustworthy.  I told her -- him that

6  she was actually recruiting for Mr. Sulla who stole our

7  property, and --

8      Q    All right.  I'm not asking about Ms. Franco, okay?

9  I'm asking your understanding of what we're here about.

10          You were not involved in the mortgage aspect of his

11  business; is that correct?

12     A    I was not involved in any other mortgage other than

13  my mortgage with his company.

14     Q    Right.  And you were not present when he was

15  interacting with individuals in this case who purchased or

16  signed up for his mortgage reduction plan; is that correct?

17     A    I did when I was researching him, videotaping him, I

18  met others who were victimized by the system that were

19  interacting with him that were engaged in other agreements and

20  contracts with him.

21     Q    Okay.  And so you know that what he was doing, he

22  was offering one-half off on people's mortgages and they'd only

23  have to pay him for half of the term for the payment of a fee,

24  right?

25     A    I read that in the indictment.  I was not aware of

42

1   that until I read that in the indictment.

2        Q     Okay.  So again, back to your basis of knowledge,

3   you don't know anything about this aspect of the case; is that

4   fair to say?

5        A     I think that there's enough relevant relationship in

6   what my knowledge is, having dealt with him in my mortgage, and

7   the integrity by which he surprised me in being legitimate

8   versus a fraud that it's relevant as facts to this case.

9        Q     Well, Mr. Horowitz, you're an educated man, aren't

10  you?

11       A     I would like to think so.

12       Q     Probably hard to get stuff by you, I'd say, correct?

13       A     I'm not sure.  Lot of people have gotten -- I'm very

14  naive when I got into this purchase of this property, I can

15  tell you that.

16       Q     Fair to say, though, you're not a Filipino

17  immigrant, correct?

18       A     I'm not a Filipino immigrant, that's correct.

19             THE DEFENDANT:  Objection --

20       Q     (BY MR. SORENSON:)  Your first language is not

21  Ilocano?

22             THE COURT:  I'm sorry.  So there's an objection.

23  Your objection is?

24             THE DEFENDANT:  It's out of scope.  He's not

25  Filipino.

UNITED STATES DISTRICT COURT

43

1          THE COURT:  I need you to stand up, yeah.  What's

2   your objection?

3          THE DEFENDANT:  It's out of scope.  I mean, he's not

4   a Filipino; he can't speak for a Filipino person.

5          THE COURT:  I don't -- okay.  So it's overruled.

6      All right.  So your next question?

7      Q    (BY MR. SORENSON:)  You're not a Filipino immigrant;

8   is that correct?

9      A    That's correct.

10     Q    And your first language isn't Ilocano, correct?

11     A    That's correct.

12     Q    And I'm guessing you read and write English very

13  well?

14     A    I would like to think so.  I have problems with

15  spelling sometimes.

16     Q    I hear you.  Okay.  So from a basis of knowledge

17  standpoint, the mortgage aspect of his business with the

18  individuals over here on Oahu is something that you don't have

19  personal observation or knowledge of?

20     A    I never sat with him during a client consultation

21  where he signed them up for a business contract.

22     Q    Right.  And you didn't hear the representations he

23  made to them, right?

24     A    No, I didn't.

25     Q    And you didn't see the documents that they signed,

44

1    right?

2         A      That's correct.

3         Q      And you didn't see how he might have used a badge or

4    a credential to augment his credibility with them; is that fair

5    to say?

6         A      Not with anyone to my -- well, actually I do recall

7    him showing his badges to other people, but I can't recall

8    whether they were his clients or whether there were just

9    others.

10        Q      He ever show you his handcuffs?

11        A      Uhm, I think I might have seen handcuffs once.

12        Q      He told you he had the authority to arrest people,

13   didn't he?

14        A      Yes, he did, actually, yeah.

15        Q      And he felt like he could just go out and arrest

16   people for crimes that he observed or crimes he believed had

17   occurred, correct?

18        A      Well, frankly, having researched that aspect --

19        Q      No, I'm asking you.  Did he tell you he could do

20   that?

21        A      I think he told me that that was within the law and

22   he was authorized by the private attorney general act and

23   public duty doctrine to be sure that others were not being

24   ripped off, defrauded, and damaged.  That was his

25   responsibility as not only a person and a spiritual person, but

UNITED STATES DISTRICT COURT

45

1    also as somebody studied in law.

2         Q    Okay.  And exactly what kind of studied in law would

3    Mr. Williams have had?

4         A    Well, I can tell you he had much more than I had,

5    and he instructed me to do some due diligence and I was shocked

6    by what I found.  The law is great.  We have a fantastic

7    Constitution, we have fantastic case law.  We have fantastic

8    legislators that provide wonderful laws.  The problem is the

9    system is failing itself.  It's failing the people.

10        Q    Thank you.  But Mr. Williams, to your knowledge,

11   has no legal training, correct?

12        A    I think he has substantial legal training as a --

13        Q    He's been to law school?

14        A    Well --

15        Q    I'm asking a question.  Has he been to law school?

16        A    Well, you know that he hasn't.

17        Q    I'm asking you.

18        A    Why are you asking a rhetorical question?

19        Q    'Cause i'm asking you.

20        A    I know that he hasn't gone to law school to my

21   knowledge.

22        Q    And has he taken the bar exam?

23        A    I don't believe he has.

24        Q    And has he -- has he been licensed in any state to

25   practice law?

UNITED STATES DISTRICT COURT

46

1       A       I don't believe that he's a member of the bar.  I

2    don't believe that the bar represents anything but a private

3    club, virtually, where you are given a certificate to go out

4    and practice now because you've gone -- I would love to have a

5    law degree myself.  I'd love -- but you know how much it costs?

6    It's outrageous for me to now go spend a couple hundred

7    thousand, $300,000, and actually go do the due diligence to

8    optimize my certification so I can go into a court of law to

9    defend a human being and their rights.  I'm sorry, there's some

10   of us -- there is some of us who don't have the wherewithal to

11   be able to do that.  However, what Mr. Williams apparently has

12   done is just that, and --

13      Q       Let me stop you there.

14              THE COURT:  Next question.  All right.

15      Q       (BY MR. SORENSON:)  You've gone off into a

16   narrative.  I'm going to ask you more about this private

17   attorney general thing.  You've indicated you know he's a

18   private attorney general, right?

19      A       Correct.

20      Q       And if you could, just tell the jury what is a

21   private attorney general?

