1                 IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF HAWAII

 3
     UNITED STATES OF AMERICA,      ) CR 17-00101 LEK
 4                                   )
                 Plaintiff,          ) Honolulu, Hawaii
 5                                   ) February 20, 2020
        vs.                         )
 6                                   ) PARTIAL TRANSCRIPT:
     (1) ANTHONY T. WILLIAMS,        ) TESTIMONY OF SHERRI KANE
 7                                   )
                 Defendant.          )
 8   _____ )

 9
                  PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
10              BEFORE THE HONORABLE LESLIE E. KOBAYASHI
                      UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Government:        KENNETH M. SORENSON, AUSA
13                             GREGG PARIS YATES, AUSA
                               Office of the United States Attorney
14                             300 Ala Moana Boulevard, Suite 6100
                               Honolulu, Hawaii 96850
15
     Also Present:             MEGAN CRAWLEY, FBI Special Agent
16
     For the Defendant (1)     ANTHONY T. WILLIAMS, *Pro Se*
17   Anthony T. Williams:      05963-122
                               Federal Detention Center Honolulu
18                             Inmate Mail/Parcels
                               P.O. Box 30080
19                             Honolulu, Hawaii 96820

20   Standby Counsel:          LARS ROBERT ISAACSON, ESQ.
                               547 Halekauwila Street, Suite 102
21                             Honolulu, Hawaii 96813

22   Official Court Reporter:  DEBRA READ, RDR
                               United States District Court
23                             300 Ala Moana Boulevard
                               Honolulu, Hawaii 96850
24
     Proceedings recorded by electronic sound recording; transcript
25   produced with computer-aided transcription (CAT).


                      UNITED STATES DISTRICT COURT

```
1                          I N D E X

2                 CHRONOLOGICAL INDEX OF WITNESSES

3

4   DEFENDANT'S WITNESS                                    PAGE

5

6   SHERRI KANE
      Direct Examination By The Defendant                   3
7     Cross-Examination By Mr. Sorenson                     36
      Redirect Examination By The Defendant                71
8

9

10                         I N D E X

11                        E X H I B I T S

12

13   NO.                                                  PAGE

14
      832                                                   21
15    835                                                   18

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1   THURSDAY, FEBRUARY 20, 2020                          8:47 A.M.
 2                     (Partial transcript begins:)
 3            SHERRI KANE, DEFENDANT'S WITNESS, WAS SWORN
 4            THE COURTROOM MANAGER:  Please be seated.
 5        State your full name and please spell your last name and
 6   speak into the microphone.
 7            THE WITNESS:  Sherri Kane, K-a-n-e.
 8            THE COURT:  Your witness.
 9                          DIRECT EXAMINATION
10   BY THE DEFENDANT:
11       Q    Good morning, Ms. Kane.
12       A    Good morning.
13       Q    Ms. Kane, what do you do for a living?
14       A    I'm an investigative journalist.
15       Q    And did you ever work for Fox News?
16       A    Yes, I work with Fox News.
17       Q    And as an investigative journalist, what are some of
18   the things that you investigate and you do?
19       A    Well, I -- well, what I did back then is a little
20   bit different than what I do now.  But what I did back then was
21   I was a writer for them.  Right now I investigate government
22   corruption.
23       Q    Okay.  And so when you say you investigate
24   government corruption, can you explain to the jury what types
25   of government corruption that you investigate?
```

```
 1              MR. SORENSON:  Objection on relevance grounds, Your

 2   Honor.  And I think there's a motion in limine on this.

 3              THE DEFENDANT:  This is a --

 4              THE COURT:  Yes.  So the objection is sustained.

 5              THE DEFENDANT:  But this is her --

 6              THE COURT:  And so --

 7              THE DEFENDANT:  I'm laying a foundation that this is

 8   what she do --

 9              THE COURT:  Yes.

10              THE DEFENDANT:  She's a former client.

11              THE COURT:  All right.  So here's the thing.  She

12   has testified with regard that she investigates government

13   corruption and now you can ask her specific things related to

14   this case.

15      Q    (BY THE DEFENDANT:)  So have you investigated

16   mortgage fraud?

17      A    I investigated mortgage fraud especially pertaining

18   to the situation -- personal situation that me and my

19   significant other were involved in.  We were victims of

20   mortgage fraud and actually our home was stolen, and the person

21   that did it has just recently got indicted.  And we been trying

22   to save our house for a really long time and suddenly this man,

23   you know, got away with stealing our house and he is an

24   attorney as well as a drug trafficker, and he preys on young

25   people in the community and --
```

1          THE COURT:  All right.  That's a narrative answer.

2     Next question.  You can ask her a question and you can

3     elicit this, but she's not going to sit here and talk for

4     10 minutes, okay?  What's the next question?

5          THE DEFENDANT:  The governments' witness did it all

6     the time but --

7          THE COURT:  All right.  I'm sorry, Mr. Williams,

8     once I make a ruling, that's the court's ruling.  I don't ask

9     for any commentary.  If you can't follow the court's rules,

10    then I'm going to have to revoke your *pro se* status and not let

11    you represent yourself and have Mr. Isaacson step in.

12     Do we understand the rules of the court?

13         THE DEFENDANT:  I understand the rules, but the

14    rules are supposed to be fair.

15         THE COURT:  Yes, and I am enforcing them fairly.  If

16    you don't like it, then we can have someone who knows the rules

17    of the court and will follow them represent you in court.

18     Do you understand me?

19         THE DEFENDANT:  I understand that it should be fair.

20         THE COURT:  Yes.  Do you understand the

21    requirements?

22         THE DEFENDANT:  Yes, I do.

23         THE COURT:  All right.  Then proceed and ask your

24    question.  We have another problem like this, Mr. Isaacson will

25    step in.

1      Q      (BY THE DEFENDANT:)  Ms. Kane, so you saying an

2  attorney did you -- did -- was this an attorney at law like

3  these prosecutors?

4            MR. SORENSON:  Your Honor, objection on relevance

5  grounds.  Don't know how this is tied.

6            THE COURT:  Sustained.  So what the legal licensing

7  status of --

8            THE DEFENDANT:  'Cause this who committed the

9  mortgage fraud against her.  So I'm asking her --

10           THE COURT:  No, stop.  I'm talking, all right?  It

11 has no relevance with regard to Mr. Sorenson and Mr. Yates.  If

12 you can ask her the question with regard if she knows he was a

13 licensed attorney.

14     Q      (BY THE DEFENDANT:)  Did Mr. -- was Mr. Sulla a

15 member of the bar association?

16     A      Yes, he was.

17     Q      And so --

18     A      Yes.  He is still to this day.

19     Q      Okay.  And so before you met me, Mr. Sulla was

20 trying to steal your home?

21     A      That's correct.

22     Q      And did he file fraudulent documents?

23     A      Yes, forgeries, and he was indicted for that.

24     Q      And what type of documents would he file to steal

25 your home?

UNITED STATES DISTRICT COURT

1         A       Well, he basically used a strawman and he put that

2   on the record and he created a fake church.  And then what he

3   did was he went to the Bureau of Conveyances and he stole -- he

4   transferred our deed into this fake church and made this

5   homeless drifter heading the fake church.  So he kept himself

6   an arm's length away.

7         Q       Okay.  Now, did you and your husband make a formal

8   complaint like with the police or prosecutors?

9         A       Yes.  We complained to every --

10              MR. SORENSON:  Your Honor, again, objection on

11  relevance grounds.

12              THE WITNESS:  -- single authority we could.

13              THE COURT:  I'm sorry.  There's an objection.

14              MR. SORENSON:  Objection on relevance grounds.

15  Don't know how this ties to the charges in this case.

16              THE COURT:  Overruled.  It'll be foundational.  She

17  can answer that, but you need to tie it back, what it has to do

18  with this.

19              All right.  So your answer is, "Yes"?

20              THE WITNESS:  Yes.

21              THE COURT:  And your question is?

22         Q       (BY THE DEFENDANT:)  And so when you went to the

23  prosecutors's office, did they do anything about the crimes

24  that you notified them that this attorney at law had committed

25  against you and your husband?

UNITED STATES DISTRICT COURT

 1          A      No.   We tried to contact them for years.   They

 2     finally had indicted him with the grand jury.   It took several

 3     years and us losing our home before they did anything.

 4          Q      And did I try to assist you in bringing this

 5     attorney at law to justice?

 6          A      Yes, you did.

 7          Q      Did I accompany you and your husband to the Kona

 8     Police Department to actually file the complaint against this

 9     attorney at law?

10          A      Yes, you did, and you advised us of our rights

11     because most people don't know their rights.

12          Q      And so when we went to the police station to file

13     the complaint, did I show the officer the law that he had to

14     assist us in arresting that attorney?

15          A      Yes, you did.

16          Q      And did you all --

17               MR. SORENSON:   Objection.   Again, I don't know that

18     this ties at all to relevance.

19               THE DEFENDANT:   It ties to relevance that this

20     is --

21               THE COURT:   So overruled, but you have to ask

22     nonleading questions.   She's your witness so you already know

23     the answer.   So you need to ask nonleading questions.

24        Okay.   Go ahead.

25          Q      (BY THE DEFENDANT:)   Did you videotape this

UNITED STATES DISTRICT COURT

```
 1    encounter with the police station?
 2        A    Yes, it was videotaped.
 3        Q    Okay.  And so did the officer state on the video
 4    that he was not going to follow the law?
 5             THE COURT:  All right.  So --
 6             THE WITNESS:  Yes.
 7             THE COURT:  -- that's hearsay.  Are you going to lay
 8    the foundation?
 9             THE DEFENDANT:  Lay the foundation.
10             THE COURT:  Okay.  So ask her open-ended questions.
11        Q    (BY THE DEFENDANT:)  Okay.  Did the officer -- did I
12    ask the officer was he going to follow the law?
13        A    Yes, you asked him.
14        Q    And what was his response?
15             MR. SORENSON:  Objection.  Hearsay.
16             THE WITNESS:  He wasn't going to.
17             THE COURT:  All right.  So sustained.  So as a
18    result of this encounter, what happened, and you can go into
19    that, but she can't testify for the officer.
20        Q    (BY THE DEFENDANT:)  Okay.  So in order to protect
21    your home, before you hired me, did you hire an attorney at law
22    to assist you?
23        A    Many attorneys and none of them could help us.  They
24    all took our money and they did nothing.  They -- some of them
25    didn't even file anything, unfortunately.  We got ripped off.
```

UNITED STATES DISTRICT COURT

1    We lost a lot of money, hundreds of thousands of dollars.

2         Q    And was one of those attorneys Gary Dubin?

3         A    That's correct.

4         Q    And approximately how much did you pay Gary Dubin?

5         A    We paid him about $50,000.

6         Q    Okay.  And you said he didn't even --

7         A    Sorry, sorry, sorry.  We paid him 20 -- sorry.  We

8    paid him $20,000.  We paid him $6,000 and then we paid him

9    additional the, total of $20,000.

10        Q    Okay.  Let's see.  I'ma show you a document and let

11   me know if you recognize.  This is Exhibit 2093, page 132, 133,

12   and 134.