22      A       Private attorney general's authorized by 42 U.S.C.,

23   1988, which is a very wonderful Civil Rights Act of Congress

24   virtually because it's there to protect our communities and

25   extended families, virtually, where we now if we see that

```
1    there's a racketeering enterprise, that there's an organization

2    that's corrupt, it's a syndicate that is engaged in drug

3    trafficking or let's say human sex trafficking or slavery or

4    stealing people's properties through fraud and mortgages, then

5    the United States Congress authorized private persons, such as

6    myself, such as Mr. Williams, to be able to actually say --

7        Q    Sir, sir, let me ask you this.

8        A    -- declare themselves as a private attorney general.

9        Q    Let me ask you this.

10            THE COURT:  Okay.  All right.

11            THE DEFENDANT:  He didn't let him finish the --

12            THE COURT:  All right.  All right.  Wait.  Stop.  So

13   we're getting a little chaotic.

14        All right.  So thank you for your answer.  Ask another

15   question and then there'll be an answer.

16        Q    (BY THE DEFENDANT:)  Sir, then your testimony is

17   that the private attorney general, all the authority comes out

18   of 42 U.S.C. 1988; is that correct?

19        A    Yes, as well as case law.

20        Q    Is it your testimony that that particular statute

21   makes specific reference to creating a position of private

22   attorney general where private individuals can go and lawfully

23   become lawyers and represent people in court?  Is that your

24   testimony?

25        A    That's a false representation -- misrepresentation
```

UNITED STATES DISTRICT COURT

1    of the Act.  The Act authorizes private individuals to

2    basically assume their public duty responsibility to defend the

3    community against an organized crime racketeering enterprise.

4         Q    Sir, isn't it a fact, though, that what that law

5    does is it --

6              THE DEFENDANT:  Objection.

7              THE COURT:  I'm sorry.  Can he finish his question?

8    Then I'll allow you to object, if you stand up.

9         All right.  Mr. Sorenson.

10        Q    (BY MR. SORENSON:)  Sir, isn't it a fact that that

11   particular law simply allows attorney's fees to be collected by

12   individuals who sue for violations of civil liberties?

13             THE COURT:  Wait, wait, before you answer.  Your

14   objection.

15             THE DEFENDANT:  Objection because it's a

16   misstatement of the actual Act.

17             THE COURT:  All right.  So overruled.  He's asking

18   him for his understanding.

19        Dr. Horowitz.

20             THE WITNESS:  My understanding is that that's one

21   part.  It implies the fact that the law provides compensation,

22   I think it's maybe a third of the savings to the community or

23   the government, where a private attorney general comes up and

24   defends and prosecutes against criminals in a racketeering

25   enterprise, if they're able then to hold at the end of the case

49

1    a third of the amount of money that's been ruled to compensate

2    those damaged.

3        So that implies to me -- as a reasonable person that

4    implies that the Congress of the United States has authorized

5    we, the people, to step up and be able to combat organized

6    crime in our communities.

7        Q    (BY MR. SORENSON:)  So you would concede then that

8    this law, 42, 1988, doesn't specifically set out this concept

9    of private attorney general; it's something that Mr. Williams

10   and you have interpreted from the law; is that fair to say?

11       A    I think that that's close, but I don't think

12   it's -- I think it's a biased presumption because the United

13   States Congress was specific about the applicability of that

14   for going up against organized crime and enterprise.

15       Q    Okay.  And so let me ask you this then:  Your belief

16   then is that -- is that it is okay to practice law in U.S.

17   courts when you're not a licensed attorney as long as you're a

18   private attorney general?

19       A    I would say -- I'd have to say yes to that.

20       Q    So that's your belief then, correct?

21       A    If we're truly -- I would say --

22       Q    Let me follow-up.

23       A    Let me qualify my yes.

24       Q    All right.

25       A    I would say that if justice is required and your

UNITED STATES DISTRICT COURT

1    spiritual endowment of public duty and public duty doctrine

2    compels you, your heart and soul, to go up against organized

3    crime, there are few people, like Mr. Williams or myself, who

4    would be having the wherewithal to do that because of the fear,

5    because of the intimidation, because of the retaliation.

6            Mr. Williams has been incarcerated for doing just

7    that.  Is he -- is he a demon?  Is he a criminal?  In my

8    opinion no, and that's connected to your answer.

9            THE COURT:  All right.  Next question.

10   Q     (BY MR. SORENSON:)  Okay.  Thank you.

11           Okay.  So back on point, your belief then, I think

12   your testimony is, is that a private person can simply become a

13   private attorney general and then represent people in both

14   state and federal courts; is that correct?

15   A     I believe that that's the intention of the Congress

16   in citing that aspect.  The Congress didn't come right out and

17   say, Hey, you know, you and I should go and become private

18   attorney generals and combat evil.  No, it didn't do that.  But

19   what it implied was that.

20   Q     It's simply an implication that you've interpreted;

21   fair to say?

22   A     I think that that's reasonable interpretation based

23   on others who have acted as private attorney generals.  The

24   only stipulation and the question that I have is that private

25   attorney generals are not to charge people up front for those

1    services.  They're to wait.  Their compensation comes after

2    they win the cases and they save the community money; that's

3    when they're supposed to be paid.  So that's the only question

4    I have.

5          Q    Sir, this law never says anything about private

6    attorney generals, does it?

7          A    It's -- it's actually -- in your legal profession,

8    you must be aware that it is referenced as the Private Attorney

9    General's Act.

10         Q    No, no, I'm not aware of that.  But I will ask you

11   again, is that terminology used in the statute?

12         A    No, it's not, but it's -- obviously, so in case law,

13   when you do research it, you can go and find that's true.

14         Q    Okay.  And you're aware, sir that it's unlawful to

15   appear in court and represent other people?  It's a violation

16   of law.  You're aware of that, correct?

17         A    Unless you are designating yourself, frankly, as a

18   private attorney general.

19         Q    Okay.  So let's talk about how do you become a

20   private attorney general.  What are the training requirements

21   for that?

22         A    Actually, maybe it's more of a calling from the

23   creator than it is an actual academic exercise.

24         Q    So this is a spiritual calling from the creator?

25         A    Could be both.

UNITED STATES DISTRICT COURT

1      Q      And that can mandate you to become a private

2  attorney general?

3      A      It could be both.

4      Q      Okay.  So once you've been ordained by the creator

5  to be a private attorney general, are there -- is there some

6  accreditation system where you can go and take an exam or pass

7  something due to your qualifications?  Is there something like

8  that where you're vetted, or could just anybody do this?

9      A      Actually I think that's a question for the judge.

10  The courts --

11      Q      I'm asking your belief.

12      A      My belief is that that capacity and that

13  congressional authorization is subject to the individual courts

14  and their opinions and the manner in which they then rule.

15  It's -- but in terms of the law that you're asking about and

16  you want me to say that, Oh, that Private Attorney General Act

17  doesn't cover Mr. Williams, I'm sorry, I can't do that.

18      Q      Did Mr. Williams appoint himself to be a private

19  attorney general?