13             MR. SORENSON:  Could we have those page numbers

14   again?

15             THE DEFENDANT:  Page No. 132, 133 and 134.

16        Q    (BY THE DEFENDANT:)  Ms. Kane, is this -- are you

17   familiar with this email on the screen?

18        A    Oh, sorry.  Yes, yes, I am.

19        Q    And is that a email addressed to you?

20        A    It's addressed to me and to Leonard, yes, my

21   significant other.

22        Q    Okay.  And who was it addressed from?

23        A    Gary Dubin.

24             THE DEFENDANT:  Okay.  I'd like to enter this into

25   evidence.

UNITED STATES DISTRICT COURT

1           MR. SORENSON:  Objection, Your Honor.  There's

2    absolutely no relevance to this case and it's all hearsay.

3    These are apparently the communications from Mr. Dubin to

4    Mr. Horowitz.

5           THE WITNESS:  And myself, sir.  My name --

6           THE COURT:  All right.  Listen.

7           THE WITNESS:  I'm sorry.

8           THE COURT:  You only answer if there's a question.

9           THE WITNESS:  Okay.  I'm just saying that my name's

10   on there.

11          THE COURT:  Yes.

12          THE WITNESS:  Okay.

13          THE COURT:  So the jury is to disregard Ms. Kane's

14   last statement.  It was not a response and it's not testimony.

15      What's your objection?

16          MR. SORENSON:  Well, relevance and hearsay, Your

17   Honor.

18          THE COURT:  All right.  Sustained.

19          THE DEFENDANT:  This was a email that was sent to

20   her, so I'm questioning her does she recognize the email; she

21   said yes.

22          THE COURT:  I know and I've sustained the objection.

23   It's not coming in.  All right?  It's not relevant.

24      So ask her a question about what it relates to you or the

25   charges or your defenses in this case.

12

 1      Q      (BY THE DEFENDANT:)  So when you hired Mr. Dubin,

 2  you said that he didn't file anything on your behalf?

 3      A      That's correct.

 4      Q      And so when you found out that he didn't file, did

 5  you have to hire another attorney?

 6      A      Yes.

 7      Q      And who was that?

 8      A      After Gary Dubin, we hired I believe Margaret Wille.

 9      Q      And what did they do for you in fighting your

10  mortgage?

11      A      Well, Margaret's really trying hard for us.  She

12  sees the injustice and she's been trying really hard, but

13  she -- she too understands the system is not -- is corrupt.  So

14  we have not been able to get any justice so far.

15      Q      Okay.  And so is this the reason that you contacted

16  me and hired me to assist you into fighting your foreclosures?

17      A      Yes.  We wanted to know what other rights we had

18  because the judges were all working with Mr. Sulla.  We had no

19  justice at all.  We had no trial for when he took our house.

20  We had no alternatives but to try to find another form of law

21  and we sought out common law.

22      Q      And so when you all sought me out, did you come to

23  my office and visit me at my office?

24      A      We did.

25      Q      And when you would visit me at my office, would

UNITED STATES DISTRICT COURT

13

1   sometimes there would be other clients there?

2        A     There would be.

3        Q     Okay.  And did you ever hear me tell a client that

4   I'm an attorney at law?

5        A     Never.

6        Q     And did I introduce myself as a private attorney

7   general?

8        A     Yes.

9        Q     And did I always explain the difference between me

10  as a private attorney general and attorneys at law?

11       A     Yes, very explicitly.

12       Q     And do you remember a conversation that we had with

13  me and your husband, your significant other, about attorneys

14  not having a license to practice law?

15       A     Right, yes.

16       Q     And at that time was it your position that attorneys

17  did have a license?

18             MR. SORENSON:  Objection.  Leading, Your Honor.

19             THE COURT:  Sustained.

20       Q     (BY THE DEFENDANT:)  Did you believe that attorneys

21  at law had a license?

22             MR. SORENSON:  Objection.  Leading.

23             THE COURT:  Sustained.  Ask her an

24  open-ended -- what was her belief.

25       Q     (BY THE DEFENDANT:)  What was your belief about

UNITED STATES DISTRICT COURT

1    attorneys having a real license to practice law?

2         A    I actually believed that they had a license.

3         Q    And did you -- did I encourage you to do research on

4    that fact?

5         A    Yes, you did.

6         Q    And did you do the research as an investigative

7    journalist?

8         A    Yes.

9         Q    And what did you find when you researched?

10         A    That was all -- just they were part of a club and it

11   wasn't really relative to somebody understanding the rights and

12   defending themselves.

13         Q    So in your research you found out that they really

14   didn't have a license?

15         A    I found out that they did not.

16         Q    Okay.  And so when I would interact with clients in

17   your presence, did I take off my sovereign peace officer badge

18   and parade it around like this and say, "Hey, I'm a sovereign

19   peace officer"?

20         A    No.

21         Q    Did I use it to say, "Hey, I cannot be arrested by

22   the police"?

23         A    No.

24         Q    So did I make it to where I'm grandstanding or I'm

25   more than what I say I am?

```
 1                    MR. SORENSON:  Objection.

 2                    THE WITNESS:  No.

 3                    MR. SORENSON:  Leading, Your Honor.

 4                    THE COURT:  Sustained.  The last answer will be

 5     stricken from the record.

 6          All right.  Ask her an open-ended question.

 7          Q    (BY THE DEFENDANT:)  So when you would come to the

 8     office and -- you and your husband, was I very descriptive on

 9     what I could do --

10                    MR. SORENSON:  Objection.  Leading.

11                    THE COURT:  Okay.  So let him finish his question.

12     But it is leading.  So you can ask her, you know, What did I

13     tell you?  What was your impression of me?

14          Q    (BY THE DEFENDANT:)  Well, when -- did I explain to

15     you fully what the common law was about?

16          A    Yes.

17          Q    Did I actually show you the laws regarding --

18          A    Yes, and you encouraged us to read 42 U.S.C. 1988.

19          Q    And did I actually show you Hawaii law?

20          A    Yes.

21          Q    That Hawaii law actually is under common law?

22          A    Yes.

23          Q    And so did I explain to you everything that I did

24     was constitutional?

25          A    Yes.
```

UNITED STATES DISTRICT COURT

1      Q      And that it was under the common law?

2      A      Yes.

3      Q      And so did I ever pretend to be a licensed member of

4  the bar?

5      A      Never.

6      Q      And was I not emphatic that I was not?

7      A      You never ever said you were a licensed member of

8  the bar or an attorney.  We knew exactly what you were trying

9  to do and we believed totally and still do that you were trying

10 to help people.

11     Q      So you wasn't tricked into believing that I was a

12 member of the bar?

13     A      No, not at all.

14     Q      So I never misconstrued that -- that notion that I

15 was --

16            MR. SORENSON:  Objection.  Leading.

17            THE COURT:  Sustained.  You can't suggest the

18 answer.  You just ask her what was her impression or opinion of

19 you.  She's --

20            THE DEFENDANT:  So --

21            THE COURT:  -- can answer the question.

22     Q      (BY THE DEFENDANT:)  So in your interaction with me,

23 Ms. Kane, was I a man that was very sincere and passionate

24 about what he did?

25     A      Yes, and we still see you as a man of God.  We know

UNITED STATES DISTRICT COURT

 1    how much you love Yeshua.  We totally believed in what you were

 2    doing.  And the system, what we experienced, was -- made me

 3    physically sick.

 4            We really need people like you to help educate

 5    people on their rights.  They need to know their rights because

 6    most people then just allow their houses to be stolen and they

 7    don't realize that they do have rights and they can defend

 8    themselves.

 9    Q    Now, did I file a mortgage on your behalf, you and

10    your husband?

11    A    You filed something to help us stop Mr. Sulla.

12    Q    Okay.  And can you look at the screen, see if that's

13    a copy?

14            THE COURT:  Can you identify the --

15            THE DEFENDANT:  Can you identify that document?

16            THE WITNESS:  Yes.

17            THE COURT:  Can you identify it, Mr. Williams, what

18    you're showing her, what exhibit?

19            THE DEFENDANT:  It's exhibit -- Government

20    Exhibit 835.

21            THE COURT:  Okay.  All right.  So she recognized the

22    exhibit.

23            THE WITNESS:  Yes.

24    Q    (BY THE DEFENDANT:)  Is that your signature?

25    A    Yes.

UNITED STATES DISTRICT COURT

1              THE DEFENDANT:  I'd like to enter this into

2     evidence.

3              MR. SORENSON:  No objection.

4              THE COURT:  Received.

5              THE DEFENDANT:  I'd like to publish it.

6              THE COURT:  You may.

7              (Exhibit 835 received into evidence.)

8         Q    (BY THE DEFENDANT:)  Now, Ms. Kane, on this mortgage

9     that I filed, did I make sure that you and your husband was

10    listed as the secure party?

11        A    Yes.

12        Q    And did I explain to you why I did that?

13        A    Yes.

14        Q    And did you understand that my company would not own

15    your home?

16        A    Yes, we understood that.

17        Q    Did I explain that very extensively?

18        A    Yes.

19        Q    And was the meaning of filing this document

20    specifically to protect your home?

21        A    Yes.

22             THE DEFENDANT:  Government Exhibit 832.

23        Q    (BY THE DEFENDANT:)  And do you recognize this

24    document, Ms. Kane?

25        A    Yes.

UNITED STATES DISTRICT COURT

1     Q     And what is this document?

2     A     It's a UCC financing statement.

3     Q     And did I explain to you and your husband exactly

4  what a UCC financing statement is?

5     A     You did.

6     Q     And did I explain to you what the purpose of the UCC

7  financing statement was?

8     A     Yes.

9     Q     And is my name anywhere on the document?

10     A     No.

11         THE DEFENDANT:  I'd like to enter this into

12  evidence.

13         MR. SORENSON:  Your Honor, no objection.  Probably

14  just the first three pages I think of this exhibit are the

15  financing statement.  We're fine with that.

16         THE COURT:  So how many pages were you seeking to

17  admit?  Those first three pages?

18         THE DEFENDANT:  No, it's actually -- 'cause the

19  other documents are a part of the actual filing.  Sorry.  6, 7,

20  8 --

21         MR. SORENSON:  Your Honor, just for the record, the

22  rest of the document appears to be about 38-odd pages.

23         THE DEFENDANT:  Yeah, it's actually one document.

24         MR. SORENSON:  Your Honor, I just think the rest of

25  this is excludable on 401 and 403 grounds.

UNITED STATES DISTRICT COURT

1          THE COURT:  All right.  Let me take a look at it.

2          MR. SORENSON:  We think the financing statement is

3    what he's after.

4          THE DEFENDANT:  Well, this is all --

5          THE COURT:  Wait.  Let me see it.

6          MR. SORENSON:  There's an affidavit.

7          THE COURT:  Ms. Feria, could you get the hard copy

8    and show it to the witness?

9        All right.  Ms. Kane, in front of you is Exhibit 832.  The

10   first three pages, that's the UCC financing statement that was

11   prepared for you by Mr. Williams; is that correct?

12         THE WITNESS:  Yes.

13         THE COURT:  All right.  The next page refers to an

14   affidavit and with an exhibit list, I think, attached to it.