20      A      That's not a question for me.  You can ask

21  Mr. Williams.

22      Q      I'm just asking you.

23      A      I would assume.  I would assume that he had a

24  calling to do so.  It's obvious.  He wouldn't be putting up

25  with all of this abuse he's gone through all these years

UNITED STATES DISTRICT COURT

53

1    without having been called to be a private attorney general.

2        Q     Was it then the creator who appointed him to be a

3    private attorney general --

4        A     I would have --

5        Q     -- in your view?

6        A     In my opinion, yes.

7             THE COURT:  You just have to wait till he finishes

8    his question 'cause our poor court reporter can only take one

9    person at a time.

10        So your question?

11        Q     (BY MR. SORENSON:)  Would it be the creator who

12    ordained him to become a private attorney general in your view?

13        A     Actually, I can say that absolutely definitively yes

14    and here's why, a fact:  When I was filming Mr. Williams, we

15    have up on video when the judge asked him, "Who are you

16    standing for?" he said, "I'm standing for Yeshua," which is

17    Jesus.

18        Q     Okay.  All right, sir.  So did Mr. Williams tell you

19    that as a private attorney general he did not have to comply

20    with certain laws?

21        A     Never, never.

22        Q     Did --

23        A     In fact --

24        Q     Excuse me.  You answered the question.

25             THE COURT:  Wait, wait, wait.  So finish your

54

1    answer.  Okay.

2            THE WITNESS:  In fact, he -- he told me to research

3    the laws, to apply the laws.

4            Q    (BY MR. SORENSON:)  Okay.  Did he tell you that he

5    didn't need a license to drive?

6            A    He actually inferred that and maybe made some

7    statements about that.  And subsequently when I began to

8    research that, I found just like the Kingdom of Hawaii people

9    today are claiming that they should be authorized by their own

10   kingdom laws to be able to have a Kingdom of Hawaii license, I

11   think that there's some intertwining of those two concepts and

12   I'm not an expert in that field.

13           Q    So once you become ordained as a private attorney

14   general, you don't need a driver's license?  Is that what

15   Mr. Williams told you?

16           A    I don't believe that I can make that association nor

17   attribute that association to Mr. Williams.

18           Q    How about having a registered vehicle?  Did you ever

19   hear him say that he didn't need to register his vehicle

20   because he was a private attorney general?

21           THE DEFENDANT:  Objection.  That's beyond the scope.

22   That's beyond the scope.

23           THE COURT:  All right.  Overruled.  You asked him

24   about private attorney generals.

25           THE WITNESS:  To my understanding, I -- I think -- I

1   recall from years ago that Mr. Williams applied to the state

2   for a license plate for an ambassador.  That's what I believe.

3   So it wasn't that Mr. Williams was circumventing the system; he

4   was applying the rules and laws that existed to have a unique

5   driver's license associated with an ambassadorship, but don't

6   hold me to that as a fact because I'm a little foggy.  It's

7   been many years.

8        Q    (BY MR. SORENSON:)   Okay.  And would it surprise you

9   to learn that Mr. Williams has been told by a federal judge

10  here in Hawaii that he could not represent people in court?

11       A    Would it surprise me?

12       Q    Yes.

13       A    No.  It would absolutely certify what it is that

14  Mr. Williams is up against.

15       Q    You would not disagree with that, then, correct?

16       A    I'm appalled at the injustice in the system, just as

17  Bernie Sanders is today, just as President Trump is today.

18  There's an absolute -- it's headline news this morning about

19  Stone being now -- his sentence has been commuted to 40 months

20  instead of -- what? -- 9 years.  So the system itself is

21  broken.  How many times have you heard a politician say that?

22           We're dealing with a corrupted system.  So

23  Mr. Williams should not be, in my opinion -- unless you want to

24  object to my opinion -- my opinion is that he's being

25  retaliated against for being out there on a limb, virtually all

1   alone, and saying I'm not going to put up with this because

2   I've got Jesus behind me and I don't care about what you do, I

3   don't care about you putting me in jail, I don't care about you

4   smashing my head with whatever to make me bleed almost

5   unconscious and die.  I'm here to assert the truth.

6        Q    Mr. Horowitz, you have not heard the evidence in

7   this case; is that fair to say?

8        A    That's fair to say.

9        Q    So you don't know what Mr. Williams has been doing

10  or not been doing; is that fair to say?

11       A    That's fair to say.

12       Q    And it's also fair to say that you're not aware of

13  what he has done in federal or state court in his attempts to

14  represent people; is that fair to say?

15       A    That's not fair to say because I filmed him and I

16  was thrown out of Judge Ayabe's courtroom for being there to

17  observe the mortgage fraud that was being perpetrated, in my

18  opinion, by the banks against those who they had used altered

19  signatures, these photocopied signatures, on people's

20  mortgages, altered the mortgages, and he was there defending

21  them.

22       Q    Right.  And so when Mr. Williams would represent

23  people in court and advocate that he was a private attorney

24  general and authorized to do so, it was in his financial

25  interest and to his benefit to do that, wasn't it?

1          A      I would say that there was -- yes, and I would say

2     that that is a question for a fact as well as law.

3          Q      Right.  And Mr. Williams, would it surprise you to

4     learn, was making or trying to make 2- or 3- or $400,000 per

5     person that he signed up for his mortgages?

6               THE DEFENDANT:  Objection.  That's not what I was

7     doing and that's not -- no evidence to that.

8               THE COURT:  All right.  And so he's already said he

9     doesn't know about --

10              MR. SORENSON:  I'm asking if he would be surprised

11    to learn that since he's ahead of his opinions about

12    Mr. Williams.

13              THE WITNESS:  Would it --

14              THE COURT:  Wait.  I have to rule.  So the

15    objection's overruled.

16          So he's just asking you would you be surprised if you

17    learned that?

18              THE WITNESS:  If I was surprised to learn that

19    Mr. Williams was making several hundred thousand dollars on

20    clients?  Uhm, yeah, that doesn't seem reasonable to me.  I

21    would be surprised to learn that.

22          Q      (BY MR. SORENSON:)  And if you learned that there

23    were like 120 or so people here that had signed notes with him

24    promising to pay similar amounts of money to him based on this

25    idea that he could represent them, would that surprise you?