15         THE WITNESS:  Yes, this was all attached to the same

16   document.

17         THE COURT:  Okay.  Do you know who prepared this?

18         THE WITNESS:  The affidavit?

19         THE COURT:  Yes.

20         THE WITNESS:  That was, I believe, me and Leonard

21   prepared that affidavit.

22         THE COURT:  I'm sorry.  Who?

23         THE WITNESS:  Leonard and I.  Dr. Horowitz and I.

24         THE COURT:  Okay.  You folks prepared that.  And

25   then after that there's a --

```
1                THE WITNESS:  The exhibit list we prepared.

2                THE COURT:  Yeah.

3                THE WITNESS:  All the rest we prepared.

4                THE COURT:  The land court system filing.

5                THE WITNESS:  That was all part of our -- of our

6    property that was stolen.  That was all what we wanted to add

7    to the exhibits in our filings, yep.

8                THE COURT:  Okay.  Was that filed at the same time

9    with the UCC financing statement?  Or these are

10   separate -- they appear to be separate dates.

11               THE WITNESS:  No, we filed -- we attached it to the

12   UCC financing statement with the Bureau of Conveyances.

13               THE COURT:  Okay.  So all of the things that follow

14   the UCC financing statement you included with your filing --

15               THE WITNESS:  Yes, that's correct.

16               THE COURT:  Okay.  All right.  So the objection's

17   overruled.  It's all one document.

18               MR. SORENSON:  Okay, Your Honor, thank you.

19               THE COURT:  You're offering it into evidence?

20               THE DEFENDANT:  Yes.

21               THE COURT:  It's received.

22               THE DEFENDANT:  And I'd like to publish it.

23               THE COURT:  You may.

24               (Exhibit 832 received into evidence.)

25        Q     (BY THE DEFENDANT:)  Now, Ms. Kane, on the secure
```

1  party on the UCC, did I explain to you all why I had you all

2  listed as the secure party creditor also on the UCC?

3      A    Yes.

4      Q    And you did understand that that was to also protect

5  your property?

6      A    Yes.

7           MR. SORENSON:  Objection.  Leading.

8           THE COURT:  Sustained.

9           THE WITNESS:  We understood that --

10          THE COURT:  I'm sorry.

11          THE WITNESS:  Okay.

12          THE COURT:  I sustained the objection, so the last

13 answer is stricken.  The jury is to disregard it.

14      Ask her an open -- what did you understand?

15      Q    (BY THE DEFENDANT:)  What did you understand about

16 you being a secure party creditor on your own UCC?

17      A    Well, what we understood was we needed protection

18 about our home being stolen and this was our protection.  And

19 we -- we had put this into information -- reading the common

20 law into evidence, reading common law and understanding that

21 this was part of our ability to be able to try to defend

22 ourselves because we had no other defense ever.  I mean, not

23 with the authorities, not with the judges, not with the

24 prosecutors, no one.  This was our defense.

25          And we knew Mr. Sulla, who's been stealing homes

UNITED STATES DISTRICT COURT

 1    for -- you know, he's been practicing law for 40 years -- we

 2    knew that he was a serial land thief and we knew that our home

 3    was going to be stolen if we didn't do anything to protect it

 4    and we totally understood how this could help us.

 5         Q    And do you remember you and Doc coming to the office

 6    and seeing some of my videos that I did that I uploaded to

 7    YouTube?

 8         A    Yes.

 9         Q    And can you -- do you remember what some of the

10    videos were about?

11         A    You were always trying to help people and try to

12    help people whose homes were being stolen.  I actually appeared

13    in court to -- to witness that and I was assaulted in the

14    courtroom for filming it.  So I completely know all of the

15    stuff that you were trying to do.  And we really appreciate

16    what you were trying to do for people.

17         Q    And do you remember you and Doc coming to the office

18    and telling me that what I was doing, that the government would

19    come after me?

20         A    To -- I -- we believe that yes, we believe that you

21    were in danger for sure by the government if they would find

22    out you were trying to help people.

23         Q    And why did you feel like I would be in danger?

24         A    Because what we've experienced in the courts.  I

25    mean, I came in to film.  I was assaulted in a courtroom as a

```
 1   journalist and then I was -- I didn't -- basically the
 2   ambulance came, checked my blood pressure, said, "Oh, you need
 3   to go to the hospital," and the head of the sheriff said --
 4   well, first he said, "You should leave now because they didn't
 5   lay a hand on you."  And next thing you know, the ambulance
 6   comes, takes my blood pressure and says, "Oh, well, now we're
 7   going to have to take you to the hospital."
 8           And the head of the sheriff's that was there that
 9   day, he said, "Well, if you go to the hospital, then we're
10   going to have to arrest you."  And they forced injections into
11   my vein to lower my blood pressure at the hospital.  I was
12   assaulted.
13           And then when I went to the arraignment that day,
14   they basically disappeared the case and they said, "We have no
15   record that you were ever arrested."
16           And I said, "That's unbelievable," but they gave me
17   back a hundred dollar bail check, right?
18           And so I -- I've witnessed what the judges have
19   done.  I've witnessed Judge Ronald Ibarra retiring right after
20   he gave our home to Mr. Sulla; Judge Melvin Fujino was
21   complicit; Judge Elizabeth Strand -- never with a trial.
22           And then finally Mr. Sulla was -- got indicted by a
23   grand jury, but, you know, that was after our home was
24   stealing.  Now we have to wait for Mr. Sulla to get a trial.
25   He's got a fixer attorney that he hired that was our attorney,
```

1    conflict of interest.

2                    MR. SORENSON:  Your Honor --

3                    THE WITNESS:  But I -- this is all of the stuff--

4                    MR. SORENSON:  I'm just going to just generally

5    object to try to save us some time here.  It's fascinating, but

6    I don't know where this is going.

7                    THE COURT:  Okay.  So -- so that's the end of her

8    response.  You can ask her another question.  I believe the

9    objection was a narrative.  Sustained.

10       Q    (BY THE DEFENDANT:)  Do you remember having a court

11   hearing on the Big Island with Judge Elizabeth Strand?

12       A    Yes.

13       Q    And did I appear at the courtroom for you?

14       A    Yes.  You were definitely supporting us, yes.

15       Q    And was I forcibly removed from being able to assist

16   you?

17       A    Yes.

18       Q    By the sheriffs?

19       A    Yes.

20       Q    And so I wasn't able to execute my fiduciary duties

21   because I was prevented from doing that, correct?

22       A    That's right.  And I believe you could have helped

23   us, but then they incarcerated you.  They put you in a cell.

24   Seven men walked in, they banged your head, you were bleeding

25   on the floor, left to die with your skull cracked open.  I

1  remember that.  I remember the sheriffs using racial slurs

2  against you.  I remember all of what you went through and I

3  remember what we went through and we've been through a living

4  hell all of us.

5        Q     And now you mentioned about the hearing that you

6  were at.  That was my extradition hearing that you was at,

7  correct?

8        A     Yes.

9        Q     And do you remember the charges I was charged with?

10       A     Yes, yes.  You were -- they actually were trying to

11  claim that you used -- that you robbed a house.  And it turned

12  out you were only like six months old at the time.  They used

13  somebody by the same name as you with a different social

14  security number.  They tried to pin it on you.

15             Yes, I've witnessed them trying to pin everything on

16  you.  That's what this is all about.  It's making you to blame

17  for all of the things that they have not done.  And if they had

18  all done their job, there would be no need to look for

19  alternative resources to try to help -- to help us and other

20  people from saving their homes.

21             MR. SORENSON:  Objection.  Again, narrative.

22             THE COURT:  All right.  Sustained.

23        Okay.  So that's her answer.  And then what's the next

24  question?

25        Q     (BY THE DEFENDANT:)  Did you and Dr. Horowitz

UNITED STATES DISTRICT COURT

```
 1   videotape this hearing?

 2        A      The hearing at --

 3        Q      When they tried to fake my fingerprints.

 4        A      Oh, yes, we did.

 5        Q      And did you all upload that to YouTube?

 6        A      Yes, we did.

 7        Q      Okay.  And --

 8        A      We uploaded also to our video channel as well,

 9   revolutiontelevision.net.

10        Q      And so I was extradited back to Georgia based on

11   those fake fingerprints, correct?

12        A      Yes.

13        Q      And do you know if I got the case dismissed?

14        A      Yes, of course you did.  I mean, and they were

15   putting other charges to try to character assassinate you and

16   we've witnessed all of that.

17               THE COURT:  Okay.  Wait.

18               THE WITNESS:  We witnessed trying to blame

19   everything on you and it's -- it's really, really, really sad,

20   and anybody who does that should be ashamed of themselves

21   because they have not done their jobs.  They have not.  They

22   have you here and Mr. Sulla is out walking, stealing more

23   houses and forging more deeds.

24               THE COURT:  All right.  So you need to answer the

25   question that's asked of you, Ms. Kane.
```

28

1          All right.  So what's the next question?

2          Q     (BY THE DEFENDANT:)  Ms. Kane, did you and

3    Dr. Horowitz ever fly with me on an airplane?

4          A     Yes.

5          Q     Did you physically see my private attorney general

6    ID be accepted by the TSA?

7          A     Yes.

8          Q     And did they ever say that my ID was fake?

9          A     No.

10         Q     Did they ever say that my badge was fake?

11         A     No.

12         Q     So they let me gain entrance to the airport and on

13   the airplane with my private attorney general ID?

14         A     Yes.

15         Q     And you was a specific witness to that?

16         A     Yes.

17         Q     Okay.  And so did I ever try to scam you or your

18   husband?

19         A     No, you never did.

20         Q     Did you see me where I tried to scam any other

21   clients?

22         A     No.

23         Q     And you know a lot of people in the community,

24   correct?

25         A     I saw people scamming you, though.

UNITED STATES DISTRICT COURT

```
 1     Q     Right.  And who do you refer to?

 2     A     Edna Franco, who should be in prison.

 3     Q     And what did she do?

 4     A     She basically was going around saying that he

 5   represented -- or she worked in your company, and she was

 6   stealing and doing all kinds of backhanded things.  I believe

 7   that eventually she got indicted or something, but she was able

 8   to walk free and I believe she is still walking free because

 9   she's somehow a government informant.

10           But I've witnessed her do some really bad things to

11   people and --

12           MR. SORENSON:  Objection.  Again, relevance and

13   narrative, Your Honor.

14           THE COURT:  Yeah.  Sustained.

15      Okay.  Ask the next question.

16     Q     (BY THE DEFENDANT:)  So, Ms. Kane, this is -- you

17   had did a journal on the attorney that had stolen your home.

18   Do you remember you all had -- actually doing a journal and a

19   website --

20     A     Yes.

21     Q     -- regarding the fraud?

22     A     Yes.

23     Q     And the fraud consisted of him filing fraudulent

24   documents and things like that not only to steal your home, but

25   steal other people's home?
```

 1       A       That's right.  He's currently doing the Waikoloa

 2  Highlands.  He actually just -- he managed to do that and we

 3  have documented that online on judicialcorruptionnews.com.

 4       Q       Was there a recent case where a young lady was

 5  actually murdered?