UNITED STATES DISTRICT COURT

```
1              THE DEFENDANT:  Objection, 'cause that's not what
2    the note states.
3              THE COURT:  All right.  Overruled.
4         All right.  He's just asking if you found out that
5    information, would that surprise you?
6              THE WITNESS:  It would surprise me.
7         Q    (BY MR. SORENSON:)  And so Mr. Williams's advocacy
8    as a private attorney general was, if that was all true --
9    would be quite financially beneficial for him, would it not be?
10        A    Actually, I think there's a separation between what
11   you're claiming here and what he -- not was doing, but the
12   separation is his contract to make the money.
13             Let's assume what you're saying is true, that he's
14   going to make a couple hundred thousand dollars off of each
15   mortgage and it's going to go through his companies and that's
16   what your primary complaint is, mortgage fraud.  For him to, A,
17   study law, to then go into a court of law that is opposing him
18   and have him be such a nuisance in the face of being arrested
19   and condemned is unreasonable that we would assume that there
20   was any illegitimacy in his action.  It doesn't seem reasonable
21   that a intelligent person who's got a contract for somebody for
22   $200,000, let's say, would -- that's based on fraud, would
23   suddenly now go and represent that person and say to law
24   enforcement and the judges, I'm here to defend what?  Not
25   fraud.  I'm here to defend the fraud that's being perpetrated
```

59

1   against this person.

2          So this whole -- to me this whole process is a sham.

3   It's a retaliation against this man.

4      Q    Let me ask -- let's have a question pending, okay?

5   And so if Mr. Williams had been told by the federal court here

6   that he could not represent people in court but he continued to

7   tell people that he could represent them in court, would that

8   change your answer?

9      A    No.  It's reasonable that they're both.  They're not

10  exclusive.  They're not one or the other.  It's -- the court

11  says you're not allowed to be here doing this, and Mr. Williams

12  is here saying I have every right and under God and under

13  country and under people's, communities' civil rights I have

14  every right to be here, and that's where the conflict is.

15         Now, what Kenji Price has done --

16     Q    So let me follow up.

17         THE COURT:  So okay.

18     Q    (BY MR. SORENSON:)  So your testimony then is

19  Mr. Williams, because he's a private attorney general and may

20  be ordained by the creator, he's above the law, so to speak?

21     A    False.  That's a misrepresentation and omissions.

22  It's -- you know.

23     Q    Well, he doesn't have to listen to the federal judge

24  telling him he can't represent people; is that correct?

25     A    He doesn't have to represent -- he doesn't have to

60

1    listen to the judge?  If the judge is not following the rules

2    and the laws.  He is under public duty and so am I and so is

3    every one of the jurors under public duty actually to go beyond

4    the fear, as this man has modeled, and say No, this is not what

5    the law says and that's how the law and the justice system is

6    improved, by people standing up against it and saying This is

7    unjust.  It's -- it's unconscionable and it doesn't follow the

8    legislative mandate of the rules and the laws established.

9    That's a brave hero.  That's not a criminal.

10        Q     So if Mr. Williams were convicted of the

11   unauthorized practice of law in the state of Florida --

12             THE DEFENDANT:  Objection.

13        Q    (BY MR. SORENSON:) -- and continued to do what he's

14   doing here --

15             THE DEFENDANT:  Objection.

16             THE COURT:  Wait until he finishes the question.

17        Q    (BY MR. SORENSON:) -- and continue to do what he was

18   he's doing here, telling people he could represent them, would

19   you have a problem with that?

20             THE COURT:  Wait.  Before you answer, do you have an

21   objection?

22             THE DEFENDANT:  Objection.  That's irrelevant and

23   this is not the state of Florida.  This is State of Hawaii.

24   And that also was overturned 'cause it's unlawful.

25             THE COURT:  All right.  So --

UNITED STATES DISTRICT COURT

1          THE DEFENDANT:  And it's beyond -- and also is

2    beyond the scope.

3          THE COURT:  So I'm going to sustain the objection

4    because I don't think it's relevant.

5       So do you have another question?

6     Q    (BY MR. SORENSON:)  Well, here in the state of

7    Hawaii, if you learned that there was an injunction against

8    Mr. Williams for the unauthorized practice of law, telling him

9    he could not represent people in court, would that change your

10   answer?

11    A    It wouldn't change my answer.  My answer's pretty

12   clear.

13    Q    Your answer is that he is above the law, so to

14   speak?

15    A    That's your words.  My -- my words would be that he

16   is confronting the system and the courts that are

17   misrepresenting and abusing the laws that the legislature, the

18   three branches of government -- the judicial system is supposed

19   to act out the laws by the legislature.  And Mr. Williams is,

20   from my opinion based on my experience -- has been saying to

21   the courts, You're -- You have obviously a fraudulent operation

22   going here.  You have a syndicate that is protecting the elite

23   and it's not helping the people, and I'm here to say to you and

24   I'm willing to go to jail -- and he's gone to jail and he's

25   been in jail and that's his -- that's his whatever.  That's his

1    karma, that's his job, that's his duty, that's his calling.

2            So I'm not going to misjudge him and/or use your

3    language to claim that because he has been doing this

4    repeatedly that he's a criminal.

5            THE COURT:  All right.  Thank you for your answer.

6        Do you have any other questions?

7            MR. SORENSON:  I do, Your Honor.

8            THE COURT:  Okay.

9        Q    (BY MR. SORENSON:)  Okay.  So just to make sure

10   we're clear about this --

11           THE COURT:  No.  Move on to another area.  You're

12   beating a dead horse, all right?  Asked and answered.  Let's

13   go.  Pick another area or sit down.

14       Q    (BY MR. SORENSON:)  Let's talk about the mortgage

15   that you entered into with apparently yourself.  I want to

16   direct your attention to 835, Exhibit 835.

17       A    Okay.

18           MR. SORENSON:  Your Honor, could we publish?

19           THE COURT:  You may.

20       Q    (BY MR. SORENSON:)  All right.  First off, I want to

21   direct your attention to the screen.  Do you see Exhibit 835?

22       A    Yes.

23           MR. SORENSON:  All right.  Your Honor, may we

24   publish?

25           THE COURT:  Yeah, it's published.

63

1           MR. SORENSON:  Okay.

2      Q     (BY MR. SORENSON:)  Okay.  I think you testified

3  about this document on direct examination; is that correct?

4      A     I believe I did.

5      Q     And you testified, I believe, that you were the

6  grantor here in capital letters, correct, Leonard G. Horowitz,

7  and I believe that is your common law wife, Sherri Kane,

8  correct?

9      A     Correct.

10     Q     And you have titled yourself legal persons and

11 fictions here, correct?

12     A     Correct.

13     Q     Is this one of Mr. Williams's documents?  Did he

14 help you with this?

15     A     Yes.

16     Q     Did he draft this for you?

17     A     Yes.

18     Q     And is it true then here that you are noted as the

19 borrower here?

20     A     Yes.

21     Q     Okay.  And -- but this is the capitalized letter

22 version of you; is that correct?

23     A     Yes.

24     Q     And then as we look down in the document, we see

25 that the servicer, the mortgagee is Mortgage Enterprise

UNITED STATES DISTRICT COURT

64

1    Investments, and that's in capital letters, correct?

2        A     Yes.  That says it's the borrower, right.

3        Q     And the trustee is Federal Mortgage American Trust.

4    Do you see that?

5        A     Yes.

6        Q     Okay.  So -- and down below you are also listed as

7    the secured party creditor, correct?