 6       A       There is a case that a woman was murdered.  She was

 7  hanging out with we call it the ayahuasca death coal.

 8  Mr. Sulla has an ayahuasca -- illegal ayahuasca church on the

 9  Hamakua Coast the -- uh, all of the authorities know about --

10  the DEA knows, a state, uhm, drug prosecutor knows about it,

11  all of them know.  And --

12              MR. SORENSON:  Your Honor, objection on relevance

13  grounds --

14              THE WITNESS:  -- he's allowed to get away with it.

15              THE COURT:  Stop, Ms. Kane.  So, I'm sorry.  Your

16  objection?

17              MR. SORENSON:  Relevance and narrative.

18              THE COURT:  Yeah.  Sustained.

19       Okay.  So you can ask her questions that have to do with

20  this case, that Mr. Sulla is not part of this case,

21  Mr. Williams.

22              THE DEFENDANT:  Well --

23              THE COURT:  So ask her the next question.

24       Q       (BY THE DEFENDANT:)  So with the mortgage fraud that

25  was perpetrated against you, you knew when you hired me that I

1    was not a member of the bar, correct?

2        A     Right.

3        Q     And so --

4        A     We didn't want a member of the bar at that point.

5    We wanted to be able to save our home --

6             THE COURT:  All right.  The question was a yes or

7    no.  Did you know that he was not a member of the bar?

8             THE WITNESS:  We -- yes, we knew he was not.

9             THE COURT:  All right.  Thank you.

10        Okay.  Next question.

11        Q     (BY THE DEFENDANT:)  And so did that ever influence

12   your decision knowing that I was not a member of the bar?

13        A     No.

14            THE COURT:  All right.  Next question.

15            THE WITNESS:  It --

16            THE COURT:  Sorry --

17            THE WITNESS:  Hold on.  I'm not done.  Let me

18   finish.

19            THE COURT:  No, no, no.  He just asked you a leading

20   question --

21            THE WITNESS:  No, no.  I'm sorry.  I mean yes, yes.

22   Yes, it influenced our decision, yes.

23            THE COURT:  Stop.  Stop.

24        Okay.  So then ask her the next question.  If you want to

25   ask her leading questions, it's a yes or no, okay?  So if you

UNITED STATES DISTRICT COURT

1    want her to to explain her question[*sic*], you need to ask her

2    an open-ended question.

3         Q    (BY THE DEFENDANT:)  Ms. Kane, in your experience,

4    would you refer someone to a private attorney general like me

5    to help them or an attorney at law?

6         A    Well, we haven't seen many honest attorneys, so I

7    would say that I would definitely recommend you.  And there are

8    a few good attorneys.  I mean, Margaret Wille is a really good

9    attorney.  She hasn't been able to -- you know, to really

10   overcome this level of corruption, but, yes, there are some

11   good attorneys.

12        Q    Do you feel that if I wasn't unlawfully

13   incarcerated, I would be able to do more to help you?

14        A    I believe that your incarceration prevented you from

15   helping us further and finishing what you had started to help

16   us with.

17             THE DEFENDANT:  Okay.  I'd like to get Government

18   Exhibit 209, please.

19             MR. ISAACSON:  Is it in?

20             THE DEFENDANT:  Yeah, it's already into evidence.

21             MR. ISAACSON:  Oh, it is up.

22             THE COURTROOM MANAGER:  You got the document?

23             MR. ISAACSON:  It's on --

24             THE COURTROOM MANAGER:  Oh, they have it.  Okay.

25             THE DEFENDANT:  I'd like to publish it.

UNITED STATES DISTRICT COURT

33

1                THE COURT:  You may.

2                THE DEFENDANT:  Okay.

3                THE COURT:  Okay.  Wait.  I'm sorry.  Now it is.

4      Thank you.  Go ahead.

5           Q    (BY THE DEFENDANT:)  Okay.  Ms. Kane, did you ever

6      call the OCP or the DCCA and file a complaint against me or my

7      company, Mortgage Enterprise Investments?

8           A    Never.

9           Q    Did you file a complaint against my company, Common

10     Law Office of America?

11          A    Never.

12          Q    Did you file a personal complaint against me?

13          A    Never.

14          Q    Did you authorize the Department of Consumer Affairs

15     to void out your mortgage that was filed on your behalf to

16     protect your property?

17          A    No.

18          Q    Can you turn -- go down to the page -- I don't know

19     what page it is -- but it shows where -- next page, next page,

20     next page, next page, next page, next page, next page, next

21     page, next page.  Okay.

22               You see the letter M?

23          A    Yes.

24          Q    Okay.  And this is a document where the Office of

25     consumer protection Voided your mortgage.  Did you know that

                    UNITED STATES DISTRICT COURT

34

 1   they took this action without your knowledge?

 2        A     No, we did not.

 3        Q     If you would have known this, would you told them

 4   not to void your mortgage?

 5        A     Of course, yes.  I would have told them I don't know

 6   why anybody put our name on the document without our

 7   authorization.

 8        Q     Exactly.  And so you never would have authorized

 9   them to void out your mortgage?

10        A     And I never seen a copy of this either.  That's the

11   worst part.  No, I would not have authorized them to do

12   anything.  The DCCA is part of the racket that's stealing

13   people's homes and allowing criminals to get away with things

14   that they should not, people that should be locked up.

15        Q     So you never received a letter from OCP or DCCA

16   stating like We're going to void your mortgage 'cause --

17        A     No, never received -- never saw this document.

18              THE COURT:  I'm sorry.  You have to let him finish

19   his question.

20              THE WITNESS:  Okay.

21              THE COURT:  So next question.

22        Q     (BY THE DEFENDANT:)  So you never received a letter

23   that they was going to void out your Uniform Commercial Code

24   financing statement?

25        A     No, never received anything.

35

```
 1     Q    So they totally did this without your knowledge?

 2     A    That's correct.

 3     Q    And this is probably part of the reason that --

 4          MR. SORENSON:  Objection.  Leading.

 5          THE COURT:  Sustained.  So ask her an open-ended

 6  question.

 7     Q    (BY THE DEFENDANT:)  Do you feel like this is part

 8  of the reason that Paul Sulla was able to steal your home?

 9          MR. SORENSON:  Objection.  Leading.

10          THE COURT:  Sustained.  What do you think --

11     Q    (BY THE DEFENDANT:)  What do you think by them

12  voiding it what effect it had on you?

13     A    I'm sure it helped Paul Sulla and that's what

14  they've been doing; they've been helping Paul J. Sulla, Jr.

15     Q    And so, Ms. Kane, what do you feel about me

16  personally as a man?

17     A    As I said earlier, I believe you're a man of God.  I

18  believe that you love God and you are -- you love Yeshua.

19  We've talked about it.  We've had Bible conversations many

20  times and we really appreciate you.  We can see your heart.

21  You have a great heart and you're a very kind man.  You just

22  wanted to help people.

23          You saw the corrupt system and you wanted to help

24  people and educate them of their rights because all of these

25  elderly people and people that don't speak English are being
```

UNITED STATES DISTRICT COURT

1    ripped off.  It's unfair.

2              THE DEFENDANT:  That's right.  I have no more

3    questions.

4              THE COURT:  All right.  Thank you.

5          All right.  Cross-examination.  Your witness.

6              MR. SORENSON:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8    BY MR. SORENSON:

9      Q    Ms. Kane, let's start off with your -- your mortgage

10   that you were just asked about.  This is Exhibit 835.

11             Your Honor, could we have this published?  It's in

12   evidence.

13             THE COURT:  Yes, you may.

14     Q    (BY MR. SORENSON:)  You've identified this document;

15   is that correct?

16     A    Yes.

17     Q    And is this the mortgage that you filed in an effort

18   to frustrate a prior interest in your property?

19     A    No.

20     Q    What is it?

21     A    Our home was paid already.  It was an effort to try

22   to save our home from being stolen by Mr. Paul J. Sulla, Jr.

23   He had no interest in our property.  He had no interest and

24   he --

25     Q    Okay.

1          A      -- got indicted for it.

2          Q      Let me ask you this.  When you refer to somebody

3     stealing your home, are you talking about somebody foreclosing

4     on your residence --

5          A      No.

6          Q      -- because you failed to pay a note?

7          A      No.  We paid off our mortgage.  Mr. Sulla came in --

8     as I said earlier, he created a fake church.  He used a

9     strawman named Jason Hester as the leader of this church, and

10    what he did was he went to the Bureau of Conveyances, he

11    claimed that we didn't pay any mortgage.  He created a new

12    mortgage and then he went and had a nonjudicial foreclosure.

13          After we spent four years in court beating the

14    judicial foreclosure -- we won because the mortgage had been

15    paid -- Mr. Sulla comes in later, a year later, and he files a

16    nonjudicial foreclosure on the court steps.  He doesn't file

17    with the court.  He goes on the court steps and he gives our

18    house for $10 to Jason Hester, a homeless drifter who is

19    heading this fake church, the Gospel of Believers it was

20    called.

21          If you read our articles online --

22          Q      I'm sorry.  I'm sorry.  I'm just going to have to

23    just ask you just answer the question, okay?

24          A      I just answered it.

25          Q      Okay.  And -- well, let me ask you this then.  This

UNITED STATES DISTRICT COURT

38

1    was an effort to frustrate his mortgage that he had filed; is

2    that correct?

3          A     This was an effort to stop him from stealing our

4    home.  He had forged the documents which he was --

5          Q     Okay, thank you.

6          A     He was later found to have done that by a grand

7    jury, okay?  He was later found to have done that.

8          Q     Now, as we look at this document, I want to direct

9    your attention to a few parts of it, okay?  It's up on the

10   screen.  Do you see it?  And I'm going to make a mark here.

11              THE COURT:  Do you want the hard copy of it as well

12   or are you all right --

13              THE WITNESS:  I think -- no, it's not in here,

14   right?

15              THE COURT:  835.

16         Q     (BY MR. SORENSON:)  Do you see, Ms. Kane, what I've

17   boxed in up there?

18         A     Yes.

19         Q     Okay.  I know it's hard.  We can -- we can make it

20   bigger, if you need?

21         A     I don't need it bigger.  I don't need it bigger.

22         Q     Okay.  So this document says it's a mortgage; is

23   that correct?

24         A     That's right.

25         Q     And it's dated May 6, 2014; is that correct?

UNITED STATES DISTRICT COURT

```
 1        A      It's -- yes, yes.

 2        Q      And both you and Leonard Horowitz, common law

 3   husband and wife, are listed as the borrowers; is that right?

 4        A      Yes.

 5        Q      Okay.  So you're the borrowers, true?

 6        A      Uhm --

 7        Q      See where it says "borrower" right after your names,

 8   next paragraph down?

 9        A      Uhm, I don't see.

10        Q      Next paragraph down?

11        A      Can you read the paragraph, please?

12        Q      Yeah, it starts with "Borrower" and then it says

13   "the servicer mortgagee"?

14        A      Okay, yes.

15        Q      So you're the borrower, correct?

16        A      Uh-huh.

17        Q      And the servicer mortgagee is listed as MEI.  That's

18   Mr. Williams's company; is that correct?

19        A      Yes.

20        Q      And MEI is listed as a business out of Killeen,

21   Texas, right?

22        A      Yes.

23        Q      And then we see the trustee is Federal American

24   Mortgage, right?

25        A      Federal Mortgage -- I'm sorry.  Where is that?
```

UNITED STATES DISTRICT COURT

1    Q    The next line down, the Federal Mortgage American

2  Trust.  Do you see that?

3    A    No.  I think I'm going to need a hard copy.

4    Q    Okay.

5    A    'Cause I think you have -- you've crossed out that

6  part of it so I can't see it.