8        A     Correct.

9        Q     But this is in small letters.

10       A     Yes, correct.

11       Q     And I think you indicated that one of these entities

12   is a fake entity.  In other words, one of these is really not

13   you.  One of these is the blood you and the other one is a

14   fiction of you?

15       A     Well, not according to commerce.  The entire system

16   of commerce is based on capital strawmen.

17       Q     Okay.  But I'm just asking about this document for

18   you.  One of these is the capital-lettered Horowitz and one of

19   these is the small-lettered Horowitz?

20       A     Yes.

21       Q     And the idea is that you can be both the creditor

22   and debtor because you've sort of subdivided yourself into two

23   entities?

24       A     It's not particularly unlike me filing a UCC lien on

25   a multimillion dollar investment property that I have.

UNITED STATES DISTRICT COURT

65

 1     Q     Okay.  And also the trustee here, Federal Mortgage

 2  American Trust, what do you know about that company?

 3     A     Nothing, really.

 4     Q     Okay.

 5     A     It's basically based on trust and faith and

 6  Mr. Williams and his knowledge of law which was superior to

 7  mine.

 8     Q     And you trust that Federal Mortgage American Trust

 9  is a real company, I'm guessing?

10     A     If Mr. Williams says it is.

11     Q     Then you're going to believe it?

12     A     I will believe it.

13     Q     And would it surprise you to learn that it is not a

14  real company?

15     A     Well, what's a real company?

16     Q     Well, a company that's registered, a company that

17  has a name, a company that pays taxes and files tax returns,

18  company that exists.  That's a real company.

19     A     Well, that would help for providing assurance and

20  assurance that it does because, again, I'm involved in the

21  commercial system and I think that I'd go on the Bureau of

22  Conveyances or DCCA and look up a search of a company and see

23  whether it's been in business, whether it has a footprint in

24  the commercial business.  So that helps me as a consumer to

25  rely on a certain representation that this is a company.

UNITED STATES DISTRICT COURT

1          But, unfortunately, now knowing that I know, it

2     would not surprise me that Mr. Williams's companies, as he's

3     named them here, given his knowledge, far superior to mine in

4     law, that this would be a misrepresentation or fraud.

5          Q     Okay.  You're saying that Mr. Williams, if he made

6     this company up and it was fake, that's okay with you; is that

7     fair to say?

8          A     Uhm, if he made -- if he made this company up and it

9     was a fraud, did you say?

10         Q     Yes.

11         A     That that's okay with me?

12         Q     Yes.

13         A     I think that that's a misrepresentation.  No, I

14    don't believe that.

15         Q     Okay.  You don't believe -- you think there really

16    is a Federal Mortgage American Trust?

17         A     If Mr. Williams says so, and I take him on his word

18    that there is, that he's using this in legal documents, I would

19    say yes, I believe it.  And if I then researched and found what

20    you're alleging, I would feel uncomfortable and that discomfort

21    would then cause me to not rely on this document which is what

22    I have done all along because I know there are people

23    throughout the entire justice system that operate and see

24    things just like you.  And I'm not interested in jeopardizing

25    my rights, my family, my investments with depending on a

UNITED STATES DISTRICT COURT

67

1     document that people like you represent as fraudulent.

2          Q     Well, I'm asking if you knew this company didn't

3     exist, would that change your views of what Mr. Williams had

4     drafted for you?

5          A     If I knew if it was fraud, of course it would.

6          Q     Well, if he's representing this is going to be the

7     trustee on your deed of trust, then I'm assuming that you have

8     full faith that this is actually a company that is going to act

9     in that role?

10         A     Yes, that's exactly right.

11         Q     So you're relying upon the representation that this

12    is a real entity?

13         A     That's correct, yes.

14         Q     And if you learned that this company also shared the

15    same address as the United States private attorney general

16    office, would that surprise you?

17         A     Not at all, and I'll give you a reason why.  The

18    person that stole our property by forgeries used multiple times

19    in various entities that he established with DCCA that he

20    registered the same address.  That's partly how as an

21    investigative journalist I was able to determine links between

22    companies that supposedly were not linked.  So those addresses

23    are commonly shared, particularly post office boxes.

24               So what you're asking me, would it surprise me or

25    would that raise a red flag if I see Mr. Williams's two

UNITED STATES DISTRICT COURT

 1   companies using the same address, no.  It's done all the time.

 2        Q     Well, but you've indicated that's also possibly an

 3   indicator for you of something to be aware of?

 4        A     Yes, that's right.  It would certainly raise a

 5   reasonable caution.

 6        Q     And would it cause you any concern that this actual

 7   address has never housed either the Federal Mortgage American

 8   Trust or the U.S. Private Attorney General Office?

 9        A     I don't know of those facts and I don't know of the

10   details.  So I'm not sure about the question, how I can answer

11   it, if I don't know about it really.

12        Q     Let me show you what's been marked as Exhibit 501.

13              Your Honor, may we publish?

14              THE COURT:  I believe 501 is in evidence.

15              MR. SORENSON:  Yeah.  May we publish?

16              THE COURT:  Yes, uh-huh.

17        Q     (BY MR. SORENSON:)  All right.  You recognize this?

18        A     Yes.

19        Q     And you see Mr. Williams there, correct?

20        A     Yes.

21        Q     And you see the Great Seal of the United States of

22   America on there?

23        A     Yes.

24        Q     And you see United States Office of the Private

25   Attorney General, correct?

1       A       Yes.

2       Q       All right.  Go to the back side here.  Down at the

3   bottom, U.S. Office of the Private Attorney General.  Do you

4   see that?

5       A       Yes.

6       Q       And do you see the address?

7       A       Yes.

8       Q       Is that the same address for the Federal Mortgage

9   American Trust?

10      A       I don't know.

11      Q       Okay.  Well, you have signed a mortgage document

12  that purports to have the address for the Federal Mortgage

13  American Trust, have you not?

14      A       Based on faith, yes.

15      Q       Based faith, right?

16      A       Yes.

17      Q       And the address that's on this document is the same

18  address that's on this credential, correct?

19      A       Okay.

20      Q       Okay.  So my question is does that change your faith

21  in Mr. Williams?

22      A       No.

23      Q       Okay.  And also I'll ask you do you see where it

24  says "Do not detain.  Do not arrest"?

25      A       Yes.

UNITED STATES DISTRICT COURT

1       Q      Is that consistent with the positions you've heard

2   from Mr. Williams that he could not be arrested?

3       A      Oh, thank you.  Now, I remember the flight.  You

4   just triggered my memory.