7           THE COURT:  Can't see it with the blue line.

8           THE WITNESS:  Yeah, you've crossed it out.

9           THE COURT:  Can you -- can you -- well, do that, but

10 are you able to enlarge it so she can see it?

11          MR. SORENSON:  Yes, Your Honor.

12          THE WITNESS:  I can see it, but he had it all --

13          THE COURT:  There you go.

14          THE WITNESS:  Okay.  So borrower.  Okay.  I don't

15 see where you're saying --

16          MR. SORENSON:  Okay.  So --

17          THE WITNESS:  The trustee is Federal Mortgage

18 American Trust, yes.

19   Q    (BY MR. SORENSON:)  You see that, right?

20   A    Yes.

21   Q    And so you've got your servicer mortgagee is

22 Mr. Williams and his company, right?

23   A    Yes.  I mean, it's our home so we could do anything

24 we want to protect our home; so you understand that.

25   Q    And you're the borrower in this document, correct?

UNITED STATES DISTRICT COURT

```
 1       A      Yes.  We actually created this to stop Mr. Sulla.

 2   We had no other alternative --

 3       Q      Yeah, I think you --

 4       A      -- to save our home.  I want you to understand that.

 5              THE COURT:  Okay.  Wait, Ms. Kane, he's just

 6   asking --

 7              THE WITNESS:  I understand but it's really --

 8              THE COURT:  No, no --

 9              THE WITNESS:  It's very hurtful and frustrating --

10              THE COURT:  No, Ms. Kane.

11              THE WITNESS:  -- that we got our home stolen and

12   this man --

13              THE COURT:  I understand.  Ms. Kane, Ms. Kane.  So I

14   understand that you went through a very tough time and it's

15   hard for you to talk about it, but you've been called as a

16   witness by Mr. Williams.

17              THE WITNESS:  But, you know, why is not Mr. Sulla

18   here?  That's -- he stole our home.

19              THE COURT:  So, Ms. Kane, so this is not about your

20   home.  This is a criminal case involving charges against

21   Mr. Williams.  So Mr. Sorenson's going to have an opportunity

22   to ask you some questions and he's just asking you about this

23   document that you've already told Mr. Williams that you filed

24   and you've explained why you filed it.  So he's just asking you

25   some questions to understand the document.
```

1          THE WITNESS:  Yeah, but honestly, it's really,

2   really demeaning to have someone like that question me.  I

3   mean, it is.  It's so demeaning to me.

4          THE COURT:  Well, so, Ms. Kane --

5          THE WITNESS:  Your Honor, I appreciate you so

6   much --

7          THE COURT:  Yeah.

8          THE WITNESS:  And I love -- and I think you're a

9   great judge, I think.  But I'm saying to you that this man

10  that's doing this, he's malicious though.  I can feel it in my

11  heart he's malicious.

12          THE COURT:  But, see, this is the process.

13          THE WITNESS:  He's malicious because he put this --

14          THE COURT:  Ms. Kane, Ms. Kane.  All right.  Listen,

15  we're going to have to take a break so you and I can have a

16  conversation.

17          THE WITNESS:  Can I say one thing to you?

18          THE COURT:  No, no.  What I'm going to do is excuse

19  the jury and I'll give you an opportunity to speak what's in

20  your heart, okay?  So why don't we do that.

21      So, ladies and gentlemen, we are going to take a recess.

22  It's going to be at least 15 minutes.  If you could leave your

23  notes and iPads behind.  And, of course, don't discuss the case

24  with anyone or allow anyone to discuss it with you.

25      Please rise for the jury.  They're in recess for at least

1   15 minutes.

2        (Discussion off the record not included in this

3        partial transcript.)

4        (Open court in the presence of the jury.)

5        THE COURT:  And the record will reflect the presence

6   of the ladies and gentlemen of the jury, welcome back, counsel

7   and Mr. Williams.  The witness is on the stand.

8        Mr. Sorenson, your witness.

9        MR. SORENSON:  Thank you, Your Honor.

10   Q    (BY MR. SORENSON:)  Ms. Kane, we were talking about

11   the MEI mortgage that we have, the deed of trust

12   mortgage -- excuse me -- the deed of trust mortgage that you

13   entered into apparently as a borrower in this.  Do you recall

14   that?

15   A    Yes.

16   Q    Okay.  And you see it up on the screen there, right?

17   We were talking about that second paragraph, right?

18   A    You're talking about the -- hold on.  Is this right?

19   The borrower, the service mortgagee.  Okay.  Yes.

20   Q    Now, we've established that you were the borrower in

21   this document, correct?

22   A    Dr. Horowitz and I.

23   Q    Yes.  And the servicer was Mortgage Enterprise

24   Investments and that is Mr. Williams's company, right?

25   A    Yes.

UNITED STATES DISTRICT COURT

44

1      Q      This trustee, though, Federal Mortgage American
2   Trust, I want to ask you some questions about this.  What do
3   you know about this witness?

4      A      You'll have to speak with Dr. Horowitz.  I don't
5   know much about it.

6      Q      Is it your belief though that this is a valid, real
7   company?

8      A      Yes.

9      Q      Okay.  And why do you think that?

10     A      Because I 100 percent trust Anthony.

11     Q      So if Anthony Williams told you that Federal
12  Mortgage American Trust really existed and it really was at
13  this address, would you believe that?

14     A      Yes.

15     Q      And you would believe that because you trust him?

16     A      Right, yes.

17     Q      Now, the secured party creditors and beneficiaries
18  on this document, interestingly, are listed as both you and
19  Dr. Horowitz, correct?

20     A      That's correct.

21     Q      And so you are both the borrower and the creditor
22  and beneficiary on this document; is that fair to say?

23     A      Yes.

24     Q      So you occupy two roles here; you're going to be the
25  borrower and the creditor?

UNITED STATES DISTRICT COURT

45

1        A        We're going to do anything to protect our home

2   again.

3        Q        And that includes filing a document that has you

4   listed as the borrower and the creditor, correct?

5        A        Correct.

6        Q        Now, if we can go down in this document, at the

7   bottom part, did you see any other mortgages like this that

8   Mr. Williams did for other customers of MEI?

9        A        No, I didn't see them.

10       Q        So you don't have any personal knowledge of that,

11  correct?

12       A        I know that he helped other people the same way, but

13  I didn't look into other people's personal documents.

14       Q        You have no idea what he filed for them, right?

15       A        I know that he filed similar things with them that

16  he filed for us.

17       Q        And I think you've indicated that you were present

18  from time to time when he interacted with other clients; is

19  that correct?

20       A        I wasn't in the room with him, but they were waiting

21  for him I know.  I've known some of them and they were all very

22  positive about Anthony.

23       Q        Right, right.  And -- but when you testified about

24  knowing what he said to them, that was because you were sitting

25  outside while he was meeting with them?

UNITED STATES DISTRICT COURT

1      A      Uh-huh.

2      Q      So you weren't present during those conversations?

3      A      I was -- I was in the room, but I -- you know,

4   that's personal stuff.  But I talked to them on a one-on-one

5   basis and I know that they were very positive about Anthony.

6      Q      But talking to them, you don't know what he said to

7   them; is that fair to say?

8      A      They told me -- a lot of them told me.  If they felt

9   like they wanted to share it, they told me what --

10      Q      And did they tell you that he was a private attorney

11   general?

12      A      Yes.

13      Q      And they believed that he could represent them,

14   correct?

15      A      Well, he wasn't representing them; he was helping

16   them.

17      Q      He wasn't -- he wasn't telling --

18      A      He wasn't like representing them like a lawyer would

19   represent them.  He was basically helping them, helping them

20   understand their rights, helping them understand what they

21   needed to file in order to protect their rights.

22      Q      So your belief then is that he never would go to

23   court and represent people; is that correct?

24      A      He would go to court to help them but not represent

25   them in the same way an attorney would represent them.  An

1    attorney is different than that.  He would go to court and

2    basically support them, go to court, be with them and -- and if

3    they -- even if he needed to and they asked him to, he would

4    stand up with them.

5         Q     Were you present with him when he would stand up in

6    court and represent people?

7         A     No.

8         Q     So you don't really know that, do you?

9         A     I went to court with him and I saw what he did in

10   our case.

11        Q     And so when you went to court with him in your case,

12   did he stand up in court?

13        A     We -- he came -- we wanted him to come up there with

14   us because we knew we were being railroaded.

15        Q     I understand that.  Did he didn't, though?  Did

16   he --

17        A     He didn't represented us like a lawyer.  He

18   basically just said these are their rights.  He just was making

19   sure that the court knew that we knew our rights.

20        Q     All right.  But did he sit at table, counsel table

21   with you?

22        A     If we asked him to, he did, yes.

23        Q     Did you ask him to?

24        A     Yes.

25        Q     And did he?

```
 1       A       I can't remember right now if he did or not.

 2       Q       Well, you just said that he stood up and said things

 3   for you; is that correct?

 4       A       Yes, because he saw we were being railroaded.  I

 5   can't remember if he was sitting at the table with us.

 6       Q       Did he file documents for you?

 7       A       He told us what to file.  I don't remember him

 8   filing, just the UCC, these documents that you put up there.

 9       Q       Did he draft court documents for you?

10       A       I can't recall if he did or not.

11       Q       In most respects, though, he was representing your

12   interests; is that fair to say?

13       A       He was, very supportive of us.

14       Q       And is it your belief that he was also representing

15   the interests of other people, other clients of MEI?

16       A       Other clients are none of my business.  I just know

17   that he was trying to help us and I know from speaking to

18   clients that he was trying to help them as well.

19       Q       But you weren't present during his conversations

20   with those people, were you?

21       A       I don't know what he said to those people.  It's

22   not -- it's -- you know.  But I know what we know about Anthony

23   and speaking to the clients.

24       Q       I understand.  For instance, do you know Loreen

25   Troxel?
```

UNITED STATES DISTRICT COURT

```
 1       A       Who.

 2       Q       Loreen Troxel?

 3       A       No.

 4       Q       You don't know who she is?

 5       A       I don't know.

 6       Q       So you don't know what he said to her, right?

 7       A       I don't know what he said to her.  I know a few

 8  other people.  I know -- I know what he said to them basically

 9  that --

10       Q       What about Julita Asuncion?

11       A       I don't know her.

12       Q       You weren't present during any conversations?

13       A       I don't know who she is.

14       Q       Don't know what he said to her?

15       A       No.

16       Q       Anabel Cabebe, do you know what he said to her?

17       A       Who?

18       Q       Anabel Cabebe.

19       A       Anabel -- that name sounds very, very familiar, but

20  I believe there was a group of people that were trying to hurt

21  Anthony.  I don't remember all their names.  I thought maybe

22  Anabel might have been one of those people.  But there were a

23  few people that were trying to hurt him that were connected to

24  Edna Franco.

25       Q       What about Evelyn Subia?
```

```
 1        A     I don't know who that is.

 2        Q     Melvyn Ventura?

 3        A     Melvyn Ventura, he might have been one of the people

 4   that were trying to go after -- go after Anthony.  I don't

 5   remember all their names, but there were a few other people

 6   that were trying to hurt him.  They were defrauding Anthony.

 7   They were going out and saying they were private attorney

 8   generals and they weren't doing good to people and they were

 9   saying they worked for Anthony when they didn't even work for

10   him.

11        Q     Nelson Madamba?

12        A     He might have been one of them too.

13        Q     Might have been?

14        A     His name sounds familiar.

15        Q     You don't know who he is, though, do you?

16        A     I might have met him before.  I don't know him by

17   his name, no.

18        Q     I guess my question is you don't know what he was

19   saying to clients of MEI; is that fair to say?

20        A     I know -- I know what he said to us and I know what

21   he said to a few other people.  I know Robin, for instance, I

22   know.

23        Q     Robbin Krakauer?

24        A     Yes.

25        Q     Didn't she work for Mr. Williams?
```

1        A        I don't know if she worked for him or not.  But I

2    know what she said and how he tried to help her.  I witnessed

3    that.  And she's also very positive about.  Even to this day

4    she's very positive about Anthony.