5       Q      Please answer my question, though.

6       A      To answer your question, give me the question again.

7              THE COURT:  I'll read the --

8       Q      (BY MR. SORENSON:)  It says, "Do not detain.  Do not

9   arrest."  Do you see that?

10      A      Yes.

11      Q      Is that consistent with your understanding from

12  Mr. Williams that he could not be arrested?

13      A      Yes.  And on that flight, TSA basically virtually

14  arrested him and he used this explanation and defended against

15  that and, in fact, ultimately -- unfortunately, we never

16  pursued a civil case against TSA because of the violations of

17  the law that they had to pull him over because of this

18  identification.  Thank you for triggering my memory about that

19  flight.

20      Q      When you say TSA pulled him over and arrested him,

21  are you saying that TSA at the airport --

22      A      Yes.

23      Q      -- pulled him -- you mean they pulled him -- not his

24  car over, but him over?

25      A      Him over, that's right.  That's right.  Right after

1    we got off the flight, yes.  It was in Hilo.  That's right.

2         Q    Is it because he had used this ID --

3         A    Yes.

4         Q    -- to pass through the security checkpoint?

5         A    Yes that's right.

6         Q    They had a problem with that?

7         A    That's correct.

8         Q    And Mr. Williams filed a lawsuit; is that correct?

9         A    I don't know that.  I don't know if he did or not.

10   I remember we talked about him doing that.  I don't know if he

11   did or not.

12        Q    Were you not a party the that lawsuit as well?

13        A    Might have been because I authorized him to sign me

14   on as a party.  So if he filed it, I certainly would have shown

15   up to defend what I -- my experience and relay the facts as a

16   witness in that case.  And I was appalled because, again, from

17   my knowledge of the law, based on reading what Mr. Williams had

18   directed me to read and review, I found nothing wrong with this

19   identification, that TSA should not have subjected him to a

20   breach of his civil rights of travel, period.

21        Q    Okay.  So you think then it's okay for a private

22   citizen to dummy up their own credential, throw the Great Seal

23   of the United States of America on there, and then pass through

24   as if it's a U.S. document?

25        A    Some frauds, scams, artists, no.  But in this

UNITED STATES DISTRICT COURT

1    particular case, I think that Mr. Williams had every right to

2    create this document to show it off as legitimate.  And from my

3    understanding of the law from what I've read, he had every

4    right to do that and he's not to be charged with any crime.

5         Q    And so he can self-ordain that he has sovereign

6    immunity; is that correct?

7         A    Well, I think that that is -- I think that that's

8    correct from a spiritual perspective.  I think that we're all

9    supposedly sovereigns in our own body temples, so I think from

10   that perspective again if you're looking at law, is it man's

11   law?  Is it God's law?  Is it scriptural?  Or is it case law?

12   And I think that there's some question as to that.

13        Q    Well, then you agree that anybody who feels this

14   particular calling can dummy up their own little credential and

15   then become above the law?

16        A    And that they're going to get their karma.

17        Q    Their karma?

18        A    Yeah, absolutely.  Judgment.  Justice.

19        Q    Okay.  So --

20        A    Righteousness is the same thing ultimately.

21        Q    But you agree then that this is something that

22   private citizens can do?

23        A    I believe that private citizens have the right to

24   defend against fraud in the community and a duty, in fact.  A

25   public duty doctrine compels those of us who are brave enough

```
 1    to stand against the beast, so to speak, to literally go up and

 2    say, I hold myself up against you.  I rebuke you, and I'm going

 3    to do whatever it takes -- if I have to go to jail, if I have

 4    to do whatever, be damaged, whatever, I am going to stand.

 5    That's heroic.

 6         Q    So is TSA then the beast here that he's defeating?

 7              THE COURT:  So you need to move on.  We've sort of

 8    gone through this whole issue.  So --

 9              MR. SORENSON:  That's all I got, Your Honor.  Thank

10    you.

11              THE COURT:  Thank you very much.

12              MR. SORENSON:  I know you'll be happy to hear that.

13              THE COURT:  Thank you, Mr. Sorenson.

14              THE DEFENDANT:  Yes, for redirect.

15              THE COURT:  Yes.

16                         REDIRECT EXAMINATION

17    BY THE DEFENDANT:

18         Q    Dr. Horowitz, now he just triggered your memory

19    about the airplane flight?

20         A    Yes.

21         Q    Now, do you remember that we were in Kona when they

22    denied me?

23              MR. SORENSON:  Objection to the leading.

24              THE WITNESS:  Yes, now I do.

25              THE COURT:  Wait, wait.  All right.  So objection's
```

74

1    overruled.  It's foundational.

2         What's your next question.

3         Q    (BY THE DEFENDANT:)  Okay.  And so did we have to

4    drive that morning to Hilo?

5         A    Yes.

6         Q    And so I had to present my ID to the Hilo TSA,

7    correct?

8         A    Yes.

9         Q    And then they had -- then they did the checking?

10        A    That's right.  Thank you.  Yes, I remember that now.

11        Q    And so remember they had to call the FBI?

12        A    That's right.

13             THE COURT:  All right.  Now you're leading him.

14             MR. SORENSON:  Your Honor --

15             THE COURT:  You can ask him what he remembers --

16             THE DEFENDANT:  Okay.

17             THE COURT:  -- but --

18        Q    (BY THE DEFENDANT:)  Do you remember them calling

19    the FBI?

20        A    I do.

21        Q    And do you remember the FBI saying, Yes, his ID is

22    valid, let him on the plane?

23        A    I did.

24             THE COURT:  No, no.  All right.  So the last

25    question -- I mean, the last answer is stricken.  You can't

UNITED STATES DISTRICT COURT

75

1    lead him and you're asking him about hearsay.  So you just need

2    to ask him what he remembers about what happened.

3         Q    (BY THE DEFENDANT:)  Do you remember that the ID

4    was --

5              THE COURT:  No, no, no.  Not Do you remember this,

6    that, and the other thing.  That's a yes or no.  That's a

7    leading.  That's --

8         Q    (BY THE DEFENDANT:)  What do you remember about my

9    ID being accepted?

10             THE COURT:  Great.

11             THE WITNESS:  I remember that you were very angry

12   and that you then pursued further authorities to judge whether

13   or not that was a legitimate ID.  And subsequently I believe it

14   was the FBI or some other higher authority than TSA said, Yes,

15   you should allow him to go on this flight.

16        Q    (BY MR. SORENSON:)  And they allowed me to get on

17   the flight with my private attorney general ID?

18        A    That's -- that's the best of my knowledge, yes.

19             THE DEFENDANT:  And Defendant Exhibit 2086, please.

20        Q    (BY THE DEFENDANT:)  And do you remember me drafting

21   the lawsuit against the Kona TSA?