5        Q        Would it surprise you to know she's on the

6    letterhead of the Common Law Office of America?

7        A        She could be.  But, you know, it doesn't mean

8    that -- you know, if he was doing really bad things, if she was

9    on this letterhead, then why would she say good things about

10   him if he was doing something bad?  She worked for him, right?

11   You're claiming she had firsthand knowledge?  That's what

12   you're claiming, right?  So why would she --

13       Q        I'm not claiming anything.  I'm asking you

14   questions.

15       A        But I'm asking you so I can understand.  If she was

16   on his letterhead, like you're claiming, and she has positive

17   things to say, then she was a witness to what he was doing and

18   that just speaks to him -- to him very positively.

19       Q        You don't know what she testified to either in this

20   trial, do you?

21       A        No.

22       Q        Okay.  All right.  Let me ask you.  You've talked a

23   little bit about seeing Anthony go through TSA checkpoints with

24   his ID; is that correct?

25       A        Once.

UNITED STATES DISTRICT COURT

52

1      Q      Just once?   Just once?

2      A      Once.

3      Q      Okay.   Were you ever present when he was denied

4  access by TSA?

5      A      No, no, never.

6      Q      Did you ever take part in a lawsuit against TSA with

7  Mr. Williams --

8      A      I wasn't part of the lawsuit.

9             THE COURT:   Okay.   So you just have to wait till he

10  finishes his question.

11             THE WITNESS:   Sorry, sorry, sorry.

12             THE COURT:   I understand.   Just give it a beat.

13             THE WITNESS:   Sorry.

14             THE COURT:   Okay.

15      Q      (BY MR. SORENSON:)   Were you ever part of a lawsuit

16  joining Mr. Williams because you were present when he was

17  denied --

18      A      There was something that happened when he -- one

19  incident, but I don't remember if I was on any of the documents

20  or not.   I don't remember.   Maybe as a witness.

21      Q      So you do have knowledge then that he was denied --

22      A      I don't know exactly what --

23             THE COURT:   I'm sorry.

24             THE WITNESS:   Sorry.

25             THE COURT:   Ms. Kane, you just have to wait till he

UNITED STATES DISTRICT COURT

53

```
 1   finishes --

 2              THE WITNESS:  All right.

 3              THE COURT:  -- you know.

 4      Q   (BY MR. SORENSON:)  So then you do know -- you've

 5   heard at least that he was denied access --

 6      A   I can't recall.  It might have been a really long

 7   time ago.  I can't recall any of the information.

 8      Q   If it's represented in the lawsuit that you were

 9   present and you observed it --

10      A   Okay.  I can't recall.  I can't recall.

11      Q   Okay.  But you wouldn't dispute that; is that fair

12   to say?

13      A   I wouldn't dispute it unless I looked at the

14   documents and saw exactly what the claims were 'cause I don't

15   remember it.

16      Q   So you have a recollection that he was allowed

17   through a TSA checkpoint at one point --

18      A   Yes, I do.  We were --

19              THE COURT:  I'm sorry.  You --

20              THE WITNESS:  Sorry.

21              THE COURT:  -- have to wait till he finishes the

22   question.

23              THE WITNESS:  Sorry, sorry.

24              THE COURT:  So your question is?

25      Q   (BY MR. SORENSON:)  You have a recollection that he
```

UNITED STATES DISTRICT COURT

54

1   was allowed through on one point?

2       A     Yes, I do remember that 'cause he was walking in

3   with me, so I remember that.

4       Q     And you have some recollection that he may have been

5   denied access at some point?

6       A     You know, I don't -- I can't recall that.  I don't

7   think I was standing next to him at the time.  Might have been

8   there present, but I can't remember exactly.  I didn't hear

9   what anyone said to him.  I might -- I can't recall.  It's

10  been -- must have been -- it was many years ago.

11      Q     Did Mr. Williams tell you that this mortgage that

12  we've got up on the screen, did he tell you that that would

13  eradicate a prior interest, if there was one?

14      A     We knew there was no one.

15      Q     Right, right.  But that's not the question --

16      A     He didn't tell me that because we knew -- we didn't

17  discuss that, no.

18      Q     My question is is did he tell you that it would get

19  rid of whatever claim this person had?

20      A     It told us that it would protect us.  That's it.  He

21  didn't say anything about that.

22      Q     Did he tell that a clause like this in your mortgage

23  would get rid of a prior mortgage or prior interest --

24      A     I don't recall.

25      Q     Okay.  Did he do a UCC financing statement for you?

UNITED STATES DISTRICT COURT

55

1          A     Yes.  You saw it earlier.

2          Q     I did.  And did he do that for you?

3          A     Yes.

4          Q     Okay.  So in that document, you're listed as both a

5    creditor and a debtor; is that correct?

6          A     Yes.

7          Q     Okay.  So do you know what a financing statement is?

8          A     I know a little bit about it, but you'll have to

9    talk to my husband.  He's an expert as well in common law.

10         Q     I understand.  And was it your understanding that

11   this UCC financing statement would affect some interest in your

12   real estate?

13         A     He -- I was just told it would protect my interest

14   and Dr. Horowitz knows a lot more about it, but, yes.

15         Q     And you were told that by Mr. Williams; is that

16   right?

17         A     We were told -- we were -- you'll have to speak to

18   Dr. Horowitz.  He had more conversations with Anthony regarding

19   this.

20               But, yes.  I mean, we were -- we -- I know -- I felt

21   and I totally to this day believe that according to common law

22   it would protect us.  And my husband's read very much up on

23   common law.

24         Q     But you believe that because Mr. Williams told

25   you --

UNITED STATES DISTRICT COURT

56

1          A       No, because what was read when researching common

2     law.  We -- I know that Leonard always researched anything that

3     Anthony told him.

4          Q       What is the common law basis for a UCC financing

5     statement --

6          A       Ask Dr. Horowitz.

7          Q       -- affecting an interest in property?

8          A       You'll have to ask Dr. Horowitz.

9          THE COURT:  You have to wait until he finishes his

10    question.

11         Q       (BY MR. SORENSON:)  Would your answer then be that

12    you have no idea whether it affects --

13         A       No, I don't.  I didn't read --

14         THE COURT:  Again, you have no wait until he

15    finishes his question.

16         THE WITNESS:  Sorry.

17         MR. SORENSON:  I'll stop and then you answer.

18         Q       (BY MR. SORENSON:)  So you have no idea whether this

19    UCC financing statement would effect an interest in real estate

20    or not; is that true?

21         A       My husband is the primary person that was being

22    attacked.  It was his home, his life savings, and he's the one

23    that researched common law.  He spoke with Anthony and he can

24    tell you all the details regarding this.

25         Q       Is that a, "No"?

UNITED STATES DISTRICT COURT

57

```
 1      A      It's a I trust my husband.

 2      Q      But as far as --

 3      A      I trust my husband.

 4      Q      -- knowledge base, you're on this document as far as

 5   your knowledge base --

 6      A      I was told that it would protect our interest.

 7             THE COURT:  Okay.  So --

 8             THE DEFENDANT:  Objection.  It's not relevant

 9   whether --

10             THE COURT:  Okay.  So as to the objection, it's

11   overruled.  You're asking for her understanding.

12             MR. SORENSON:  Yes.

13             THE COURT:  Okay.  So just wait till he finishes the

14   question and then he'll wait till you finish your answer.

15   Okay?

16       Mr. --

17      Q      (BY MR. SORENSON:)  Ms. Kane, you're on this

18   document.  My question is what is your understanding?

19      A      My understanding is that it would protect us from

20   Sulla trying to steal our house.

21      Q      So your understanding is then, based on what

22   Mr. Williams told you, is that this would eradicate his

23   interest if there was one?

24      A      Based on my husband's research of what Mr. Williams

25   told -- Mr. Williams told him to look.
```

1    Q      Now, this private attorney general thing, what's

2    your understanding of a private attorney general?  What is

3    that?

4    A      Uhm, well, if you research 42 U.S.C. 1988, it was

5    authorized for private citizens to go into court and be able to

6    represent themselves and also help other people in situations.

7    Q      Have you read that statute?

8    A      I -- my husband has read it thoroughly.  I just -- I

9    understand just the simple stuff.  My husband, he's very well

10   versed in the common law.

11   Q      All right.  But as far as your knowledge, you're

12   saying that you have not read 42 1988 --

13   A      I did a long time ago, but I'm getting older now and

14   I don't have a great memory any more.  But, yes, I understood

15   it was our ability to do -- to go into court and be able to

16   help other people as well as represent ourselves, yes.

17   Q      If you learned that this statute actually just

18   authorizes payment of fees to licensed attorneys for

19   representing people in civil rights actions, would that

20   surprise you?

21          THE DEFENDANT:  Objection.  He's testifying.

22          THE COURT:  Okay.  Overruled.  He's asking for her

23   state of mind and her understanding.

24      Do you understand the question?

25          THE WITNESS:  Uhm, he's asking if I, uhm -- just

UNITED STATES DISTRICT COURT

1    repeat the question again.

2         Q    (BY MR. SORENSON:)  If you learned that 42 U.S.C.,

3    1988 authorized private attorneys, licensed attorneys --

4              THE DEFENDANT:  Objection.  That's a misstatement of

5    the law.

6              THE COURT:  All right.  So you have to let him

7    finish.  Your objection's overruled.  So he's asking for her

8    understanding.  All right.

9              THE WITNESS:  I don't -- okay.

10             THE COURT:  So let him get the question out.

11             THE WITNESS:  Okay.

12             THE COURT:  And then you can answer.

13        Q    (BY MR. SORENSON:)  If you learned that 42 U.S.C.,

14   1988 authorized private attorneys to collect fees for

15   representing people in civil rights actions, would that

16   surprise you?