22        A    I'm sorry, Mr. Williams.  Vaguely.

23        Q    I know it's been a while.

24        A    I remember vaguely.  I'm not sure if I'm on there.

25   I know I authorized you to put me on there.

UNITED STATES DISTRICT COURT

1    Q    Let's see.  See that right there?  Can you

2  look -- can you see on the screen?

3         THE COURT:  If you look at the screen.

4         THE WITNESS:  Oh, yes.

5         THE COURT:  Take a look at it.  Read it to yourself,

6  don't read it out loud, and see if that refreshes --

7         THE WITNESS:  Yes.

8         THE COURT:  -- your recollection.

9         THE WITNESS:  Thank you.  Yes, I do remember this

10  now, that's correct.

11    Q    (BY THE DEFENDANT:)  Okay.  I'm going to show you

12  the other part.  Kind of read those statement of the facts.

13         MR. SORENSON:  Your Honor, objection.  This is not

14  in evidence.

15         THE DEFENDANT:  I'm not publishing.

16         THE COURT:  You're asking him to --

17         THE DEFENDANT:  I'm asking him to read it right now.

18         THE COURT:  You want to refresh his recollection?

19         THE DEFENDANT:  Right.

20         THE COURT:  He already testified he remembers this.

21         THE DEFENDANT:  Well, this is more aspects of it

22  that --

23         THE COURT:  You can ask him.  If he doesn't

24  remember, he can look at it, but it's not to feed him

25  information and then you ask him questions.  He says he

UNITED STATES DISTRICT COURT

1   remembers it, so you just ask him what he can remember.

2         Q      (BY THE DEFENDANT:)  So you remember that at the

3   Kona TSA there was like --

4               MR. SORENSON:  Objection.  Leading.

5               THE COURT:  Sustained.  Okay.

6          So what did -- you want to ask him what he remembers in

7   Kona?

8         Q      (BY THE DEFENDANT:)  Do you remember what Kona --

9   why they rejected my private attorney general ID at the Kona

10  airport?

11        A      I don't recall specifics, but I remember that they

12  would not accept it as legitimate ID.

13        Q      Right.  And so do you remember me arguing with them

14  that all you have to do is call the FBI and verify it and we

15  can get this problem resolved?

16        A      Yes, I remember that.

17        Q      And did they refuse to call?

18        A      Yes.

19        Q      And they refused to allow me on the plane?

20        A      That's correct.

21        Q      And so we had to travel to Hilo?

22              MR. SORENSON:  Objection again.  Leading.

23              THE WITNESS:  That's correct.  That's right.

24              THE COURT:  So there's an objection.  Overruled.  So

25  it's foundational.

UNITED STATES DISTRICT COURT

1       But you're going over stuff you've already -- he's already

2   testified about Hilo and that you got on.  So you need to move

3   to a different area 'cause we're just repeating the same thing

4   about the same incident.

5       Q    (BY THE DEFENDANT:)  So do you remember me telling

6   you about the TSA website and what's actually on the website?

7       A    Yes.

8            THE COURT:  Again, no.  So move to a different area.

9   We've finished this thing with Hilo and the TSA.  Do you have

10  any other areas that you want to ask him questions about?

11      Q    (BY THE DEFENDANT:)  Yes.  Do you remember when I

12  assisted you in Judge Elizabeth Strand's courtroom?

13      A    Unfortunately it's a horrible memory, yes.

14      Q    And do you remember before I would appear before any

15  judge, I would file a notice of appearance of common law

16  counsel?

17      A    Yes, I do recall you did that.

18      Q    And in this document, did I put a plethora of U.S.

19  Supreme Court cases that allows me to assist people in court?

20      A    Yes.

21      Q    And was *NAACP v. Button* one of those cases?

22      A    Yes.

23      Q    Do you remember the *Schware v. The Board of*

24  *Examiners* being one of the cases?

25      A    Vaguely.

UNITED STATES DISTRICT COURT

1    Q    Do you remember the *Gideon v. Wainwright*?

2         MR. SORENSON:  Your Honor, again leading.

3         THE COURT:  All right.  So it's foundational.

4    Overruled.

5         Okay.  So your answer.  Do you remember *Gideon v.* --

6         THE WITNESS:  Yes.

7         THE COURT:  -- *Wainwright*?

8    Q    (BY THE DEFENDANT:)  Okay.  Do you remember the --

9         THE COURT:  No, I'm not going to have you recite the

10   whole thing.

11        THE DEFENDANT:  Because the whole --

12        THE COURT:  I understand what you're getting at, but

13   we're not going to sit here and listen to all the things that

14   you included in it.  He has a general recollection of what you

15   filed, so you can ask him questions about his --

16   Q    (BY THE DEFENDANT:)  So you actually looked up these

17   case laws?

18   A    I remember looking up a couple of them.  I may not

19   have looked up all of them.

20   Q    Okay.  And the ones you looked up, did it authorize

21   someone like me to assist people in court?

22        MR. SORENSON:  Objection to the legal opinion.

23        THE COURT:  All right.  Sustained.  He's not going

24   to answer that question.  He's not a lawyer.  But you can ask

25   him what he observed.

UNITED STATES DISTRICT COURT

```
 1       Q      (BY THE DEFENDANT:)  Saying when you read the case
 2  law --
 3              THE COURT:  No.  I'm not going to have him testify
 4  about his interpretation of the case law.  He's not qualified
 5  as an expert in law.  You can ask him about his experiences
 6  with you or observing you in court.
 7       Q      (BY THE DEFENDANT:)  Now, he made such a big deal
 8  about my private attorney general certification, and you
 9  already testified that you saw that it was a Apostille by the
10  Secretary of State, correct?
11       A      Yes.
12       Q      And did it have the actual official Secretary of
13  State seal on there?
14       A      Yes.
15       Q      And you verified that?
16       A      Yes.
17       Q      Now, he said that I feel like I don't have to listen
18  to the judge if the judge ordered me to not assist people.
19  Now, it's your understanding, your experience with me --
20              THE COURT:  Are you asking him if he heard that
21  question from Mr. Sorenson?
22       Q      (BY THE DEFENDANT:)  Right.  You remember that
23  question?
24       A      Yes, I do.
25       Q      Okay.  So your experience with me is that if I feel
```

1   like it's a violation of the law --

2            MR. SORENSON:  Objection.  He can ask him what the

3   experience is, but I think he's trying to tell him.

4            THE COURT:  So your objection is leading?

5            MR. SORENSON:  Yes.

6            THE COURT:  Sustained.  So you need to ask him

7   open-ended questions 'cause he's your witness.  You're

8   providing him as a witness to this court.  So you can ask him

9   What was your experience?  What did you see?

10       Q     (BY THE DEFENDANT:)  In your experience with me and

11  attorneys at law, who would you say is more competent in law?