17        A    No.  I think that -- it wouldn't surprise me what

18   any licensed bar members -- alleged bar members after

19   understanding that the license is all a scam.  The whole

20   justice system is a scam.  There is no justice.  That's why

21   you're here with Anthony instead of Paul Sulla.

22        Q    Okay.  So I guess your answer is you have no idea

23   what 42 U.S.C. 1988 stands --

24             THE DEFENDANT:  Objection.

25             MR. SORENSON:  -- is that correct?

UNITED STATES DISTRICT COURT

1          THE DEFENDANT:  And that's --

2          THE COURT:  So objection's overruled.  You're asking

3    for her understanding.

4          THE WITNESS:  I understand that you can go into

5    court and help other people with their cases and as well as

6    represent yourself.

7     Q     (BY MR. SORENSON:)  So your understanding is is that

8    unlicensed, untrained individuals can go in and represent other

9    people in court?  Is that your understanding?

10    A     Not the same way that you're explaining.  It's

11   completely different.  Common law is completely different.  The

12   way -- the way that they help you is they educate you on what

13   you can file to protect yourself.  They educate you on what the

14   laws and the rules are.

15         But since is statutory laws are always broken by

16   these licensed attorneys who don't follow their own rules and

17   laws, there's a need for private attorney generals to help

18   educate people like me.

19    Q     Okay.  So let me ask you about your understanding of

20   the private attorney generals then.  Are there rigorous

21   requirements to become a private attorney general, do you know?

22    A     It's a lot -- a lot of reading -- a lot of reading

23   and understanding.

24    Q     Is there an accreditation process?

25    A     Not that I know of, but there's lot of -- a lot of

1   learning and reading, yeah.

2       Q      Is there a -- like a licensing bureaucracy that

3   says, Okay.  You've done the training, you're good to go; we're

4   going to license you to be a private attorney general?  Is

5   there that?

6       A      I don't know.  You're asking the wrong person.  I

7   don't believe in bureaucracies so you're really asking the

8   wrong person.

9       Q      I'm just asking you yes or no do you know whether

10  there's such a thing?

11      A      Do I know whether there's -- I'm not interested if

12  there is or there isn't.  I know if somebody can try to help us

13  and they point me to the law or they point Leonard, my husband,

14  to the law and we read it and what he says is confirmed, what

15  Anthony said is confirmed -- we didn't just go off of what

16  Anthony told us.  What Anthony told us, we went and

17  did -- well, Leonard went and did our own research to really

18  understand the rules and the laws.

19      Q      Yes.  Is there anybody else that is associated with

20  being a private attorney general other than Anthony Williams

21  that you know of?

22      A      Uhm, we have not.  We've met a few people, but

23  Anthony's the only one we really knew.

24      Q      And are you familiar with the United States Office

25  for Private Attorney Generals?  Have you heard of that?

62

1        A       Probably Leonard has.  I'm not sure.

2        Q       And would it surprise you to learn that

3    Mr. Williams's credentials say that there is a U.S. Office of

4    the Private Attorney General?

5        A       Okay.  Yeah, then there is.

6        Q       Okay.

7        A       If Mr. Williams would say it, then there is for

8    sure.  100 percent I -- I agree with him 100 percent.

9                MR. SORENSON:  Your Honor, I'm going to fetch an

10   exhibit for a moment, if you give me a second.

11               THE COURT:  All right.  You may.

12       Q       (BY MR. SORENSON:)  Okay.  Have you seen this

13   before?

14       A       Yes.

15       Q       Okay.  First off, do you see Mr. Williams's picture

16   there?

17       A       Yes.

18       Q       And you see the statute, right, the 42 U.S.C., 1988

19   that you referenced?

20       A       Yes.

21       Q       And you see it says here he is a private attorney

22   general, right?

23       A       Yes.

24       Q       And we got the American flag there behind.  You see

25   that?

UNITED  STATES  DISTRICT  COURT

1      A      Yes.

2      Q      And you see down there United States Office of the

3   Private Attorney General?  You see that?

4      A      That's right.

5      Q      All right.  And underneath that do you see the Great

6   Seal of the United States of America?

7      A      Yes.

8      Q      Okay.  And when you look at that, you automatically

9   start to think this is somebody associated with the United

10   States of America, correct?

11      A      Uhm, again, I guess you would say yes.  Yes.

12      Q      Okay.  Now we're going to flip this over.

13            THE DEFENDANT:  Can we move this into evidence?

14            MR. SORENSON:  It's in evidence.

15            THE COURT:  It's already been -- could you just --

16            MR. SORENSON:  This is 501, Your Honor.

17            THE COURT:  Thank you.

18            MR. SORENSON:  For the record.

19            THE COURT:  Thank you.

20            THE DEFENDANT:  Can the jury see it?

21            THE COURT:  It's not been published.

22            MR. SORENSON:  Yeah.  Your Honor, may we publish

23   this?

24            THE COURT:  Yes, you may.

25            MR. SORENSON:  Thank you.

UNITED STATES DISTRICT COURT

64

1    Q    (BY MR. SORENSON:)  All right.  As we look at the

2    back here of this credential, again what kind of sticks out

3    first off, do you see the Great Seal of the United States of

4    America?

5    A    Yes.

6    Q    All right.  Do you see the line where it says "Do

7    not detain.  Do not arrest"?

8    A    Yes.

9    Q    And you also see an FBI number --

10   A    Uhm --

11   Q    -- down below that?

12   A    Yes.

13   Q    Okay.  So -- and at the very bottom, the U.S. Office

14   of the Private Attorney General, do you see that?

15   A    Yes.

16   Q    And that tells you that there is an office of the

17   private attorney general, correct?

18   A    Yes.  And you know, if you go online, you can see a

19   lot of people have actually won cases as a private attorney

20   generals.  I've seen -- I've seen tons of cases online

21   regarding -- it seems that only Hawaii is not -- is not looking

22   at this, but -- is not honoring private attorney generals.  But

23   I've seen a lot of cases won and I've looked them up by

24   private -- so, obviously, there's --

25   Q    Yes?

UNITED STATES DISTRICT COURT

65

 1     A     -- something to this.

 2     Q     And this is probably where they're all located,

 3  right?  This is their home base?  Wouldn't you say that?

 4     A     Probably.  I don't know.

 5     Q     Yeah.  Well, that's their --

 6     A     Why is it relevant?

 7     Q     That's their address, 6230 Third Street, Suite 5,

 8  right?

 9     A     Yes.  I don't know.  I don't know.  Why is this even

10  relative to Anthony's case --

11            THE COURT:  Okay.

12            MR. SORENSON:  Well, I have another question.  You

13  don't have to worry about that.

14            THE COURT:  Okay.

15            MR. SORENSON:  All right.  So, Your Honor, if we can

16  go back to this mortgage of Ms. Kane's.  Let's remember that

17  address, okay?  6230 Third Street.  All right.  If we can

18  publish again 835?

19            THE COURT:  All right.  835 you may.

20     Q     (BY MR. SORENSON:)  All right.  Now let's look here

21  again at this middle part.

22     A     Okay.

23     Q     Do you see where it says Federal Mortgage American

24  Trust?

25     A     Federal Mortgage -- yeah.

UNITED STATES DISTRICT COURT

66

 1      Q      And this is the company that you indicated that you

 2   believed in because Mr. Williams told you that it was a valid

 3   company?

 4      A      Yes.

 5      Q      Okay.  Now, why don't you read to the jury what is

 6   the address of Federal Mortgage American Trust?

 7      A      6230 Third Street, Suite 5, Washington, D.C.

 8      Q      Well, darn.  They seem to share the same office as

 9   the U.S. private attorney general.

10      A      Yes.

11      Q      So do you think they're co-located?

12      A      Possibly.  I don't -- I mean, if Anthony says

13   they're co-located I'm sure they are?

14      Q      Would it surprise you to learn that neither one of

15   these businesses or entities occupy this space or ever occupied

16   this space?

17      A      I would really have to see massive amounts of

18   evidence to believe that.

19      Q      Well, you don't have to.  I'm just asking you --

20      A      No, it --

21      Q      -- would it surprise you?

22      A      It would surprise me, yes.

23      Q      Okay.  And would it change your views about

24   Mr. Williams being a trustworthy person?

25      A      No.

UNITED STATES DISTRICT COURT

1      Q      And there isn't really a whole lot that would change

2  those views, is there?

3      A      Not compared to what all the thousands -- hundreds

4  of thousands of dollars that was taken by these licensed

5  attorneys to try to help us, no.  Mr. Williams is not -- is not

6  a criminal.  But I can tell -- I've witnessed -- witnessed

7  attorneys, many of them, that are criminals that should be

8  locked up.

9      Q      Right.  And -- but as we look at this, we've learned

10 that Federal Mortgage American Trust shares a location with the

11 United States Office of the Private Attorney General, right?

12     A      It probably does.  There's a bank in this building,

13 too.

14     Q      Okay.  Federal credit union?

15     A      Yeah.

16     Q      Yeah.  Now, you've indicated that other people's

17 homes have been stolen.  Do you remember saying that?

18     A      Yes.

19     Q      Okay.  And are you referencing foreclosure actions

20 against -- not talking about your property; I know there's a

21 lot of sensitivities there -- but other people's properties,

22 other people that have mortgages when there have been

23 foreclosures?  Are you referencing those as being thefts?

24     A      I'm referencing anybody who lost their homes

25 unlawfully.  When I say unlawfully, just because a judge tells

1    you -- tells the bank, "Oh, you can have their house," I'm

2    talking about predatory lenders, I'm talking about

3    robo-signing, those kind of situations.  That's what I'm

4    talking about.

5        Q    So any time there's any of that stuff going on,

6    people should not pay their mortgage any more?  Is that your

7    belief?

8        A    I believe that -- no.  There needs to be some sort

9    of a trial that's fair.  There needs to be -- they just can't

10   be taking people's houses based on what one judge says.  They

11   can't -- they need a fair trial.  They need to be able to show

12   their evidence.

13       What I've witnessed is people not getting their day

14   in court, not being able to show their evidence and their

15   houses being taken from them, including their life savings.

16       Q    So you if you borrow let's say $800,000 to buy a

17   house, and you find a little later that your mortgage got

18   assigned, is that an excuse to not pay your mortgage?

19       A    Got assigned how?

20       Q    Got assigned to another company.

21       A    I don't think that that's the case.  I think they

22   need to go to court and I think they needed to be notified of

23   that.  I think that if they didn't sign a contract, that stated

24   who they were borrowing from and suddenly that person raises

25   their mortgage on them, there's lots of things that need to go

1      through the court system.

2              What I've witnessed is railroading.  I've witnessed

3      people who don't get their day in court.  I've witnessed homes

4      being stolen, and I've been assaulted in a court for filming

5      that evidence because they didn't want anybody to know what was

6      going on in that court.  This is in state court.

7      Q      Were these -- were these like bankers that were

8      assaulting you?  I mean --

9      A      No, no, no.

10     Q      -- who was coming after you?

11     A      The sheriffs because the judge, Judge Ayabe, you

12     know the one that's holding Obama's real birth certificate,

13     that person right there, he was the judge, and he said, "I

14     don't want that camera in the courtroom.  Remove her."  And

15     they just tore -- I had even -- I had signed up to have -- to

16     film that day.  They had tore the camera out of my hand, they

17     ripped my arms out of my joints, and then they drug me out like

18     it was a western saloon.  And then --

19     Q      Wait, wait, wait, wait, wait. Let me just --

20     A      -- never lay a hand on me.

21     Q      Let me stop you there.  Are you telling the jury

22     that these sheriffs are somehow the flunkies of the lending

23     industry, and they're going to haul--

24     A      No, I'm saying that -- no, you just -- you took that

25     completely out of context.  I'm saying to you that the judge

UNITED STATES DISTRICT COURT

1    was the one that told them, "Remove her," and they took it

2    as --

3        Q    Ah.

4        A    -- like the dogs that were going to bite me.  Okay?

5    And they basically --

6        Q    Let me -- let me ask you this then.  So was it the

7    judge then that was the flunky of the lending industry?

8        A    I believe that a lot of judges, especially in the

9    state court -- 'cause I can't speak for the federal court; I

10   can speak for the state court -- I believe a lot of those state

11   court judges are actually getting paid off or -- for instance,

12   in Mr. Sulla's case, they're doing drugs and there's rumors of

13   young women being raped in that church and he's got the

14   videotapes on them.

15             So there's a couple things goin' on here.  There's

16   either the black know, or he's paying them off.  And people

17   like Mr. Sulla are doing that with certain judges who need to

18   be investigated.  And there's also real estate fraud going on.

19   You see -- suddenly look up --

20       Q    Whoa, whoa, whoa, whoa, whoa.  That's about as much

21   fraud as I can handle in one question.

22             But your answer, I believe, was yes, there are

23   judges that are in cahoots with the lending industry and that's

24   where some of the corruption is.  Is that your belief

25   structure?

```
 1        A     I do believe that 100 percent.

 2              MR. SORENSON:  Your Honor, that's all the questions

 3  I have.  Thank you.

 4              THE COURT:  All right.  Mr. Williams?

 5              THE WITNESS:  Judges and lawyers.  Get that on the

 6  record.

 7              THE COURT:  Okay.

 8              THE WITNESS:  And lawyers.

 9              MR. SORENSON:  Thank you.  Thank you.

10              THE COURT:  All right.  So Mr. Williams?

11              THE DEFENDANT:  Yes.  I'd like to bring up the

12  mortgage back, mortgage document back up.

13              THE COURT:  Is that 835?  Exhibit 835, Mr. Williams?

14  Is it 835?

15              MR. SORENSON:  Yes, Your Honor.

16              THE DEFENDANT:  Yes.

17              THE COURT:  Do you wish to publish?

18              THE DEFENDANT:  Yes.

19              THE COURT:  All right.  You may.

20              THE DEFENDANT:  And I want to highlight this part

21  right here.  Make it bigger, that part.

22                          REDIRECT EXAMINATION

23  BY THE DEFENDANT:

24        Q     Okay.  Ms. Kane, I'm fixing to go back over this

25  mortgage document that he mischaracterized so we can really get
```

1    it correct.

2              Now, on the borrower line, does it have your name

3    and Mr. Horowitz's name in all capital letters?

4         A    Yes.

5         Q    Okay.  And then at the end of it it says "legal

6    persons or fictions," correct?

7         A    That's right.

8         Q    Correct.  Now, when you and Mr. Horowitz did the

9    research, the legal person legal fiction, that's considered a

10   strawman, right?

11        A    Right, right.

12        Q    So you've done your research on what a strawman is,

13   right?

14        A    Yes.

15        Q    So the strawman, which everyone has, is actually the

16   borrower on the document, correct?

17        A    Yes.

18        Q    Now, the secure party creditor, is that name

19   capitalized or is it upper case lower case?

20        A    Secured party creditor -- okay.  Where am I -- I'm

21   sorry.  Where am I looking?

22        Q    Right there.

23        A    Okay.  Okay.  It's lower case.

24        Q    So that's actually you and Mr. --

25        A    Yes.

UNITED STATES DISTRICT COURT

1    Q    -- Horowitz?

2    A    Yes.

3    Q    Okay.  Let's go to -- can you go to the signature

4    page, please.

5         And now you and Mr. Horowitz did -- well, I know

6    Mr. Horowitz did extensive research on the strawman and being

7    able to be the secure party creditor and being able to sign on

8    behalf of your strawman, correct?

9    A    Yes.

10   Q    Okay.  So where it says the all capital letters, you

11   all were able to sign for the strawman on this document,

12   correct?

13   A    Yes.

14   Q    Okay.  Go to the next page, please.  Excuse me.  Go

15   back -- go back one page.  No, go back.  Right there.

16        Do you see the line says "Secured Party accepts

17   Debtor's signature in accord with UCC 1-201(39),3-401(b)"?

18   A    Yes.

19   Q    And I'm pretty sure your husband looked that statute

20   up, correct?

21   A    Yes.

22   Q    Right.  And go to the next page, please.

23        Now, on the secure party creditors, how does it have

24   you and your husband name listed?

25   A    Secure party -- oh, there.  It has us in small

1    letters.

2          Q     Right.  So upper case lower case letters?

3          A     Right.

4          Q     And does it say "secure party creditors"?  Right?

5          A     It has -- yes.

6          Q     Okay.  So this document is actually stating that the

7    strawman is the borrower and that you and your husband are the

8    actual secure party creditors?

9          A     Yes.

10         Q     Okay.  Now, go back to the front page, please.

11         A     I think that's what a lot of people don't understand

12   is the capital letters versus the lower case letters in common

13   law.

14         Q     Uh-huh.  Okay.  Now erase that -- the writing on the

15   screen, please.

16               THE COURT:  Ms. Feria, if you'd clear the screen.

17               THE DEFENDANT:  Clear the screen.  Thank you.

18         Q     (BY THE DEFENDANT:)  Okay.  Now he brought out

19   the -- my Washington, D.C. address on -- on the document, that

20   it's the same as my U.S. private attorney general address.  And

21   me having the same address for two companies, in your

22   experience is that against the law?

23         A     No.

24         Q     So have you known that I've ever been charged with

25   making up a fake address or anything like that?

UNITED STATES DISTRICT COURT

1      A      No.

2      Q      But your experience with me, would I try to fake

3 something to make something appear like it's valid?

4      A      I don't believe that.

5      Q      So your experience with me, you know I do my

6 research and I'm very thorough what I do, correct?

7      A      Yes.

8             MR. SORENSON:  Your Honor, objection.  The leading

9 is getting a little far.

10            THE COURT:  Yeah.  Sustained.  Ask an open-ended

11 question.  It's your witness.  You have to ask an open-ended

12 question.

13     Q      (BY THE DEFENDANT:)  So that doesn't deter you that

14 I had --

15            MR. SORENSON:  Objection.  Leading.

16            THE COURT:  Sustained.  So ask an open -- you know,

17 What's your impression of me --

18     Q      (BY THE DEFENDANT:)  Did that change your impression

19 of me that I had a address for both of my companies?

20     A      No.

21     Q      Okay.  And so when you and your husband did research

22 on my company, did you all check my Better Business Bureau

23 rating?

24     A      I believe Leonard probably did, but --

25     Q      Okay.  But you never did?

UNITED STATES DISTRICT COURT

```
 1        A     No.  I mean, he did most of the legal research.  I

 2  just like helped with other things regarding the research, but

 3  he did like the real intense common law studies and also

 4  statutory law.  So he's --

 5        Q     Right.

 6        A     Because he's been totally ripped off by all those

 7  lawyers.  I mean, you got to learn how to, you know, protect

 8  and represent yourself, you know.

 9        Q     Yeah.

10        A     And for me, I've just been so emotional towards this

11  whole thing pretty much, you know, so --

12        Q     So on the -- you all -- I had you actually look at

13  the Seventh Amendment of the Constitution.  You remember that?

14        A     I believe so.

15        Q     About, you know, you having to have a trial before

16  you can be deprived of your property?

17        A     Right.

18              MR. SORENSON:  Your Honor, I'm going to object.

19  This is --

20              THE WITNESS:  We understood that.

21              THE COURT:  I'm sorry.

22              MR. SORENSON:  -- beyond the scope, I believe, Your

23  Honor.  I don't know --

24              THE DEFENDANT:  No.

25              THE COURT:  Sustained.  Yeah.  He didn't ask
```

UNITED STATES DISTRICT COURT

1    him -- Mr. -- your questions on redirect are confined to the

2    area of -- you had an opportunity on direct to ask questions

3    and then he has to ask cross-examination within that scope, and

4    you have to answer questions within the scope of his cross.

5        So it's -- the objection's sustained.  Do you have any

6    other questions?

7            THE DEFENDANT:  Yes.

8        Q    (BY THE DEFENDANT:)  So with the mortgage that was

9    filed, you understood that that was to protect your property?

10       A    That's right.

11       Q    And for no other purpose?

12       A    That's right.

13       Q    And --

14       A    We knew that you weren't going to go try and steal

15   our property at all.  I mean, we've been through and we've seen

16   all the people that have ripped us off, and it was all

17   attorneys who did that.  And then, you know, we knew you.  We

18   understood you.  We never for one second thought that you were

19   trying to be deceptive in what you were doing or we would never

20   have signed anything, right?

21       Q    Right.  Now, how much did you all have to pay me,

22   Ms. Kane?

23       A    I can't recall.

24       Q    Do you recall you even paying me anything?

25       A    I think we -- I think we did, but we never asked you

                    UNITED STATES DISTRICT COURT

1    for anything back.  You got incarcerated and we knew you were

2    doing good for people, so...

3         Q    Right.  So your whole experience with me, has it

4    been a positive experience?

5         A    Yes.

6         Q    And would you recommend my services to anybody?

7         A    I would.  I would.  I think that you're educated.  I

8    know, especially at me, a little -- 'cause I wasn't, you know.

9    But Leonard was really, really well educated on what you said.

10   I mean, he went to exactly the points in the law that you said

11   look at, and in the meantime he studied statutory law.

12             So I don't think there's anybody if it's a fair

13   court that he can't, you know, win against now.

14             THE DEFENDANT:  Right.  Thank you.  I have no more

15   questions.

16             THE COURT:  All right.  Thank you.  Thank you,

17   Ms. Kane.  You're excused as a witness.

18             THE WITNESS:  Thank you so much.

19             THE COURT:  I wish you a good day.  Please don't

20   discuss your testimony with anyone until after the trial.

21             THE WITNESS:  Thank you.

22             THE COURT:  All right.  Good day to you, ma'am.

23        (This concludes the partial testimony requested.)

24

25


                      UNITED STATES DISTRICT COURT

1                    COURT REPORTER'S CERTIFICATE

2

3          I, DEBRA READ, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

6    true, and correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the regulations

9    of the Judicial Conference of the United States.

10                   DATED at Honolulu, Hawaii, February 23, 2020.

11

12

13                    */s/ Debra Read*

14                   DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25

                         UNITED STATES DISTRICT COURT