12       A     Uhm, I can't really answer that because I don't know

13  the other attorneys that you're referencing.

14       Q     Well, the ones that you had hired.

15       A     Oh, my goodness.  Prior to Margaret Wille --

16       Q     Right.

17       A     -- I would say you were far more competent, far more

18  reliable, honest, and I'd been so heavily damaged and

19  unfortunately biased by all the damage that we have sustained

20  by attorneys who were grossly incompetent that for me, it's,

21  I'm sorry to say, sad to say.

22       Q     And would you say the difference between me and

23  attorneys at law is that I --

24            MR. SORENSON:  Objection.  Leading.

25            THE COURT:  Sustained.  So you can ask him What do

 1   you think the difference is between me and attorneys in law?

 2   But you can't tell him the answer.

 3       Q    (BY THE DEFENDANT:)  Well, do you think the

 4   difference is that I educate --

 5            MR. SORENSON:  Objection.  Leading.

 6            THE COURT:  Sustained.  Okay.  So you can ask him,

 7   you know, what he thinks the difference is or why he thinks

 8   there's a difference.  Those are open-ended questions.

 9       Q    (BY THE DEFENDANT:)  So what do you think the

10   difference between how I assist these people and how attorneys

11   at law assist people?

12       A    Your Honor, I don't want to give a lecture here.

13            THE COURT:  Okay.  Clearly it's an open-ended

14   question, so I'll cut of you off if you go too long.

15            THE WITNESS:  You're a street fighter.  You're not

16   educated in the academic exercise of going through law.  That

17   should not, as a reasonable person, preclude you or me judging

18   you as incompetent or that you would no longer be potentially

19   able to help me or that I couldn't think of maybe researching

20   what you're telling me to research.

21       I would respect the fact that you have risked your neck

22   and everything and life to instruct me.  And so if I were to

23   compare that and your training, having virtually, I presume,

24   come out of a ghetto, and presume having had a calling on your

25   life to research this, and that you've done a serious amount of

83

1    research and literature review and case law analysis, compared

2    to an academic training program of a bar member, licensed

3    attorney, I would say that you would potentially even be more

4    reliable because you're not a bar member.  You're not part of

5    a, in my opinion, a corrupted judicial syndicate.

6              THE COURT:  All right.  Thank you.

7         Next question.

8         Q    (BY THE DEFENDANT:)  Do you remember the Judge

9    Richard Lee that hired me?

10        A    I don't recall Richard Lee that hired you.  A judge

11   Richard Lee?

12        Q    Yes.

13        A    I'm sorry.  I don't remember that.

14        Q    You rep Hep Guinn, right?

15        A    I remember Hep Guinn.

16        Q    What was your experience with Hep Guinn?

17        A    She stole $2800.

18             MR. SORENSON:  Your Honor, this is beyond the scope.

19             THE COURT:  All right.  It is.  So --

20        Q    (BY THE DEFENDANT:)  So did any of the attorneys

21   that you hired, did they encourage you to do research the way I

22   did?

23        A    Only Margaret Wille.

24        Q    So the other six did not encourage you to do any

25   type of research?

UNITED STATES DISTRICT COURT

84

1          A       That's correct.

2          Q       Now, you've viewed many of my YouTube videos; is

3    that correct?

4          A       I'd say half a dozen.

5          Q       So my YouTube videos you saw me actually in court in

6    front of plenty of judges assisting people, correct?

7                  MR. SORENSON:  Objection.  Leading.

8                  THE COURT:  Overruled.  Foundational.

9           So did you, yes or no, see him in court?

10                 THE WITNESS:  I saw you in court, yes, on couple of

11   occasions.

12                 THE COURT:  Nonleading from here on in.

13         Q       (BY THE DEFENDANT:)  And did I ever state in front

14   of that judge --

15                 MR. SORENSON:  Objection.  Leading.

16                 THE COURT:  Sustained.  Now you got to ask

17   open-ended questions, what he thought of it, what did he think.

18         Q       (BY THE DEFENDANT:)  Did I ever misrepresent myself

19   in front of that judge as a bar member?

20         A       Never.  The opposite.  You told them straight out

21   that you were not.

22         Q       Right.  And did I always recite the U.S. Supreme

23   Court rulings that gave me the authority?

24                 MR. SORENSON:  Leading.

25                 THE WITNESS:  Yes.

UNITED STATES DISTRICT COURT

1          THE COURT:  Wait.  So it is leading.  It's

2    sustained.  The jury's to disregard the answer to the last

3    question.

4          Q     (BY THE DEFENDANT:)  What did I recite to the judge

5    to give him the knowledge that I had authority to assist

6    people?

7          A     Case law.

8          Q     And was this case law something that you actually

9    researched yourself?

10         MR. SORENSON:  Objection.  This is asked and

11   answered and gone over a few times.

12         THE COURT:  All right.  Well, overruled.  So he's

13   asking about the case law that was represented in the YouTube

14   videos.

15    All right.  So your answer is?

16         THE WITNESS:  My answer is yes, verified from my

17   research based on your citations of case law that you were

18   correct.

19         THE COURT:  All right.

20         Q     (BY THE DEFENDANT:)  And so your whole experience

21   with me is that I'm very thorough in law?

22         MR. SORENSON:  Objection.  Leading.

23         THE COURT:  Yes.  So what is your experience with

24   me?

25         Q     (BY THE DEFENDANT:)  So what has your experience

UNITED STATES DISTRICT COURT

1  with me overall, Dr. Horowitz, in reference to me citing case

2  law and the law and me operating in and out of the courtroom?

3      A    That you're an intelligent, passionate victim of

4  organized crime that has persecuted you and prevented you from

5  having a life.

6          THE DEFENDANT:  Thank you.  I have no more

7  questions.

8          THE COURT:  All right.  Thank you very much,

9  Dr. Horowitz.  You're excused as a witnesses.  Good day to you.

10  Please don't discuss your testimony with anyone until after the

11  trial.  All right.  Thank you.

12      Oh, yes, and we'll give this back to you, your notes.

13  Thank you.

14          (This concludes the partial testimony requested.)

15

16

17

18

19

20

21

22

23

24

25

                        UNITED STATES DISTRICT COURT

```
 1                    COURT REPORTER'S CERTIFICATE

 2

 3              I, DEBRA READ, Official Court Reporter, United

 4    States District Court, District of Hawaii, do hereby certify

 5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 6    true, and correct transcript of the stenographically reported

 7    proceedings held in the above-entitled matter and that the

 8    transcript page format is in conformance with the regulations

 9    of the Judicial Conference of the United States.

10
                DATED at Honolulu, Hawaii, February 23, 2020.
11

12

13                    /s/ Debra Read

14                    DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT